Nos. 23-2361, 24-1043, -1050, -1318, -1320

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

APPLE INC.,

*Appellant*

v.

MEMORYWEB, LLC,

*Cross-Appellant.*

Appeals from the U.S. Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2022-00031, -00032, -00033,
and PGR2022-00006

## OPENING BRIEF OF APPLE INC.

BITA RAHEBI
REBECCA E. WEIRES
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

BRIAN R. MATSUI
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.:  (202) 887-8784
BMatsui@mofo.com

JOEL F. WACKS
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

*Counsel for Appellant Apple Inc.*

APRIL 15, 2024

## <u>'020 Patent Claims 1-3, 13</u>

**1**. A method comprising:

    causing an interface to display a people view, the people view including:

        a first thumbnail image associated with a first person,

        a first name associated with the first person,

        a second thumbnail image associated with a second person, and

        a second name associated with the second person;

    responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including:

        a first digital file associated with the first person,

        the first name associated with the first person, and

        a first map image;

    responsive to an input that is indicative of a selection of the first map image in the first person view, causing a first location view to be displayed on the interface, the first location view including:

        an interactive geographic map,

        a first indication positioned at a first location on the interactive geographic map, and

        a second indication positioned at a second location on the interactive geographic map; and

    responsive to an input that is indicative of a selection of the first digital file in the first person view, causing a slideshow to be displayed on the interface, the slideshow including a plurality of images associated with the first person.

**2.** The method of claim 1, wherein the first indication is associated with a first set of digital files and the first location, and the second indication is associated with a second set of digital files and the second location.

**3.** The method of claim 2, wherein the first set of digital files and the second set of digital files are associated with the first person.

**13.** The method of claim 3, further comprising responsive to an input that is indicative of a selection associated with the second person, causing a second person view to be displayed on the interface, the second person view including the second digital file associated with the second person, the second name associated with the second person, and a second map image.

## <u>'376 Patent Claim 1</u>

**1.** A computer-implemented method of displaying digital files, comprising:

    storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having embedded therein content data and metadata including tags, the content data including a digital photograph or image or video, the metadata including a geotag indicative of geographic coordinates where the digital photograph or image or video was taken;

displaying a map view on a video display device, the displaying the map view including displaying:

(i) a representation of an interactive map, the representation of the interactive map comprising a majority portion of a first screenshot of the video display device;

(ii) a first user selectable thumbnail image at a first location on the interactive map corresponding to the geographic coordinates of a first geotag, a first set of digital files including all of the digital files having the first geotag;

(iii) a first count value image partially overlapping or directly connected to the first user selectable thumbnail image, the first count value image including a first number that corresponds to the number of digital photographs or images or videos in the first set of digital files;

(iv) a second user selectable thumbnail image at a second location on the interactive map corresponding to the geographic coordinates of a second geotag, a second set of digital files including all of the digital files having the second geotag; and

(v) a second count value image partially overlapping or directly connected to the second user selectable thumbnail image, the second count value image including a second number that corresponds to the number of digital photographs or images or videos in the second set of digital files;

responsive to a click or tap of the first user selectable thumbnail image, displaying a first location view on the video display device, the first location view comprising a majority portion of a second screenshot of the video display device, the displaying the first location view including displaying (i) a first location name corresponding to the first geotag, (ii) a scaled replica of each of the digital photographs or images or videos in the first set of digital files, and (iii) a first map image indicating the geographic coordinates of the first geotag, the displayed scaled replicas of each of the digital photographs or images or videos in the first set of digital files not being overlaid on the first map image and the second screenshot of the video display device not including the interactive map; and

responsive to a click or tap of the second user selectable thumbnail image, displaying a second location view on the video display device, the second location view comprising a majority portion of a third screenshot of the video display device, the displaying the second location view including displaying (i) a second location name corresponding to the second geotag, (ii) a scaled replica of each of the digital photographs or images or videos in the second set of digital files, and (iii) a second map image indicating the geographic coordinates of the second geotag, the displayed scaled replicas of each of the digital photographs or images or videos in the second set of digital files not being overlaid on the second map image and the third screenshot of the video display device not including the interactive map.

# CERTIFICATE OF INTEREST

Counsel for Apple Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1.     **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Apple Inc.

2.     **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

3.     **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

4.     **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.

SIDLEY AUSTIN LLP: Jeffrey P. Kushan, Samuel A. Dillon, Kyle S. Smith, Thomas A. Broughan, III, Scott M. Border

5.     **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes, see separately filed notices.

6.     **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated: April 15, 2024                          /s/ Brian R. Matsui
                                   _____
                                            Brian R. Matsui

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF RELATED CASES .................................................. vi

JURISDICTIONAL STATEMENT ....................................................... vi

INTRODUCTION ................................................................................ 1

STATEMENT OF THE ISSUES.......................................................... 3

STATEMENT OF THE CASE.............................................................. 4

      A.    The Prior Art ................................................................... 4

            1.    The Aperture manual ................................................. 4

            2.    Belitz ........................................................................ 9

      B.    The '020 Patent And Post-Grant Review .......................... 11

            1.    The '020 patent ......................................................... 11

            2.    The Board's decision ................................................. 12

      C.    The '376 Patent And *Inter Partes* Review ......................... 14

            1.    The '376 patent ......................................................... 14

            2.    The Board's decision ................................................. 16

SUMMARY OF ARGUMENT ............................................................ 18

STANDARD OF REVIEW ................................................................. 21

ARGUMENT ...................................................................................... 21

I.     The Board's Failure To Address Apple's Challenge To The '020 Patent Claims Reciting A Second Map Image Requires A Limited Vacatur And Remand ............................................................................... 21

A.    The Board Legally Erred By Requiring That The Petition Provide More Than A Reasoned And Supported Explanation For Unpatentability ....................................................................22

B.    Apple's Petition Presented An Understandable And Adequately Supported Argument That The Aperture Manual Discloses A Second Map Image ............................................................................24

C.    None Of The Board's Reasons For Refusing To Address The Petition's Clear Rationale Supports Affirmance ..................................28

II.    The Board Erred In Rejecting Apple's Obviousness Theory For The '376 Patent Claims Based On Immaterial Distinctions And Similar Errors ...............................................................................................31

A.    Apple Again Presented A Straightforward Obviousness Challenge ........................................................................................32

B.    The Board Erred In Relying On An Immaterial Distinction To Uphold The Claims ............................................................................37

C.    The Board's Alternative Reasoning Cannot Support Affirmance Because It Repeats Many Of The Same Errors And Adds New Ones ...........................................................................................................43

1.    The Board's "alternative" reasoning continued to rely on the same misreading of the petition ..........................................43

2.    The Board's loss-of-functionality rationale is legally and factually flawed ........................................................................44

CONCLUSION .......................................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC,*
No. 21-1051, 2021 WL 4470062 (Fed. Cir. Sept. 30, 2021) .............................23

*Apple Inc. v. Andrea Elecs. Corp.,*
949 F.3d 697 (Fed. Cir. 2020) .............................................................42

*Axonics, Inc. v. Medtronic, Inc.,*
73 F.4th 950 (Fed. Cir. 2023) ........................................................44, 45

*Corephotonics, Ltd. v. Apple Inc.,*
84 F.4th 990 (Fed. Cir. 2023) ........................................................21, 22

*CRFD Research, Inc. v. Matal,*
876 F.3d 1330 (Fed. Cir. 2017) ......................................................27, 28

*Ericsson Inc. v. Intell. Ventures I LLC,*
901 F.3d 1374 (Fed. Cir. 2018) ..............................21, 22, 27, 41, 42

*In re Fulton,*
391 F.3d 1195 (Fed. Cir. 2004) .............................................................47

*Graham v. John Deere Co.,*
383 U.S. 1 (1966) .............................................................................21

*Int'l Great Brands LLC v. Kellogg N. Am. Co.,*
869 F.3d 1336 (Fed. Cir. 2017) .............................................................37

*KSR Int'l Co. v. Teleflex, Inc.,*
550 U.S. 398 (2007) ....................................................................32, 37

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.,*
463 U.S. 29 (1983) ...........................................................................37

*In re Mouttet,*
686 F.3d 1322 (Fed. Cir. 2012) .............................................................47

*PGS Geophysical AS v. Iancu,*
891 F.3d 1354 (Fed. Cir. 2018) .............................................................22

*Provisur Techs., Inc. v. Weber, Inc.*,
   50 F.4th 117 (Fed. Cir. 2022) ...................................................23

*Randall Mfg. v. Rea*,
   733 F.3d 1355 (Fed. Cir. 2013) ..............................................43

*SAS Inst. Inc. v. Iancu*,
   138 S. Ct. 1348 (2018) ............................................................22

*Uniloc 2017 LLC v. Facebook, Inc.*,
   No. 19-2159, 2021 WL 5370480
   (Fed. Cir. Nov. 18, 2021)......................... 22, 23, 24, 26, 28, 29, 31

*WesternGeco LLC v. Ion Geophysical Corp.*,
   889 F.3d 1308 (Fed. Cir. 2018) ..............................................47

**Statutes**

28 U.S.C. § 1295 ..............................................................................vi

35 U.S.C. § 6 ....................................................................................vi

35 U.S.C. § 103 ................................................................................37

35 U.S.C. § 141 ................................................................................vi

## STATEMENT OF RELATED CASES

No appeal from these Patent Trial and Appeal Board proceedings between Apple Inc. and MemoryWeb, LLC on U.S. Patent Nos. 11,017,020 and 9,552,376 has previously been before this or any other appellate court.

Claims of the '020 and/or '376 patent are at issue in the following proceedings, which thus may be directly affected by this Court's decision in these appeals:

- *MemoryWeb, LLC v. Apple, Inc.*, No. 3:21-cv-09839 (N.D. Cal.)

- *MemoryWeb, LLC v. Samsung Elecs. Co.*, No. 3:22-cv-03776 (N.D. Cal.)

- *MemoryWeb, LLC v. Samsung Elecs. Co.*, Nos. 24-1315, 24-1316 (Fed. Cir.)

- *MemoryWeb, LLC v. Unified Patents*, *LLC*, No. 24-1328 (Fed. Cir.)

## JURISDICTIONAL STATEMENT

On June 7, 2023, the Board issued a final written decision in PGR2022-00006. Appx1. Apple timely requested rehearing, which the Board denied on August 3, 2023. Appx105. Apple timely appealed on October 3, 2023. Appx1456-1458.

On June 30, 2023, the Board issued a final written decision in IPR2022-00032. Appx116, Appx168. Apple timely appealed on August 31, 2023. Appx12252-12254.

The Board had jurisdiction over both proceedings under 35 U.S.C. §§ 6(b)(4) and 311. This Court has jurisdiction over Apple's appeals under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

**INTRODUCTION**

The '020 and '376 patents claim minor variations on existing interfaces for displaying digital photographs. With earliest alleged priority dates in 2011, the patents recite such basic features as displaying thumbnail images of people. When a user selects a thumbnail, the interface shows information like the person's name and a map. Given the late priority date, MemoryWeb did not invent photo organizing applications or come up with the idea to display photos based on person or location information (metadata) associated with the photos—these were standard features of photo organizer apps before 2011, including Apple's own Aperture 3. MemoryWeb merely claimed long-known common functionality arranged in particular, and obvious, ways.

The Board itself determined this was true for the '020 patent and determined all challenged independent claims, and most of the dependent claims, would have been obvious. Yet the Board declined to resolve the substance of Apple's challenge on a subset of dependent claims that mimic the functionality already required by the independent claims. Where the unpatentable independent claims require responding to a selection of a first person by displaying features like a selectable map image, the upheld dependent claims simply require the same steps in response to a selection of a second person. Apple's petition thus addressed both sets of claims in kind, explaining for both that what would have been obvious to do for a first person was

equally obvious to do for a second person. And MemoryWeb joined issue with Apple, directly addressing Apple's reasoning. Yet the Board refused to address Apple's petition on these claims, *sua sponte* concluding that the petition arguments that were clear, and successful, for the independent claims were somehow so unclear they could not even be considered for the dependent claims.

The Board made similar errors in upholding MemoryWeb's '376 patent claims. Apple's petition was express that its obviousness challenge was based on modifications to its own Aperture manual's teachings in light of other prior art to make navigating between different disclosed features more efficient by reducing the number of required clicks. Yet the Board cut short its analysis based on a finding about what the unmodified Aperture manual expressly discloses. That was error, because obviousness demands a flexible inquiry that goes beyond the disclosures of individual references. Plus, the express-disclosure finding the Board made—about where an intermediate click would be placed according to the Aperture manual's teachings—is immaterial to Apple's ultimate obviousness challenged based on eliminating intermediate clicks.

The Board's decisions as to Apple's appeals should be vacated and remanded.

# STATEMENT OF THE ISSUES

1. Certain dependent claims of the '020 patent recite requirements for a "second map image" related to a "second person" that parallel requirements for a "first map image" related to a "first person" recited in the independent claims. Apple's petition addressed both sets of claims in kind, explaining why the parallel requirements would have been obvious for similar reasons. Did the Board err in refusing to consider Apple's challenge to the dependent claims for purportedly not addressing how the prior art teaches or suggests a second map image?

2. Apple's petition showed that the '376 patent's claims would have been obvious over the Aperture manual and other prior art in part because skilled artisans would have been motivated to eliminate some of the clicks required to navigate between Aperture's different views. Although Apple's modification would have provided such an efficiency gain, the Board upheld the claims because it concluded the petition was wrong about the placement of one click Apple proposed eliminating and because Apple's proposed modification allegedly would lose some Aperture functionality not required by the '376 patent's claims. Did the Board err in basing its decision on these and related findings?

# STATEMENT OF THE CASE

## A.     The Prior Art

From the 1990s through the mid-2000s, digital photography rapidly displaced conventional film-based photography. Appx2298-2299. Digital cameras and smartphones users began accumulating large collections of digital photographs. Appx2299-2300. Photo organizer applications and websites, like Flickr, Google's Picasa, and Apple's Aperture, allowed users to manage these collections. Appx2301-2304. Developers frequently added new functionality to keep pace with competitors. Appx2304. By 2011, photo organizers commonly offered photo albums or collections, thumbnail previews, facial recognition, and metadata tagging. Appx2304-2306. They enabled users to group, find, and sort photographs using person or location metadata. Appx2304-2306. They also often used the Google Maps API to display the location of photos in a map interface. Appx2301-2307.

### 1.     *The Aperture manual*

Apple's primary reference, the user manual for Aperture 3 (called "A3UM" before the Board), catalogs one of the most advanced photo organizer applications of the time. Appx11522; Appx688, Appx700; *see* Appx2462-2526. According to the manual, Aperture 3 had a sophisticated interface with several panes, including (i) a "Viewer" displaying a selected digital image, Appx2512; Appx2711-2715, (ii) an "Inspector" providing access to collections of digital images in the user's library as

well as metadata in digital images, Appx2515-2524; (iii) a "Browser" that "displays the thumbnail images contained in a folder, project or album," Appx2508-2511; Appx2667-2682, and (iv) a "Toolbar," Appx2525-2526:



Appx2507; Appx2331.[1] The manual teaches that users can adjust the layout of the panes and customize the Toolbar. Appx2511, Appx3529; Appx2382; Appx12967; Appx12993-12994, Appx12866-13034; *see* Appx3514-3529.

---

[1] Unless noted, all annotations are native to the Aperture user manual.

By selecting icons in the Toolbar or in the Library inspector, users can change the layout of the panes and switch between different "views."





Appx2516, Appx2526, Appx2585-2587; Appx2317-2318; Appx2344-2345. Users can select a "Split View" (shown above) where images appear in both the Browser and Viewer, and selecting a thumbnail image in the Browser causes a larger version of the image to appear in the Viewer. Appx2526, Appx2892. The "Faces" and "Places" views provide different ways for users to organize their photos. Appx2489-2491; Appx2332-2333.

In the Faces view, images are organized by the people who appear in them. Appx2489-2491, Appx2539-2541, Appx2878-2889; Appx2332-2333. Selecting the Faces icon in the Toolbar or Library inspector displays snapshots of people to whom the user has assigned names:

6



Appx2489-2491; Appx2332-2337. From there, users can select a person's snapshot, which causes all images associated with the person to appear in a "Faces browser":



Appx2490; Appx2332-2333.

In the "Places" view, images are organized by location. Appx2491, Appx2542-2544, Appx2890-2927; Appx2331-2332. Selecting the Places button— represented by a map icon—in the Toolbar or Library inspector displays a view with an interactive map with pins (illustrated below). Appx2542; Appx2331-2332; Appx2897-2898. Selecting a pin at a map location displays the photos associated with that location in the Browser below the interactive map:



Appx2491; Appx2894-2898; Appx2331-2332.

Users can also view and edit a photo's location information in the Metadata tab of the Inspector pane. Appx2919-2920; Appx2923-2927. A button at the bottom of the Metadata inspector opens the Map Pane, which is a small map that displays the photo's location:



Appx2919-2920. A location label in the Map Pane displays the location name and image count. Appx11561 (citing Appx2919-2920).

## 2. *Belitz*

Belitz, a published patent application, was one of Apple's secondary references in its petitions. Appx11531; Appx3584-3595. Belitz discloses a map interface overlaid with photograph thumbnails. Appx3584; Appx3593 ¶62;

9

Appx12933-12936. The thumbnail images are placed on the map where they were taken, as shown in Figures 4a-4b:



Fig. 4a          Fig. 4b

Appx3587; Appx3593 ¶62; Appx12933-12934. Photographs taken close to each other are "stacked." Appx3529-3530 ¶¶54, 62; Appx12934-12935. Selecting a thumbnail opens a popup window with a larger version of one of the images taken at the corresponding location, as shown in Figure 4c:



Fig. 4c

Appx3587; Appx3593 ¶60; Appx12936-12937.

## B.    The '020 Patent And Post-Grant Review

### 1.    The '020 patent

MemoryWeb's '020 patent claims methods of "causing an interface to display" images, digital files, and other information in various "view[s]." Appx444-446 (col.35:17-col.40:41). The interface of claim 1 includes a "first person view" with a name, a digital file associated with a first person, and a "first map image." Appx444 (col.35:17-45). The first map image is a functional element. Claim 1 requires that "selection of the first map image in the first person view [causes] a first location view to be displayed." Appx444 (col.35:17-45). Claim 3 specifies functionality of the "first map image" that is specific to the first person: selecting the "first map image" opens a location view with the digital files that are "associated with the first person." Appx444 (col.35:50-53).

Claims 13-16 parallel the limitations of claims 1-3 but specify elements of a "second person view" rather than of a "first person view." Appx444 (col.36:22-46). The "second person view" includes a "second map image" with functionality analogous to that of the first. Appx444 (col.36:22-46). Selecting the second map image opens a location view with the digital files that are associated with the second person. Claims 45-48 depend from independent claim 31 and are the same as claims 13-16 in relevant part. Appx446 (col.39:9-33).

### 2.    *The Board's decision*

The Board invalidated claims 1-3 for obviousness over the Aperture manual. The Board found that Aperture's Faces browser, by displaying all the images of a selected person, met Claim 1's limitations on the "first person view." Appx40-59 (citing, *e.g.*, Appx2490). The Board agreed with Apple that Aperture's Places button, which in Faces view appears in the Toolbar and the Library Inspector, is the claimed "first map image" in the "first person view." Appx53-55 (citing, *e.g.*, Appx715-716 (Petition) and Appx2542, Appx2896 (Aperture manual)).



Appx2542.

The Board also agreed with Apple that the functionality of the "first map image" required by claims 1-3 was disclosed or would have been obvious from the Aperture 3 manual. The manual shows that clicking the Places button in either the Toolbar or the Library Inspector causes the Places view ("first location view") to appear. Appx59-60 (citing Appx721 (Petition); Appx2542, Appx2896 (Aperture manual)). That functionality met the requirements of claims 2 and 3 with one exception. Appx73-78. In Aperture, Apple explained, "[s]electing the Places item in

the Library inspector will invoke Places view" "but would not be limited to linking to respective 'sets of digital files associated with the first person'" as claim 3 requires. Appx734 (emphasis and alterations omitted). The Board agreed with Apple that it would have been obvious "to modify [the Aperture manual] so that the Places toolbar button (a 'first map image' and also part of the 'first person view,') could be selected to display the photos of the selected person in the Places view ('wherein the first set of digital files and the second set of digital files are associated with the first person.')." Appx74-78 (citing Appx734-735) (italics omitted).

Despite holding claim 1 unpatentable for obviousness, the Board held that Apple had not shown parallel claim 13 to be unpatentable. Appx82-86. For claim 13's "second map image," Apple relied on the Faces browser for a "second person." Appx747-748. Apple explained that the Aperture manual "discloses providing the same functionality for each face." Appx747-748. "Because [the manual] discloses or renders obvious these features with respect to a 'first person' (claims 1 and 31), [the manual] discloses or renders obvious these features with respect to a 'second person.'" Appx747-748 (citing Appx713-721; italics omitted). MemoryWeb responded, understanding Apple's position that the "second map image" is the same Places button displayed in the "second person view." Appx1064 (citing Appx747; Appx10457-10458); Appx967-1083.

13

The Board nevertheless held that the petition "lacks any discussion of a second map image or how" the Aperture manual "teaches or suggests this subject matter." Appx82 (citing Appx747-748). The Board acknowledged that MemoryWeb understood Apple's petition to be pointing to "the Places link in the Library inspector and the Places button in the toolbar" for both the first and second map image and that MemoryWeb responded to that challenge. Appx83; Appx110-111. But the Board thought the petition was still "unclear" on this issue and so declined to consider any discussion of the issue in Apple's reply. Appx84. For this reason alone, the Board refused to consider Apple's unpatentability challenge on claims 13-16 and claims 45-48, which are materially the same as claims 13-16. Appx86. The Board denied Apple's request for rehearing, largely reiterating the reasoning of its Final Written Decision. Appx106-114.

### C.    The '376 Patent And *Inter Partes* Review

#### 1.    *The '376 patent*

Much like the '020 patent, MemoryWeb's '376 patent claims a basic method for displaying digital photographs or videos with location metadata. Claim 1 requires two types of views: a "map view" and a "location view." Appx516 (col.35:13-col.36:14). The map view includes "an interactive map" with a "user selectable thumbnail image" displayed at a "location on the interactive map corresponding to [its] geographic coordinates":

14



Appx489 (cropped); Appx516 (col.35:13-col.36:14). The location view includes a "location name," "a scaled replica of each of the digital photographs" in a set, and a "map image":



Appx482 (cropped); Appx516 (col.35:13-col.36:14). The map image is different from the interactive map and does not have images overlaid on it. When the map

image is displayed, the interactive map is not. Independent claim 12 is identical in relevant part. Appx517-518 (col.37:60-col.39:8). Independent claim 5 includes identical location-view limitations but also requires accessing the location view by clicking a "user selectable element" with a "location name" rather than by clicking a "user selectable thumbnail image." Appx516-517 (col.36:43-col.37:13).

### 2. *The Board's decision*

The Board upheld all claims for the same reasons, rejecting Apple's obviousness theory.

Apple's petition explained how the Aperture manual discloses a Places view (image below) with an interactive map and a Viewer Pane with a Metadata Inspector in which the user can open a Map Pane (images on next page):





Appx11547-11549 (cropped), Appx11557-11561; Appx11505-11600. In the manual, it takes multiple clicks to navigate between these two views, so Apple argued that a skilled artisan would have modified Aperture in view of Belitz to use just one click in a way that would have rendered obvious MemoryWeb's claims. Appx11547-11566.

The Board rejected this theory without disagreeing with Apple's key assertions. Appx151-162. For example, the Board did not disagree that the Aperture manual expressly discloses both the Places view and the Viewer-with-Map-Pane view that Apple identified. Appx151-162. It acknowledged that users could navigate between these views and that doing so would require multiple clicks. Appx151-162. And it did not disagree that Apple's proposed combination achieved that navigation in fewer clicks. Appx152-162. Instead, the Board upheld the patentability of the

claims because it believed Apple's obviousness theory was "based on an incorrect assertion about how [the manual]'s Places view works." Appx151. It thought Apple's obviousness challenge depended on whether the unmodified Aperture manual describes that users can switch between the Places and Viewer-with-Map-Pane views by clicking on a photo in the Browser. Appx151-157. Because the Board found that the unmodified manual did not describe such a click, it refused to consider Apple's modification theory of obviousness and rejected Apple's challenge to all claims. Appx152-160. The Board also purported to adopt alternative reasoning rejecting Apple's proposed combination. Appx161-163.

For these reasons, the Board concluded that Apple failed to show any claims of the '376 patent to be unpatentable.

## SUMMARY OF ARGUMENT

I. For the '020 patent, the Board read out of the petition Apple's argument that the Aperture Places button is a "second map image." The petition explained that the Places button is claim 1's "first map image" in the "first person view," and the Board agreed. The petition then stated that claim 13's parallel "second map image" in the "second person view" was satisfied because the Aperture manual "provid[es] the same functionality" in each person view. Appx747. The petition went on to explain how the Places button also provides the "second map image" functionality required by claim 14. Appx748. MemoryWeb understood and responded to Apple's theory.

Given all this, the Board had no basis for refusing to address the substance of Apple's challenge because Apple's petition purportedly lacked a discussion of a second map image. And although the Board pointed to alleged ambiguities in the petition as an additional basis for declining to resolve the substance of Apple's challenge, the Board overlooked that under any interpretation, the Places button is still the "second map image." Nor is there anything improper about arguing that the prior art discloses particular claim language in several different ways. In the end, the Board's failure to address the substance of Apple's petition challenge was an abuse of discretion warranting remand.

II. The Board erred in its determination of non-obviousness for the '376 patent too. Apple's petition relied on known Aperture features for both a "map view" with an "interactive map" and a "location view" with a "map image" as recited in claim 1. Apple's petition explained that it takes multiple clicks to navigate between two relevant views in the Aperture manual and proposed substituting the multiple clicks for just one, based on the teachings of Belitz. Apple thus presented a straightforward case of obviousness based on substituting one known element for another. The Board made no findings contrary to Apple's core theory, which thus should have led to a legal conclusion of obviousness.

The Board concluded otherwise for legally flawed reasons, and the record lacks support for a conclusion of nonobviousness in any event. The Board never

disagreed that Aperture's manual includes the views Apple identified, nor that they could be modified in the way Apple proposed. Instead, the Board got hung up on where one of the inefficient clicks that would be eliminated in the proposed combination occurs in the unmodified Aperture manual. But the Board did not articulate any plausible reason that the placement of one click, which would be eliminated in the obviousness combination, mattered to obviousness. And it would not matter, because the claims would have been obvious regardless of where the eliminated click occurs. That is, Apple is not arguing that the Board erred in its finding about the unmodified Aperture manual; it is arguing the Board was wrong on the law to end its analysis at that finding when Apple's challenge was based on modifying the manual in routine and predictable ways.

Although the Board purported to adopt alternative reasons for rejecting Apple's challenge, that alternative reasoning is just as flawed. The Board thought Apple's obviousness challenge insufficient because certain features of Aperture would purportedly be lost with Apple's proposed modification. This Court recently rejected similar Board reasoning because there is no requirement to show that a combination preserves features of the individual references that are not part of the claimed invention. Even so, the Board was wrong that any features would be lost. The allegedly lost features were redundant, so an instance of each would be preserved in Apple's proposed combination even if another instance were lost.

## STANDARD OF REVIEW

This Court "review[s] the Board's legal determinations de novo and its factual findings for substantial evidence." *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1001 (Fed. Cir. 2023) (citation omitted). "Obviousness is a legal question based on underlying findings of fact." *Id.* at 1003 (citation omitted); *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

This Court reviews the Board's judgments concerning what arguments are fairly presented in a petition "for abuse of discretion." *Ericsson Inc. v. Intell. Ventures I LLC*, 901 F.3d 1374, 1380 (Fed. Cir. 2018). The Board abuses its discretion when its decision "is based on an erroneous conclusion of law." *Id.*

## ARGUMENT

I.  **The Board's Failure To Address Apple's Challenge To The '020 Patent Claims Reciting A Second Map Image Requires A Limited Vacatur And Remand**

The Board read out of Apple's petition a clearly presented challenge to dependent claims 13-16 and 45-48. Its refusal to consider the substance of that challenge based on a purported lack of clarity or ambiguities was an abuse of discretion that requires a remand for the Board to address Apple's challenge in the first instance.

A.    **The Board Legally Erred By Requiring That The Petition Provide More Than A Reasoned And Supported Explanation For Unpatentability**

In creating *inter partes* reviews, Congress made the petitioner "master of its complaint." *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). Under the statutorily mandated scheme, petitioners "get[] to define the contours of the proceeding" with a petition "describing 'each claim challenged' and 'the grounds on which the challenge to each claim is based.'" *Id.* The "petitioner's contentions" in the petition thus "define the scope of the litigation all the way from institution through to conclusion." *Id.* at 1357; *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018). And once a review is instituted, the Board "must consider all evidence and argument" that "is submitted in connection with the petition." *Corephotonics*, 84 F.4th at 1003.

Although this Court has recognized Board discretion in interpreting what a petition says, it has also imposed restraints to ensure the Board does not depart from Congress's controlling scheme. For instance, the Board abuses its discretion when it parses a petitioner's arguments "with too fine of a filter" and declines to address arguments fairly presented in the petition. *Ericsson*, 901 F.3d at 1380. A petition need merely include "an understandable explanation of the element-by-element specifics of its unpatentability contentions." *Uniloc 2017 LLC v. Facebook, Inc.*, No. 19-2159, 2021 WL 5370480, at *8-9 (Fed. Cir. Nov. 18, 2021) (citation

omitted). A petition crosses that threshold if it "asserts that a claim requirement is met, provides a reason that the assertion is true, and cites evidentiary support." *AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*, No. 21-1051, 2021 WL 4470062, at *6 (Fed. Cir. Sept. 30, 2021). Once a petition meets those requirements, the Board errs if it "does not substantively engage with" the petition's arguments. *Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 125 (Fed. Cir. 2022).

In *Uniloc*, for instance, this Court vacated the Board's decision because the "petition together with [a] reinforcing reply statement put the Board on notice" of a challenge the Board failed to consider on the merits. 2021 WL 5370480 at *8. In two related IPRs, Facebook had challenged claims 3 and 4 of the same patent. *Id.* at *2. Claim 3 required "wherein the instant voice message includes an object field," and claim 4 required "wherein the instant voice message includes an action field." *Id.* at *1 (emphasis omitted). Facebook relied on a first reference's "voice container" as the "instant voice message" of claim 3. *Id.* at *2. For claim 4, Facebook mentioned the first reference's "voice container" yet ultimately relied on a second reference's "HTTP message" as the "instant voice message." *Id.* at *3. The Board upheld claim 4 without considering the second reference's HTTP message, apparently concluding Facebook's petition was insufficiently clear on that point. *Id.* at *5. That was error— there was "no inconsistency" in Facebook's theories for claims 3 and 4, which "fairly" conveyed Facebook's challenge even if they "could have been more clearly"

presented. *Id.* at *7-9. That was especially so given Facebook's "more explicit" explanation in its "reinforcing reply," which was "permissibly clarifying." *Id.* Because "the substance of the petition" was "clear enough," the "Board was obliged to recognize that substance—especially after the reply made it still clearer." *Id.*

**B.    Apple's Petition Presented An Understandable And Adequately Supported Argument That The Aperture Manual Discloses A Second Map Image**

The Board violated these basic legal principles when it refused to consider the substance of Apple's challenge on the disputed dependent claims. The disputed claims merely require a "second map image" that parallels the "first map image" recited in the independent claims. That is, these dependent claims track language in the independent claims but merely use "second" labels instead of "first" labels.

Apple's petition presented an understandable explanation for how the Aperture manual expressly discloses both parallel elements based on the same disclosures—including by relying on the Places button as the claimed "second map image." Appx682-789. For claim 1, Apple explained how the Aperture Faces View, when displaying the photos associated with one person, meets claim 1's limitations on a "first person view." Appx713. The "first map image" is one such limitation, and Apple explained that the Places button, which appears as a small map both in the Toolbar and Library inspector of Aperture, is a "first map image" in the "first person view." Appx715-717. MemoryWeb and the Board understood these portions of the

24

petition, and the Board found that the Places button met the "first map image" limitation of claim 1. Appx53-55.

For claim 13, Apple began by restating the elements required for this claim, including a "second person view" with "second map image." Appx747-748. Apple then explained that these claim elements were satisfied in the same way as the parallel elements of claim 1 because the Aperture manual "discloses providing the same functionality for each face identified by the system." Appx747. Specifically, because the manual "discloses or renders obvious these features with respect to a 'first person' (claims 1 and 31)," it "discloses or renders obvious these features with respect to a 'second person.'" Appx747-748 (emphasis omitted). The petition then cited other petition portions addressing the parallel "first person view" limitations of claim 1, Appx748 (citing Appx713-721), including the discussion of the Places button as a "first map image" at Appx715-717.

Apple's arguments on claim 14 put to rest any question about the clarity of Apple's petition. Claim 14 recites functionality of the "second map image" that parallels the identical requirements in claim 1 for the first map image: "responsive to an input that is indicative of a selection of the second map image in the second person view, causing a second location view to be displayed on the interface." Appx444 (col.36:29-39). Addressing claim 14, Apple's petition explained—by citing back to the argument on claim 1—that clicking the Places button opens the

25

location view. Appx748 (citing Appx721-722). That argument makes sense only because the petition, in addressing claim 13 and referring back to claim 1, had already identified the Places button as the second map image. The petition did not argue that there is any selectable element except the Places button that causes a location view to open. *See Uniloc*, 2021 WL 5370480, at \*4 (noting Facebook not only relied on HTTP message as claim 4's "instant voice message" but also for additional limitations imposed by claim 5).

MemoryWeb understood Apple to be "applying the same displayed element (whether it is the Places toolbar button or Places link)" in the Aperture manual "as both the first map image and the second map image," an interpretation that Apple's expert "confirmed during his deposition." Appx1053 (citing Appx747; Appx10457-10458). MemoryWeb recognized Apple was arguing that the claim language does not require a "first" map image to be a different display element from a "second" map image. Appx1053. MemoryWeb built its opposition around this understanding, arguing that the second map image should be construed to be "different than the first map image," so the same Places button cannot be both. Appx988-990; Appx1064. MemoryWeb's understanding of Apple's theory confirms that the petition was clear.

Apple's reply further shows the clarity with which Apple presented its challenge. *Uniloc*, 2021 WL 5370480, at \*8-9 (reply may be "permissibly clarifying"). For claims 13-16 and 45-48, Apple argued that MemoryWeb was

wrong to "presume[e] that the first/second map image cannot be the same image." Appx1144 (citing Appx1113-1114); Appx1100-1150. Instead, Apple explained that the first/second map image can be the same, making clear that its challenge was based on identifying the same Places buttons as both the "first map image" and "second map image." Appx1144 (citing Appx1113-1114). In its sur-reply, MemoryWeb never argued the reply presented a new argument.

The contrast between the Board's treatment of the first and second map image shows it applied "too fine of a filter" to Apple's arguments. *Ericsson*, 901 F.3d at 1380. The Board had no difficulty interpreting Apple's arguments regarding the "first map image" of claim 1. To the contrary, the Board found that the Aperture manual's disclosure of the Places button satisfied the "first map image" claim element, and that the functionality of the "first map image" was disclosed or would have been obvious. Appx53-55, Appx59-60, Appx74-78. Yet Apple's petition addressed the "second map image" of the disputed dependent claims by expressly referring back to those same arguments. Appx747-749.

Incorporating an argument by citation to identical elements is perfectly allowable, and the Board's failure to address an argument presented clearly in this way is error. In *CRFD Research, Inc. v. Matal*, for example, the Court reversed because the Board failed to consider an obviousness argument that the petitioner "incorporated" from one ground into other grounds "by direct citation" to the

relevant petition portions. 876 F.3d 1330, 1346, 1349 (Fed. Cir. 2017). So too here: Apple's petition succinctly stated, with supporting citations, that it was relying on the same reasoning for claim 13 as claim 1—meaning it was relying on the same Places button for the respective map images of these claims. Appx747-748. The petition did not argue that any feature or functionality of the Aperture manual except the Places button corresponds to a map image. *See* Appx713-723; Appx732-736; Appx740-742; Appx747-748; Appx773. As in *CRFD* and *Uniloc*, the Board erred in failing to address the substance of that clearly presented challenge.

### C.    None Of The Board's Reasons For Refusing To Address The Petition's Clear Rationale Supports Affirmance

None of the Board's reasoning justifies its refusal to address the substance of Apple's challenge. Start with the purported ambiguities the Board thought doomed the petition. The Board listed different ways that the Places button in the Toolbar or the Library inspector could correspond with the "second map image." Appx84-85; Appx109, Appx111-112. But "[t]here is nothing improper about arguing that the prior art discloses particular claim language in several different ways." *Uniloc 2017*, 2021 WL 5370480 at *8. That is all Apple did—its petition showed multiple ways in which the prior art discloses first and second map images, including based on both the Toolbar Places button and Library inspector Places button. Appx715; Appx721. Regardless, even under the Board's various readings, the petition still relies only on a Places button as the "second map image." Appx84-85; Appx109, Appx111-112.

Because neither the Board nor MemoryWeb "advanced[] any contrary fair reading of the petition," the Board was required to address Apple's argument that the Places button is the second map image. *Uniloc 2017*, 2021 WL 5370480 at *8. And because the petition was unequivocal in pointing to the Places button as both the first and second map image, the Board had no basis for refusing to consider Apple's petition reply on that point. *See id.* (reply may be "permissibly clarifying"); Appx85.

The Board also contorted Apple's petition statements about "providing the same functionality" for first and second persons as somehow encompassing everything but the "second map image." Appx82-86. It acknowledged that the petition states that the Aperture manual "discloses providing the same functionality for each face identified by the system, including showing that person in Faces view, [and] displaying their name within [Aperture]'s overall user interface." Appx82 (quoting Appx747). The Board thought that insufficient because it believed "the 'second map image' is not a function." Appx107-108; Appx82. But the allegedly missing limitation is a function. Claim 13 requires "causing a second person view to be displayed on the interface, the second person view including … a second map image." Appx444 (col.36:22-28). The claim thus requires performing functions, such as causing a second map image to be displayed on the interface. Appx444 (col.36:22-28). Claims 14-16 punctuate the functional nature of the second map image, requiring it to be an interactive image that responds to user input in specific

ways. Appx444 (col.36:29-46); Appx59-60 (Board similarly treating as function). And Apple's petition provided a clear explanation for how the manual discloses that functionality: the manual "discloses providing the same functionality for each face identified by the system," Appx747, and the petition had already walked through these features for a first person's face, Appx713-721. Plus the petition expressly used the word "including," introducing a list of identical functionality between faces of first and second persons that is open, not closed. Appx747. Because displaying a second map image is just as much a function as showing a second person and displaying their name, the petition's "same functionality" language was more than clear in referring to all three of those functions.

Nor is there merit to the Board's suggestion that the petition supposedly uses the words "first" and "second" inconsistently. The Board thought the petition treated the first and second persons as different people but did not take a parallel approach for the map images—that is, identify a "second map image" different from the first. Appx83-84. Yet that reasoning depends on a claim-construction dispute the Board refused to resolve about whether the same interface element can be both a first and a second map image: "[w]e need not determine whether the recited first and second map images can be the same." Appx83; Appx1113-1114. Regardless, Apple did identify differences between the first and second map images in the petition. Claim 3 and parallel claim 16 specify functionality of the map image that is specific to the

first person or second person respectively: selecting the map image in the first or second person view opens a location view with digital files associated with the first or second person. Apple argued it would be obvious to impart this functionality to the Places button too. Appx734, Appx749. MemoryWeb responded to this obviousness rationale in its discussion of the "second map image." Appx1065-1066. Again, the Board departed from both parties' consistent understanding of the petition.

In the end, the Board had no good reason for reading out Apple's argument, set forth in the petition and further clarified in the reply, that the Places button is the "second map image" required by claims 13-16 and 45-48. The Court should vacate the Board's decision on these claims and remand for the Board to consider the parties' arguments on them. *Uniloc 2017*, 2021 WL 5370480 at *9.

## II.   The Board Erred In Rejecting Apple's Obviousness Theory For The '376 Patent Claims Based On Immaterial Distinctions And Similar Errors

The Board similarly cut short its obviousness analysis on the '376 patent. It wrongly focused on what the unmodified Aperture manual discloses when Apple's challenge was based on modifying the manual in routine and predictable ways. Under de novo review of obviousness, and indeed any standard of review, the Board's own findings and unrebutted facts compelled a conclusion of obviousness on the issues the Board addressed. And because the Board ended its analysis without

resolving additional disputes between the parties, the Court should vacate the Board's decision and remand for consideration of the unresolved issues.

### A.    Apple Again Presented A Straightforward Obviousness Challenge

"[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 416 (2007). That is all that the '376 patent claims do, as Apple's petition showed. The patent describes displaying a "map view" with an "interactive map," such as the one shown below with thumbnails of photos associated with specific locations:



Appx489 (cropped); Appx516 (col.35:13-col.36:14). If a user clicks or taps on a thumbnail from the map, a "location view" may be displayed showing information like that below, including a "location name," a "map image," and photos:



Appx482 (cropped); Appx516 (col.35:13-col.36:14). The claims recite similar features, such as "displaying a map view" with first and second "user selectable thumbnail image[s]," and, "responsive to a click or tap" of a thumbnail image "displaying a first location view" including a "first map image." Appx516 (col.35:13-col.36:14).

Apple's petition relied on specifically identified modifications to express prior-art disclosures to show how MemoryWeb's claimed approach would have been obvious. Apple started with the Aperture manual, explaining that it includes a Places view with an interactive map:



Appx2897-2898; Appx11547-11549. Apple explained that the manual discloses selecting a pin on the map to identify in the image Browser pane below the map all photos associated with a location, as also indicated in the graphic. Appx11556-11557.

Apple further identified functionality in the Aperture manual in which selecting an image in the Browser causes display of a full-size image of the selected photo in a Viewer above the Browser along with a Metadata inspector to the left:



Appx2482, Appx2919-2920; Appx11558-11561. The Metadata inspector may "optionally" include a "small Map Pane," as shown by the alternative inspector on the far left above. Appx2919-2920; Appx11561. This various functionality is all part of the same, single commercial embodiment described in the Aperture manual. Appx11548-11549 (citing Appx2491, Appx2897-2898); Appx11560-11561 (citing Appx2482, Appx2919-2920).

Apple acknowledged differences between this functionality and the challenged claims and identified in the petition proposed modifications to the Aperture manual's teachings. Apple explained that it would have been obvious in light of Belitz to replace the manual's map pins with image thumbnails that include a photo count:



A3UM                          A3UM-Belitz

Appx11538, Appx11554.

Apple also acknowledged that it takes multiple clicks in the Aperture manual to switch from the Places view, which displays a large interactive map as the central feature of the window, to displaying an image in the Viewer with a Map Pane in the Inspector. Appx11559-11564. Here, too, Apple's petition described that it would have been obvious to modify the Aperture manual's teachings in light of Belitz to switch between these views in fewer clicks. Appx11562-11564. Specifically, the petition explained that "it would have been obvious" to change the manual's original behavior and "to display, in [the] Viewer, one of the images shown in the selected location in response to selecting the map location." Appx11562. Apple proposed substituting the multiple clicks for just one based on the teachings of Belitz, which teaches "in response to selecting a map marker, a 'popup window'" that includes "an image 'shown in a larger size.'" Appx11562-11564. "The only functional distinction between the operations of [the Aperture manual] and Belitz in this regard is that

36

Belitz automatically displays an image from the selected location" when a user clicks on a marker on the map (whether a pin or a thumbnail) "while [the manual] does not." Appx11563. Combining Belitz's teachings with the Aperture manual's would result in displaying an image in the Viewer, with the Map Pane in the inspector, when the user clicks on a map-marker thumbnail image without the need for any further clicks. Appx11564-11566.

Apple thus presented a straightforward case of obviousness involving substituting one known element for another, which, in this case, were both described in the same publication as part of the same interface. *KSR*, 550 U.S. at 416. The Board made no contrary findings—it never disagreed that the Aperture manual and Belitz disclose the functionality just presented or that modifying Aperture in light of Belitz was a predictable combination of known prior-art elements. Appx116-168. Section 103 and Supreme Court and this Court's precedent thus compelled holding the challenged claims unpatentable for obviousness. *KSR*, 550 U.S. at 416; *Int'l Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1344 (Fed. Cir. 2017).

## B. The Board Erred In Relying On An Immaterial Distinction To Uphold The Claims

In upholding all challenged claims, the Board departed from settled law on obviousness and failed to provide "a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

37

The Board's primary reason for upholding the claims was that Apple's obviousness "challenge is based on an incorrect assertion about how [the] *Places* view works." Appx151. But the Board was wrong that Apple's challenge was based on such an assertion. The Board pointed to the following petition passage:

> [The Aperture manual] discloses selecting a pin on the interactive map to display a thumbnail representation of all photos matching that location in the Browser. Selecting a thumbnail in the Browser then prompts display of the original digital image in the Viewer. This display will be the digital image (*e.g.*, a full-size photo) represented by the thumbnail in the Browser ("*not including the interactive map*").

Appx153 (citing Appx2512, Appx2712, Appx2897-2898; Appx2378-2379; emphasis added). The Board understood that to mean that clicking on an image in the Aperture Browser when it is displayed in the Places view would directly replace the map with a full-size image in the Viewer. Appx162. But the Board found, in a finding Apple does not challenge, that "the Places-view map is not replaced with an image when the user selects a thumbnail image in the Places-view Browser." Appx152-157 (italics omitted). Based solely on that finding, the Board concluded Apple had not shown the prior art "teaches or suggests" all elements of the challenged claims. Appx152-157, Appx159-161, Appx164-166 (Board repeatedly relying on same).

The Board's reasoning fails to support its conclusion. Even accepting the Board's finding about how the Places view works, the Board was wrong that Apple's

challenge was "based on" a contrary assertion about where a user clicks to switch between the undisputedly disclosed views in the Aperture manual. Far from it. Apple's theory was based on *eliminating* intermediate clicks so that selecting a marker in the Places-view map would directly present a full-size image in the Viewer. Appx11562-11566. Nothing about that theory turned on which precise clicks would be eliminated.

The Board's own findings about the Aperture manual confirm the soundness of Apple's obviousness challenge independent of which clicks would be eliminated. The Board acknowledged that the manual discloses displaying an interactive Places-view map in the Viewer and that "viewing a larger version of an image" in the Viewer is also "provided elsewhere in the interface." Appx162 (citing Appx2712). It found that clicking on a marker on the Places-view map would select images in the Browser associated with the location but would not replace the map in the Viewer. Appx152. Instead, as Apple had explained in reply and the Board acknowledged, replacing the map with a full-size image in the Viewer would require at least one additional click, such as "'clicking an icon in the toolbar.'" Appx162 (quoting Appx2526); Appx11958-11959. These findings confirm that the Aperture manual discloses the features Apple identified and that switching between those features requires multiple clicks. They prove Apple's theory of replacing the

39

multiple clicks required to access the relevant functionality in Aperture with fewer clicks as suggested by Belitz. Appx160-162.

The Board did not articulate any plausible reason that the placement of one intermediate click mattered to Apple's obviousness rationale when the very motivation for the rationale was eliminating intermediate clicks. Instead, the Board stated that Apple "does not explain how or why multiple embodiments in the Aperture manual would be combined," and "the Petition presents an obviousness rationale for modifying [Aperture]'s Places view with Belitz's teachings, not for combining multiple views." Appx158 (emphasis omitted). But the Board made too much of the idea that Apple was combining "multiple embodiments." As the Board itself recognized, Apple relied on features in different views *of the same product* disclosed in the same reference, where the user can navigate between the views. Appx162 (Board acknowledging all features in same "interface"). And Apple's petition did identify a rationale for modifying the manual's teachings: "it would have been obvious to display, in the [Aperture manual]'s Viewer, one of the images shot in the selected location in response to selecting the map location" to "improve the user experience, such as by reducing the number of steps between selecting a map location and seeing an image with that location." Appx11562-11564. The Board never explained what was inadequate or missing in that explanation.

The Board also relied on the language in the petition that the Aperture manual "discloses selecting a pin," and "[s]electing a thumbnail in the Browser then prompts display of the original digital image in the Viewer"; "[a] skilled person would retain this functionality" in the proposed combination. Appx158; Appx160 (similar). The Board thought that "[t]he phrase 'would retain' suggests that [Aperture] would be unmodified in the combination." Appx158. But that reasoning directly contradicts the petition's express statement that "it would have been obvious *to modify* [the Aperture manual] to combine these two steps" of selecting a pin and displaying a full-size image in the Viewer. Appx11562-11566 (emphasis added). As Apple's petition made clear, the "functionality" that would be retained in the combination would be "displaying an image in" Aperture's Viewer, which in the combination would be done "automatically" as in Belitz and without any extra clicks. Appx11564.

The Board also suggested Apple's reply had wrongly "introduce[d] a new rationale" by arguing obviousness based on different views in Aperture. Appx158-159. For all the reasons explained, that was the same obviousness theory presented in Apple's petition. Nothing the Board identified rises to the level of an improper new rationale under this Court's precedent. Apple did "not identify a previously unidentified piece of prior art," or any new embodiment or view of Aperture not referenced in the petition "to make a meaningfully distinct contention." *Ericsson*

*Inc. v. Intell. Ventures I LLC*, 901 F.3d 1374, 1380-81 (Fed. Cir. 2018). At most, Apple permissibly "expand[ed] on the same argument made in its" petition about features in different parts of Aperture that support obviousness based on the proposed combination. *Id.*. The Board abused its discretion both by excluding Apple's explanation in reply and by declining to address any features except those in the Places view of Aperture, despite recognizing that Apple's petition expressly identified features in other views in presenting its challenge, the same features and views to which Apple pointed in reply. *E.g., Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020) (vacating Board decision in similar circumstances where reply "relies on the same" prior-art disclosures "from the same prior art reference[s] to support the same legal argument").

In any event, the Board's reading of Apple's petition missed the forest for the trees. In focusing on the petition's description of "selecting a pin on the interactive map" and "[s]electing a thumbnail in the Browser," the Board overlooked that the petition did not stop there in explaining Apple's obviousness challenge. Appx11559-11560. Rather, the petition went on and expressly identified that it was proposing "to modify" the Aperture manual and "combine" the multiple steps required to replace "the Places map" with "an image to display in a larger fashion in the viewer." Appx11562-11564. The Board thus erred in its "blinkered focus" on the petition's description of one aspect of one prior-art reference without considering the "context"

42

and "additional record evidence" Apple cited. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362-63 (Fed. Cir. 2013) (citation omitted; rejecting similar narrow focus). Under the required "'expansive and flexible approach,'" the Board's own findings and undisputed evidence show the claimed invention is "nothing more than the 'combination of familiar elements according to known methods'" to yield predictable results. *Id.* (citation omitted).

**C.    The Board's Alternative Reasoning Cannot Support Affirmance Because It Repeats Many Of The Same Errors And Adds New Ones**

Although the Board purported to provide alternative reasoning that addressed Apple's obviousness rationale, none of its alternative reasoning supports affirmance. Appx161.

**1.    *The Board's "alternative" reasoning continued to rely on the same misreading of the petition***

The Board wrongly discounted Apple's assertion that its modifications would "reduc[e] the number of steps between selecting a map location and seeing an image with that location." Appx161; Appx11564. It suggested that the need to "reduce the number of steps" is a problem introduced by Apple's combination of "various embodiments" in Aperture. Appx160-161. But as already explained, Apple relied on different features disclosed in the manual of a single product, Aperture 3. *Supra* p. 40. And there is no dispute that the Aperture manual discloses using multiple clicks to achieve the functionality on which Apple focused. Thus, the "number of

steps" Apple proposed reducing were already required in the Aperture manual, not steps that arose from a new combination of products or references.

In fact, the Board appeared to understand that the relied-upon functionality was all available within one embodiment in the Aperture manual when it found that "the feature that Petitioner proposes adding—viewing a larger version of an image—is provided elsewhere in the interface." Appx162; *see* Appx121 (characterizing the reference as a "user manual for Apple's Aperture 3 product"). The Board acknowledged that a user could access the different functions with a few clicks. Appx162. Rather than undermining a skilled artisan's motivation, these findings show that the proposed modification would be simple to implement.

### 2. *The Board's loss-of-functionality rationale is legally and factually flawed*

As an alternative basis to reject Apple's obviousness theory, the Board listed functionality from the Aperture manual that would supposedly be missing or difficult to access with Apple's proposed modification. Yet that reasoning was also based on an incorrect standard for obviousness and, in any event, unsupported by any substantial evidence.

The Board errs when it rejects obviousness because a proposed combination allegedly fails to preserve features of a reference that are not claim requirements. *Axonics, Inc. v. Medtronic, Inc.*, 73 F.4th 950, 957 (Fed. Cir. 2023). In *Axonics*, the Board had upheld claims to a neurostimulation system because it believed the

proposed combination would not have preserved one prior-art system's ability to work in the "trigeminal-nerve context." *Id.* at 956-57. This Court held that was legal error: "[t]he inquiry is not whether a relevant artisan would combine a first reference's feature with a second reference's feature to meet requirements of the first reference that are not requirements of the claims." *Id.* That is because a skilled artisan often may be motivated "to secure some benefits at the expense of others, even when bodily incorporation would be impossible or inadvisable." *Id.* The Court thus vacated and remanded for the Board to apply the correct standard. *Id.*

The Board committed the same error here. Just as in *Axonics*, the Board reasoned that Apple's proposed combination was insufficient because it would remove, or "require additional steps" to access, "features in [Aperture] that depend on" the interface functionality Apple proposed modifying. Appx162-163. The Board faulted Apple's petition for "not explain[ing] how" those features would be preserved or remain easily accessible in the proposed combination. Appx162-163. *Axonics* confirms that Apple bore no such burden.

Even so, the record contradicts the Board's rationale. It shows that the Aperture manual has redundant functionality across its different views and Apple's proposed modification would merely eliminate some redundancy without losing any functionality or ease of access. Specifically, the Board thought that Apple's proposed combination "ignores the features in [Aperture] that depend on selecting

the Browser images to interact with the map." Appx162-163. It thought the proposed combination would lose a "location label" and the ability to assign metadata in Aperture's Places view. Appx162-163.

But the user would not lose easy access to these features. Aperture displays a "location label" on the interactive map that shows the name of the location and the number of images at the location. Appx11568 (citing Appx2899, Appx2904). In Apple's proposed obviousness combination, the number of photos at a location is still displayed on the interactive map alongside a thumbnail image, as taught by Belitz. Appx11554-11556. Further, when the user navigates away from the interactive map, the Map Pane displays the location name and image count. Appx11561 (citing Appx2919-2920). The Aperture manual explains that the user can manually assign locations in various Views. Appx2904 (Places view), Appx11547 (citing Appx2916-2918), Appx2923-2927 (Metadata inspector). In Apple's proposed combination, selecting a thumbnail image on the interactive map causes the Metadata Inspector to be displayed. Appx11564-11566. From there, a user can edit the image's location data. Appx2923-2927. The purportedly lost features would in fact be easily accessed in the Metadata Inspector in Apple's proposed combination. The Board's contrary findings lack substantial-evidence support.

Tellingly, the Board departed from MemoryWeb's own arguments in raising these allegedly lost features as deficiencies of the combination. Appx11885-11887 (arguing instead about different alleged deficiencies). The Board thus was wrong that Apple "ignored" purported deficiencies. Appx162.

In any event, even if Apple's proposed modification involved tradeoffs in functionality, that alone would not defeat obviousness. Obviousness does not require a proposed combination to be the preferred or most desirable one. *In re Fulton*, 391 F.3d 1195, 1200-01 (Fed. Cir. 2004). "[J]ust because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes. " *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012); *WesternGeco LLC v. Ion Geophysical Corp.*, 889 F.3d 1308, 1326 (Fed. Cir. 2018). For that reason, MemoryWeb cannot avoid obviousness by arguing it would become more difficult in Apple's combination to "select a different pin on the map to investigate images at that new location." Appx11886; Appx162-163. MemoryWeb never disputed that a user could easily navigate back to the interactive map in the proposed combination. Although that might involve an additional click, that is not enough to support the Board's conclusion that Apple's "obviousness rationale is insufficient." Appx161.

<p style="text-align:center">*          *          *</p>

Because the Board relied on the same flawed reasoning for all 12 claims of the '376 patent and did not further address the parties' disputes on those claims, the

<p style="text-align:center">47</p>

Court should vacate the Board's entire decision and remand for the Board to consider Apple's arguments on any other disputed claim limitations.

## CONCLUSION

The Court should vacate the Board's decisions that claims 13-16 and 45-48 of the '020 patent and claims 1-12 of the '376 patent are not unpatentable and remand for the Board to address any remaining unresolved issues.

Dated: April 15, 2024

Respectfully submitted,

/s/ Brian R. Matsui

BITA RAHEBI
REBECCA E. WEIRES
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, CA 90017

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

BRIAN R. MATSUI
SETH W. LLOYD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.:  (202) 887-8784
BMatsui@mofo.com

JOEL F. WACKS
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

*Counsel for Appellant Apple Inc.*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

| **Date** | **Document** | **Appx** |
|---|---|---|
| 06/07/2023 | Final Written Decision – PGR2022-00006 | Appx1 |
| 08/03/2023 | Decision Denying Request for Rehearing – PGR2022-00006 | Appx105 |
| 06/07/2023 | Final Written Decision – IPR2022-00032 | Appx116 |
| | U.S. Patent No. 11,017,020 | Appx371 |
| | U.S. Patent No. 9,552,376 | Appx447 |

Trials@uspto.gov
571-272-7822

Paper 41
Date: June 7, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

———————

PGR2022-00006
Patent 11,017,020 B2

———————

Before LYNNE H. BROWNE, KEVIN C. TROCK, and
JASON M. REPKO, *Administrative Patent Judges.*

REPKO, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision

Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 328(a)*

Denying Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*

PGR2022-00006
Patent 11,017,020 B2

## I.     INTRODUCTION

Apple Inc. ("Petitioner") filed a petition to institute a post-grant
review of claims 1–59 of U.S. Patent No. 11,017,020 (Ex. 1001, "the '020
patent"). Paper 1 ("Pet."). MemoryWeb, LLC ("Patent Owner") filed a
Preliminary Response. Paper 8 ("Prelim. Resp."). With the Board's
authorization, Petitioner filed a Reply (Paper 10) and Patent Owner filed a
Sur-reply (Paper 11).

On May 17, 2022, we instituted a post-grant review of all challenged
claims based on all grounds in the Petition. Paper 12 ("Inst. Dec."). Patent
Owner filed a Response. Paper 20 ("PO Resp."). Petitioner filed a Reply.
Paper 26 ("Reply"). Patent Owner filed a Sur-reply. Paper 31 ("Sur-reply").
An oral hearing was held on March 14, 2023. A transcript of that hearing has
been entered into the record. Paper 40 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision
is issued under 35 U.S.C. § 328(a). For the reasons that follow, Petitioner
has shown by a preponderance of the evidence that claims 1–12, 17–44, and
49–59 are unpatentable, but has not shown that 13–16 and 45–48 are
unpatentable.

### A.     Related Matters

According to the parties, the '020 patent is, or has been, involved in
the following proceedings: *MemoryWeb, LLC v. Apple Inc.*, No. 6-21-cv-
00531 (W.D. Tex.); *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et
al.*, No. 6-21-cv-00411 (W.D. Tex.); *MyHeritage (USA), Inc. et al. v.
MemoryWeb, LLC*, No. 1-21-cv-02666 (N.D. Ill.); IPR2022-00111;
IPR2022-00033; IPR2022-00032; IPR2022-00031; and IPR2021-01413.
Pet. 3; Paper 6, 2–3 (Mandatory Notices).

2

PGR2022-00006
Patent 11,017,020 B2

Patent Owner also identifies the following proceedings as related: IPR2022-00222; IPR2022-00221. Paper 6, 2.

### B. The '020 Patent

The '020 patent relates to a platform for managing and using digital files, such as digital photographs. *See* Ex. 1001, 1:22–24. Through the platform's interface, a user can tag and select files to create views. *See id.* at 5:40–45. For example, the "people view" is shown below. *Id.* at 6:24–26, Fig. 6.

**FIG. 6**



The people view, above, shows thumbnail photos of all the people in the system. *Id.* Clicking on the thumbnail causes a "profile view," shown below, to be displayed. *See id.* at 6:24–30.

3

PGR2022-00006
Patent 11,017,020 B2

**FIG. 7**



The profile view, above, displays a person's image, date of birth, date of death, parents' names, and other biographical information. *Id.* at 6:26–30. The profile view also displays links to other views containing information about the person: Locations, Timeline, Family Tree, and Recipes. *Id.* The Locations view, for example, has an interactive map showing where the digital files were taken. *Id.* at 6:18–23.

<div align="center">

*C.    Claims*

</div>

Of the challenged claims, claims 1 and 31 are independent. Claim 1 is reproduced below.

1. A method comprising:
causing an interface to display a people view, the people view including:

a first thumbnail image associated with a first person,

a first name associated with the first person,

4

> a second thumbnail image associated with a second person, and
>
> a second name associated with the second person;
>
> responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including:
>
> > a first digital file associated with the first person,
> >
> > the first name associated with the first person, and
> >
> > a first map image;
>
> responsive to an input that is indicative of a selection of the first map image in the first person view, causing a first location view to be displayed on the interface, the first location view including:
>
> > an interactive geographic map,
> >
> > a first indication positioned at a first location on the interactive geographic map, and
> >
> > a second indication positioned at a second location on the interactive geographic map; and
>
> responsive to an input that is indicative of a selection of the first digital file in the first person view, causing a slideshow to be displayed on the interface, the slideshow including a plurality of images associated with the first person.

Ex. 1001, 35:17–45.

### D.    Evidence

| Name | Reference | Exhibit No. |
|---|---|---|
| A3UM | Aperture 3 User Manual, Apple Inc. (2010) | 1005 |

### E.    Asserted Grounds

Petitioner asserts that claims 1–59 are unpatentable on the following grounds. Pet. 3.

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–59 | 103 | A3UM |
| 6, 7, 38, 39 | 112(a) | Written Description |

5

PGR2022-00006
Patent 11,017,020 B2

## II.    ELIGIBILITY FOR POST GRANT REVIEW

The parties agree that the '020 patent is eligible for post-grant review. *See* Pet. 9; Prelim. Resp. 6. For the reasons stated in our Decision on Institution, we determine that the '020 patent is eligible. *See* Inst. Dec. 6–8.

## III.    ANALYSIS

### A.    *Status of A3UM as a Printed Publication*

#### 1.    *The Petition*

Petitioner challenges claims 1–59 as obvious over A3UM. *See* Pet. A3UM is a user manual for Apple's Aperture 3 product. *Id.* at 16. The Aperture 3 product is digital-image management software. *Id.* at 15 (citing Ex. 1005, 1–4). Petitioner asserts that A3UM is a "printed publication that was publicly disseminated in February 2010." *Id.* Thus, Petitioner asserts that A3UM is prior art under section 102. *Id.*

According to Petitioner, the A3UM was published in two forms: an HTML file set and a PDF file. *Id.* at 16. The challenges in the Petition are based on the HTML file set. *Id.* (citing Ex. 1005). In this Decision, we refer to those files as "the A3UM HTML file set."

Petitioner obtained the A3UM HTML file set from an Aperture 3 installation DVD. *See id.* at 17–18. According to Petitioner, "Dr. Terveen inspected Aperture 3 retail boxes obtained from Apple and from two independent sources and confirmed that the installation DVD in each was the same as the version disseminated in February of 2010 (*i.e.*, v.3.0)." *Id.* at 17 (citing Ex. 1003 ¶¶ 74–85). Dr. Terveen testifies that Exhibit 1005 "is a true and correct copy of the HTML file set both on the Aperture 3 installation DVDs and as copied to computers during Aperture 3's installation." *Id.* at 17–18 (citing Ex. 1003 ¶¶ 72, 89, 96–97).

6

PGR2022-00006
Patent 11,017,020 B2

To show that the A3UM HTML file set was publicly disseminated, Petitioner primarily relies on the declaration of Matthew Birdsell. *Id.* at 16. Mr. Birdsell "is an Apple employee with personal knowledge of the publication and dissemination of the Aperture 3 User Manual in early 2010." *Id.* (citing Ex. 1020 ¶¶ 2–4). In February 2010, Mr. Birdsell was an independent contractor for Apple who "personally worked on Apple documentation and publications regarding each version of Aperture throughout its lifespan, including Aperture 3." Ex. 1020 ¶ 2.

a.      *The Locally Stored A3UM HTML File Set*

Mr. Birdsell testifies that the A3UM HTML file set "was included on the installation DVD in retail packages of Aperture 3 that were sold and distributed within the United States in early 2010 and was copied to local storage of a computer during installation of Aperture 3." Pet. 16 (citing Ex. 1020 ¶¶ 12–16).

Petitioner asserts that users can access the locally stored A3UM HTML file set "by selecting 'Help>Aperture Help' from the menu while Aperture was running and clicking 'Aperture 3: User Manual' on the page that appeared." *Id.* at 18 (citing Ex. 1003 ¶¶ 85–96, 98); *see also* Reply 3 (citing Ex. 1003 ¶¶ 86–89; Ex. 1020 ¶ 12(b)). According to Petitioner, contemporaneous Apple publications explain that the A3UM HTML file set is accessible through internal Aperture's help function. Pet 18 (citing Ex. 1051, 7, 159). Patent Owner does not dispute this. *See generally* PO Resp.; Sur-reply. We determine that Petitioner's assertion (Pet. 18) and Dr. Terveen's testimony (Ex. 1003 ¶¶ 85–96) is sufficiently supported by the evidence of record. *See* Ex. 1020 ¶ 12(b); Ex. 1051, 7 ("Open Aperture, then choose Help > Aperture Help. Then click the link to the user manual"), 159

7

PGR2022-00006
Patent 11,017,020 B2

(providing a similar explanation). Thus, we credit Dr. Terveen's testimony
on this issue. *See* Ex. 1003 ¶¶ 85–96.

In addition to the internal help function, Petitioner asserts that
"[s]killed artisans could obtain A3UM from the Aperture 3 installation DVD
or from computers onto which Aperture 3 had been installed." Pet. 18. Dr.
Terveen testifies that, to access the content of A3UM, a skill artisan could
open the A3UM HTML file set with a web browser. *Id.* (citing Ex. 1003
¶¶ 77–84, 90–96). Petitioner asserts that the user "would see the same
content and interface when opening the HTML file sets obtained from the
installer DVD or as placed on local storage during installation of Aperture
3." *Id.* at 18–19 (citing Ex. 1003 ¶¶ 90–96).

> b. *The A3UM HTML File Set on Apple's Website*

Mr. Birdsell testifies that the A3UM HTML file set "was also
published on the www.apple.com website." Ex. 1020 ¶¶ 17–20. Petitioner
asserts that "the A3UM HTML file set was loaded onto a publicly accessible
website (http://documentation.apple.com/en/aperture/usermanual/) where it
became accessible to any member of the public starting on the date of
commercial sale of Aperture 3." Pet. 19 (citing Ex. 1020 ¶¶ 9–11). Petitioner
asserts that archived copies of the Aperture 3 website from 2010 "include an
embedded URL pointing to the HTML-based User Manual" and "display the
same table of contents entries as A3UM (EX1005), including sub-sections
when manually selected." *Id.* (citing Ex. 1003 ¶¶ 102; Ex. 1021, 6).
Petitioner contends that "a skilled artisan, exercising only reasonable
diligence, could have located A3UM by following links on the apple.com
web site" or "[a]lternatively, that person could have located A3UM using the
search feature within the apple.com web site or using well-known search

8

PGR2022-00006
Patent 11,017,020 B2

engines." *Id.* at 19–20 (citing Ex. 1003 ¶¶ 100–102; Ex. 1021; Ex. 1020 ¶¶ 18–19).

Petitioner submits a screen capture of Apple.com from *the Internet Archive's Wayback Machine*[1] showing Aperture 3 for sale in February 2010, and a table of contents for the user manual. *Id.* at 16 (citing Ex. 1021); Reply 3.

Petitioner also includes three articles discussing Aperture 3 software and its February 9, 2010, release date. Pet. 17 (citing Exs. 1044, 1045, 1048); *see also* Reply 3 (citing Ex. 1044, 1; Ex. 1045, 2; Ex. 1077, 1; Ex. 1089, 181:14–182:11, 192:2–7, 189:10–14, 170:6–13). Petitioner argues that "many individuals had installed Aperture 3—and thereby transferred A3UM—onto their computers before June 2010, which required use of the installer DVD supplied via the retail package of Aperture 3." Pet. 17.

For the reasons that follow, we determine that Petitioner has shown that the A3UM HTML file set (1) was sufficiently disseminated through the Aperture 3 installer DVD that was sold by Apple, and (2) was sufficiently publicly accessible via Apple's website at the relevant time to meet the requirements to be a "printed publication" under 35 U.S.C. § 102. *See id.* at 16–20.

### 2.    Analysis

A person is not entitled to a patent if their invention was "described in a printed publication . . . before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(1). The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case

---

[1] *The Internet Archive's Wayback Machine,* from Archive.org, archives webpages. Ex. 1022, 1 (Archive.org affidavit); Pet. 16 n.1.

9

PGR2022-00006
Patent 11,017,020 B2

inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1380 (Fed. Cir. 2018) (citing *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004)).

"Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). "A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008) (quoting *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006)).

### a. Is A3UM an executing software program?

Patent Owner argues that the A3UM HTML file set is not a "printed publication" as that term is used in Section 102. *See* PO Resp. 52–55; Surreply 5–6. Patent Owner argues that, because users can only access the contents for A3UM when running the software program or following installation of the Aperture 3 application, A3UM "is part of an executing software program," which "cannot be the basis of an IPR[2]." PO Resp. 55

---

[2] This proceeding is a post grant review. Unlike a petition for *inter partes* review (IPR), which can be based on "only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications," a petition for post grant review may be

10

PGR2022-00006
Patent 11,017,020 B2

(citing *Ex Parte Nelson*, No. 2020-004978, 2020 WL 8186425, at *15

(PTAB Dec. 31, 2020); *Capsugel Belgium NV v. Innercap Techs., Inc.*,

IPR2013-00331, Paper 9 at 15 (PTAB Dec. 9, 2013); *Supercell Oy v. GREE,

Inc.*, IPR2021-00501, Paper 7 at 6 (PTAB Aug. 17, 2021)); Sur-reply 5–6.

    We disagree that the A3UM HTML file set is an executing software

program. The files can be read and rendered by software, including but not

limited to Aperture 3. *See, e.g.*, Ex. 1089, 98:5–99:10; Ex. 2023, 80:2–81:6.

In the context of the printed publication requirement of Section 102, there is

not a meaningful difference between the A3UM HTML file set and other

documents stored on a computer. Indeed, "[t]he traditional process of

'printing' is no longer the only process synonymous with 'publication.'" *In

re Wyer*, 655 F.2d. 221, 226 (CCPA 1981).

    The files themselves are linked by their content, source, and

organization to form the Aperture 3 user manual. *See* Ex. 1005. The A3UM

HTML file set has a coherent organization, and the files collectively

function as a single document separate from the executing software itself

(Aperture 3). *See id.* For example, the text "Aperture 3 User Manual"

appears in the header of each page, and "/aperture/usermanual/" appears in

the footers. *See id.* Also, the manual's index page contains embedded

hyperlinks to help the user navigate the manual's sections. *See, e.g.*, Ex.

1003 ¶¶ 101.f, 102; Ex. 1020 ¶ 19.f; Ex. 1021, 8. Based on its form and

---

based on any ground that could be raised under paragraph (2) or (3) of 35
U.S.C. § 282(b) relating to invalidity. *Compare* 35 U.S.C. § 321(b), *with* 35
U.S.C. § 311(b). Still, the basis for Petitioner's challenge is that A3UM is a
"printed publication" under § 102(a)(1). *Id.* at 15. So that is the focus of our
analysis.

PGR2022-00006
Patent 11,017,020 B2

purpose, the A3UM HTML file set should be considered a single document that is separate from the executing software itself.

Patent Owner argues that the A3UM HTML file set was hidden on the installation disk and required "a convoluted series of steps that likely proved challenging even to Petitioner's expert" to find. PO Resp. 50–51 (citing *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01436, Paper 40 at 23 (PTAB Jan. 23, 2020)). In Patent Owner's view, because the A3UM HTML file set is embedded within Aperture 3, there is not a "bright line demarcation" between the product and user manual. *Id.* at 51 (citing *Cisco*, IPR2018-01436, Paper 40 at 23).

We disagree. Both Petitioner and Patent Owner demonstrate that the A3UM HTML file set can be opened from the DVD installer disk before installation and from local storage after installation. Ex. 1020 ¶¶ 12–16; Ex. 1003 ¶ 94; Ex. 1089, 27:4–7, 98:5–99:10; Ex. 1071, 5; Ex. 2023, 80:2–81:6; Ex. 2026, 71:11–72:8. Although the user manual is accessible through the actual Aperture 3 software in the internal help functionality after installation, that does not necessarily make it part of a product. Rather, the files are in a folder on their own and their contents can be accessed without Aperture 3 running. Ex. 1089, 98:5–99:10; Ex. 2023, 80:2–81:6.

The evidence does not show that finding the files required "a convoluted series of steps," as Patent Owner argues. PO Resp. 50. As discussed in detail below, the files could be located and revealed with only a few commands. *See, e.g.*, Reply 16. Also, the A3UM HTML file set was available on the Aperture 3 website. *See, e.g.,* Ex. 1021. This shows that the user manual functioned as a standalone document outside the Aperture 3 software. *See id.* So, although the A3UM HTML file set could be viewed by executing Aperture 3, that was only one of several ways to view the files.

12

PGR2022-00006
Patent 11,017,020 B2

Thus, we determine that the A3UM HTML file set is not executing software or inseparable from it. Rather, the A3UM file set is read and displayed by an executing software program, which is not meaningfully different from any other document stored on a computer.

### b.    Was the A3UM HTML file set publicly accessible via distribution of the Aperture 3 DVD?

#### i.    Sales of the Aperture 3 DVD

Petitioner asserts that Apple sold and distributed the Aperture 3 DVD, which installed A3UM HTML file set on a user's computer. Pet. 16 (citing Ex. 1020 ¶¶ 12–16). Petitioner relies on the testimony of Mr. Birdsell to support this argument. *See id.* Mr. Birdsell testified that "more than 100,000 customers had purchased and were using the Aperture 3 product between February and June of 2010," which he based on his personal "experience with the utilization levels of the help resources on the Apple.com website at the time." Ex. 1020 ¶ 7. According to Mr. Birdsell's testimony, website analytics for *documentation.Apple.com* corresponded to sales figures, and website access volume for Aperture 3 indicated that about 100,000 people had purchased the product. Ex. 2026, 51:16–20; 54:6–22.

Patent Owner argues that Petitioner's evidence of sales is insufficient to show that the A3UM HTML file set was publicly accessible. PO Resp. 40–41. Patent Owner argues that Mr. Birdsell "merely 'believe[s]' that a number of customers purchased and were using the Aperture 3 product before June of 2010." *Id.* at 41. Patent Owner argues that Mr. Birdsell's testimony on sales of Aperture 3 is offered "without any evidentiary support or conducting a personal investigation" and "[m]ere speculation about the number of Aperture 3 purchases falls short of the preponderance of the evidence burden Petitioner is required to meet." *Id.* at 51–52 (citing Ex.

13

PGR2022-00006
Patent 11,017,020 B2

1020 ¶¶ 5–7; Ex. 2026, 53:16–55:17, 61:15–62:3; *Instradent USA, Inc. v. Nobel Biocare Servs. AG*, IPR2015-01786, Paper 106 at 33 (PTAB Feb. 15, 2017); *Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1373 n.3 (Fed. Cir. 2019)). Patent Owner argues that Petitioner's evidence, at best, only shows offers for sale. *Id.* at 52 (citing Ex. 1021, 1–2; Ex. 2026, 56:23–57:9).

But "a petitioner need not establish that specific persons actually accessed or received a work to show that the work was publicly accessible." *Samsung*, 929 F.3d at 1374. "In fact, a limited distribution can make a work publicly accessible under certain circumstances." *Id.* (citing *GoPro, Inc. v. Contour IP Holding LLC*, 908 F.3d 690, 694 (Fed. Cir. 2018)).

Here, Patent Owner does not dispute Petitioner's evidence that Apple offered to sell Aperture 3, or that a copy of A3UM was included on the Aperture 3 installer DVD sold in the relevant timeframe. *See* PO Resp. 40–41, 51–52. Rather, Patent Owner disputes whether there were actual sales of the DVD with the A3UM HTML file set. *Id.* at 3 (citing Ex. 2026, 54:23–55:17, 69:13–19, 53:16–54:17; *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 138 (Fed. Cir. 1986); *Parrot S.A. v. Qfo Labs, Inc.*, IPR2018-01690, Paper 40 at 63–64 (PTAB Feb. 20, 2020); *Paint Point Med. Sys., Inc. v. Blephex, LLC*, IPR2016-01670, Paper 44 at 19–20 (PTAB Feb. 28, 2018)); *see also id.* at 52 (disputing whether there were actual sales). Yet, even if the number of sales cannot be directly corroborated, Patent Owner has not offered any evidence beyond attorney argument that suggests Mr. Birdsell's testimony that there were over 100,000 sales is unreliable. *See id.* at 3, 40–41, 51–52.

On the other hand, Petitioner's evidence is beyond mere speculation. Rather, we determine Petitioner has shown that Apple sold a sufficient

14

PGR2022-00006
Patent 11,017,020 B2

number of DVDs that contained the A3UM HTML file set. Mr. Birdsell's testimony on this issue is credible and adequately supported by corroborating evidence. Ex. 1020 ¶ 7. For instance, Aperture 3 was marketed as shown by a press release (Exhibit 1048) and a feature on the home page of Apple (Exhibit 1021). Patent Owner's expert noted that Apple's website was "probably" one of the most visited websites in the world in 2010. Ex. 1089, 188:9–16. In fact, Mr. Birdsell testified that that the presence of Aperture 3 on the Apple home page meant that it received "top billing." Ex. 2026, 57:3–12. Also, Petitioner has provided two articles about Aperture from 2010 that discuss using an installed copy. *See* Ex. 1044, 2 ("Installation of Aperture 3 took ages."), 1045, 3 ("Before I installed Aperture 3 . . . .").

We agree with Petitioner that the 100,000 copies sold "far exceeds the number of disclosures recognized under the relevant dissemination law for printed publications." Pet. 17 (quoting *Cisco,* IPR2018-01436, Paper 40 at 23–31 (finding 586 copies to be sufficient for being publicly available through dissemination); citing *Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985) (determining six copies sufficient for dissemination)); Reply 4.

Patent Owner argues that Petitioner is "unable to distinguish between users who purchased retail boxes of Aperture 3 versus those who upgraded from Aperture 2 to Aperture 3" without having the Aperture 3 DVD. PO Resp. 41 (citing Ex. 2026, 62:23–63:20; 65:5–13); *see also id.* at 52. In Patent Owner's view, customers who purchased the DVD would not have navigated to the website. *Id.* at 41.

Yet, even without the knowledge of the exact number of users that purchased Aperture 3 retail boxes with the DVD instead of upgrading from Aperture 2 without the DVD, it is far more likely than not that a sufficient

15

PGR2022-00006
Patent 11,017,020 B2

number of the over 100,000 people that purchased Aperture 3 did so by purchasing the DVD for it to be considered publicly disseminated. Ex. 1020 ¶ 7. That is, under a preponderance of the evidence standard, Petitioner has shown that Apple publicly disseminated the A3UM HTML file set in "thousands of retail boxes containing the Aperture 3 installation DVD to users between February 2010 and June 9, 2010." Pet. 16 (citing Ex. 1020 ¶ 7; Ex. 1021, 2; Ex. 1044; Ex. 1045; Ex. 1048).

Patent Owner argues that Dr. Terveen, an alleged person of ordinary skill in the art, had no knowledge of any Aperture 3 sales prior to this case. PO Resp. 41; Ex. 2023; 49:14–19; *see also id.* at *33*–34 (citing Ex. 2023, 49:4–50:11, 51:9–20; 52:2–4). But Petitioner need not show specific persons accessed Aperture 3, let alone that every person of ordinary skill in the art knew about Aperture 3 or its sales. *See Nobel*, 903 F.3d at 1374.

Patent Owner argues that "*Klopfenstein* did not hold that 'sales are not required;' the court noted that '[p]rotective measures' like 'license agreements' prohibiting copying weigh against a finding of accessibility." Sur-reply 3 (citing *In re Klopfenstein*, 380 F.3d at 1351). Patent Owner argues that "Aperture 3 users were bound by a license agreement" that prohibits copying A3UM as part of the software program, so actual sales are required. *Id.* (citing Ex. 2007, 1–2). Even assuming this is true, for the reasons discussed above, Petitioner has provided sufficient evidence concerning actual sales. So Patent Owner's argument here is unavailing.

Thus, Petitioner has shown that the A3UM HTML file set was sufficiently disseminated on the Aperture 3 installer DVD that was sold by Apple. *See* Pet. 16–20.

16

PGR2022-00006
Patent 11,017,020 B2

### ii.    Indexing of the A3UM HTML File Set

"[I]ndexing is not required to show that a work is publicly accessible." *Samsung,* 929 F.3d at 1369. "When a reference is uploaded to a website or deposited in a library, the fact that the reference is indexed or cataloged in some way can indicate that it is publicly accessible." *Id.*

Patent Owner analogizes finding the files on the Aperture 3 DVD to locating books in a physical library:

> The physical analogy would be requiring a person to know about the existence of a hidden section of a library (the *pkg. files), know how to access the hidden section of the library (i.e., unhiding the hidden files), know to move a portion of the hidden library section to another location (decompressing the Archive.pax.gz file), then know to navigate through thousands of shelves to collect a particular set of 746 books (the HTML file set).

PO Resp. 49; *see also* Sur-reply 6 (arguing that finding the files is like "being told that a book has been hidden in the library and then being asked to find it without guidance") (citing Ex. 1089, 409:2–19). According to Patent Owner, Petitioner failed to establish that "the installation DVD included any search functionality for locating the HTML file set" or that "a POSITA[3] would somehow look for hidden files, locally save and decompress one, then navigate through numerous sub-folders." PO Resp. 49.

Patent Owner argues that the HTML file set was intentionally "hidden" or "invisible" on the installation DVDs and that Petitioner's own expert was unable to "testify that he knew where or how to find the 'hidden files' on his own" and that "his testimony suggests Petitioner's counsel provided him with 'tips' on how to find the hidden files." *Id.* at 42–43 (citing Ex. 2023, 63:23–64:5, 64:19–66:10; 67:8–19; 73:10–22, 79:10–15);

---

[3] A person of ordinary skill in the art.

17

PGR2022-00006
Patent 11,017,020 B2

Sur-reply 4–5 (arguing that hidden files are not publicly accessible). Patent Owner argues that Dr. Terveen took many steps to locate the files. PO Resp. 44–49. Patent Owner argues that, when questioned, Dr. Terveen could not recall how long the process took. *Id.* at 49 (citing Ex. 2023, 101:11–102:20). Patent Owner argues that, to find the files, a person of ordinary skill in the art needed to already know what to look for and where to look, or needed to expand and inspect every single folder. *Id.* at 48.

Yet "a printed publication need not be easily searchable after publication if it was sufficiently disseminated at the time of its publication." *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1365 (Fed. Cir. 2014). For the reasons explained in Section III.A.2.b.i, the A3UM HTML file set was sufficiently disseminated through use of the help functionality on the Aperture 3 installer DVD that anyone could purchase, even if the files were not visible on the DVD itself. That is, even without considering whether the reference was sufficiently indexed, Petitioner's has shown that A3UM was sufficiently disseminated.

Still, Petitioner's evidence of indexing is sufficient and bolsters its case that A3UM was accessible. The relevant inquiry here is whether the reference was made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, could locate it. *SRI*, 511 F.3d at 1194.

Patent Owner's arguments focus on "hidden" files. PO Resp. 42–43. "Hidden" files may not be visible in certain views of a directory. *See, e.g.*, Reply 16–17. According Dr. Terveen, the default view of a folder may hide files to reduce the number of files that are shown to the user. Ex. 2023, 65:23–68:24. For example, Dr. Terveen testified that configuration files could be "hidden." *See id.* 67:25.

18

PGR2022-00006
Patent 11,017,020 B2

But Petitioner has shown that "hidden" files appear in other views of MacOS. Reply 17. Such a view is shown in the screenshot below.



In the screenshot from MacOS, above, the same directory is shown in two ways. *Id.* The top screenshot shows the "Aperture" directory in a window with two folder icons, captioned "Documentation" and "Sample Library," along with two other files represented by icons captioned "Before You Install Aperture 3.app" and "Install Aperture." *Id.* The bottom screenshot

19

PGR2022-00006
Patent 11,017,020 B2

shows a window titled "Terminal" displaying the same directory as text. *Id.* But, unlike the top window, the "Terminal" window also displays the names of "hidden" files. *Id.*

The "Terminal" window displays the command "ls -l -a." *Id.* Petitioner explains that the command "ls -l -a" shows the "hidden" files in the "Terminal" window. Reply 16 (citing Ex. 1069, 112; Ex. 1089, 72:21–24, 73:18–74:4, 108:18–21; Ex. 1073, 6; Ex. 1084; Ex. 1085). In sum, Petitioner has shown that "hidden" files are simply files that are excluded for convenience in some views but are shown in other views, e.g., the "Terminal" window shown above. *See id.*

Patent Owner's expert testified that it "would be a reasonable assumption" that a person of ordinary skill in the art would figure out how to unhide files, for example, by looking at books or searching the internet if interested. Ex. 1089, 138:11–139:14. As such, the "hidden files" could be viewed by navigating to the directory and typing a single command to list the files ("ls -l -a"). *See* Reply 16 (citing Ex. 1069, 112; Ex. 1089, 72:21–24, 73:18–74:4, 108:18–21; Ex. 1073, 6; Ex. 1084; Ex. 1085). Typing a few commands in "Terminal" is not an unreasonable amount of effort. *See id.*

As for locating the directory where the files are stored, Petitioner has provided references that a person of ordinary skill in the art would be able to consult to familiarize themselves with a MacOS application's[4] organization and distribution methods. *See, e.g.,* Ex. 1089, 56:17–57:17 (MacOS application bundles), 79:19–80:15 (hierarchical structure), 59:13–23 ("Resources" folder). These references provide the basic principles for navigating a MacOS application's file structure. According to Dr. Terveen,

---

[4] Aperture 3 is a MacOS application. *See, e.g.*, 2025 ¶ 112.

PGR2022-00006
Patent 11,017,020 B2

one of ordinary skill in the art would expect an application's help files in HTML format to be in the Resources subfolder of the application bundle. Ex. 1003 ¶ 93. Dr. Terveen's testimony here (*id.*) is adequately supported by the cited references, so we credit Dr. Terveen on this point. In sum, this evidence shows that the HTML file set was indexed in a meaningful way in the MacOS filesystem such that an interested person of ordinary skill in the art would be able to find it with no more than reasonable effort.

We do not credit the Surati Declaration on these issues because he does not give sufficient weight to the evidence about how MacOS applications are organized and distributed, and for reasons similar to those discussed above in connection with Patent Owner's arguments. *See* Ex. 2025 ¶¶ 109–122; *see also* Reply 13–15 (discussing Dr. Surati's testimony).

Patent Owner argues that Petitioner has not shown why a person of ordinary skill in the art would navigate to various subfolders or manipulate the files. Sur-reply 4–5 (citing Ex. 2025 ¶¶ 118–119, 121; Ex. 1071). We disagree. The Petition explains that a user has multiple ways of viewing the files because they "would see the same content and interface when opening the HTML file sets obtained from the installer DVD or as placed on local storage during installation of Aperture 3." Pet. 18–19 (citing Ex. 1003 ¶¶ 90–96). Dr. Terveen's original testimony submitted with the Petition shows that, to access the HTML file set outside of Aperture 3, one of ordinary skill in the art would navigate the subfolders because they would expect an application's help files in HTML format to be in the Resources subfolder of the application bundle. Ex. 1003 ¶ 93. In fact, there was specific guidance on how to do this. *See* Ex. 1070, 15–16 (a programming guide describing the bundle structure used to store resources and code); Ex. 1071,

21

PGR2022-00006
Patent 11,017,020 B2

5–6 (a programming guide describing bundle resources). So the record shows that users had multiple options to view the files and had ample guidance on how to use those options. *See* Pet. 18–19; Ex. 1003 ¶ 93.

Although Petitioner was not required to show that the A3UM HTML file set was sufficiently indexed to establish that it was publicly accessible, we determine that Petitioner has produced sufficient evidence that it was sufficiently indexed. And we disagree with Patent Owner's arguments that the "hidden" files or the structure of the files weighs against Petitioner's showing that the A3UM HTML file set was accessible. PO Resp. 41–50; Sur-reply 4–5.

### iii.    *Aperture 3 DVD - Conclusion*

For the reasons discussed above, we disagree with Patent Owner's arguments about the sale of Aperture 3. *See* PO Resp. 40–41, 51–52. As explained above, we also disagree with Patent Owner's arguments about the accessibility of the A3UM HTML file set. *Id.* at 41–50; Sur-reply 4–5. Rather, considering the totality of the evidence, Petitioner has sufficiently shown that the A3UM HTML file set was publicly accessible through the sales and distribution of the Aperture 3 DVD, and the A3UM HTML file set was sufficiently indexed. *See* Pet. 16. We credit the testimony of Matthew Birdsell (Ex. 1020 ¶¶ 5–7) and Dr. Terveen (Ex. 1003 ¶¶ 90–96) on these issues. For reasons similar to those discussed in connection with Patent Owner's arguments, we assign little weight to the Surati Declaration on these issues. *See* Ex. 2025 ¶¶ 109–122.

### c.    *Was the A3UM HTML file set publicly accessible via Apple's website?*

In addition to proving by a preponderance of the evidence that A3UM was "publicly accessible" through distribution of public sales of the Aperture 3 software, Petitioner also has shown that the A3UM HTML file

22

PGR2022-00006
Patent 11,017,020 B2

set was "publicly accessible" via the Aperture 3 website. Pet. 19 (citing Ex.
1020 ¶¶ 9–11).

Mr. Birdsell testified that the HTML file set was loaded onto a staging
server the night before Aperture 3's launch, and he verified that "the files
were live and accessible to customers and that all the links worked" on the
website on launch day. Ex. 2026, 51:16–20, 54:6–22, 55:20–56:11; *see also*
Ex. 1020 ¶ 7. Also, Patent Owner's expert, Dr. Surati, testified that, because
Apple had published a press release and marketed Aperture 3 on its home
page, a person of ordinary skill in the art using a search engine such as
Google to find photo management and editing software could find the
Aperture 3 support page containing A3UM. *See* Ex. 1089, 187:12–188:8,
202:12–204:4, 205:17–206:2.

Patent Owner argues that (1) consumers did not know about Aperture
3 to look for it on Apple.com in the first place; (2) if they did go to
Apple.com, they would not find it, exercising reasonable diligence; (3)
A3UM was not available on Apple's website for long enough; and (4)
Exhibit 1005 does not accurately represent the website's version of the
Aperture 3 manual before June 2010. PO Resp. 31–40. Patent Owner's
arguments are unavailing. Our reasoning follows.

i.     *Knowledge of Aperture 3*

Patent Owner argues that a person of ordinary skill in the art
exercising reasonable diligence would not have known to search for
Aperture 3 or A3UM. PO Resp. 32; Sur-reply 6. In Patent Owner's view, it
is not enough to show whether a person of ordinary skill in the art interested
in Apple software would have visited the Apple.com website. PO Resp. 32.
According to Patent Owner, Petitioner must show that a person of ordinary

23

PGR2022-00006
Patent 11,017,020 B2

skill in the art would have known to navigate to Apple.com and then look for
the Aperture 3 user-manual page in search of A3UM. *Id.* at 33.

Patent Owner argues that there is no evidence that consumers who
knew about Aperture 3 were persons of ordinary skill in the art, or that a
person of ordinary skill in the art interested in this subject matter would have
known of Aperture 3. *See id.*; *see also* Sur-reply 6 (arguing no evidence that
Apple was known for photo management). In Patent Owner's view, "The
'Aperture' Product name is not descriptive of photo management
technology." PO Resp. 33. Patent Owner argues that Petitioner offers no
evidence a person of ordinary skill in the art, including Dr. Terveen, would
have known of or looked for information about Aperture 3. *Id.* at 34–33
(citing Ex. 2023, 49:4–50:11, 51:9–20; 52:2–4).

We disagree. Mr. Birdsell's testimony shows that approximately 95%
of traffic accessing Aperture 3 came from search engines. Ex. 2026: 67:13–
20. This suggests that a person did not need *a priori* knowledge of the
reference in order to access it. *See Samsung*, 979 F.3d at 1374. Because
Petitioner has demonstrated accessibility, Petitioner had no requirement to
show the specific number of people who actually accessed it. *Id.*; *Constant v.
Adv. Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988)
("Accessibility goes to the issue of whether interested members of the
relevant public could obtain the information if they wanted to.").

*ii.    Indexing*

Patent Owner argues "a POSITA exercising reasonable diligence
would not have found the website version of A3UM on Apple.com." PO
Resp. 32, 36–37. Patent Owner argues that "the Aperture 3 user manual page
could be found only after executing several steps such as knowing to search
for 'Aperture' or 'Aperture 3' in the search box or by navigating through a

24

PGR2022-00006
Patent 11,017,020 B2

number of links on Apple.com" and that "there is no evidence on the record that searching Apple.com for other terms that would be common, like 'photo,' for example, would have yielded any Aperture-related results." *Id.* at 34–35 (citing Ex. 1020 ¶ 18; Ex. 2026, 67:21–69:11; Ex. 1003 ¶ 101).

Patent Owner does note that "[w]hile users could have theoretically navigated to the product manual page, analytics evidence tracking the number of users who did so is unavailable and not in evidence." *Id.* at 34 n.3 (citing Ex. 2026, 69:20–23). Patent Owner contends, even if a person of ordinary skill in the art accessed "the Aperture 3 webpage through the homepage, a POSITA would still have needed to navigate through at least four more pages to reach the manual." *Id.* at 36 (Ex. 1003 ¶ 101; Ex. 1020 ¶ 19; Ex. 2026, 67:21–69:11). Patent Owner argues, because "the website's structure is critical in determining whether a reference is publicly accessible or merely technically accessible," Petitioner's argument lacks evidence of meaningful indexing and shows technical accessibility at best. *Id.* at 36–37 (citing *Salesforce.com, Inc. v. WSOU Inv., LLC*, IPR2022-00428, Paper 10 at 14 (July 13, 2022); *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 773 (Fed. Cir. 2018); *Samsung*, 929 F.3d at 1373).

We disagree. There is sufficient evidence that a person of ordinary skill could have reasonably found the website and then found the reference on that website. *See* Ex. 1089, 188:9–16 (testifying that Apple was probably one of the most visited sites in the world). Dr. Terveen was able to find the Aperture 3 support page on Apple.com in a few clicks by navigating to pages describing photo management and editing. Ex. 1003 ¶ 101; *see generally* Exs. 1021 (archived screenshots from Apple.com); 1074 (collection of screenshots of web pages advertising Aperture 3). For example, Dr. Terveen explained that the Apple.com website provided a

25

PGR2022-00006
Patent 11,017,020 B2

"straightforward path" to access the web-hosted version of A3UM, which included links mentioning the Aperture 3 product and other helpful information to guide the user: Click "Introducing *Aperture 3*," Click "Resources," Click the "Learn more" link below "Aperture Support page," Click "Aperture 3 User Manual." Ex. 1003 ¶ 101 (emphasis added). Dr. Terveen explained that the navigation involved five clicks after navigating to Apple.com, which is not an unreasonable number. *See id.* This evidence suggests that a person of ordinary skill in the art in 2010 could have found the Aperture 3 software through reasonable diligence without needing to run text-based searches on the website. We credit Dr. Terveen's Declaration on this issue. *Id.*

   iii.  *The Date that A3UM was Available on the Website*

   Patent Owner argues that Petitioner has not demonstrated that Exhibit 1005 was on Apple.com in February 2010. PO Resp. 37–40. Patent Owner alleges that the version of the A3UM Table of Contents shown in the archived version of the website (Ex. 2010) has a copyright date of 2011, indicating that the A3UM HTML file set may not have been available on the website until after the critical date. *Id.* at 40 n.6; *compare* Ex. 2010, *with* Ex. 1021; Sur-reply 7.

   But Mr. Birdsell's testimony indicates that the text of Exhibit 2010 also has a different font than the one used on Apple.com. *See, e.g.*, Ex. 2026, 49:1–13. Neither party fully explains why this and other minor discrepancies exist in the versions that were archived by the *Wayback Machine*. *See* PO Resp. 39–40.

   Considering all the evidence and arguments, we determine that Petitioner has sufficiently explained, by a preponderance of the evidence, that the extended URL accurately reflects the date that the *Wayback*

26

PGR2022-00006
Patent 11,017,020 B2

*Machine* archived the page. Pet. 16 n.1 (citing Ex. 1022, 1). For example,
"the extended URL http://web.archive.org/web/19970126045828/http://
www.archive.org/ would be the URL for the record of the Internet Archive
home page HTML file (http://www.archive.org/) archived on January 26,
1997 at 4:58 a.m. and 28 seconds (1997/01/26 at 04:58:28)"). *Id.* The
extended URL for the last page of the file with the title Aperture 3 User
Manual is "https://web.archive.org/web/20100217035925/
http://documentation.apple.com/en/aperture/usermanual/." Ex. 1021, 8. So,
according to the Internet Archive's extended URL ("20100217035925"), the
archived date is February 17, 2010. *See* Ex. 1022, 1. This is consistent with
Mr. Birdsell's testimony that Aperture 3.0 was distributed in February 2010.
Ex. 1020 ¶ 5. Thus, we credit the declarations of Dr. Terveen and Mr.
Birdsell on this issue. Ex. 1003 ¶ 102, Ex. 1020 ¶ 5.

      Patent Owner argues that Exhibit 1005 was created using the HTML
file set from the DVD, not from the archived version of Apple.com that
existed in 2010. PO Resp. 37–38; Sur-reply 2. Patent Owner argues that
Petitioner has been unable to provide the version that existed on the website.
PO Resp. 37–38. In Patent Owner's view, Dr. Terveen's and Dr. Birdsell's
depositions indicate that they do not know how Exhibit 1005 was prepared,
and that neither could testify that it is a true-and-correct copy of the
website's version. *Id.* at 38–39; Sur-reply 2 (citing Ex. 2023, 57:10–59:10;
Ex. 2026, 20:5–6, 44:15–17, 44:21–23). Patent Owner argues that there are
inconsistencies that cannot be resolved by looking at the exhibits because
Exhibit 1021 is incomplete. PO Resp. 39–40.

      Both Mr. Birdsell and Dr. Terveen, however, individually compared
Exhibit 1005 to the HTML file set and found no discrepancies in the content
itself. Ex. 2026, 41:14–16; Ex. 2023, 61:13–17. Also, the path for each file

PGR2022-00006
Patent 11,017,020 B2

is shown in the bottom-left corner of each page of Exhibit 1005. *See*
Ex. 1005. The file path is consistent with the file path given above for the
help files. *See id.* Also, we credit Mr. Birdsell's unrebutted testimony that
the same version of A3UM would have been sent to both the disk packaging
team and the team responsible for loading A3UM onto the website. Ex.
2026, 40:15–41:10. All this evidence taken together indicates that Exhibit
1005 is the same as the HTML file set. Apart from speculation, we have no
evidence from Patent Owner to suggest otherwise.

### iv.    Duration of Dissemination

In determining whether interested persons could have accessed the
publication, the duration of dissemination can be one of the factors that is
considered. *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 847 F. App'x 869,
877 (Fed. Cir. 2021) (citing *GoPro*, 908 F.3d at 694–95). For references that
were never distributed to the public or indexed, "[d]uration of display is
important in determining the opportunity of the public in capturing,
processing and retaining the information conveyed by the reference." *In re
Klopfenstein*, 380 F.3d at 1350. The more transient the duration that a
reference was displayed, for example, "the less likely it is to be considered a
'printed publication.'" *Id.*

Here, for all the reasons discussed above, Petitioner has shown that
the A3UM HTML file set was sufficiently distributed and indexed. *See, e.g.*,
§§ III.A.2.c.ii–iii *supra*.

Even so, Patent Owner argues that "the reference to Aperture 3 only
existed on the Apple.com homepage for only a matter of 'weeks,'" and such
"limited duration of accessibility is a strong indication that the user manual
through Apple.com website was not publicly accessible." PO Resp. 35–36

28

PGR2022-00006
Patent 11,017,020 B2

(citing Ex. 2026, 56:23–57:9; *Centripetal Networks*, 847 F. App'x at 876–77).

Although Aperture 3 was marketed for weeks on the home page, Aperture 3's product page remained for much longer. For example, Mr. Birdsell testified that he verified access to A3UM in 2010 and removed A3UM from the Apple website at the beginning of the COVID-19 pandemic in 2020. Ex. 2026, 66:4–12. Thus, Petitioner has proven by a preponderance of the evidence that A3UM was "publicly accessible" by a POSITA for a sufficient amount of time. *See Klopfenstein*, 380 F.3d at 1351–52 (determining that three days was long enough to consider a reference "publicly available").

### v. *Apple Webpage - Conclusion*

Thus, based on the totality of the evidence, the Apple webpage, more likely than not, displayed the A3UM HTML file set in 2010, and Petitioner has shown that the A3UM HTML file set was publicly accessible via Apple's website at the relevant time.

### 3. *Mr. Birdsell's Testimony*

Patent Owner argues that Mr. Birdsell's testimony lacks credibility, and that we should consider the fact that he is an Apple employee in assessing his testimony. PO Resp. 55–56; Sur-reply 3.

Yet Patent Owner has offered little evidence beyond attorney argument that suggests Mr. Birdsell's testimony is unreliable on the basis of his employment or otherwise. On the other hand, Petitioner has provided corroborating evidence, for example, to show that Aperture 3 was marketed, including a press release (Exhibit 1048), featured on Apple's home page (Exhibit 1021), and reviewed by three separate reviewer (Exhibits 1044, 1045, 1048), which is consistent with Mr. Birdsell's testimony. In Sections

29

PGR2022-00006
Patent 11,017,020 B2

III.A.2.b–c, above, we discuss other instances in which we credit Mr. Birdsell's testimony because it is sufficiently persuasive and supported by the record.

Also, we disagree with Patent Owner's suggestion that Mr. Birdsell's situation is sufficiently similar to the specific circumstance in *Parrot S.A. v. Qfo Labs, Inc.* IPR2018-01690, Paper 40 at 63–64 (PTAB Feb. 20, 2020). PO Resp. 55–56; Reply 3. Patent Owner has provided no evidence to suggest that Mr. Birdsell has a financial stake in the outcome of this matter, such as by losing employment for example. *See Parrot*, IPR2018-01690, Paper 40 at 63–64 (giving little weight to testimony from witness who was a party's cofounder and admitted to having a financial stake in the outcome of the proceeding). But we do not disagree with Patent Owner on the more general point that we should consider the fact that Mr. Birdsell is an Apple employee when weighing his credibility. *See* PO Resp. 55–56.

That is, we disagree with Patent Owner to the extent that it argues Mr. Birdsell's testimony should be given no weight on the basis that he is employed by Apple. *Id.*; Sur-reply 3. Rather, we give Mr. Birdsell's testimony the appropriate weight where it is sufficiently persuasive and corroborated. *See supra* §§ III.A.2.b–c.

### 4. Conclusion

Petitioner has proven by a preponderance of the evidence that A3UM is a printed publication under Section 102.

### B. Level of Ordinary Skill in the Art

According to Petitioner,

A person of ordinary skill in the art in 2011 would have had (1) at least a bachelor's degree in computer science, computer engineering, or electrical engineering, and (2) at least

30

one year of experience designing graphical user interfaces for applications such as photo management systems.

Pet. 12 (citing Ex. 1003 ¶¶ 44–46).

In the Institution Decision, we applied Petitioner's proposed definition. Inst. Dec. 12. Patent Owner does not dispute Petitioner's proposed level of ordinary skill in the art. PO Resp. 7. We continue to find that the skill level identified by Petitioner (Pet. 12) is consistent with the record. Thus, we use the same definition here that we used in the Institution Decision.

## C.    Claim Construction

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

### 1.    Digital File

Claim 1 recites, in part,

> responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including:
>
> > a first *digital file* associated with the first person . . . .

Ex. 1001, 35:25–31 (emphasis added).

Petitioner has two alternative rationales for how the prior art teaches or suggests the "digital file" recited in the claims. Pet. 31, 35–36. The first rationale assumes that "digital file" is a full-size image. *Id.* at 31. The second rationale assumes that the "digital file" is a reduced-size image. *Id.* at 35–36.

Patent Owner disagrees that the claimed "digital file" must be a full-size image. PO Resp. 76 n. 3 (citing Pet. 31; Ex. 2023, 200:1–11).

31

PGR2022-00006
Patent 11,017,020 B2

As discussed in Section III.C, we need not determine the precise contours of what a "digital file" means to resolve the patentability issues in this case because Petitioner has shown that the A3UM teaches or suggests the recited "digital file" under either interpretation. Even so, we determine that a digital file at least encompasses both a full-size or a reduced-size image.

The claim merely recites "digital file" without reference to any sizes. The claim only requires an association with a person, which does not require any particular size. The claim also recites thumbnails, but we see no reason why a digital file could not also encompass thumbnails as well as other files stored in digital forms.

Neither party directs us to any relevant parts of the written description or prosecution history on this point. The '020 patent, though, provides the following explanation: "Digital Files—An electronic file that can be in various file formats (e.g., PNG, JPEG, PDF, TIFF, MP3, MP4, WAY, and GIF) that are of items such as photos, videos, audio files, and documents." *See* Ex. 1001, 10:49–57. This description is consistent with how the term is used throughout the '020 patent. *See, e.g., id.* at 1:44–47 ("Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc."); 1:65–66 (referring to "digital files, including documents, photos, videos, and audio . . . ."); 13:22 (same), 4:40 ("digital files such as photos"). Likewise, Dr. Terveen testified that, generally, a digital file "is literally just a file stored in a digital form on a computer." Ex. 2023, 192:17–19.

We see nothing in the written description that would prescribe a particular size to the digital file to limit the recited digital file to a full-size or reduced-size image. Rather, the patent explains that "[t]he user may choose

32

PGR2022-00006
Patent 11,017,020 B2

to present the digital files in any of the various types of ways disclosed herein." Ex. 1001, 8:1–2. And the patent explains that digital files can be enlarged. *Id.* at 6:1–2. These sections combined with the broad description of a digital file elsewhere suggest that the recited digital file is not limited to a particular size.

Thus, we disagree with Patent Owner and determine that the recited "digital file" encompasses reduced- and full-size images. *See* PO Resp. 76; Pet. 31, 35–36.

### 2.    *Group Image*

Claims 11 and 43 recite, in part, "the first person includes a first group image." Ex. 1001, 36:15–16 (claim 11), 39:1–2 (claim 43).

Patent Owner argues that "group image" means "an image including content associated with a group of people." PO Resp. 16. In Patent Owner's view, the word "group" must define the "image" content, otherwise it would add nothing to distinguish it from the other images. *Id.*; *see also* Sur-reply 12–13 (arguing that its construction gives meaning to all the words). Patent Owner argues that its construction is consistent with the "people profile view" of Figure 7. *Id.* Figure 7 is shown below with Patent Owner's annotations. PO Resp. 17.

33

PGR2022-00006
Patent 11,017,020 B2



Figure 7 above shows the person view, with a digital file and a row of images at the bottom: locations (labeled "map image"), timeline, a "family tree" (labeled "group image), and recipes. *Id.* Next to the digital view is the person's name and biographical information. *Id.*

According to Patent Owner, "The image labeled 'Family Tree' is a 'group image' because its content (a depiction of a family tree) is tied to a group of people (a family)." *Id.* (citing Ex. 2025 ¶ 147). In Patent Owner's view, a person of ordinary skill in the art would understand that selecting the family-tree image displays the family view in Figure 8, an example of the "group view." *Id.* at 17–18 (citing Ex. 1001, 6:24–35; Ex. 2025 ¶ 148).

Petitioner argues that "[t]he correct construction of 'group image' is 'an interface element associated with a group of images.'" Reply 6. Petitioner argues that term "group image" only appears in the claims, not in

PGR2022-00006
Patent 11,017,020 B2

the rest of the patent. *Id.* at 5–6. Petitioner argues that the role of the "group image" that Patent Owner identifies "is to indicate to a user that clicking it will display the 'group view.'" *Id.* at 6. Petitioner argues that "the content of the visual element is non-functional descriptive matter not entitled to any patentable weight." *Id.* (citing *In re Yeager*, 527 F. App'x 859, 861 (Fed. Cir. 2013)).

Having considered the parties' arguments and the evidence, we agree with Petitioner's construction of the recited "group image": "an interface element associated with a group of images." *See* Reply 6.

Claims 11 and 43 do not recite what the group image includes. Rather, the claims recite (1) where the group image is located, "the first person view," and (2) that the image can be selected—i.e., "responsive to an input that is indicative of a selection of the first group image." Ex. 1001, 36:15–16 (claim 11), 39:1–2 (claim 43). The recited selection is consistent with Petitioner's construction that the group image is an "interface element," and its role "is to indicate to a user that clicking it will display the 'group view.'" Reply 6.

The claims recite what the "group view" includes: "one or more digital files associated with another person that is associated with the first person." Ex. 1001, 36:17–19 (claim 11), 39:4–5 (claim 43). This is consistent with Petitioner's construction that the group image is "associated with a group of images." Reply 6.

The intrinsic record of the '020 patent provides no basis for construing the term "group image" to require the particular content that Patent Owner argues for. PO Resp. 16–17. In fact, the intrinsic record provides no additional context regarding the meaning of this term. *See* Ex. 1001. The patent's written description does not use the term "group

35

PGR2022-00006
Patent 11,017,020 B2

image" outside of the claims, and it provides no definition—explicit or implicit—for it. *Id.*

Even so, the intrinsic record better supports Petitioner's construction. *See* Reply 6. In particular, the patent explains that Figure 7's shows a "people profile view." Ex. 1001, 6:26–27. Although the patent does not use the term "group image," this view shows "links to other views that contain that individual in the system." *Id.* at 6:26–30. As Patent Owner explains (PO Resp. 17–18), clicking on the Family Tree interface element ("group image") takes the user to the Family Tree Application View. *See* Ex. 1001, 6:24–35; Ex. 2025 ¶ 148. The "Family Tree Application View" is "where the individual people that have been created within the application can be displayed with family relationships." *Id.* at 34:35–38. In this way, the group-image interface element is associated with a group of images, as in Petitioner's construction. *See* Reply 6.

We disagree with Patent Owner that Petitioner's interpretation renders the word "group" meaningless. PO Resp. 16; Sur-reply 12–13. Rather, under Petitioner's construction, the interface element must be associated with a group of images. Reply 6. Because of this association, the construction gives meaning to the word "group." *Id.*

The interface elements at issue and discussed in this proceeding are rendered on a computer screen. In this way, adding the word "image" to Petitioner's construction, as Patent Owner's appears to argue (Sur-reply 12–13), would be redundant. Also, it is unclear how Patent Owner's argument (*id.*) has any bearing on the issues here.

Patent Owner's construction further adds that the group image "is associated with a group of *people*." PO Resp. 16 (emphasis added). We note that, for the reasons discussed below, Petitioner has shown that the prior art

36

PGR2022-00006
Patent 11,017,020 B2

teaches or suggests a group image even adding Patent Owner's limitation about "people" to the group image. Specifically, the claim expressly requires an association to the people in the "group view" via the recited selection's effect: "causing a first group view to be displayed on the interface." *See* Ex. 1001, 36:15–16 (claim 11), 39:1–2 (claim 43). So the "group of people" aspect of Patent Owner's construction adds little to what the claim already recites.

Thus, we construe "group image" as "an interface element associated with a group of images." *See* Reply 6. But our analysis below would be the same even if we construed group image to be an interface element that is an image associated with a group of people.

### D.     *Obviousness over A3UM*

Petitioner asserts that the subject matter recited in claims 1–59 would have been obvious over A3UM. Pet. 24–91.

### 1.     *A3UM*

A3UM is a user manual for Apple's Aperture 3 digital-image management software. Ex. 1005. Aperture provides photographers with image management and adjustment tools. *Id.* at 1. For example, Faces is a face-detection and face-recognition tool provided in Aperture. *Id.* at 28. Faces can identify and track people through all the images in a digital library. *Id.* Places is also a tool provided in Aperture that organizes images by location. *Id.* at 81. In Places, a user can search for image locations on a map and zoom to view those locations in detail. *Id.* The Slideshow Editor allows the user to create slideshows. *Id.* at 84. These slideshows may include images, video, and audio clips. *Id.*

37

### 2.    Claim 1

#### a.    Preamble and People View

Claim 1 recites, in part,

1. A method comprising:

causing an interface to display a people view, the people view
    including:

> a first thumbnail image associated with a first person,
>
> a first name associated with the first person,
>
> a second thumbnail image associated with a second
> person, and
>
> a second name associated with the second person . . . .

Ex. 1001, 35:17–24.

Petitioner asserts that A3UM teaches a "people view" because the
application window in A3UM displays a Faces view. Pet. 25 (citing
Ex. 1005, 28–29, 78–80, 417–428; Ex. 1003 ¶ 11).

Patent Owner does not specifically rebut these assertions. *See
generally* PO Resp.; Sur-reply.

Considering the totality of the evidence, Petitioner has shown that
A3UM teaches or suggests the preamble and the people view. *See* Pet. 24–
27. In particular, the Petition reproduces an image of the A3UM interface,
which is shown below. *Id.* at 25.

38

PGR2022-00006
Patent 11,017,020 B2



The figure above shows an interface displaying three images in a window. *Id.* Each image shows a person's face. *Id.* A name appears underneath each image. *Id.* The names "Alice" and "Daniel" are associated with a first and a second person. *Id.* at 26. In this way, Petitioner sufficiently shows that A3UM teaches or suggests the recited thumbnail images and names.

Petitioner explains that, to the extent that the recited "thumbnail image" must be a "reduced-size version of the original photo (*i.e.*, uncropped)," it would have been obvious to modify A3UM to have this feature. *Id.* at 25–26.

We determine that Petitioner's obviousness rationale is adequately supported by the current record, including the relevant parts of the Terveen Declaration. *See id.* According to the Terveen Declaration, using a scaled and cropped version of a photo was known, and modifying A3UM to use a version like this would be an arrangement of old elements performing their known function with expected results: A3UM displaying uncropped

39

PGR2022-00006
Patent 11,017,020 B2

thumbnails of people in the Places view. Ex. 1003 ¶¶ 113–115, *cited in* Pet. 25–26.

Thus, we determine that Petitioner has shown that A3UM teaches or suggests the preamble and the people-view limitations of claim 1, and that the recited subject matter would have been obvious over A3UM alone. *See* Pet. 24–27.

### b.    *First Person View*

### i.    *"digital file"*

Claim 1 recites, in part,

> responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including:
>
> > a first *digital file* associated with the first person . . . .

Ex. 1001, 35:25–31 (emphasis added).

Petitioner asserts that A3UM's interface will display confirmed and unconfirmed images containing a person's face responsive to a user selecting a snapshot. Pet. 28–29 (citing Ex. 1005, 79, 418–419; Ex. 1003 ¶¶ 120–121).

Petitioner has two alternative rationales for how A3UM's display of confirmed and unconfirmed images teaches or suggests that the first person view includes the recited digital file. Pet. 31, 35–36. The first rationale assumes that "digital file" must be a full-size image. *Id.* at 31. The second rationale assumes that the "digital file" can be a reduced-size image. *Id.* at 35–36.

Patent Owner disagrees that the claimed "digital file" must be a full-size image. PO Resp. 76 n. 3 (citing Pet. 31; Ex. 2023, 200:1–11).

40

PGR2022-00006
Patent 11,017,020 B2

As discussed in Section III.C, Petitioner has shown that the A3UM teaches or suggests the recited "digital file" under either interpretation—i.e., a reduced- or full-size image. Our analysis follows.

*(a)    Full-Size Version*

Assuming that "digital file" means a full-size image, Petitioner asserts that A3UM's first person view does not include the recited digital file. Pet. 31. Rather, in Petitioner's view, A3UM displays "thumbnails or scaled versions of underlying digital files containing the selected person's face," not "the digital files themselves." *Id.*

According to the Petition, it would have been obvious "to modify A3UM to display at least one of the images containing the selected person's face at its full-size" in the Faces browser." *Id.* (citing Ex. 1003 ¶¶ 126–134). That is, under this rationale, the recited "digital file" means "an image at its full size." *Id.* Petitioner provides multiple reasons why one of ordinary skill in the art would have made this modification. *See, e.g., id.* at 33–35. In sum, Petitioner relies on a combination of A3UM's Faces, Viewer, and Browser interfaces to arrive at the claimed first person view including a digital file. *See id.* at 32–35.

Patent Owner does not present specific arguments directed to the issue of whether A3UM's images are digital files, as recited in claim 1. *See generally* PO Resp.; Sur-reply. Patent Owner, though, argues that Petitioner's proposed modification "would radically modify the A3UM Faces browser by replacing the entire view with the unrelated split Viewer/Browser interface shown elsewhere in A3UM." PO Resp. 69 (citing Pet. 31–32; Ex. 1003 ¶ 127).

In Patent Owner's view, "the unmodified Faces browser is specifically and intentionally designed to display confirmed images of a person

41

PGR2022-00006
Patent 11,017,020 B2

simultaneously with suggested images of the person to facilitate a process of tagging images with people." PO Resp. 68. Patent Owner argues that, to accomplish this, the Faces browser is divided into two sections. *Id.* To illustrate, Patent Owner annotates A3UM's Faces browser, shown below. *Id.* at 69.



The screenshot above shows A3UM's Faces browser as annotated by Patent Owner. *Id.* at 69. The Faces browser has various buttons ("All Faces,"

42

PGR2022-00006
Patent 11,017,020 B2

"Faces," "Photos," "Confirm Faces"), a *Sorting* menu, and a slider for resizing the thumbnail images. *Id.* Patent Owner's annotates the browser's top section as "confirmed image(s)" and the bottom section as "suggested images." *Id.*

We largely agree with Patent Owner's description of this interface: In A3UM, a user can view all the images in a photo library that include a particular person. Ex. 1005, 29. To start this process, the user double-clicks the person's snapshot in Faces view. *Id.* A confirmed image of the person appears in the browser's top section. *Id.* Aperture compares the person's face with other faces in the photo library. *Id.* It then offers suggested images for the user to confirm or reject as matches. *Id.* Suggested images appear in the browser's bottom section. *Id.* When the user confirms a suggested image, it moves from the bottom section to the top section of the browser. *See id.*; PO Resp. 69.

Patent Owner argues that Petitioner's proposed modification would "radically" modify and "frustrate the entire purpose" of A3UM's Faces browser, which is to compare confirmed and suggested images. PO Resp. 69–72. Patent Owner argues that, under its proposed combination, Petitioner does not explain what would happen to the suggested images, and that Dr. Terveen admitted this alleged failure. *Id.* at 69–71 (Pet. 31–35; Ex. 1003 ¶¶ 129–134; Ex. 2025 ¶¶ 187–189; Ex. 2023, 210:5–211:2, 212:24–213:9). Patent Owner argues that, for this reason, Dr. Terveen's analysis is incomplete and should be afforded no weight. *Id.* at 71. Patent Owner evaluates options for where the suggested images might go and concludes that those options "would be impractical and reduce the usability of the interface." *See id.* at 71–72 (citing Ex. 2025 ¶¶ 190–192; Ex. 1005, 29, 207).

43

PGR2022-00006
Patent 11,017,020 B2

We disagree with Patent Owner's arguments for at least the reason
that they do not squarely address Petitioner's rationale. In particular,
Petitioner proposes using A3UM's Viewer-Browser interface to display both
confirmed and suggested images. *See* Pet. 31, 35.[5] The Petition states that it
would have been obvious "to modify A3UM's Faces browser to display
*confirmed* images of a person using A3UM's Viewer and Browser
interfaces." *Id.* at 32 (citing Ex. 1003 ¶ 129) (emphasis added). The Petition
also states that the modification displays "unconfirmed images 'at full size'
before confirming them." *Id.* at 35 (Ex. 1003 ¶ 133; Ex. 1005, 419–420,
424–425).

We disagree with Patent Owner's argument that it is unclear what
happens to the suggested images or whether the suggested images are
displayed in the modified interface at all. *See* PO Resp. 69–72; Sur-reply
18–19.

Dr. Terveen's testimony makes clear that the proposed modification
displays both suggested and confirmed images:

> I'm saying it would have been obvious to have a modification
> where you would display a full-size image for *both* the confirmed
> and unconfirmed . . . they weren't exclusive, you know, one or
> the other.

Ex. 2023, 206:11–16 (emphasis added). Patent Owner mischaracterizes the
proposed combination as having only a "single row of images." *Id.* at 72. Dr.
Terveen, however, explained "I'm proposing a Browser where you're

---

[5] In the Reply, Petitioner argues that the suggested images "remain in the
library but are not displayed—A3UM teaches that the Faces browser can
select/display desired images (e.g., confirmed using keywords)." Reply 27.
We, however, agree with Patent Owner that this is clearly inconsistent with
the Petition, and Dr. Terveen's testimony. Sur-reply 18–19 (citing Pet. 35;
Ex. 2023, 208:19–209:16).

PGR2022-00006
Patent 11,017,020 B2

showing thumbnails *and* a viewer where you're showing one image at full size." *Id.* at 213:10–11 (emphasis added). That is, both suggested and confirmed images are in their own Viewer/Browser. This testimony is consistent with the Petition because it discusses displaying both confirmed and unconfirmed images using the Viewer/Browser. *See* Pet. 32, 35.

The Viewer/Browser is reproduced below. *Id.* at 32



The Viewer/Browser, above shows sets of images from a folder, project or album. *Id.* (citing Ex. 1005, 47). Unlike the Faces browser, the images shown above, though, do not appear to contain faces. *Id.* Essentially, the Petition proposes using this interface to "display another set of images maintained by A3UM's system: images containing faces of a selected person." *Id.* at 33 (citing Ex. 1003 ¶ 129). The Petition discusses not only "confirmed" faces but also "unconfirmed" images. *Id.* at 31, 35

45

PGR2022-00006
Patent 11,017,020 B2

Apart from the Petition's discussion of "unconfirmed" images (*id.* at 35), the Petition also compares the grid of thumbnail images in the Viewer/Browser*'s* Grid view to the Faces browser (*id.* at 33–34). The comparison is shown below.



EX1005, 216



EX1005, 80

The above figure are an excerpt from the Petition that shows that Viewer/Browser's Grid view on the left and the Faces browser on the right. *Id.* at 34. As the Petition points out, "both display a grid of thumbnail images." *Id.* at 33. In the screenshot on the right, "all the confirmed images of that person appear at the top of the Faces browser, and all the suggested images of the person appear in a separate section below the confirmed images." Ex. 1005, 79. Notably, the top of the Faces browser has only a single image. Pet. 34. The grid that the Petition refers to is apparent only when including images from the suggested-image section. *Id.* Thus, the Petition indicates that the suggested images are to be considered as well in this analysis. *Id.*

Considering the totality of the evidence, the Petition sufficiently explains that both confirmed and suggested images are displayed in the

46

PGR2022-00006
Patent 11,017,020 B2

Viewer/Browser in proposed modification. *See* Pet. 34. Thus, we disagree with Patent Owner's arguments that are directed to modifications that do not involve displaying suggested images in this way. *See* PO Resp. 69–72. And we disagree with Patent Owner's argument that Dr. Terveen's analysis is incomplete. *Id.* at 71.

Also, the Petition shows that the similarity between the two interfaces further supports the obviousness rationale. *See* Pet. 33–34. For example, both the Viewer/Browser and Faces browser organize and display a collection of images. *Id.* These different views were merely alternatives for performing the same function. *Id.* at 34–35 (citing Ex. 1003 ¶ 131). Thus, we agree with Petitioner that the proposed "modification would arrange known elements performing the same function each had been known to perform individually—the images in A3UM's Faces browser displayed with A3UM's Viewer interface—to yield expected results, with no change in the Faces browser other than adopting the visual interface of A3UM's Viewer." *Id.* at 34.

As Dr. Terveen explains, both ways of viewing the images have their benefits. Ex. 1003 ¶ 131. And the Petition sufficiently explains what those benefits were:

> A skilled artisan also would have been motivated to modify the Faces browser to adopt a Viewer/Browser arrangement that displays selected images "at full size" to give users other known benefits of the Viewer: (1) "examine an image at its full size"; (2) "apply adjustments, keywords, and metadata to an image in the Viewer"; (3) customize how images are displayed, such as "at full resolution" and with "metadata," and (4) use the Loupe tool, i.e., a magnifying glass.

Pet. 35 (citing Ex. 1005, 51, 260, 266; Ex. 1003 ¶ 132).

47

PGR2022-00006
Patent 11,017,020 B2

As for the first benefit, Patent Owner argues that "Petitioner fails to identify a benefit to showing the images at 'full size.'" PO Resp. 76. We disagree. The Petition explains that examining the image at its full size would help the user confirm images. *Id.* (citing Ex. 1003 ¶ 133; Ex. 1005, 419–420, 424–425). Dr. Terveen testifies that "being able to view an image at 'full size' when confirming whether it contains a specific detected face" would be beneficial. Ex. 1003 ¶ 133. We credit this testimony because it is supported by A3UM, which shows that the images in the Faces browser occupy less space than those in the Viewer. *See, e.g.*, Pet. 32 (showing the Viewer), 34 (showing Faces browser). The record shows that, for example, A3UM teaches that it is easier to identify a person's face in a larger image. Ex. 1005, 425.

Patent Owner argues that this benefit is already in the unmodified Faces browser. PO Resp. 75–76. Patent Owner argues that the Faces browser has a tool to show only faces in the thumbnails. *Id.* at 76. Patent Owner argues that A3UM has a thumbnail resizer to provide larger images. *Id.* (citing Ex. 1005, Ex. 2025 ¶¶ 199–200; Ex. 2023, 130:13–131:24, 137:4–11, 142:8–15).

We disagree with Patent Owner's argument (*id.*) and assign little weight to Dr. Surati's Declaration on this issue (Ex. 2025 ¶¶ 199–200, 205) because the record shows that Viewer/Browser and thumbnail-resizer slider work differently.  In particular, Dr. Terveen explained that the thumbnail-resizer slider has a different effect than the Viewer/Browser because the slider enlarges all thumbnails. Ex. 2023, 215:10–16. Dr. Terveen explained that, by contrast, the Viewer/Browser provides the user with "more screen real estate to one particular thing as opposed to dividing it up among all the thumbnails as they got bigger." *Id.*

48

PGR2022-00006
Patent 11,017,020 B2

Indeed, A3UM supports Dr. Terveen's testimony. For example, A3UM explains, "As the number of confirmed images of a person grows, it can be difficult to identify a person's face in a small thumbnail image." Ex. 1005, 425, *discussed in* PO Resp. 76. A3UM explains that dragging the thumbnail-resize slider changes "the size of the thumbnail images shown in the Faces browser." Ex. 1005, 80. Also, "[t]o make it easier to identify a person's face in an image, [A3UM's user] can either make the thumbnail images larger or switch from showing whole images to showing only faces." *Id.* at 425. This feature only further supports Dr. Terveen's testimony because it shows that A3UM recognizes that enlarging the faces aids identification. *Id.* at 80, 425, *discussed in* PO Resp. 76. We credit Dr. Terveen's testimony about the benefits of enlarging the images of faces (Ex. 1003 ¶ 132; Ex. 2023, 215:10–16) because it is consistent with A3UM (Ex. 1005, 80, 425).

Patent Owner argues that there is no need to display the images at full size to confirm a face "because users recognize faces very quickly." PO Resp. 76 (citing Ex. 2025 ¶¶ 203–204; Ex. 2030, 110, 115). Dr. Surati cites "Designing with the Mind in Mind," a user-interface design textbook, states that "people recognize human faces very quickly—usually in a fraction of a second." Ex. 2025 ¶ 204 (citing Ex. 2030, p. 110).

We do not credit Dr. Surati on this issue because it is unclear how the speed at which a person recognizes a human face relates to the A3UM interface. *Id.* Dr. Surati provides insufficient support for the assertion that "[w]hether an image is displayed as a thumbnail or 'full size' will have very little, if any, impact on how quickly a user will recognize a face." *Id.* To the contrary, A3UM teaches enlarging the images makes it "easier to identify a

49

PGR2022-00006
Patent 11,017,020 B2

person's face in an image." Ex. 1005, 425. Thus, we assign little weight to

Dr. Surati's testimony on this issue. Ex. 2025 ¶ 204.

Thus, Petitioner sufficiently supports its rationale that it would have

been obvious to modify the Faces browser to allow users to examine an

image at its full size. Pet. 35.

As for the benefits other than viewing the images at full size, Patent

Owner argues that the Faces browser can already (1) add adjustments,

keywords, and metadata, and (2) allow users to invoke the Loupe tool. PO

Resp. 76–77. We note that these other benefits are cumulative in Petitioner's

rationale, and we determine that Petitioner has sufficiently shown that the

proposed modification would at least improve A3UM in one way. Pet. 35.

Even so, if true, Patent Owner's argument (*id.*) only bolsters Petitioner's

argument that the "modification would arrange known elements performing

the same function each had been known to perform individually . . . to yield

expected results, with no change in the Faces browser other than adopting

the visual interface of A3UM's Viewer." Pet. 35 (citing Ex. 1003 ¶ 134).

Patent Owner essentially argues that the toolbar and Library inspector

would be unchanged in the proposed combination. *See* PO Resp. 76–77.

Specifically, Patent Owner argues that the Library inspector's metadata and

adjustment tab would provide the same functionality without being

modified. *See id.* (citing Ex. 2025 ¶¶ 205–208; Ex. 1005, 54, 58, 61; Ex.

2023, 146:17–147:1). Likewise, Patent Owner argues that the Loupe tool is

included by default in the toolbar in the unmodified version of the Faces

browser. *Id.* at 77 (citing Ex. 2025 ¶¶ 211–212; Ex. 1005, 29, 65, 247;

Ex. 2023, 146:9–16). This somewhat undermines its other argument that the

proposed modification would "radically modify the A3UM Faces browser"

(*id.* at 69), frustrate the entire purpose of the A3UM Faces browser

50

(*id.* at 72, 75), or require substantial reconstruction (*id.* at 75). Rather, the record better supports Petitioner that the viewing functions are interchangeable, requiring no change to the Faces browser other than adopting a new visual interface. *See* Pet. 35. Thus, we disagree with Patent Owner's arguments and assign little weight to Dr. Surati's testimony on these issues. *See* PO Resp. 69, 72, 74–78; Ex. 2025 ¶¶ 127, 130–131, 179–186, 191–192, 195–198.

For similar reasons, we disagree with Patent Owner's argument that the proposed modification would reduce usability. PO Resp. 69–77. Patent Owner assumes various configurations not proposed in the Petition. *See id.* For example, Patent Owner discusses using only a single row of images without distinguishing between confirmed and suggested images (*id.* at 72, 74–75) or not showing the suggested images at all (*id.* at 70–71). Patent Owner also speculates about where the buttons for confirming faces would be placed in Petitioner's combination. *Id.* at 73 (Ex. 1003 ¶¶ 129–134; Ex. 2025 ¶¶ 193–194). In making these arguments, Patent Owner does not squarely address the Petition's rationale of displaying each section of the confirmed and suggested images in its own Viewer/Browser. *See, e.g.*, Pet. 32, 35; *see also* Ex. 2023, 206:11–16, 213:10–11. For similar reasons, we do not credit the corresponding parts of Dr. Surati's Declaration. Ex. 2025 ¶¶ 185–186, 191–194, 197–198.

Thus, Petitioner has shown that A3UM teaches or suggests the recited "digital file" under its first rationale that "digital file" means a full-size image. Pet. 31.

### (b)    *Reduced-Size Version*

Alternatively, Petitioner asserts that, if the causing limitation is interpreted to cover displaying a reduced-size version of a digital file,

A3UM meets this limitation because the Faces browser displays all "confirmed and unconfirmed images in reduced-size form." *Id.* at 35–36 (citing Ex. 1005, 79; Ex. 1003 ¶ 135). That, this second rationale is based on A3UM's Faces browser alone. *Id.* at 36.

Patent Owner disagrees with the interpretation that the claimed "digital file" must be a full-size image. PO Resp. 76 n.11. Patent Owner argues that "[e]ven if the Board were to adopt Petitioner's alternative argument for limitation 1[c] that does not require modifying the A3UM Faces Browser to meet the claims (*see* [Pet. 35–36]), Petitioner would still fail to meet its burden for claim 1." *Id.* at 78. n.12. Patent Owner, though, does not specifically present arguments or evidence directly rebutting Petitioner's assertion that A3UM's Faces browser includes digital files under the reduced-size rationale. *See generally* PO Resp.; Sur-reply.

Considering the totality of the evidence and arguments, we agree with Petitioner that the A3UM's Faces browser includes digital files. Pet. 35–36. As discussed in Section III.C, the term "digital file" at least encompasses a reduced-size image, as relied upon in Petitioner's second rationale. *See id.* It is undisputed that A3UM at least shows images associated with a person of some size in the Faces browser—i.e., the confirmed and unconfirmed images. *See id.*; *see generally* PO Resp.; Sur-reply. We agree with Petitioner on this point and determine that this assertion is sufficiently supported by the evidence of record because the images in the Faces browser show a person's face. *See* Ex. 1005, 79; Ex. 1003 ¶ 135. In this additional way, Petitioner has shown that A3UM's confirmed and unconfirmed image teach the recited "digital file." Pet. 35–36.

52

PGR2022-00006
Patent 11,017,020 B2

Thus, considering the totality of the evidence, Petitioner has shown that A3UM teaches or suggests "a first digital file associated with the first person," as recited in claim 1.

*ii.*     *"map image"*

Claim 1 recites, in part, "responsive to an input . . . causing a first person view to be displayed on the interface, first person view including . . . a first *map image*." Ex. 1001, 35:25–31 (emphasis added).

As for the map image, Petitioner asserts, "A3UM's interface includes two selectable links with miniature map icons . . . , the Places link in the Library inspector and the Places button in the toolbar, that can be selected to display the Places view." Pet. 30 (citing Ex. 1005, 81, 435). The icons from A3UM are reproduced below, as shown in the Petition. *Id.*



The screenshot above shows the Library inspector pane on the left, and the "Places" button on the tool bar on the right. *Id.* In the Library inspector pane, the "Places" option is highlighted to distinguish it from the other options in the "APERTURE 3 SAMPLE LIBRARY": "Projects," "Photos," "Faces," "Flagged," and "Trash." *Id.* Beside each option is an icon. *Id.* The "Places" option has an icon representing a map. *Id.* The right-hand side of the screenshot shows the "Places" button on a toolbar between the "Faces" button and the "Full Screen" button. *Id.* The buttons have icons

53

PGR2022-00006
Patent 11,017,020 B2

above their name. *Id.* The icon associated with the "Places" button is a miniature map. *Id.*

Petitioner argues that the Places icons in each view "represent maps and a skilled artisan would consider them to be '*map images[s].*'" *Id.* Petitioner asserts that "these icons can be selected as part of the Places link and Places button." *Id.* at 30–31 (citing Ex. 1005, 81, 435; Ex. 1003 ¶ 123).

Patent Owner argues that neither icon is "caused to be displayed 'responsive to' selecting one of the snapshots in the Faces view"—i.e., the input that Petitioner asserts indicates that the first person is selected. PO Resp. 61 (citing Ex. 2025 ¶¶ 159–164). In Patent Owner's view, "those buttons are in exactly the same state on the interface *regardless of any input* in a Faces view." *Id.* (citing Ex. 2003, 180:20–183:4, 184:17–185:23, 187:15–189:21). In other words, unlike the claimed "map image," Patent Owner views A3UM's Places buttons as static elements that are continuously displayed between views. *See, e.g., id.* at 61–65. Thus, Patent Owner argues that A3UM lacks a map image that is displayed in response to any input in the Faces view. *Id.* at 61.

But the claim does not require causing a map image to be displayed on the interface in response to an input. Rather, the claim recites "responsive to an input that is indicative of a selection associated with the first person, causing *a first person view* to be displayed." Ex. 1001, 35:25–31.

Patent Owner disagrees and argues that "[t]he claims define the first person view as including (1) a first digital file, (2) the first name, and (3) *the first map image*." Sur-reply 15 (citing Ex. 2026 ¶ 124). So, in Patent Owner's view, "all three of these—including the first map image—must be displayed 'responsive to the input.'" *Id.* (citing Ex. 2026 ¶ 125). Patent Owner argues that "all three elements of the first person view are displayed

54

PGR2022-00006
Patent 11,017,020 B2

together to make up the first person view; they are not displayed
independently." *Id.*

We agree that the first person view must include a map view.
Although Patent Owner identifies other views where the A3UM Places
link/button (the recited "map image") appears (*see, e.g.,* PO Resp. 62
(Ex. 1005, 6, 64–65)), we disagree that the claim precludes other views from
also including a map view. Specifically, claim 1's method uses the term
"comprising," indicating that additional unrecited views may also contain a
map image. Under this understanding of the claim, the map view need not be
displayed independently, as Patent Owner argues. Sur-reply 15. Thus, we
disagree with Patent Owner's argument that adds an unrecited limitation to
the claim. *Id.*

Rather, the claim is satisfied if at least the first person view contains
the map view, along with the other recited elements. And A3UM teaches
that same view displays the first name a first digital file associated with the
first person (the image in the Faces Browser), the first name associated with
the first person (A3UM's Face name) also displays the map image (the icon
associated with Places). Pet. 28–31.

Patent Owner argues that the claimed causal relationship is
meaningful in human-interface design. PO Resp. 63 (citing Ex. 2021, 26,
39–41; Ex. 2025 ¶ 166). Patent Owner argues that Petitioner has not shown a
cause and effect. *See id* at 61; *see also id.* at 11–12, 62 (analogizing the
recited cause-and-effect to a drought causing prairie fires). We disagree with
Patent Owner's argument for at least the reason that Patent Owner focuses
on an effect that is not recited: the only time the map image appears is in
response to the input. We assign little weight to the Surati Declaration about
the causal relationship because Dr. Surati relies on Patent Owner's reasoning

55

that the only time that the map image appears is in response to the input. *See* Ex. 2025 ¶¶ 154–170.

<div align="center">

*iii.*    *"responsive to"*

</div>

Even under Patent Owner's construction of "responsive to," Petitioner has shown that A3UM teaches or suggests the first person-view limitation. In particular, Patent Owner argues that "responsive to" means "a cause-effect relationship between (i) an input that is indicative of a selection associated with the first person and (ii) causing a first person view to be displayed on the interface." PO Resp. 8.

As for part (i) of the construction, Patent Owner does not dispute that double clicking a faces thumbnail on A3UM's Faces view is "an input that is indicative of a selection associated with the first person." *See, e.g., id.* at 68. Indeed, we agree with Petitioner that A3UM teaches that double clicking a photo in the Faces view ("an input") will display a view of the images, the toolbar, and the inspector panes (the recited "first person view" as modified under Petitioner's combination). Pet. 28–29. For example, A3UM states, "If you double-click a person's snapshot in Faces view, Aperture presents suggested images of the person at the bottom of the Faces browser." Ex. 1005, 419. Here, A3UM describes a cause-effect relationship between the input and the display of a view of the images, the toolbar, and the inspector panes. *See id.* We credit Dr. Terveen's testimony, which is consistent with this disclosure. *See* Ex. 1003 ¶¶ 120–122.

As for part (ii) of Patent Owner's construction, Petitioner has shown a A3UM's Viewer, toolbar, and inspector panes are the recited "first person view." Patent Owner does not dispute Petitioner's assertion that A3UM displays "a first digital file associated with the first person, the first name associated with the first person," as required by the claim. Pet. 28–30.

<div align="center">

56

</div>

PGR2022-00006
Patent 11,017,020 B2

Petitioner shows that A3UM's view displays the first name in the title bar as the "Face name." *Id.* An example of A3UM interface is shown below.



The screenshot above shows part of the interface in A3UM. *Id.* at 30 (citing Ex. 1005, 79–80; Ex. 1003 ¶ 122). In particular, the screenshot shows various buttons ("All Faces," "Faces," "Photos," "Confirm Faces"), a Sorting menu, and a slider for resizing thumbnails. *Id.* The interface is divided into an upper and lower part, each showing images. *Id.* The "Face name" appears in the title bar. *Id.* According to A3UM, "The title bar contains the name of the person in the images." Ex. 1005, 80, *cited in* Pet. 30. Thus, Petitioner has shown that A3UM's "first person view"

57

PGR2022-00006
Patent 11,017,020 B2

includes "a first digital file associated with the first person, the first name associated with the first person." Pet. 28–30. We credit Dr. Terveen's testimony, which is consistent with this disclosure. *See* Ex. 1003 ¶ 122.

In addition to the Faces view, Petitioner asserts that the toolbar and inspector panes are also part of the recited "first person view." Pet. 28–30. We agree. For example, we reproduce the rest of the A3UM interface with Patent Owner's annotations below. PO Resp. 59.



The annotated screenshot above shows a toolbar highlighted in red, the Library inspector pane highlighted in yellow, and a Faces browser highlighted in blue. *Id.* As discussed in detail above, purported map image appears in Library inspector pane on the Left, and the "Places" button on the tool bar on the right. *Id.* The interface is divided into an upper and lower part, each showing images of the person with the "Face name" at the top. *Id.*

58

PGR2022-00006
Patent 11,017,020 B2

In sum, Petitioner has shown that A3UM teaches, "response to an input . . . causing a first person view to be displayed on the interface, first person view including . . . a first map image." *See* Pet. 28–36.

<div style="text-align:center">c.    *First Location View*</div>

Claim 1 recites,

responsive to an input that is indicative of a selection of the first map image in the first person view, causing a first location view to be displayed on the interface, the first location view including:

an interactive geographic map,

a first indication positioned at a first location on the interactive geographic map, and

a second indication positioned at a second location on the interactive geographic map . . . .

Ex. 1001, 35:32–40.

Petitioner asserts that A3UM's Places view is displayed within the Aperture user interface as a whole, which is collectively a "first location view." Pet. 38. According to the Petition, "A3UM describes a Places view comprising an embedded Google Map ('interactive geographic map') that is displayed when a user clicks or taps ('responsive to an input that is indicative of a selection of the first map image in the first person view') on either (1) the 'Places' item in the Library Inspector ('first map image') or (2) the Places button in the toolbar (another 'first map image')." *Id.* at 36 (citing Ex. 1003 ¶¶ 138–140; Ex. 1005, 81, 435).

As for the first and second indications, Petitioner asserts that the Places view displays pins at locations on an interactive map where the photos were taken. *Id.* at 37–38 (citing Ex. 1005, 30, 65, 81–83, 429–466, 1115; Ex. 1003 ¶ 138).

<div style="text-align:center">59</div>

PGR2022-00006
Patent 11,017,020 B2

Patent Owner does not specifically dispute these assertions. *See generally* PO Resp.; Sur-reply.

Considering the entire record, Petitioner's assertions are adequately supported. For example, we agree with Petitioner's characterization of the A3UM's Places view (Pet. 36–38), which is displayed below.



The figure above is a screenshot of the interface described in A3UM. Ex. 1005, 437. The interface contains a map. *Id.* In the figure, the interface is annotated with a line identifying a "location pin" within the map. *Id.* According to A3UM,

> Depending on the zoom setting in Places view, Aperture might use a single pin to represent a group of images shot in close

60

> proximity. However, you can view the precise location where each image in the group was shot.

*Id.* The bottom of the interface displays five images. *Id.* The annotation below the images says, "Images shot in the selected location." *Id.*

Thus, Petitioner has shown that A3UM teaches or suggests the first location-view limitations of claim 1.

### *d.*     *Slideshow*

Claim 1 recites,

> responsive to an input that is indicative of a selection of the first digital file in the first person view, causing a slideshow to be displayed on the interface, the slideshow including a plurality of images associated with the first person.

Ex. 1001, 35:41–45.

In its analysis, Petitioner refers to the combination discussed in connection with the person-view limitation. Pet. 38–39 (referring to § VII.B.1.b. of the Petition); *see supra* § III.D.2.b. Petitioner asserts that, under its proposed modification, the Faces browser would use the functionality from the Viewer. *Id.* at 38 (emphasis omitted). Under this rationale, the Viewer would be above "a Browser of images that can be selected to display the image in full resolution," which "would allow a user to view the set of images containing the selected person's face, such as by selecting one of the images in the Browser to display it in the Viewer." *Id.* at 38–39 (citing Ex. 1005, 251; Ex. 1003 ¶ 143). Petitioner's assertions and obviousness rationale are sufficiently supported, as discussed in Section III.D.2.b.

In the sections that follow, we analyze each part of the limitations directed to the slideshow limitation under Petitioner's proposed Faces browser modified with the Viewer-Browser features. *See id.*

61

*i.*     *"responsive to"*

Petitioner explains that A3UM's "user can select multiple images in the Browser (comprising photos of a specific person), including the image currently displayed in the Viewer, and then start a 'slideshow' by choosing File->Play Slideshow, or by pressing Shift-S." *Id.* at 40 (Ex. 1003 ¶ 146; Ex. 1005, 36, 828). According to the Petition, "That prompts the Play Slideshow dialog, which allows the user to 'specify how you want images displayed by choosing a slideshow preset.'" *Id.* Petitioner asserts that "[o]nce the user selects a preset and clicks 'Start,' A3UM will cause a 'slideshow' (*'causing a slideshow to be displayed on the interface'*) to display the selected images (*'the slideshow including a plurality of images associated with the first person'*)." *Id.* (citing Ex. 1003 ¶ 146; Ex. 1005, 830–831).

A3UM's "Play Slideshow" dialog is shown below. Ex. 1005, 830.



The "Play Slideshow" dialog above shows an image of a person, a "Cancel" button, a "Start" button, and a "Slideshow Preset" dropdown showing "Dissolve" as the current item. *Id.*

We determine that A3UM's description of creating a slideshow sufficiently supports Petitioner's assertion that A3UM teaches or suggests

62

PGR2022-00006
Patent 11,017,020 B2

"an input that is indicative of a selection of the first digital file in the first person view," as recited. Pet. 40. For example, A3UM teaches that a user "can also create a slideshow *by selecting the images* that [they] want to show in the Browser and then choosing File > Play Slideshow." Ex. 1005, 36 (emphasis added), *cited in* Pet. 40. That is, A3UM's user selects images that are included in the slideshow. *See id.* In fact, A3UM specifically tells the user how to select the images for the slideshow:

> To create and play a slideshow . . .1. Select a set of images by doing one of the following: . . . Select an item in the Library inspector. . . . Select individual images or image stacks in the Browser. . . .

*Id.* at 830. Step 2 is "Choose File > Play Slideshow (or press Shift-S)." *Id.* Step 3 is "Choose a preset." *Id.* Step 4 is "Click Start"—i.e., start the slideshow. *Id.* at 831.

Patent Owner argues that the term "responsive to" means that there are no intervening actions between the input and the slideshow display. Sur-reply 21. Under this interpretation, Patent Owner argues that A3UM's slideshow does not meet the limitation because selecting an image in the Browser (Step 1) does not start the slideshow. *Id.* at 20–21 (citing Ex. 2025 ¶¶ 222–223).

We agree that, at least, steps 2 ("Choose File > Play Slideshow") and 3 ("Choose a preset") are intervening steps between selection (Step 1) and the actual presentation of the slideshow itself. *See* Ex. 1005, 830. Even so, we disagree with Patent Owner's argument that "responsive to" excludes any events between the cause and the effect. In particular, the proper construction of "responsive to" in claim 1 does not exclude A3UM's method simply because there are other steps in the chain of causation, e.g., "Click Start" in Step 4. Ex. 1005, 830–831.

63

The plain and ordinary meaning of "responsive to . . . causing" that is found in Patent Owner's Response, as opposed to its Sur-reply, is largely consistent with this view. *See* PO Resp. 8–12, 15–16. In particular, Patent Owner argues, "The plain and ordinary meaning of the phrase 'responsive to . . . causing' requires a causal relationship between the cause . . . and the effect . . . ." PO Resp. 8. Patent Owner argues that the surrounding claim language confirms this construction. *Id.* at 9–10. Patent Owner argues that the Board and numerous courts have likewise understood the phrase to require a cause-effect relationship. *Id.* at 10–11. Patent Owner also introduces dictionary definitions in support of its argument about "a cause-effect relationship." *Id.* at 11–12.

None of this evidence suggests that the cause-effect relationship excludes intervening events. *Id.* at 8–12. For example, Patent Owner illustrates its construction from its Response by analogy:

> The word "responsive" is defined by dictionaries as "saying or doing something as a reaction to something or someone" and "constituting a response or made in response to something." Ex. 2028; Ex. 2029; Ex. 2025, ¶¶129-30. To illustrate its meaning, the Webster's Third New International Dictionary uses "responsive" in the following example: "prairie fires sprang up [responsive] to the drought." Ex. 2029; Ex. 2025, ¶130. This confirms that the plain meaning of "responsive to" defines a cause-effect relationship where in the dictionary example, the drought is the "cause" and prairie fires are the "effect."

*Id.* at 11–12. Notably, Patent Owner's prairie-fire example contemplates a causal event (drought) that triggers a sequence of events culminating in the effect (fires). *Id.*

Nor do the examples in the '020 patent's written description preclude intervening events. Patent Owner identifies Figure 17's embodiment in which "the user can click on the digital file to start a slideshow feature." PO

64

PGR2022-00006
Patent 11,017,020 B2

Resp. 15 (citing Ex. 1001, 7:15–18, Ex. 2025 ¶ 136). But the patent
describes other ways to start a slideshow. For example, the user can select a
digital file in any Application View, and then use the Slideshow View's
features to start the slideshow. Ex. 1001, 21:58–62, 22:1–25, *cited in*
Reply 1–2. In this example, the user selects file in one view, and must also
interact with another view. *See id.* at 21:58–62, 22:1–25. And, similar to
A3UM's start button, the user starts the slideshow by clicking the "play
sign." *Id.* at 22:14–20.

 Patent Owner argues that this alternative embodiment does not
"outweigh" the claim language. Sur-reply 9–10 (citing *Tip. Sys., LLC v.
Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008)).

 But we disagree that the claim language is inconsistent with the
embodiments involving the "play sign." *See, e.g.*, Ex. 1001, 22:14–20.
Instead, we agree with Petitioner that "'causing' a specified action (e.g.,
starting a slideshow) may be 'responsive to an input indicative of a
selection' even if there are intervening events (e.g., display of a new window
and/or user interactions)." Reply 4. That is, in the context of the slideshow
limitation, Patent Owner explains "the plain meaning of 'responsive to'
requires a causal relationship between (i) the input that is indicative of a
selection of the first digital file in the first person view (the cause) and (ii)
the slideshow to be displayed on the interface (the effect)." PO Resp. 15
(citing Ex. 2025 ¶ 135). Likewise, in A3UM, selecting the images for the
slide show (Step 1) is the cause, and the resulting slideshow is the effect.
Pet. 38–40. In this way, Petitioner has shown that A3UM teaches the
slideshow limitation even under Patent Owner's construction from its
Response. *See* PO Resp. 15.

65

PGR2022-00006
Patent 11,017,020 B2

In its Sur-reply, Patent Owner argues that Petitioner's construction conflicts with a purpose of the invention: saving a user significant time and providing significant information with minimal screen space to enhance the user experience. Sur-reply 10 (citing Ex. 1001, 13:19–23; Ex. 2025 ¶ 63). Patent Owner argues that Petitioner's construction is antithetical to these objectives and allows for an infinite number of actions between the relevant input and display. *Id.* But Patent Owner's Sur-reply argument does not address the similarities between the '020 patent's Figure 31 and A3UM's operation. *See id.* That is, if Petitioner's construction conflicts with a purpose of the invention, then Figure 31 would also conflict with the purpose of the invention because it too has intervening events. *Id.* We disagree with Patent Owner argument because it makes no attempt to resolve this tension and does not give sufficient weight to Figure 31. *Id.*

We assign little weight to the testimony of Dr. Surati on this issue for the same reasons that we disagree with Patent Owner's arguments. *See* Ex. 2025 ¶¶ 218–221. In particular, Dr. Surati's Declaration does not give sufficient weight to the embodiment described in Figure 31 of the patent. *See id.*

### ii.     *"in the first person view"*

Under similar reasoning, Patent Owner argues that "choosing File->Play Slideshow or pressing Shift-S" is different from the input recited in the claims. PO Resp. 79 (citing Ex. 2025 ¶¶ 218–220). According to Patent Owner, the claim recites that the input must be "in the first person view," but selecting "File->Play Slideshow requires navigation outside of" the view that Petitioner identified as the first person view. *Id.* (Ex. 2025 ¶ 220; Ex. 2023, 228:14–229:8, 230:4–231:7); *see also* Sur-reply 21–22. Patent Owner similarly argues that the key combination of "Shift-S" is not associated with

66

PGR2022-00006
Patent 11,017,020 B2

any view. PO Resp. 79. Patent Owner argues that, apart from not being in the first person view, "selecting the File or Play slideshow button or Shift-S is not an input indicative of a selection of the first digital file." *Id.* (citing Ex. 2025 ¶ 221).

We disagree with Patent Owner's argument because it does not squarely address Petitioner's rationale. Pet. 40. In particular, Petitioner identifies the user's selection of multiple images as the input. *See id.* at 39 ("A3UM discloses that selecting a thumbnail in the Browser ('*responsive to an input*')"); *see also* Reply 29 ("Both start with a user selecting a set of digital images/files in a 'first person view.'"); 30 ("Starting a slideshow as A3UM describes is responsive to an input indicative of a selection—the user selects images and displays the 'Play Slideshow' window . . . ."). That is, Petitioner's rationale relies on selections made "in the Browser." Pet. 39. And, for the reasons discussed in Section III.D.2.b, Petitioner has shown that A3UM teaches or suggests the recited first person view.

Patent Owner's argument (PO Resp. 79) is also unpersuasive for similar reasons to those discussed in connection with its claim construction arguments. *See supra* III.D.2.d.i. In particular, Patent Owner's argument does not give sufficient weight to the patent's description of Figure 31. Referring to the Slideshow View in Figure 31, the patent describes that the user can start a slideshow by clicking a play button 757, or clicking on a thumbnail 758. *See* Ex. 1001, 22:14–18. Neither of these selections is in the person view. *Id.* Similarly, Petitioner asserts that "[o]nce the user selects a preset and clicks 'Start,' A3UM will cause a 'slideshow,'" not the "File>Play Slideshow" or "Shift-S." *See* Pet. 40. That is, we disagree with Patent Owner's argument because, like the example from Figure 31 of the '020 patent, the claim does preclude intervening events between the image

67

PGR2022-00006
Patent 11,017,020 B2

selection (Step 1) and the slideshow for the reasons discussed above. We do
not credit Dr. Surati's testimony on this issue for the same reasons.
Ex. 2025 ¶¶ 218–221.

In sum, Petitioner has sufficiently shown that A3UM teaches "causing
a slideshow to be displayed on the interface, the slideshow including a
plurality of images associated with the first person," as recited in claim 1,
under A3UM's slideshow-preset method. Pet. 40 (citing Ex. 1003 ¶ 146;
Ex. 1005, 830–831).

Thus, we determine that Petitioner has sufficiently shown that the
subject matter recited in the slideshow limitations would have been obvious.
Because we determine that Petitioner's A3UM's slideshow-preset is
sufficient, we need not address Petitioner's alternative rationale under the
scrolling and shuttle control. *See id.* at 38–40.

### e. Conclusion

Petitioner provides articulated reasoning, supported by rational
underpinnings, why one of ordinary skill in the art would have combined the
cited parts of A3UM, as discussed above. *See KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398, 418 (2007).

We conclude that Petitioner has shown that the subject matter recited
in claim 1 is unpatentable.

### 3. Claim 31

Claim 31 recites limitations similar in scope to those of claim 1,
except that instead of displaying a slideshow, claim 31 recites grouping
digital files based on year, month, and day:

> responsive to receiving a year input, grouping a plurality of
> digital files based on year and causing at least one of the plurality
> of digital files to be displayed on the interface;

68

PGR2022-00006
Patent 11,017,020 B2

> responsive to receiving a month input, grouping the plurality of
> digital files based on month and causing at least one of the
> plurality of digital files to be displayed on the interface; and
>
> responsive to receiving a day input, grouping the plurality of
> digital files based on day and causing at least one of the plurality
> of digital files to be displayed on the interface.

Ex. 1001, 38:13–26.

Petitioner asserts that the subject matter recited in claim 31 is obvious in view of A3UM. *See* Pet. 24–47.

In its arguments, Patent Owner analyzes the limitations of claim 31 together with those of claim 1. *See, e.g.*, PO Resp. 8 (discussing "limitations l[b] and 31[b]"), 12 (discussing "[l]imitations 1[c] and 31[c]"), 16 (discussing the "group image" in claims 1 and 31), 57 (discussing "limitations 1[a] and 31[a]"), 60 (discussing "limitations 1[b] and 31[b]"); Sur-reply 8 (discussing "responsive to . . . causing" recited in claim 31), 13–20 (discussing the "first person view" recited in claim 31).

Our analysis of the subject matter recited in claim 1 that is also recited in claim 31 applies to our assessment of Petitioner's challenge to claim 31. *See supra* §§ III.C (claim construction) & III.D.2 (claim 1). That is, for the reasons described in Sections III.C and III.D.2, we disagree with Patent Owner's arguments that apply to the subject matter recited in both claim 1 and claim 31, and we determine that Petitioner has shown that A3UM teaches or suggests that subject matter. *See id.* Also, for the reasons discussed in connection with claim 1, Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have combined the cited parts of A3UM that relate to the limitations common to both claim 1 and 31. *See KSR*, 550 U.S. at 418.

69

PGR2022-00006
Patent 11,017,020 B2

Patent Owner does not separately address Petitioner's evidence or arguments about the subject matter recited in the limitations to the year-month-day grouping recited only in claim 31. *See generally* PO Resp.; Sur-reply.

From our assessment of the entire record, we determine that Petitioner sufficiently shows that A3UM teaches or suggests the year-month-day grouping limitations recited in claim 31. Petitioner asserts that A3UM's Smart Albums group sets of images by search criteria that includes a date range. Pet. 41–44. Petitioner's assertions are supported by Dr. Terveen's testimony. Ex. 1003 ¶¶ 149–152, 154. The cited parts of A3UM that describe the Smart Albums are consistent with Petitioner's assertions and Dr. Terveen's testimony. *See* Ex. 1005, 472–476, 505–510, *cited in* Pet. 41–44.

In particular, users set the Smart-Album search criteria using the Smart Settings HUD. *Id.* at 508. "The controls in the Smart Settings HUD are nearly identical to the Filter HUD." *Id.* The "Calendar selection criteria" in the Filter HUD allows the user to enter a date range. *Id.* at 475. To find images taken on a specific date, users select the Calendar checkbox along with a date or range of dates. *Id.* at 472–474. As for the recited month, day, and year input, the user enters the date range by selecting the starting and ending year, month, and day. *See id.* 474. We credit Dr. Terveen's testimony on this subject matter, which is consistent with these parts of A3UM. *See* Ex. 1003 ¶¶ 149–152.

Petitioner also sufficiently explains how A3UM groups the images "responsive to receiving" an "input." Pet. 42–43. After filtering, the Browser displays the images that meet the search criteria—i.e., "[t]he images taken on the dates" specified by the user. Ex. 1005, 474; *see also id.* at 505. We

70

PGR2022-00006
Patent 11,017,020 B2

credit Dr. Terveen's testimony about this subject matter. *See*
Ex. 1003 ¶¶ 149–152, 154. Thus, we agree with Petitioner that "A3UM thus
discloses receiving Calendar search criteria in the Smart Settings HUD
which can be used to create groupings of images in the form of Smart
Albums," and in this way, A3UM creates "a first Smart Album responsive to
a first set of date-range inputs and a second Smart Album responsive to a
second set of date-range inputs." Pet. 43–44. Thus, Petitioner has shown
claim 31 is unpatentable under the first rationale. *See id.*

Also, Petitioner has shown claim 31 is unpatentable under an
alternative obviousness rationale. *Id.* at 44–47. In particular, Petitioner
argues that "it would have been obvious to modify A3UM's Browser to
visually 'group' digital files by '[*year/month/day*],' such as visually
grouping the associated thumbnails by date (*i.e.*, day/month/year) in a Smart
Album's Browser in response to a user's '[*year/month/day*] *input*.'" *Id.* at 44
(citing Ex. 1003 ¶¶ 155–160).

We agree that A3UM already discloses sorting images in the Browser
by date. *Id.* Petitioner further argues that it was well known to visually group
user-interface (UI) elements by date. *Id.* (citing Ex. 1003 ¶ 156;
Ex. 1009 ¶¶ 86, 90–91, Figs. 19C–D; Ex. 1059, 8:29–30, 10:50–61, 12:35–
64; Ex. 1060 ¶¶ 208–210, Figs. 42b, 46,). We agree that A3UM groups some
UI elements by date. *See* Ex. 1005, 152 ("In Projects view, choose Group by
Year from the Sorting pop-up menu. The projects are grouped by year."),
*cited in* Pet. 45–46. To the extent that some additional grouping beyond
what A3UM already discloses is required, Petitioner has provided sufficient

71

PGR2022-00006
Patent 11,017,020 B2

evidence that such grouping was known: Arrouye[6] describes grouping files, including images, by date. *See* Ex. 1009 ¶¶ 86, 90–91, Figs. 19C–D. Matsumoto[7] discloses grouping thumbnails by date. *See* Ex. 1059, 8:29–30, 10:50–61, 12:35–64, Fig. 25. And Berger[8] displays groups as a row of images below a date formatted as a day, month, and year. Ex. 1060 ¶¶ 208–210, Figs. 42b, 46. We credit corresponding parts of the Terveen Declaration. Ex. 1003 ¶ 156.

Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have grouped the digital files in a Smart Album by date "by visually grouping the associated thumbnails once they are sorted in the Browser." Pet. 46 (citing Ex. 1003 ¶ 158). Specifically, Petitioner sufficiently explains why there would have been a reasonable expectation of success, and why a person of ordinary skill in the art would have been motivated to make this modification. *Id.* at 46–47 (citing Ex. 1003 ¶¶ 158–160; Ex. 1005, 214, 218; Ex. 1009 ¶ 86). Thus, Petitioner has shown claim 31 is unpatentable under the second rationale. *See id.*

In sum, we are persuaded that Petitioner has demonstrated that claim 31 is unpatentable for the reasons discussed in Section III.D.2, analyzing claim 1, and from our assessment of the arguments and evidence specific to claim 31 discussed in this section.

---

[6] Exhibit 1009 is US Patent Application Publication No. 2010/0257178 A1 to Arrouye (published October 7, 2010).

[7] Exhibit 1059 is US Patent 6,590,608 B2 to Matsumoto (published July 8, 2003).

[8] Exhibit 1060 is US Patent Application Publication No. 2012/0210200 A1 to Berger (published August 16, 2012).

72

PGR2022-00006
Patent 11,017,020 B2

*4.     Claims 2 and 34*

Claim 2 recites, "The method of claim 1, wherein the first indication is associated with a first set of digital files and the first location, and the second indication is associated with a second set of digital files and the second location." Claim 34 recites the same limitations, but depends from claim 31. *See* Ex. 1002, 578 (changing the dependency from claim 30 to 31 via a Certificate of Correction issued on May 25, 2021).

Petitioner asserts that A3UM discloses this limitation. Pet. 47–48. A screenshot of A3UM's interface is shown below. Ex. 1005, 436–438.



The interface shows a map with locations marked with red pins, a selected location marked with a pin in orange, and a browser below the map showing images shot in the selected location. *Id.*

73

Petitioner asserts that, when A3UM's user selects a red pin, the interface focuses on that information for that location. Pet. 47. According to Petitioner, "the 'selected pin turns orange, and the image or images associated with the location marked by the orange pin are selected in the Browser' and displayed." *Id.* at 47–48 (citing Ex. 1005, 436–437; Ex. 1003 ¶ 163). As for how the recited first and second indication are associated with the first and second set of digital files and the first and second locations, Petitioner asserts that "[e]ach location pin is associated with a different location and thus a different set of '[i]mages shot in the selected location.'" *Id.* at 48 (citing Ex. 1005, 437; Ex. 1003 ¶ 163).

Patent Owner does not substantively address Petitioner's arguments and evidence about claim 2. *See generally* PO Resp.; Sur-reply.

From the totality of the evidence, we determine that Petitioner has shown by a preponderance of the evidence that A3UM teaches or suggests the subject matter recited in claims 2 and 34.

### 5.    *Claims 3 and 35*

Claim 3 recites, "The method of claim 2, wherein the first set of digital files and the second set of digital files are associated with the first person." Claim 35 recites similar limitations.

Petitioner asserts that A3UM's Places view has "location information for images across the entire Aperture Library," not just files associated with the first person. Pet. 49 (citing Ex. 1005, 81; Ex. 1003 ¶ 167).

According to the Petition, "It would have been obvious to a skilled artisan in 2010 to modify A3UM so that the Places toolbar button (a *"first map image"* and also part of the *"first person view"*) could be selected to display the photos of the selected person in the Places view (*"wherein the first set of digital files and the second set of digital files are associated with*

74

PGR2022-00006
Patent 11,017,020 B2

*the first person")." Id.* (citing Ex. 1003 ¶ 167). That is, Petitioner proposes "using the Places toolbar button to display maps that display locations for only a subset of the user's library." *Id.* (citing Ex. 1003 ¶¶ 168; Ex. 1005, 81, 428, 436).

Petitioner argues that A3UM supports this modification. *Id.* at 49–50. In particular, Petitioner asserts that A3UM's a user can "select an item in the Library inspector, then click the Places button in the toolbar" to show the location information for images in a specific Library-inspector item: Projects, folders, albums, and Smart Albums. *Id.* at 49 (citing Ex. 1005, 81, 436). Petitioner asserts that "Smart Albums" are albums defined by search criteria. *Id.* (citing Ex. 1005, 113, 116–118, 506–507). Petitioner asserts that "It was also well-known by early 2010 to filter map-based image interfaces to specific groupings of images, such as was disclosed by Flickr." *Id.* at 50 (citing Ex. 1033, 2; Ex. 1003 ¶ 169).

In Petitioner's view, "A skilled artisan would have been motivated to make this modification to improve the user experience and to allow exploring the locations of pictures of a given person." *Id.* (citing Ex. 1003 ¶¶ 170–171; Ex. 1033, 2). Petitioner argues that A3UM discloses several grouping-specific Places views, and person-specific Smart Albums. *Id.* (citing Ex. 1005, 81, 116–118, 428, 436, 506–507; Ex. 1003 ¶ 170). Petitioner asserts that the proposed modification "would simply extend A3UM's grouping-specific Places maps to one additional grouping," which "would provide a more focused Places view that displays only images from a given set of images, *e.g.*, images of one specific person." *Id.* (citing Ex. 1003 ¶¶ 170–171).

In Patent Owner's view, Petitioner's modification would cause different results when the user selects the Places toolbar without providing

75

PGR2022-00006
Patent 11,017,020 B2

sufficient context to the user because clicking on A3UM's Places toolbar
button normally shows all locations for the entire album. PO Resp. 85–86;
Sur-reply 23. According to Patent Owner, "Petitioner's proposed
modification would render the interface unpredictable and more difficult to
use given that the inconsistent function of the Places toolbar button," which
is contrary to the *Apple HI Guidelines*. PO Resp. 86–87 (citing Ex. 2021, 35,
51; Ex. 2023, 35:14–38:1, 40:4–43:20, 46:11–47:9; Ex. 2025 ¶ 241). Patent
Owner also argues that the textbook *The Essential Guide to User Interface
Design* (Ex. 2022) states that "[t]he same action should always yield the
same result" and "[t]he function of elements should not change." *Id.* at 87
(citing Ex. 2022, 48; Ex. 2025 ¶ 242). Patent Owner points to other passages
that emphasize consistency and uniformity in design. *Id.* In Patent Owner's
view, "A POSITA would have followed this guidance, and would not have
made the modification proposed by Petitioner because it would lead to
inconsistent behavior of the Places button in the toolbar." *Id.* (citing Ex.
2025 ¶¶ 239–242).

    We disagree with Patent Owner's arguments because they
mischaracterize Petitioner's rationale. Petitioner is proposing to select a
subset of images—those associated with a selected person—before clicking
on the Places toolbar button. Pet. 49–50. Petitioner is not proposing to
repurpose the Places toolbar button. Rather, under Petitioner's proposed
combination, selecting the Places toolbar button would still display the
selected images on the Places map. *Id.* Thus, we disagree with Patent
Owner's argument. *See* PO Resp. 85–87; Sur-reply 23. For the same reasons,
we assign little weight to Dr. Surati's testimony about this issue. Ex. 2025
¶¶ 239–242.

76

PGR2022-00006
Patent 11,017,020 B2

We also disagree with Patent Owner's argument that "Petitioner proposes modifying its behavior for one situation to show less than all locations for the album without context to inform the user of this difference." Sur-reply 23; *see also* PO Resp. 86–87. Under Petitioner's proposed combination, the user selects a subset of images before clicking on the Places toolbar button. Pet. 49–50. In this case, there would be no need to inform the user about the difference because the user's selection indicates their intention to view only a subset of images. *See id.*

We also agree with Petitioner that Patent Owner and Dr. Surati misquote and mischaracterize the *Apple HI Guidelines*. PO Resp. 86–87. In particular, the part relied upon by Patent Owner states, "A toolbar can also contain icons that represent *recognizable interface elements from elsewhere in the system* (such as the Colors window icon or the iDisk icon) . . . ." Ex. 2021, 152 (emphasis added). Here, the guidance does not apply to all icons, as Patent Owner's argument suggests. Instead, the guidance here applies to a particular subset—icons that are "recognizable" and "elsewhere." PO Resp. 86. Other recognizable icons found elsewhere include the standard MacOS X icons: "the Numbers toolbar [that] contains the Colors window and Fonts window icons, which are *standard icons used throughout* Mac OS X." Ex. 2021, 153 (emphasis added). The *Guidelines* then state that clicking on these toolbar icons behave "just as users would expect." *Id.* Likewise, the *Guidelines* state that "[u]sers expect *such icons* to mean the same thing in every context." *Id.* at 152–153. Here, "such icons" refers to icons that are recognizable and found elsewhere—e.g., the "iDisk icon." *Id.*

Petitioner is not proposing to repurpose the Places icon, let alone recognizable interface elements from elsewhere in the system. Pet. 49–50.

PGR2022-00006
Patent 11,017,020 B2

Under Petitioner's proposed combination, selecting the Places toolbar button would still display the selected images on the Places map. *See id.* Even if Petitioner were to propose changing the Places icon, which we disagree is the case, there is insufficient evidence to conclude that the Places icon is used elsewhere in the system for a different purpose. *Id.* Thus, we disagree with Patent Owner's argument about the *Apple HI Guidelines* (PO Resp. 86–87) and assign little weight to Dr. Surati's corresponding testimony about the *Guidelines* specifically and consistent behavior generally (Ex. 2025 ¶¶ 239–242).

From the totality of the evidence, we determine that Petitioner has shown by a preponderance of the evidence that A3UM teaches or suggests the subject matter recited in claims 3 and 35.

### 6.    *Claims 11 and 43*

Claim 11 recites, "The method of claim 1, wherein the first person view includes a first group image, and responsive to an input that is indicative of a selection of the first group image, causing a first group view to be displayed on the interface, the first group view including one or more digital files associated with another person that is associated with the first person." Ex. 1001, 36:14–19. Claim 43 recites a similar limitation. *Id.* at 39:1–6.[9]

Petitioner asserts that A3UM's "Smart Albums are displayed as selectable user interface elements including an icon ('*first group image*')."

---

[9] In the certificate of correction dated May 25, 2021, the word "croup" at column 39, line 5 was deleted and "group" was inserted.

78

PGR2022-00006
Patent 11,017,020 B2

Pet. 59–60.[10] A screenshot of A3UM's user interface is shown below. *Id.* at 60.



The screenshot above shows an interface element for entering a name for the Smart Album, a Smart Settings HUD button, and a purple icon next to the Smart Album name. *Id.* Petitioner explains that "A3UM's interface as a whole when displaying the Faces browser (the 'first person view') would also display the Library inspector pane." *Id.*

As discussed in Section III.C.2, a "group image" is "an interface element associated with a group of images." We agree with Petitioner that the icon is an interface element because it appears in the A3UM interface. Pet. 59–60.

We also agree that it is "associated with a group of images." Specifically, Petitioner has shown that users can create a Smart Album

---

[10] In the Reply, Petitioner states that "[t]he Petition showed A3UM teaching use of a visual element containing a folder icon plus a unique string of text for a 'smart folder.'" Reply 35. Patent Owner argues that including the unique string of text is a new rationale. Sur-reply 25–26. It is undisputed, though, that Petitioner relied on the icon in the analysis in the Petition. The rationale in the Petition, without relying on anything from the Reply, is sufficient to teach or suggest the first group image for the reasons discussed in this section.

79

PGR2022-00006
Patent 11,017,020 B2

including at least two people because "[u]sers can repeatedly add 'additional person[s]' to the definition of the Smart Album." *Id.* at 60–61 (citing Ex. 1005, 428; Ex. 1003 ¶¶ 207–208). A Smart Album can be used to collect photos of particular people—e.g., family members. Ex. 1005, 428, *cited in* Pet. 60. User's configure a Smart Album by entering the name of the person they want to include or dragging a person's snapshot in the Faces view to the Library inspector. *Id.*

As for the recited "input that is indicative of a selection of the first group image," Petitioner asserts, and we agree, that a user can select the Smart Album from the Library inspector. Pet. 61 (citing Ex. 1005, 31, 506–507; Ex. 1003 ¶ 209). For example, A3UM instructs users to "[s]elect a Smart Album to see its contents in the Browser." Ex. 1005, 506.

This passages also supports Petitioner's assertion that the Smart-Album selection causes the Browser and Viewer to display the associated images, which shows that A3UM teaches the recited group view that is displayed as a result. *Id.*

Petitioner has shown that A3UM teaches "the first group view including one or more digital files associated with another person that is associated with the first person." *Id* at 61. In particular, we agree with Petitioner that the user in A3UM selects images that are "displayed in the Viewer, [Ex. 1005, 51], meaning that a user that selects such a Smart Album will then be able to display images that contain one or both of the people selected when defining the Smart Album." *Id.*

Our analysis would be the same even if we construed group image to be an interface element that is an image associated with a group of people, as in Patent Owner's construction, because Petitioner has shown that A3UM's Smart Albums are at least associated with photos of family members (Ex.

80

PGR2022-00006
Patent 11,017,020 B2

1005, 428) and represented in the interface by an icon, which is an image.
Pet 60.

On these issues, we credit Dr. Terveen's testimony because it is consistent with the cited passages of A3UM. Ex. 1003 ¶¶ 207–208.

We disagree with Patent Owner that "[t]he Smart Album icon is not a 'first group image' – it is a generic, default icon used for every Smart Album regardless of its content." PO Resp. 94 (citing Ex. 1005, 506; Ex. 2025 ¶¶ 276; Ex. 2024: 285:4–11). Patent Owner argues that the Smart-Album icon's "content has no connection whatsoever to any group that is displayed responsive to select in the icon." *Id.* at 94–95 (citing Ex. 2025 ¶¶ 276–78).

We disagree with Patent Owner's construction for the reasons discussed in Section III.C.2 on the correct construction of "group image."

But, even under Patent Owner's construction, it is unclear why the recited "first group image" could not encompass such a default icon. Patent Owner's construction only requires that the content of the "first group image" must be associated with a group of people. *Id.* As discussed in Section III.C.2, the claim already recites an association. Patent Owner has not pointed to anything in the patent's written description or elsewhere in the record that requires, for example, the "group image" to be an image that depicts a specific group of people. Rather, we agree with Petitioner that both the claims and the patent's written description better support the position that the group image serves as an interface element that is selectable.

We assign little weight to Dr. Surati's testimony about claims 11 and 43 because it is based on Patent Owner's incorrect construction and for reasons similar to those discussed in connection with Patent Owner's arguments. *See* Ex. 2025 ¶¶ 276–278.

81

PGR2022-00006
Patent 11,017,020 B2

From the totality of the evidence, we determine that Petitioner has shown by a preponderance of the evidence that A3UM teaches or suggests the subject matter recited in claims 11 and 43.

### 7.    *Claims 13–16 and 45–48*

Claim 13 recites,

> The method of claim 3, further comprising responsive to an input that is indicative of a selection associated with the second person, causing a second person view to be displayed on the interface, the second person view including the second digital file associated with the second person, the second name associated with the second person, and *a second map image*.

Ex. 1001, 36:22–28 (emphasis added). Claim 45 recites a similar limitation.

Petitioner challenge is based on the premise that A3UM treats all faces in the same way:

> A3UM discloses providing the same functionality for each face identified by the system, including showing that person in Faces view, displaying their name within A3UM's overall user interface. EX1003, ¶215; EX1005, 418-420. Because A3UM discloses or renders obvious these features with respect to a "*first person*" (claims 1 and 31), A3UM discloses or renders obvious these features with respect to a "*second person.*" *See* § VII.B.1.b; EX1003, ¶215.

Pet. 62–63. Here, Petitioner refers to Section VII.B.1.b. of the Petition which analyzes the "first person view." *See id.* at 28–36. In the analysis of the first person view, Petitioner asserts that the "first map image" is taught by A3UM's miniature map icons in the Places link in the Library inspector and the Places button in the toolbar. Pet. 30 (citing Ex. 1005, 81, 435). Those icons are reproduced below, as shown in the Petition. Pet. 30 (citing Ex. 1005, 81, 435).

82

PGR2022-00006
Patent 11,017,020 B2



The screenshot above shows the Library inspector pane on the Left, and the "Places" button on the tool bar on the right. *Id.* Although Petitioner asserts the map icon is the recited map image in its challenge to independent claim 1, Petitioner does not discuss "a second map image" in its challenge to dependent claim 13. *Id.* at 62–63.

Patent Owner argues that the Petition does not identify how A3UM teaches a "second map image." PO Resp. 88. Patent Owner argues that, by default, A3UM's interface always displays the Places link in the Library inspector and the Places button in the toolbar. *Id.* (citing Ex. 2025 ¶ 262; Ex. 1005, 6, 64–65). In Patent Owner's view, the first and second map images cannot be the same, and "Petitioner's failure to identify a 'second map image' distinct from the alleged 'first map image' is fatal to its challenges to claims 13 and 45 and their dependent claims." *Id.*

We need not determine whether the recited first and second map images can be the same because the Petition as originally filed lacks any discussion of a second map image or how A3UM teaches or suggests this subject matter. *See* Pet. 62–63. The Petitioner discusses a first and second person, which it interprets as different people. *See id.*; *see also id.* at 26 (identifying "Alice" and "Daniel" as the first and second person). The Petition, though, does not explain how A3UM teaches or suggests different

83

PGR2022-00006
Patent 11,017,020 B2

map images. *Id.* at 62–63. Nor does it explain whether (1) both the first and second map images encompass a single instance of the icon, (2) each of the first and second map images encompass both instances (i.e., in the toolbar and the Library inspector), or (3) one map image corresponds to one instance. *See id.* at 62–63; *see also id.* at 30 (identifying the map icons of the Places button as the first map image).

During his deposition, Dr. Terveen explained that the second map image would be the same feature in the A3UM interface:

> I've been talking about the Place toolbar button as being the map image, satisfying the map image, and I think it would be in this case when we talk about the second map image, it would be the same button that I would be referring to. That's what I – that's the *implication of what I wrote for claim 13.*

Ex. 2024, 288:16–291:19 (emphasis added). But there is little evidence that the Petition even implicitly asserted this. For example, the Petition maps the first and second person to different people shown in A3UM. *Id.* at 26 (identifying "Alice" and "Daniel" as the first and second person). During his deposition, Dr. Terveen's confirmed that the terms "first" and "second" understood to refer to different things in the analysis of other claimed features. *See, e.g.*, Ex. 2024, 286:21–288:5. So the Petition does not consistently use the terms "first" and "second" to be the same thing throughout its challenges such that we could even infer that it believed the first and second map images were the same. *See id.*

In sum, the Petition is completely silent—or at best unclear—about what Petitioner regards as the first and second map images in its challenges to claim 13 and 45.

For the first time, in its Reply, Petitioner suggests that the second map image could be mapped to the same feature in A3UM as the first map image.

84

PGR2022-00006
Patent 11,017,020 B2

Reply 4–5 (proposing a construction for first and second map image), 35. But even this is unclear. For example, Petitioner explains that "Patentee's response on these claims presumes that the first/second map image cannot be the same image, and that visual aspects of the first and second map have patentable significance," but "[n]either is true." *Id.* at 35. Yet, even assuming—without deciding—that it is possible that the first and second map images cover the same feature in A3UM, there is no indication in the Petition that this interpretation is the basis for the challenge. Pet. 62–63.

"[A]n IPR petitioner may not raise in reply 'an entirely new rationale' for why a claim would have been obvious." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1331–32 (Fed. Cir. 2019). Rather, Petitioner is required to "identif[y], in writing and with particularity . . . the grounds on which the challenge to each claim is based" in the petition. 35 U.S.C. § 312(a)(3). Thus, to the extent that Petitioner argues in the Reply that the first and second map image correspond to the same icon for the Places button, then it would be an entirely new rationale that has no basis in the Petition as originally filed. *See* Reply 4–5, 35.

Still, there are multiple possible mappings to the features of A3UM even if we adopt Petitioner's construction in the Reply. *See id.* at 5 ("If a construction of '[first/second] map image' is necessary, it is 'the map image in the [first/second] person' view.'"). For instance, both the first and second map images could be a single instance of the icon, each of the first and second map images could be both the icon in the toolbar and the Library inspector, or one map image corresponds to only one instance. So even under this new rationale, the basis for Petitioner's challenge is remains unclear. *Id.*

85

PGR2022-00006
Patent 11,017,020 B2

Thus, Petition has not shown that claims 13 and 45 are unpatentable. Nor has Petitioner shown that claims 14, 15, 16, 46, 47, and 48 are unpatentable because those claims incorporate the first and second map image subject matter through a dependency from either claim 13 or 45.

### 8.    *Claim 24*

Claim 24 recites, "The method of claim 3, wherein the first set of digital files includes a photo, a video, and an audio file." Ex. 1001, 37:25–26. Claim 24 depends from claim 3, which inherits the limitations of claims 1 and 2. *Id.* at 37:25, 35:17–52 (claims 1–3). Claims 1, 2, and 3 recite that the first set of digital files are "associated with the first person" (claim 3) and "associated with" the "first indication" (claim 2) on the "interactive geographic map" (claim 1). *Id.* at 35:36 (claim 1), 35:46–47 (claim 2), 35:50–52 (claim 3).

To address claim 1, Petitioner's challenge relies on A3UM's Faces view in combination with other views. *See supra* § III.D.2. To address claim 3, Petitioner proposes modifying that combination by adding a Places toolbar button that, when selected, displays the photos of a person in the Places view. Pet. 49 (citing Ex. 1003 ¶ 167); *see supra* § III.D.5. That is, under this combination, the Places toolbar button displays maps with locations for only a subset of the user's library. *Id.* (citing Ex. 1003 ¶ 168; Ex. 1005, 81, 428, 436); *see supra* § III.D.5.

To address claim 24, Petitioner's challenge discusses both the Places and Faces views. As for the Places view, Petitioner asserts that it would have been obvious to geotag videos to link them to geographic locations via metadata. Pet. 77–81. As for the Faces view, Petitioner asserts that it would have been obvious to modify A3UM to detect faces in video to allow videos to be associated with faces in the same way as photos. *Id.* at 83–84.

86

PGR2022-00006
Patent 11,017,020 B2

In this obviousness analysis, Petitioner provides articulated reasoning, supported by rational underpinnings, why one of ordinary skill in the art would have made the proposed combination. *See KSR*, 550 U.S. at 418. Our reasoning follows.

### a.    *Faces View*

In Petitioner's view, A3UM already has extensive support for videos: the Browser displays videos in-line with photos, and users can interact with videos as if they were images, until they press "play" on the video. Pet. 83–84 (citing Ex. 1005, 51, 157, 166, 185, 250–251, 271, 413, 793; Ex. 1003 ¶¶ 282–283). Petitioner asserts that "detecting faces in videos was well known, including by extracting keyframes and identifying faces in them." *Id.* at 84 (citing Ex. 1003 ¶ 283; Ex. 1049 ¶¶ 14–19, 51–53, Fig. 3; Ex. 1050, 1:6–15, 2:17–27, Fig. 1A). According to the Petition,

> Allowing support for videos in Faces view would involve at most detecting faces in the representative image of the video, such as the woman's face shown above. . . . A user would have been motivated to detect faces in either the video still frame or the video itself and associate them with people in Faces view to expand the set of media made easily accessible through Faces view, which would have been an predictable arrangement of old techniques.

*Id.* at 84 (citing Ex. 1003 ¶¶ 283–284; Ex. 1005, 23, 28–29).

Patent Owner argues that "Petitioner's references do not support its contention as [Kim[11] (Ex. 1049)] seemingly describes the opposite order (detecting faces in every frame then determining keyframes) and [Casillas[12] (Ex. 1050)] does not mention keyframes at all." PO Resp. 99 (citing Ex. 2025 ¶¶ 299–230).

---

[11] US Pub. No. 2007/0030391 A1 to Kim et al.
[12] US Patent No. 7,978,936 B1 to Casillas et al.

87

PGR2022-00006
Patent 11,017,020 B2

Yet neither Petitioner's obviousness rationale nor Dr. Terveen's testimony is limited to a particular technique or order of operations. Instead, the Petition and corresponding parts of the Terveen Declaration are based on a broader point: The technique of detecting faces from a subset of video frames was known. *See* Pet. 83–84. In particular, Petitioner relies on Dr. Terveen's testimony that it was known to detect faces in "still frames," "representative images," or "keyframes." Ex. 1003 ¶¶ 282–283. Here, "still frames, "representative images," and "keyframes" are all subsets of the entire video sequence. *Id.* Kim and Casillas both adequately support the Petitioner's reasoning about detecting faces in a subset of frames. Pet. 83–84.

Kim's videos are a sequence of frames. *See* Ex. 1049 ¶¶ 14–19, 51–53. To identify a subset of frames belonging to a scene, Kim's pre-processing unit detects scene changes. Ex. 1049 ¶ 14. To obtain a number of main characters, a face-detection unit detects faces in the frames belonging to each scene. *Id.* In this way, the face-detection unit does not operate on the entire video sequence. *See id.*; *see also id.* ¶ 53. Because Kim describes processing frames selected to represent a scene, it is consistent with Dr. Terveen's testimony about processing representative frames. Ex. 1003 ¶ 283. Thus, we credit Dr. Terveen on this issue. *See id.*

Patent Owner's argument about Casillas is also unavailing. PO resp. 99. Casillas supports Dr. Terveen's testimony and Petitioner's assertion about detecting faces in single images. *See* Ex. 1003 ¶¶ 283–284; Pet. 84 (citing Ex. 1050, 1:6–15, 2:17–27, Fig. 1A). Petitioner relies on Casillas's Figure 1A, reproduced below. Ex. 1050, Fig. 1A, *cited in* Pet. 84.

88

PGR2022-00006
Patent 11,017,020 B2



Figure 1A above shows image 100 "including objects resulting from a detection process." *Id.* at 2:17–18, *cited in* Pet. 84. "[I]mage 100 may be a frame of video." *Id.* at 2:26–27, *cited in* Pet. 84. Likewise, Dr. Terveen explained that detecting faces in video was known, and a user would have been motivated to detect faces in a still frame of video. Ex. 1003 ¶¶ 283–284. Because his testimony is supported by Casillas's description of image 100, we credit Dr. Terveen's testimony on this point. *See id.*

Patent owner argues that "Petitioner has not demonstrated that a POSITA would have a reasonable expectation of success in modifying A3UM to include facial recognition for videos." PO Resp. 99 (citing Pet. 83–84; Ex. 2025 ¶ 297). According to Patent Owner, the "A3UM's facial recognition was not even successful for still images, let alone videos." *Id.* (citing Ex. 1044; Ex. 1045; Ex. 2025 ¶¶ 298–301). According Dr. Surati, "the documented problems for still images would be just as bad for videos, but with the added problem that analyzing video frames would

89

PGR2022-00006
Patent 11,017,020 B2

require more computational resources." *Id.* at 100; Ex. 2025 ¶¶ 300–302; *see also* Sur-reply 26–27 (discussing performance and processor burden). Patent Owner argues that, in view of these problems, one of ordinary skill would "would not have been motivated to further extend that unreliable functionality to videos." PO Resp. 100 (citing Ex. 2025 ¶¶ 292–297); Sur-reply 27.

      We disagree with Patent Owner's arguments because "the expectation of success need only be reasonable, not absolute." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364, 1367–68 (Fed. Cir. 2007). That is, even considering all Patent Owner's evidence and arguments, Patent Owner has at most shown that the Faces feature did not always detect faces in images or video. PO Resp. 99–100; Sur-reply 26–28. Petitioner, though, is not required to show "absolute predictability of success." *See OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019); *see also Acorda Therapeutics, Inc. v. Roxane Lab., Inc.*, 903 F.3d 1310, 1333 (Fed. Cir. 2018) ("This court has long rejected a requirement of '[c]onclusive proof of efficacy' for obviousness.").

      For similar reasons, we disagree that Aperture's software license agreement supports Patent Owner's view. PO Resp. 99–100 (citing Ex. 2007, 1; Ex. 2025 ¶ 302). Patent Owner argues that the "agreement requires users to acknowledge that 'results from the use of the Faces feature may vary.'" *Id.* This part of the agreement, though, provides scant additional information about why or under what specific conditions. *Id.* So it is unclear how this part of the agreement is relevant to Petitioner's proposed combination or the specific techniques described in the evidence that Petitioner cites to support it. *See* Exs. 1049, 1050. At best, the license agreement suggests that the Faces feature may not perform with absolute

90

Case: 23-2361     Document: 30     Page: 150     Filed: 04/15/2024

PGR2022-00006
Patent 11,017,020 B2

success, which Petitioner is not required to show. *See Pfizer*, 480 F.3d at 1364, 1367–68.

In fact, Patent Owner's evidence about users that were purportedly dissatisfied with the performance of Aperture's face detection tends to favor Petitioner's obviousness rationale. PO Resp. 99 (citing Ex. 1044; Ex. 1045; Ex. 2025 ¶¶ 298–301). "A 'court must ask whether the [claimed] improvement is more than the predictable use'—a 'predictable variation'—'of prior art elements according to their established functions,' considering whether more is involved than 'the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art *ready for the improvement*.'" *See KSR*, 550 U.S. at 417 (emphasis added). "[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.*

Here, even if we accept that at least some users were dissatisfied with Aperture's performance, it would tend to show that Petitioner's combination is nothing more than applying a known face-detection technique, such as those disclosed in Kim and Casillas, to a known method that is ready for an improvement. Pet. 84. We disagree with Patent Owner's argument that one of ordinary skill would be discouraged from exploring other, better ways to detect faces. PO Resp. 100. Rather, Patent Owner's evidence, if accepted, tends to show that other more capable methods might satisfy a recognized need to improve Aperture's face-detection feature. Indeed, Petitioner provides evidence that other known face-detection methods had even greater capabilities—such as the ability to successfully detect faces both images and video. *See, e.g.*, Pet. 84 (citing Exs. 1049, 1050); Ex. 1003 ¶ 284.

91

PGR2022-00006
Patent 11,017,020 B2

We see little support for Dr. Surati's argument that one of ordinary skill would have been discouraged from making this improvement by the increased computational resources that it would require. PO Resp. 100; Ex. 2025 ¶¶ 300–302; *see also* Sur-reply 26–27. This argument does not address Dr. Terveen's testimony that faces could be detected in individual video frames in the same way as single images. Pet. 84; Ex. 1003 ¶¶ 283–284 (discussing detecting faces in a single still image of the video). The Petition's reasoning is supported by Casillas's teaching that image 100 may be a video frame or a single image. Ex. 1050, 2:26–27, *cited in* Pet. 84.

Also, Dr. Surati's testimony (Ex. 2025 ¶¶ 296–302) does not give sufficient weight to Petitioner's evidence that A3UM already supports "videos and displays them in-line with photos in the Browser." Pet. 84 (citing Ex. 1005, 157, 166, 185, 250, 413, 793). In particular, Petitioner has shown that A3UM allows users to interact with videos as if they were images by identifying several examples where Aperture applies the same management and browsing techniques to both video and images. *See id.* at 81–84. For instance, A3UM displays both videos and photos in a Browser and elsewhere. *See, e.g.*, Ex. 1005, 51, 251, 271, *cited in* Pet. 84; *see also* Ex. 1003 ¶¶ 282–283 (discussing this functionality). The examples show that the proposed modification would simply extend existing functionality to an already supported file type—expanding the set of media made easily accessible through Faces view. Pet. 84 (citing Ex. 1003 ¶ 284; Ex. 1005, 28–29). Considering the cited examples in A3UM (*id.* at 81–84), we credit Dr. Terveen's testimony on this issue (Ex. 1003 ¶¶ 282–284) and assign little weight to Dr. Surati's corresponding testimony (Ex. 2025 ¶¶ 296–302).

From the totality of the evidence, Petitioner has shown that it would have been obvious to modify A3UM such that "the first set of digital files

92

PGR2022-00006
Patent 11,017,020 B2

includes a photo, a video, and an audio file," as recited in claim 24.
Although Petitioner has other rationales related to claim 24, we need not
reach them because Petitioner rationale based on modifying A3UM is
sufficient. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984,
990 (Fed. Cir. 2020) (non-precedential) (recognizing that the "Board need
not address issues that are not necessary to the resolution of the
proceeding").

### b.    Places View

First, Petitioner asserts that A3UM teaches applying geotags to videos
and displaying them in the Places view. Pet. 77–79. Second, Petitioner also
asserts that it would have been obvious to do so. *Id.* at 79–81 (citing
Ex. 1043, 1; Ex. 1028 ¶¶ 18, 30, 34; Ex. 1007, 1:25–45, 6:60–64, 5:31–38,
12:5–26, Fig. 11; Ex. 1038, 6; 1037, 17, 31, 37, 38, 47). That is, Petitioner
relies upon two rationales: a first based on an unmodified Places view, and
second involving modifying the Places view to incorporate video.

Apart from the arguments and evidence discussed in Section
§ III.D.8.a that generally apply to claim 24, Patent Owner does not directly
dispute Petitioner's reasoning about A3UM's Projects in connection with
videos in the Places view. *See generally* PO Resp.; Sur-reply.

For the reasons that follow, we are persuaded by Petitioner's
arguments and evidence under both rationales.

As for the first rationale, Petitioner assertion that A3UM's Projects
contain both photos and videos, and applies a geotag to the project, which in
turn, geotags the associated videos and photos. Pet. 77–81 (citing
Ex. 1003 ¶¶ 266–268). Petitioner's assertion is adequately supported by
A3UM. *See id.* In particular, there is abundant evidence that A3UM's
libraries contain both photos and video. *See, e.g.,* Ex. 1005, 157, 166, 185,

93

PGR2022-00006
Patent 11,017,020 B2

250, 413, 793, *cited in* Pet. 78–79. Petitioner identifies an example of a
project in A3UM, the "Sports Profile," that contains both photos and video.
*See* Pet. 77–78 (citing Ex. 1005, 9, 23, 413; Ex. 1003 ¶ 270). A3UM states
that "you can manually enter location information for single photos or *entire
projects.*" Ex. 1005, 30 (emphasis added). This is consistent with Dr.
Terveen's testimony about adding location information to a project and its
associated videos and photos. Ex. 1003 ¶¶ 266–268, 270. Thus, we credit Dr.
Terveen's testimony on this issue. *Id.*

Based on the totality of the arguments and evidence here, Petitioner
has shown that A3UM teaches applying geotags to videos and displaying
them in the Places view. Pet. 77–79.

As for the second rationale based on modifying the Places view, we
also agree that, to the extent that it could be argued that A3UM does not add
geotags to videos, doing so would have been obvious. Pet. 79–81 (citing
Ex. 1043, 1; Ex. 1028 ¶¶ 18, 30, 34; Ex. 1007, 1:25–45, 6:60–64, 5:31–38,
12:5–26, Fig. 11; 1037, 17, 31, 37, 38, 47; Ex. 1038, 6).

Petitioner has shown that A3UM supports the metadata standard
IPTC. *Id.* at 80 (citing Ex. 1037, 17, 47; Ex. 1005, 397–398). In particular,
A3UM has a Metadata view for "IPTC Core," which displays the
information IPTC subject codes, location, city, state/province, country, and
ISO country code. Ex. 1005, 397–398.[13] The IPTC standard supports
embedding geotags in video files, including the "Audio plus Moving Video"
(AVI) format, and using location related metadata codes. Ex. 1037, 17, 31,

---

[13] IPTC stands for International Press Telecommunications Council.
Ex. 1005, 378.

94

PGR2022-00006
Patent 11,017,020 B2

37, 38 (describing the codes); *id* at 47 (describing the file formats).[14] Thus, Petitioner has adequately shown that it would have been obvious to a person of ordinary skill in the art to "enable geotagging of video files" because A3UM supports generic GPS metadata tags and the IPTC codes. Pet. 80 (citing Ex. 1003 ¶ 273; Ex. 1005, 397–398, 1110). We credit the Terveen Declaration on this issue (Ex. 1003 ¶ 273) because it is consistent with A3UM's teachings on IPTC and GPS metadata (Ex. 1005, 397–398, 1110) and the IPTC teachings about codes and file formats (Ex. 1037, 17, 31, 37, 38, 47).

    We have also reviewed the other arguments and evidence and determine that it also supports Petitioner's obviousness rationale. *See* Ex. 1043, 1 (describing the Flickr interface); Ex. 1028 ¶¶ 18, 30, 34 (describing digital images with associated location information, displaying thumbnails on maps); Ex. 1007, 1:25–45, 6:60–64, 5:31–38, 12:5–26, Fig. 11 (describing photos and videos presented on a map); Ex. 1038, 6 (describing metadata about "where . . . the image was taken.").

    Thus, Petitioner has shown that claim 24 is unpatentable as obvious in view of A3UM.

### 9.     Claims 6, 7, 38, and 39

    Because Petitioner has shown that claims 6, 7, 38, and 39 are unpatentable as lacking adequate written-description support (*see infra* § III.D.11), we need not reach the issue of whether those claims are obvious over A3UM. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (holding that a petitioner "is entitled to a final written decision addressing all

---

[14] Exhibit 1037 is Comité International des Télécommunications de Presse, IPTC – NAA Information Interchange Model (4th Ed. Rev. 1 1999).

of the claims it has challenged"); *Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (non-precedential) (recognizing that the "Board need not address issues that are not necessary to the resolution of the proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

10.     *Claims 4, 5, 8–10, 12, 17–23, 25–30, 32, 33, 36, 37, 40–42, 44, and 49–59*

Petitioner argues that the combination of A3UM teaches the recited limitations of dependent claims 4, 5, 8–10, 12, 17–23, 25–30, 32, 33, 36, 37, 40–42, 44, and 49–59. *See* Pet. 51–90.

Patent Owner does not separately address Petitioner's evidence or arguments directed to dependent claims 4, 5, 8–10, 12, 17–23, 25–30, 32, 33, 37, 40–42, 44, and 49–59. *See generally* PO Resp.; Sur-reply. Rather, Patent Owner relies on its arguments against the obviousness rationale based on A3UM.

We have considered Petitioner's evidence and arguments with respect to dependent claims 4, 5, 8–10, 12, 17–23, 25–30, 32, 33, 36, 37, 40–42, 44, and 49–59, as well as the testimonial evidence of Dr. Terveen. Based on the totality of the record, we are persuaded that Petitioner has demonstrated that these claims are unpatentable.

11.     *Written Description: Claims 6, 7, 38, and 39*

Petitioner asserts that claims 6, 7, 38, and 39 are unpatentable as lacking adequate written-description support. Pet. 91–93.

Claim 6 recites, in part, "The method of claim 4, wherein, in the people view, the first name is displayed adjacent to the first digital file associated with the first thumbnail image and the second name is displayed

96

Case: 23-2361     Document: 30     Page: 156     Filed: 04/15/2024

PGR2022-00006
Patent 11,017,020 B2

adjacent to the second thumbnail image." Ex. 1001, 35:59–62. Claim 38

recites similar limitations. *See id.* at 38:47–50. Claim 7 depends from claim

6, and claim 39 depends from claim 38. *Id.* at 35:63–65 (claim 7), 38:51–53

(claim 39).

> Petitioner asserts that claims 6 and 38 require that
>
> the "people view" includes at least the following: (i) "a first thumbnail image associated with a first person," (ii) "a first name associated with the first person," (iii) "a second thumbnail image associated with a second person," (iv) "a second name associated with the second person," and (v) a "first digital file associated with the first person."

Pet. 91. Petitioner argues that the '020 patent lacks written-description

support for a people view with these features. *Id.* at 92 (citing

Ex. 1003 ¶ 315).

Under Petitioner's interpretation, digital files are "plainly distinct"

from thumbnails because claims 6 and 38 recite that "'the first digital file' is

'associated with the first thumbnail image.'" *Id.* (emphasis omitted).

Petitioner argues that Figures 6 and 32 of the '020 patent show people

views. *Id.* But neither figure shows a view that displays a thumbnail and a

first digital file associated with both the first person and the first thumbnail

image. *Id.* (citing Ex. 1003 ¶ 316). Petitioner argues that, "while Figure 6

discloses duplicate thumbnails in the people view, it does not show any

'digital files' being displayed in the people view with those thumbnails." *Id.*

According to Petitioner, "The absence of any illustration or description of a

'people view' including a 'digital file' associated with both a 'first person'

and the 'first thumbnail image' demonstrates a lack of possession of the

process as it is defined by claims 6-7 and 38-39." *Id.* at 92–93 (citing

Ex. 1003 ¶ 317).

97

Appx97

PGR2022-00006
Patent 11,017,020 B2

 Patent Owner argues that claims 6 and 38 require a "'people view' includes the 'first thumbnail image associated with the first person' and the 'first person view' includes the 'first digital file associated with the first person.'" PO Resp. 101. Patent Owner illustrates this by annotating Figures 6 and 7, shown below.



Ex. 1001, FIGS. 6-7 (annotated)

In annotated Figures 6 and 7 above, the people view (right) has thumbnail images and names, and the first person view (left) has the digital file and a name. *Id.* Patent Owner argues that, although the claim recites "in the people view, the first name is displayed adjacent to the *first digital file* associated with the *first thumbnail image*," it should be interpreted as "in the people view, the first name is displayed adjacent to the *first thumbnail image* associated with the *first digital file*." PO Resp. 101–103. In other words, "the first digital file" and "the first thumbnail image" should be switched in the claim.

 Patent Owner explains that "the wording was inadvertently transposed." *Id.* at 102–103. In Patent Owner's view, "[w]hile the words in the claim appear to be inadvertently transposed, that does not mean the

98

PGR2022-00006
Patent 11,017,020 B2

Board cannot adopt an interpretation consistent with how a POSITA would read the claim." *Id.* at 103. Patent Owner asserts that "[n]othing in the specification or prosecution history suggests that the claims should be interpreted as argued by Petitioner." *Id.* at 104.

In sum, both parties agree that the nothing in the descriptive part of the '020 patent's specification says anything about a people view where "the first name is displayed adjacent to the *first digital file* associated with the *first thumbnail image*." Pet. 92–93; PO Resp. 104. This feature is only recited in claims 6 and 38. That is, the parties argue that (1) we should determine that claims 6 and 38 do not satisfy the written-description requirement of Section 112, as set forth in the Petition, or (2) interpret the claims as covering a different people view—i.e., one where the first name is displayed adjacent to a thumbnail, not the digital file—recognizing that the claim terms were "inadvertently transposed." *See* Pet. 92–93; PO Resp. 104.

The test for written-description sufficiency "is whether the specification 'reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of [the relevant time].'" *In re Glob. IP Holdings LLC*, 927 F.3d 1373, 1376–77 (Fed. Cir. 2019) (quoting *Ariad Pharms, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010)) Claims 6 and 38 are original claims. *See* Ex. 1002, 4, 473. "Original claims are part of the original specification and *in many cases* will satisfy the written description requirement." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1297 (Fed. Cir. 2017) (citing *Ariad*, 598 F.3d at 1349) (emphasis added). This is not one of those cases.

The Petition states that "neither Figure 6 nor Figure 32 *nor any other portion of the '020 patent disclosure* describes a 'people view'" with the

99

PGR2022-00006
Patent 11,017,020 B2

recited features. Pet. 92 (citing Ex. 1003 ¶ 316) (emphasis added). This is
undisputed. *See* PO Resp. 102–104.

We decline to adopt Patent Owner's interpretation that we should
switch the "inadvertently transposed" terms "first digital file" and "first
thumbnail image" in the claim so that the claims encompass the disclosed
embodiments. *Id.* at 102–103. The mere fact that the patent discloses an
embodiment "does not outweigh the language of the claim." *Tip. Sys.,* 529
F.3d at 1373. Indeed, "the claims of the patent need not encompass all
disclosed embodiments." *Id.*

Because there is no support for the people view with the recited
feature, Petitioner has shown that claims 6, 7, 38, and 39 are unpatentable
under the written-description requirement of Section 112. Pet. 91–93.

## IV.    MOTION TO EXCLUDE

Patent Owner filed a motion to exclude A3UM (Exhibit 1005). Paper
35 ("Motion" or "Mot."). According to Patent Owner, Petitioner has not
properly authenticated Exhibit 1005 as a true and correct copy of A3UM.
Mot. 1.[15]

Patent Owner acknowledges that its objections were untimely under
37 C.F.R. § 42.64(b). *Id.* Patent Owner, though, "requests the Board waive
the service requirement of 37 C.F.R. § 42.64(b) as Patent Owner's delay did
not prejudice Petitioner." *Id.* Patent Owner argues that "Patent Owner's
request for waiver of Rule 42.62(b) is in 'the interests of justice.'" *Id.*

---

[15] Patent Owner's Motion does not have page numbers. In this Decision, we
refer to the pages in numerical order, excluding the cover page.

100

PGR2022-00006
Patent 11,017,020 B2

Petitioner argues that "Patent Owner failed to timely object to Exhibit 1005, so it has waived its objection." Paper 36 ("Opp") (citing Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012)).

"Any objection to evidence submitted during a preliminary proceeding must be filed within ten business days of the institution of the trial." 37 C.F.R. § 42.64(b)(1). Here, A3UM was submitted with the Petition. The institution of trial was June 10, 2022. Patent Owner's objection to evidence was made on June 28, 2022. Paper 14. Thus, Patent Owner's objection was not filed in time, and thus, it is waived.

The rules are designed to promote fairness and efficiency. Patent Owner argues that we should waive the rules in this case in the interests of justice, but provides no specific reasons for doing so. *See* Mot. Thus, we have no basis for accepting Patent Owner's untimely objection in this case.

Thus, we deny Patent Owner's Motion to Exclude.

## V.     CONCLUSION

Petitioner has shown by a preponderance of the evidence that claims 1–12, 17–44, and 49–59 are unpatentable, but has not shown that claims 13–16 and 45–48 are unpatentable.[16]

---

[16] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding after this decision issues, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

101

PGR2022-00006
Patent 11,017,020 B2

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–59 | 103 | A3UM | 1–5, 8-12, 17–37, 40–44, 49–59 | 13–16, 45–48 |
| 6, 7, 38, 39 | 112 | Written Description | 6, 7, 38, 39 | |
| **Overall Outcome** | | | 1–12, 17–44, 49–59 | 13–16, 45–48 |

102

PGR2022-00006
Patent 11,017,020 B2

## VI.   ORDER

It is

ORDERED that Petitioner has shown that claims 1–12, 17–44, and 49–59 of U.S. Patent 11,017,020 B2 are unpatentable;

FURTHER ORDERED that Petitioner has not shown that claims 13–16 and 45–48 of U.S. Patent 11,017,020 B2 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is denied; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

103

PGR2022-00006
Patent 11,017,020 B2

FOR PETITIONER:

Jeffrey P. Kushan
SIDLEY AUSTIN LLP
jkushan@sidley.com


FOR PATENT OWNER:

Jennifer Hayes
George Dandalides
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com

104

Trials@uspto.gov                                    Paper 43
571-272-7822                          Date: August 3, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

———————————

PGR2022-00006
Patent 11,017,020 B2

———————————

Before LYNNE H. BROWNE, KEVIN C. TROCK, and
JASON M. REPKO, *Administrative Patent Judges.*

REPKO, *Administrative Patent Judge.*


DECISION
Denying Petitioner's Request for Rehearing
*37 C.F.R. § 42.71*

PGR2022-00006
Patent 11,017,020 B2

## I.    INTRODUCTION

Petitioner filed a Request for Rehearing (Paper 42, "Request" or "Reh'g Req.") under 37 C.F.R. § 42.71(d) to seek modification of the Board's Final Decision. Paper 41 ("Decision" or "Dec.").

The Request is denied.

## II.    STANDARD OF REVIEW

The party requesting rehearing has the burden to show that the decision should be modified. 37 C.F.R. § 42.71(d). The request for rehearing "must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, or a reply." *Id.*

## III.    ANALYSIS

Petitioner argues that the Board should grant rehearing because (1) the Board misapprehended or overlooked its rationale why A3UM discloses the "second map image" recited in claims 13 and 45 and (2) its Reply arguments were proper and should have been credited. Reh'g Req. 2–15. We disagree.

### A.    The Petition

Claim 13 recites,

> The method of claim 3, further comprising responsive to an input that is indicative of a selection associated with the second person, causing a second person view to be displayed on the interface, the second person view including the second digital file[1] associated with the second person, the second name associated with the second person, and *a second map image*.

---

[1] Petitioner interprets the phrase "the second digital file" as "*a* second digital file." Pet. 62 n.2.

2

PGR2022-00006
Patent 11,017,020 B2

Ex. 1001, 36:22–28 (emphasis added). Claim 45 recites similar limitations.
*Id.* at 39:9–15.

In the Final Decision, the Board found that Petitioner did not show
that claims 13 and 45 are unpatentable because "the Petition is completely
silent—or at best unclear—about what Petitioner regards as the first and
second map images in its challenges to claim 13 and 45." Dec. 84.

Apart from quoting the claim, the Petition's entire analysis of claims
13 and 45 is the following:

> A3UM discloses providing the same functionality for each
> face identified by the system, including showing that person in
> Faces view, displaying their name within A3UM's overall user
> interface. EX1003, ¶215; EX1005, 418-420. Because A3UM
> discloses or renders obvious these features with respect to a "*first
> person*" (claims 1 and 31), A3UM discloses or renders obvious
> these features with respect to a "*second person.*" *See* § VII.B.1.b;
> EX1003, ¶215.

Pet. 62–63. Notably, this paragraph does not mention or discuss "a second
map image" at all. *Id.*

In its Request, Petitioner argues that the Board overlooked or
misunderstood that it addressed the recited "second map image" by
explaining that "A3UM discloses providing the same functionality for each
face." *See* Reh'g Req. 3, 7, 9 (quoting Pet. 62).

But it is not apparent, and Petitioner does not explain, how or why
"the same functionality for each face" is relevant to the recited "second map
image." *See id.* The phrase "the same functionality for each face" is
followed by a list of functions unrelated to a second map image: "showing
that person in Faces view, displaying their name within A3UM's overall
user interface." Pet. 62. Unlike "showing that person" and "displaying their
name," the "second map image" is not a function. And A3UM's *Places* icon

3

PGR2022-00006
Patent 11,017,020 B2

does not display a face. So it is unclear how it can provide "functionality for each face." *Id.* Thus, the most natural reading of the Petition is that the phrase "same functionality for each face" refers to functions, such as "showing the person" or "displaying their name" (*id.* at 62–63), and "the Petition is completely silent" about the "second map image" (Dec. 84). The Petition offers no explanation why one would regard the "second map image" as part of "the same functionality for each face." *See* Reh'g Req. 3, 7, 9.

Petitioner also argues that the Decision misapprehended or overlooked the relevance of its analysis of claim 1 to claims 13 and 45. *Id.* at 4–9. For example, in the analysis of claim 1, the Petition states that "[e]ach of these icons represent maps and a skilled artisan would consider them to be '*map image[s]*'"—i.e., more than one image. *Id.* (citing Pet 30 (§ VII.B.1.b)). Petitioner argues that the Board's findings regarding the Petition's analysis of claim 1[2] shows that "the same functionality within A3UM meets the 'second map image' within a 'second person view' as claims 13 and 45 specify." *Id.* at 4–7 (citing Dec. 53–55).

We disagree. Claim 1 only recites one map image—i.e., "a first map image." Ex. 1001, 35:17–45. Claim 13, which depends from claim 1, adds "a second map image." *Id.* at 36:22–28. Although the analysis of claim 1 discusses two instances of a map icon, the Petition lacks a sufficient explanation of "whether (1) both the first and second map images encompass a single instance of the [map] icon, (2) each of the first and second map images encompass both instances (i.e., in the toolbar and the Library

---

[2] We agree with Petitioner's understanding of the quoted passage from the Board's analysis on page 55 of the Decision. *See* Request 6 n.1.

4

PGR2022-00006
Patent 11,017,020 B2

inspector), or (3) one map image corresponds to one instance" in the challenge to claim 13. Dec. 84 (citing Pet. 30, 62–63). Petitioner argues that the second interpretation is correct (Reh'g Req. 7), but as we explained in the Decision, there is little evidence to support this (Dec. 84–85). That is, the Board considered Petitioner's analysis of claim 1 in assessing the challenge to claim 13, but it is unclear how that analysis addresses the "second map image" in claim 13. *See id.*

Put simply, the Petition fails to show that claim 13 and 45 are unpatentable because the Petition "lacks any discussion of a second map image or how A3UM teaches or suggests this subject matter." *Id.* at 83 (citing Pet 62–63). As we stated in the Decision, "the Petition is completely silent" on this feature. *Id.* at 84. This is a failure of proof. Even if the Board were to consider claim 1's analysis applicable to claims 13 and 45, there are multiple contradictory interpretations of how the features from A3UM that are relied upon in the analysis of claim 1 can correspond to the subject matter in claims 13 and 45. *See id.* at 82–84. So, even under a reading of the Petition favorable to Petitioner, the challenge to claims 13 and 45 fails. *See id.* at 84 (explaining the Petition is "at best unclear").

B.    *Patent Owner's Response and Petitioner's Reply*

Petitioner argues that "[t]he Board found that the Petition did not set forth with sufficient particularity Apple's rationale why 'the first and second map images cover the same feature in A3UM.'" Reh'g Req. 9 (citing Dec. 84–85). This suggests that the Board relied on the particularity requirement of the statute. The Board, however, found that no such rationale appeared in the Petition, and the Decision cited the statute setting forth the requirements of the Petition to emphasize that Petitioner was required to make its case in

5

PGR2022-00006
Patent 11,017,020 B2

the Petition, not the Reply. Dec. 85 (citing *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1331–32 (Fed. Cir. 2019)); *see also* 35 U.S.C. § 322(a)(3) (setting forth the requirements for a Petition in a post grant review). The Decision stated that "to the extent that Petitioner argues in the Reply that the first and second map image correspond to the same icon for the Places button, then it would be *an entirely new rationale* that has no basis in the Petition as originally filed." *Id.* (emphasis added). The Decision stated that "the Petition is completely silent" about the "second map image." *Id.* at 84.

Petitioner argues that Patent Owner understood that Petitioner's challenge was based on "applying the same displayed element (whether it is the Places toolbar button or Places link) in A3UM as both the first map image and the second map image." Reh'g Req. 10–11 (citing PO Resp. 88–90). Petitioner argues that Patent Owner's arguments and claim construction show that Patent Owner "fully understood the obviousness rationale Apple set forth in the Petition." *Id.*

But Patent Owner relied on the deposition of Petitioner's declarant, Dr. Terveen, to fill in the gaps in the Petition and then proceeded to argue against Dr. Terveen's position in its Response. *See, e.g.*, PO Resp. 88–89; *see also* Dec. 84 (discussing Dr. Terveen's deposition). During his deposition, Dr. Terveen explained that the second map image would be the same feature in the A3UM interface:

> I've been talking about the Places toolbar button as being the map image, satisfying the map image, and I think it would be in this case when we talk about the second map image, it would be the same button that I would be referring to. That's what I – that's the *implication of what I wrote for claim 13.*

6

PGR2022-00006
Patent 11,017,020 B2

Ex. 2024, 288:16–291:19 (emphasis added), *quoted in* Dec. 84. As stated in the Decision, the Board disagreed that Dr. Terveen even implied this in the declaration submitted with the Petition. Dec. 84.

Petitioner further argues that the Board misapprehended or overlooked that Petitioner relied on the second out of the three possible rationales that the Board identified—i.e., each of the first and second map images encompass both instances of A3UM's icon. Reh'g Req. 7. According to Petitioner, the challenge to claim 1 states that "[e]ach of these icons [i.e., the Places Link in the Library inspector and the Places button in the toolbar] represent maps and a skilled artisan would consider them to be 'map image[s].'" *Id.* (citing Pet. 30) (emphasis removed). In Petitioner's view, this means that the "first map image" and the "second map image" correspond to the same feature in A3UM: both instances of the same icon. *See id.*

But Petitioner did not provide any such construction in the Petition. *See* Dec. 85. In fact, this interpretation of "first" and "second" is inconsistent with how the Petition interpreted other terms qualified by "first" and "second." *Id.* at 84. We explained why in the Decision:

> For example, the Petition maps the first and second person to different people shown in A3UM. *Id.* at 26 (identifying "Alice" and "Daniel" as the first and second person). During his deposition, Dr. Terveen[] confirmed that the terms "first" and "second" understood to refer to different things in the analysis of other claimed features. *See, e.g.*, Ex. 2024, 286:21–288:5. So the Petition does not consistently use the terms "first" and "second" to be the same thing throughout its challenges such that we could even infer that it believed the first and second map images were the same. *See id.*

Dec. 84.

Also, Dr. Terveen's answer in the deposition focuses on the icon in the *Places* toolbar button. Ex. 2024, 288:16–291:19. But the Petition's

7

PGR2022-00006
Patent 11,017,020 B2

analysis also identifies another instance of the *Places* icon—the one in the *Library inspector*. *See, e.g.*, Pet. 30; Reh'g Req. 4. The first map image need not be the same thing as the second map image in the rationale found in the Petition because (1) both the first and second map images could encompass a single instance of the *Places* icon, (2) each of the first and second map images could encompass both instances (i.e., in the toolbar and the *Library inspector*), or (3) one map image could correspond to one instance. Dec. 84 (citing Pet. 30, 62–63).

Thus, we disagree that, from the Petition, one would have understood that Petitioner's challenge was based on "applying the same displayed element (whether it is the Places toolbar button or Places link) in A3UM as both the first map image and the second map image." Reh'g Req. 10–11.

We also disagree with Petitioner's characterization that Patent Owner's arguments were entirely based on the claim construction that the first and second images were the same. *See id.* at 9–10, 14–15. For example, in the Response, Patent Owner argues that "the Places link is a static element that is always displayed by default and always causes the same result when selected," and "the Places toolbar button is continuously displayed by default." PO Resp. 88. Patent Owner argues that this is one of the reasons why A3UM's toolbar buttons cannot be the second map image. *Id.* In the Decision, the Board addressed this argument in its analysis of claim 1, but the Board did not need to reach this argument with respect to claim 13 and 45 because Petitioner's analysis did not discuss the "second map image." *See* Dec. 54, 82–86.

In sum, Petitioner's Reply arguments about the "second map image" are improper. Reply 4–5, 35. Petitioner cannot rely on Dr. Terveen's deposition to add a new theory to the proceeding. Ex. 2024, 288:16–291:19,

8

PGR2022-00006
Patent 11,017,020 B2

*discussed in* Dec. 84. Rather, Petitioner was required to make its case in the Petition. *See* 35 U.S.C. § 322(a)(3). Thus, we disagree with Petitioner that the Board misapprehended or overlooked the record and "the legal authority that governs the proper scope of a reply brief." Reh'g Req. 11–15.

Petitioner argues that Patent Owner raised a claim-construction dispute in its Response and Petitioner did not have an opportunity to address it until its Reply. *Id.* at 14. According to Petitioner, "the Board overlooked and/or misapprehended that it needed to resolve the claim construction dispute MemoryWeb raised in its POR in order to resolve the parties dispute over the obviousness ground that Apple had raised in its Petition." *Id.*

Yet only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)). As stated in the Decision, "even assuming—without deciding—that it is possible that the first and second map images cover the same feature in A3UM, there is no indication in the Petition that this interpretation is the basis for the challenge." Dec. 85 (citing Pet. 62–63). There is no need to construe the claims to resolve the dispute because the Petition "lacks any discussion of a second map image or how A3UM teaches or suggests this subject matter." *Id.* at 83 (citing Pet 62–63).

Petitioner argues that "[t]he only argument MemoryWeb presented in this proceeding in response to Apple's obviousness ground for claims 13-16 and 45-48 was its claim construction argument that contends the 'first' and 'second' map images cannot be the same image." Reh'g Req. 15. According to Petitioner, "[b]ecause that claim construction argument is incorrect (see Reply at 4-5, 35), and because it was the only argument MemoryWeb

9

PGR2022-00006
Patent 11,017,020 B2

presented in response to Apple's obviousness ground on claims 13-16 and
45-48, the Board misapprehended and/or overlooked that it should have
found claims 13-16 and 45-48 unpatentable." *Id.*

 We disagree that Patent Owner made a single argument for the
reasons discussed above. *See* PO Resp. 88. But even if Patent Owner had
only made the claim-construction argument, "the petitioner has the burden
from the onset to show with particularity why the patent it challenges is
unpatentable" *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed.
Cir. 2016) (quoting 35 U.S.C. § 312(a) for *inter partes* review); *see* 35
U.S.C. § 322(a) (setting forth the requirements for a petition for post grant
review). The burden of persuasion never shifts to Patent Owner. *Dynamic
Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed.
Cir. 2015). For the reasons discussed in the Decision, Petitioner did not meet
its burden with respect to claims 13–16 and 45–48. *See* Dec. 82–86.


IV. CONCLUSION

 Petitioner has not shown that the Board overlooked or
misapprehended any matter.


V. ORDER

 It is ORDERED that Petitioner's Request for Rehearing is *denied*.


10

PGR2022-00006
Patent 11,017,020 B2

FOR PETITIONER:

Jeffrey P. Kushan
SIDLEY AUSTIN LLP
jkushan@sidley.com

FOR PATENT OWNER:

Jennifer Hayes
George Dandalides
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com

11

Trials@uspto.gov                                              Paper 42
571-272-7822                                        Entered: June 30, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

———————

IPR2022-00032
Patent 9,552,376 B2

———————

Before LYNNE H. BROWNE, NORMAN H. BEAMER, and
JASON M. REPKO, *Administrative Patent Judges.*

REPKO, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision

Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

Dismissing Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*

IPR2022-00032
Patent 9,552,376 B2

# I.     INTRODUCTION

Apple Inc. ("Petitioner") filed a petition requesting *inter partes* review of claims 1–12 of U.S. Patent No. 9,552,376 B2 (Ex. 1001, "the '376 patent"). Paper 1 ("Pet."). On July 8, 2022, we instituted a review of all challenged claims based on all grounds in the Petition. Paper 12 ("Inst. Dec."). Patent Owner filed a Response. Paper 20 ("PO Resp."). Petitioner filed a Reply. Paper 39[1] ("Reply"). Patent Owner filed a Sur-reply. Paper 31 ("Sur-reply"). An oral hearing was held on March 14, 2023. A transcript of that hearing has been entered into the record. Paper 41 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued under 35 U.S.C. § 318(a). For the reasons that follow, Petitioner has not shown by a preponderance of the evidence that claims 1–12 are unpatentable.

## A.     *Related Matters*

Patent Owner identifies the following related matters: *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et al.*, No. 6-21-cv-00411 (W.D. Tex.); *MemoryWeb, LLC v. Apple Inc.*, No. 6-21-cv-00531 (W.D. Tex.); *MyHeritage (USA), Inc. et al. v. MemoryWeb, LLC*, No. 1-21-cv-02666 (N.D. Ill.); IPR2022-00111; PGR2022-00006; IPR2022-00033; IPR2022-00031; IPR2022-00222; and IPR2021-01413. Paper 6, 2–3 ("Patent Owner's Updated Mandatory Notice").

---

[1] As authorized by the Board, Petitioner filed a corrected Reply to change incorrect citations to the deposition transcript of Patent Owner's expert, Dr. Surati. *See* Ex. 3002 (email from the parties, and response from the Board). Patent Owner did not oppose. *Id.*

2

IPR2022-00032
Patent 9,552,376 B2

### B.      The '376 Patent

The '376 patent relates to a platform for managing and using digital files, such as digital photographs. *See* Ex. 1001, 1:14–17. Through the platform's interface, a user can tag and select files to create views. *See id.* at 5:26–35. For example, the "people view" is shown below. *Id.* at 6:20–26, Fig. 6.

**FIG. 6**



The people view, above, shows thumbnail photos of all the people in the system. *Id.* Clicking on the thumbnail causes a "profile view," shown below, to be displayed. *See id.*

3

IPR2022-00032
Patent 9,552,376 B2

**FIG. 7**



The profile view, above, displays a person's image, date of birth, date of death, parents' names, and other biographical information. *Id.* The profile view also displays links to other views containing information about the person: Locations, Timeline, Family Tree, and Recipes. *Id.* at 6:27–49. The Locations view, for example, has an interactive map showing where the digital files were taken. *Id.* at 6:14–19.

<div align="center">

*C.     Claims*

</div>

Of the challenged claims, claims 1, 5, and 12 are independent. Claim 5 is reproduced below.

> 5. A computer-implemented method, comprising:
>
> storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having a content data portion and a metadata portion including tags, the content data including a digital photograph or image or video;

4

IPR2022-00032
Patent 9,552,376 B2

displaying, on a video display device associated with a client device, the digital photograph or image or video of a first of the digital files and overlaying thereon:

(i) a first user selectable element, all of the digital files associated with a person tag being members of a first set of digital files, the first user selectable element having a first boundary with alphanumeric text therein indicating (i) a name of a person corresponding to the person tag and (ii) the number of digital files in the first set of digital files, and

(ii) a second user selectable element, all of the digital files associated with a geotag being members of a second set of digital files, the second user selectable element having a second boundary with alphanumeric text therein indicating (i) a location name corresponding to the geotag and (ii) the number of digital files in the second set of digital files;

responsive to a click or tap of the first user selectable element via a user interface device of the client device, displaying a people view on the video display device, the displaying the people view including displaying (i) the name of the person corresponding to the person tag and (ii) all of the digital photographs or images or videos in the first set of digital files; and

responsive to a click or tap of the second user selectable element via the user interface device of the client device, displaying a location view on the video display device, the displaying the location view including displaying (i) the location name corresponding to the geotag, (ii) all of the digital photographs or images or videos in the second set of digital files, and (iii) a map image indicating geographic coordinates of the geotag.

Ex. 1001, 36:43–37:14.

*D.    References*

| Name | Reference | Exhibit No. |
|------|-----------|-------------|
| A3UM | Aperture 3 User Manual, Apple Inc. (2010) | 1005 |
| Belitz | US 2010/0058212 A1 | 1006 |
| Rasmussen | US 7,620,496 B2 | 1025 |

5

IPR2022-00032
Patent 9,552,376 B2

*E.    Asserted Grounds*

Petitioner asserts that claims 1–12 are unpatentable on the following

ground. Pet. 4.

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–12 | 103[2] | A3UM, Belitz, and Rasmussen |

II.    ANALYSIS

*A.    Status of A3UM as a Printed Publication*

*1.    The Petition*

Petitioner challenges claims 1–12 as obvious over A3UM, Belitz, and

Rasmussen. *See* Pet. 4. A3UM is a user manual for Apple's Aperture 3

product. *Id.* at 14. Aperture 3 is digital-image management software. *Id.* at

13 (citing Ex. 1005, 1–4). Petitioner asserts that A3UM is a "printed

publication that was publicly disseminated in February 2010." *Id.* at 14.

Thus, Petitioner asserts that A3UM is prior art under section 102. *Id.*

According to Petitioner, A3UM was published in two forms: an

HTML file set and a PDF file. *Id.* The challenges in the Petition are based on

the HTML file set. *Id.* (citing Ex. 1005). In this Decision, we refer to those

files as "the A3UM HTML file set."

Petitioner obtained the A3UM HTML file set from an Aperture 3

installation DVD. *See id.* at 15–16. According to Petitioner, "Dr. Terveen

inspected Aperture 3 retail boxes obtained from Apple and from two

independent sources and confirmed that the installation DVD in each was

the same as the version disseminated in February of 2010 (*i.e.*, v.3.0)."

---

[2] Congress amended section 103 when it passed the Leahy-Smith America
Invents Act (AIA). Pub. L. No. 112–29, § 3(c), 125 Stat. 284, 287 (2011).
Petitioner asserts that the claims are unpatentable under either version of
section 103. Pet. 4.

6

IPR2022-00032
Patent 9,552,376 B2

*Id.* at 15 (citing Ex. 1003 ¶¶ 75–85). Dr. Terveen testifies that Exhibit 1005 "is a true and correct copy of the HTML file set both on the Aperture 3 installation DVDs and as copied to computers during Aperture 3's installation." *Id.* at 16 (citing Ex. 1003 ¶¶ 73, 90, 97, 98).

To show that the A3UM HTML file set was publicly disseminated, Petitioner primarily relies on the declaration of Matthew Birdsell. *Id.* at 14. Mr. Birdsell "is an Apple employee with personal knowledge of the publication and dissemination of the Aperture 3 User Manual in early 2010." *Id.* (citing Ex. 1020 ¶¶ 2–4). In February 2010, Mr. Birdsell was an independent contractor for Apple who "personally worked on Apple documentation and publications regarding each version of Aperture throughout its lifespan, including Aperture 3." Ex. 1020 ¶ 2.

*a.    The Locally Stored A3UM HTML File Set*

Mr. Birdsell testifies that the A3UM HTML file set "was included on the installation DVD in retail packages of Aperture 3 that were sold and distributed within the United States in early 2010 and was copied to a computer's local storage during installation of Aperture 3." Pet. 14 (citing Ex. 1020 ¶¶ 12–14).

Petitioner asserts that users can access the locally stored A3UM HTML file set "by selecting 'Help>Aperture Help' from the menu while Aperture was running and clicking 'Aperture 3: User Manual' on the page that appeared." *Id.* at 16 (citing Ex. 1003 ¶¶ 86–90). According to Petitioner, contemporaneous Apple publications explain that the A3UM HTML file set is accessible through internal Aperture's help function. *Id.* (citing Ex. 1051, 7, 159; Ex. 1003 ¶ 99). Patent Owner does not dispute this. *See generally* PO Resp.; Sur-reply. We determine that Petitioner's assertion (Pet. 16) and Dr. Terveen's testimony (Ex. 1003 ¶¶ 86–90, 99) is sufficiently supported by the

7

evidence of record. *See* Ex. 1020 ¶ 12(b); Ex. 1051, 7 ("Open Aperture, then choose Help > Aperture Help. Then click the link to the user manual"), 159 (providing a similar explanation). Thus, we credit Dr. Terveen's testimony on this issue. *See* Ex. 1003 ¶¶ 86–90, 99.

In addition to the internal help function, Petitioner asserts that "[s]killed artisans could obtain A3UM from the Aperture 3 installation DVD or from computers onto which Aperture 3 had been installed." Pet. 16. Dr. Terveen testifies that, to access the content of A3UM, a skilled artisan could open the A3UM HTML file set with a web browser. *Id.* at 16–17 (citing Ex. 1003 ¶¶ 91–97). Petitioner asserts that the user "would see the same content and interface when opening the HTML file sets obtained from the installer DVD or as placed on local storage during installation of Aperture 3." *Id.* at 16–17 (citing Ex. 1003 ¶¶ 91–97).

> b.    *The A3UM HTML File Set on Apple's Website*

Mr. Birdsell testifies that the A3UM HTML file set "was also published on the www.apple.com website." Ex. 1020 ¶¶ 17–20. Petitioner asserts that "the A3UM HTML file set was loaded onto a publicly accessible website (http://documentation.apple.com/en/aperture/usermanual/) where it became accessible to any member of the public starting on the date of commercial sale of Aperture 3." Pet. 17 (citing Ex. 1020 ¶¶ 9–11). Petitioner asserts that archived copies of the Aperture 3 website from 2010 "include an embedded URL pointing to the HTML-based User Manual" and "display the same table of contents entries as A3UM (EX1005), including sub-sections when manually selected." *Id.* (citing Ex. 1003 ¶ 103; Ex. 1021, 6). Petitioner contends that "a skilled artisan, exercising only reasonable diligence, could have located A3UM by following links on the apple.com web site" or "[a]lternatively, that person could have located A3UM using the search

8

feature within the apple.com web site or using well-known search engines." *Id.* at 17–18 (citing Ex. 1003 ¶¶ 101–103; Ex. 1021; Ex. 1020 ¶¶ 18–19).

Petitioner submits a screen capture of Apple.com from *the Internet Archive's Wayback Machine[3]* showing Aperture 3 for sale in February 2010, and a table of contents for the user manual. *Id.* at 15 (citing Ex. 1021, 2).

Petitioner also includes three articles discussing Aperture 3 software and its February 9, 2010, release date. *Id.* (citing Exs. 1044, 1045, 1048). Petitioner argues that "many individuals had installed Aperture 3—and thereby transferred A3UM—onto their computers before June 2010, which required use of the installer DVD supplied via the retail package of Aperture 3." *Id.*

For the reasons that follow, we determine that Petitioner has shown that the A3UM HTML file set (1) was sufficiently disseminated through the Aperture 3 installer DVD that was sold by Apple, and (2) was sufficiently publicly accessible via Apple's website at the relevant time to meet the requirements to be a "printed publication" under 35 U.S.C. § 102. *See id.* at 14–18.

## 2.     *Analysis*

A person is not entitled to a patent if their invention was "described in a printed publication . . . before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(1). The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *Medtronic, Inc. v. Barry*, 891 F.3d

---

[3] *The Internet Archive's Wayback Machine,* from Archive.org, archives webpages. Ex. 1022, 1 (Archive.org affidavit); Pet. 15 n.1.

9

IPR2022-00032
Patent 9,552,376 B2

1368, 1380 (Fed. Cir. 2018) (citing *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004)).

"Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). "A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008) (quoting *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006)).

### a.    Is A3UM an executing software program?

Patent Owner argues that the A3UM HTML file set is not a "printed publication" as that term is used in Section 102. *See* PO Resp. 41–44; Sur-reply 6–7. Patent Owner argues that, because users can only access the contents for A3UM when running the software program or following installation of the Aperture 3 application, A3UM "is part of an executing software program," which "cannot be the basis of an IPR." PO Resp. 44 (citing *Ex Parte Nelson*, No. 2020-004978, 2020 WL 8186425, at *15 (PTAB Dec. 31, 2020); *Capsugel Belgium NV v. Innercap Techs., Inc.*, IPR2013-00331, Paper 9 at 15 (PTAB Dec. 9, 2013); *Supercell Oy v. GREE, Inc.*, IPR2021-00501, Paper 7 at 6 (PTAB Aug. 17, 2021)); Sur-reply 6–7.

We disagree that the A3UM HTML file set is an executing software program. The files can be read and rendered by software, including but not

10

IPR2022-00032
Patent 9,552,376 B2

limited to Aperture 3. *See, e.g.*, Ex. 1089, 98:5–99:10; Ex. 2023, 80:2–81:6. In the context of the printed publication requirement of Section 102, there is not a meaningful difference between the A3UM HTML file set and other documents stored on a computer.

The files themselves are linked by their content, source, and organization to form the Aperture 3 user manual. *See* Ex. 1005. The A3UM HTML file set has a coherent organization, and the files collectively function as a single document separate from the executing software itself (Aperture 3). *See id.* For example, the text "Aperture 3 User Manual" appears in the header of each page, and "/aperture/usermanual/" appears in the footers. *See id.* Also, the manual's index page contains embedded hyperlinks to help the user navigate the manual's sections. *See, e.g.*, Ex. 1003 ¶¶ 102.f, 103; Ex. 1020 ¶ 19.f; Ex. 1021, 8. Based on its form and purpose, the A3UM HTML file set should be considered a single document that is separate from the executing software itself.

Patent Owner argues that the A3UM HTML file set was hidden on the installation disk and required "a convoluted series of steps that likely proved challenging even to Petitioner's expert" to find. PO Resp. 39–40. In Patent Owner's view, because the A3UM HTML file set is embedded within Aperture 3, there is not a "bright line demarcation" between the product and user manual. *Id.* at 40 (citing *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01436, Paper 40 at 23 (PTAB Jan. 23, 2020)).

We disagree. Both Petitioner and Patent Owner demonstrate that the A3UM HTML file set can be opened from the DVD installer disk before installation and from local storage after installation. Ex. 1020 ¶¶ 12–16; Ex. 1003 ¶ 95; Ex. 1089, 27:4–7, 98:5–99:10; Ex. 1071, 5; Ex. 2023, 80:2–81:6; Ex. 2026, 71:11–72:8. Although the user manual is accessible through the

11

IPR2022-00032
Patent 9,552,376 B2

actual Aperture 3 software in the internal help functionality after installation, that does not necessarily make it part of a product. Rather, the files are in a folder on their own and their contents can be accessed without Aperture 3 running. Ex. 1089, 98:5–99:10; Ex. 2023, 80:2–81:6.

The evidence does not show that finding the files required "a convoluted series of steps," as Patent Owner argues. PO Resp. 39–40. As discussed in detail below, the files could be located and revealed with only a few commands. *See, e.g.*, Reply 10–11. Also, the A3UM HTML file set was available on the Aperture 3 website. *See, e.g., Ex.* 1021. This shows that the user manual functioned as a standalone document outside the Aperture 3 software. *See id.* So, although the A3UM HTML file set could be viewed by executing Aperture 3, that was only one of several ways to view the files.

Thus, we determine that the A3UM HTML file set is not executing software or inseparable from it. Rather, the A3UM HTML file set is read and displayed by an executing software program, which is not meaningfully different from any other document stored on a computer.

> b. *Was the A3UM HTML file set publicly accessible via distribution of the Aperture 3 DVD?*

> i. *Sales of the Aperture 3 DVD*

Petitioner asserts that Apple sold and distributed the Aperture 3 DVD, which installed A3UM HTML file set on a user's computer. Pet. 14 (citing Ex. 1020 ¶¶ 12–16). Petitioner relies on the testimony of Mr. Birdsell to support this argument. *See id.* Mr. Birdsell testified that "more than 100,000 customers had purchased and were using the Aperture 3 product between February and June of 2010," which he based on his personal "experience with the utilization levels of the help resources on the Apple.com website at the time." Ex. 1020 ¶ 7. According to Mr. Birdsell's testimony, website

12

IPR2022-00032
Patent 9,552,376 B2

analytics for *documentation.Apple.com* corresponded to sales figures, and website access volume for Aperture 3 indicated that about 100,000 people had purchased the product. Ex. 2026, 51:16–20; 54:6–22.

Patent Owner argues that Petitioner's evidence of sales is insufficient to show that the A3UM HTML file set was publicly accessible. PO Resp. 29–30. Patent Owner argues that Mr. Birdsell "merely 'believe[s]' that a number of customers purchased and were using the Aperture 3 product before June of 2010." *Id.* at 29. Patent Owner argues that Mr. Birdsell's testimony on sales of Aperture 3 is offered "without any evidentiary support or conducting a personal investigation" and "[m]ere speculation about the number of Aperture 3 purchases falls short of the preponderance of the evidence burden Petitioner is required to meet." *Id.* at 40–41 (citing Ex. 1020 ¶¶ 5–7; Ex. 2026, 53:16–55:17, 61:15–62:3; *Instradent USA, Inc. v. Nobel Biocare Servs. AG*, IPR2015-01786, Paper 106 at 33 (PTAB Feb. 15, 2017); *Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1373 n.3 (Fed. Cir. 2019)). Patent Owner argues that Petitioner's evidence, at best, only shows offers for sale. *Id.* at 51 (citing Ex. 1021, 1–2; Ex. 2026, 56:23–57:9).

But "a petitioner need not establish that specific persons actually accessed or received a work to show that the work was publicly accessible." *Samsung*, 929 F.3d at 1374. "In fact, a limited distribution can make a work publicly accessible under certain circumstances." *Id.* (citing *GoPro, Inc. v. Contour IP Holding LLC*, 908 F.3d 690, 694 (Fed. Cir. 2018)).

Here, Patent Owner does not dispute Petitioner's evidence that Apple offered to sell Aperture 3, or that a copy of A3UM was included on the Aperture 3 installer DVD sold in the relevant timeframe. *See* PO Resp. 29–30, 40–41, 51. Rather, Patent Owner disputes whether there were actual

13

IPR2022-00032
Patent 9,552,376 B2

sales of the DVD with the A3UM HTML file set. Reply 3–4 (citing Ex. 2026, 54:23–55:17, 69:13–19, 53:16–54:17; *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 138 (Fed. Cir. 1986); *Parrot S.A. v. Qfo Labs, Inc.*, IPR2018-01690, Paper 40 at 63–64 (PTAB Feb. 20, 2020); *Paint Point Med. Sys., Inc. v. Blephex, LLC*, IPR2016-01670, Paper 44 at 19–20 (PTAB Feb. 28, 2018)). Yet, even if the number of sales cannot be directly corroborated, Patent Owner has not offered any evidence beyond attorney argument that suggests Mr. Birdsell's testimony that there were over 100,000 sales is unreliable. *See* Reply 3; PO Resp. 29–30, 40–41, 51.

On the other hand, Petitioner's evidence is beyond mere speculation. Rather, we determine Petitioner has shown that Apple sold a sufficient number of DVDs that contained the A3UM HTML file set. Mr. Birdsell's testimony on this issue is credible and adequately supported by corroborating evidence. Ex. 1020 ¶ 7. For instance, Aperture 3 was marketed as shown by a press release (Exhibit 1048) and a feature on the home page of Apple (Exhibit 1021). Patent Owner's expert noted that Apple's website was "probably" one of the most visited websites in the world in 2010. Ex. 1089, 188:9–16. In fact, Mr. Birdsell testified that that the presence of Aperture 3 on the Apple home page meant that it received "top billing." Ex. 2026, 57:3–12. Also, Petitioner has provided two articles about Aperture from 2010 that discuss using an installed copy. *See* Ex. 1044, 2 ("[I]nstallation of Aperture 3 took ages."), 1045, 3 ("Before I installed Aperture 3 . . . .").

We agree with Petitioner that the 100,000 copies sold "far exceeds the number of disclosures recognized under the relevant dissemination law for printed publications." Pet. 15 (quoting *Cisco,* IPR2018-01436, Paper 40 at 23–31 (finding 586 copies to be sufficient for being publicly available

14

IPR2022-00032
Patent 9,552,376 B2

through dissemination); citing *Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985) (determining six copies sufficient for dissemination)).

Patent Owner argues that Petitioner is "unable to distinguish between users who purchased retail boxes of Aperture 3 versus those who upgraded from Aperture 2 to Aperture 3" without having the Aperture 3 DVD. PO Resp. 30 (citing Ex. 2026, 62:23–63:20; 65:5–13); *see also id.* at 41. In Patent Owner's view, customers who purchased the DVD would not have navigated to the website. *Id.* at 30.

Yet, even without the knowledge of the exact number of users that purchased Aperture 3 retail boxes with the DVD instead of upgrading from Aperture 2 without the DVD, it is far more likely than not that a sufficient number of the over 100,000 people that purchased Aperture 3 did so by purchasing the DVD for it to be considered publicly disseminated. Ex. 1020 ¶ 7. That is, under a preponderance-of-the-evidence standard, Petitioner has shown that Apple publicly disseminated the A3UM HTML file set in "thousands of retail boxes containing the Aperture 3 installation DVD to users between February 2010 and June 9, 2010." Pet. 14 (citing Ex. 1020 ¶ 7; Ex. 1021, 2; Ex. 1044; Ex. 1045; Ex. 1048).

Patent Owner argues that Dr. Terveen, an alleged person of ordinary skill in the art, had no knowledge of any Aperture 3 sales prior to this case. PO Resp. 40; *see also id.* at 22. But Petitioner need not show specific persons accessed Aperture 3, let alone that every person of ordinary skill in the art knew about Aperture 3 or its sales.

Patent Owner argues that "*Klopfenstein* did not hold that 'sales are not required;' the court noted that '[p]rotective measures' like 'license agreements' prohibiting copying weigh against a finding of accessibility."

15

IPR2022-00032
Patent 9,552,376 B2

Sur-reply 4 (citing *In re Klopfenstein*, 380 F.3d at 1351). Patent Owner
argues that "Aperture 3 users were bound by a license agreement" that
prohibits copying A3UM as part of the software program, so actual sales are
required. *Id.* (citing Ex. 2007, 1–2). Even assuming this is true, for the
reasons discussed above, Petitioner has provided sufficient evidence
concerning actual sales. So Patent Owner's argument here is unavailing.

Thus, Petitioner has shown that the A3UM HTML file set was
sufficiently disseminated on the Aperture 3 installer DVD that was sold by
Apple. *See* Pet. 14–17.

<div align="center">

*ii.    Indexing of the A3UM HTML File Set*

</div>

"[I]ndexing is not required to show that a work is publicly accessible."
*Samsung,* 929 F.3d at 1369. Yet, "[w]hen a reference is uploaded to a
website or deposited in a library, the fact that the reference is indexed or
cataloged in some way can indicate that it is publicly accessible." *Id.*

Patent Owner analogizes finding the files on the Aperture 3 DVD to
locating books in a physical library:

> The physical analogy would be requiring a person to know
> about the existence of a hidden section of a library (the *pkg.
> files), know how to access the hidden section of the library (i.e.,
> unhiding the hidden files), know to move a portion of the
> hidden library section to another location (decompressing the
> Archive.pax.gz file), then know to navigate through thousands
> of shelves to collect a particular set of 746 books (the HTML
> file set).

PO Resp. 38; *see also* Sur-reply 6 (arguing that finding the files is like
"being told that a book has been hidden in the library and then being asked
to find it without guidance") (citing Ex. 1089, 409:2–19; PO Resp. 38).
According to Patent Owner, Petitioner does not argue that "the installation
DVD included any search functionality for locating the HTML file set," and

<div align="center">

16

</div>

IPR2022-00032
Patent 9,552,376 B2

Dr. Terveen's assertion that "a POSITA[4] would somehow look for hidden files, locally save and decompress one, then navigate through numerous sub-folders is implausible and does not satisfy the requirements of public accessibility." PO Resp. 38.

Patent Owner argues that the HTML file set was intentionally "hidden" or "invisible" on the installation DVDs and that Petitioner's own expert was unable to "testify that he knew where or how to find the 'hidden files' on his own" and that "his testimony suggests Petitioner's counsel provided him with 'tips' on how to find the hidden files." *Id.* at 31–32 (citing Ex. 2023, 63:23–64:5, 64:19–66:10; 67:8–19; 73:10–22, 79:10–15); Sur-reply 5–6 (arguing that hidden files are not publicly accessible). Patent Owner argues that Dr. Terveen took many steps to locate the files. PO Resp. 32–38. Patent Owner argues that, when questioned, Dr. Terveen could not recall how long the process took. *Id.* at 38 (citing Ex. 2023, 101:11–102:20). Patent Owner argues that, to find the files, a person of ordinary skill in the art needed to already know what to look for and where to look, or needed to expand and inspect every single folder. *Id.* at 37.

Yet "a printed publication need not be easily searchable after publication if it was sufficiently disseminated at the time of its publication." *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1365 (Fed. Cir. 2014). For the reasons explained in Section II.A.2.b.i, the A3UM HTML file set was sufficiently disseminated through use of the help functionality on the Aperture 3 installer DVD that anyone could purchase, even if the files were not visible on the DVD itself. That is, even without considering whether the

---

[4] A person of ordinary skill in the art.

17

IPR2022-00032
Patent 9,552,376 B2

reference was sufficiently indexed, Petitioner's has shown that A3UM was sufficiently disseminated.

Still, Petitioner's evidence of indexing is sufficient and bolsters its case that A3UM was accessible. The relevant inquiry here is whether the reference was made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, could locate it. *SRI*, 511 F.3d at 1194.

Patent Owner's arguments focus on "hidden" files. *See, e.g.*, PO Resp. 30–32. "Hidden" files may not be visible in certain views of a directory. *See, e.g.*, Reply 10–11. According Dr. Terveen, the default view of a folder may hide files to reduce the number of files that are shown to the user. Ex. 2023, 67:23–68:24. For example, Dr. Terveen testified that configuration files could be "hidden." *See id.* at 67:25.

But Petitioner has shown that "hidden" files appear in other views of MacOS. Reply 11. Such a view is shown in the screenshot below.

18

IPR2022-00032
Patent 9,552,376 B2



In the screenshot from MacOS, above, the same directory is shown in two ways. *Id.* The top screenshot shows the "Aperture" directory in a window with two folder icons, captioned "Documentation" and "Sample Library," along with two other files represented by icons captioned "Before You Install Aperture 3.app" and "Install Aperture." *Id.* The bottom screenshot shows a window titled "Terminal" displaying the same directory as text. *Id.*

19

IPR2022-00032
Patent 9,552,376 B2

But, unlike the top window, the "Terminal" window also displays the names of "hidden" files. *Id.*

The "Terminal" window displays the command "ls -l -a." *Id.* Petitioner explains that the command "ls -l -a" shows the "hidden" files in the "Terminal" window. Reply 10 (citing Ex. 1069, 112; Ex. 1089, 72:21–24, 73:18–74:4, 108:18–21; Ex. 1073, 6; Ex. 1084; Ex. 1085). In sum, Petitioner has shown that "hidden" files are simply files that are excluded for convenience in some views but are shown in other views, e.g., the "Terminal" window shown above. *See id.*

Dr. Surati testified that it "would be a reasonable assumption" that a person of ordinary skill in the art would figure out how to unhide files, for example, by looking at books or searching the internet if interested. Ex. 1089, 138:11–139:14. The "hidden files" could be viewed by navigating to the directory and typing a single command to list the files ("ls -l -a"). *See* Reply 10 (citing Ex. 1069, 112; Ex. 1089, 72:21–24, 73:18–74:4, 108:18–21; Ex. 1073, 6; Ex. 1084; Ex. 1085). Typing a few commands in "Terminal" is not an unreasonable amount of effort. *See id.*

As for locating the directory where the files are stored, Petitioner has provided references that a person of ordinary skill in the art would be able to consult to familiarize themselves with a MacOS application's[5] organization and distribution methods. *See, e.g.,* Ex. 1089, 56:17–57:17 (MacOS application bundles), 79:19–80:15 (hierarchical structure), 59:13–23 ("Resources" folder). These references provide the basic principles for navigating a MacOS application's file structure. According to Dr. Terveen, one of ordinary skill in the art would expect an application's help files in

---

[5] Aperture 3 is a MacOS application. *See, e.g.*, 2025 ¶¶ 119–120.

20

IPR2022-00032
Patent 9,552,376 B2

HTML format to be in the Resources subfolder of the application bundle.
Ex. 1003 ¶ 94. Dr. Terveen's testimony here (*id.*) is adequately supported by
the cited references, so we credit Dr. Terveen on this point. In sum, this
evidence shows that the HTML file set was indexed in a meaningful way in
the MacOS filesystem such that an interested person of ordinary skill in the
art would be able to find it with no more than reasonable effort.

We do not credit the Surati Declaration on these issues because he
does not give sufficient weight to the evidence about how MacOS
applications are organized and distributed, and for reasons similar to those
discussed above in connection with Patent Owner's arguments. *See*
Ex. 2025 ¶¶ 114–129; *see also* Reply 7–9 (discussing Dr. Surati's
testimony).

Patent Owner argues that Petitioner has not shown why a person of
ordinary skill in the art would navigate to various subfolders or manipulate
the files. Sur-reply 5–6 (citing Ex. 2025 ¶¶ 125–126, 128; Ex. 1071). We
disagree. The Petition explains that a user has multiple ways of viewing the
files because they "would see the same content and interface when opening
the HTML file sets obtained from the installer DVD or as placed on local
storage during installation of Aperture 3." Pet. 16–17 (citing
Ex. 1003 ¶¶ 91–97). Dr. Terveen's original testimony submitted with the
Petition shows that, to access the HTML file set outside of Aperture 3, one
of ordinary skill in the art would navigate the subfolders because they would
expect an application's help files in HTML format to be in the Resources
subfolder of the application bundle. Ex. 1003 ¶ 94. In fact, there was specific
guidance on how to do this. *See* Ex. 1070, 15–16 (a programming guide
describing the bundle structure used to store resources and code); Ex. 1071,
5–6 (a programming guide describing bundle resources). So the record

21

IPR2022-00032
Patent 9,552,376 B2

shows that users had multiple options to view the files and had ample guidance on how to use those options. *See* Pet. 16–17; Ex. 1003 ¶ 94.

Although Petitioner was not required to show that the A3UM HTML file set was sufficiently indexed to establish that it was publicly accessible, we determine that Petitioner has produced sufficient evidence that it was sufficiently indexed. And we disagree with Patent Owner's arguments that the "hidden" files or the structure of the files weighs against Petitioner's showing that the A3UM HTML file set was accessible. PO Resp. 30–44; Sur-reply 5–6.

### iii.    *Aperture 3 DVD - Conclusion*

For the reasons discussed above, we disagree with Patent Owner's arguments about the sale of Aperture 3. *See* PO Resp. 29–30, 40–41. As explained above, we also disagree with Patent Owner's arguments about the accessibility of the A3UM HTML file set. *Id.* at 30–39; Sur-reply 5–6. Rather, considering the totality of the evidence, Petitioner has sufficiently shown that the A3UM HTML file set was publicly accessible through the sales and distribution of the Aperture 3 DVD, and the A3UM HTML file set was sufficiently indexed. *See* Pet. 14–17. We credit the testimony of Matthew Birdsell (Ex. 1020 ¶¶ 5–7) and Dr. Terveen (Ex. 1003 ¶¶ 72–99) on these issues. For reasons similar to those discussed in connection with Patent Owner's arguments, we assign little weight to the Surati Declaration on these issues. *See* Ex. 2025 ¶¶ 114–129.

*c.*    *Was the A3UM HTML file set publicly accessible via Apple's website?*

In addition to proving by a preponderance of the evidence that A3UM was "publicly accessible" through distribution of public sales of the Aperture 3 software, Petitioner also has shown that the A3UM HTML file

22

IPR2022-00032
Patent 9,552,376 B2

set was "publicly accessible" via the Aperture 3 website. Pet. 17 (citing Ex. 1020 ¶¶ 9–11).

Mr. Birdsell testified that the HTML file set was loaded onto a staging server the night before Aperture 3's launch, and he verified that "the files were live and accessible to customers and that all the links worked" on the website on launch day. Ex. 2026, 36:3–12. Also, Patent Owner's expert, Dr. Surati, testified that, because Apple had published a press release and marketed Aperture 3 on its home page, a person of ordinary skill in the art using a search engine such as Google to find photo management and editing software could find the Aperture 3 support page containing A3UM. *See* Ex. 1089, 187:12–188:8, 202:12–204:4, 205:17–206:2.

Patent Owner argues that (1) consumers did not know about Aperture 3 to look for it on Apple.com in the first place; (2) if they did go to Apple.com, they would not find it, exercising reasonable diligence; (3) A3UM was not available on Apple's website for long enough; and (4) Exhibit 1005 does not accurately represent the website's version of the Aperture 3 manual before June 2010. PO Resp. 21–29. Patent Owner's arguments are unavailing. Our reasoning follows.

<p style="text-align:center"><em>i.</em>    <em>Knowledge of Aperture 3</em></p>

Patent Owner argues that a person of ordinary skill in the art exercising reasonable diligence would not have known to search for Aperture 3 or A3UM. PO Resp. 21; Sur-reply 7-8. In Patent Owner's view, it is not enough to show whether a person of ordinary skill in the art interested in Apple software would have visited the Apple.com website. PO Resp. 21. According to Patent Owner, Petitioner must show that a person of ordinary skill in the art would have known to navigate to Apple.com and then look for the Aperture 3 user-manual page in search of A3UM. *Id.*

<p style="text-align:center">23</p>

IPR2022-00032
Patent 9,552,376 B2

Patent Owner argues that there is no evidence that consumers who knew about Aperture 3 were persons of ordinary skill in the art, or that a person of ordinary skill in the art interested in this subject matter would have known of Aperture 3. *See id.*; *see also* Sur-reply 7 (arguing no evidence that Apple was known for photo management). In Patent Owner's view, "The 'Aperture' Product name is not descriptive of photo management technology." PO Resp. 21. Patent Owner argues that Petitioner offers no evidence a person of ordinary skill in the art, including Dr. Terveen, would have known of or looked for information about Aperture 3. *Id.* at 21–22 (citing Ex. 2023, 49:4–50:11, 51:9–20; 52:2–4).

We disagree. Mr. Birdsell's testimony shows that approximately 95% of traffic accessing Aperture 3 came from search engines. Ex. 2026: 67:13–20. This suggests that a person did not need *a priori* knowledge of the reference in order to access it. *See Samsung*, 979 F.3d at 1374. Because Petitioner has demonstrated accessibility, Petitioner had no requirement to show the specific number of people who actually accessed it. *Id.*; *Constant v. Adv. Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988) ("Accessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to.").

*ii.     Indexing*

Patent Owner argues a person of ordinary skill in the art "exercising reasonable diligence would not have found the website version of A3UM on Apple.com." PO Resp. 21. Patent Owner argues that "the Aperture 3 user manual page could be found only after executing several steps such as knowing to search for 'Aperture' or 'Aperture 3' in the search box or by navigating through a number of links on Apple.com" and that "there is no evidence on the record that searching Apple.com for other terms that would

24

IPR2022-00032
Patent 9,552,376 B2

be common, like 'photo,' for example, would have yielded any Aperture-related results." *Id.* at 23 (citing Ex. 1003 ¶ 102; Ex. 1020 ¶ 18; Ex. 2026, 67:21–69:11).

Patent Owner does note that "[w]hile users could have theoretically navigated to the product manual page, analytics evidence tracking the number of users who did so is unavailable and not in evidence." *Id.* at 23 n.3 (citing Ex. 2026, 69:20–23). Patent Owner contends, even if a person of ordinary skill in the art accessed "the Aperture 3 webpage through the homepage, a POSITA would still have needed to navigate through at least four more pages to reach the manual." *Id.* at 25 (Ex. 1003 ¶ 102; Ex. 1020 ¶ 19; Ex. 2026, 67:21–69:11). Patent Owner argues, because "the website's structure is critical in determining whether a reference is publicly accessible or merely technically accessible," Petitioner's argument lacks evidence of meaningful indexing and shows technical accessibility at best. *Id.* at 25–26 (citing *Salesforce.com, Inc. v. WSOU Inv., LLC*, IPR2022-00428, Paper 10 at 14 (PTAB July 13, 2022); *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 773 (Fed. Cir. 2018); *Samsung*, 929 F.3d at 1373).

We disagree. There is sufficient evidence that a person of ordinary skill could have reasonably found the website and then found the reference on that website. *See* Ex. 1089, 188:9–16 (testifying that Apple was probably one of the most visited sites in the world). Dr. Terveen was able to find the Aperture 3 support page on Apple.com in a few clicks by navigating to pages describing photo management and editing. Ex. 1003 ¶ 101; *see generally* Ex. 1021 (archived screenshots from Apple.com), Ex. 1074 (collection of screenshots of web pages advertising Aperture 3). For example, Dr. Terveen explained that the Apple.com website provided a "straightforward path" to access the web-hosted version of A3UM, which

25

IPR2022-00032
Patent 9,552,376 B2

included links mentioning the Aperture 3 product and other helpful information to guide the user: Click "Introducing *Aperture 3*," Click "Resources," Click the "Learn more" link below "Aperture Support page," Click "Aperture 3 User Manual." Ex. 1003 ¶ 102 (emphasis added). Dr. Terveen explained that the navigation involved five clicks after navigating to Apple.com, which is not an unreasonable number. *See id.* This evidence suggests that a person of ordinary skill in the art in 2010 could have found the Aperture 3 software through reasonable diligence without needing to run text-based searches on the website. We credit Dr. Terveen's Declaration on this issue. *Id.*

       *iii.*    *The Date that A3UM was Available on the Website*

Patent Owner argues that Petitioner has not demonstrated that Exhibit 1005 was on Apple.com in February 2010. PO Resp. 26–29. Patent Owner alleges that the version of the A3UM Table of Contents shown in the archived version of the website (Ex. 2010) has a copyright date of 2011, indicating that the A3UM HTML file set may not have been available on the website until after the critical date. PO Resp. 28 n.4; *compare* Ex. 2010, *with* Ex. 1021; Sur-reply 8–9.

But Mr. Birdsell's testimony indicates that the text of Exhibit 2010 also has a different font than the one used on Apple.com. *See, e.g.*, Ex. 2026, 49:1–13. Neither party fully explains why this and other minor discrepancies exist in the versions that were archived by the *Wayback Machine*. *See* PO Resp. 28–29.

Considering all the evidence and arguments, we determine that Petitioner has sufficiently explained, under the preponderance-of-the-evidence standard, that the extended URL accurately reflects the date that the *Wayback Machine* archived the page. Pet. 15 n.1 (citing Ex. 1022, 1).

26

IPR2022-00032
Patent 9,552,376 B2

For example, "the extended URL http://web.archive.org/web/ 19970126045828/http://www.archive.org/ would be the URL for the record of the Internet Archive home page HTML file (http://www.archive.org/) archived on January 26, 1997 at 4:58 a.m. and 28 seconds (1997/01/26 at 04:58:28)." Ex. 1022, 1. The extended URL for the last page of the file with the title Aperture 3 User Manual is "https://web.archive.org/web/ 20100217035925/http://documentation.apple.com/en/aperture/usermanual/." Ex. 1021, 8. So, according to the Internet Archive's extended URL (" 20100217035925"), the archived date is February 17, 2010. *See* Ex. 1022, 1. This is consistent with Mr. Birdsell's testimony that Apple began selling Aperture 3.0 in February 2010. Ex. 1020 ¶ 5. Thus, we credit the declarations of Dr. Terveen and Mr. Birdsell on this issue. Ex. 1003 ¶ 102; Ex. 1020 ¶ 5.

Patent Owner argues that Exhibit 1005 was created using the HTML file set from the DVD, not from the archived version of Apple.com that existed in 2010. PO Resp. 26–27; Sur-reply 2. Patent Owner argues that Petitioner has been unable to provide the version that existed on the website. PO Resp. 26–27. In Patent Owner's view, Dr. Terveen's and Dr. Birdsell's depositions indicate that they do not know how Exhibit 1005 was prepared, and that neither could testify that it is a true-and-correct copy of the website's version. *Id.* at 27–28; Sur-reply 3. Patent Owner argues that there are inconsistencies that cannot be resolved by looking at the exhibits because Exhibit 1021 is incomplete. PO Resp. 28–29.

Both Mr. Birdsell and Dr. Terveen, however, individually compared Exhibit 1005 to the HTML file set and found no discrepancies in the content itself. *See* Ex. 2026, 41:14–16; Ex. 2023, 61:13–17. Also, the path for each file is shown in the bottom-left corner of each page of Exhibit 1005. *See*

27

Ex. 1005. The file path in the bottom left corner is consistent with the expected file path discussed above in Section II.A.2.b.ii. *See id.*, 1 (showing the file path as "file:///Applications/Aperture.app/Contents/<u>Resources</u>/ English.lproj/aperture_help/en/aperture/usermanual/index.html") (emphasis added) (emphasis added); *see* Ex. 1003 ¶ 94 (explaining that one of ordinary skill in the art would expect an application's help files in HTML format to be in the Resources subfolder of the application bundle). We credit Mr. Birdsell's unrebutted testimony that the same version of A3UM would have been sent to both the disk packaging team and the team responsible for loading A3UM onto the website. Ex. 2026, 40:15–41:10. All this evidence taken together indicates that Exhibit 1005 is the same as the HTML file set. Apart from speculation, we have no evidence from Patent Owner to suggest otherwise.

### iv. Duration of Dissemination

In determining whether interested persons could have accessed the publication, the duration of dissemination can be one of the factors that is considered. *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 847 F. App'x 869, 877 (Fed. Cir. 2021) (citing *GoPro*, 908 F.3d at 694–95). For references that were never distributed to the public or indexed, "[d]uration of the display is important in determining the opportunity of the public in capturing, processing and retaining the information conveyed by the reference." *In re Klopfenstein*, 380 F.3d at 1350. The more transient the duration that a reference was displayed, for example, "the less likely it is to be considered a 'printed publication.'" *Id.*

Here, for all the reasons discussed above, Petitioner has shown that the A3UM HTML file set was sufficiently distributed and indexed. *See supra* §§ II.A.2.c.ii–iii.

28

IPR2022-00032
Patent 9,552,376 B2

Even so, Patent Owner argues that "the reference to Aperture 3 only existed on the Apple.com homepage for only a matter of 'weeks,'" and such "limited duration of accessibility is a strong indication that the user manual through Apple.com website was not publicly accessible." PO Resp. 24 (citing Ex. 2026, 56:23–57:9; *Centripetal Networks*, 847 F. App'x at 876–77).

Although Aperture 3 was marketed for weeks on the home page, Aperture 3's product page remained for much longer. For example, Mr. Birdsell testified that he verified access to A3UM in 2010 and removed A3UM from the Apple website at the beginning of the COVID-19 pandemic in 2020. Ex. 2026, 66:4–12. Thus, Petitioner has proven by a preponderance of the evidence that A3UM was "publicly accessible" by a person of ordinary skill in the art for a sufficient amount of time. *See Klopfenstein*, 380 F.3d at 1351–52 (determining that three days was long enough to consider a reference "publicly available").

*v.    Apple Webpage - Conclusion*

Thus, based on the totality of the evidence, the Apple webpage, more likely than not, displayed the A3UM HTML file set in 2010, and Petitioner has shown that the A3UM HTML file set was publicly accessible via Apple's website at the relevant time.

*3.    Mr. Birdsell's Testimony*

Patent Owner argues that Mr. Birdsell's testimony lacks credibility, and that we should consider the fact that he is an Apple employee in assessing his testimony. PO Resp. 44–45.

Yet Patent Owner has offered little evidence beyond attorney argument that suggests Mr. Birdsell's testimony is unreliable on the basis of his employment or otherwise. On the other hand, Petitioner has provided

29

IPR2022-00032
Patent 9,552,376 B2

corroborating evidence, for example, to show that Aperture 3 was marketed, including a press release (Ex. 1048), featured on Apple's home page (Ex. 1021), and reviewed (*see* Exs. 1044 (*CrunchGear* review), 1045 (*Using Aperture 3: Part 1*), 1048 (press release with a quote from photographer Jim Richardson)), which is consistent with Mr. Birdsell's testimony. In Sections II.A.2.b–c, above, we discuss other instances in which we credit Mr. Birdsell's testimony because it is sufficiently persuasive and supported by the record.

Also, we disagree with Patent Owner's suggestion that Mr. Birdsell's situation is sufficiently similar to the specific circumstance in *Parrot S.A. v. Qfo Labs, Inc.* IPR2018-01690, Paper 40 at 63–64 (PTAB Feb. 20, 2020). PO Resp. 44–45; Reply 3. Patent Owner has provided no evidence to suggest that Mr. Birdsell has a financial stake in the outcome of this matter, such as by losing employment for example. *See Parrot*, IPR2018-01690, Paper 40 at 63–64 (giving little weight to testimony from witness who was a party's cofounder and admitted to having a financial stake in the outcome of the proceeding). But we do not disagree with Patent Owner on the more general point that we should consider the fact that Mr. Birdsell is an Apple employee when weighing his credibility. *See* PO Resp. 44–45.

That is, we disagree with Patent Owner to the extent that it argues Mr. Birdsell's testimony should be given no weight on the basis that he is employed by Apple. *Id.*; *see also* Sur-reply 3. Rather, we give Mr. Birdsell's testimony the appropriate weight where it is sufficiently persuasive and corroborated. *See supra* §§ II.A.2.b–c.

### 4.    Conclusion

Petitioner has proven by a preponderance of the evidence that A3UM is a printed publication under Section 102.

30

IPR2022-00032
Patent 9,552,376 B2

### B.    *Level of Ordinary Skill in the Art*

According to Petitioner,

> A person of ordinary skill in the art in 2011 (or 2014) would have had (1) at least a bachelor's degree in computer science, computer engineering, or electrical engineering, and (2) at least one year of experience designing graphical user interfaces for applications such as photo management systems.

Pet. 9 (citing Ex. 1003 ¶¶ 41–43).

In the Institution Decision, we applied Petitioner's proposed definition. Inst. Dec. 10. Patent Owner does not dispute Petitioner's proposed level of ordinary skill in the art. PO Resp. 18. We continue to find that the skill level identified by Petitioner (Pet. 9) is consistent with the record. Thus, we use the same definition here that we used in the Institution Decision.

### C.    *Claim Construction*

Only those claim terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)). We do no need to construe any terms to resolve the issues in this case.

### D.    *Obviousness*

Petitioner asserts that the subject matter recited in claims 1–12 would have been obvious over A3UM, Belitz, and Rasmussen. Pet. 4.

### 1.    *A3UM*

A3UM is a user manual for Apple's Aperture 3 digital-image management software. Ex. 1005. Aperture provides photographers with image management and adjustment tools. *Id.* at 1. For example, *Faces* is a

31

IPR2022-00032
Patent 9,552,376 B2

face-detection and face-recognition tool provided in Aperture. *Id.* at 28.
*Faces* can identify and track people through all the images in a digital
library. *Id. Places* is also a tool provided in Aperture that organizes images
by location. *Id.* at 81. In *Places*, a user can search for image locations on a
map and zoom to view those locations in detail. *Id.* The *Slideshow Editor*
allows the user to create slideshows. *Id.* at 84.

<p align="center">2.     *Belitz*</p>

Belitz describes a user interface that displays a map with marked
locations. Ex. 1006, code (57). Belitz explains "[i]f many locations are
located close to one another they overlap and the view of the associated
images become cluttered and it is difficult to discern between the various
objects and the user is not provided with a good view of what location is
associated with what." *Id.* ¶ 2. According to Belitz, the disclosed user
interface addresses those concerns. *Id.* ¶ 5. Figures 4a and 4b, below, show
screenshots of the user interface. *Id.* ¶ 51, 55.



<p align="center">**Fig. 4a**          **Fig. 4b**</p>

<p align="center">32</p>

IPR2022-00032
Patent 9,552,376 B2

Figure 4a shows map 409. *Id.* ¶ 51. On the map, location 408 is marked by a graphical object 410. *Id.* Graphical object 410 contains visual representation 411. *Id.* ¶ 52. Visual representation 411 can be a photograph that is associated with the location. *Id.* Number indicator 412 shows how many graphical objects 410 are "stacked" at that location. *Id.* ¶ 54. Stacked graphical objects can be associated with other locations that are near marked location 408. *Id.*

### 3.    *Rasmussen*

Rasmussen describes a digital map and tools for interacting with it. Ex. 1025, 9:35–49. In one example, a user creates a measuring tool on the map by positioning endpoints at various locations. *Id.* at 9:61–65. The user clicks the endpoints or the line between them to open an information window. *Id.* at 10:17–27. The window can display "latitude/longitude and/or geocode information." *Id.*

### 4.    *Claim 1*

#### a.    *Map View and Location View*

Claim 1 recites a "map view" that displays a thumbnail image on an interactive map:

> . . . displaying a map view on a video display device, the displaying the *map view* including displaying:
>
> (i) a representation of an *interactive map*, . . .
>
> (ii) a first user selectable *thumbnail image* at a first location on the interactive map . . . .

Ex. 1001, 35:23–30 (emphasis added).

33

IPR2022-00032
Patent 9,552,376 B2

Figure 41 of the '376 patent, reproduced below in-part, shows an example of an interactive map.



In Figure 41, individual or groups of "Digital Files" are represented as thumbnails 0874 and 0875 on an interactive map. *Id.* at 29:33–37. A user can select the thumbnail to see the Digital Files at the location. *Id.*

Claim 1 further recites a "location view" that is displayed in response to a click or a tap on the thumbnail in the "map view":

> responsive to a click or tap of the first user selectable thumbnail image, displaying *a first location view* on the video display device, the first location view comprising a majority portion of a [second[6]] screenshot of the video display device, the displaying the first location view including displaying (i) a first location name corresponding to the first geotag, (ii) a scaled replica of each of the digital photographs or images or videos in the first set of digital files, and (iii) a first map image indicating the geographic coordinates of the first geotag, the displayed scaled replicas of each of the digital photographs or images or

---

[6] The Certificate of Correction dated January 24, 2017 replaced "a majority portion of a screenshot of the video display" with "a majority portion of a *second* screenshot of the video display." Ex. 1002, 554 (emphasis added).

34

IPR2022-00032
Patent 9,552,376 B2

> videos in the first set of digital files not being overlaid on the first
> map image and the second screenshot of the video display device
> not including the interactive map

*Id.* at 35:51–65 (emphasis added). Claim 1 recites a second location view
with similar limitations that is displayed in response to a click or a tap on a
second thumbnail. *See id.*

Figure 34 from the '376 patent, below, shows a single location
application view. *Id.* at 24:24–41.



Figure 34's single location application view has one photo (1634). *Id.* The
view displays a location name (1632), a zoomed-in image of the specific
map location (1635), and an indication of how many photos were taken at
the location (1633). *Id.*

> b.  *The Petition and Patent Owner's Response*

To address the recited "location view," Petitioner asserts that A3UM's
user selects a pin on the interactive map in the *Places* view, then the user
selects a thumbnail of an image in the *Browser*, which causes the *Viewer* to

35

IPR2022-00032
Patent 9,552,376 B2

display the original, full-size image. Pet. 50. This assertion is the basis for Petitioner's obviousness rationale. *See id.* at 50–57.

The record developed during the trial shows that Petitioner's challenge is based on an incorrect assertion about how A3UM's *Places* view works. *See* PO Resp. 52–56. Our reasoning follows.

<div align="center">

*c.    The Second Screenshot*

</div>

In claim 1, the "first location view" comprises "a second screenshot," among other things. Ex. 1001, 35:51–65. The claimed "map view" displays an "interactive map." *Id.* at 35:23–25. According to claim 1, the second screenshot does not include the interactive map. *Id.* at 35:63–65.

Petitioner asserts that A3UM teaches the recited location view and the second screenshot because, in part,

> when a user "[s]elect[s] a red pin" ("*click or tap*") the interface (*e.g.*, viewer, browser, inspector, toolbar), focuses on that information for that location ("*[first/second] location view[s]*"): the "selected pin turns orange, and the image or images associated with the location marked by the orange pin are selected in the Browser."

Pet. 47 (citing Ex. 1005, 436–437; Ex. 1003 ¶ 178). Here, Petitioner is referring to A3UM's *Places* view. *See id.*

If the user shot images with a GPS-enabled camera or iPhone, Aperture automatically plots each image on a location of a map shown in the *Places* view. Ex. 1005, 435. A screenshot of the *Places* view is reproduced below. *Id.* at 437.

<div align="center">

36

</div>

IPR2022-00032
Patent 9,552,376 B2



The *Places* view shows a map with orange and red location pins. *Id.* A location label appears above the orange pin, indicating where the image was shot. *Id.* at 435.

We agree with Petitioner that a red pin turns orange when selected and the images associated with the location marked by the orange pin are selected in the *Browser. Id.* at 436; Pet. 47. The *Browser* is located at the bottom of the *Places* view. Ex. 1005, 437. The screenshot labels the images shot in the selected location that appear in the *Browser. Id.*

Patent Owner, though, disputes the Petition's description of what happens after this, when the user selects images in the *Browser.* PO Resp. 52–56. In particular, to address the requirement that the second

37

IPR2022-00032
Patent 9,552,376 B2

screenshot does not include the interactive map, the Petition provides the following rationale:

> A3UM discloses selecting a pin on the interactive map to display a thumbnail representation of all photos matching that location in the Browser. EX1005, 436-437. <u>Selecting a thumbnail in the Browser then prompts display of the original digital image in the Viewer.</u> EX1005, 251. This display will be the digital image (e.g., a full-size photo) represented by the thumbnail in the Browser ("not including the interactive map"). EX1005, 51; EX1003, ¶186.

Pet. 50 (formatting removed, underlining added). That is, the Petition states that A3UM displays the original image in the *Viewer*. *Id.* According to the Petition, this means the display does not include the interactive map, as required by claim 1. *Id.* So, here, Petitioner asserts that the original digital image corresponding to the *Browser* selection replaces the interactive map displayed in the *Places* view. *Id.*

Patent Owner argues that A3UM does not replace the map with a full-size version of the selected image in the *Places* view. PO Resp. 55 (citing Ex. 2025 ¶¶ 156–157). Patent Owner's argument is adequately supported by Dr. Surati's testimony. Ex. 2025 ¶¶ 156–157. We credit Dr. Surati over Dr. Terveen on this issue because Dr. Surati's testimony is consistent with the teachings in A3UM. *See id.*; Ex. 1003 ¶ 186.

Specifically, the Petition and Dr. Terveen's declaration rely on page 251 of A3UM to support the assertion that the *Places* view displays the original digital image in the *Viewer*. *See* Pet. 50; Ex. 1003 ¶ 186. The cited part of A3UM provides an overview of the *Viewer*. Ex. 1005, 251. A screenshot showing the *Viewer* and *Browser* is reproduced below. *Id.*

38

IPR2022-00032
Patent 9,552,376 B2



The screenshot shows a *Viewer* displaying the image selected in the *Browser*. *Id.* The *Browser* displays several thumbnail images. *Id.* The *Viewer* displays a larger detailed view of the selected thumbnail image. *Id.*

Dr. Surati testifies that this part of A3UM is not describing the *Places* view. Ex. 2025 ¶ 159. According to Dr. Surati, "clicking the thumbnail in the Browser in the Places view does **not** cause the Places view map to be replaced with a full size image corresponding to the selected thumbnail image." *Id.* ¶ 156.

Dr. Surati's testimony (*id.* ¶¶ 155–157) is adequately supported by several examples from A3UM.

In the section explaining how to view the location information for an image or group of images, A3UM instructs the user to switch to the *Places* view. Ex. 1005, 435. A3UM then instructs the user: "In the Browser, select

39

IPR2022-00032
Patent 9,552,376 B2

an image." *Id.* "A location label appears above a pin in Places view, indicating the location where the image was shot." *Id.* This is illustrated in the screenshot below. *Id.*



The screenshot shows a location pin on the map and a selected image in the *Browser. Id.* The location pin has a label, indicating the location's name and the number of images that were captured there. *Id.* That is, contrary to Dr. Terveen's assertion and unlike the claimed second screenshot, the *Places* view displays a map after the user selects the thumbnail image in the *Browser. See* Ex. 1003 ¶ 186; Ex. 1001, 35:64–65 ("the second screenshot of the video display device not including the interactive map"). In fact, the *Places* view adds information to the map, the location label, to provide additional useful information in response to the user's selection. *See* Ex. 1005, 435.

40

IPR2022-00032
Patent 9,552,376 B2

Dr. Surati points to another example that supports his view. *See* Ex. 2025 ¶ 157 (citing Ex. 1005, 444). The screenshot below illustrates manually assigning locations to images in the *Browser* in *Places* view. Ex. 1005, 443–444.



The screenshot shows the *Places* view with a map and a *Browser* containing five images. *Id.* at 444. One of the images in the *Browser* is selected. *Id.* The map has a purple pin with a location label marking the location "where the image selection was shot." *Id.* at 443. According to A3UM, the user selected an image and dragged it to a location on the *Places*-view map. *Id.* In this example, the user has selected an image and *Places* view still shows the map. *Id.* As in the other example, the user's selection of the thumbnail image

41

in the *Places*-view *Browser* and subsequent interaction with the map serves a purpose: manually assigning locations to images. *See id.*

During his deposition, Dr. Terveen could not explain under what circumstances the *Places*-view map would be replaced with a full-size image in response to selecting a thumbnail image in the *Browser*. Ex. 2023, 152:10–154:22; Ex. 2024, 323:7–324:16. In particular, Dr. Terveen acknowledged that the example on page 436 does not replace the interactive map with the image selected in the *Browser*. Ex. 2023, 154:13–14 ("Well, not in this case it doesn't"). Dr. Terveen could not identify where that feature was found. *See id.* at 154:18–19 ("I can't recall right offhand if that is the case.").

In view of the two examples discussed above (Ex. 1005, 435, 443), we determine that the record favors Dr. Surati's testimony, and credit the Surati Declaration (Ex. 2025 ¶¶ 155–157) over the Terveen Declaration (Ex. 1003 ¶ 186). The record developed during trial shows that the *Places*-view map is not replaced with an image when the user selects a thumbnail image in the *Places*-view *Browser*. *See* PO Resp. 52–56.

In this way, Petitioner's challenge is based on an incorrect assertion about how A3UM's *Places* view works. *See id.* So, in the Petition as originally filed, Petitioner has not shown that A3UM teaches or suggests "the second screenshot of the video display device not including the interactive map," as recited in claim 1. *See* Pet. 50.

### d. Petitioner's Reply

In the Reply, Petitioner argues that the Petition's obviousness challenge was based on a combination of teachings in different sections of A3UM, describing different behaviors of the *Browser* in different views. Reply 23 (citing Pet. 50–52). Petitioner argues that it explained why one of

42

IPR2022-00032
Patent 9,552,376 B2

ordinary skill in the art would have replaced how the *Browser* functions in the *Places* view with how the *Browser* functions in other views. *Id.* (citing Pet. 53). We disagree that the Petition contains any such analysis.

The Petition states, "A3UM discloses selecting a pin . . . Selecting a thumbnail in the Browser *then* prompts display of the original digital image in the Viewer." Pet. 50 (emphasis added). Here, the term "then" implies some relationship in time between the two selections. *Id.* Next, the Petition states, "A skilled person *would retain* this functionality in A3UM-Belitz-Rasmussen combination— thumbnails would replace the pin, but selecting the thumbnail would prompt display of the full image." *Id.* at 50–51 (emphasis added). The phrase "would retain" suggests that A3UM would be unmodified in the combination. *Id.* Also, before explaining that a skilled person would retain the function in the combination, Petitioner does not explain how or why multiple embodiments in A3UM would be combined. *See id.*

In discussing combining A3UM with Belitz, the Petition describes A3UM as disclosing the feature at issue:

> A3UM *discloses* that selecting a map marker in Places view will display "[i]mages shot in the selected location" in the Browser, but the Places map will remain in the Viewer *until a user selects an image to display in a larger fashion in the viewer.*

*Id.* at 53 (emphasis added). Here, the Petition does not mention combining multiple views in A3UM. *Id.* Rather, after this discussion, the Petition presents an obviousness rationale for modifying A3UM's *Places* view with Belitz's teachings, not for combining multiple views in A3UM. *Id.* at 53–57.

In the Reply, Petitioner argues that Patent Owner has not alleged that combining multiple features from A3UM "would present any technical challenge to a skilled artisan to implement." Reply 23. But Petitioner has the

43

IPR2022-00032
Patent 9,552,376 B2

burden to show that the challenged claims are unpatentable. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). And in the Petition as originally filed, Petitioner did not provide any reason for combining the *Viewer-Browser* features on page 251 with the *Places* view described elsewhere. *See* Pet. 50–57. Apart from alleging that it was possible to combine the *Places* view with the *Browser* features from other views, the Reply does not attempt to explain why one of ordinary skill in the art would have done so. *See* Reply 23–24. The Reply only cites page 53 of the Petition, which describes combining A3UM's *Places* view with Belitz to address the claimed "map image." *See id.*

Thus, Petitioner's Reply introduces a new rationale. *See id.* But "an IPR petitioner may not raise in reply 'an entirely new rationale' for why a claim would have been obvious." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330–31 (Fed. Cir. 2019).

In sum, the Petition does not provide us with any reason to believe that Petitioner was relying upon a combination of multiple embodiments of A3UM to address the claimed second screenshot, but even ignoring the language indicating that A3UM's functionality was being retained, the Petition provided no relevant obviousness rationale.

### e.    Map Image

Claim 1 further recites that the "first location view" displays "a first map image":

> responsive to a click or tap of the first user selectable thumbnail image, displaying *a first location view* . . . the displaying the first location view including *displaying* . . . (iii) *a first map image* indicating the geographic coordinates of the first geotag, the displayed scaled replicas of each of the digital photographs or images or videos in the first set of digital files not being overlaid on the first map image . . . .

44

IPR2022-00032
Patent 9,552,376 B2

Ex. 1001, 35:51–63 (emphasis added).

To address this limitation, Petitioner combines A3UM's *Places* view, Belitz, and A3UM's Metadata inspector. *See* Pet. 50–57. Petitioner's obviousness rationale is flawed because the basis for it is the incorrect assertion about the *Places* view discussed above. *Id.*; *see supra* § II.D.4.c.

Specifically, Petitioner proposes using Belitz's teachings to replace the alleged interaction between the *Browser* and interactive map in A3UM's *Places* view:

> A3UM discloses that selecting a map marker in Places view will display "[i]mages shot in the selected location" in the Browser, but the Places map will remain in the Viewer until a user selects an image to display in a larger fashion in the viewer. EX1005, 436-438. By early 2010, it would have been obvious to modify A3UM to combine *these two steps* in view of Belitz's disclosure of displaying, in response to selecting a map marker, a "popup window" showing "at least some of the visual representations 411 of the graphical object 410c," as well as an image "shown in a larger size than the others which are shown in a list" . . . .

Pet. 53–54 (emphasis added). Yet A3UM does not disclose the "two steps" mentioned here. *See supra* § II.D.4.c. Petitioner asserts that replacing these "two steps" would "improve the user experience, such as by reducing the number of steps between selecting a map location and seeing an image with that location." Pet. 54–55 (citing Ex. 1003 ¶¶ 196–197). Petitioner explains that A3UM discloses that "users may prefer certain UI elements be automatically displayed." *Id.* at 55 (Ex. 1005, 74, 183, 259, 303–304).

Patent Owner argues that Petitioner failed to meet its burden because A3UM does not disclose the steps that are part of Petitioner's combination. PO Resp. 57–58 (citing Ex. 1005, 435–436; Ex. 2025 ¶ 164). We agree.

45

IPR2022-00032
Patent 9,552,376 B2

Because Petitioner has not shown that the user selects images in the *Browser* that replace the interactive map with a larger version of those images (*see supra* § II.D.4.c), Petitioner has not shown that it would have been obvious to replace those steps with Belitz's teachings. Pet. 53–54. Dr. Terveen does not give sufficient weight to the examples in A3UM where a user selects images in the *Browser* to add information to the interactive-map display. *See* Ex. 1005, 435, 443–444; *see supra* § II.D.4.c. Because the Surati Declaration is more consistent with those examples, we credit Dr. Surati's testimony (Ex. 2025 ¶ 164) over Dr. Terveen's (Ex. 1003 ¶ 197). For at least this reason, Petitioner has not shown that it would have been obvious to combine A3UM and Belitz to arrive at the claimed "location view" displaying the recited "map image."

Even assuming that Petitioner intended to combine the various embodiments in A3UM, as described for the first time in the Reply, Petitioner's obviousness rationale is still insufficient. *See* Reply 23–24. Under the reasoning introduced in the Reply, Petitioner proposes (1) modifying the *Places* view to allow the user to replace the interactive map with an image shown in the *Browser* (*id.* at 23), and (2) further modifying that combination to display an image in the *Viewer* in response to selecting the map marker in the *Places* view (Pet. 54–55). Petitioner asserts that this modification would "improve the user experience, such as by reducing the number of steps"—i.e., steps resulting from combining different embodiments. *See* Pet. 55; Reply 23. In this way, Petitioner's proposed combination creates an inefficiency that did not exist in A3UM, then purports to improve it by adding Belitz. *See* Reply 23. Here, the reason for adding Belitz's teaching weighs against modifying A3UM in the first place. *See id.*

46

IPR2022-00032
Patent 9,552,376 B2

Apart from that deficiency, Petitioner's proposal to incorporate Belitz's function also ignores the features in A3UM that depend on selecting the *Browser* images to interact with the map. *See id.* at 23–24. For example, as discussed in connection with the second screenshot, the user manually assigns locations to images by selecting them in the *Browser* and then interacting with the map shown in *Places* view. Ex. 1005, 443. The Petition does not explain how the user would be able to accomplish this if the map were replaced with the full-size image when the *Browser* image is selected. Pet. 54–55. Also, selecting the image in the *Places*-view *Browser* causes a location label to appear above a pin on the map. Ex. 1005, 435. This indicates where the image was shot. *Id.* Replacing the map with a larger image would remove this feature.

Petitioner's obviousness analysis purports to reduce steps at the expense of eliminating useful features in the *Places* view. *See* Pet. 53; Reply 23–24. Also, the feature that Petitioner proposes adding—viewing a larger version of an image—is provided elsewhere in the interface. Ex. 1005, 251. In fact, Petitioner argues that a user could access the larger image with very few steps, stating that "switching from the Places view to one with Viewer and Browser involves clicking an icon in the toolbar." Reply 23–24 (Ex. 1005, 65). This tends to show that there is little need to "reduce the number of steps," which is the reason for adding Belitz that is stated in the Petition. Pet. 55. Thus, under the reasoning in the Reply, Petitioner proposes removing features from the *Places* view with no discernable benefit. *See* Reply 23–24.

The record better aligns with Dr. Surati's testimony on this issue. *See* Ex. 2025 ¶¶ 167, 170. In particular, Dr. Surati highlights the problem with replacing the *Places*-view map with an image:

47

IPR2022-00032
Patent 9,552,376 B2

> Modifying A3UM so that the Places map is replaced by an image when selecting a pin/marker would destroy the interplay between selections in the Browser and selections on the map. For instance, once a user selects a pin on the map, they would no longer be able to select a different pin on the map to investigate images at that new location because the map has been replaced by the Browser, without needing to take additional step(s).

*Id.* ¶ 167. Dr. Surati also explains that, contrary to Dr. Terveen's assertions (Ex. 1003 ¶ 197), the proposed modification would require additional steps to investigate other pins:

> Dr. Terveen does not address the fact that the proposed modification would require additional steps to investigate locations on the Places map. For instance, if a user clicked one of the pins on the map and the map were then replaced with an image, the user would have to take some additional step(s) to navigate back to the view including the map and pins to investigate additional pins.

Ex. 2025 ¶ 170. Here, Dr. Surati's testimony is more consistent with A3UM's teachings than Dr. Terveen's testimony that the proposed modification would "improve the user experience" and "reduce the number of steps." *See* Ex. 1003 ¶ 197. Thus, we credit Dr. Surati's testimony (Ex. 2025 ¶¶ 167, 170) over Dr. Terveen's (Ex. 1003 ¶ 197).

To summarize, the most natural reading of the Petition leads to the conclusion that Petitioner's obviousness rationale rests on an assertion that was shown to be incorrect based on the record that was developed during trial. *See* Pet. 53–54; PO Resp. 57. But, even if we were to read the Petition as proposing to modify the *Browser* in *Places* view to work the way that it does in other views, Petitioner has not shown that it would have been obvious to incorporate Belitz's teachings in the manner proposed. *See* Reply 23–24. For these reasons, Petitioner has not shown that it would have

48

IPR2022-00032
Patent 9,552,376 B2

been obvious to combine A3UM and Belitz to arrive at the "location view" that displays a first map image, as recited in claim 1.

### 5.    *Claim 5*

Claim 5 recites a location view displaying a map image, similar to the location views recited in claim 1. *Compare* Ex. 1001, 37:7–14 (claim 5), *with id.* at 35:51–36:14 (claim 1). Notably, claim 5 does not recite a location view with the second screenshot that is recited in claim 1. *See id.* at 37:6–15. Even so, Petitioner's challenge to claim 5 relies on the same reasons for combining Belitz and A3UM presented in connection with claim 1, which were shown to be unpersuasive. *See* Pet. 47–57, 65–66. In particular, referring to the location view in claim 5, Petitioner argues that "A3UM as combined with Belitz and Rasmussen satisfies these features for the same reasons as claim 1's '[first/second] location view' limitations." *Id.* at 66 (citing Pet. § VII.B.2.e; Ex. 1003 ¶ 237) (emphasis removed). Thus, for the reasons discussed in Section II.D.4.e, Petitioner has not shown that it would have been obvious to combine A3UM and Belitz to arrive at the location view displaying a map image, as recited in claim 5.

### 6.    *Claim 12*

Claim 12 recites a location view displaying a map image similar to the location views recited in claim 1. *Compare* Ex. 1001, 38:28–47 (claim 12), *with id.* at 35:51–36:14 (claim 1). Referring to the location view in claim 12, Petitioner asserts that "A3UM as combined with Belitz and Rasmussen satisfies these features for the same reasons as claim 1's '[first/second] location view' features," and "A3UM as combined with Belitz and Rasmussen satisfies these features for the same reasons as claim 1's '[first/second] map image' features." Pet. 76–77 (citing Pet. §§ VII.B.2.e & f; Ex. 1003 ¶¶ 185–204, 288, 291) (emphasis removed).

49

IPR2022-00032
Patent 9,552,376 B2

For the reasons discussed in Section II.D.4 analyzing the challenge to claim 1, Petitioner has not shown that it would have been obvious to combine A3UM, Belitz, and Rasmussen to arrive at the "location view" and "map image" in claim 12.

### 7.    *Claims 2–4 and 6–11*

Claims 2–4 and 6–11 depend from claims 1 or 5. Petitioner's challenges to those claims do not remedy the deficiencies identified above in Section II.D.4.

Claim 2 inherits the limitations of claim 1 and further defines the user-selectable thumbnail images. Ex. 1001, 36:15–21. Petitioner relies on Belitz's thumbnails to address the features recited in claim 2, and the challenge depends on combining Belitz with A3UM, as discussed in connection with claim 1. *See* Pet. 57–58. For the reasons discussed in Section II.D.4 analyzing the challenge to claim 1, Petitioner has not shown that it would have been obvious to combine A3UM, Belitz, and Rasmussen to arrive at the subject matter in claim 2.

Claim 3 further recites limitations related to the location view: "responsive to a click or tap of a first one of the displayed scaled replicas in the first location view." Ex. 1001, 36:22–24. In the challenge to claim 3, Petitioner repeats and relies upon the incorrect assertion about A3UM's *Places* view: "Selecting a pin on A3UM's Places map displays in the Browser thumbnail representations of all photos matching the pin location, EX1005, 436-437, and selecting a thumbnail ('a click or tap' of a 'scaled replica[]') displays the original digital image in the Viewer." Pet. 59. Thus, Petitioner's challenge is deficient for the same reasons discussed in Section II.D.4.

50

IPR2022-00032
Patent 9,552,376 B2

Claim 4 depends from claim 3 and recites limitations to the overlaying feature. Ex. 1001, 36:34–42. Petitioner's challenge to claim 4 depends on combining Belitz with A3UM, as discussed in connection with claim 1, because claim 4 incorporates the subject matter from claim 1 via its dependency. Pet. 61–63. For the reasons discussed in Section II.D.4 analyzing the challenge to claim 1, Petitioner has not shown that it would have been obvious to combine A3UM, Belitz, and Rasmussen to arrive at the subject matter in claim 4. *See id.*

Claims 6–11 depend from claim 5. Ex. 1001, 37:14–56. Petitioner's challenges to claims 6–11 depend on combining Belitz with A3UM, as discussed in connection with claim 5, because claims 6–11 incorporate the subject matter from claim 5. Pet. 66–72. None of the challenges address or obviate the deficiencies of Petitioner's combination of A3UM with Belitz. *See id.* For the reasons discussed in Section II.D.5 analyzing the challenge to claim 5, Petitioner has not shown that it would have been obvious to combine A3UM, Belitz, and Rasmussen to arrive at the subject matter in claims 6–11. *See id.*

Thus, Petitioner has not shown that the subject matter recited in claims 2–4 and 6–11 would have been obvious over the combination of A3UM, Belitz, and Rasmussen. *See id.* at 57–63, 66–72.

## III.    MOTION TO EXCLUDE

Patent Owner filed a motion to exclude A3UM (Exhibit 1005). Paper 35 ("Motion" or "Mot."). According to Patent Owner, Petitioner has not properly authenticated Exhibit 1005 as a true and correct copy of A3UM. *See id.* Even without excluding this exhibit, Petitioner has not proven any of

51

IPR2022-00032
Patent 9,552,376 B2

the challenged claims as unpatentable. *See supra* § II.D. Thus, we dismiss

Patent Owner's Substitute Motion to Exclude as moot.

## IV. CONCLUSION

Petitioner has not shown by a preponderance of the evidence that

claims 1–12 are unpatentable.

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–12 | 103 | A3UM, Belitz, Rasmussen | | 1–12 |
| **Overall Outcome** | | | | 1–12 |

52

IPR2022-00032
Patent 9,552,376 B2

## V.    ORDER

It is

ORDERED that Petitioner has not shown that claims 1–12 of U.S. Patent 9,552,376 B2 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is dismissed; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-00032
Patent 9,552,376 B2

FOR PETITIONER:

Jeffrey P. Kushan
SIDLEY AUSTIN LLP
jkushan@sidley.com

FOR PATENT OWNER:

Jennifer Hayes
George Dandalides
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com

54

(12) **United States Patent**
Desmond et al.

(10) **Patent No.:** US 11,017,020 B2
(45) **Date of Patent:** May 25, 2021

(54) **METHOD AND APPARATUS FOR MANAGING DIGITAL FILES**

(71) Applicant: **Memoryweb, LLC**, Glen Ellyn, IL (US)

(72) Inventors: **Christopher J. Desmond**, Glen Ellyn, IL (US); **Nancy L. Desmond**, Glen Ellyn, IL (US); **L. Michael Taylor**, Chicago, IL (US)

(73) Assignee: **MEMORYWEB, LLC**, Glen Ellyn, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/079,208**

(22) Filed: **Oct. 23, 2020**

(65) **Prior Publication Data**

US 2021/0042349 A1     Feb. 11, 2021

**Related U.S. Application Data**

(63) Continuation of application No. 16/536,300, filed on Aug. 8, 2019, which is a continuation of application
(Continued)

(51) **Int. Cl.**
 *G06F 16/58* (2019.01)
 *G06F 16/51* (2019.01)
(Continued)

(52) **U.S. Cl.**
 CPC .......... *G06F 16/5866* (2019.01); *G06F 16/51* (2019.01); *G06F 16/901* (2019.01); *G06F 16/907* (2019.01); *G06F 3/0481* (2013.01)

(58) **Field of Classification Search**
 None
 See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,450,504 A     9/1995  Calia
5,694,514 A    12/1997  Evans
(Continued)

FOREIGN PATENT DOCUMENTS

CN     102591922 B    10/2015
EP     2466869 A3      2/2017
(Continued)

OTHER PUBLICATIONS

Yee et al., "Faceted Metadata for Image Search and Browsing," CHI 2003, pp. 401-408, 2003, ACM.
(Continued)

*Primary Examiner* — Ashish Thomas
*Assistant Examiner* — Mellissa M. Ohba
(74) *Attorney, Agent, or Firm* — Nixon Peabody LLP

(57) **ABSTRACT**

A computer-implemented method of associating digital tags with digital files comprises storing a plurality of digital files having embedded therein content data and metadata including tags; receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and displaying, on a video display device associated with the client device, a first indication of the first tag label.

**59 Claims, 50 Drawing Sheets**



Petitioner Apple Inc. - Ex. 1001, p. 1

**US 11,017,020 B2**

Page 2

### Related U.S. Application Data

No. 15/375,927, filed on Dec. 12, 2016, now Pat. No. 10,423,658, which is a continuation of application No. 14/193,426, filed on Feb. 28, 2014, now Pat. No. 9,552,376, which is a continuation-in-part of application No. 13/157,214, filed on Jun. 9, 2011, now Pat. No. 9,098,531.

(51) **Int. Cl.**

| | | |
|---|---|---|
| *G06F 16/901* | (2019.01) | |
| *G06F 16/907* | (2019.01) | |
| *G06F 3/0481* | (2013.01) | |

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,835,616 | A | 11/1998 | Lobo |
| 5,850,470 | A | 12/1998 | Kung |
| 5,982,912 | A | 11/1999 | Fukui |
| 6,002,401 | A * | 12/1999 | Baker ..................... G06F 16/10 |
| | | | 715/839 |
| 6,134,339 | A | 10/2000 | Luo |
| 6,246,779 | B1 | 6/2001 | Fukui |
| 6,301,370 | B1 | 10/2001 | Steffens |
| 6,629,104 | B1 | 9/2003 | Parulski |
| 6,697,502 | B2 | 2/2004 | Luo |
| 6,714,215 | B1 | 3/2004 | Flora |
| 6,728,401 | B1 | 4/2004 | Hardeberg |
| 6,940,545 | B1 | 9/2005 | Ray |
| 6,965,693 | B1 | 11/2005 | Kondo |
| 7,003,135 | B2 | 2/2006 | Hsieh |
| 7,190,829 | B2 | 3/2007 | Zhang |
| 7,372,976 | B2 | 5/2008 | Rhoad |
| 7,461,099 | B1 | 12/2008 | Sharpe |
| 7,474,317 | B2 | 1/2009 | Dolph |
| 7,475,060 | B2 | 1/2009 | Toyama |
| 7,480,669 | B2 | 1/2009 | Lo |
| 7,522,701 | B2 | 4/2009 | Jensen |
| 7,587,671 | B2 | 9/2009 | Saft |
| 7,634,662 | B2 | 12/2009 | Monroe |
| 7,646,895 | B2 | 1/2010 | Haupt |
| 7,694,236 | B2 | 4/2010 | Gusmorino |
| 7,702,185 | B2 | 4/2010 | Keating |
| 7,804,982 | B2 | 9/2010 | Howard |
| 7,822,746 | B2 | 10/2010 | Svendsen |
| 7,840,344 | B2 | 11/2010 | Sloo |
| 7,840,892 | B2 * | 11/2010 | Pyhalammi ............. G06F 16/58 |
| | | | 715/230 |
| 7,860,846 | B2 | 12/2010 | Takahashi |
| 7,916,905 | B2 | 3/2011 | Yen |
| 7,929,771 | B2 | 4/2011 | Ko |
| 7,948,502 | B2 | 5/2011 | Stanton |
| 7,962,467 | B2 | 6/2011 | Howard |
| 7,965,908 | B2 | 6/2011 | Hayashi |
| 7,970,240 | B1 * | 6/2011 | Chao ................... G06F 3/04817 |
| | | | 382/305 |
| 7,991,283 | B2 | 8/2011 | Chen |
| 8,001,124 | B2 | 8/2011 | Svendsen |
| 8,015,144 | B2 | 9/2011 | Zheng |
| 8,024,317 | B2 | 9/2011 | Nair |
| 8,032,508 | B2 | 10/2011 | Martinez |
| 8,055,675 | B2 | 11/2011 | Higgins |
| 8,060,492 | B2 | 11/2011 | Nair |
| 8,069,142 | B2 | 11/2011 | Davis |
| 8,073,461 | B2 * | 12/2011 | Altman ................... H04L 67/04 |
| | | | 455/456.1 |
| 8,086,048 | B2 | 12/2011 | Naaman |
| 8,086,867 | B2 | 12/2011 | Freeman |
| 8,108,778 | B2 | 1/2012 | Athsani |
| 8,121,408 | B2 | 2/2012 | Omori |
| 8,144,232 | B2 * | 3/2012 | Larson ............. H04N 5/232935 |
| | | | 348/333.05 |
| 8,150,844 | B2 | 4/2012 | Redstone |
| 8,150,967 | B2 | 4/2012 | King |
| 8,165,352 | B1 | 4/2012 | Mohanty |
| 8,166,016 | B2 | 4/2012 | Higgins |
| 8,166,168 | B2 | 4/2012 | Hayashi |
| 8,171,388 | B2 | 5/2012 | Zaltzman |
| 8,175,340 | B2 | 5/2012 | Tsutsui |
| 8,230,338 | B2 | 7/2012 | Dugan |
| 8,239,784 | B2 | 8/2012 | Hotelling |
| 8,255,379 | B2 | 8/2012 | Govindachetty |
| 8,264,570 | B2 | 9/2012 | Karimoto |
| 8,271,506 | B2 | 9/2012 | Martinez |
| 8,281,027 | B2 | 10/2012 | Martinez |
| 8,285,483 | B2 | 10/2012 | Amer-Yahia |
| 8,307,029 | B2 | 11/2012 | Davis |
| 8,315,959 | B2 | 11/2012 | Zheng |
| 8,326,000 | B2 | 12/2012 | Jung |
| 8,332,402 | B2 | 12/2012 | Forstall |
| 8,358,811 | B2 | 1/2013 | Adams |
| 8,359,314 | B2 | 1/2013 | Svendsen |
| 8,364,611 | B2 | 1/2013 | Tendjoukian |
| 8,380,039 | B2 | 2/2013 | Luo |
| 8,386,506 | B2 | 2/2013 | Martinez |
| 8,390,702 | B2 | 3/2013 | Bhatt |
| 8,401,771 | B2 | 3/2013 | Krumm |
| 8,402,356 | B2 | 3/2013 | Martinez |
| 8,416,312 | B2 | 4/2013 | Matsunaga |
| 8,429,156 | B2 | 4/2013 | Buchmueller |
| 8,447,120 | B2 | 5/2013 | Ji |
| 8,458,115 | B2 | 6/2013 | Cai |
| 8,463,931 | B2 | 6/2013 | Evans |
| 8,484,223 | B2 | 7/2013 | Ota |
| 8,489,115 | B2 | 7/2013 | Rodriguez |
| 8,490,011 | B2 | 7/2013 | Stapleton |
| 8,493,495 | B2 | 7/2013 | D'Souza |
| 8,503,791 | B2 | 8/2013 | Conwell |
| 8,504,073 | B2 | 8/2013 | Svendsen |
| 8,520,979 | B2 | 8/2013 | Conwell |
| D689,079 | S | 9/2013 | Edwards |
| D689,080 | S | 9/2013 | Edwards |
| D689,083 | S | 9/2013 | Pasceri |
| D689,084 | S | 9/2013 | Pasceri |
| D689,085 | S | 9/2013 | Pasceri |
| 8,538,811 | B2 | 9/2013 | Higgins |
| 8,538,813 | B2 | 9/2013 | Kakarla |
| 8,542,294 | B2 | 9/2013 | Bhatt |
| 8,554,623 | B2 | 10/2013 | Higgins |
| 8,560,390 | B2 | 10/2013 | Higgins |
| 8,560,517 | B2 | 10/2013 | Yang |
| 8,583,620 | B2 | 11/2013 | Govindachetty |
| 8,583,668 | B2 | 11/2013 | Higgins |
| 8,584,015 | B2 | 11/2013 | Osten |
| 8,589,389 | B2 | 11/2013 | Bisdikian |
| 8,589,486 | B2 | 11/2013 | Martinez |
| 8,594,702 | B2 | 11/2013 | Nauman |
| 8,606,021 | B2 | 12/2013 | Conwell |
| 8,626,699 | B2 | 1/2014 | Xie |
| 8,649,604 | B2 | 2/2014 | Steinberg |
| 8,660,358 | B1 | 2/2014 | Bergboer |
| 8,671,154 | B2 | 3/2014 | Davis |
| 8,676,001 | B2 | 3/2014 | Bracher |
| 8,698,762 | B2 * | 4/2014 | Wagner ............... G06F 3/04883 |
| | | | 345/173 |
| 8,706,406 | B2 | 4/2014 | Kalaboukis |
| 8,712,192 | B2 | 4/2014 | Thota |
| 8,743,411 | B2 | 6/2014 | Bachman |
| 8,745,133 | B2 | 6/2014 | Martinez |
| 8,750,574 | B2 | 6/2014 | Ganong |
| 8,762,285 | B2 | 6/2014 | Davis |
| D708,196 | S | 7/2014 | Pasceri |
| D708,197 | S | 7/2014 | Pasceri |
| D708,198 | S | 7/2014 | Pasceri |
| 8,769,099 | B2 | 7/2014 | Kalaboukis |
| 8,769,393 | B1 | 7/2014 | Abhyanker |
| 8,799,371 | B2 | 8/2014 | Davis |
| 8,805,165 | B2 | 8/2014 | Luo |
| 8,806,365 | B2 | 8/2014 | Stapleton |
| 8,810,597 | B2 | 8/2014 | Akiya |
| 8,811,775 | B1 * | 8/2014 | Chao ..................... G06F 16/54 |
| | | | 382/305 |
| 8,813,107 | B2 | 8/2014 | Higgins |
| 8,825,472 | B2 | 9/2014 | Raghuveer |

Petitioner Apple Inc. - Ex. 1001, p. 2

**US 11,017,020 B2**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,831,352 | B2 | 9/2014 | Gao |
| 8,845,855 | B2 | 9/2014 | Hubacek et al. |
| 8,849,854 | B2 | 9/2014 | Kakarla |
| 8,849,909 | B2 | 9/2014 | Farmer |
| D715,819 | S | 10/2014 | Pasceri |
| 8,880,535 | B1 | 11/2014 | Agarwal |
| 8,880,568 | B2 | 11/2014 | Perczynski |
| 8,890,888 | B2 | 11/2014 | Lee |
| 8,892,495 | B2 | 11/2014 | Hoffberg |
| 8,914,342 | B2 | 12/2014 | Kalaboukis |
| 8,923,889 | B2 | 12/2014 | Svendsen |
| 8,930,848 | B2 | 1/2015 | Lim |
| 8,949,212 | B1 | 2/2015 | Dhandapani |
| 8,954,425 | B2 | 2/2015 | Xiao |
| 8,966,121 | B2 | 2/2015 | Josefsberg |
| 8,972,177 | B2 | 3/2015 | Zheng |
| 8,998,422 | B1 | 4/2015 | Snavely |
| 9,009,177 | B2 | 4/2015 | Zheng |
| 9,014,511 | B2 | 4/2015 | Bracher |
| 9,015,617 | B2 | 4/2015 | Stapleton |
| 9,015,633 | B2 | 4/2015 | Takamura |
| 9,020,247 | B2 | 4/2015 | Adam |
| 9,031,953 | B2 | 5/2015 | Rathnavelu |
| 9,032,320 | B2 | 5/2015 | Crawford |
| 9,047,847 | B2 | 6/2015 | Hochmuth |
| 9,055,037 | B2 | 6/2015 | Evans |
| 9,063,226 | B2 | 6/2015 | Zheng |
| 9,076,259 | B2 | 7/2015 | Hourie |
| 9,092,409 | B2 | 7/2015 | Charaniya |
| 9,098,545 | B2 | 8/2015 | Abhyanker |
| 9,104,729 | B2 | 8/2015 | Dong |
| 9,104,915 | B2 | 8/2015 | Conwell |
| 9,110,903 | B2 | 8/2015 | Martinez |
| 9,135,751 | B2 | 9/2015 | Moore |
| 9,151,618 | B2 | 10/2015 | Amer-Yahia |
| 9,152,849 | B2 | 10/2015 | Ganong |
| 9,158,794 | B2 | 10/2015 | Higgins |
| 9,160,802 | B2 | 10/2015 | Svendsen |
| 9,172,666 | B2 | 10/2015 | Murdock |
| D742,405 | S | 11/2015 | Choi |
| 9,202,200 | B2 | 12/2015 | Stibel |
| 9,218,328 | B2 | 12/2015 | Stapleton |
| 9,224,172 | B2 | 12/2015 | Churchill |
| 9,235,766 | B2 | 1/2016 | Yi |
| 9,239,848 | B2 | 1/2016 | Liu |
| 9,245,041 | B2 | 1/2016 | Pilskalns |
| 9,261,376 | B2 | 2/2016 | Zheng |
| D751,597 | S | 3/2016 | Pasceri |
| 9,311,396 | B2 | 4/2016 | Meadow |
| 9,323,855 | B2 | 4/2016 | Hochmuth |
| 9,336,240 | B2 | 5/2016 | Bhatt |
| 9,372,931 | B2 | 6/2016 | Capt |
| 9,390,104 | B2 | 7/2016 | Thomee |
| 9,405,981 | B2 | 8/2016 | Li |
| 9,418,485 | B2 | 8/2016 | Lindberg |
| 9,424,595 | B2 | 8/2016 | Svendsen |
| 9,436,374 | B2 | 9/2016 | Marr |
| 9,460,116 | B2 | 10/2016 | Pilskalns |
| 9,462,054 | B2 | 10/2016 | Poletto |
| 9,465,513 | B2 | 10/2016 | sims |
| 9,471,200 | B2 | 10/2016 | Dellinger |
| 9,471,834 | B1 | 10/2016 | Filip |
| 9,483,500 | B2 | 11/2016 | Blucher |
| 9,495,583 | B2 | 11/2016 | Gilley |
| 9,501,577 | B2 | 11/2016 | Zheng |
| 9,507,778 | B2 | 11/2016 | Jaffe |
| 9,419,682 | B2 | 12/2016 | Pujara |
| 9,535,563 | B2 | 1/2017 | Hoffberg |
| 9,536,146 | B2 | 1/2017 | Zheng |
| 9,552,376 | B2 | 1/2017 | Desmond |
| 9,557,162 | B2 | 1/2017 | Rodriguez |
| 9,576,253 | B2 | 2/2017 | Zaltzman |
| 9,582,546 | B2 | 2/2017 | Hartford |
| 9,593,957 | B2 | 3/2017 | Zheng |
| 9,600,484 | B2 | 3/2017 | Davis |

| | | | |
|---|---|---|---|
| 9,606,668 | B2 | 3/2017 | Hotelling |
| 9,626,685 | B2 | 4/2017 | Martinez |
| 9,639,740 | B2 * | 5/2017 | Ganong ............ G06K 9/00288 |
| 9,646,022 | B2 | 5/2017 | Boyns |
| 9,654,570 | B2 | 5/2017 | Bisdikian |
| 9,674,650 | B2 | 6/2017 | Hartford |
| 9,677,886 | B2 | 6/2017 | Didjusto |
| 9,679,456 | B2 | 6/2017 | East |
| 9,680,929 | B2 | 6/2017 | Tseng |
| 9,683,858 | B2 | 6/2017 | Zheng |
| 9,691,073 | B2 | 6/2017 | Tseng |
| 9,703,873 | B2 | 7/2017 | Fakeih |
| 9,706,345 | B2 | 7/2017 | Davis |
| 9,710,961 | B2 | 7/2017 | Setlur |
| 9,715,366 | B2 | 7/2017 | Bostick |
| 9,721,188 | B2 | 8/2017 | Adam |
| 9,754,226 | B2 | 9/2017 | Zheng |
| 9,772,745 | B2 | 9/2017 | Hasenei |
| 9,787,799 | B2 | 10/2017 | Grue |
| 9,805,123 | B2 | 10/2017 | Nair |
| 9,811,879 | B2 | 11/2017 | Miller |
| 9,836,183 | B1 | 12/2017 | Love |
| 9,857,941 | B2 | 1/2018 | Wagner |
| 9,858,348 | B1 | 1/2018 | Higgins |
| 9,870,572 | B2 | 1/2018 | Chapin |
| 9,881,179 | B2 | 1/2018 | Patton |
| 9,882,994 | B2 | 1/2018 | Bisdikian |
| 9,916,075 | B2 | 3/2018 | Zhao |
| 9,942,121 | B2 | 4/2018 | Poletto |
| 10,001,917 | B2 | 6/2018 | Kim |
| 10,019,850 | B2 | 7/2018 | Lindberg |
| 10,037,327 | B2 | 7/2018 | Thomee |
| 10,068,178 | B2 | 9/2018 | van Zwol |
| 10,073,584 | B2 | 9/2018 | Miura |
| 10,074,093 | B2 | 9/2018 | Higgins |
| 10,083,533 | B2 | 9/2018 | Bhatt |
| 10,110,541 | B2 | 10/2018 | Li |
| 10,120,947 | B2 | 11/2018 | Kritt |
| 10,139,989 | B2 | 11/2018 | Shiroor |
| 10,140,743 | B2 | 11/2018 | Hochmuth |
| 10,145,704 | B2 | 12/2018 | Lanza |
| 10,147,215 | B2 | 12/2018 | Lanza |
| 10,187,543 | B2 | 1/2019 | Lahcanski |
| 10,223,701 | B2 | 3/2019 | King |
| 10,230,803 | B2 | 3/2019 | Higgins |
| 10,235,444 | B2 | 3/2019 | Poletto |
| 10,242,051 | B2 | 3/2019 | Shinn |
| 10,282,752 | B2 | 5/2019 | Athsani |
| 10,288,433 | B2 | 5/2019 | Zheng |
| 10,289,643 | B2 | 5/2019 | Brucher |
| 10,303,975 | B2 | 5/2019 | Adam |
| 10,311,611 | B2 | 6/2019 | Stoop |
| 10,318,110 | B2 | 6/2019 | Naaman |
| 10,324,973 | B2 | 6/2019 | Circlaeys |
| 10,331,863 | B2 | 6/2019 | Patton |
| 10,360,352 | B2 | 7/2019 | Patton |
| 10,430,452 | B2 | 10/2019 | Ross |
| 10,445,346 | B2 | 10/2019 | Govindachetty |
| 10,489,980 | B1 | 11/2019 | Canavor |
| 10,540,668 | B2 | 1/2020 | Hoertz |
| 10,606,449 | B2 | 3/2020 | Canavor |
| 10,628,463 | B2 | 4/2020 | Purumala |
| 10,643,263 | B2 | 5/2020 | Wormhoudt |
| 10,650,039 | B2 | 5/2020 | Mariner |
| 10,650,475 | B2 | 5/2020 | Berg |
| 2001/0030667 | A1 * | 10/2001 | Kelts .................. H04N 21/4314 |
| | | | 715/854 |
| 2001/0043727 | A1 | 11/2001 | Cooper |
| 2002/0019224 | A1 | 2/2002 | Meyers |
| 2002/0075322 | A1 * | 6/2002 | Rosenzweig ........... G06F 16/58 |
| | | | 715/835 |
| 2002/0097894 | A1 * | 7/2002 | Staas .................... G06F 16/58 |
| | | | 382/113 |
| 2002/0112237 | A1 * | 8/2002 | Kelts ..................... G06F 16/954 |
| | | | 725/39 |
| 2002/0191818 | A1 | 12/2002 | Matsuo |
| 2003/0033296 | A1 * | 2/2003 | Rothmuller ............ G06F 16/40 |
| 2003/0039380 | A1 | 2/2003 | Sukegawa |
| 2003/0053663 | A1 | 3/2003 | Chen |

Petitioner Apple Inc. - Ex. 1001, p. 3

**US 11,017,020 B2**

Page 4

(56)        **References Cited**

U.S. PATENT DOCUMENTS

2003/0063669 A1    4/2003    Lee
2003/0103652 A1    6/2003    Lee
2003/0122787 A1    7/2003    Zimmerman
2003/0133599 A1    7/2003    Tian
2003/0179911 A1    9/2003    Ho
2003/0198368 A1    10/2003    Kee
2003/0210808 A1    11/2003    Chen
2004/0081338 A1    4/2004    Takenaka
2004/0109584 A1    6/2004    Lestideau
2004/0125991 A1    7/2004    Yokoi
2004/0135797 A1    7/2004    Meier
2004/0190758 A1    9/2004    Doi
2004/0205504 A1    10/2004    Phillips
2004/0218894 A1    11/2004    Harville
2004/0225635 A1    11/2004    Toyama
2004/0264780 A1    12/2004    Zhang
2004/0264810 A1    12/2004    Taugher
2005/0031173 A1    2/2005    Hwang
2005/0060299 A1    3/2005    Filley
2005/0094849 A1    5/2005    Sung
2005/0100195 A1    5/2005    Li
2005/0105806 A1    5/2005    Nagaoka
2005/0117802 A1    6/2005    Yonaha
2005/0141766 A1    6/2005    Nagahashi
2005/0180627 A1    8/2005    Yang
2005/0183026 A1    8/2005    Amano
2005/0220347 A1    10/2005    Enomoto
2005/0251015 A1    11/2005    Takikawa
2005/0265603 A1    12/2005    Porter
2006/0001652 A1    1/2006    Chiu
2006/0021027 A1    1/2006    Saito
2006/0029265 A1    2/2006    Kim
2006/0050933 A1    3/2006    Adam
2006/0078201 A1    4/2006    Kim
2006/0133672 A1    6/2006    Li
2006/0165380 A1    7/2006    Tanaka
2006/0204034 A1    9/2006    Steinberg
2006/0222215 A1    10/2006    Jung
2006/0222217 A1    10/2006    Kitamura
2006/0224738 A1*    10/2006    McIntyre ........... H04N 1/00132
                                                        709/225
2007/0110305 A1    5/2007    Corcoran
2007/0118508 A1    5/2007    Svendsen
2007/0152984 A1    7/2007    Ording
2007/0206834 A1    9/2007    Shinkai
2007/0211925 A1    9/2007    Aoki
2007/0239764 A1    10/2007    Song
2007/0271297 A1    11/2007    Jaffe
2007/0282908 A1    12/2007    Van der Meulen
2008/0040034 A1    2/2008    Kanno
2008/0051994 A1    2/2008    Fisher
2008/0052945 A1    3/2008    Matas
2008/0056580 A1    3/2008    Okada
2008/0080743 A1*    4/2008    Schneiderman ...... G08B 13/196
                                                        382/118
2008/0122944 A1    5/2008    Zhang
2008/0148175 A1    6/2008    Naaman
2008/0168349 A1    7/2008    Lamiraux
2008/0168402 A1    7/2008    Blumenberg
2008/0201302 A1    8/2008    Kimchi
2008/0212849 A1    9/2008    Gao
2008/0212879 A1    9/2008    Torii
2008/0220750 A1    9/2008    Steinberg
2008/0232695 A1    9/2008    Noda
2008/0250398 A1    10/2008    Takahashi
2008/0298766 A1*    12/2008    Wen ..................... G06F 16/5854
                                                        386/282
2008/0309632 A1    12/2008    Westerman
2008/0317379 A1    12/2008    Steinberg
2009/0013041 A1    1/2009    Farmer
2009/0019085 A1    1/2009    Abhyanker
2009/0049408 A1    2/2009    Naaman
2009/0106705 A1    4/2009    Takamura
2009/0113350 A1    4/2009    Hibino
2009/0132689 A1    5/2009    Zaltzman

2009/0132941 A1    5/2009    Pilskalns
2009/0135438 A1    5/2009    Chopra
2009/0185784 A1    7/2009    Hiroike
2009/0216704 A1    8/2009    Zheng
2009/0222302 A1    9/2009    Higgins
2009/0254867 A1    10/2009    Farouki
2009/0265631 A1    10/2009    Sigurbjornsson
2009/0278806 A1    11/2009    Duarte
2009/0279794 A1    11/2009    Brucher
2009/0288005 A1    11/2009    Stapleton
2009/0290812 A1    11/2009    Naaman
2009/0307618 A1    12/2009    Lawler
2009/0324018 A1    12/2009    Tell
2009/0325602 A1    12/2009    Higgins
2010/0030578 A1*    2/2010    Siddique ............... G06Q 40/12
                                                        705/3
2010/0041419 A1    2/2010    Svendsen
2010/0046842 A1    2/2010    Conwell
2010/0053371 A1    3/2010    Karimoto
2010/0061631 A1    3/2010    Omori
2010/0064239 A1    3/2010    Crawford
2010/0082427 A1    4/2010    Burgener
2010/0083173 A1    4/2010    Germann
2010/0088641 A1    4/2010    Choi
2010/0107125 A1    4/2010    Ockene
2010/0153348 A1    6/2010    Perczynski
2010/0162411 A1    6/2010    Chang
2010/0171763 A1*    7/2010    Bhatt .................. G06F 16/9537
                                                        345/660
2010/0172550 A1    7/2010    Gilley
2010/0182341 A1    7/2010    Lee
2010/0185509 A1    7/2010    Higgins
2010/0231537 A1    9/2010    Pisula
2010/0241689 A1    9/2010    Davis
2010/0241944 A1    9/2010    Athsani
2010/0245614 A1    9/2010    Matsunaga
2010/0268717 A1    10/2010    Pilskalns
2010/0268766 A1    10/2010    Bouget
2010/0272363 A1    10/2010    Steinberg
2010/0280913 A1    11/2010    O'Sullivan
2010/0283743 A1    11/2010    Coddington
2010/0287053 A1    11/2010    Ganong
2010/0293035 A1    11/2010    Athsani
2010/0293193 A1    11/2010    Harrison
2010/0302179 A1    12/2010    Aim
2010/0312596 A1*    12/2010    Saffari ................ G06F 3/0481
                                                        705/7.32
2011/0040779 A1    2/2011    Svendsen
2011/0063108 A1    3/2011    Aonuma
2011/0093458 A1    4/2011    Zheng
2011/0109769 A1    5/2011    Bhatt
2011/0113064 A1    5/2011    Govindachetty
2011/0145258 A1    6/2011    Kankainen
2011/0188713 A1    8/2011    Chin
2011/0191014 A1    8/2011    Feng
2011/0191253 A1    8/2011    Pilskalns
2011/0202267 A1    8/2011    Svendsen
2011/0208426 A1    8/2011    Zheng
2011/0289031 A1    11/2011    Zheng
2011/0301832 A1    12/2011    Zheng
2011/0307836 A1    12/2011    Cho
2011/0314016 A1    12/2011    Svendsen
2012/0047457 A1    2/2012    Park
2012/0096361 A1    4/2012    Osten
2012/0113475 A1    5/2012    Sugiyama
2012/0114249 A1    5/2012    Conwell
2012/0158755 A1    6/2012    Gammill
2012/0162249 A1    6/2012    Tsuda
2012/0192110 A1    7/2012    Wu
2012/0204101 A1    8/2012    Yoshida
2012/0210200 A1*    8/2012    Berger ................ G06F 3/0481
                                                        715/202
2012/0218150 A1    8/2012    Oyabu
2012/0220311 A1    8/2012    Rodriguez
2012/0251011 A1    10/2012    Gao
2012/0266090 A1    10/2012    Nealer
2012/0278171 A1    11/2012    Tang
2012/0278767 A1    11/2012    Stibel
2012/0329441 A1    12/2012    Tseng

**US 11,017,020 B2**

Page 5

(56)　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2012/0331091 A1 | 12/2012 | Tseng |
| 2013/0018881 A1 | 1/2013 | Bhatt |
| 2013/0036165 A1 | 2/2013 | Tseng |
| 2013/0063613 A1 | 3/2013 | Conwell |
| 2013/0073202 A1 | 3/2013 | Zheng |
| 2013/0101157 A1 | 4/2013 | Li |
| 2013/0138685 A1 | 5/2013 | Brucher |
| 2013/0141612 A1 | 6/2013 | Bhatt |
| 2013/0151597 A1 | 6/2013 | Akiya |
| 2013/0185676 A1 | 7/2013 | Cao |
| 2013/0202198 A1 | 8/2013 | Adam |
| 2013/0275536 A1 | 10/2013 | Murdock |
| 2013/0339440 A1 | 12/2013 | Balassanian |
| 2014/0040774 A1 | 2/2014 | Chartyoniuk |
| 2014/0059477 A1 | 2/2014 | Wong |
| 2014/0059492 A1 | 2/2014 | Hashida |
| 2014/0071272 A1 | 3/2014 | Rodriguez |
| 2014/0088861 A1 | 3/2014 | Nash |
| 2014/0089811 A1 | 3/2014 | Meadow |
| 2014/0101531 A1 | 4/2014 | Capt |
| 2014/0101601 A1 | 4/2014 | Tang |
| 2014/0112553 A1 | 4/2014 | Yamaguchi |
| 2014/0143247 A1 | 5/2014 | Rathnavelu |
| 2014/0149036 A1 | 5/2014 | Amer-Yahia |
| 2014/0161326 A1 | 6/2014 | Ganong |
| 2014/0181089 A1 | 6/2014 | Desmond |
| 2014/0188880 A1 | 7/2014 | Abhyanker |
| 2014/0193087 A1 | 7/2014 | Conwell |
| 2014/0207444 A1 | 7/2014 | Heiman |
| 2014/0258850 A1 | 9/2014 | Carey |
| 2014/0354628 A1 | 12/2014 | Lindberg |
| 2015/0039630 A1 | 2/2015 | Thomee |
| 2015/0066919 A1 | 3/2015 | Park |
| 2015/0070165 A1 | 3/2015 | East |
| 2015/0070397 A1 | 3/2015 | Miller |
| 2015/0116540 A1 | 4/2015 | Gilman |
| 2015/0117713 A1 | 4/2015 | Zheng |
| 2015/0131872 A1 | 5/2015 | Ganong |
| 2015/0156247 A1 | 6/2015 | Hensel |
| 2015/0186389 A1 | 7/2015 | Zheng |
| 2015/0213057 A1 | 7/2015 | Brucher |
| 2015/0213329 A1 | 7/2015 | Adam |
| 2015/0244794 A1 | 8/2015 | Poletto |
| 2015/0244833 A1 | 8/2015 | Gru |
| 2015/0358224 A1 | 12/2015 | Poletto |
| 2016/0048279 A1 | 2/2016 | Han |
| 2016/0092741 A1 | 3/2016 | Li |
| 2016/0162512 A1 | 6/2016 | Battistini |
| 2016/0247307 A1 | 8/2016 | Stoop |
| 2016/0253358 A1 | 9/2016 | Bhatt |
| 2016/0314187 A1 | 10/2016 | Poletto |
| 2016/0321269 A1 | 11/2016 | Thomee |
| 2016/0328444 A1 | 11/2016 | Shinn |
| 2016/0344888 A1 | 11/2016 | Lahcanski |
| 2016/0357822 A1 | 12/2016 | Woods |
| 2017/0024415 A1 | 1/2017 | Brucher |
| 2017/0046565 A1 | 2/2017 | Gilley |
| 2017/0069123 A1 | 3/2017 | Hochmuth |
| 2017/0103081 A1 | 4/2017 | Jones |
| 2017/0192645 A1 | 7/2017 | Murray |
| 2017/0357672 A1 | 12/2017 | Circlaeys |
| 2018/0181281 A1 | 6/2018 | Suki |
| 2018/0364872 A1 | 12/2018 | Miura |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 2410414 B1 | 10/2019 |
| WO | WO 2011/070225 A1 | 6/2011 |
| WO | WO 2013/019376 A1 | 2/2013 |
| WO | WO 2013/099704 A1 | 7/2013 |

OTHER PUBLICATIONS

Kustanowitz et al., "Motivating Annotation for Personal Digital Phot Libraries: Lowering Barriers while Raising Incentives," tech. Report HCIL-2004-18, U. Maryland, 2005 (10 pages).

Jaffe et al., "Generating Summaries and Visualization for Large Collections of GeoReferenced Photogra[hs," MIR '06, pp. 89-98, 2006 ACM.

Snavely et al., "Photo Tourism: Exploring Photo Collection in 3D," SIGGRAPH '06 ACM Transactions on Graphics, 25(3): 835-846, 2006 ACM.

Ahern et al., "World Explorer: Visualizing Aggregate Data From Unstructured Text in Geo-Referenced Collections," JCDL '07, pp. 1-10, 2007, ACM.

Ames et al., "Why we tag: motivations for annotation in mobile and online media," CHI-07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 971-980, ACM, 2007 (10 pages).

Chen, Y-F. et al.; "GeoTracker: Geospatial and Temporal RSS Navigation"; At&T Labs—Research, Florham Park, NJ; WWW 2007 / Track: Browsers and User Interfaces, Session: Smarter Browsing, pp. 41-50 (10 pages).

Ferre, "CAMELIS: Organizing and Browsing a Personal Photo Collection with a Logical Information System," Int. Conf. Concept Lattices and Their Applications, pp. 112-123, 2007, HAL.

Goodman, E.; "Destination Services: Tourist media and networked places"; School of Information, UC Berkeley; Mar. 2, 2007 (11 pages).

Kang et al., "Capture, Annotate, Browse, Find, Share: novel Interfaces for Personal Photo Management," International Journal of Human-Computer Interaction, 23(3): 315-337, 2007, Lawrence Eribaum Associates, Inc.

Kennedy, L. et al.; "How Flickr Helps Us Make Sense of the World: Context and Content in Community-Contributed Media Collections"; MM '07, Sep. 23-28, 2007; Augsburg, Bavaria, Germany; Copyright 2007; ACM 978-1-59593-701-8/07/0009 (10 pages).

Rattenbury, T. et al.; "Towards Automatic Extraction of Event and Place Semantics from Flickr Tags"; SIGIR '07, Jul. 23-27, 2007; Amsterdam, The Netherlands; ACM 978-1-59593-597-7/07/0007 (8 pages).

Slingsby, A. et al.; "Interactive tag maps and tag clouds for the multiscale exploration of large spatio-temporal datasets"; Information Visualization, pp. 497-504; 2007, IV '07. 11th International Conference. ISSN: 1550-6037 (9 pages).

Torniai et al., "Sharing, Discovering and Browsing Geotagged Pictures on the Web," 2007, Hewlett-Packard Development Company, L.P., pp. 1-18.

Amundsen, J.; "Using the Geographical Location of Photos in Mobile Phones"; Master of Science in Computer Science submission; Norwegian University of Science and Technology; Jul. 2008 (112 pages).

Hollenstein, L.; "Capturing Vernacular Geography from Georeferenced Tags"; Master Thesis; Institute of Geography, University of Zurich; Nov. 2008 (139 pages).

Kopf et al., "Deep photo: model-based photograph enhancement and viewing," ACM Transactions on Graphics, vol. 27, No. 5, Article 116, Dec. 2008, ACM (10 pages).

Miller et al., Give and take: a study of consumer photo-sharing culture and practice, CHI 07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 347-356, 2008 (10 pages).

Bartolini et al., "Integrating Semantic and Visual Facets for Browsing Digital Photo Collections," SBED, pp. 65-72, 2009.

Kisilevich et al., "Event-based analysis of People's Activities and Behavior Using Flickr and Panoramio Geotagged Photo Collections," 14th International Conference Information Visualization, pp. 289-296, 2010 IEEE.

Gentile, L; "Using Flickr Geotags to Find Similar Tourism Destinations"; master thesis, 2011; Politecnico di Milano, Dept. of Computer Engineering (96 pages).

Hoffman, A.; "Create Great iPhone Photos: Apps, Tips, Tricks, and Effects"; copyright 2011; ISBN-10: 1-59327-285-5, ISBN-13: 978-1-59327-285-2 (216 pages).

Petitioner Apple Inc. - Ex. 1001, p. 5

**US 11,017,020 B2**

Page 6

(56)        **References Cited**

OTHER PUBLICATIONS

Tomasson et al., "PhotoCube: Effective and Efficient Multi-Dimensional Browsing of Personal Photo Collections," ICMR '11, 2011, ACM.

Trattner et al., "Evaluating Tag-Based Information Access in Image Collections," Proceedings of the 23rd ACM Conference on Hypertext and Social Media, pp. 113-122, 2012 ACM.

Kadar, B. et al.; "Where Do Tourists Go? Visualizing and Analysing the Spatial Distribution of Geotagged Photography"; Cartographica 48:2, pp. 78-88; 2013; University of Toronto Press; doi: 10.3138/carto.48.2.1839 (11 pages).

Nutanong, S. et al.; "An Efficient Layout Method for a Large Collection of Geographic Data Entries"; Center for Automation Research, Institute for Advanced Computer Studies, Dept. of Computer Science, University of Maryland; pp. 717-720 (4 pages).

Richard, G. et al.; "Geotagging Photographs for Distribution on the Web"; Mineral Physics Institute, Earth and Space Sciences Building, Stony Brook University, Stony Brook. NY; date unknown (9 pages).

Pogue, D. & Biersdorfer, J. D., "iPhoto '09: The Missing Manual," O'Reilly Media, Inc. (2009).

* cited by examiner

Petitioner Apple Inc. - Ex. 1001, p. 6

**FIG. 1**



Petitioner Apple Inc. - Ex. 1001, p. 7

**FIG. 2**





Comments:
Suzanne and Anthony's Wedding Party where the cousins posed
for a photo in the grass.  Note, Jack with the lollipop and the
photographer with his shoe in the photo

Location:
Historical Society
Lisle, IL 60532

People:
Jack Wong
CJ Wong
Mary Firestone
Zoe Peika
Nick Persons

Event: Suzanne & Anthony's Wedding Reception 2010

Camera Details: more

Petitioner Apple Inc. - Ex. 1001, p. 8

**FIG. 3**



Petitioner Apple Inc. - Ex. 1001, p. 9

**FIG. 4**



Petitioner Apple Inc. - Ex. 1001, p. 10

**FIG. 5**



Petitioner Apple Inc. - Ex. 1001, p. 11

**FIG. 6**



Petitioner Apple Inc. - Ex. 1001, p. 12

# FIG. 7



**Clinton Dewitt Firestone IV**

Birth:      July 12, 1896
Death:      April 29, 1971
Parents:    Clinton Dewitt Firestone III and Viola Miller
Comments:   He was a WWII U.S. Air force pilot and POW in WWII and veteran honorably discharged in December of 1947. He worked for 44 years for the Firestone Tire and Rubber Company in retail, wholesale and original equipment sales, marketing and management. He was born in Akron, OH and is buried in Columbiana, OH.

Edit bio

Locations          Timeline          Family Tree          Recipes





Petitioner Apple Inc. - Ex. 1001, p. 13

# FIG. 8



Petitioner Apple Inc. - Ex. 1001, p. 14

**FIG. 9**



Petitioner Apple Inc. - Ex. 1001, p. 15

# FIG. 10



**Desmond's Yellow Thai Chicken Curry**

Curry Mix
- Coconut milk (400 ml) – DO NOT SHAKE IT UP
- 800 gram of chicken (4 chicken breast)
- Fish sauce (Nam Pla) Thai Bamboo Garden – Bottle
- Garlic (2 cloves)
- Broccoli ( 2cups chopped)
- 2 Peppers (chopped)
- 2 Carrots (chopped)

- 1 Zucchini (chopped)
- Thai Basil (8 leaves)
- Lemon Grass (in jar) 1 teaspoon
- Chinese Ginger Root (in jar) 1 teaspoon

Rice
- Thai Rice (something that only takes 2 cups of water)
- Dice chicken in bowl and add two tablespoons of fish sauce. Let marinate for 20 minutes.
- Take thick part of coconut milk out into pan (about 4 tablespoons), Curry paste, 1 spoon of lemon grass, 1 spoon of ginger and garlic. Heat over high with boil and THEN stir for 1 minute. Add meat (uncooked) and fry until cooked over high heat
- Add milk, brown sugar and salt. Bring back to slight boil and constantly stir. Add veggies and soy sauce. Cook for about 10-14 minutes COVERED until veggies are cooked. Serve with a smile.

| Chef: Barry Desmond | Video on How to Make It | Original Handwritten Recipe |
|---|---|---|
|  |  | |

Petitioner Apple Inc. - Ex. 1001, p. 16

## FIG. 11

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 17

**FIG. 12**

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 18

**U.S. Patent**     May 25, 2021     **Sheet 13 of 50**     **US 11,017,020 B2**

# FIG. 13

Thumbnail | Table

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| + Alberts | 2 | 8 | 0 | 0 |
| + Annex | 2 | 7 | 0 | 0 |
| + Bade | 3 | 8 | 0 | 0 |
| + Bacon | 4 | 8 | 0 | 0 |
| + Bates | 5 | 7 | 1 | 0 |
| + Boone | 6 | 6 | 2 | 2 |
| + Danas | 7 | 5 | 4 | 1 |
| + Danes | 8 | 7 | 3 | 2 |
| - Monk (All) | 2 | 499 | 4 | 14 |
| ▨ Monk, CJ | 1 | 200 | 2 | 7 |
| ▨ Monk, Jack | 1 | 199 | 2 | 7 |
| + Firestone | 21 | 1249 | 17 | 39 |
| + Moore | 1 | 4 | 6 | 3 |
| + Slythe | 1 | 9 | 0 | 9 |
| + Stein | 2 | 249 | 1 | 3 |
| + Testy | 4 | 788 | 2 | 12 |

Petitioner Apple Inc. - Ex. 1001, p. 19

# FIG. 14

Thumbnail | Table

| Last Name | Relationship | # Photos | # Videos | # Docs |
|-----------|--------------|----------|----------|--------|
| Alberts, John | Cousin | 8 | 0 | 0 |
| Killian, Jack | Son | 7 | 0 | 0 |
| Killian, Brian | Nephew | 8 | 0 | 0 |
| Killian, Kevin | Nephew | 8 | 0 | 0 |
| Killian, Sarah | Daughter-in-law | 7 | 1 | 0 |
| Killian, John | Great Nephew | 6 | 2 | 2 |
| Killian, Mark | Great Nephew | 5 | 4 | 1 |
| Killian, Louis | Great Grandson | 7 | 3 | 2 |
| Killian, John | Grandson | 499 | 4 | 14 |
| Monk, CJ | Great Grandson | 200 | 2 | 7 |
| Monk, Jack | Great Grandson | 199 | 2 | 7 |
| Firestone, Mike | Third Cousin | 1249 | 17 | 39 |
| Moore, Bertha | Great Niece | 4 | 6 | 3 |
| Slythe, Sarah | Sister | 9 | 0 | 9 |
| Killian, John | Brother | 249 | 1 | 3 |
| Killian, Mike | Brother | 788 | 2 | 12 |

Petitioner Apple Inc. - Ex. 1001, p. 20

## FIG. 15

Thumbnail | Table

| Location Name | Address | City | State | Country | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|---|---|
| Dom | | Cologne | | Germany | 3 | 2 | 0 |
| Lucilla & Roberto | | Montalcino | | Italy | 6 | 1 | 0 |
| Lisle Home | 898 West St | Lisle | IL | USA | 45 | 12 | 2 |
| College | 545 Market | Akron | OH | USA | 64 | 2 | 0 |
| Amazon Trip | | Manus | | Brazil | 235 | 8 | 2 |
| Cabin | 999 Pine | Lake Geneva | WI | USA | 98 | 2 | 0 |
| Grad School | 903 Plymouth | Charleston | IL | USA | 1256 | 32 | 4 |
| Griffith Park | 298 Glencarin | Los Feliz | CA | USA | 12 | 0 | 0 |
| LA Equestrian Ctr | 568 Horse Dr | Glendale | CA | USA | 4 | 4 | 0 |
| Del Coronado | 12 Coronado Dr | Coronado | CA | USA | 321 | 4 | 0 |
| Fenway Park | 123 Yawke | Boston | MA | USA | 57 | 3 | 5 |
| Wrigley Field | 1190 W Addison | Chicago | IL | USA | 498 | 7 | 3 |
| Home | 444 Main | Anywhere | IL | USA | 10,987 | 49 | 9 |
| GA Grill Party | 321 Silver | Macon | GA | USA | 15 | 0 | 0 |
| Pike's Market | 786 Market | Seattle | WA | USA | 18 | 1 | 0 |
| Raffels | 345 Fong | Singapore | | Singapore | 23 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 21

## FIG. 16

Category | Card | Table

| Recipe | Chef | Date | Category |
|---|---|---|---|
| Blacks Yellow Thai Chicken Curry | Jack Black | 31 Jan 2010 | Dinner |
| Skinny Germans | Gerda | 29 Dec 2003 | Breakfast |
| KFC in a Bag | The Kernal | 13 Sept 1988 | Anytime |
| Shit on a Shingle | George James | 5 Aug 1998 | Anytime |
| Mrs. Fields Cookies | Mrs. Fields | 21 July 1978 | Dessert |
| Chicken Pot Pie | Jack Black | 31 Jan 2010 | Dinner |
| Roll Your Own Dough | Vito Spadavecchio | 29 Dec 2003 | Dinner |
| Pizza ala Franciscan | Charles Faso | 13 Sept 1988 | Dinner |
| Meatball Delight | Ben Delight | 5 Aug 1998 | Dinner |
| Almond Cookies | Lori James | 21 July 1978 | Dessert |
| Jumpin Jack Flap Jacks | Jack Jack | 31 Jan 2010 | Breakfast |
| Vicki's Chow Mein | Vicki Firestone | 29 Dec 2003 | Dinner |
| Fat Steak | Barry Monk | 13 Sept 1988 | Dinner |
| Mud Pie | Nancy Monk | 5 Aug 1998 | Dessert |
| Caesar Salad | Christopher Monk | 21 July 1978 | Anytime |
| Daddio Pancakes | Barry Monk | 2 March 2011 | Breakfast |

Petitioner Apple Inc. - Ex. 1001, p. 22

**FIG. 17**



Petitioner Apple Inc. - Ex. 1001, p. 23

**FIG. 18**



Petitioner Apple Inc. - Ex. 1001, p. 24

# FIG. 19

**Captain Phil's Memory-Webb**

Welcome, Captain Phil
Last Login:    11.18.2010

**My recent memories:**
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10
- 12 visitors since last login date
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10

**My recent Webb views:**
- Captain Phil 2010 (photo album)
- Chicken Pot Pie (recipe)
- Captain Phil (Timeline)

**Updates and Alerts:**
- License renewal due 1.15.2011

| Media | Count | Archive Status | | Count |
|---|---|---|---|---|
| # Photos | 1,342 | | | 80% complete |
| # Videos | 75 | | | 61% complete |
| # Documents | 173 | | | |

**People Stats:**

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Monk | 7 | 499 | 4 | 14 |
| Firestone | 11 | 1,249 | 17 | 39 |
| Testy | 4 | 788 | 1 | 12 |

**Event Stats:**

| Event | Date | Location | # Media |
|---|---|---|---|
| Mike Testy's 1st Birthday | 13-Sept-1988 | Minneapolis, MN | 21 |
| Cubs Beat Cards Aug 1998 | 5-Aug-1998 | Chicago, IL | 2,199 |
| Nancy Learns to Ride Bike | 21-July-1978 | St. Louis, MO | 2 |

Petitioner Apple Inc. - Ex. 1001, p. 25

U.S. Patent     May 25, 2021     Sheet 20 of 50     US 11,017,020 B2

**FIG. 20**



Petitioner Apple Inc. - Ex. 1001, p. 26

**FIG. 21**



Petitioner Apple Inc. - Ex. 1001, p. 27

## FIG. 22

**EXIF Tags version 2.3 Image File Directories (Data Blocks)** 0320

**MemoryWeb_Tag (Data Blocks)** 0360



| Tag Labels (0321) | EXIF Family Group Name (0322) | Location (0323) | MemoryWeb Tag (0361) |
|---|---|---|---|
| Description Title (0324) | IFD0 | 0x9c9b or 0x010e | MediaAsset.Caption (0362) |
| Description Subject | IFD0 | 0x9c9f | |
| Description Rating (0325) | IFD0 | N/A | MediaAsset.StarRanking (0363) |
| Description Tags | IFD0 | 0x9c9e | |
| Description Comments | IFD0 | 0x9c9c | |
| Origin Authors | IFD0 | 0x9c9d | |
| Origin Date Taken (0326) | ExifIFD (0334) | 0x9003 (0335) | MediaAsset.DateCreated (0364) |
| Origin Date Acquired | | N/A | |
| Origin Copyright | IFD0 | 0x8298 | |
| Image (Image ID, Dimensions, Width Height, etc) | | Multiple | |
| Width (0327) | | 0xbc80 | MediaAsset.Width (0365) |
| Height (0328) | | 0xbc81 | MediaAsset.Height (0366) |
| Camera (Camera Maker, Camera Model, etc) | | Multiple | |
| Advanced Photo (Lens Maker, Lens Model, etc) | | Multiple | |
| User Comment (0329) | ExifIFD | 0x9286 | This is used to inject information that do not currently have EXIF standardized tags including Collection, People, Location Name, Recipe Name, Person Tag Data Blocks (0380), etc. (0367) |
| GPS Latitude (0330) | GPS | 0x0002 | MediaAsset.Location.Latitude (0368) |
| GPS Latitude Ref (0331) | GPS | 0x0003 | MediaAsset.Location.Latitude (0369) |
| GPS Longitude (0332) | GPS | 0x0004 | MediaAsset.Location.Longitude (0370) |
| GPS Longitude Ref (0333) | GPS | 0x0005 | MediaAsset.Location.Longitude (0371) |
| GPS Altitude | GPS | 0x0006 | |

Petitioner Apple Inc. - Ex. 1001, p. 28

**FIG. 23**



Petitioner Apple Inc. - Ex. 1001, p. 29

# FIG. 24



Petitioner Apple Inc. - Ex. 1001, p. 30

**FIG. 25**



Petitioner Apple Inc. - Ex. 1001, p. 31

FIG. 26



Petitioner Apple Inc. - Ex. 1001, p. 32

**FIG. 27**



| Item |
|---|
| User's Name |
| Payment ID |
| Password |
| Account Type |
| User's email |
| Language preference |
| Date format |
| Email notifications |
| Contacts (with third Party Social Media) |
| Facebook ID |
| API Token |
| Payment Date |
| ... |

Petitioner Apple Inc. - Ex. 1001, p. 33

**FIG. 28**



Petitioner Apple Inc. - Ex. 1001, p. 34

**FIG. 29**



Petitioner Apple Inc. - Ex. 1001, p. 35

## FIG. 30



Petitioner Apple Inc. - Ex. 1001, p. 36

## FIG. 31



Petitioner Apple Inc. - Ex. 1001, p. 37

**FIG. 32**



Multiple People Application View

Uploads  Collections  People  Locations  Recipe  Family Tree    Fast Search    Apply Filters

Sort By: Newest to Oldest

Jon Smith    Jane Smith (Doe)    Jackson Smith    JC Jon Smith

Page: 1    Items Per Page: 20  50  100

Single People Profile Application View

Uploads  Collections  People  Locations  Recipe  Family Tree    Fast Search    Apply Filters

< View all People    JC Jon Smith    Edit

Nicknames: Chip
Born: 1/1/2004
Parents: Jon Smith  and  Jane Smith (Doe)
Siblings: Jackson Smith
Children:
Biography: JC was named after his great, great grandfather from German who's real name was Johan Christoph.

JC Tags:
4 Photos  3 Collections  2 Facial Recognitions  3 Locations  7 Family Relationships  1 Recipe

Change Profile Photo

Page: 1    Items Per Page: 20  50  100

Petitioner Apple Inc. - Ex. 1001, p. 38

**FIG. 33**



Petitioner Apple Inc. - Ex. 1001, p. 39

**FIG. 34**



Petitioner Apple Inc. - Ex. 1001, p. 40

## FIG. 35



Petitioner Apple Inc. - Ex. 1001, p. 41

**FIG. 36**



Petitioner Apple Inc. - Ex. 1001, p. 42

**FIG. 37**



Petitioner Apple Inc. - Ex. 1001, p. 43

**FIG. 38**



Petitioner Apple Inc. - Ex. 1001, p. 44

**FIG. 39**



Petitioner Apple Inc. - Ex. 1001, p. 45

**FIG. 40**



Petitioner Apple Inc. - Ex. 1001, p. 46

**FIG. 41**



Petitioner Apple Inc. - Ex. 1001, p. 47

**U.S. Patent**    May 25, 2021    Sheet 42 of 50    US 11,017,020 B2

## FIG. 42



Petitioner Apple Inc. - Ex. 1001, p. 48

**FIG. 43**



Petitioner Apple Inc. - Ex. 1001, p. 49

U.S. Patent          May 25, 2021          Sheet 44 of 50          US 11,017,020 B2

**FIG. 44**



Petitioner Apple Inc. - Ex. 1001, p. 50

**FIG. 45**



Petitioner Apple Inc. - Ex. 1001, p. 51

**FIG. 46**



Petitioner Apple Inc. - Ex. 1001, p. 52

FIG. 47



Petitioner Apple Inc. - Ex. 1001, p. 53

**FIG. 48**



Petitioner Apple Inc. - Ex. 1001, p. 54

**FIG. 49**



Petitioner Apple Inc. - Ex. 1001, p. 55

U.S. Patent    May 25, 2021    Sheet 50 of 50    US 11,017,020 B2

## FIG. 50



Petitioner Apple Inc. - Ex. 1001, p. 56

Appx426

US 11,017,020 B2

1

**METHOD AND APPARATUS FOR MANAGING DIGITAL FILES**

CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/536,300, filed Aug. 8, 2019, which is a continuation of U.S. patent application Ser. No. 15/375,927, filed Dec. 12, 2016, now U.S. Pat. No. 10,423,658, which is a continuation of U.S. patent application Ser. No. 14/193, 426, filed Feb. 28, 2014, now U.S. Pat. No. 9,552,376, which is a continuation-in-part of and claims priority to U.S. patent application Ser. No. 13/157,214, filed Jun. 9, 2011, now U.S. Pat. No. 9,098,531, each of which is hereby incorporated by reference herein in its entirety.

FIELD OF THE INVENTION

The present invention relates generally to the management of digital files and, more particularly, to a computer-implemented system and method for managing and using digital files such as digital photographs.

BACKGROUND OF THE INVENTION

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums, or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, event, etc.) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos were printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of digital files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty digital files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of digital tags, dynamic viewing of digital files, and the ability to export the digital files with new digital tags. Questionable and ever-changing privacy terms for user/account information, including privacy files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of digital files is a medium that allows people to organize, view, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow digital files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

2

SUMMARY

In accordance with one embodiment, a computer-implemented method of associating digital tags with digital files comprises (1) storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having embedded therein content data and metadata including tags; (2) receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; (3) modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; (4) receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; (5) responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and (6) displaying, on a video display device associated with the client device, a first indication of the first tag label.

In another embodiment a computer-implemented method of associating digital tags with digital files comprises storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having a content data portion and a metadata portion including tags; displaying, on a video display device associated with a client device, a first graphical representation of a first tag label of a first of the tags and associated with a first of the digital files; receiving, via a user interface device of the client device, a selection by a user of the client device of the first graphical representation of the first tag label as a search filter criterion or a search string entered via the user interface device corresponding to the first tag label; responsive to the receiving, automatically searching the digital files, using at least the first tag label as a search filter, for the digital files satisfying at least the search filter criterion; and displaying, on the video display device, an indication of the first tag label and a representation of the number of the digital files satisfying at least the search filter criterion.

In accordance with a further embodiment, a web-based digital file storage system comprises a digital file repository for storing and retrieving digital files; a digital tagging system permitting the user to assign a plurality of digital tags to each of the digital files, wherein the digital tagging system comprises at least one type of data selected from the group consisting of a person's name, a location, a recipe, a date, a family relationship, a person's profile, an event name, a rating, and a document type; a search filter, wherein the search filter allows the digital files to be searched according to a plurality of types of data; and a user interface that presents the digital files on a user's screen based on the digital tags, wherein the user interface further comprises a digital tag image, the digital tag image having at least one type of data represented thereon with text.

As described in detail below, the various embodiments provide much-needed platforms that save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention may best be understood by reference to the following description taken in conjunction with the accompanying drawings, in which:

FIG. 1 is a screenshot of an organizational functionality view of one embodiment of the disclosed system.

Petitioner Apple Inc. - Ex. 1001, p. 57

US 11,017,020 B2

3

FIG. **2** is a screenshot of a photo detail view of one embodiment of the disclosed system.

FIG. **3** is a screenshot of a gallery view of an event or album of one embodiment of the disclosed system.

FIG. **4** is screenshot of an individual event or album view of one embodiment of the disclosed system.

FIG. **5** is a screenshot of a location view of one embodiment of the disclosed system.

FIG. **6** is a screenshot of a people thumbnail view of one embodiment of the disclosed system.

FIG. **7** is a screenshot of a people profile view of one embodiment of the disclosed system.

FIG. **8** is a screenshot of a family tree view of one embodiment of the disclosed system.

FIG. **9** is a screenshot of a timeline view of one embodiment of the disclosed system.

FIG. **10** is a screenshot of a recipe chart, according to one embodiment of the disclosed system.

FIG. **11** is a screenshot of an album chart view of one embodiment of the disclosed system.

FIG. **12** is a screenshot of an event chart view of one embodiment of the disclosed system.

FIG. **13** is a screenshot of a people chart view of one embodiment of the disclosed system.

FIG. **14** is a screenshot of a family tree chart view of one embodiment of the disclosed system.

FIG. **15** is a screenshot of a location chart view of one embodiment of the disclosed system.

FIG. **16** is a screenshot of a recipe chart view of one embodiment of the disclosed system.

FIG. **17** is a screenshot of a slideshow view of one embodiment of the disclosed system.

FIG. **18** is a screenshot of an advanced search filter view of one embodiment of the disclosed system.

FIG. **19** is a screenshot of a homepage view of one embodiment of the disclosed system.

FIG. **20** is a diagram of the Overall System Process Flow of MemoryWeb.

FIG. **21** is a diagram of the System for Reading Phase, System Interpreting, and Adding Digital File and Corresponding Data to Relationship Table Phase.

FIG. **22** is a table of the EXIF and MemoryWeb Tag Data Blocks

FIG. **23** is a table of the Microsoft Windows and MemoryWeb Tag Data Blocks.

FIG. **24** is a table of the MemoryWeb Person Tag Data Blocks.

FIG. **25** is a diagram of the Third Party Facial Recognition System.

FIG. **26** is a diagram of the Third Party Media System (Data Exchange).

FIG. **27** is a table of the User Settings Table.

FIG. **28** is a diagram of the Application Digital Tag Organizer System.

FIG. **29** is an illustration of the Application Dot-Tag Shape and Content.

FIG. **30** is a diagram of the Continuous Link of Application Dot-Tag System.

FIG. **31** is an illustration of the Slideshow View of Digital File and Application Dot-Tags.

FIG. **32** is a screenshot of People Application Views.

FIG. **33** is a screenshot of Collection Application Views.

FIG. **34** is a screenshot of Location Application Views.

FIG. **35** is screenshot of Uploads Application View.

FIG. **36** is a screenshot of Recipe Application View.

FIG. **37** is a diagram of the Advanced Filters System.

4

FIG. **38** is a screenshot of Adding the First Application Dot-Tag using Advanced Filter.

FIG. **39** is a screenshot of Single Application Dot-Tag Filter for Each Application View.

FIG. **40** is a screenshot of Single Application Dot-Tag Filter for Date in Uploads Application View.

FIG. **41** is a screenshot of the Single Application Dot-Tag Filter in Location Application View.

FIG. **42** is a screenshot of Adding Another Application Dot-Tag Filter.

FIG. **43** is a screenshot of the Multi-Dot-Tag Filter in Location Application View.

FIG. **44** is a diagram of the Keyword Fast Search System.

FIG. **45** is a screenshot illustration of Using Keyword Fast Search.

FIG. **46** is a diagram of the Share to Third Party Social Network Provider System.

FIG. **47** is a diagram of the Third Party Location Mapping System.

FIG. **48** is a diagram of the Share to Individual System.

FIG. **49** is a diagram of the Application Export System.

FIG. **50** is a table illustrating the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb.

## DETAILED DESCRIPTION OF ILLUSTRATED EMBODIMENTS

Although the invention will be described in connection with certain preferred embodiments, it will be understood that the invention is not limited to those particular embodiments. On the contrary, the invention is intended to cover all alternatives, modifications, and equivalent arrangements as may be included within the spirit and scope of the invention as defined by the appended claims.

The present disclosure relates to one or more of the following features, elements or combinations thereof. A web-based digital file storage system is disclosed. The storage system may include a digital file repository for storing and retrieving digital files, such as photos, a digital tagging system configured to assign digital tags to the digital files, a sorting system, and a user interface.

The digital tagging system may include various types of data, such as a person's name, a location, a recipe, a date, a family relationship to the user, an event name, a rating, sharing rights, file type and a document name. The sorting system can allow the digital files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the digital files on a user's screen based on these user inputs.

The digital file repository may be accessible over the Internet. The sorting system may provide a user with the ability to search based on a plurality of digital tags. The disclosed system may also provide a way to track relationships between users, so that a family tree can be displayed.

Recipes may also be linked to a person's name, with, for example, a video and digital copy of original hand-written recipe to create a recipe view.

Moreover, the digital files and data can be exported as a single file with the digital tagging embedded within the exported file.

In another embodiment, a method of storing digital photographs is disclosed. The method may include the steps of storing a digital photograph in a file repository, associating a plurality of digital tags having different tag types with the digital photograph, providing a search function that permits

Petitioner Apple Inc. - Ex. 1001, p. 58

US 11,017,020 B2

<table><tr><td>5</td><td>6</td></tr></table>

searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship, an event name, a rating, file type and a document type. The method may include a further step of providing access to the file repository via the Internet. The method may also allow for tracking relationships between users so that a family tree can be displayed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The presently disclosed method and application (herein alternatively referred to as a "system") provides users with an Internet-based interactive platform to gather, organize, view, share and archive digital files using a proprietary organization system and export tagging process. As used herein, the word "tag" refers to any type of digital data that can be assigned to a file to describe some aspect of that file through a tagging process. For images, the tagging is preferably in EXIF format. For videos, documents and other file formats, any appropriate format may be used. The disclosed system allows users to create, view and share digital files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

One disclosed embodiment includes an import feature. Users can import media files from users' favorite sources (e.g., computers, mobile phones, social networks, etc.). If any meta-tag information is embedded within the media (e.g., date taken and GPS coordinates), the system could automatically read and utilize it for the user. Digital files, media, meta-tags, and other data discussed herein may be saved to one or more file repositories (also referred to as a database herein).

In another aspect of the disclosed system, organizational functionality is provided. Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system and organizing feature allows a user to arrange large amounts of digital files with tags that can characterize and document the digital file(s). Digital files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, event, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. Tags can be assigned to a single file at a time, or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos and enter the tag only once. An example of the manner in which digital photos can be organized is presented in FIG. 1.

Yet another feature is the multiple views from which a user can display his or her digital media files and their tagged attributes. Using a user interface (e.g. a keyboard, mouse, or touch screen), users can select individual files, groups of files meeting specific criteria, or all files in their account from which to create views. These views may alternately take the form of a chart. These views will be auto-populated based upon either tag information already associated with the digital file upon import or the tags assigned to the digital files by the user within the aforementioned organization functionality. Each digital file can be enlarged, from any view or chart, by clicking an information ("i") button to show an enlarged version of the digital media file with all the tags that are assigned to that digital file, as illustrated in FIG. 2. In another embodiment, the user interface may be user-configurable, as discussed further herein.

The following views are shown with particularity. In FIG. 1, the gallery view allows the user to see all the digital media that are associated within a group such as an event or custom album. The gallery view for either events or albums is illustrated in FIG. 3.

As shown in FIG. 2, an individual album or event view allows one to see the files associated with a specific group. For example, one can view the digital files that relate to a group of files called "Trip to Italy 2011." The individual album or event view is illustrated in FIG. 4.

A location view, as shown in FIG. 5, identifies within an interactive map (Google map shown as an example), where digital files were taken or originated. The location view can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users.

A people view, as shown in FIG. 6, shows thumbnail photos of all the people in the system that can be clicked in for a people profile view. A people profile view, as shown in FIG. 7, shows a profile picture of an individual, their birth/death information, family relationships, overview (comments) on the person, as well as links to other views that contain that individual in the system.

A family tree view, as shown in FIG. 8, can illustrate interactive family trees where one can see the family tree of an individual or family. If a user clicks on an individual within the family tree, it will take him or her to the people profile view of that person.

The timeline view, as shown in FIG. 9, will be an interactive timeline that allows you to set ranges of digital files by year, month and day. The digital files shown in the timeline will also be interactive and if the user clicks on a digital file or group of digital files (e.g., event or album), the user will then view the information related to the digital file(s).

A recipe view, as shown in FIG. 10, will show a recipe along with any digital files that are associated with it. For example, a cherished family recipe may show a digital copy of the original handwritten recipe, a photo of the family member who was the chef and a video of the family member making the recipe.

Each of the aforementioned views may also be seen in a chart format view that is interactive when any item on the chart is clicked, the user will them be taken to a new screen that details all relevant digital files (and file types) for the clicked item.

For album or event chart views, as shown in FIGS. 11 and 12, the elements listed in those charts will include individuals who are part of each album/event, number of digital files, date and other pertinent information.

A people view, shown in FIG. 13, may demonstrate all the names of individuals that are in the system in an alphabetical listing. Such a people view can also contain details on each person such as the number of photos and videos that are associated with that person. The user can click on that person to pull up the profile view of the individual or click on the number of photos to see all the photos associated with that person.

In the family tree chart view, shown in FIG. 14, family lineage can be viewed in multiple ways. For example, a user

Petitioner Apple Inc. - Ex. 1001, p. 59

US 11,017,020 B2

7

can set himself as the tree anchor and then see a tree of all people entered into the database related to the user. The user could also set a contact as the tree anchor and then just view the descendants of that individual.

For a location chart view, as show in FIG. **15**, listings of all the locations that are in the system are displayed along with the number of digital files, as well as names of persons associated with each. A user can click on the location to see all the digital media files that are associated with a specific location.

A recipe chart, as shown in FIG. **16**, can show recipes that uploaded to the system. Along with the ingredients and steps of each recipe, this view can identify the chef(s) name, number of photos and videos associated with each.

For any of the views, the user can click on the digital file to start a slideshow feature that will allow them to scroll through an enlarged view of the digital file as illustrated in FIG. **17**.

Another aspect of the disclosure is the search filter. This filter allows users to select one or more criteria that will narrow down their results to just those digital files matching input criteria. The entire system can be filtered by, for example, key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify digital files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, no upload date information or are lacking any other tag.

It should be noted that in one embodiment, searching via key word will search through all tagged information (user populated or auto-generated upon import). For example, if a user searched for the term "Ohio," the system would search for that term associated with any file in any way. If the user had files with Ohio as a state, file name, street name, person's name, file comment, etc., all would be retrieved.

Settings applied in the advanced search filter can cumulatively carry over to any subsequent pages until new criteria are selected. For example, a user can apply a filter to retrieve files associated with a particular person. Then the user can set a date range to further narrow results to show only those files for that selected person within the date range. Any pages viewed from that point forward throughout the entire site would only contain files associated with person and the date range specified. The advanced search filter is illustrated in FIG. **18**.

Yet another feature can be a user's homepage, as illustrated in FIG. **19**, that can summarize the user's content within the system including relevant information in the system. It is contemplated that a user's homepage may show a summary of the total number of photos, videos, documents and audio files that the user has uploaded. In this embodiment, for each group of digital files (e.g., photos), the percent of files that has been organized with pertinent data such as date, name(s) and location can be noted. In addition, the homepage can show a list of people that are in the system and the respective count for photos, videos, documents and audio files associated with each person. Also contemplated is a summary of the events, albums and locations that have been entered into the system. The user homepage may serve as an executive summary dashboard of one's entire system and can be modified to provide data in an executive summary format for a user.

Another feature is that the entire system including the dynamic views can be presented in a wide range of user outputs—e.g. on the user's computer, smartphone or tablet

8

display. The user may choose to present the digital files in any of the various types of ways disclosed herein. Other ways of outputting the files are also possible. The user can create and modify various sharing rights so that third parties may view the files and if desired, provide comments, apply tags or even download/copy the files for their own use.

Still another embodiment can provide export functionality. Once a user has used the organization functionality to assign information to data file(s), a user may want to export the file in its original form (e.g., .jpg, .mp4, etc.) with the tags embedded within the digital file in the form of EXIF tags. In other words, a user can export his or her entire set of digital files, or may choose a subset based on keywords and tags. The exported digital files can include key tags and attributes users have assigned, and in one embodiment, such tags and attributes can be embedded within the digital files. For example, each exported digital file may be imbedded with user-entered data such as the people, location, and event name. This feature will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing digital files such as a social media website) where it can be viewed with these attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its digital files to a new digital archiving system.

A method is also disclosed. The method may include the steps of storing a digital file in a file repository, associating a plurality of digital tags having different tag types with the digital file, providing a search function that permits simultaneously searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship between individuals, an event name, a rating, and a document type.

Under the disclosed method, access may be provided to the repository via the Internet. Relationships between users may also be tracked such that a family tree can be displayed. A recipe may also be linked to a user or person. Finally, the method may include the step of outputting a digital file and its associated digital tags into a single file.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

A plurality of advantages arise from the various features of the present disclosure. It will be noted that alternative embodiments of various components of the disclosure may not include all of the features described yet still benefit from at least some of the advantages of such features. Those of ordinary skill in the art may readily devise their own implementations of a digital file organization system that incorporate one or more of the features of the present disclosure and fall within the spirit and scope of the disclosure and fall within the spirit and scope of the disclosure.

Application (also called "MemoryWeb Application" or "System")—The application is an online program constructed using a mix of freeware code as well as custom-built proprietary coding with an interface that has many functions including: 1) the ability to import, associate and embed

US 11,017,020 B2

9

10

Digital Tags to Digital Files by using existing Tags of a Digital File as well as the application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the application; 2) view, sort, annotate, and share Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export Digital Files with the Digital Tags embedded within the Digital Files. This application has already been disclosed in U.S. patent application Ser. No. 13/157,214 and incorporated herein by reference. This application is also being trademarked as "Memory-Web" with the US Commissioner for Trademarks on Dec. 26, 2013 under application Ser. No. 86/152,930. The application may be accessible over various user interfaces that may use the Internet and via applications that would be used on mobile communication devices such as smart phones (e.g., iPhones), Personal Digital Assistants (PDAs) and Tablets (e.g., iPads).

Application Views—The Application Views utilizes the application's ability to associate Digital Tags to Digital Files and display them in customized views such as Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes.

Application Advanced Filter System—A function that provides search capabilities using one or more Digital Tags within the application, resulting in a narrowed output display of the applied filters to display one or more Digital Files and viewed in one or more Application Views. The Application Advanced Filter System can allow Digital Files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the Digital Files on a user's screen based on these user inputs.

Application Dot-Tag—The manner in which a Digital Tag is displayed within the application using pill-shaped indicators that can reside near a file's image or overlaid on the file's image. MemoryWeb Tags are illustrated as Application Dot-Tags within the application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag. However, it should be understood that other shapes and indicators are contemplated by the present invention, and may even be user-configurable. For example, the indicator may take the form of a sticky note, a different shape, a doted shape, or any number of variations of indicators that may be functional in displaying one or more words. Colors may also be used to indicate differing categories of indicators, or differing associations/intersection of the indicators. Within the pill-shaped indicator, the specific Digital Tag information is used to display information about a Digital File. Throughout this document, the Application Dot-Tag is shown as illustrated in FIG. **29** (indicators **0650**, **0654**, **0655** and **0656**).

Application Digital Tag Organizer System—Within the application, a function for assigning one or more Digital Tags to one or more Digital Files at the same time through the Application Dot-Tag Organizer System. This feature allows Digital Tags to be assigned to items such as photos, videos, audio files, and documents. The information created from this functionality drives the outputs for the Application Views. The Application Digital Tag Organizer System will allow the tagging of key items as date, GPS location, star ranking, people (both name and facial recognition), album(s), family relationships, a date, event name, sharing rights, file type, document name, and recipes. Each of the Digital Tags is user-configurable.

Application Export System—Ability to export Digital File(s) from the application, with the Digital Tags that were created within or imported/uploaded into the application, embedded inside the Digital File. The Digital Tags within the exported Digital File can then be viewed and used by any other applications that can read EXIF tags.

Application Programming Interface ("API")—The Application Programming Interface (API) is the system that interacts with other communication points or services over HTTP via a POST, GET, PUT, DELETE methods. The API provides a way for users to access their MemoryWeb data outside of the web browser on mobile devices or other web connected devices. The actions within the API deliver MemoryWeb Digital Files and Digital Tags along with all meta data associated with such files and tags.

MW Automatic Uploader/Downloader Application—Separate from the main MemoryWeb Application, there are additional proprietary applications created by MemoryWeb for user to upload and download (export) Digital files to and from the main MemoryWeb Application. The first is the MW Automatic Uploader/Downloader built for Window's compatible computers. The second is the MW Automatic Uploader/Downloader build for MAC computer. Both of the MW Automatic Uploader/Downloader applications can be installed on the user's computer to automatically upload the desired Digital Files from their computer to the main MemoryWeb Application. In addition, the MW Automatic Uploader/Downloader applications allow for Digital Files to be exported from the main MemoryWeb Application to a desired folder on the user's computer with the updated tags embedded within the Digital File.

Storage System—A storage system can be a cloud-based Storage System (e.g., Amazon's AWS, Dropbox, Box.net, Deutsche Telecom's Cloud, etc.), hard-drive, server, or any venue that allows one's information to be stored. The storage system would act as a database and file repository for storage and retrieval of Digital Files to and from the application.

Digital Files—An electronic file that can be in various file formats (e.g., PNG, JPEG, PDF, TIFF, MP3, MP4, WAV, and GIF) that are of items such as photos, videos, audio files, and documents.

Digital Tags—The word "Digital Tag" refers to any type of digital data that can be assigned to a file to distinguish and describe some aspect of that file through a tagging process. Digital Tags will be comprised of various groups of digital data including:

a) EXIF Tags—EXIF stands for "Exchangeable Image File Format" and is a standard that specifies the formats for images, sound, video, and ancillary tags. The EXIF standard is an Open Standard produced by the Standardization Committee and is detailed within their document called *Standard of the Camera & Imaging Products Association*. Standard of the Camera & Imaging Products Association, CIPA DC-008 Translation-2012. Exchangeable image file format for digital still cameras: EXIF Version 2.3. Established on April, 2010

Petitioner Apple Inc. - Ex. 1001, p. 61

US 11,017,020 B2

11 12

and Revised on December, 2012. Prepared by: Standardization Committee. EXIF tags are also called "meta tags" or "metadata." The EXIF information is formatted according to the TIFF specification, and may be found in JPG, TIFF, PNG, JP2, PGF, MIFF, HDP, PSP and XCF images, as well as many TIFF-based RAW images, and even some AVI and MOV videos. The EXIF meta information is organized into different Image File Directories (IFD's) within an image. The names of these IFD's correspond to the ExifTool family 1 group names.

When Digital Files are captured with digital cameras (including smartphones), scanners and other systems handling image, video and sound files, certain EXIF tags are automatically populated within the Digital File and can cover a broad spectrum of information such as:

Descriptions (e.g., Title, Subject, Star Ratings, Tags, People, Comments)

Origin (e.g., Authors, Date taken, Copyright)

Image information (e.g., dimensions, color representation and size)

Camera Setting Information (e.g., camera maker, camera model), including static information such as the camera model and make, and information that varies with each image such as orientation (rotation), aperture, shutter speed, focal length, metering mode, and ISO speed information.

Advanced Photo Information (e.g., lens maker, lens model, contrast, brightness, EXIF version, etc.)

File Information (e.g., file name, item type (e.g., JPG file), date created, date modified, size, etc.)

A thumbnail for previewing the picture on the camera's LCD screen, in file managers, or in photo manipulation software.

Global Positioning System (GPS) information that is also known as geocoding.

The application will auto-populate any existing EXIF Tags from the original Digital File upon upload into the applications (as illustrated in FIG. 21) and put this information into the Users Relationship Table on the Storage System.

b) Extensible Metadata Platform (XMP)—This is Adobe's Extensible Metadata Platform (XMP) format for labeling metadata within an Adobe file.

c) Png Textual Data (tEXt)—This is Portable Network Graphics (PNG) metadata format for labeling within a PNG file.

d) Microsoft Windows Tags—These are Microsoft Windows File Attributes that are stored in Data Blocks from Microsoft's system.

e) MemoryWeb Tags—These tags are typically developed within MemoryWeb and can relate to People Names, Recipes, Collections, Location Name, Family Relationships (also discussed in MemoryWeb Person Tags), Social Network Data (e.g., ID, contact IDs, etc.), File Folder Batch Name. This would be folder directory name that includes the name of each folder that eventually leads to the folder that the digital file was actually stored within the User's PC. This is used to help the user organize data within MemoryWeb based upon the users organization system used on their PC. Facial Recognition Data, and other type of tags that are user defined.

f) MemoryWeb Person Tags—These user defined tags within MemoryWeb are specific to each person profile including such areas as Nicknames, Birthdates, Date of Birth, Date of Death, Biography, Family Relationships

(e.g., Mother, Father, Brother, Sister, Daughter, Son, Spouse, etc.), Pets, and Firsts (e.g., First Steps, First Words, First time riding a bike, etc.).

The combination of all the aforementioned tags is collectively referred to as "Digital Tags." The list of groups and Digital Tag types will grow as technology in this area improves over time. These Digital Tags are also referred to as "File DNA" for MemoryWeb.

User Relationship Table—Within the application, each User will store the data related to Digital Files, Digital Tags, User Settings, and other specific information related to a User's repository of information is kept within the User Relationship Table.

Data Blocks—Within the User Relationship Table, there are Data Blocks that will store information related to EXIF Tags, Microsoft Windows Tags, MemoryWeb Tags, and MemoryWeb Person Tags. These Data Blocks are used to generate the information that is displayed in such key components such as the Application Views and Application Dot-Tags.

Custom Code—Proprietary scripts and code developed by MemoryWeb to enable key functions such as Dot-Tag relationships and ability to embed new user-defined tags into a file and/or override existing EXIF tags and the ability to navigate the application and it's functions via connections drawn from the associated tags

Open Source Libraries—Non-proprietary code taken from the free, open source community integrated that is used by the application.

User Interface—The application may be accessible over various "User Interfaces" including Personal Computers (e.g., Macs, Windows, etc.), Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad). The User Interfaces can be controlled through the application using various tools such as a keyboard, mouse, and touch screen.

The present invention relates to an application that has many functions including: 1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the application; 2) view, sort, annotate, and share Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files.

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, and event) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos may have been printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of Digital Files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtu-

Petitioner Apple Inc. - Ex. 1001, p. 62

US 11,017,020 B2

13

ally every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty Digital Files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of Digital Tags, dynamic viewing of Digital Files, and the ability to export the Digital Files with new Digital Tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of Digital Files is a medium that allows people to organize, view, navigate, search, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow Digital Files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

As disclosed in detail herein, the application provides the much needed platform that saves a user significant time, provides significant information with minimal screen space, and provides an appealing and customizable interface that will enhance the user experience.

Anytime the MemoryWeb Application exchanges information with an external Storage System or User Interface such as a phone, tablet, computer or other internet based user device, the interaction with the MemoryWeb Application involves Application Programming Interface (API). The API's allow each system to call the specific Digital Files and Digital Tags associated with each request so they can be viewed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The present disclosure relates to one or more of the following features, elements or combinations thereof. The application allows the importation of Digital Files and then the association of Digital Tags to the Digital Files by using existing EXIF Tags of a Digital File as well as the application's custom organization of Digital Tags for use in the application. The application then allows the Digital Files to be viewed, sorted, annotated, navigated, and shared using the various Application Views. The application can also filter Digital Files using the Application Advanced Filter System functionality. The Digital Files can be stored through a Storage System that interacts with the application. In addition, the application allows for Digital Files to be exported with the Application's Digital Tags embedded within the Digital Files.

The application may be accessible over various user interfaces that may use the Internet and via applications that would be used on User Interfaces such as Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad).

The presently disclosed application provides users with an interactive platform to gather, organize, view, share and archive Digital Files using a proprietary organization system called the Application Digital Tag Organizer and export the modified Digital files with the Application's Digital Tags embedded within the Digital Flies using the Application Export feature.

14

The application allows users to create, navigate, search, view and share Digital Files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

DESCRIPTION OF EMBODIMENTS

In FIG. **20**, the overall process flow of MemoryWeb is depicted. Each of the boxes depicted that are Inside the Memory-Web System (**0050**) are detailed additional figures within this application. However, to help illustrate the overall process flow, FIG. **20** was created. In FIG. **20**, the process begins when original digital file(s) are uploaded to MemoryWeb (**0101**). This process can take place in a variety of ways including when a user manually selects uploads from the Uploads Application View (see FIG. **35** indicator **1701**), installs the a MW Automatic Uploader/Downloader Application on their computer, or imports Digital Files from the users' other sources (e.g., mobile phones, social networks, etc.).

Once a file is uploaded, the System Reading Phase (**0100**) begins. Information from the System Reading Phase is then sent to the System Interpreting and Adding Data to Relationship Table Phase (**0200**). During this phase, information is passed back and forth to the Third Party Facial Recognition System (**0400**) to the Third Party Facial Recognition Provider (**0401**). The system will also coordinate between the Third Party Social Media (Data Exchange) (**0500**) and then to various Third Party Media Providers (**0501**). Another key step from the System Interpreting and Adding Data to Relationship Table Phase is adding both the Digital Files and the corresponding tags to the User Relationship Table (**0300**). As illustrated in subsequent figures within the patent application, the User Relationship Table serves as the key repository for all of the user's data that generates virtually every display from the application. From the User Relationship Table, the user can use the Applications Digital Tag Organizer System (**0600**), the Continuous Link of the Application Dot-Tag System (**0700**), the Advanced Filters System (**0800**), or the Keyword Fast Search System (**0900**). The user can also share Digital File(s) through the Share to Social Network Provider System (**1000**) to a Third Party Social Network Provider (**0501**) that is outside the MemoryWeb system or use the Share to Individual System (**1200**) to a Person (**1201**) that is Outside the MemoryWeb system using the data from the User Relationship Table. To help generate some of the map views, the system will utilize a Third Party Geographical Mapping System (**1100**) that connects to a Third Party Geographical Mapping Provider (**1101**) that is Outside the MemoryWeb system. The user can also export Digital Files with the Digital Tags embedded within the Digital File using the Application Export System (**1300**) that will send a MemoryWeb Modified File from MemoryWeb (**1301**) to a designated location by the User that is outside the MemoryWeb system.

As illustrated in FIG. **21**, the System Reading Phase (**0100**) is described in further detail. The System Reading Phase will first check if the digital file is a duplicate file (**0102**) that is already in the User's collection. If the file is a duplicate, it will not be uploaded (**0104**). However, if it is a new file for the user, the System Reading Phase will then locate the EXIF Image File Directories in the digital file (**0103**) and then send that information to the System Interpreting and Adding Data to Relationship Table Phase (**0200**).

Petitioner Apple Inc. - Ex. 1001, p. 63

US 11,017,020 B2

15

As further illustrated in FIG. **21**, the System Interpreting and Adding Data to Relationship Table Phase will take the EXIF Image File Directories sent from the System Reading Phase and read and iterate through each EXIF tag item (**0201**). At this time, the system will identify faces from the digital file and then send this information to the Third Party Facial Recognition System (**0400**) that will coordinate with the Third Party Facial Recognition Provider (**0401**) that is outside the MemoryWeb. When the Third Party Facial Recognition System (**0400**) sends back data related to facial recognition of faces in the Digital File, it comes back then the system sends information related to people facial recognition tags to the MemoryWeb Person Tag (Data Blocks) within the User Relationship Table (**0300**). The detailed process of the Third Party Facial Recognition System (**0400**) is further explained in FIG. **25**.

During the Read & Integrate Through Each EXIF Tag item (**0201**) the process will also upload a the original Digital File in MemoryWeb (**0211**), the process will also store a copy of the original file within the User Relationship Table (**0300**) and create five duplicate copies (**0203**) of different resolution sizes as follows: XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and a Thumbnail Duplicate File (**0306**). Each duplicate file is used in different parts of the application depending upon the photo size needed for such areas within the application such as Application Views, Application Dot-Tags, and Application Tag Organizer System.

Another embodiment during the Read and iterate through each EXIF tag item (**0201**) stage is determining if a MemoryWeb tag exists (**0204**). A MemoryWeb tag is a Digital Tag that is currently being used as an Application Dot-Tag within the application. If it is not a Digital Tag that MemoryWeb is currently using, the application will Save EXIF data to the User Relationship Table for Digital File (**0205**) and send this to the User Relationship table. This is done in case there are EXIF data that are desired to be used in future releases of the Application. For the Digital Tags that are being used in the application, the system will Parse EXIF data into MemoryWeb Tags (**0206**), look up MW tag data (**0207**) and determine if a Digital Tag currently exists (**0208**). If a Digital Tag does not exist, the system will Create a new MW tag data ((**0209**) and send this to the appropriate Data Blocks within the User Relationship Table (**0300**). If Digital Tag data does exist, the system will Associate existing tag data ((**0210**) to the appropriate Data Blocks within the User Relationship Table (**0300**).

The third and final area within FIG. **21** is the System Indexing Digital Files and Tag Data Blocks for a Digital File within the User Relationship table (**0300**). In the User Relationship Table, the user's information system information stored such as User Settings (**0390**). Copies of the Original Digital File (**0301**), XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and Thumbnail Duplicate File (**0306**) are stored. The final area of the User Relationship Table relates to the data blocks including EXIF Tag (Data Blocks) (**0320**), Microsoft Windows Tag (Data Blocks) (**0320**), MemoryWeb Tag (Data Blocks) (**0360**), and MemoryWeb Person Tag (Data Blocks) (**0380**).

In FIG. **22**, there are two charts that illustrate EXIF and MemoryWeb Tag Data Blocks. The first chart illustrates the EXIF Tags Version 2.3 (Data Blocks) (**0320**). For the EXIF Tags Version 2.3 (Data Blocks) (**0320**), the information from this table is an expert from an Open Source Library code produced by the Standardization Committee that is detailed

16

within their document called Standard of the Camera & Imaging Products Association. While all the EXIF tags that are contained within a Digital File are read (as previously illustrated in FIG. **21** within the System Interpreting and Adding Data to Relationship Table Phase (**0200**)) and are stored within the system's User Relationship Table (**0300**), a summary of the primary EXIF tags that are currently used within MemoryWeb are illustrated in the EXIF Tag Blocks (**0320**). The EXIF tag information is organized into different Image File Directories (IFD's) or "Data Blocks" within an image and organized in the column heading of Tag Label (**0321**). The names of these IFD's correspond to an EXIF standard for ExifTool family 1 group names that are depicted in the column heading of EXIF Group (**0322**). The IFD's are stored within a specific data block location within a Digital File and these locations have a standard name of the specific location (**0323**) within the Digital File. The primary EXIF tags that are read and used by MemoryWeb to generate Application Dot-Tags are: Description Title (**0324**), Imaging Rating (**0325**), Origin Date Taken (**0326**), Digital File Width (**0327**), Digital File Height (**0328**), User Comment (**0329**), GPS Latitude (**0330**), GPS Latitude Ref (**0331**), GPS Longitude (**0332**), and GPS Longitude Ref (**0333**).

In FIG. **22**, the second chart illustrates the MemoryWeb Tag (Data Blocks) (**0360**) that overlap with standard EXIF Tag blocks. As previously illustrated in FIG. **21**, the EXIF Tag Data blocks are read and brought into the User Relationship Table (**0300**). When the data is stored within the system's User Relationship Table, they are also stored with the corresponding EXIF tag label as illustrated in the column called MemoryWeb Tag (**0361**). For example, when a Digital File is brought into MemoryWeb and the system reads the Origin Date Taken (**0326**) for the EXIF Tag block, the system will denote this in the MemoryWeb table as MediaAsset.DateCreated (**0364**). This designation is very important as it allows MemoryWeb to re-inject any updated or new MemoryWeb Tag data into the corresponding standard EXIF Tag blocks of a Digital File when it is exported from MemoryWeb (as previously illustrated in FIG. **20** with the Application Export System (**1300**)). Continuing with this example, if the Origin Date Taken is modified within the MemoryWeb system, when the file is exported through the Application Export System (**1300**), the new updated date from MemoryWeb (**0364**) will be mapped to the EXIF Tag data block with the Tag Label of Origin Date Taken (**0326**) with the EXIF Group called ExifIFD (**0334**) and the Location called 0x9003 (**0335**).

In situations where there is no standard EXIF Tag data block for the MemoryWeb Tag for such items such as Collections, People Location Name, Recipe Name, etc. (**0367**), they are mapped to a general EXIF Tag data block called User Comment (**0329**). As the standards for EXIF Tag data blocks change, the system can be mapped to any new specific EXIF Tag data blocks. For example, if an EXIF Tag Data block is made for Recipe Name, the MemoryWeb Tag related to Recipe Name will be mapped specifically to that new EXIF Tag data block as opposed to User Comment.

In FIG. **23**, there are two charts that illustrate Microsoft Windows and MemoryWeb Tag Data Blocks. The first chart illustrates the standard Windows Imaging Component (WIC) Metadata (Data Blocks) (**0340**). Microsoft Windows has their metadata tag blocks contained in areas called Tag Labels (**0341**). The primary WIC Metadata data blocks that are read and used by MemoryWeb to generate Application Dot-Tags are: File Name (**0342**) and File Folder Path (**0343**). The corresponding MemoryWeb Tag data blocks (**0360**) for the WIC metadata tag blocks are called MediaAsset.File-

Petitioner Apple Inc. - Ex. 1001, p. 64

name (**0372**) for the Microsoft file name and MediaAsset.UploadBatch.Batchname (**0373**) for the Microsoft File Folder Path. The ability for MemoryWeb to read the File Folder Path from Microsoft is a unique process used within MemoryWeb to help the user organize their photos based upon the organization methods they have already used within Microsoft. For example, if the user stored a group of photos on their Microsoft computer in the file directory C:/Photos/2013/First Day of School, MemoryWeb will automatically place the photos that were located within that Microsoft File Folder Path into a MemoryWeb Application Dot-Tag under a collection called "First Day of School" based upon the last folder within the file folder path. An example of the Application Dot-Tag that would be generated from the File Folder Path is in FIG. **31** with the label "First Day of School" (**0770**). In addition, MemoryWeb will allow the user to view the photos that are within a specific File Folder Path in the MemoryWeb Uploads Application View so that the user can organize photos from the same File Folder Path. An example of how this will be illustrated within MemoryWeb's Uploads Application View is in FIG. **35** with the groping of photos with the File Path Name C:/Photos/2013/First Day of School (**0709**).

In FIG. **24**, the MemoryWeb Person Tag Data Blocks (**0380**) that are contained with a User Relationship Table are illustrated. For any person that is added within a user's account, various MemoryWeb Person Tag Data Blocks are stored including: Person Name (**0395**), Nickname (**0381**), Birthdate (**0382**), Date of Death (**0383**), Biography (**0384**), Mother (**0385**), Father (**0386**), Brother(s) (**0387**), Sister(s) (**0388**), Daughter(s) (**0389**), Son(s) (**0390**), Spouse(s) (**0391**), Facial Recognition (**0392**), FacebookID (**0393**), Pets (**0394**), and other data blocks that will be added in the future as the application grows (**0396**). These data blocks are primarily used in the People Profile Application View as illustrated in FIG. **32** (indicator **1430**). One embodiment within the MemoryWeb Person Tag Data Block contains the FacebookID (**0393**). As illustrated in FIG. **26** (indicator **0507**), information from Third Party Media Providers will be exchanged within MemoryWeb and the user's FacebookID will be provided and stored within the MemoryWeb Person Tag Data Block. In addition, any of the User's contacts from Facebook will also be downloaded into the corresponding MemoryWeb Person Tag Data Blocks for any matching persons within the User's MemoryWeb account. The information from the Third Party Media Providers that are stored within MemoryWeb will be used to provide "push notifications" to the user for various items such as when the user or any one of its contacts posts a photo to that Social Media venue.

As illustrated in FIG. **25**, the Third Party Facial Recognition System (**0400**) is described in further detail. As photos are imported or uploaded into the application, the systems will request thumbnail Digital Files (**0404**) from the User Relationship Table (**0300**). On a routine basis (e.g., daily), the system will retrieve all the thumbnails of Digital Files with unconfirmed faces (**0403**) and the send those Digital Files (**0404**) to the Third Party Recognition Provider (**0401**). The Third Party Facial Recognition Provider (**0401**) uses their algorithms to find location of eyes, nose, mouth and many other points for each face detected in the photo. They will also determine gender, check if the person is smiling, have eyes open, lips sealed or wearing glasses. The Third Party Facial Recognition Provider will use their algorithms to associate potential matches of faces for the user's collection of photos. For each face, the system will send back attributes including gender (male, female), glasses (true,

false), smiling (true, false), lips (sealed, parted), eyes, (open, closed), mood (happy, sad, angry, surprised, disgusted, scared, neutral), field in the response have two subfields: value (string) and confidence (integer). For each attribute, the Third Party Facial Recognition Provider will assign percentages of confidence (0% to 100%) for each attribute that can be used by the MemoryWeb Application to utilize.

The Third Party Facial Recognition Provider will then send the information relating to a person back to MemoryWeb (**0405**). The MemoryWeb Application parse the identified faces and corresponding Facial Recognition data for each Digital File (**0406**). The system will interact with the User Relationship Table and determine if the face is an existing (i.e., "trained") face in MemoryWeb where there is a Face ID in the User Relationship Table (**0407**). If not, the system generates a facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0410**). If yes, the system will then determine if the face is above the system's thresholds for confirming a face is a specific person in the user's MemoryWeb system (**0408**). If no, system generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0411**). If yes, the system records and associates specific face for Digital File with a MemoryWeb Person ID and sends to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0409**).

Typically, the ability to confirm and deny facial recognition matches will be within the People Profile Application View as illustrated in FIG. **32** within the facial recognitions area (indicator **1442**). The system will also have other facial resonations areas where the user can confirm or deny the suggested facial recognitions of a person for a Digital File. When the user denies the suggested facial recognition, the system dis-associates potential person match Tag, search's the user's collection for other potential matches, and then sends information to Tag Data Block of Relationship Table for the Digital File. If the user accepts the suggested facial recognition, the system sends this facial recognition tag confirmation to the User Relationship Table for the Digital File. Once a confirmation is made, the newly associated Digital File will have that confirmed person Application Dot-Tag associated to that Digital File for all Application Views. Each time an accepted or denied facial recognition is made for a specific person, the specific data points used for facial recognition is improved and sent to the Third Party Facial Recognition Provider for more accurate confirmations of that person during the next run for that person.

As illustrated in FIG. **26**, the Third Party Media System (Data Exchange) (**0500**) is described in further detail. There are numerous types of third party media systems that are contemplated for MemoryWeb including social network providers (e.g., Facebook, Twitter, and LinkedIn) and other photo sites (e.g., Flickr and Picasa). In addition, it is contemplated for the ability to print Digital Files from MemoryWeb using third party print providers such as Walgreens or Shutterfly. Further contemplated solutions might be from digital file warehouses such as Dropbox and box.net. All of the Third Party Media Systems will interact with MemoryWeb using the same system that is described within FIG. **26**. The Third Party Social Media System starts when the user initiates sharing of their information with Third Party Media Provider with MemoryWeb (**0502**). When this is initiated, the system will send registration information (**0503**) to the Third Party Media Provider (**0501**). Once received, the Third Party Media Provider will

19 20

send back a confirmation with the Third Party Social Media ID (**0504**) and then the system will send the information (**0505**) to the User Settings Table (**0390**) within the User Relationship Table (**0300**). The system will then send daily requests from the User Relationship Table for contact names and IDs (**0506**) to the Social Media Provider (**0506**). If there are new contact names that are not part of the user's current people, the system will receive new contact names and IDs from the Social Media Provider (**0501**). The user will have the ability to confirm or deny matches (**0508**) with their contacts within MemoryWeb. If there is a match, the system will associate the existing person within MemoryWeb to the same ID of the person within the Third Party Social Media platform (**0509**) and then send this to the User Relationship Table. If there is not a match, the system will add this additional contact as a new person and send (**0510**) this to the User Relationship Table. If the user wants to share or print Digital Files from MemoryWeb, they can do this with the Share to Third Party Media Provider System (**1000**) that is further detailed within FIG. **46**.

In FIG. **27**, the MemoryWeb User Settings Table is illustrated. As illustrated in the User Settings Table (**1900**), various data blocks of information is stored including the User's Name (**1901**), Payment ID (**1902**) that is used with third party payment providers, Password (**1903**), Account Type (**1904**) (i.e., free or paid account), User's email (**1905**), Language preference (**1906**), Date format preference (**1907**), Email notification (**1908**) preferences, the ability to share Contacts (with third party Social Media) (**1909**), Facebook ID (**1910**), API Token (**1911**), Payment Date (**1912**) and other settings that will evolve as the application grows (**1913**).

In FIG. **28**, the Application Digital Tag Organizer System (**0600**) is illustrated. Within various Application Views the user can select, add, delete and edit MemoryWeb Tags for such areas as people, date, location, collections, star rankings, and recipes. An illustration of an Uploads Application View where MemoryWeb Tags for a Digital File can be selected, added, deleted, or edited is illustrated in FIG. **35**. The Application Digital Tag Organizer System begins when the user selects one or more Digital Files in MemoryWeb (**0601**). The system then sends a request to the User Relationship Table for the specific Digital File (**0602**). The system then retrieves the Digital File and the Digital File Tag Data Blocks (**0603**) from the User Relationship Table (**0300**). Next, the system will display the Digital File and the corresponding Digital File Tag Data Blocks in the form of Application Dot-Tags (**0604**). An example of how the system can illustrate a Digital File with the corresponding Application Dot-Tags is in FIG. **31** (indicators **0780**, **0765**, **0766**, **0768**, **0770**, and **0771**).

If the user selects an Application Dot-Tag (**0605**), the system will utilize the Continuous Link of Application Dot-Tags System (**0700**) to produce the results of that Application Dot-Tag within one of the Application Views that is later illustrated in FIG. **30**.

If the user selects add for a MemoryWeb Tag (**0606**), the user can add a new MemoryWeb Tag. When the user begins to type in text to add a tag, the system will produce suggestions on matching MemoryWeb Tags or the option to add a new tag (**0607**). If a matching tag is selected (**0608**), the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0610**). Alternatively, if the tag does not exist the user can create a new MemoryWeb Tag (**0609**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0611**).

If the user selects edit for a MemoryWeb Application Dot-Tag (**0612**), the user can add annotation text to edit the MemoryWeb Tag and the system will produce suggestions or matching MemoryWeb tags or the option to add a new tag (**0613**). If there is a match within the user's system, the matching MemoryWeb Tag will appear and the user can select the MemoryWeb Tag (**0614**). Once the matching tag is selected, the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0616**). Alternatively, the user can create a new MemoryWeb Tag (**0615**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0617**). If the user selects delete for a MemoryWeb Application Dot-Tag (**0618**), the system deletes the association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File (**0619**).

In FIG. **29**, the Application Dot-Tag Shape and Content is illustrated (**0650**). MemoryWeb Tags are illustrated as Application Dot-Tags within the application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag (as illustrated in FIG. **30**). In essence, the Application Dot-Tags operate as mini search engines for the user's Digital Tags.

The structure of an Application Dot-Tag (**0650**) can take on an solid-line enclosed shape of a pill, dot or similar depiction (**0651**) and within the shape the name of the MemoryWeb Tag is displayed (**0653**) along with the number of Digital Files (**0652**) that are also associated with that same MemoryWeb Tag. FIG. **29** further illustrates more examples of the Application Dot-Tags. If the number of Digital Files associated with a specific MemoryWeb Tag is less than a certain number (e.g., 1000), the actual number of Digital Files associated with that MemoryWeb Tag is displayed. In FIG. **29**, this is illustrated with an Application Dot-Tag that has 453 files that are associated with the location of Cologne, Germany (**0654**). However, if the number of Digital Files associated with a specific MemoryWeb tag are greater than the character length, a greater sign along with a number sequence that is less than the total number of associated Digital Files will be displayed (**0655**). In FIG. **29**, this is illustrated with an Application Dot-Tag that has ">999" (**0657**) as the number of Digital Files with the exact same MemoryWeb Tag and if the name of the MemoryWeb tag is longer than the text sequence, only a portion of the MemoryWeb tag will be displayed along with an ellipse as illustrated with "Holiday Photos from . . . " (**0658**). Finally, the Application Dot-Tag may be illustrated with a dotted or similar distinction (as opposed to a solid line) to help indicate a partial relationship (**0656**). In the illustration in FIG. **29**, the dotted line is to indicate that only some of the selected Digital Files have the MemoryWeb Tag of Frank Smith.

In FIG. **30**, the Continuous Link of Dot Tag System is illustrated (**0700**). When a user selects an Application Dot-Tag, it will take them to the corresponding Application View that relates to the type of MemoryWeb Tag. The Continuous Link of Application Dot-Tag System begins when a user selects an Application Dot-Tag (**0701**).

Petitioner Apple Inc. - Ex. 1001, p. 66

US 11,017,020 B2

21 22

If the Application Dot-Tag is a Person (**0702**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of how a user can select a person Application Dot-Tag is in FIG. **31** (indicator **0764**). For a person tag, the system receives data for that person from the User Relationship Table and displays the relationship data in a People Profile View (**0709**). A sample illustration of a selected Person Application Dot-Tag is in FIG. **32** (indicator **1430**).

If the Application Dot-Tag is a Collection (**0703**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a collection Application Dot-Tag that can be selected is in FIG. **31** (indicator **0781**). For a collection tag, the system receives data for that collection from the User Relationship Table and displays the relationship data in a Collection View (**0710**). A sample illustration of a selected Collection Application Dot-Tag within a Collection View is in FIG. **33** (indicator **1530**).

If the Application Dot-Tag is a Location (**0704**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a location Application Dot-Tag that can be selected is in FIG. **31** (indicator **0768**). For a location tag, the system receives data for that location from the User Relationship Table and displays the relationship data in a Location View (**0711**). A sample illustration of a selected Location Application Dot-Tag within a Location View is in FIG. **34** (indicator **1630**).

If the Application Dot-Tag is a Date (**0705**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a date Application Dot-Tag that can be selected is in FIG. **31** (indicator **0766**). For a date tag, the system receives data for that date from the User Relationship Table and displays the relationship data in Uploads View with that date filtered (**0712**). A sample illustration of a selected Date Application Dot-Tag within Uploads View is in FIG. **40** (indicator **0861**).

If the Application Dot-Tag is a Recipe (**0706**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). For a recipe tag, the system receives data for that recipe from the User Relationship Table and displays the relationship data in a Recipe View with that date filtered (**0713**). A sample illustration of a selected Date Application Dot-Tag within Recipe View is in FIG. **36** (indicator **1800**).

The application is contemplated to have additional types of Application Dot-Tags (**0707**) in the future including Family Trees, Timespan, etc. and each of these MemoryWeb Tags will go through the same continuous link of Application Dot-Tag process. For an additional type of Application Dot-Tag, the system will receive data from the User Relationship Table and displays the relationship data in the corresponding view for that type of Application Dot-Tag (**0714**).

If within any of the Application Views the user selects a Digital File (**0715**), the Digital File is then displayed in a Slideshow View (**0716**) where the user can again select an Application Dot-Tag (**0701**) and start the continuous link of Application Dot-Tag functionality over again. Also within an Application View, if the user selects another Application Dot-Tag (**0717**), the entire continuous link of Application Dot-Tag functionality begins again and sends the request back to ask if the newly selected Application Dot-Tag is a person (**0702**).

In FIG. **31**, the Slideshow view of a Digital File, Application Dot-Tags, and comments are illustrated (**0750**). When viewing a Digital File or group of Digital Files within the Slideshow Application View (**0750**), the selected Digital File is displayed in the center of the screen (**0754**). If the user wants to export this photo with all the associated Memory-Web Tags, they can select export (**0751**) which will initiate the Application Export System as illustrated in FIG. **49**. If the user wants to see the Digital File that is one file before the selected Digital File, they select the left arrow (**0752**) or they can select the right arrow (**0753**) to display the next photo in the sequence. Below the Digital File, the comments (**0755**) that are specific to that Digital file are depicted. If the user wants to edit the comments, they select edit (**0756**). If the user would like to see a moving slideshow of all the photos that are part of the group of Digital Files, they can select on the play sign (**0757**) or simply click the specific thumbnail of a Digital File (**0758**) to be displayed. The user can also have the slideshow in a full screen slideshow by selecting the full screen icon (**0759**). If the user wants to share the individual Digital file via email, they can select the mail icon (**0760**) or share it through a third party median provider, in this case Facebook (**0761**). A more detailed description on how the share functionality works is in FIG. **46** (indicator **1000**).

In FIG. **31**, each Application Dot-Tag that is associated with a Digital File is illustrated to the right of the Digital File under each major MemoryWeb Tag area. For this example, the People area (**0763**) has Application Dot-Tags of Jackson Smith (**0780**) and JC Smith (**0764**) associated with the selected Digital File. In the Dates area (**0765**), the Application Dot-Tag of Aug. 28, 2013 (**0766**) is associated with the selected Digital File. In the Locations Area (**0767**), the Application Dot-Tag of Abe Lincoln Elementary School (**0768**) in the location associated with the selected Digital File. In the Collections Area (**0769**), the Application Dot-Tags of First Day of School (**0770**) and Jackson and JC Photos **2013** (**0771**) are associated with the selected Digital File. The Star Rankings Area (**0782**) shows that four out of five stars (**0773**) was selected for this Digital File. If the Digital File is associated with a Recipe (**0774**) the Application Dot-Tag would be illustrated in this area. The Media Type area indicates that this is a Memento (**0776**). If the user wants to delete this Digital File from the application, they can select the Delete Item function (**0779**). If the user wants to edit the Application Dot-Tags, they can select the edit icon (**0762**) and all the MemoryWeb Tag areas will be in edit mode as later illustrated in FIG. **35**. Finally, any original Digital File detail (e.g., file name, camera specifications, etc.) is illustrated (**0778**).

In FIG. **32**, both of the People Application Views are illustrated. The first People Application View (**1400**) is used to display all the people that were created within the user's application. This view can be seen by selecting "People" (**1401**) from any of the Application Views within the application. The people can be listed in various sort orders though a drop-down (**1402**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. Additional sorts are contemplated such as age sort. For each person, a thumbnail of their face along with their name is depicted. In this figure, Jon Smith (**1403**) and JC Jon Smith (**1404**) along with some other people are illustrated. Also, the user can determine if they want to have 20, 50 or 100 people shown at one time (**1405**) by selecting the corresponding number box. At the top of every Application View within the application, the user can select Fast Search (**1450**) that is further described in FIG. **44**. Also at the

Petitioner Apple Inc. - Ex. 1001, p. 67

US 11,017,020 B2

23                                                    24

top of every Application View within the application, the user can select Apply Filters (**1451**) that is further described in FIGS. **37**-**43**.

In the second People Application View within FIG. **32**, a single people profile (**1430**) is illustrated. The individuals name is displayed at the top of the page (**1431**) along with their Nicknames (**1433**), when they were Born (**1434**), who their parents are (**1435**), Siblings (**1436**), Children (**1437**), and the person's Biography (**1438**). The Person Profile Photo of that individual is illustrated (**1439**) and if the user wants to change the profile photo, they can change by selecting change profile photo (**1440**). For each person, the system can allow the user to quickly see all the tags that are associated to a person. In this example, the system illustrates that there are four photos (**1452**) associated with that person and will also illustrate thumbnails of each of the four photos (**1446**). These thumbnails can be selected and then the user will be taken to the slideshow view for that Digital File. If the user selects Collections (**1441**), all of the collections that the person has been tagged within will be displayed. If the user selects Facial Recognitions (**1442**), all the faces that are confirmed or need to be confirmed are displayed. This is the area where the user can select to confirm or deny a suggested facial recognition through the Third Party Facial Recognition System that is illustrated in FIG. **25**. If the user selects Locations (**1443**), all of the Locations that the specific person has been tagged within will be displayed. If the user selects Family Relationships (**1444**), the seven people that the user is associated with will be displayed in a family chart or tree. If the user selects Recipe (**1445**), all the recipe's that the user has been tagged within will be displayed. If the user wants to edit any details within the individual people profile, they can select edit (**1447**) and all the fields will allow the ability to edit the details. If the user selects any of the Application Dot-Tags such as the individuals mother Jane Smith (Doe) (**1449**), the application will utilize the Continuous Link of Application Dot-Tag System (see FIG. **30**) and take the user to an individual people profile view of Jane Smith (Doe). If the user selects View all People (**1432**), the application will go back to the multiple People View (**1400**).

In FIG. **33**, both of the Collection Application Views are illustrated. The first Collection Application View is used to display all the collections that were created within the user's application (**1500**). This view can be seen by selecting "Collections" (**1501**) from any of the Application Views within the application. The collections can be listed in various sort orders though a drop-down (**1502**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each collection, a thumbnail of a Digital File from that collection depicted. In this figure, Smith Family Photos (**1503**), Europe Trip (**1504**), First Day of School (**1505**), Jackson and JC Photos 2013 (**1506**), and Baseball Games (**1507**) is illustrated. At the top of every Application View within the application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the application, the user can select Apply Filters that is further described in FIGS. **37**-**43**.

In the second Collections Application View within FIG. **33**, a single collection (**1530**) is illustrated. The individual collection name is displayed at the top of the page (**1532**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system shows photos (**1533**) associated with the Smith Family Photos Collection. If the user wants to edit any Digital Files within the collection, they can select edit (**1535**) and then the user can add or delete any Digital Files as well as set the cover

photo for a collection. If the user wants to share this collection (**1534**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1531**), the application will go back to the multiple Collection View (**1500**).

In FIG. **34**, both of the Location Application Views are illustrated. The first Location Application View is used to display all the locations that were created within the user's application (**1600**). This view can be seen by selecting "Locations" (**1605**) from any of the application Views within the application. The locations can be listed in various sort orders though a drop-down (**1606**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each location, a thumbnail of a Digital File from that location depicted. In this figure, Wrigley Field (**1601**), Abe Lincoln Elementary School (**1602**), Home Sweet Home (**1603**), and Stonehenge (**1604**) is illustrated. What is also contemplated instead of a Digital File from that location is that a zoomed in image of a map from the specific location using the Third Party Geographical Mapping System later depicted in FIG. **47**. At the top of every Application View within the application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the application, the user can select Apply Filters that is further described in FIGS. **37**-**43**.

In the second Locations Application View within FIG. **34**, a single location (**1630**) is illustrated. The individual location name is displayed at the top of the page (**1632**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system illustrates a one photo (**1633**) taken at Wrigley Field (**1634**) that is associated with the location called Wrigley Field. If the user wants to edit any Digital Files within the collection, they can select edit (**1637**) and then the user can add or delete any Digital Files. If the user wants to share the Digital Files associated with this location (**1636**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1631**), the application will go back to the multiple Collection View (**1600**). As part of the individual Location View, an interactive map displaying a zoomed-in image of the specific location is displayed (**1635**).

In FIG. **35**, the Uploads Application View and how it uses the Application Digital Tag Organizer System is illustrated (**1700**). Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system (also called Application Digital Tag Organizer) allows a user to select large amounts of Digital Files and add Digital Tags that can characterize and document the digital file(s). Digital Files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. One or more Digital Files can be selected at the same time and displayed with an overlaid check mark when activated (**1705** and **1710**) and then Digital Tags can be assigned to a single file at a time or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos (**1713**) and enter the tag only once. In addition, the system does include an indicator that appears when a user hovers over the Digital File providing all the relevant Digital Tags

Petitioner Apple Inc. - Ex. 1001, p. 68

US 11,017,020 B2

25      26

associated with that specific Digital File (**1737**) and in this example it shows the caption of "Family Smith finally sees Stonehenge," that four People are tagged to this photo, one collection is tagged to this photo, there are zero people recognized through Facial Recognition, and the date of this photo is from Dec. 21, 2013. If the user wants to delete a single photo from uploads, they can click on the "x" (**1735**) that is displayed when the user hovers over the Digital File thumbnail. When there are multiple Digital Files, the user can determine how many images are displayed at one time in the Items Per Page Buttons (**1738**) that include such numbers at 20, 50 and 100 on the page at the same time. When there is more Digital Files that items per page, they are automatically grouped by pages and a Page Button (**1739**) can be selected to see the next set of Digital Files.

In the Uploads Location View, Digital Files can be directly uploaded to the application by selecting Upload Files (**1701**) and the user will have the option to select the specific Digital Files to be uploaded from their Storage System. Users also have the option to install the Memory-Web Download Application that can be installed on either a Microsoft or MAC computer that will automatically upload and sync photos to and from the users Storage System to the MemoryWeb Application. Also displayed is the amount of space being used by the user within the application (**1702**). Uploads of Digital Files can be listed in various sort orders though a drop-down (**1703**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. In addition, the Digital Files can be sorted by File Batch Name (A-Z) or File Batch Name (Z-A). In FIG. **35**, the sort of File Batch Name (A-Z) is selected (**1703**) and this provides three groups of Digital Files with the names File Folder C:/2013/Family Fun (**1704**), File Folder C:/2013/General (**1706**), and of File Folder C:/2013/First Day of School (**1709**). The File Batch Name is created when Digital Files are uploaded to the application. The File Batch Name allows the user to see the file directory of how they had their Digital Files stored from another Storage System (e.g., on their computer hard drive) that allows for easier organization within the MemoryWeb Application. For example, in the sort of File Folder C:/2013/General (**1706**), two digital files (**1707** and **1708**) are illustrated that came from the exact same file folder path of the Users Storage system upon upload. At the top of every Application View within the application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the application, the user can select Apply Filters that is further described in FIGS. **37**-**43**.

On the right side of FIG. **35**, the associated Application Dot-Tags along with the ability to organize one or more Digital Files at the same time is illustrated. At the top of the screen, it shows how two Digital Files are selected (**1712**) that correspond to the selected (checked) Digital Files (**1705** and **1710**). Below this area illustrates all the Application Dot-Tags that are associated with the two selected Digital Files. The user has the option to select all (**1713**) the Digital Files being viewed in the Uploads View as well as selecting none (**1714**). By selecting all, the user can administer Application Dot-Tags to all the selected Digital Files at the same time. If the user wants to delete Digital Files, they can select the Digital Files to be deleted and then select the Delete Selection (**1715**) option.

In FIG. **35**, each Application Dot-Tag that is associated with the selected Digital File(s) is illustrated. For this example, the People area (**1716**) has Application Dot-Tags of Jackson Smith (**1734**), Jane Smith (**1733**), Jon Smith (**1731**, and JC Smith (**1717**) that are associated with the two

selected Digital Files (**1710** and **1705**). If the user wants to add a person to all the selected Digital Files, they can click on "+Add People" (**1718**) that will display a pop-up where the user can search for an existing person within the user's existing people within the application or add a new person to the user's group of people within the application. It is contemplated to have a Facial Recognition suggestions appear in this area of the application that will allow users to confirm or deny a recognized person to a specific Digital File. However, the current version of the People area is useful for situations where a face is not recognized, but the user desires to tag a person to a Digital File, they can manually assign a Person Application Dot-Tag to that Digital File for an existing person (e.g., if the person's back is turned, it is a document that contains that person, a piece of art created by that person, etc.).

In the Dates area (**1719**), the organize functionality for assigning a Digital Tag of a date within the Digital File(s) is illustrated. Upon upload, the date when the Digital File was created is automatically read by the application and illustrated as an Application Dot-Tag (**1720** and **1730**). As illustrated in the Dates area, the Application Dot-Tags of Jul. 4, 2013 (**1720**) and Aug. 28, 2013 (**1730**) are illustrated as they correspond to the dates that are associated with each of the selected Digital Files. If the user wants to change the date for all the selected Digital Files, they can click on "+Add/Edit Date" (**1721**) that will display a pop-up where the user can add a new date for the selected digital files within the application. This is a very useful feature when an incorrect date is assigned to a digital file (e.g., if a photo from Oct. 31, 1951 was digitized on Dec. 31, 2012, the digitized dates would show as an Application Dot-Tag that the user can change in this section to the correct date of Oct. 31, 1951).

In the Locations area (**1722**), the organize functionality for assigning Digital Tags of locations within the Digital File(s) is illustrated. Upon upload, the GPS location of where the Digital File was created (if applicable) is automatically read by the application and illustrated as an Application Dot-Tag for locations of the selected files. In the locations area, the Application Dot-Tags of Abe Lincoln Elementary School (**1723**) and Wrigley Field (**1735**) are illustrated as they correspond to the locations that are associated with each of the selected Digital Files. If the user wants to change the location for all the selected Digital Files, they can click on "+Add/Edit location" (**1724**) that will display a pop-up where the user can search for an existing location within the user's existing locations within the application or add a new location to the user's group of locations within the application. Another added function to assign a location to the selected Digital Files is to use Search with Map (**1732**) that utilizes the Application's Third Party Geographical Mapping System that is further illustrated in FIG. **47** that allows the user to type in any relevant information (e.g., location name, address, state, etc.) and then the application will search and pinpoint that location on a map.

In the Collections Area (**1725**), the organize functionality for assigning Digital Tags of albums within the Digital File(s) is illustrated. Digital Files can be associated to multiple albums. As illustrated in the Collections area, the Application Dot-Tags of First Day of School (**1726**), Jackson and JC Photos **2013** (**1727**), and Baseball Games (**1728**) are associated with the Collections for the selected Digital Files. If the user wants to add a Collection to all the selected Digital Files, they can click on "+Add/Create Collection" (**1729**) that will display a pop-up where the user can search for an existing Collection within the user's existing Collec-

Petitioner Apple Inc. - Ex. 1001, p. 69

US 11,017,020 B2

27

tions within the application or add a new Collection to the user's group of Collections within the application.

Within the Uploads View, the ability to perform similar tagging of Star Rankings, Recipes, Family Relationships, and Media Types/Document Type are also contemplated as part of the Application Digital Tag Organizer System. For Star Rankings, it is contemplated to assign MemoryWeb Tags of star rankings within the Digital File(s). Upon upload, if the star ranking is already contained within the Digital File, it is automatically read by the application and illustrated as an Application Dot-Tag. The user can select one or more Digital Files and then apply a star ranking between 1 and 5 in the Uploads Application View. For Recipes, it is contemplated to assign MemoryWeb Tags of Recipes to Digital File(s). The user can select one or more Digital Files and then type within the "Recipe" search bar to either add a new recipe or associate the Digital File(s) to an existing recipe. Digital Files can be associated to multiple recipes. For Media Type/Document Type, the user can choose from a list of common document types (e.g., Birth Certificate, Death Certificate, Marriage Certificate, etc.) can be utilized for common document type associations. Once a document type is assigned to one or more Digital Files, the document type appears within an Application Dot-Tag. Digital Files can be associated to multiple document types.

In FIG. 36, an individual recipe view (1800) allows one to see all the information that is associated with a specific recipe. The name of the specific recipe is displayed at the top of the page (1801) and the People Profile picture of the "chef" associated with the recipe is illustrated (1804). If no chef is assigned, the user can select the "+add/edit chef" (1803) to either choose an existing person from the user's People in the application or add a new person.

The view of various Digital Files within the recipe (1808) along with scrolling through the Digital Files using the arrow icons (1814 and 1815), the ability to share this recipe with others by selecting the sharing icon (1812), As the Digital Files are selected on using the film strip on the bottom, a larger thumbnail illustrating the Digital File is shown (1807). The recipe view also allows you to choose a chef for the recipe from the people within the user's application. When a chef is selected, the profile picture (1804) of the person along with their name as an Application Dot-Tag (1816) is displayed. For each recipe, the user can insert the ingredients (1809), directions (1810), and comments (1811). Each of these areas can be edited by selecting the edit button (1813). Another contemplated feature allows the user to apply star rankings for the recipe as well as categorize they type of recipe (e.g., appetizer, entrée, etc.). It is further contemplated that the Digital Files within the individual recipe view may also include videos where they can be watched showing the chef making the recipe. It is also contemplated that the recipes will be interactive with external sources (e.g., the Food Network) so that recipes can be shared or imported with the application and that visitors to the account will be able to post/share comments about the recipe. It is further contemplated that the user can print the recipe using a print icon.

In FIG. 37, the Advanced Filters System is illustrated (1800). This feature allows the user to narrow the Digital Files being viewed within the Application Views by searching the user's entire collection of MemoryWeb Tags within the application and then displaying the filtered information in one of the Application Views. Advanced Filters System can be filtered by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter

28

based on more than one criterion at a time. To help users quickly identify Digital Files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, and no upload date information or are lacking any other tag. The Advanced Search Filter can be used within many of the views the application to narrow the set of Digital Files being viewed. For example, you can use the Advanced Filter Button to only show the map view of locations a specific person has traveled in their lifetime.

When a user selects the "Advanced Filters" from almost any Application View (0801) (the button can be seen in FIGS. 32, 33, 34, 35, and 36), a pop-up will appear that allows the user to type in text into the text box (0802). As the user is typing, the system sends a request (0803) to the User Relationship Table (0300) to look up any possible MemoryWeb Tag matches. The system will then produce the request (0804) and illustrate the potential matches of the filters to the user (0805). As the user types in another letter, the process of sending a request (0803) to the User Relationship Table (0300), producing results (0804) and producing a new set of results (0805) is re-run. If the user selects one of the suggested MemoryWeb tags (0806) and then selects to apply this filter (0807), the system will send this request to the User Relationship Table (0300). This portion of the Advanced Filter System is further illustrated in FIG. 38.

If the Advanced Filter System is applied within the Uploads View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (0809). An example of this output is later illustrated in FIG. 39 (indicator 0850).

If the Advanced Filter System is applied within the Collections View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (0810). An example of this output is later illustrated in FIG. 39 (indicator 0852).

If the Advanced Filter System is applied within the Locations View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (0811). An example of this output is later illustrated in FIG. 40 (indicator 0856).

If the Advanced Filter System is applied within the People View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (0814). An example of this output is later illustrated in FIG. 39 (indicator 0854).

If the Advanced Filter System is applied within other contemplated views within the application such as Recipe, Family Trees, Timespan, etc. the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (0812).

If the user decides to add an additional filter (0813), the process is repeated when the user selects "Advanced Filter" (0801) while the pre-existing filters are still applied. An example of this process is later illustrated in FIG. 42 and FIG. 43. If the user selects an Application Dot-Tag, then the continuous Link of Application Dot-Tags System is engaged as illustrated in FIG. 30 (0700).

In FIG. 38, the process of the Adding the First Application Dot-Tag using the Advanced Filter is illustrated. This is a visual depiction of the process that was illustrated in FIG. 37. In Stage 1 (0830), the user selects "Apply Filters." This takes the user to Stage 2 where the application generates the Apply Multiple Filters box (0831). The user can then type in the alphanumeric text search criteria within the Advanced Filters text box (0838). In this example, the word "Smith"

Petitioner Apple Inc. - Ex. 1001, p. 70

US 11,017,020 B2

<table>
<tr><td>29</td><td>30</td></tr>
</table>

was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters (**0836**) that meet the criteria. In this example, the user selects the Application Dot-Tag of a person named JC Smith (**0832**). In Stage **3**, "Apply" is selected and then the application lists the Application Dot-Tag of a Person named JC Smith as a current active filter (**0837**). This filter will then be applied to each application view that is further illustrated in FIGS. **39** through **41**. If the user wants to clear all the filters, they can select "clear filters" (**0839**).

In FIG. **39**, an illustration of the results for a Single Application Dot-Tag Filter for each application view is depicted. If the Advanced Filter is applied in the Uploads Application View (**0850**), the filter of "JC Smith" (**0851**) is illustrated and only the Digital Files that contain the person JC Smith are illustrated. If the Advanced Filter is applied in the Collections Application View (**0852**), the filter of "JC Smith" (**0853**) is illustrated and only the Collections that contain the person JC Smith are illustrated. If the Advanced Filter is applied in the People Application View (**0854**), the filter of "JC Smith" (**0855**) is illustrated and only the person named JC Smith is illustrated.

In FIG. **40**, an illustration of the results for a Single Application Dot-Tag Filter for a date within the Uploads Application View is depicted (**0860**). If the Advanced Filter is applied using a date filter within the Uploads Application View (**0861**), the filter date of "2013-07-04" (**0876**) is illustrated and only the Digital Files that contain that date are illustrated.

In FIG. **41**, an illustration of the results for a Single Application Dot-Tag Filter in the Location Application View is depicted (**0870**). Within the Location Application View the Digital Files are displayed within an interactive map (Google map shown as an example). The Location View can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users. In this view, individual or groups of Digital Files are illustrated as photo thumbnails (see indicators **0874** and **0875**)) on the map and the user can select the thumbnail to see all the Digital Files with the same location (as seen FIG. **34** (indicator **1630**)) or the user can use the interactive map and narrow the map view by either using the zoom in/zoom out bar (**0876**) on the left or simply selecting the map. Note that the pinned locations include a thumbnail of the Digital File (or Collection cover) and the number of Digital Files for that location.

If the Advanced Filter is applied in the Locations Application View, the filter of "JC Smith" (**0872**) is illustrated and only the Digital Files that contain the person JC Smith are illustrated with their geographic location on the map. The user can select to clear this filter (**0873**) or see this Advanced Filter with the view of locations as a list (**0871**). In FIG. **41**, there are two illustrated on the map (**0874** and **0875**).

In FIG. **42**, the process of the Adding another Application Dot-Tag using the Advanced Filter is illustrated. Continuing on the process that was illustrated in FIG. **38** where the first Application Dot-Tag filter of "Person: JC Smith" was applied, the ability to add a second Application Dot-Tag if further illustrated in FIG. **42**. As with FIG. **38**, FIG. **42** is a visual depiction of the process that was illustrated in FIG. **37**. In Stage **1** (**0880**), the user selects "Apply Filters." This takes the user to Stage **2** where the application generates the Apply Multiple Filters box (**0881**). The user can then type in the text search criteria for the second Advanced Filter within the Advanced Filters text box. In this example, the word "Abe" was typed within the text box. As the alphanumeric

text is typed within the text box, the application automatically generates the available filters that meet the criteria. In this example, the user selects the Application Dot-Tag of a location named Abe Lincoln Elementary School (**0882**). In Stage **3** (**0883**), the application lists the Application Dot-Tags of both the Person named JC Smith (**0884**) as well as the location of Abe Lincoln Elementary School (**0885**) as part of the Current Active Filters. The user then selects "Apply" (**0886**) to see these filters illustrated in the Application Views. This filter will then be applied to each application view as previously illustrated in FIGS. **39** through **41**.

In FIG. **43**, an illustration of the results for Adding Another Application Dot-Tag Filter in the Location Application View is depicted (**0890**). Continuing on the process that was illustrated in FIG. **42**, in FIG. **43** (**0890**) the Application Dot-Tag filters of "Person: JC Smith" (**0891**) and "Location: Abe Lincoln Elementary School" (**0892**) are illustrated. There is one overlapping location that contains both filters for a Digital File that is illustrated on the map (**0893**).

In FIG. **44**, the Fast Search System is illustrated (**0900**). Throughout the application, groups or individual Digital Files can be searched quickly using the Fast Search bar that is at the top of each Application View. Once a key word or phrase is entered into this area, the user's entire collection of Digital Tags within the application that includes all the Digital tags are searched for potential matches. This feature allows the user to search their entire collection of MemoryWeb Tags within the application and then displays the information grouped by people, collections, locations, documents, and recipes. The Fast Search System can be searched by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates.

When a user selects the Fast Search bar from almost any Application View (**0901**), the user can type in alphanumeric text into the text box (**0902**). As the user is typing, the system sends a request (**0903**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0904**) and illustrate the potential matches by category for the user (**0905**). As the user types in another letter, the process of sending a request (**0903**) to the User Relationship Table (**0300**), producing results (**0904**) and producing a new set of results (**0905**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0906**), the system will send this request to the User Relationship Table (**0300**). This process is further illustrated in FIG. **45**.

If the user selects a person Fast Search tag, the system retrieves data for the person from the User's Relationship Table and displays the relationship data (**0907**) in the Person Profile View as illustrated in FIG. **32** (indicator **1430**).

If the user selects a collection Fast Search tag, the system retrieves data for the collection from the User's Relationship Table and displays the relationship data (**0908**) in the Collection View as illustrated in FIG. **33** (indicator **1530**).

If the user selects a location Fast Search tag, the system retrieves data for the location from the User's Relationship Table and displays the relationship data (**0909**) in the Location View as illustrated in FIG. **34** (indicator **1630**).

If the user selects a date Fast Search tag, the system retrieves data for the date from the User's Relationship Table and displays the relationship data (**0910**) in the Uploads View as illustrated in FIG. **40** (indicator **1861**).

If the Fast Search System is applied within other contemplated views within the application such as Family Trees, Timespan, etc. the system retrieves data for the search from

Petitioner Apple Inc. - Ex. 1001, p. 71

US 11,017,020 B2

31                                                        32

the User's Relationship Table and displays the relationship data (**0911**). As part of the contemplated search process is to also search comments related to a Digital File.

In FIG. **45**, the process of using the Keyword Fast Search is illustrated. This is a visual depiction of the process that was illustrated in FIG. **44**. In Stage **1** (**0930**), the user selects the Fast Search bar at the top of one of the Application Views. This takes the user to Stage **2** (**0931**) where the user can then type in the alphanumeric text search criteria within the Fast Search text box (**0932**). In this example, the word "Wrigley" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available MemoryWeb Tag results (**0933**) that meet the criteria. Note how the results are organized by various MemoryWeb Tag categories such as Person, Collection, Location, Recipe, and comments. In Stage **3** (**0934**), the user selects one of the results. In this example, the user selects the location of Wrigley Field (**0935**). When the user selects a specific MemoryWeb Tag, it takes them to Stage **4** where the information related to that tag is displayed in the corresponding view as discussed within FIG. **44**. For the example where the user selected the Location of Wrigley Field, the user was taken to the individual locations Application View where the location of Wrigley Field and the corresponding Digital Files are displayed (**0936**).

In FIG. **46**, the Share to Third Party Media Provider System (**1000**) is illustrated. This feature allows the user to share Digital Files from MemoryWeb directly to a third party application. The process begins when the user selects to share a Digital File or collection of Digital Files within the MemoryWeb Application (**1001**). Examples of where the user can select share can be seen in FIG. **31** (indicator **0760**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Once the request is made, the system requests the Digital File and Tag Data Blocks (**1002**) from the User Relationship Table (**0300**). The system then retrieves the Digital File from the User Relationship Table (**1003**). At the same time, the system will also retrieve the Digital Tags from the Relationship Table (**1004**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1005**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1006**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**1300**) which then sends the Digital File outside the MemoryWeb Application to the Third Party Media Provider (**0501**).

In FIG. **47**, the Third Party Geographical Mapping System is illustrated (**1100**). When Digital Files are imported into MemoryWeb, if there is any GPS data available from the EXIF Tags (See FIG. **22** (indicators **0330**, **0331**, **0332**, and **0333**)), the system will utilize this data and automatically create a MemoryWeb location tag within the application (See FIG. **22** (indicators **0368**, **0369**, **0370** and **0371**)). However, if the GPS coordinates were missing from a Digital File when it was imported into the application (See FIG. **50** (indicators **1418** and **1419**)), the user can add the Location (which the application will automatically add the associated GPS tags) to the Digital File using the Application Digital Tag Organization System (see FIG. **28**). As locations are associated with a Digital File, the application can interact with a Third Party Geographical Mapping

System to pull maps that correspond to the exact location of Digital Files that have a location tag (see FIG. **34** (indicator **1630** and FIG. **40**, indicator **0875**)). In addition, the application utilizes a world map view to illustrate all the locations that are associated to one or more Digital Files for a user within the Location Application View (see FIG. **41** (indicator **0880**)).

The Third Party Geographical Mapping System begins when a Location Application Dot Tag (**1102**) is selected (**1104**), the system will send a request (**1105**) to the User Relationship Table (**0300**). Examples of when Location Application Dot-Tags can be selected are illustrated in FIG. **31** (indicator **0768** and FIG. **35**, indicators **1723** and **1735**). In FIG. **47** if the Locations Application View is selected (**1103**), the system will send a request (**1105**) to the User Relationship Table. The Location Application View can be selected from almost any application view as illustrated in FIG. **34** (indicator **1605**). When either a single location or the world map view is selected, the system will retrieve the data (**1108**) from the User Relationship Table (**0300**) and send a request (**1106**) to the Third Party Geographical Mapping Provider (**1101**) who generates the map request and then sends the information back to the system for the specific location (**1107**). At the same time, the Application Dot-Tags and Digital Files associated with the location or map request are retrieved and then sent (**1109**) to the Locations application view. The system will combine the map information along with the Application Dot-Tags and Digital Files and display this information within the Location Application View (**1100**). Examples of a single Location Application View can be seen in FIG. **34** (indicator **1630** and FIG. **40** (indicator **0875**), and an example of a world map view can be seen in FIG. **41** (indicator **0880**).

In FIG. **48**, the Share to Individual System is illustrated (**1200**). The Share to an individual person or a group of people starts when a user initiates share of a Digital File or a Collection of Digital Files (**1201**). Examples of where the user share functions are illustrates are in FIG. **31** (indicators **0760** and **0761**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Next, the system requests the Digital File and Tag Data Blocks (**1202**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1203**) from the User Relationship Table.

At the same time, the system will also retrieve the Digital Tags of the Digital File from the Relationship Table (**1204**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1206**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1205**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**1300**) which then sends the Digital File outside the MemoryWeb Application to an Individual or Group of People (**1207**).

In FIG. **49**, the Application Export System is illustrated (**1300**). The Application Export System starts when a user selects the export of a Digital File within the application (**1302**) or has installed the MW Automatic Uploader/Downloader Application (**1308**). An example of where the user can select the export of a Digital file within the application is FIG. **31** (indicator **0751**). If the user has installed the MW Automatic Uploader/Downloader Application, the export

Petitioner Apple Inc. - Ex. 1001, p. 72

US 11,017,020 B2

33 34

functionality of the user's entire collection of Digital Files will be downloaded to the User's desired folder on their computer with the Digital Tags embedded within the Digital Files. If neither a user initiated download nor the MW Automatic Uploader/Downloader Application is not used, then the Application Export is not initiated (**1309**). For either a user initiated download or one using the MW Automatic Uploader/Downloader Application, the system requests the Digital File(s) and Tag Data Blocks (**1303**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1304**) from the User Relationship Table. At the same time, the system will also retrieve the Digital Tags of the Digital File from the User Relationship Table (**1305**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1306**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. 22. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File(s) (**1307**). The application then exports the Digital File(s) with the new EXIF Tag Data Blocks to the desired Storage System of the user (**1301**).

In FIG. 50, there are three charts for the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb. This Figure is meant to demonstrate how the EXIF Tag Data Blocks for a Digital File (in this example a JPG file) prior to the use of MemoryWeb Application appear and then how these EXIF Tag Data Blocks are populated with Digital Tags upon export from the MemoryWeb Application.

The first chart illustrates common EXIF Tags (Data Blocks) (**1401**) and lists certain common the EXIfTool Family 1 Group names that are displayed in the file properties of a JPG file when using Microsoft Windows (these are the same EXIF Tag Blocks that were illustrated in FIG. 22 (indicator **1320**)). In the second chart (**1402**), the Digital Tags associated with the original Digital File are displayed. In the third chart (**1403**), the updated Digital Tags for the same original Digital File once exported from the MemoryWeb Application is displayed.

In the second chart (**1402**), the original Digital File prior to import to the MemoryWeb Application did not have Digital Tags for data blocks such as Description Rating (**1416**), Description Comments (**1417**), GPS Latitude (**1418**), GPS Longitude (**1419**). Also in the second chart the Digital Tags for the data blocks of File Folder Path (**1420**) and File Date Created (**1421**) are illustrated.

In the third chart (**1403**), the original Digital File that was exported from the MemoryWeb Application now contains new or modified Digital Tags for certain data blocks. For example, a star rating of four out of five stars (**1410**) with the new MW Modified Digital File is now associated with the Description Rating (**1404**) where it was blank (**1416**) with the original file before using the MemoryWeb Application.

Another example is the listing of MemoryWeb Tags within the Description Comments data block (**1411**) as: CAPTION: Jackson and JC's first day at school!, PERSON: Jackson Smith, J C Smith, LOCATION NAME: Abe Lincoln Elementary School, COLLECTION: First Day of School, COLLECTION: Jackson and JC Photos **2013**, DATE: Aug. 28, 2013. All of these Digital Tags are now associated with the Description Comments (**1405**) where it was blank (**1417**) with the original file before using the MemoryWeb Application.

Also updated in the MW Modified Digital File are the GPS Latitude (**1412**) and GPS Longitude (**1413**) as Digital Tags that were assigned in the MemoryWeb Application using the location feature with the Application Digital Tag Organizer System. These tags now replace the blank tags (indicators **1418** and **1419**) that were in the original file before using the MemoryWeb Application.

A final example is how the date was modified in the MemoryWeb Application where a new date of Aug. 28, 2013 (**1415**) was assigned to the Digital File. This replaced the old date that was originally tagged with a date of Nov. 1, 2013 (**1421**). In a typical Digital File, only the date and perhaps the GPS location if taken with certain newer photo device is pre-populated in a Digital File. For the example in FIG. **50**, the Digital File may have been created or scanned on Nov. 1, 2013, but with the MemoryWeb Application Digital Tag Organizer System the user was able to correctly assign the date the photo was taken and now this date is always part of the Digital File within the MemoryWeb Application, but also when the Digital File is exported from MemoryWeb.

A benefit of the Export System is that users can export a single Digital File or their entire set of Digital Files (using the MW Automatic Uploader/Downloader Application), with all the updated Digital Tags from the MemoryWeb Application embedded within the Digital File(s). This feature is unique as it will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing Digital Files such as a social media website) where it can be viewed with these Digital Tag attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its Digital Files to a new digital system.

The application also contemplates the use of a Family Tree Application View where the individual people that have been created within the application can be displayed with family relationships. This view can illustrate interactive family trees where one can see the family tree of an individual or family. Any family relationships created in the user's personal profile are already pre-populated by the application for the Family Tree View. If a user selects on an individual within the family tree, it will take them to the people profile Application View of that person. Family Trees can quickly be viewed with the family tree drop-down sort feature. As with other areas within the application, the family tree view can be narrowed down using an Advanced Filters System. For matching family members, the system will have drag/drop functionality to make new associations to a family tree. It is also contemplated that various family tree views could be displayed (e.g., pedigree chart, fan chart, directs descendants chart, etc.). In addition, it is contemplated that family tree relationships from either data files (e.g., GEDCOM files) or other sources (e.g., Family Search database) would either be imported into the user's versions of the application or utilize these sources in associating the family tree information.

Another Application View that is contemplated is Timespan or Timeline. The Timeline Application View will have an interactive timeline to display the dates within the Digital Files of the application for a user. The timeline view acts as an interactive filter or funnel of Digital Files whereas when the user starts to define the parameters of dates towards the bottom, the information above it is filtered to display the major groups of Digital Files that meets the selected date range criteria in various formats until you are able to view an individual Digital File. This funnel approach is designed

Petitioner Apple Inc. - Ex. 1001, p. 73

US 11,017,020 B2

35                                                                                          36

to allow the user to appreciate the vast amount of data that can be associated with a date range, but then allow them to filter the information with the user's desired criteria. This will be a very useful tool when users want to see the growth and progress of an individual as well as memorialize a lifetime of a friend or family member.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

The invention claimed is:

1. A method comprising:
causing an interface to display a people view, the people view including:
  a first thumbnail image associated with a first person,
  a first name associated with the first person,
  a second thumbnail image associated with a second person, and
  a second name associated with the second person;
responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including:
  a first digital file associated with the first person,
  the first name associated with the first person, and
  a first map image;
responsive to an input that is indicative of a selection of the first map image in the first person view, causing a first location view to be displayed on the interface, the first location view including:
  an interactive geographic map,
  a first indication positioned at a first location on the interactive geographic map, and
  a second indication positioned at a second location on the interactive geographic map; and
responsive to an input that is indicative of a selection of the first digital file in the first person view, causing a slideshow to be displayed on the interface, the slideshow including a plurality of images associated with the first person.

2. The method of claim 1, wherein the first indication is associated with a first set of digital files and the first location, and the second indication is associated with a second set of digital files and the second location.

3. The method of claim 2, wherein the first set of digital files and the second set of digital files are associated with the first person.

4. The method of claim 3, wherein the first thumbnail image includes at least a portion of a face of the first person and the second thumbnail images includes at least a portion of a face of the second person.

5. The method of claim 4, wherein the first thumbnail image includes at least a portion of the first digital file.

6. The method of claim 4, wherein, in the people view, the first name is displayed adjacent to the first digital file associated with the first thumbnail image and the second name is displayed adjacent to the second thumbnail image.

7. The method of claim 6, wherein, in the first person view, the first map image is positioned below the first digital file.

8. The method of claim 1, further comprising, prior to the causing the interface to display the people view:

causing the first digital file to be displayed on the interface;
receiving alphanumeric text as a first user-generated tag; and
associating the first digital file with the first user-generated tag.

9. The method of claim 8, wherein the first user-generated tag includes the name of the first person.

10. The method of claim 9, further comprising exporting the first digital file to a remote device, the exported first digital file including information associated with the first user-generated tag.

11. The method of claim 1, wherein the first person view includes a first group image, and responsive to an input that is indicative of a selection of the first group image, causing a first group view to be displayed on the interface, the first group view including one or more digital files associated with another person that is associated with the first person.

12. The method of claim 11, wherein the another person is the second person.

13. The method of claim 3, further comprising responsive to an input that is indicative of a selection associated with the second person, causing a second person view to be displayed on the interface, the second person view including the second digital file associated with the second person, the second name associated with the second person, and a second map image.

14. The method of claim 13, further comprising:
responsive to an input that is indicative of a selection of the second map image in the second person view, causing a second location view to be displayed on the interface, the second location view including:
  the interactive geographic map,
  a third indication positioned at a third location on the interactive geographic map, and
  a fourth indication positioned at a fourth location on the interactive geographic map.

15. The method of claim 14, wherein the third indication is associated with a third set of digital files and the third location, and the fourth indication is associated with a fourth set of digital files and the fourth location.

16. The method of claim 15, wherein the third set of digital files and the fourth set of digital files are associated with the second person.

17. The method of claim 1, further comprising causing the interface to display an interactive timeline view, the interactive timeline view permitting a user to group a plurality of digital files by year, month, and day.

18. The method of claim 17, further comprising:
responsive to receiving a year input, grouping the plurality of digital files based on year and causing at least one of the plurality of digital files to be displayed on the interface;
responsive to receiving a month input, grouping the plurality of digital files based on month and causing at least one of the plurality of digital files to be displayed on the interface; and
responsive to receiving a day input, grouping the plurality of digital files based on day and causing at least one of the plurality of digital files to be displayed on the interface.

19. The method of claim 1, further comprising receiving one or more filtering criteria and causing one or more digital files to be displayed on the interface based at least in part on the one or more filtering criteria.

Petitioner Apple Inc. - Ex. 1001, p. 74

US 11,017,020 B2

37                                                38

**20**. The method of claim **19**, further comprising:

causing a plurality of images to be displayed on the interface;

receiving alphanumeric text as the album name;

causing each of the plurality of images to be associated with an album name; and

causing an album view to be displayed on the interface, the album view including the album name and the plurality of images.

**21**. The method of claim **2**, further comprising responsive to a selection associated with the first location, causing the first set of digital files to be displayed on the interface and responsive to a selection associated with the second location, causing the second set of digital files to be displayed on the interface.

**22**. The method of claim **21**, further comprising causing (i) a first number associated with a number of digital files in the first set of digital files to be displayed on the interface and (ii) a second number associated with a number of digital files in the second set of digital files to be displayed on the interface.

**23**. The method of claim **3**, wherein each of the first digital file, the second digital file, the first set of digital files, and the second set of digital files include a photo, a video, or both.

**24**. The method of claim **3**, wherein the first set of digital files includes a photo, a video, and an audio file.

**25**. The method of claim **21**, wherein at least one digital file in the first set of digital files displayed on the interface responsive to the selection associated with the first location is not overlaid on the interactive geographic map and at least one digital file in the second set of digital files displayed on the interface responsive to the selection associated with the second location are not overlaid on the interactive geographic map.

**26**. The method of claim **19**, wherein the one or more filtering criteria include a keyword, a location, a person, an event, a date, or any combination thereof.

**27**. The method of claim **10**, wherein the exporting the first digital file includes exporting exchangeable image file format (EXIF) data associated with the first digital file.

**28**. The method of claim **1**, wherein the input that is indicative of the selection of the first person includes a touch or click of the first thumbnail image associated with the first person.

**29**. The method of claim **1**, wherein the input that is indicative of the selection of the first map image is a touch or click of the first map image.

**30**. The method of claim **25**, wherein each of the digital files in the first set of digital files displayed on the interface responsive to the selection associated with the first location are not overlaid on the interactive geographic map and each of the digital files in the second set of digital files displayed on the interface responsive to the selection associated with the second location are not overlaid on the interactive geographic map.

**31**. A method comprising:

causing an interface to display a people view, the people view including:

a first thumbnail image associated with a first person,

a first name associated with the first person,

a second thumbnail image associated with a second person, and

a second name associated with the second person;

responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including:

a first digital file associated with the first person,

the first name associated with the first person, and

a first map image;

responsive to an input that is indicative of a selection of the first map image in the first person view, causing a first location view to be displayed on the interface, the first location view including:

an interactive geographic map,

a first indication positioned at a first location on the interactive geographic map, and

a second indication positioned at a second location on the interactive geographic map;

responsive to receiving a year input, grouping a plurality of digital files based on year and causing at least one of the plurality of digital files to be displayed on the interface;

responsive to receiving a month input, grouping the plurality of digital files based on month and causing at least one of the plurality of digital files to be displayed on the interface; and

responsive to receiving a day input, grouping the plurality of digital files based on day and causing at least one of the plurality of digital files to be displayed on the interface.

**32**. The method of claim **31**, wherein the first digital file is included in the plurality of digital files.

**33**. The method of claim **31**, further comprising causing the interface to display an interactive timeline view prior to receiving the year input, prior to receiving the month input, and prior to receiving the day input, the interactive timeline view permitting a user to provide the year input, the month input, the day input, or any combination thereof to group the plurality of digital files.

**34**. The method of claim **30**, wherein the first indication is associated with a first set of digital files and the first location, and the second indication is associated with a second set of digital files and the second location.

**35**. The method of claim **34**, wherein the first set of digital files and the second set of digital files are associated with first person.

**36**. The method of claim **35**, wherein the first thumbnail image includes at least a portion of a face of the first person and the second thumbnail images includes at least a portion of a face of the second person.

**37**. The method of claim **36**, wherein the first thumbnail image includes at least a portion of the first digital file.

**38**. The method of claim **36**, wherein, in the people view, the first name is displayed adjacent to the first digital file associated with the first thumbnail image and the second name is displayed adjacent to the second thumbnail image.

**39**. The method of claim **38**, wherein, in the first person view, the first map image is positioned below the first digital file.

**40**. The method of claim **31**, further comprising, prior to the causing the interface to display the people view:

causing the first digital file to be displayed on the interface;

receiving alphanumeric text as a first user-generated tag; and

associating the first digital file with the first user-generated tag.

**41**. The method of claim **40**, wherein the first user-generated tag includes the name of the first person.

**42**. The method of claim **41**, further comprising exporting the first digital file to a remote device, the exported first digital file including information associated with the first user-generated tag.

Petitioner Apple Inc. - Ex. 1001, p. 75

US 11,017,020 B2

39      40

**43**. The method of claim **31**, wherein the first person view includes a first group image and responsive to an input that is indicative of a selection of the first group image, causing a first group view to be displayed on the interface, the first croup view including one or more digital files associated with another person that is associated with the first person.

**44**. The method of claim **43**, wherein the another person is the second person.

**45**. The method of claim **35**, further comprising responsive to an input that is indicative of a selection associated with the second person, causing a second person view to be displayed on the interface, the second person view including the second digital file associated with the second person, the second name associated with the second person, and a second map image.

**46**. The method of claim **45**, further comprising:

responsive to an input that is indicative of a selection of the second map image, causing a second location view to be displayed on the interface, the second location view including:

the interactive geographic map,

a third indication positioned at a third location on the interactive geographic map, and

a fourth indication positioned at a fourth location on the interactive geographic map.

**47**. The method of claim **46**, wherein the third indication is associated with a third set of digital files and the third location, and the fourth indication is associated with a fourth set of digital files and the fourth location.

**48**. The method of claim **47**, wherein the third set of digital files and the fourth set of digital files are associated with the second person.

**49**. The method of claim **31**, further comprising receiving one or more filtering criteria and causing one or more digital files to be displayed on the interface based at least in part on the one or more filtering criteria.

**50**. The method of claim **49**, further comprising:

causing a second plurality of images to be displayed on the interface;

receiving alphanumeric text as the album name;

causing each of the second plurality of images to be associated with an album name; and

causing an album view to be displayed on the interface, the album view including the album name and the second plurality of images.

**51**. The method of claim **32**, further comprising responsive to a selection associated with the first location, causing the first set of digital files to be displayed on the interface and responsive to a selection associated with the second location, causing the second set of digital files to be displayed on the interface.

**52**. The method of claim **51**, further comprising causing (i) a first number associated with a number of digital files in the first set of digital files to be displayed on the interface and (ii) a second number associated with a number of digital files in the second set of digital files to be displayed on the interface.

**53**. The method of claim **33**, wherein each of the first digital file, the second digital file, the first set of digital files, and the second set of digital files include a photo, a video, or both.

**54**. The method of claim **33**, wherein the first set of digital files includes a photo, a video, and an audio file.

**55**. The method of claim **51**, wherein the first set of digital files displayed on the interface responsive to the selection associated with the first location are not overlaid on the interactive geographic map and the second set of digital files displayed on the interface responsive to the selection associated with the second location are not overlaid on the interactive geographic map.

**56**. The method of claim **49**, wherein the one or more filtering criteria include a keyword, a location, a person, an event, a date, or any combination thereof.

**57**. The method of claim **42**, wherein the exporting the first digital file includes exporting exchangeable image file format (EXIF) data associated with the first digital file.

**58**. The method of claim **31**, wherein the input that is indicative of the selection of the first person includes a touch or click of the first thumbnail image associated with the first person.

**59**. The method of claim **31**, wherein the input that is indicative of the selection of the first map image is a touch or click of the first map image.

\* \* \* \* \*

Petitioner Apple Inc. - Ex. 1001, p. 76

US009552376B2

(12) **United States Patent**
Desmond et al.

(10) Patent No.: **US 9,552,376 B2**
(45) Date of Patent: **Jan. 24, 2017**

(54) **METHOD AND APPARATUS FOR MANAGING DIGITAL FILES**

(71) Applicant: **MemoryWeb, LLC**, Glen Ellyn, IL (US)

(72) Inventors: **Christopher J. Desmond**, Glen Ellyn, IL (US); **Nancy L. Desmond**, Glen Ellyn, IL (US); **L. Michael Taylor**, Chicago, IL (US)

(73) Assignee: **MemoryWeb, LLC**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 81 days.

(21) Appl. No.: **14/193,426**

(22) Filed: **Feb. 28, 2014**

(65) **Prior Publication Data**

US 2014/0181089 A1    Jun. 26, 2014

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 13/157,214, filed on Jun. 9, 2011, now Pat. No. 9,098,531.

(51) **Int. Cl.**
*G06F 7/00* (2006.01)
*G06F 17/30* (2006.01)

(52) **U.S. Cl.**
CPC ..... *G06F 17/30268* (2013.01); *G06F 17/3028* (2013.01); *G06F 17/30946* (2013.01); *G06F 17/30997* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,694,514 A * | 12/1997 | Evans | G06K 17/0022 358/906 |
| 6,629,104 B1 * | 9/2003 | Parulski | G06F 17/30265 348/231.2 |
| 7,372,976 B2 | 5/2008 | Rhoads et al. | |
| 7,480,669 B2 | 1/2009 | Lo et al. | |
| 7,694,236 B2 * | 4/2010 | Gusmorino | G06F 3/04817 715/763 |

(Continued)

OTHER PUBLICATIONS

Kustanowitz et al., "Motivating Annotation for Personal Digital Photo Libraries: Lowering Barriers while Raising Incentives", Tech. Report HCIL-2004-18, U. Maryland, 2005.*

(Continued)

*Primary Examiner* — Michael Hicks
(74) *Attorney, Agent, or Firm* — Nixon & Peabody LLP

(57) **ABSTRACT**

A computer-implemented method of associating digital tags with digital files comprises storing a plurality of digital files having embedded therein content data and metadata including tags; receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and displaying, on a video display device associated with the client device, a first indication of the first tag label.

**12 Claims, 50 Drawing Sheets**





Petitioner Apple Inc. - Ex. 1001, p. 1

## US 9,552,376 B2

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,150,844 B2 | | 4/2012 | Redstone |
| 8,484,223 B2 * | | 7/2013 | Ota ................... G06F 17/30247 |
| | | | 707/748 |
| 2006/0165380 A1 * | | 7/2006 | Tanaka ................... G11B 27/34 |
| | | | 386/227 |
| 2007/0282908 A1 * | | 12/2007 | Van der Meulen |
| | | | et al. .......................... 707/104.1 |
| 2009/0113350 A1 * | | 4/2009 | Hibino .............. G06F 17/30061 |
| | | | 715/853 |
| 2009/0265631 A1 * | | 10/2009 | Sigurbjornsson ...... G06Q 10/10 |
| | | | 715/716 |

OTHER PUBLICATIONS

Kisilevich et al., "Event-based analysis of people's activities and behavior using Flickr and Panoramio geotagged photo collections", 14th International Conference Information Visualization, pp. 289-296, 2010, IEEE.*

Ahern et al., "World Explorer: Visualizing Aggregate Data from Unstructured Text in Geo-Referenced Collections", JCDL'07, pp. 1-10, 2007, ACM.*

Kang et al., "Capture, Annotate, Browse, Find, Share: Novel Interfaces for Personal Photo Management", International Journal of Human-Computer Interaction, 23(3), pp. 315-337, 2007, Lawrence Erlbaum Associates, Inc.*

Jaffe et al., "Generating Summaries and Visualization for Large Collections of GeoReferenced Photographs", MIR'06, pp. 89-98, 2006, ACM.*

Torniai et al., "Sharing, Discovering and Browsing Geotagged Pictures on the Web", 2007, Hewlett-Packard Development Company, L.P.*

Snavely et al., "Photo Tourism: Exploring Photo Collections in 3D", SIGGRAPH '06, ACM transactions on graphics, vol. 25, Issue 3, pp. 835-846, 2006, ACM.*

Kopf et al., "Deep photo: model-based photograph enhancement and viewing", ACM Transactions on Graphics, vol. 27, No. 5, Article 116, Dec. 2008, ACM.*

Trattner et al., "Evaluating tag-based information access in image collections", Proceedings of the 23rd ACM conference on Hypertext and social media, pp. 113-122, 2012, ACM.*

Kustanowitz et al., "Motivating Annotation for Personal Digital Photo Libraries: Lowering Barriers while Raising Incentives," Tech. Report HCIL-2004-18, U. Maryland, 2005 (10 pages).

Miller et al., "Give and take: a study of consumer photo-sharing culture and practice," CHI '07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 347-356, 2007 (10 pages).

Ames et al., "Why we tag: motivations for annotation in mobile and online media," CHI '07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 971-980, ACM, 2007 (10 pages).

Yee et al., "Faceted Metadata for Image Search and Browsing", CHI 2003, pp. 401-408, 2003, ACM.

Ferre, "CAMELIS: Organizing and Browsing a Personal Photo Collection with a Logical Information System", Int. Conf. Concept Lattices and Their Applications, pp. 112-123, 2007, HAL.

Tomasson et al., "PhotoCube: Effective and Efficient Multi-Dimensional Browsing of Personal Photo Collections", ICMR '11, 2011, ACM.

Bartolini et al., "Integrating Semantic and Visual Facets for Browsing Digital Photo Collections", SBED, pp. 65-72, 2009.

* cited by examiner

Petitioner Apple Inc. - Ex. 1001, p. 2

**FIG. 1**



Petitioner Apple Inc. - Ex. 1001, p. 3

**FIG. 2**

 

Comments:
Suzanne and Anthony's Wedding Party where the cousins posed
for a photo in the grass.  Note, Jack with the lollipop and the
photographer with his shoe in the photo

People:
Jack Wong
CJ Wong
Mary Firestone
Zoe Peika
Nick Persons

Event: Suzanne & Anthony's Wedding Reception 2010

Camera Details: more

Location:
Historical Society
Lisle, IL 60532

Petitioner Apple Inc. - Ex. 1001, p. 4

**FIG. 3**



Petitioner Apple Inc. - Ex. 1001, p. 5

# FIG. 4



Petitioner Apple Inc. - Ex. 1001, p. 6

**FIG. 5**



Petitioner Apple Inc. - Ex. 1001, p. 7

**FIG. 6**



# FIG. 7



**Clinton Dewitt Firestone IV**

<u>Birth:</u>      July 12, 1896
<u>Death:</u>     April 29, 1971
<u>Parents:</u>   <u>Clinton Dewitt Firestone III</u> and <u>Viola Miller</u>
<u>Comments:</u>  He was a WWII U.S. Air force pilot and POW in WWII and veteran
honorably discharged in December of 1947. He worked for 44 years for the
Firestone Tire and Rubber Company in retail, wholesale and original equipment
sales, marketing and management. He was born in Akron, OH and is buried in
Columbiana, OH.

<u>Edit bio</u>

| Locations | Timeline | Family Tree | Recipes |
|-----------|----------|-------------|---------|
|  |  |  |  |

Petitioner Apple Inc. - Ex. 1001, p. 9

**U.S. Patent**     **Jan. 24, 2017**     **Sheet 8 of 50**     **US 9,552,376 B2**

## FIG. 8



Petitioner Apple Inc. - Ex. 1001, p. 10

**FIG. 9**



Petitioner Apple Inc. - Ex. 1001, p. 11

## FIG. 10



**Desmond's Yellow Thai Chicken Curry**

Curry Mix
- Coconut milk (400 ml) – DO NOT SHAKE IT UP
- 800 gram of chicken (4 chicken breast)
- Fish sauce (Nam Pla) Thai Bamboo Garden – Bottle
- Garlic (2 cloves)
- Broccoli ( 2cups chopped)
- 2 Peppers (chopped)
- 2 Carrots (chopped)

- 1 Zucchini (chopped)
- Thai Basil (8 leaves)
- Lemon Grass (in jar) 1 teaspoon
- Chinese Ginger Root (in jar) 1 teaspoon

Rice
- Thai Rice (something that only takes 2 cups of water)
- Dice chicken in bowl and add two tablespoons of fish sauce. Let marinate for 20 minutes.
- Take thick part of coconut milk out into pan (about 4 tablespoons), Curry paste, 1 spoon of lemon grass, 1 spoon of ginger and garlic. Heat over high with boil and THEN stir for 1 minute. Add meat (uncooked) and fry until cooked over high heat
- Add milk, brown sugar and salt. Bring back to slight boil and constantly stir. Add veggies and soy sauce. Cook for about 10-14 minutes COVERED until veggies are cooked. Serve with a smile.

Chef: Barry Desmond



Video on How to Make It



Original Handwritten Recipe

Petitioner Apple Inc. - Ex. 1001, p. 12

**U.S. Patent**      Jan. 24, 2017      Sheet 11 of 50      US 9,552,376 B2

## FIG. 11

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 13

## FIG. 12

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 14

# FIG. 13

Thumbnail | Table

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| + Alberts | 2 | 8 | 0 | 0 |
| + Annex | 2 | 7 | 0 | 0 |
| + Bade | 3 | 8 | 0 | 0 |
| + Bacon | 4 | 8 | 0 | 0 |
| + Bates | 5 | 7 | 1 | 0 |
| + Boone | 6 | 6 | 2 | 2 |
| + Danas | 7 | 5 | 4 | 1 |
| + Danes | 8 | 7 | 3 | 2 |
| - Monk (All) | 2 | 499 | 4 | 14 |
| Monk, CJ | 1 | 200 | 2 | 7 |
| Monk, Jack | 1 | 199 | 2 | 7 |
| + Firestone | 21 | 1249 | 17 | 39 |
| + Moore | 1 | 4 | 6 | 3 |
| + Slythe | 1 | 9 | 0 | 9 |
| + Stein | 2 | 249 | 1 | 3 |
| + Testy | 4 | 788 | 2 | 12 |

Petitioner Apple Inc. - Ex. 1001, p. 15

# FIG. 14

Thumbnail | Table

| Last Name | Relationship | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Alberts, John | Cousin | 8 | 0 | 0 |
| Killian, Jack | Son | 7 | 0 | 0 |
| Killian, Brian | Nephew | 8 | 0 | 0 |
| Killian, Kevin | Nephew | 8 | 0 | 0 |
| Killian, Sarah | Daughter-in-law | 7 | 1 | 0 |
| Killian, John | Great Nephew | 6 | 2 | 2 |
| Killian, Mark | Great Nephew | 5 | 4 | 1 |
| Killian, Louis | Great Grandson | 7 | 3 | 2 |
| Killian, John | Grandson | 499 | 4 | 14 |
| Monk, CJ | Great Grandson | 200 | 2 | 7 |
| Monk, Jack | Great Grandson | 199 | 2 | 7 |
| Firestone, Mike | Third Cousin | 1249 | 17 | 39 |
| Moore, Bertha | Great Niece | 4 | 6 | 3 |
| Slythe, Sarah | Sister | 9 | 0 | 9 |
| Killian, John | Brother | 249 | 1 | 3 |
| Killian, Mike | Brother | 788 | 2 | 12 |

Petitioner Apple Inc. - Ex. 1001, p. 16

# FIG. 15

Thumbnail | Table

| Location Name | Address | City | State | Country | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|---|---|
| Dom | | Cologne | | Germany | 3 | 2 | 0 |
| Lucilla & Roberto | | Montalcino | | Italy | 6 | 1 | 0 |
| Lisle Home | 898 West St | Lisle | IL | USA | 45 | 12 | 2 |
| College | 545 Market | Akron | OH | USA | 64 | 2 | 0 |
| Amazon Trip | | Manus | | Brazil | 235 | 8 | 2 |
| Cabin | 999 Pine | Lake Geneva | WI | USA | 98 | 2 | 0 |
| Grad School | 903 Plymouth | Charleston | IL | USA | 1256 | 32 | 4 |
| Griffith Park | 298 Glencarin | Los Feliz | CA | USA | 12 | 0 | 0 |
| LA Equestrian Ctr | 568 Horse Dr | Glendale | CA | USA | 4 | 4 | 0 |
| Del Coronado | 12 Coronado Dr | Coronado | CA | USA | 321 | 4 | 0 |
| Fenway Park | 123 Yawke | Boston | MA | USA | 57 | 3 | 5 |
| Wrigley Field | 1190 W Addison | Chicago | IL | USA | 498 | 7 | 3 |
| Home | 444 Main | Anywhere | IL | USA | 10,987 | 49 | 9 |
| GA Grill Party | 321 Silver | Macon | GA | USA | 15 | 0 | 0 |
| Pike's Market | 786 Market | Seattle | WA | USA | 18 | 1 | 0 |
| Raffels | 345 Fong | Singapore | | Singapore | 23 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 17

# FIG. 16

Category | Card | Table

| Recipe | Chef | Date | Category |
|---|---|---|---|
| Blacks Yellow Thai Chicken Curry | Jack Black | 31 Jan 2010 | Dinner |
| Skinny Germans | Gerda | 29 Dec 2003 | Breakfast |
| KFC in a Bag | The Kernal | 13 Sept 1988 | Anytime |
| Shit on a Shingle | George James | 5 Aug 1998 | Anytime |
| Mrs. Fields Cookies | Mrs. Fields | 21 July 1978 | Dessert |
| Chicken Pot Pie | Jack Black | 31 Jan 2010 | Dinner |
| Roll Your Own Dough | Vito Spadavecchio | 29 Dec 2003 | Dinner |
| Pizza ala Franciscan | Charles Faso | 13 Sept 1988 | Dinner |
| Meatball Delight | Ben Delight | 5 Aug 1998 | Dinner |
| Almond Cookies | Lori James | 21 July 1978 | Dessert |
| Jumpin Jack Flap Jacks | Jack Jack | 31 Jan 2010 | Breakfast |
| Vicki's Chow Mein | Vicki Firestone | 29 Dec 2003 | Dinner |
| Fat Steak | Barry Monk | 13 Sept 1988 | Dinner |
| Mud Pie | Nancy Monk | 5 Aug 1998 | Dessert |
| Caesar Salad | Christopher Monk | 21 July 1978 | Anytime |
| Daddio Pancakes | Barry Monk | 2 March 2011 | Breakfast |

Petitioner Apple Inc. - Ex. 1001, p. 18

**FIG. 17**



Petitioner Apple Inc. - Ex. 1001, p. 19

**FIG. 18**



Petitioner Apple Inc. - Ex. 1001, p. 20

# FIG. 19

**Captain Phil's Memory-Webb**

Welcome, Captain Phil
Last Login:    11.18.2010

**My recent memories:**
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10
- 12 visitors since last login date
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10

**My recent Webb views:**
- Captain Phil 2010 (photo album)
- Chicken Pot Pie (recipe)
- Captain Phil (Timeline)

**Updates and Alerts:**
- License renewal due 1.15.2011

| Media | Count | Archive Status | Count |
|---|---|---|---|
| # Photos | 1,342 | | 80% complete |
| # Videos | 75 | | 61% complete |
| # Documents | 173 | | |

**People Stats:**

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Monk | 7 | 499 | 4 | 14 |
| Firestone | 11 | 1,249 | 17 | 39 |
| Testy | 4 | 788 | 1 | 12 |

**Event Stats:**

| Event | Date | Location | # Media |
|---|---|---|---|
| Mike Testy's 1st Birthday | 13-Sept-1988 | Minneapolis, MN | 21 |
| Cubs Beat Cards Aug 1998 | 5-Aug-1998 | Chicago, IL | 2,199 |
| Nancy Learns to Ride Bike | 21-July-1978 | St. Louis, MO | 2 |

Petitioner Apple Inc. - Ex. 1001, p. 21

**FIG. 20**



Petitioner Apple Inc. - Ex. 1001, p. 22

**FIG. 21**



Petitioner Apple Inc. - Ex. 1001, p. 23

**FIG. 22**



EXIF Tags version 2.3 Image File Directories (Data Blocks)  0320

MemoryWeb_Tag (Data Blocks)  0360

| Tag Labels  0321 | EXIF Family Group Name  0322 | Location  0323 | MemoryWeb Tag  0361 | |
|---|---|---|---|---|
| Description Title  0324 | IFD0 | 0x9c9b or 0x010e | MediaAsset.Caption  0362 | |
| Description Subject | IFD0 | 0x9c9f | | |
| Description Rating  0325 | | N/A | MediaAsset.StarRanning  0363 | |
| Description Tags | IFD0 | 0x9c9e | | |
| Description Comments | IFD0 | 0x9c9c | | |
| Origin Authors | IFD0 | 0x9c9d | | |
| Origin Date Taken  0326 | ExifIFD  0334 | 0x9003  0335 | MediaAsset.DateCreated  0364 | |
| Origin Date Acquired | | N/A | | |
| Origin Copyright | IFD0 | 0x8298 | | |
| *Image (Image ID, Dimensions, Width Height, etc)* | | *Multiple* | | |
| Width  0327 | | 0xbc80 | MediaAsset.Width  0365 | |
| Height  0328 | | 0xbb81 | MediaAsset.Height  0366 | |
| *Camera (Camera Maker, Camera Model, etc)* | | *Multiple* | | |
| *Advanced Photo (Lens Maker, Lens Model, etc)* | | *Multipir* | | |
| User Comment  0329 | ExifIFD | 0x9286 | This is used to inject information that do not currently have EXIF standardized tags including Collection, People, Location Name, Recipe Name, Person Tag Data Blocks (0380), etc  0367 | |
| GPS Latitude  0330 | GPS | 0x0002 | MediaAsset.Location.Latitude  0368 | |
| GPS Latitude Ref  0331 | GPS | 0x0003 | MediaAsset.Location.Latitude  0369 | |
| GPS Longitude  0332 | GPS | 0x0004 | MediaAsset.Location.Longitude  0370 | |
| GPS Longitude Ref  0333 | GPS | 0x0005 | MediaAsset.Location.Longitude  0371 | |
| GPS Altitude | GPS | 0x0006 | | |

Petitioner Apple Inc. - Ex. 1001, p. 24

## FIG. 23



Petitioner Apple Inc. - Ex. 1001, p. 25

**FIG. 24**



Petitioner Apple Inc. - Ex. 1001, p. 26

**FIG. 25**



Petitioner Apple Inc. - Ex. 1001, p. 27

**FIG. 26**



Petitioner Apple Inc. - Ex. 1001, p. 28

# FIG. 27



1900

| Item |
|------|
| 1901 — User's Name |
| 1902 — Payment ID |
| 1903 — Password |
| 1904 — Account Type |
| 1905 — User's email |
| 1906 — Language preference |
| 1907 — Date format |
| 1908 — Email notifications |
| 1909 — Contacts (with third Party Social Media) |
| 1910 — Facebook ID |
| 1911 — API Token |
| 1912 — Payment Date |
| 1913 — ... |

Petitioner Apple Inc. - Ex. 1001, p. 29

FIG. 28



Petitioner Apple Inc. - Ex. 1001, p. 30

FIG. 29



Petitioner Apple Inc. - Ex. 1001, p. 31

**FIG. 30**



Petitioner Apple Inc. - Ex. 1001, p. 32

**FIG. 31**



Petitioner Apple Inc. - Ex. 1001, p. 33

**FIG. 32**



Petitioner Apple Inc. - Ex. 1001, p. 34

## FIG. 33



Petitioner Apple Inc. - Ex. 1001, p. 35

**FIG. 34**



Petitioner Apple Inc. - Ex. 1001, p. 36

## FIG. 35



Petitioner Apple Inc. - Ex. 1001, p. 37

**FIG. 36**



Petitioner Apple Inc. - Ex. 1001, p. 38

**FIG. 37**



Petitioner Apple Inc. - Ex. 1001, p. 39

**FIG. 38**



Petitioner Apple Inc. - Ex. 1001, p. 40

**FIG. 39**



Petitioner Apple Inc. - Ex. 1001, p. 41

**FIG. 40**



Petitioner Apple Inc. - Ex. 1001, p. 42

**FIG. 41**



**FIG. 42**



Petitioner Apple Inc. - Ex. 1001, p. 44

**U.S. Patent**     **Jan. 24, 2017**     **Sheet 43 of 50**     **US 9,552,376 B2**

**FIG. 43**



FIG. 44



Petitioner Apple Inc. - Ex. 1001, p. 46

**FIG. 45**



Petitioner Apple Inc. - Ex. 1001, p. 47

**FIG. 46**



Petitioner Apple Inc. - Ex. 1001, p. 48

**FIG. 47**



Petitioner Apple Inc. - Ex. 1001, p. 49

FIG. 48



Petitioner Apple Inc. - Ex. 1001, p. 50

**FIG. 49**



Petitioner Apple Inc. - Ex. 1001, p. 51

## FIG. 50



| Sample EXIF Image File Directories and ExifTool family 1 group names | Original File EXIF Tag Data | MW Modified File Tag Data |
|---|---|---|
| Description Title | | |
| Description Subject | | |
| Description Rating | — 1416 | ★★★★☆ — 1410 |
| Description Tags | | |
| Description Comments | — 1417 | CAPTION: Jackson and JC's first day at school; PERSON: Jackson Smith, JC Smith; LOCATION NAME: Abe Lincoln Elementary School; COLLECTION: First Day of School; COLLECTION: Jackson and JC Photos 2013; DATE: 8/28/2013 — 1411 |
| | | |
| Origin (Authors, Date Taken, Date Acquired, Copyright) | | |
| Image (Image ID, Dimensions, Width, Height, etc.) | | |
| Camera (Camera Maker, Camera Model, etc.) | | |
| Advanced Photo (Lens Maker, Lens Model, etc.) | | |
| GPS Latitude | — 1418 | 39; 46; 1.3779999999999999 — 1412 |
| GPS Longitude | — 1419 | 89; 89; 55.319999999999993 — 1413 |
| File Name | IMG_3826.JPG | IMG_3826.JPG |
| File Item Type | JPG | JPG |
| File Folder Path | C:\Photos\2013 — 1420 | C:\Photos\MW Backup\2013 — 1414 |
| File Date Created | 11/01/2013 10:00 AM — 1421 | 08/28/2013 8:00 AM — 1415 |
| File Date Modified | | |
| File Size | 2.42 MB | 2.42 MB |
| File Attributes | A | A |
| File (Offline availability, Offline status, Shared with, Owner, Computer, etc.) | | |

1401    1402    1403
1404    1405    1406    1407    1408    1409

Petitioner Apple Inc. - Ex. 1001, p. 52

US 9,552,376 B2

**1**

# METHOD AND APPARATUS FOR MANAGING DIGITAL FILES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of and claims priority to pending U.S. patent application Ser. No. 13/157, 214, filed Jun. 9, 2011, which is incorporated herein in its entirety.

## FIELD OF THE INVENTION

The present invention relates generally to the management of digital files and, more particularly, to a computer-implemented system and method for managing and using digital files such as digital photographs.

## BACKGROUND OF THE INVENTION

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums, or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, event, etc.) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos were printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of digital files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty digital files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of digital tags, dynamic viewing of digital files, and the ability to export the digital files with new digital tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of digital files is a medium that allows people to organize, view, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow digital files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

## SUMMARY

In accordance with one embodiment, a computer-implemented method of associating digital tags with digital files comprises (1) storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each

**2**

of the digital files having embedded therein content data and metadata including tags; (2) receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; (3) modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; (4) receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; (5) responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and (6) displaying, on a video display device associated with the client device, a first indication of the first tag label.

In another embodiment a computer-implemented method of associating digital tags with digital files comprises storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having a content data portion and a metadata portion including tags; displaying, on a video display device associated with a client device, a first graphical representation of a first tag label of a first of the tags and associated with a first of the digital files; receiving, via a user interface device of the client device, a selection by a user of the client device of the first graphical representation of the first tag label as a search filter criterion or a search string entered via the user interface device corresponding to the first tag label; responsive to the receiving, automatically searching through the digital files, using at least the first tag label as a search filter, for the digital files satisfying at least the search filter criterion; and displaying, on the video display device, an indication of the first tag label and a representation of the number of the digital files satisfying at least the search filter criterion.

In accordance with a further embodiment, a web-based digital file storage system comprises a digital file repository for storing and retrieving digital files; a digital tagging system permitting the user to assign a plurality of digital tags to each of the digital files, wherein the digital tagging system comprises at least one type of data selected from the group consisting of a person's name, a location, a recipe, a date, a family relationship, a person's profile, an event name, a rating, and a document type; a search filter, wherein the search filter allows the digital files to be searched according to a plurality of types of data; and a user interface that presents the digital files on a user's screen based on the digital tags, wherein the user interface further comprises a digital tag image, the digital tag image having at least one type of data represented thereon with text.

As explained in detail below, the various embodiments provide much-needed platforms that save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention may best be understood by reference to the following description taken in conjunction with the accompanying drawings, in which:

FIG. **1** is a screenshot of an organizational functionality view of one embodiment of the disclosed system.

FIG. **2** is a screenshot of a photo detail view of one embodiment of the disclosed system.

FIG. **3** is a screenshot of a gallery view of an event or album of one embodiment of the disclosed system.

FIG. **4** is screenshot of an individual event or album view of one embodiment of the disclosed system.

Petitioner Apple Inc. - Ex. 1001, p. 53

US 9,552,376 B2

**3**

FIG. **5** is a screenshot of a location view of one embodiment of the disclosed system.

FIG. **6** is a screenshot of a people thumbnail view of one embodiment of the disclosed system.

FIG. **7** is a screenshot of a people profile view of one embodiment of the disclosed system.

FIG. **8** is a screenshot of a family tree view of one embodiment of the disclosed system.

FIG. **9** is a screenshot of a timeline view of one embodiment of the disclosed system.

FIG. **10** is a screenshot of a recipe chart, according to one embodiment of the disclosed system.

FIG. **11** is a screenshot of an album chart view of one embodiment of the disclosed system.

FIG. **12** is a screenshot of an event chart view of one embodiment of the disclosed system.

FIG. **13** is a screenshot of a people chart view of one embodiment of the disclosed system.

FIG. **14** is a screenshot of a family tree chart view of one embodiment of the disclosed system.

FIG. **15** is a screenshot of a location chart view of one embodiment of the disclosed system.

FIG. **16** is a screenshot of a recipe chart view of one embodiment of the disclosed system.

FIG. **17** is a screenshot of a slideshow view of one embodiment of the disclosed system.

FIG. **18** is a screenshot of an advanced search filter view of one embodiment of the disclosed system.

FIG. **19** is a screenshot of a homepage view of one embodiment of the disclosed system.

FIG. **20** is a diagram of the Overall System Process Flow of MemoryWeb.

FIG. **21** is a diagram of the System for Reading Phase, System Interpreting, and Adding Digital File and Corresponding Data to Relationship Table Phase.

FIG. **22** is a table of the EXIF and MemoryWeb Tag Data Blocks

FIG. **23** is a table of the Microsoft Windows and MemoryWeb Tag Data Blocks.

FIG. **24** is a table of the MemoryWeb Person Tag Data Blocks.

FIG. **25** is a diagram of the Third Party Facial Recognition System.

FIG. **26** is a diagram of the Third Party Media System (Data Exchange).

FIG. **27** is a table of the User Settings Table.

FIG. **28** is a diagram of the Application Digital Tag Organizer System.

FIG. **29** is an illustration of the Application Dot-Tag Shape and Content.

FIG. **30** is a diagram of the Continuous Link of Application Dot-Tag System.

FIG. **31** is an illustration of the Slideshow View of Digital File and Application Dot-Tags.

FIG. **32** is a screenshot of People Application Views.

FIG. **33** is a screenshot of Collection Application Views.

FIG. **34** is a screenshot of Location Application Views.

FIG. **35** is screenshot of Uploads Application View.

FIG. **36** is a screenshot of Recipe Application View.

FIG. **37** is a diagram of the Advanced Filters System.

FIG. **38** is a screenshot of Adding the First Application Dot-Tag using Advanced Filter.

FIG. **39** is a screenshot of Single Application Dot-Tag Filter for Each Application View.

FIG. **40** is a screenshot of Single Application Dot-Tag Filter for Date in Uploads Application View.

**4**

FIG. **41** is a screenshot of the Single Application Dot-Tag Filter in Location Application View.

FIG. **42** is a screenshot of Adding Another Application Dot-Tag Filter.

FIG. **43** is a screenshot of the Multi-Dot-Tag Filter in Location Application View.

FIG. **44** is a diagram of the Keyword Fast Search System.

FIG. **45** is a screenshot illustration of Using Keyword Fast Search.

FIG. **46** is a diagram of the Share to Third Party Social Network Provider System.

FIG. **47** is a diagram of the Third Party Location Mapping System.

FIG. **48** is a diagram of the Share to Individual System.

FIG. **49** is a diagram of the Application Export System.

FIG. **50** is a table illustrating the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb.

DETAILED DESCRIPTION OF ILLUSTRATED EMBODIMENTS

Although the invention will be described in connection with certain preferred embodiments, it will be understood that the invention is not limited to those particular embodiments. On the contrary, the invention is intended to cover all alternatives, modifications, and equivalent arrangements as may be included within the spirit and scope of the invention as defined by the appended claims.

The present disclosure relates to one or more of the following features, elements or combinations thereof. A web-based digital file storage system is disclosed. The storage system may include a digital file repository for storing and retrieving digital files, such as photos, a digital tagging system configured to assign digital tags to the digital files, a sorting system, and a user interface.

The digital tagging system may include various types of data, such as a person's name, a location, a recipe, a date, a family relationship to the user, an event name, a rating, sharing rights, file type and a document name. The sorting system can allow the digital files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the digital files on a user's screen based on these user inputs.

The digital file repository may be accessible over the Internet. The sorting system may provide a user with the ability to search based on a plurality of digital tags. The disclosed system may also provide a way to track relationships between users, so that a family tree can be displayed.

Recipes may also be linked to a person's name, with, for example, a video and digital copy of original hand-written recipe to create a recipe view.

Moreover, the digital files and data can be exported as a single file with the digital tagging embedded within the exported file.

In another embodiment, a method of storing digital photographs is disclosed. The method may include the steps of storing a digital photograph in a file repository, associating a plurality of digital tags having different tag types with the digital photograph, providing a search function that permits searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship, an event name, a rating, file type and a document type. The method may include a further step of

Petitioner Apple Inc. - Ex. 1001, p. 54

US 9,552,376 B2

5

providing access to the file repository via the Internet. The method may also allow for tracking relationships between users so that a family tree can be displayed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The presently disclosed method and application (herein alternatively referred to as a "system") provides users with an Internet-based interactive platform to gather, organize, view, share and archive digital files using a proprietary organization system and export tagging process. As used herein, the word "tag" refers to any type of digital data that can be assigned to a file to describe some aspect of that file through a tagging process. For images, the tagging is preferably in EXIF format. For videos, documents and other file formats, any appropriate format may be used. The disclosed system allows users to create, view and share digital files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

One disclosed embodiment includes an import feature. Users can import media files from users' favorite sources (e.g., computers, mobile phones, social networks, etc.). If any meta-tag information is embedded within the media (e.g., date taken and GPS coordinates), the system could automatically read and utilize it for the user. Digital files, media, meta-tags, and other data discussed herein may be saved to one or more file repositories (also referred to as a database herein).

In another aspect of the disclosed system, organizational functionality is provided. Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system and organizing feature allows a user to arrange large amounts of digital files with tags that can characterize and document the digital file(s). Digital files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, event, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. Tags can be assigned to a single file at a time, or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos and enter the tag only once. An example of the manner in which digital photos can be organized is presented in section in FIG. 1.

Yet another feature is the multiple views from which a user can display his or her digital media files and their tagged attributes. Using a user interface (e.g. a keyboard, mouse, or touch screen), users can select individual files, groups of files meeting specific criteria, or all files in their account from which to create views. These views may alternately take the form of a chart. These views will be auto-populated based upon either tag information already associated with the digital file upon import or the tags assigned to the digital files by the user within the aforementioned organization functionality. Each digital file can be enlarged, from any view or chart, by clicking an information ("i") button to show an enlarged version of the digital media file with all the tags that are assigned to that digital file, as

6

illustrated in FIG. 2. In another embodiment, the user interface may be user-configurable, as discussed further herein.

The following views are shown with particularity. In FIG. 1, the gallery view allows the user to see all the digital media that are associated within a group such as an event or custom album. The gallery view for either events or albums is illustrated in FIG. 3.

As shown in FIG. 2, an individual album or event view allows one to see the files associated with a specific group. For example, one can view the digital files that relate to a group of files called "Trip to Italy 2011." The individual event or event view is illustrated in FIG. 4.

A location view, as shown in FIG. 5, identifies within an interactive map (Google map shown as an example), where digital files were taken or originated. The location view can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users.

A people view, as shown in FIG. 6, shows thumbnail photos of all the people in the system that can be clicked in for a people profile view. A people profile view, as shown in FIG. 7, shows a profile picture of an individual, their birth/death information, family relationships, overview (comments) on the person, as well as links to other views that contain that individual in the system.

A family tree view, as shown in FIG. 8, can illustrate interactive family trees where one can see the family tree of an individual or family. If a user clicks on an individual within the family tree, it will take him or her to the people profile view of that person.

The timeline view, as shown in FIG. 9, will be an interactive timeline that allows you to set ranges of digital files by year, month and day. The digital files shown in the timeline will also be interactive and if the user clicks on a digital file or group of digital files (e.g., event or album), the user will then view the information related to the digital file(s).

A recipe view, as shown in FIG. 10, will show a recipe along with any digital files that are associated with it. For example, a cherished family recipe may show a digital copy of the original handwritten recipe, a photo of the family member who was the chef and a video of the family member making the recipe.

Each of the aforementioned views may also be seen in a chart format view that is interactive when any item on the chart is clicked, the user will them be taken to a new screen that details all relevant digital files (and file types) for the clicked item.

For album or event chart views, as shown in FIGS. 11 and 12, the elements listed in those charts will include individuals who are part of each album/event, number of digital files, date and other pertinent information.

A people view, shown in FIG. 13, may demonstrate all the names of individuals that are in the system in an alphabetical listing. Such a people view can also contain details on each person such as the number of photos and videos that are associated with that person. The user can click on that person to pull up the profile view of the individual or click on the number of photos to see all the photos associated with that person.

In the family tree chart view, shown in FIG. 14, family lineage can be viewed in multiple ways. For example, a user can set himself as the tree anchor and then see a tree of all people entered into the database related to the user. The user could also set a contact as the tree anchor and then just view the descendants of that individual.

Petitioner Apple Inc. - Ex. 1001, p. 55

US 9,552,376 B2

7

8

For a location chart view, as show in FIG. **15**, listings of all the locations that are in the system are displayed along with the number of digital files, as well as names of persons associated with each. A user can click on the location to see all the digital media files that are associated with a specific location.

A recipe chart, as shown in FIG. **16**, can show recipes that uploaded to the system. Along with the ingredients and steps of each recipe, this view can identify the chef(s) name, number of photos and videos associated with each.

For any of the views, the user can click on the digital file to start a slideshow feature that will allow them to scroll through an enlarged view of the digital file as illustrated in FIG. **17**.

Another aspect of the disclosure is the search filter. This filter allows users to select one or more criteria that will narrow down their results to just those digital files matching input criteria. The entire system can be filtered by, for example, key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify digital files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, no upload date information or are lacking any other tag.

It should be noted that in one embodiment, searching via key word will search through all tagged information (user populated or auto-generated upon import). For example, if a user searched for the term "Ohio," the system would search for that term associated with any file in any way. If the user had files with Ohio as a state, file name, street name, person's name, file comment, etc., all would be retrieved.

Settings applied in the advanced search filter can cumulatively carry over to any subsequent pages until new criteria are selected. For example, a user can apply a filter to retrieve files associated with a particular person. Then the user can set a date range to further narrow results to show only those files for that selected person within the date range. Any pages viewed from that point forward throughout the entire site would only contain files associated with person and the date range specified. The advanced search filter is illustrated in FIG. **18**.

Yet another feature can be a user's homepage, as illustrated in FIG. **19**, that can summarize the user's content within the system including relevant information in the system. It is contemplated that a user's homepage may show a summary of the total number of photos, videos, documents and audio files that the user has uploaded. In this embodiment, for each group of digital files (e.g., photos), the percent of files that has been organized with pertinent data such as date, name(s) and location can be noted. In addition, the homepage can show a list of people that are in the system and the respective count for photos, videos, documents and audio files associated with each person. Also contemplated is a summary of the events, albums and locations that have been entered into the system. The user homepage may serve as an executive summary dashboard of one's entire system and can be modified to provide data in an executive summary format for a user.

Another feature can be a user's homepage including the dynamic views can be presented in a wide range of user outputs—e.g. on the user's computer, smartphone or tablet display. The user may choose to present the digital files in any of the various types of ways disclosed herein. Other ways of outputting the files are also possible. The user can create and modify various sharing rights so that third parties

may view the files and if desired, provide comments, apply tags or even download/copy the files for their own use.

Still another embodiment can provide export functionality. Once a user has used the organization functionality to assign information to data file(s), a user may want to export the data file in its original form (e.g., .jpg, .mp4, etc.) with the tags embedded within the digital file in the form of EXIF tags. In other words, a user can export his or her entire set of digital files, or may choose a subset based on keywords and tags. The exported digital files can include key tags and attributes users have assigned, and in one embodiment, such tags and attributes can be embedded within the digital files. For example, each exported digital file may be imbedded with user-entered data such as the people, location, and event name. This feature will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing digital files such as a social media website) where it can be viewed with these attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its digital files to a new digital archiving system.

A method is also disclosed. The method may include the steps of storing a digital file in a file repository, associating a plurality of digital tags having different tag types with the digital file, providing a search function that permits simultaneously searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship between individuals, an event name, a rating, and a document type.

Under the disclosed method, access may be provided to the repository via the Internet. Relationships between users may also be tracked such that a family tree can be displayed. A recipe may also be linked to a user or person. Finally, the method may include the step of outputting a digital file and its associated digital tags into a single file.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

A plurality of advantages arise from the various features of the present disclosure. It will be noted that alternative embodiments of various components of the disclosure may not include all of the features described yet still benefit from at least some of the advantages of such features. Those of ordinary skill in the art may readily devise their own implementations of a digital file organization system that incorporate one or more of the features of the present disclosure and fall within the spirit and scope of the disclosure.

Application (also called "MemoryWeb Application" or "System")—The Application is an online program constructed using a mix of freeware code as well as custom-built proprietary coding with an interface that has many functions including: 1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share

Petitioner Apple Inc. - Ex. 1001, p. 56

US 9,552,376 B2

9
10

Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files. This Application has already been disclosed in U.S. patent application Ser. No. 13/157,214 and incorporated herein by reference. This Application is also being trademarked as "Memory-Web" with the US Commissioner for Trademarks on Dec. 26, 2013 under application Ser. No. 86/152,930. The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on mobile communication devices such as smart phones (e.g., iPhones), Personal Digital Assistants (PDAs) and Tablets (e.g., iPads).

Application Views—The Application Views utilizes the Application's ability to associate Digital Tags to Digital Files and display them in customized views such as Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes.

Application Advanced Filter System—A function that provides search capabilities using one or more Digital Tags within the Application, resulting in a narrowed output display of the applied filters to display one or more Digital Files and viewed in one or more Application Views. The Application Advanced Filter System can allow Digital Files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the Digital Files on a user's screen based on these user inputs.

Application Dot-Tag—The manner in which a Digital Tag is displayed within the Application using pill-shaped indicators that can reside near a file's image or overlaid on the file's image. MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag. However, it should be understood that other shapes and indicators are contemplated by the present invention, and may even be user-configurable. For example, the indicator may take the form of a sticky note, a different shape, a doted shape, or any number of variations of indicators that may be functional in displaying one or more words. Colors may also be used to indicate differing categories of indicators, or differing associations/intersection of the indicators. Within the pill-shaped indicator, the specific Digital Tag information is used to display information about a Digital File. Throughout this document, the Application Dot-Tag is shown as illustrated in FIG. 29 (indicators 0650, 0654, 0655 and 0656).

Application Digital Tag Organizer System—Within the Application, a function for assigning one or more Digital Tags to one or more Digital Files at the same time through the Application Dot-Tag Organizer System. This feature allows Digital Tags to be assigned to items such as photos, videos, audio files, and documents. The information created from this functionality drives the outputs for the Application

Views. The Application Digital Tag Organizer System will allow the tagging of key items as date, GPS location, star ranking, people (both name and facial recognition), album(s), family relationships, a date, event name, sharing rights, file type, document name, and recipes. Each of the Digital Tags is user-configurable.

Application Export System—Ability to export Digital File(s) from the Application, with the Digital Tags that were created within or imported/uploaded into the Application, embedded inside the Digital File. The Digital Tags within the exported Digital File can then be viewed and used by any other applications that can read EXIF tags.

Application Programming Interface ("API")—The Application Programming Interface (API) is the system that interacts with other communication points or services over HTTP via a POST, GET, PUT, DELETE methods. The API provides a way for users to access their MemoryWeb data outside of the web browser on mobile devices or other web connected devices. The actions within the API deliver MemoryWeb Digital Files and Digital Tags along with all meta data associated with such files and tags.

MW Automatic Uploader/Downloader Application—Separate from the main MemoryWeb Application, there are additional proprietary applications created by MemoryWeb for user to upload and download (export) Digital files to and from the main MemoryWeb Application. The first is the MW Automatic Uploader/Downloader built for Window's compatible computers. The second is the MW Automatic Uploader/Downloader build for MAC computer. Both of the MW Automatic Uploader/Downloader applications can be installed on the user's computer to automatically upload the desired Digital Files from their computer to the main MemoryWeb Application. In addition, the MW Automatic Uploader/Downloader applications allow for Digital Files to be exported from the main MemoryWeb Application to a desired folder on the user's computer with the updated tags embedded within the Digital File.

Storage System—A storage system can be a cloud-based Storage System (e.g., Amazon's AWS, Dropbox, Box.net, Deutsche Telecom's Cloud, etc.), hard-drive, server, or any venue that allows one's information to be stored. The storage system would act as a database and file repository for storage and retrieval of Digital Files to and from the Application.

Digital Files—An electronic file that can be in various file formats (e.g., PNG, JPEG, PDF, TIFF, MP3, MP4, WAV, and GIF) that are of items such as photos, videos, audio files, and documents.

Digital Tags—The word "Digital Tag" refers to any type of digital data that can be assigned to a file to distinguish and describe some aspect of that file through a tagging process. Digital Tags will be comprised of various groups of digital data including:

a) EXIF Tags—EXIF stands for "Exchangeable Image File Format" and is a standard that specifies the formats for images, sound, video, and ancillary tags. The EXIF standard is an Open Standard produced by the Standardization Committee and is detailed within their document called *Standard of the Camera & Imaging Products Association*. Standard of the Camera & Imaging Products Association, CIPA DC-008 Translation-2012. Exchangeable image file format for digital still cameras: EXIF Version 2.3. Established on April, 2010 and Revised on December, 2012. Prepared by: Standardization Committee. EXIF tags are also called "meta tags" or "metadata." The EXIF information is formatted according to the TIFF specification, and may

Petitioner Apple Inc. - Ex. 1001, p. 57

US 9,552,376 B2

**11**

be found in JPG, TIFF, PNG, JP2, PGF, MIFF, HDP, PSP and XCF images, as well as many TIFF-based RAW images, and even some AVI and MOV videos. The EXIF meta information is organized into different Image File Directories (IFD's) within an image. The names of these IFD's correspond to the ExifTool family 1 group names.

When Digital Files are captured with digital cameras (including smartphones), scanners and other systems handling image, video and sound files, certain EXIF tags are automatically populated within the Digital File and can cover a broad spectrum of information such as:

Descriptions (e.g., Title, Subject, Star Ratings, Tags, People, Comments)

Origin (e.g., Authors, Date taken, Copyright)

Image information (e.g., dimensions, color representation and size)

Camera Setting Information (e.g., camera maker, camera model), including static information such as the camera model and make, and information that varies with each image such as orientation (rotation), aperture, shutter speed, focal length, metering mode, and ISO speed information.

Advanced Photo Information (e.g., lens maker, lens model, contrast, brightness, EXIF version, etc.)

File Information (e.g., file name, item type (e.g., JPG file), date created, date modified, size, etc.)

A thumbnail for previewing the picture on the camera's LCD screen, in file managers, or in photo manipulation software.

Global Positioning System (GPS) information that is also known as geocoding.

The Application will auto-populate any existing EXIF Tags from the original Digital File upon upload into the Applications (as illustrated in FIG. **21**) and put this information into the Users Relationship Table on the Storage System.

b) Extensible Metadata Platform (XMP)—This is Adobe's Extensible Metadata Platform (XMP) format for labeling metadata within an Adobe file.

c) Png Textual Data (tEXt)—This is Portable Network Graphics (PNG) metadata format for labeling within a PNG file.

d) Microsoft Windows Tags—These are Microsoft Windows File Attributes that are stored in Data Blocks from Microsoft's system.

e) MemoryWeb Tags—These tags are typically developed within MemoryWeb and can relate to people Names, Recipes, Collections, Location Name, Family Relationships (also discussed in MemoryWeb Person Tags), Social Network Data (e.g., ID, contact IDs, etc.), File Folder Batch Name. This would be folder directory name that includes the name of each folder that eventually leads to the folder that the digital file was actually stored within the User's PC. This is used to help the user organize data within MemoryWeb based upon the users organization system used on their PC. Facial Recognition Data, and other type of tags that are user defined.

f) MemoryWeb Person Tags—These user defined tags within MemoryWeb are specific to each person profile including such areas as Nicknames, Birthdates, Date of Birth, Date of Death, Biography, Family Relationships (e.g., Mother, Father, Brother, Sister, Daughter, Son, Spouse, etc.), Pets, and Firsts (e.g., First Steps, First Words, First time riding a bike, etc.).

**12**

The combination of all the aforementioned tags is collectively referred to as "Digital Tags." The list of groups and Digital Tag types will grow as technology in this area improves over time. These Digital Tags are also referred to as "File DNA" for MemoryWeb.

User Relationship Table—Within the Application, each User will store the data related to Digital Files, Digital Tags, User Settings, and other specific information related to a User's repository of information is kept within the User Relationship Table.

Data Blocks—Within the User Relationship Table, there are Data Blocks that will store information related to EXIF Tags, Microsoft Windows Tags, MemoryWeb Tags, and MemoryWeb Person Tags. These Data Blocks are used to generate the information that is displayed in such key components such as the Application Views and Application Dot-Tags.

Custom Code—Proprietary scripts and code developed by MemoryWeb to enable key functions such as Dot-Tag relationships and ability to embed new user-defined tags into a file and/or override existing EXIF tags and the ability to navigate the application and it's functions via connections drawn from the associated tags

Open Source Libraries—Non-proprietary code taken from the free, open source community integrated that is used by the Application.

User Interface—The Application may be accessible over various "User Interfaces" including Personal Computers (e.g., Macs, Windows, etc.), Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad). The User Interfaces can be controlled through the Application using various tools such as a keyboard, mouse, and touch screen.

The present invention relates to an Application that has many functions including: 1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files.

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, and event) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos may have been printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of Digital Files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the

Petitioner Apple Inc. - Ex. 1001, p. 58

US 9,552,376 B2

13                                                          14

modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty Digital Files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of Digital Tags, dynamic viewing of Digital Files, and the ability to export the Digital Files with new Digital Tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of Digital Files is a medium that allows people to organize, view, navigate, search, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow Digital Files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

As disclosed in detail herein, the application provides the much needed platform that saves a user significant time, provides significant information with minimal screen space, and provides an appealing and customizable interface that will enhance the user experience.

Anytime the MemoryWeb Application exchanges information with an external Storage System or User Interface such as a phone, tablet, computer or other internet based user device, the interaction with the MemoryWeb Application involves Application Programming Interface (API). The API's allow each system to call the specific Digital Files and Digital Tags associated with each request so they can be viewed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The present disclosure relates to one or more of the following features, elements or combinations thereof. The Application allows the importation of Digital Files and then the association of Digital Tags to the Digital Files by using existing EXIF Tags of a Digital File as well as the Application's custom organization of Digital Tags for use in the Application. The Application then allows the Digital Files to be viewed, sorted, annotated, navigated, and shared using the various Application Views. The Application can also filter Digital Files using the Application Advanced Filter System functionality. The Digital Files can be stored through a Storage System that interacts with the Application. In addition, the Application allows for Digital Files to be exported with the Application's Digital Tags embedded within the Digital Files.

The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on User Interfaces such as Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad).

The presently disclosed Application provides users with an interactive platform to gather, organize, view, share and archive Digital Files using a proprietary organization system called the Application Digital Tag Organizer and export the modified digital files with the Application's Digital Tags embedded within the Digital Flies using the Application Export feature.

The Application allows users to create, navigate, search, view and share Digital Files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

DESCRIPTION OF EMBODIMENTS

In FIG. 20, the overall process flow of MemoryWeb is depicted. Each of the boxes depicted that are Inside the Memory-Web System (0050) are detailed additional figures within this application. However, to help illustrate the overall process flow, FIG. 20 was created. In FIG. 20, the process begins when original digital file(s) are uploaded to MemoryWeb (0101). This process can take place in a variety of ways including when a user manually selects uploads from the Uploads Application View (see FIG. 35 indicator 1701), installs the a MW Automatic Uploader/Downloader Application on their computer, or imports Digital Files from the users' other sources (e.g., mobile phones, social networks, etc.).

Once a file is uploaded, the System Reading Phase (0100) begins. Information from the System Reading Phase is then sent to the System Interpreting and Adding Data to Relationship Table Phase (0200). During this phase, information is passed back and forth to the Third Party Facial Recognition System (0400) to the Third Party Facial Recognition Provider (0401). The system will also coordinate between the Third Party Social Media (Data Exchange) (0500) and then to various Third Party Media Providers (0501). Another key step from the System Interpreting and Adding Data to Relationship Table Phase is adding both the Digital Files and the corresponding tags to the User Relationship Table (0300). As illustrated in subsequent figures within the patent application, the User Relationship Table serves as the key repository for all of the user's data that generates virtually every display from the application. From the User Relationship Table, the user can use the Applications Digital Tag Organizer System (0600), the Continuous Link of the Application Dot-Tag System (0700), the Advanced Filters System (0800), or the Keyword Fast Search System (0900). The user can also share Digital File(s) through the Share to Social Network Provider System (1000) to a Third Party Social Network Provider (0501) that is outside the MemoryWeb system or use the Share to Individual System (1200) to a Person (1201) that is Outside the MemoryWeb system using the data from the User Relationship Table. To help generate some of the map views, the system will utilize a Third Party Geographical Mapping System (1100) that connects to a Third Party Geographical Mapping Provider (1101) that is Outside the MemoryWeb system. The user can also export Digital Files with the Digital Tags embedded within the Digital File using the Application Export System (1300) that will send a MemoryWeb Modified File from MemoryWeb (1301) to a designated location by the User that is outside the MemoryWeb system.

As illustrated in FIG. 21, the System Reading Phase (0100) is described in further detail. The System Reading Phase will first check if the digital file is a duplicate file (0102) that is already in the User's collection. If the file is a duplicate, it will not be uploaded (0104). However, if it is a new file for the user, the System Reading Phase will then locate the EXIF Image File Directories in the digital file (0103) and then send that information to the System Interpreting and Adding Data to Relationship Table Phase (0200).

As further illustrated in FIG. 21, the System Interpreting and Adding Data to Relationship Table Phase will take the EXIF Image File Directories sent from the System Reading Phase and read and iterate through each EXIF tag item

Petitioner Apple Inc. - Ex. 1001, p. 59

US 9,552,376 B2

15

(**0201**). At this time, the system will identify faces from the digital file and then send this information to the Third Party Facial Recognition System (**0400**) that will coordinate with the Third Party Facial Recognition Provider (**0401**) that is outside the MemoryWeb. When the Third Party Facial Recognition System (**0400**) sends back data related to facial recognition of faces in the Digital File, it comes back then the system sends information related to people facial recognition tags to the MemoryWeb Person Tag (Data Blocks) within the User Relationship Table (**0300**). The detailed process of the Third Party Facial Recognition System (**0400**) is further explained in FIG. **25**.

During the Read & Integrate Through Each EXIF Tag item (**0201**) the process will also upload a the original Digital File in MemoryWeb (**0211**), the process will also store a copy of the original file within the User Relationship Table (**0300**) and create five duplicate copies (**0203**) of different resolution sizes as follows: XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and a Thumbnail Duplicate File (**0306**). Each duplicate file is used in different parts of the application depending upon the photo size needed for such areas within the Application such as Application Views, Application Dot-Tags, and Application Digital Tag Organizer System.

Another embodiment during the Read and iterate through each EXIF tag item (**0201**) stage is determining if a MemoryWeb tag exists (**0204**). A MemoryWeb tag is a Digital Tag that is currently being used as an Application Dot-Tag within the Application. If it is not a Digital Tag that MemoryWeb is currently using, the application will Save EXIF data to the User Relationship Table for Digital file (**0205**) and send this to the User Relationship table. This is done in case there are EXIF data that are desired to be used in future releases of the Application. For the Digital Tags that are being used in the Application, the system will Parse EXIF data into MemoryWeb Tags (**0206**), look up MW tag data (**0207**) and determine if a Digital Tag currently exists (**0208**). If a Digital Tag does not exist, the system will Create a new MW tag data ((**0209**) and send this to the appropriate Data Blocks within the User Relationship Table (**0300**). If Digital Tag data does exist, the system will Associate existing tag data ((**0210**) to the appropriate Data Blocks within the User Relationship Table (**0300**).

The third and final area within FIG. **21** is the System Indexing Digital Files and Tag Data Blocks for a Digital File within the User Relationship Table (**0300**). In the User Relationship Table, the user's information system information stored such as User Settings (**0390**). Copies of the Original Digital File (**0301**), XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and Thumbnail Duplicate File (**0306**) are stored. The final area of the User Relationship Table relates to the data blocks including EXIF Tag (Data Blocks) (**0320**), Microsoft Windows Tag (Data Blocks) (**0320**), MemoryWeb Tag (Data Blocks) (**0360**), and MemoryWeb Person Tag (Data Blocks) (**0380**).

In FIG. **22**, there are two charts that illustrate EXIF and MemoryWeb Tag Data Blocks. The first chart illustrates the EXIF Tags Version 2.3 (Data Blocks) (**0320**). For the EXIF Tags Version 2.3 (Data Blocks) (**0320**), the information from this table is an expert from an Open Source Library code produced by the Standardization Committee that is detailed within their document called Standard of the Camera & Imaging Products Association. While all the EXIF tags that are contained within a Digital File are read (as previously illustrated in FIG. **21** within the System Interpreting and

16

Adding Data to Relationship Table Phase (**0200**)) and are stored within the system's User Relationship Table (**0300**), a summary of the primary EXIF tags that are currently used within MemoryWeb are illustrated in the EXIF Tag Blocks (**0320**). The EXIF tag information is organized into different Image File Directories (IFD's) or "Data Blocks" within an image and organized in the column heading of Tag Label (**0321**). The names of these IFD's correspond to an EXIF standard for ExifTool family 1 group names that are depicted in the column heading of EXIF Group (**0322**). The IFD's are stored within a specific data block location within a Digital File and these locations have a standard name of the specific location (**0323**) within the Digital File. The primary EXIF tags that are read and used by MemoryWeb to generate Application Dot-Tags are: Description Title (**0324**), Description Rating (**0325**), Origin Date Taken (**0326**), Digital File Width (**0327**), Digital File Height (**0328**), User Comment (**0329**), GPS Latitude (**0330**), GPS Latitude Ref (**0331**), GPS Longitude (**0332**), and GPS Longitude Ref (**0333**).

In FIG. **22**, the second chart illustrates the MemoryWeb Tag (Data Blocks) (**0360**) that overlap with standard EXIF Tag blocks. As previously illustrated in FIG. **21**, the EXIF Tag Data blocks are read and brought into the User Relationship Table (**0300**). When the data is stored within the system's User Relationship Table, they are also stored with the corresponding EXIF tag label as illustrated in the column called MemoryWeb Tag (**0361**). For example, when a Digital File is brought into MemoryWeb and the system reads the Origin Date Taken (**0326**) for the EXIF Tag block, the system will denote this in the MemoryWeb table as MediaAsset.DateCreated (**0364**). This designation is very important as it allows MemoryWeb to re-inject any updated or new MemoryWeb Tag data into the corresponding standard EXIF Tag blocks of a Digital File when it is exported from MemoryWeb (as previously illustrated in FIG. **20** with the Application Export System (**1300**)). Continuing with this example, if the Origin Date Taken is modified within the MemoryWeb system, when the file is exported through the Application Export System (**1300**), the new updated date from MemoryWeb (**0364**) will be mapped to the EXIF Tag Data block with the Tag Label of Origin Date Taken (**0326**) with the EXIF Group called ExifIFD (**0334**) and the Location called 0x9003 (**0335**).

In situations where there is no standard EXIF Tag data block for the MemoryWeb Tag for such items such as Collections, People Location Name, Recipe Name, etc. (**0367**), they are mapped to a general EXIF Tag data block called User Comment (**0329**). As the standards for EXIF Tag data blocks change, the system can be mapped to any new specific EXIF Tag data blocks. For example, if an EXIF Tag Data block is made for Recipe Name, the MemoryWeb Tag related to Recipe Name will be mapped specifically to that new EXIF Tag data block as opposed to User Comment.

In FIG. **23**, there are two charts that illustrate Microsoft Windows and MemoryWeb Tag Data Blocks. The first chart illustrates the standard Windows Imaging Component (WIC) Metadata (Data Blocks) (**0340**). Microsoft Windows has their metadata tag blocks contained in areas called Tag Labels (**0341**). The primary WIC Metadata data blocks that are read and used by MemoryWeb to generate Application Dot-Tags are: File Name (**0342**) and File Folder Path (**0343**). The corresponding MemoryWeb Tag data blocks (**0360**) for the WIC metadata tag blocks are called MediaAsset.Filename (**0372**) for the Microsoft file name and MediaAsset.UploadBatch.Batchname (**0373**) for the Microsoft File Folder Path. The ability for MemoryWeb to read the File Folder Path from Microsoft is a unique process used within Memo-

Petitioner Apple Inc. - Ex. 1001, p. 60

US 9,552,376 B2

17
18

ryWeb to help the user organize their photos based upon the organization methods they have already used within Microsoft. For example, if the user stored a group of photos on their Microsoft computer in the file directory C:/Photos/2013/First Day of School, MemoryWeb will automatically place the photos that were located within that Microsoft File Folder Path into a MemoryWeb Application Dot-Tag under a collection called "First Day of School" based upon the last folder within the file folder path. An example of the Application Dot-Tag would be generated from the File Folder Path is in FIG. **31** with the label "First Day of School" (**0770**). In addition, MemoryWeb will allow the user to view the photos that are within a specific File Folder Path in the MemoryWeb Uploads Application View so that the user can organize photos from the same File Folder Path. An example of how this will be illustrated within MemoryWeb's Uploads Application View is in FIG. **35** with the groping of photos with the File Path Name C:/Photos/2013/First Day of School (**0709**).

In FIG. **24**, the MemoryWeb Person Tag Data Blocks (**0380**) that are contained with a User Relationship Table are illustrated. For any person that is added within a user's account, various MemoryWeb Person Tag Data Blocks are stored including: Person Name (**0395**), Nickname (**0381**), Birthdate (**0382**), Date of Death (**0383**), Biography (**0384**), Mother (**0385**), Father (**0386**), Brother(s) (**0387**), Sister(s) (**0388**), Daughter(s) (**0389**), Son(s) (**0390**), Spouse(s) (**0391**), Facial Recognition (**0392**), FacebookID (**0393**), Pets (**0394**), and other data blocks that will be added in the future as the Application grows (**0396**). These data blocks are primarily used in the People Profile Application View as illustrated in FIG. **32** (indicator **1430**). One embodiment within the MemoryWeb Person Tag Data Block contains the FacebookID (**0393**). As illustrated in FIG. **26** (indicator **0507**), information from Third Party Media Providers will be exchanged within MemoryWeb and the user's FacebookID will be provided and stored within the MemoryWeb Person Tag Data Block. In addition, any of the User's contacts from Facebook will also be downloaded into the corresponding MemoryWeb Person Tag Data Blocks for any matching persons within the User's MemoryWeb account. The information from the Third Party Media Providers that are stored within MemoryWeb will be used to provide "push notifications" to the user for various items such as when the user or any one of its contacts posts a photo to that Social Media venue.

As illustrated in FIG. **25**, the Third Party Facial Recognition System (**0400**) is described in further detail. As photos are imported or uploaded into the Application, the systems will request thumbnail Digital Files (**0404**) from the User Relationship Table (**0300**). On a routine basis (e.g., daily), the system will retrieve all the thumbnails of Digital Files with unconfirmed faces (**0403**) and the send those Digital Files (**0404**) to the Third Party Recognition Provider (**0401**). The Third Party Facial Recognition Provider (**0401**) uses their algorithms to find location of eyes, nose, mouth and many other points for each face detected in the photo. They will also determine gender, check if the person is smiling, have eyes open, lips sealed or wearing glasses. The Third Party Facial Recognition Provider will use their algorithms to associate potential matches of faces for the user's collection of photos. For each face, the system will send back attributes including gender (male, female), glasses (true, false), smiling (true, false), lips (sealed, parted), eyes, (open, closed), mood (happy, sad, angry, surprised, disgusted, scared, neutral), field in the response have two subfields: value (string) and confidence (integer). For each attribute,

the Third Party Facial Recognition Provider will assign percentages of confidence (0% to 100%) for each attribute that can be used by the MemoryWeb Application to utilize.

The Third Party Facial Recognition Provider will then send the information relating to a person back to Memory-Web (**0405**). The MemoryWeb Application parse the identified faces and corresponding Facial Recognition data for each Digital File (**0406**). The system will interact with the User Relationship Table and determine if the face is an existing (i.e., "trained") face in MemoryWeb where there is a Face ID in the User Relationship Table (**0407**). If not, the system generates a facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0410**). If yes, the system will then determine if the face is above the system's thresholds for confirming a face is a specific person in the user's MemoryWeb system (**0408**). If no, system generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0411**). If yes, the system records and associates specific face for Digital File with a MemoryWeb Person ID and sends to Memory-Web Person Tag (Data Blocks) in User Relationship Table (**0409**).

Typically, the ability to confirm and deny facial recognition matches will be within the People Profile Application View as illustrated in FIG. **32** within the facial recognitions area (indicator **1442**). The system will also have other facial resonations area where the user can confirm or deny the suggested facial recognitions of a person for a Digital File. When the user denies the suggested facial recognition, the system dis-associates potential person match Tag, search's the user's collection for other potential matches, and then sends information to Tag Data Block of Relationship Table for the Digital File. If the user accepts the suggested facial recognition, the system sends this facial recognition tag confirmation to the User Relationship Table for the Digital File. Once a confirmation is made, the newly associated Digital File will have that confirmed person Application Dot-Tag associated to that Digital File for all Application Views. Each time an accepted or denied facial recognition is made for a specific person, the specific data points used for facial recognition is improved and sent to the Third Party Facial Recognition Provider for more accurate confirmations of that person during the next run for that person.

As illustrated in FIG. **26**, the Third Party Media System (Data Exchange) (**0500**) is described in further detail. There are numerous types of third party media systems that are contemplated for MemoryWeb including social network providers (e.g., Facebook, Twitter, and LinkedIn) and other photo sites (e.g., Flickr and Picasa). In addition, it is contemplated for the ability to print Digital Files from MemoryWeb using third party print providers such as Walgreens or Shutterfly. Further contemplated solutions might be from digital file warehouses such as Dropbox and box-.net. All of the Third Party Media Systems will interact with MemoryWeb using the same system that is described within FIG. **26**. The Third Party Social Media System starts when the user initiates sharing of their information with Third Party Media Provider with MemoryWeb (**0502**). When this is initiated, the system will send registration information (**0503**) to the Third Party Media Provider (**0501**). Once received, the Third Party Media Provider will send back a confirmation with the Third Party Social Media ID (**0504**) and then the system will send the information (**0505**) to the User Settings Table (**0390**) within the User Relationship Table (**0300**). The system will then send daily requests from

US 9,552,376 B2

19

the User Relationship Table for contact names and IDs (**0506**) to the Social Media Provider (**0506**). If there are new contact names that are not part of the user's current people, the system will receive new contact names and IDs from the Social Media Provider (**0501**). The user will have the ability to confirm or deny matches (**0508**) with their contacts within MemoryWeb. If there is a match, the system will associate the existing person within MemoryWeb to the same ID of the person within the Third Party Social Media platform (**0509**) and then send this to the User Relationship Table. If there is not a match, the system will add this additional contact as a new person and send (**0510**) this to the User Relationship Table. If the user wants to share or print Digital Files from MemoryWeb, they can do this with the Share to Third Party Media Provider System (**1000**) that is further detailed within FIG. **46**.

In FIG. **27**, the MemoryWeb User Settings Table is illustrated. As illustrated in the User Settings Table (**1900**), various data blocks of information is stored including the User's Name (**1901**), Payment ID (**1902**) that is used with third party payment providers, Password (**1903**), Account Type (**1904**) (i.e., free or paid account), User's email (**1905**), Language preference (**1906**), Date format preference (**1907**), Email notification (**1908**) preferences, the ability to share Contacts (with third Party Social Media) (**1909**), Facebook ID (**1910**), API Token (**1911**), Payment Date (**1912**) and other settings that will evolve as the Application grows (**1913**).

In FIG. **28**, the Application Digital Tag Organizer System (**0600**) is illustrated. Within various Application Views the user can select, add, delete and edit MemoryWeb Tags for such areas as people, date, location, collections, star rankings, and recipes. An illustration of an Uploads Application View where MemoryWeb Tags for a Digital File can be selected, added, deleted, or edited is illustrated in FIG. **35**. The Application Digital Tag Organizer System begins when the user selects one or more Digital Files in MemoryWeb (**0601**). The system then sends a request to the user Relationship Table for the specific Digital File (**0602**). The system then retrieves the Digital File and the Digital File Tag Data Blocks (**0603**) from the User Relationship Table (**0300**). Next, the system will display the Digital File and the corresponding Digital File Tag Data Blocks in the form of Application Dot-Tags (**0604**). An example of how the system can illustrate a Digital File with the corresponding Application Dot-Tags is in FIG. **31** (indicators **0780**, **0765**, **0766**, **0768**, **0770**, and **0771**).

If the user selects an Application Dot-Tag (**0605**), the system will utilize the Continuous Link of Application Dot-Tags System (**0700**) to produce the results of that Application Dot-Tag within one of the Application Views that is later illustrated in FIG. **30**.

If the user selects add for a MemoryWeb Tag (**0606**), the user can add a new MemoryWeb Tag. When the user begins to type in text to add a tag, the system will produce suggestions on matching MemoryWeb Tags or the option to add a new tag (**0607**). If a matching tag is selected (**0608**), the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0610**). Alternatively, if the tag does not exist the user can create a new MemoryWeb Tag (**0609**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0611**).

If the user selects edit for a MemoryWeb Application Dot-Tag (**0612**), the user can add information text to edit the MemoryWeb Tag and the system will produce suggestions or matching MemoryWeb tags or the option to add a new tag

20

(**0613**). If there is a match within the user's system, the matching MemoryWeb Tag will appear and the user can select the MemoryWeb Tag (**0614**). Once the matching tag is selected, the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0616**). Alternatively, the user can create a new MemoryWeb Tag (**0615**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0617**). If the user selects delete for a MemoryWeb Application Dot-Tag (**0618**), the system deletes the association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File (**0619**).

In FIG. **29**, the Application Dot-Tag Shape and Content is illustrated (**0650**). MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag (as illustrated in FIG. **30**). In essence, the Application Dot-Tags operate as mini search engines for the user's Digital Tags.

The structure of an Application Dot-Tag (**0650**) can take on an solid-line enclosed shape of a pill, dot or similar depiction (**0651**) and within the shape the name of the MemoryWeb Tag is displayed (**0653**) along with the number of Digital Files (**0652**) that are also associated with that same MemoryWeb Tag. FIG. **29** further illustrates more examples of the Application Dot-Tags. If the number of Digital Files associated with a specific MemoryWeb Tag is less than a certain number (e.g., 1000), the actual number of Digital Files associated with that MemoryWeb Tag is displayed. In FIG. **29**, this is illustrated with an Application Dot-Tag that has 453 files that are associated with the location of Cologne, Germany (**0654**). However, if the number of Digital Files associated with a specific MemoryWeb tag are greater than the character length, a greater sign along with a number sequence that is less than the total number of associated Digital Files will be displayed (**0655**). In FIG. **29**, this is illustrated with an Application Dot-Tag that has ">999" (**0657**) as the number of Digital Files with the exact same MemoryWeb Tag and if the name of the MemoryWeb tag is longer than the text sequence, only a portion of the MemoryWeb tag will be displayed along with an ellipse as illustrated with "Holiday Photos from . . . " (**0658**). Finally, the Application Dot-Tag may be illustrated with a dotted or similar distinction (as opposed to a solid line) to help indicate a partial relationship (**0656**). In the illustration in FIG. **29**, the dotted line is to indicate that only some of the selected Digital Files have the MemoryWeb Tag of Frank Smith.

In FIG. **30**, the Continuous Link of Dot Tag System is illustrated (**0700**). When a user selects an Application Dot-Tag, it will take them to the corresponding Application View that relates to the type of MemoryWeb Tag. The Continuous Link of Application Dot-Tag System begins when a user selects an Application Dot-Tag (**0701**).

If the Application Dot-Tag is a Person (**0702**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of how a user can select a person Application Dot-Tag is in FIG. **31** (indicator **0764**). For a person tag, the

US 9,552,376 B2

21                                          22

system receives data for that person from the User Rela-
tionship Table and displays the relationship data in a People
Profile View (**0709**). A sample illustration of a selected
Person Application Dot-Tag is in FIG. **32** (indicator **1430**).

If the Application Dot-Tag is a Collection (**0703**), the
system will send a request to display the requested infor-
mation (**0708**) to the User Relationship Table (**0300**). A
sample illustration of a collection Application Dot-Tag that
can be selected is in FIG. **31** (indicator **0781**). For a
collection tag, the system receives data for that collection
from the User Relationship Table and displays the relation-
ship data in a Collection View (**0710**). A sample illustration
of a selected Collection Application Dot-Tag within a Col-
lection View is in FIG. **33** (indicator **1530**).

If the Application Dot-Tag is a Location (**0704**), the
system will send a request to display the requested infor-
mation (**0708**) to the User Relationship Table (**0300**). A
sample illustration of a location Application Dot-Tag that
can be selected is in FIG. **31** (indicator **0768**). For a location
tag, the system receives data for that location from the User
Relationship Table and displays the relationship data in a
Location View (**0711**). A sample illustration of a selected
Location Application Dot-Tag within a Location View is in
FIG. **34** (indicator **1630**).

If the Application Dot-Tag is a Date (**0705**), the system
will send a request to display the requested information
(**0708**) to the User Relationship Table (**0300**). A sample
illustration of a date Application Dot-Tag that can be
selected is in FIG. **31** (indicator **0766**). For a date tag, the
system receives data for that date from the User Relationship
Table and displays the relationship data in Uploads View
with that date filtered (**0712**). A sample illustration of a
selected Date Application Dot-Tag within Uploads View is
in FIG. **40** (indicator **0861**).

If the Application Dot-Tag is a Recipe (**0706**), the system
will send a request to display the requested information
(**0708**) to the User Relationship Table (**0300**). For a recipe
tag, the system receives data for that recipe from the User
Relationship Table and displays the relationship data in a
Recipe View with that date filtered (**0713**). A sample illus-
tration of a selected Date Application Dot-Tag within Recipe
View is in FIG. **36** (indicator **1800**).

The Application is contemplated to have additional types
of Application Dot-Tags (**0707**) in the future including
Family Trees, Timespan, etc. and each of these MemoryWeb
Tags will go through the same continuous link of Applica-
tion Dot-Tag process. For an additional type of Application
Dot-Tag, the system will receive data from the User Rela-
tionship Table and displays the relationship data in the
corresponding view for that type of Application Dot-Tag
(**0714**).

If within any of the Application Views the user selects a
Digital File (**0715**), the Digital File is then displayed in a
Slideshow View (**0716**) where the user can again select an
Application Dot-Tag (**0701**) and start the continuous link of
Application Dot-Tag functionality over again. Also within
an Application View, if the user selects another Application
Dot-Tag (**0717**), the entire continuous link of Application
Dot-Tag functionality begins again and sends the request
back to ask if the newly selected Application Dot-Tag is a
person (**0702**).

In FIG. **31**, the Slideshow view of a Digital File, Appli-
cation Dot-Tags, and comments are illustrated (**0750**). When
viewing a Digital File or group of Digital Files within the
Slideshow Application View (**0750**), the selected Digital
File is displayed in the center of the screen (**0754**). If the user
wants to export this photo with all the associated Memory-

Web Tags, they can select export (**0751**) which will initiate
the Application Export System as illustrated in FIG. **49**. If
the user wants to see the Digital File that is one file before
the selected Digital File, they select the left arrow (**0752**) or
they can select the right arrow (**0753**) to display the next
photo in the sequence. Below the Digital File, the comments
(**0755**) that are specific to that Digital file are depicted. If the
user wants to edit the comments, they select edit (**0756**). If
the user would like to see a moving slideshow of all the
photos that are part of the group of Digital Files, they can
select on the play sign (**0757**) or simply click the specific
thumbnail of a Digital File (**0758**) to be displayed. The user
can also have the slideshow in a full screen slideshow by
selecting the full screen icon (**0759**). If the user wants to
share the individual Digital file via email, they can select the
mail icon (**0760**) or share it through a third party median
provider, in this case Facebook (**0761**). A more detailed
description on how the share functionality works is in FIG.
**46** (indicator **1000**).

In FIG. **31**, each Application Dot-Tag that is associated
with a Digital File is illustrated to the right of the Digital File
under each major MemoryWeb Tag area. For this example,
the People area (**0763**) has Application Dot-Tags of Jackson
Smith (**0780**) and J C Smith (**0764**) associated with the
selected Digital File. In the Dates area (**0765**), the Applica-
tion Dot-Tag of Aug. 28, 2013 (**0766**) is associated with the
selected Digital File. In the Locations Area (**0767**), the
Application Dot-Tag of Abe Lincoln Elementary School
(**0768**) in the location associated with the selected Digital
File. In the Collections Area (**0769**), the Application Dot-
Tags of First Day of School (**0770**) and Jackson and J C
Photos 2013 (**0771**) are associated with the selected Digital
File. The Star Rankings Area (**0782**) shows that four out of
five stars (**0773**) was selected for this Digital File. If the
Digital File is associated with a Recipe (**0774**) the Applica-
tion Dot-Tag would be illustrated in this area. The Media
Type area indicates that this is a Memento (**0776**). If the user
wants to delete this Digital File from the Application, they
can select the Delete Item function (**0779**). If the user wants
to edit the Application Dot-Tags, they can select the edit icon
(**0762**) and all the MemoryWeb Tag areas will be in edit
mode as later illustrated in FIG. **35**. Finally, any original
Digital File detail (e.g., file name, camera specifications,
etc.) is illustrated (**0778**).

In FIG. **32**, both of the People Application Views are
illustrated. The first People Application View (**1400**) is used
to display all the people that were created within the user's
Application. This view can be seen by selecting "People"
(**1401**) from any of the Application Views within the Appli-
cation. The people can be listed in various sort orders though
a drop-down (**1402**) such as: Newest to Oldest (added),
Oldest to Newest (added), Alphabetical (A-Z), Alphabetical
(Z-A), etc. Additional sorts are contemplated such as age
sort. For each person, a thumbnail of their face along with
their name is depicted. In this figure, Jon Smith (**1403**) and
J C Jon Smith (**1404**) along with some other people are
illustrated. Also, the user can determine if they want to have
20, 50 or 100 people shown at one time (**1405**) by selecting
the corresponding number box. At the top of every Appli-
cation View within the Application, the user can select Fast
Search (**1450**) that is further described in FIG. **44**. Also at the
top of every Application View within the Application, the
user can select Apply Filters (**1451**) that is further described
in FIGS. **37**-**43**.

In the second People Application View within FIG. **32**, a
single people profile (**1430**) is illustrated. The individuals
name is displayed at the top of the page (**1431**) along with

Petitioner Apple Inc. - Ex. 1001, p. 63

23

their Nicknames (**1433**), when they were Born (**1434**), who their parents are (**1435**), Siblings (**1436**), Children (**1437**), and the person's Biography (**1438**). The Person Profile Photo of that individual is illustrated (**1439**) and if the user wants to change the profile photo, they can change by selecting change profile photo (**1440**). For each person, the system can allow the user to quickly see all the tags that are associated to a person. In this example, the system illustrates that there are four photos (**1452**) associated with that person and will also illustrate thumbnails of each of the four photos (**1446**). These thumbnails can be selected and then the user will be taken to the slideshow view for that Digital File. If the user selects Collections (**1441**), all of the collections that the person has been tagged within will be displayed. If the user selects Facial Recognitions (**1442**), all the faces that are confirmed or need to be confirmed are displayed. This is the area where the user can select to confirm or deny a suggested facial recognition through the Third Party Facial Recognition System that is illustrated in FIG. **25**. If the user selects Locations (**1443**), all of the Locations that the specific person has been tagged within will be displayed. If the user selects Family Relationships (**1444**), the seven people that the user is associated with will be displayed in a family chart or tree. If the user selects Recipe (**1445**), all the recipe's that the user has been tagged within will be displayed. If the user wants to edit any details within the individual people profile, they can select edit (**1447**) and all the fields will allow the ability to edit the details. If the user selects any of the Application Dot-Tags such as the individuals mother Jane Smith (Doe) (**1449**), the application will utilize the Continuous Link of Application Dot-Tag System (see FIG. **30**) and take the user to an individual people profile view of Jane Smith (Doe). If the user selects View all People (**1432**), the Application will go back to the multiple People View (**1400**).

In FIG. **33**, both of the Collection Application Views are illustrated. The first Collection Application View is used to display all the collections that were created within the user's Application (**1500**). This view can be seen by selecting "Collections" (**1501**) from any of the Application Views within the Application. The collections can be listed in various sort orders though a drop-down (**1502**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each collection, a thumbnail of a Digital File from that collection depicted. In this figure, Smith Family Photos (**1503**), Europe Trip (**1504**), First Day of School (**1505**), Jackson and J C Photos 2013 (**1506**), and Baseball Games (**1507**) is illustrated. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

In the second Collections Application View within FIG. **33**, a single collection (**1530**) is illustrated. The individual collection name is displayed at the top of the page (**1532**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system shows photos (**1533**) associated with the Smith Family Photos Collection. If the user wants to edit any Digital Files within the collection, they can select edit (**1535**) and then the user can add or delete any Digital Files as well as set the cover photo for a collection. If the user wants to share this collection (**1534**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user

24

selects View all Collections (**1531**), the Application will go back to the multiple Collection View (**1500**).

In FIG. **34**, both of the Location Application Views are illustrated. The first Location Application View is used to display all the locations that were created within the user's Application (**1600**). This view can be seen by selecting "Locations" (**1605**) from any of the Application Views within the Application. The locations can be listed in various sort orders though a drop-down (**1606**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each location, a thumbnail of a Digital File from that location depicted. In this figure, Wrigley Field (**1601**), Abe Lincoln Elementary School (**1602**), Home Sweet Home (**1603**), and Stonehenge (**1604**) is illustrated. What is also contemplated instead of a Digital File from that location is that a zoomed in image of a map from the specific location using the Third Party Geographical Mapping System later depicted in FIG. **47**. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

In the second Locations Application View within FIG. **34**, a single location (**1630**) is illustrated. The individual location name is displayed at the top of the page (**1632**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system illustrates a one photo (**1633**) taken at Wrigley Field (**1634**) that is associated with the location called Wrigley Field. If the user wants to edit any Digital Files within the collection, they can select edit (**1637**) and then the user can add or delete any Digital Files. If the user wants to share the Digital Files associated with this location (**1636**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1631**), the Application will go back to the multiple Collection View (**1600**). As part of the individual Location View, an interactive map displaying a zoomed-in image of the specific location is displayed (**1635**).

In FIG. **35**, the Uploads Application View and how it uses the Application Digital Tag Organizer System is illustrated (**1700**). Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system (also called Application Digital Tag Organizer) allows a user to select large amounts of Digital Files and add Digital Tags that can characterize and document the digital file(s). Digital Files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. One or more Digital Files can be selected at the same time and displayed with an overlaid check mark when activated (**1705** and **1710**) and then Digital Tags can be assigned to a single file at a time or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos (**1713**) and enter the tag only once. In addition, the system does include an indicator that appears when a user hovers over the Digital File providing all the relevant Digital Tags associated with that specific Digital File (**1737**) and in this example it shows the caption of "Family Smith finally sees Stonehenge," that four People are tagged to this photo, one collection is tagged to this photo, there are zero people

Petitioner Apple Inc. - Ex. 1001, p. 64

recognized through Facial Recognition, and the date of this photo is from Dec. 21, 2013. If the user wants to delete a single photo from uploads, they can click on the "x" (**1735**) that is displayed when the user hovers over the Digital File thumbnail. When there are multiple Digital Files, the user can determine how many images are displayed at one time in the Items Per Page Buttons (**1738**) that include such numbers at 20, 50 and 100 on the page at the same time. When there is are more Digital Files that items per page, they are automatically grouped by pages and a Page Button (**1739**) can be selected to see the next set of Digital Files.

In the Uploads Location View, Digital Files can be directly uploaded to the Application by selecting Upload Files (**1701**) and the user will have the option to select the specific Digital Files to be uploaded from their Storage System. Users also have the option to install the Memory-Web Download Application that can be installed on either a Microsoft or MAC computer that will automatically upload and sync photos to and from the users Storage System to the MemoryWeb Application. Also displayed is the amount of space being used by the user within the Application (**1702**). Uploads of Digital Files can be listed in various sort orders though a drop-down (**1703**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. In addition, the Digital Files can be sorted by File Batch Name (A-Z) or File Batch Name (Z-A). In FIG. **35**, the sort of File Batch Name (A-Z) is selected (**1703**) and this provides three groups of Digital Files with the names File Folder C:/2013/Family Fun (**1704**), File Folder C:/2013/General (**1706**), and of File Folder C:/2013/ First Day of School (**1709**). The File Batch Name is created when Digital Files are uploaded to the Application. The File Batch Name allows the user to see the file directory of how they had their Digital Files stored from another Storage System (e.g., on their computer hard drive) that allows for easier organization within the MemoryWeb Application. For example, in the sort of File Folder C:/2013/General (**1706**), two digital files (**1707** and **1708**) are illustrated that came from the exact same file folder path of the Users Storage system upon upload. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

On the right side of FIG. **35**, the associated Application Dot-Tags along with the ability to organize one or more Digital Files at the same time is illustrated. At the top of the screen, it shows how two Digital Files are selected (**1712**) that correspond to the selected (checked) Digital Files (**1705** and **1710**). Below this area illustrates all the Application Dot-Tags that are associated with the two selected Digital Files. The user has the option to select all (**1713**) the Digital Files being viewed in the Uploads View as well as selecting none (**1714**). By selecting all, the user can administer Application Dot-Tags to all the selected Digital Files at the same time. If the user wants to delete Digital Files, they can select the Digital Files to be deleted and then select the Delete Selection (**1715**) option.

In FIG. **35**, each Application Dot-Tag that is associated with the selected Digital File(s) is illustrated. For this example, the People area (**1716**) has Application Dot-Tags of Jackson Smith (**1734**), Jane Smith (**1733**), Jon Smith (**1731**, and J C Smith (**1717**) that are associated with the two selected Digital Files (**1710** and **1705**). If the user wants to add a person to all the selected Digital Files, they can click on "+Add People" (**1718**) that will display a pop-up where the user can search for an existing person within the user's

existing people within the Application or add a new person to the user's group of people within the Application. It is contemplated to have a Facial Recognition suggestions appear in this area of the Application that will allow users to confirm or deny a recognized person to a specific Digital File. However, the current version of the People area is useful for situations where a face is not recognized, but the user desires to tag a person to a Digital File, they can manually assign a Person Application Dot-Tag to that Digital File for an existing person (e.g., if the person's back is turned, it is a document that contains that person, a piece of art created by that person, etc.).

In the Dates area (**1719**), the organize functionality for assigning a Digital Tag of a date within the Digital File(s) is illustrated. Upon upload, the date when the Digital File was created is automatically read by the Application and illustrated as an Application Dot-Tag (**1720** and **1730**). As illustrated in the Dates area, the Application Dot-Tags of Jul. 4, 2013 (**1720**) and Aug. 28, 2013 (**1730**) are illustrated as they correspond to the dates that are associated with each of the selected Digital Files. If the user wants to change the date for all the selected Digital Files, they can click on "+Add/Edit Date" (**1721**) that will display a pop-up where the user can add a new date for the selected digital files within the Application. This is a very useful feature when an incorrect date is assigned to a digital file (e.g., if a photo from Oct. 31, 1951 was digitized on Dec. 31, 2012, the digitized dates would show as an Application Dot-Tag that the user can change in this section to the correct date of Oct. 31, 1951).

In the Locations area (**1722**), the organize functionality for assigning Digital Tags of locations within the Digital File(s) is illustrated. Upon upload, the GPS location of where the Digital File was created (if applicable) is automatically read by the Application and illustrated as an Application Dot-Tag for locations of the selected files. In the locations area, the Application Dot-Tags of Abe Lincoln Elementary School (**1723**) and Wrigley Field (**1735**) are illustrated as they correspond to the locations that are associated with each of the selected Digital Files. If the user wants to change the location for all the selected Digital Files, they can click on "+Add/Edit location" (**1724**) that will display a pop-up where the user can search for an existing location within the user's existing locations within the Application or add a new location to the user's group of locations within the Application. Another added function to assign a location to the selected Digital Files is to use Search with Map (**1732**) that utilizes the Application's Third Party Geographical Mapping System that is further illustrated in FIG. **47** that allows the user to type in any relevant information (e.g., location name, address, state, etc.) and then the Application will search and pinpoint that location on a map.

In the Collections Area (**1725**), the organize functionality for assigning Digital Tags of albums within the Digital File(s) is illustrated. Digital Files can be associated to multiple albums. As illustrated in the Collections area, the Application Dot-Tags of First Day of School (**1726**), Jackson and J C Photos 2013 (**1727**), and Baseball Games (**1728**) are associated with the Collections for the selected Digital Files. If the user wants to add a Collection to all the selected Digital Files, they can click on "+Add/Create Collection" (**1729**) that will display a pop-up where the user can search for an existing Collection within the user's existing Collections within the Application or add a new Collection to the user's group of Collections within the Application.

Within the Uploads View, the ability to perform similar tagging of Star Rankings, Recipes, Family Relationships, and Media Types/Document Type are also contemplated as

27 28

part of the Application Digital Tag Organizer System. For Star Rankings, it is contemplated to assign MemoryWeb Tags of star rankings within the Digital File(s). Upon upload, if the star ranking is already contained within the Digital File, it is automatically read by the Application and illustrated as an Application Dot-Tag. The user can select one or more Digital Files and then apply a star ranking between 1 and 5 in the Uploads Application View. For Recipes, it is contemplated to assign MemoryWeb Tags of Recipes to Digital File(s). The user can select one or more Digital Files and then type within the "Recipe" search bar to either add a new recipe or associate the Digital File(s) to an existing recipe. Digital Files can be associated to multiple recipes. For Media Type/Document Type, the user can choose from a list of common document types (e.g., Birth Certificate, Death Certificate, Marriage Certificate, etc.) can be utilized for common document type associations. Once a document type is assigned to one or more Digital Files, the document type appears within an Application Dot-Tag. Digital Files can be associated to multiple document types.

In FIG. **36**, an individual recipe view (**1800**) allows one to see all the information that is associated with a specific recipe. The name of the specific recipe is displayed at the top of the page (**1801**) and the People Profile picture of the "chef" associated with the recipe is illustrated (**1804**). If no chef is assigned, the user can select the "+add/edit chef" (**1803**) to either choose an existing person from the user's People in the Application or add a new person.

The view of various Digital Files within the recipe (**1808**) along with scrolling through the Digital Files using the arrow icons (**1814** and **1815**), the ability to share this recipe with others by selecting the sharing icon (**1812**), As the Digital Files are selected on using the film strip on the bottom, a larger thumbnail illustrating the Digital File is shown (**1807**). The recipe view also allows you to choose a chef for the recipe from the people within the user's Application. When a chef is selected, the profile picture (**1804**) of the person along with their name as an Application Dot-Tag (**1816**) is displayed. For each recipe, the user can insert the ingredients (**1809**), directions (**1810**), and comments (**1811**). Each of these areas can be edited by selecting the edit button (**1813**). Another contemplated feature allows the user to apply star rankings for the recipe as well as categorize they type of recipe (e.g., appetizer, entrée, etc.). It is further contemplated that the Digital Files within the individual recipe view may also include videos where they can be watched showing the chef making the recipe. It is also contemplated that the recipes will be interactive with external sources (e.g., the Food Network) so that recipes can be shared or imported with the Application and that visitors to the account will be able to post/share comments about the recipe. It is further contemplated that the user can print the recipe using a print icon.

In FIG. **37**, the Advanced Filters System is illustrated (**0800**). This feature allows the user to narrow the Digital Files being viewed within the Application Views by searching the user's entire collection of MemoryWeb Tags within the Application and then displaying the filtered information in one of the Application Views. Advanced Filters System can be filtered by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify Digital Files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, and no upload date information or are

lacking any other tag. The Advanced Search Filter can be used within many of the views the Application to narrow the set of Digital Files being viewed. For example, you can use the Advanced Filter Button to only show the map view of locations a specific person has traveled in their lifetime.

When a user selects the "Advanced Filters" from almost any Application View (**0801**) (the button can be seen in FIGS. **32**, **33**, **34**, **35**, and **36**), a pop-up will appear that allows the user to type in text into the text box (**0802**). As the user is typing, the system sends a request (**0803**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0804**) and illustrate the potential matches of the filters to the user (**0805**). As the user types in another letter, the process of sending a request (**0803**) to the User Relationship Table (**0300**), producing results (**0804**) and producing a new set of results (**0805**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0806**) and then selects to apply this filter (**0807**), the system will send this request to the User Relationship Table (**0300**). This portion of the Advanced Filter System is further illustrated in FIG. **38**.

If the Advanced Filter System is applied within the Uploads View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0809**). An example of this output is later illustrated in FIG. **39** (indicator **0850**).

If the Advanced Filter System is applied within the Collections View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0810**). An example of this output is later illustrated in FIG. **39** (indicator **0852**).

If the Advanced Filter System is applied within the Locations View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0811**). An example of this output is later illustrated in FIG. **40** (indicator **0856**).

If the Advanced Filter System is applied within the People View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0814**). An example of this output is later illustrated in FIG. **39** (indicator **0854**).

If the Advanced Filter System is applied within other contemplated views within the Application such as Recipe, Family Trees, Timespan, etc. the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0812**).

If the user decides to add an additional filter (**0813**), the process is repeated when the user selects "Advanced Filter" (**0801**) while the pre-existing filters are still applied. An example of this process is later illustrated in FIG. **42** and FIG. **43**. If the user selects an Application Dot-Tag, then the continuous Link of Application Dot-Tags System is engaged as illustrated in FIG. **30** (**0700**).

In FIG. **38**, the process of the Adding the First Application Dot-Tag using the Advanced Filter is illustrated. This is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0830**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0831**). The user can then type in the alphanumeric text search criteria within the Advanced Filters text box (**0838**). In this example, the word "Smith" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters (**0836**) that meet the criteria. In this example, the user selects the Application Dot-Tag of a person named J C Smith (**0832**). In Stage 3, "Apply" is

US 9,552,376 B2

29      30

selected and then the application lists the Application Dot-Tag of a Person named J C Smith as a current active filter (**0837**). This filter will then be applied to each Application view that is further illustrated in FIGS. **39** through **41**. If the user wants to clear all the filters, they can select "clear filters" (**0839**).

In FIG. **39**, an illustration of the results for a Single Application Dot-Tag Filter for each Application view is depicted. If the Advanced Filter is applied in the Uploads Application View (**0850**), the filter of "J C Smith" (**0851**) is illustrated and only the Digital Files that contain the person J C Smith are illustrated. If the Advanced Filter is applied in the Collections Application View (**0852**), the filter of "J C Smith" (**0853**) is illustrated and only the Collections that contain the person J C Smith are illustrated. If the Advanced Filter is applied in the People Application View (**0854**), the filter of "J C Smith" (**0855**) is illustrated and only the person named J C Smith is illustrated.

In FIG. **40**, an illustration of the results for a Single Application Dot-Tag Filter for a date within the Uploads Application View is depicted (**0860**). If the Advanced Filter is applied using a date filter within the Uploads Application View (**0861**), the filter date of "2013-07-04" (**0876**) is illustrated and only the Digital Files that contain that date are illustrated.

In FIG. **41**, an illustration of the results for a Single Application Dot-Tag Filter in the Location Application View is depicted (**0870**). Within the Location Application View the Digital Files are displayed within an interactive map (Google map shown as an example). The Location View can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users. In this view, individual or groups of Digital Files are illustrated as photo thumbnails (see indicators **0874** and **0875**)) on the map and the user can select the thumbnail to see all the Digital Files with the same location (as seen FIG. **34** (indicator **1630**)) or the user can use the interactive map and narrow the map view by either using the zoom in/zoom out bar (**0876**) on the left or simply selecting the map. Note that the pinned locations include a thumbnail of the Digital File (or Collection cover) and the number of Digital Files for that location.

If the Advanced Filter is applied in the Locations Application View, the filter of "J C Smith" (**0872**) is illustrated and only the Digital Files that contain the person J C Smith are illustrated with their geographic location on the map. The user can select to clear this filter (**0873**) or see this Advanced Filter with the view of locations as a list (**0871**). In FIG. **41**, there are two illustrations on the map (**0874** and **0875**).

In FIG. **42**, the process of the Adding another Application Dot-Tag using the Advanced Filter is illustrated. Continuing on the process that was illustrated in FIG. **38** where the first Application Dot-Tag filter of "Person: J C Smith" was applied, the ability to add a second Application Dot-Tag if further illustrated in FIG. **42**. As with FIG. **38**, FIG. **42** is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0880**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0881**). The user can then type in the text search criteria for the second Advanced Filter within the Advanced Filters text box. In this example, the word "Abe" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters that meet the criteria. In this example, the user selects the Application Dot-Tag of a location named Abe Lincoln Elementary School (**0882**). In Stage 3 (**0883**), the application lists the Application Dot-

Tags of both the Person named J C Smith (**0884**) as well as the location of Abe Lincoln Elementary School (**0885**) as part of the Current Active Filters. The user then selects "Apply" (**0886**) to see these filters illustrated in the Application Views. This filter will then be applied to each Application view as previously illustrated in FIGS. **39** through **41**.

In FIG. **43**, an illustration of the results for Adding Another Application Dot-Tag Filter in the Location Application View is depicted (**0890**). Continuing on the process that was illustrated in FIG. **42**, in FIG. **43** (**0890**) the Application Dot-Tag filters of "Person: J C Smith" (**0891**) and "Location: Abe Lincoln Elementary School" (**0892**) are illustrated. There is one overlapping location that contains both filters for a Digital File that is illustrated on the map (**0893**).

In FIG. **44**, the Fast Search System is illustrated (**0900**). Throughout the Application, groups or individual Digital Files can be searched quickly using the Fast Search bar that is at the top of each Application View. Once a key word or phrase is entered into this area, the user's entire collection of Digital Tags within the Application that includes all the Digital tags are searched for potential matches. This feature allows the user to search their entire collection of MemoryWeb Tags within the Application and then displays the information grouped by people, collections, locations, documents, and recipes. The Fast Search System can be searched by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates.

When a user selects the Fast Search bar from almost any Application View (**0901**), the user can type in alphanumeric text into the text box (**0902**). As the user is typing, the system sends a request (**0903**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0904**) and illustrate the potential matches by category for the user (**0905**). As the user types in another letter, the process of sending a request (**0903**) to the User Relationship Table (**0300**), producing results (**0904**) and producing a new set of results (**0905**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0906**), the system will send this request to the User Relationship Table (**0300**). This process is further illustrated in FIG. **45**.

If the user selects a person Fast Search tag, the system retrieves data for the person from the User's Relationship Table and displays the relationship data (**0907**) in the Person Profile View as illustrated in FIG. **32** (indicator **1430**).

If the user selects a collection Fast Search tag, the system retrieves data for the collection from the User's Relationship Table and displays the relationship data (**0908**) in the Collection View as illustrated in FIG. **33** (indicator **1530**).

If the user selects a location Fast Search tag, the system retrieves data for the location from the User's Relationship Table and displays the relationship data (**0909**) in the Location View as illustrated in FIG. **34** (indicator **1630**).

If the user selects a date Fast Search tag, the system retrieves data for the date from the User's Relationship Table and displays the relationship data (**0910**) in the Uploads View as illustrated in FIG. **40** (indicator **1861**).

If the Fast Search System is applied within other contemplated views within the Application such as Family Trees, Timespan, etc. the system retrieves data for the search from the User's Relationship Table and displays the relationship data (**0911**). As part of the contemplated search process is to also search comments related to a Digital File.

In FIG. **45**, the process of using the Keyword Fast Search is illustrated. This is a visual depiction of the process that

Petitioner Apple Inc. - Ex. 1001, p. 67

US 9,552,376 B2

31 32

was illustrated in FIG. **44**. In Stage 1 (**0930**), the user selects the Fast Search bar at the top of one of the Application Views. This takes the user to Stage 2 (**0931**) where the user can then type in the alphanumeric text search criteria within the Fast Search text box (**0932**). In this example, the word "Wrigley" was typed within the text box. As the alphanumeric text is typed within the text box, application automatically generates the available MemoryWeb Tag results (**0933**) that meet the criteria. Note how the results are organized by various MemoryWeb Tag categories such as Person, Collection, Location, Recipe, and comments. In Stage 3 (**0934**), the user selects one of the results. In this example, the user selects the location of Wrigley Field (**0935**). When the user selects a specific MemoryWeb Tag, it takes them to Stage 4 where the information related to that tag is displayed in the corresponding view as discussed within FIG. **44**. For the example where the user selected the Location of Wrigley Field, the user was taken to the individual locations Application View where the location of Wrigley Field and the corresponding Digital Files are displayed (**0936**).

In FIG. **46**, the Share to Third Party Media Provider System (**1000**) is illustrated. This feature allows the user to share Digital Files from MemoryWeb directly to a third party application. The process begins when the user selects to share a Digital File or collection of Digital Files within the MemoryWeb Application (**1001**). Examples of where the user can select share can be seen in FIG. **31** (indicator **0760**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Once the request is made, the system requests the Digital File and Tag Data Blocks (**1002**) from the User Relationship Table (**0300**). The system then retrieves the Digital File from the User Relationship Table (**1003**). At the same time, the system will also retrieve the Digital Tags from the Relationship Table (**1004**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1005**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1006**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**1300**) which then sends the Digital File outside the MemoryWeb Application to the Third Party Media Provider (**0501**).

In FIG. **47**, the Third Party Geographical Mapping System is illustrated (**1100**). When Digital Files are imported into MemoryWeb, if there is any GPS data available from the EXIF Tags (See FIG. **22** (indicators **0330**, **0331**, **0332**, and **0333**)), the system will utilize this data and automatically create a MemoryWeb location tag within the Application (See FIG. **22** (indicators **0368**, **0369**, **0370** and **0371**)). However, if the GPS coordinates were missing from a Digital File when it was imported into the Application (See FIG. **50** (indicators **1418** and **1419**)), the user can add the Location (which the application will automatically add the associated GPS tags) to the Digital File using the Application Digital Tag Organization System (see FIG. **28**). As locations are associated with a Digital File, the Application can interact with a Third Party Geographical Mapping System to pull maps that correspond to the exact location of Digital Files that have a location tag (see FIG. **34** (indicator **1630** and FIG. **40**, indicator **0875**)). In addition, the Application utilizes a world map view to illustrate all the locations

that are associated to one or more Digital Files for a user within the Location Application View (see FIG. **41** (indicator **0880**)).

The Third Party Geographical Mapping System begins when a Location Application Dot Tag (**1102**) is selected (**1104**), the system will send a request (**1105**) to the User Relationship Table (**0300**). Examples of when Location Application Dot-Tags can be selected are illustrated in FIG. **31** (indicator **0768** and FIG. **35**, indicators **1723** and **1735**). In FIG. **47** if the Locations Application View is selected (**1103**), the system will send a request (**1105**) to the User Relationship Table. The Location Application View can be selected from almost any Application view as illustrated in FIG. **34** (indicator **1605**). When either a single location or the world map view is selected, the system will retrieve the data (**1108**) from the User Relationship Table (**0300**) and send a request (**1106**) to the Third Party Geographical Mapping Provider (**1101**) who generates the map request and then sends the information back to the system for the specific location (**1107**). At the same time, the Application Dot-Tags and Digital Files associated with the location or map request are retrieved and then sent (**1109**) to the Locations Application view. The system will combine the map information along with the Application Dot-Tags and Digital Files and display this information within the Location Application View (**1100**). Examples of a single Location Application View can be seen in FIG. **34** (indicator **1630**) and FIG. **40** (indicator **0875**), and an example of a world map view can be seen in FIG. **41** (indicator **0880**).

In FIG. **48**, the Share to Individual System is illustrated (**1200**). The Share to an individual person or a group of people starts when a user initiates share of a Digital File or a Collection of Digital Files (**1201**). Examples of where the user share functions are illustrates are in FIG. **31** (indicators **0760** and **0761**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Next, the system requests the Digital File and Tag Data Blocks (**1202**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1203**) from the User Relationship Table.

At the same time, the system will also retrieve the Digital Tags of the Digital File from the Relationship Table (**1204**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1206**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1205**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**1300**) which then sends the Digital File outside the MemoryWeb Application to an Individual or Group of People (**1207**).

In FIG. **49**, the Application Export System is illustrated (**1300**). The Application Export System starts when a user selects the export of a Digital File within the application (**1302**) or has installed the MW Automatic Uploader/Downloader Application (**1308**). An example of where the user can select the export of a Digital file within the Application is FIG. **31** (indicator **0751**). If the user has installed the MW Automatic Uploader/Downloader Application, the export functionality of the user's entire collection of Digital Files will be downloaded to the User's desired folder on their computer with the Digital Tags embedded within the Digital Files. If neither a user initiated download nor the MW

Petitioner Apple Inc. - Ex. 1001, p. 68

US 9,552,376 B2

33      34

Automatic Uploader/Downloader Application is not used, then the Application Export is not initiated (**1309**). For either a user initiated download or one using the MW Automatic Uploader/Downloader Application, the system requests the Digital File(s) and Tag Data Blocks (**1303**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1304**) from the User Relationship Table. At the same time, the system will also retrieve the Digital Tags of the Digital File from the User Relationship Table (**1305**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1306**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File(s) (**1307**). The application then exports the Digital File(s) with the new EXIF Tag Data Blocks to the desired Storage System of the user (**1301**).

In FIG. **50**, there are three charts for the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb. This Figure is meant to demonstrate how the EXIF Tag Data Blocks for a Digital File (in this example a JPG file) prior to the use of MemoryWeb Application appear and then how these EXIF Tag Data Blocks are populated with Digital Tags upon export from the MemoryWeb Application.

The first chart illustrates common EXIF Tags (Data Blocks) (**1401**) and lists certain common the EXIfTool Family 1 Group names that are displayed in the file properties of a JPG file when using Microsoft Windows (these are the same EXIF Tag Blocks that were illustrated in FIG. **22** (indicator **1320**)). In the second chart (**1402**), the Digital Tags associated with the original Digital File are displayed. In the third chart (**1403**), the updated Digital Tags for the same original Digital File once exported from the MemoryWeb Application is displayed.

In the second chart (**1402**), the original Digital File prior to import to the MemoryWeb Application did not have Digital Tags for data blocks such as Description Rating (**1416**), Description Comments (**1417**), GPS Latitude (**1418**), GPS Longitude (**1419**). Also in the second chart the Digital Tags for the data blocks of File Folder Path (**1420**) and File Date Created (**1421**) are illustrated.

In the third chart (**1403**), the original Digital File that was exported from the MemoryWeb Application now contains new or modified Digital Tags for certain data blocks. For example, a star rating of four out of five stars (**1410**) with the new MW Modified Digital File is now associated with the Description Rating (**1404**) where it was blank (**1416**) with the original file before using the MemoryWeb Application.

Another example is the listing of MemoryWeb Tags within the Description Comments data block (**1411**) as: CAPTION: Jackson and J C's first day at school!, PERSON: Jackson Smith, J C Smith, LOCATION NAME: Abe Lincoln Elementary School, COLLECTION: First Day of School, COLLECTION: Jackson and J C Photos 2013, DATE: Aug. 28, 2013. All of these Digital Tags are now associated with the Description Comments (**1405**) where it was blank (**1417**) with the original file before using the MemoryWeb Application.

Also updated in the MW Modified Digital File are the GPS Latitude (**1412**) and GPS Longitude (**1413**) as Digital Tags that were assigned in the MemoryWeb Application using the location feature with the Application Digital Tag Organizer System. These tags now replace the blank tags

(indicators **1418** and **1419**) that were in the original file before using the MemoryWeb Application.

A final example is how the date was modified in the MemoryWeb Application where a new date of Aug. 28, 2013 (**1415**) was assigned to the Digital File. This replaced the old date that was originally tagged with a date of Nov. 1, 2013 (**1421**). In a typical Digital File, only the date and perhaps the GPS location if taken with certain newer photo device is pre-populated in a Digital File. For the example in FIG. **50**, the Digital File may have been created or scanned on Nov. 1, 2013, but with the MemoryWeb Application Digital Tag Organizer System the user was able to correctly assign the date the photo was taken and now this date is always part of the Digital File within the MemoryWeb Application, but also when the Digital File is exported from MemoryWeb.

A benefit of the Export System is that users can export a single Digital File or their entire set of Digital Files (using the MW Automatic Uploader/Downloader Application), with all the updated Digital Tags from the MemoryWeb Application embedded within the Digital File(s). This feature is unique as it will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing Digital Files such as a social media website) where it can be viewed with these Digital Tag attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its Digital Files to a new digital system.

The application also contemplates the use of a Family Tree Application View where the individual people that have been created within the Application can be displayed with family relationships. This view can illustrate interactive family trees where one can see the family tree of an individual or family. Any family relationships created in the user's personal profile are already pre-populated by the Application for the Family Tree View. If a user selects on an individual within the family tree, it will take them to the people profile Application View of that person. Family Trees can quickly be viewed with the family tree drop-down sort feature. As with other areas within the Application, the family tree view can be narrowed down using an Advanced Filters System. For matching family members, the system will have drag/drop functionality to make new associations to a family tree. It is also contemplated that various family tree views could be displayed (e.g., pedigree chart, fan chart, directs descendants chart, etc.). In addition, it is contemplated that family tree relationships from either data files (e.g., GEDCOM files) or other sources (e.g., Family Search database) would either be imported into the user's versions of the Application or utilize these sources in associating the family tree information.

Another Application View that is contemplated is Timespan or Timeline. The Timeline Application View will have an interactive timeline to display the dates within the Digital Files of the Application for a user. The timeline view acts as an interactive filter or funnel of Digital Files whereas when the user starts to define the parameters of dates towards the bottom, the information above it is filtered to display the major groups of Digital Files that meets the selected date range criteria in various formats until you are able to view an individual Digital File. This funnel approach is designed to allow the user to appreciate the vast amount of data that can be associated with a date range, but then allow them to filter the information with the user's desired criteria. This will be a very useful tool when users want to see the growth

US 9,552,376 B2

35                                             36

and progress of an individual as well as memorialize a lifetime of a friend or family member.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

The invention claimed is:

**1**. A computer-implemented method of displaying digital files, comprising:

storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having embedded therein content data and metadata including tags, the content data including a digital photograph or image or video, the metadata including a geotag indicative of geographic coordinates where the digital photograph or image or video was taken;

displaying a map view on a video display device, the displaying the map view including displaying:

(i) a representation of an interactive map, the representation of the interactive map comprising a majority portion of a first screenshot of the video display device;

(ii) a first user selectable thumbnail image at a first location on the interactive map corresponding to the geographic coordinates of a first geotag, a first set of digital files including all of the digital files having the first geotag;

(iii) a first count value image partially overlapping or directly connected to the first user selectable thumbnail image, the first count value image including a first number that corresponds to the number of digital photographs or images or videos in the first set of digital files;

(iv) a second user selectable thumbnail image at a second location on the interactive map corresponding to the geographic coordinates of a second geotag, a second set of digital files including all of the digital files having the second geotag; and

(v) a second count value image partially overlapping or directly connected to the second user selectable thumbnail image, the second count value image including a second number that corresponds to the number of digital photographs or images or videos in the second set of digital files;

responsive to a click or tap of the first user selectable thumbnail image, displaying a first location view on the video display device, the first location view comprising a majority portion of a screenshot of the video display device, the displaying the first location view including displaying (i) a first location name corresponding to the first geotag, (ii) a scaled replica of each of the digital photographs or images or videos in the first set of digital files, and (iii) a first map image indicating the geographic coordinates of the first geotag, the displayed scaled replicas of each of the digital photographs or images or videos in the first set of digital files not being overlaid on the first map image and the second screenshot of the video display device not including the interactive map; and

responsive to a click or tap of the second user selectable thumbnail image, displaying a second location view on

the video display device, the second location view comprising a majority portion of a third screenshot of the video display device, the displaying the second location view including displaying (i) a second location name corresponding to the second geotag, (ii) a scaled replica of each of the digital photographs or images or videos in the second set of digital files, and (iii) a second map image indicating the geographic coordinates of the second geotag, the displayed scaled replicas of each of the digital photographs or images or videos in the second set of digital files not being overlaid on the second map image and the third screenshot of the video display device not including the interactive map.

**2**. The computer-implemented method of claim **1**, wherein the first user selectable thumbnail image includes a scaled representation of at least one of the digital images in the first set of digital files, and wherein the second user selectable thumbnail image includes a scaled representation of at least one of the digital images in the second set of digital files.

**3**. The computer-implemented method of claim **1**, further comprising responsive to a click or tap of a first one of the displayed scaled replicas in the first location view, displaying the digital photograph or image or video of a first of the digital files associated with the first scaled replica and overlaying on the digital photograph or image or video of the first digital file a first user selectable element, the first user selectable element having a first boundary with alphanumeric text therein indicating (i) a location name corresponding to the first geotag and (ii) the number of digital photographs or images or videos in the plurality of digital files associated with the first geotag.

**4**. The computer-implemented method of claim **3**, wherein the overlaying further comprises overlaying on the digital photograph or image or video of the first digital file associated with the first scaled replica a second user selectable element, the second user selectable element having a second boundary with alphanumeric text therein indicating (i) a name of a person corresponding to a person tag and (ii) the number of digital photographs or images or videos in the plurality of digital files associated with the person tag.

**5**. A computer-implemented method, comprising:

storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having a content data portion and a metadata portion including tags, the content data including a digital photograph or image or video;

displaying, on a video display device associated with a client device, the digital photograph or image or video of a first of the digital files and overlaying thereon:

(i) a first user selectable element, all of the digital files associated with a person tag being members of a first set of digital files, the first user selectable element having a first boundary with alphanumeric text therein indicating (i) a name of a person corresponding to the person tag and (ii) the number of digital files in the first set of digital files, and

(ii) a second user selectable element, all of the digital files associated with a geotag being members of a second set of digital files, the second user selectable element having a second boundary with alphanumeric text therein indicating (i) a location name corresponding to the geotag and (ii) the number of digital files in the second set of digital files;

responsive to a click or tap of the first user selectable element via a user interface device of the client device,

Petitioner Apple Inc. - Ex. 1001, p. 70

US 9,552,376 B2

37

38

displaying a people view on the video display device, the displaying the people view including displaying (i) the name of the person corresponding to the person tag and (ii) all of the digital photographs or images or videos in the first set of digital files; and

responsive to a click or tap of the second user selectable element via the user interface device of the client device, displaying a location view on the video display device, the displaying the location view including displaying (i) the location name corresponding to the geotag, (ii) all of the digital photographs or images or videos in the second set of digital files, and (iii) a map image indicating the geographic coordinates of the geotag.

**6**. The computer-implemented method of claim **5**, further comprising:

receiving, via the user interface device, alphanumeric text created and inputted by the user as the person tag; and

associating, using a computer, the person tag with the first digital file in a computer database.

**7**. The computer-implemented method of claim **6**, further comprising:

receiving from the client device a request to export the first digital file from the storage media to another storage medium remote from the client device;

responsive to receiving the request to export, modifying at least the first tag of the first digital file and storing the modified first digital file in a non-proprietary format such that the first tag is preserved during exporting; and

responsive to the storing the modified first digital file, exporting the modified first digital file by causing the modified first digital file to be communicated, without removing the first tag and in the non-proprietary format, from the storage media to the other remote storage medium.

**8**. The computer-implemented method of claim **7**, wherein the other remote storage medium is operatively coupled to or incorporated in a computer system running a destination operating system different from an operating system on the client device, and wherein the modified first digital file with the modified first tag is stored on the other remote storage medium after the exporting.

**9**. The computer-implemented method of claim **8**, wherein the computer system includes a mobile telephony device, a personal computer, a tablet computer, a laptop computer, a television, a wearable gadget having a computer, a digital camera, a printer, or a personal data assistant having a computer.

**10**. The computer-implemented method of claim **7**, wherein the metadata of the first digital file is formatted according to an exchangeable image file format (EXIF) having a Comment field, and wherein the modified first tag is stored in the Comment field of the metadata of the first digital file as alphanumeric text corresponding to the first tag.

**11**. The computer-implemented method of claim **5**, wherein the boundary is a solid line having a generally pill-shape.

**12**. A computer-implemented method of displaying digital images using a plurality of mini-search engine tags in a continuous loop of searching and displaying digital images, the method comprising:

storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having embedded therein content data and metadata including tags, the content data including a

digital image, the metadata including a geotag indicative of geographic coordinates where the digital image was taken;

displaying a map view on a video display device, the displaying the map view including displaying:

(i) a representation of an interactive map;

(ii) a first user selectable thumbnail image at a first location on the interactive map corresponding to the geographic coordinates of a first geotag, a first set of digital files including all of the digital files having the first geotag;

(iii) a first count value image partially overlapping or directly connected to the first user selectable thumbnail image, the first count value image including a first number that corresponds to the number of digital images in the first set of digital files;

(iv) a second user selectable thumbnail image at a second location on the interactive map corresponding to the geographic coordinates of a second geotag, a second set of digital files including all of the digital files having the second geotag; and

(v) a second count value image partially overlapping or directly connected to the second user selectable thumbnail image, the second count value image including a second number that corresponds to the number of digital images in the second set of digital files;

responsive to a click or tap of the first user selectable thumbnail image, displaying a first location view on the video display device, the displaying the first location view including displaying (i) a first location name corresponding to the first geotag, (ii) a scaled replica of each of the digital images in the first set of digital files, and (iii) a first map image indicating the geographic coordinates of the first geotag, the video display device not displaying the interactive map when the first location view is displayed thereon;

responsive to a click or tap of the second user selectable thumbnail image, displaying a second location view on the video display device, the displaying the second location view including displaying (i) a second location name corresponding to the second geotag, (ii) a scaled replica of each of the digital images in the second set of digital files, and (iii) a second map image indicating the geographic coordinates of the second geotag, the video display device not displaying the interactive map when the second location view is displayed thereon;

responsive to a click or tap of a first one of the displayed scaled replicas in the first location view, displaying a slideshow view on a video display device, the displaying the slideshow view including:

(i) displaying the digital image of a first of the digital files associated with the first scaled replica;

(ii) overlaying on the digital image of the first digital file a first mini-search engine tag, the first mini-search engine tag having a first boundary with alphanumeric text therein indicating a location name corresponding to the first geotag and the number of digital images in the plurality of digital files associated with the first geotag, the first mini-search engine tag being user selectable by a click or tap to display the first location view; and

(iii) overlaying on the digital image of the first digital file a second mini-search engine tag, the second mini-search engine tag having a second boundary with alphanumeric text therein indicating a name of a person corresponding to a person tag and the

Petitioner Apple Inc. - Ex. 1001, p. 71

US 9,552,376 B2

39

40

number of digital images in the plurality of digital files associated with the person tag, the second mini-search engine tag being user selectable by a click or tap to display a people view on the video display device, the people view including the name of the person corresponding to the person tag and all of the digital images in the plurality of digital files associated with the person tag.

\* \* \* \* \*

Petitioner Apple Inc. - Ex. 1001, p. 72

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 8,995 words, excluding the parts of the filing exempted by the Rules.

Dated: April 15, 2024                            _____/s/ Brian R. Matsui_____

ny-2657011