Nos. 23-2361, 24-1043, -1050, -1318, -1320

# United States Court of Appeals
# for the Federal Circuit

---

APPLE INC.

*Appellant*

v.

MEMORYWEB, LLC,

*Cross-Appellant*

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Case Nos. IPR2022-00031, IPR2022-00032, IPR2022-00033, and PGR2022-00006

---

## CROSS-APPELLANT MEMORYWEB LLC'S PRINCIPAL AND RESPONSE BRIEF

JENNIFER HAYES
NIXON PEABODY LLP
300 S. Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
Tel: 213-629-6000

DANIEL SCHWARTZ
MATTHEW WERBER
ANGELO CHRISTOPHER
NIXON PEABODY LLP
70 W. Madison Street, Suite 5200
Chicago, IL 60602-4378
Tel: 312-977-4400

*Counsel for Cross-Appellant MemoryWeb, LLC*

# EXEMPLARY PATENT CLAIMS

## U.S. Patent 11,017,020

**Claim 1:**

1. A method comprising:

 causing an interface to display a people view, the people view including:

  a first thumbnail image associated with a first person, a first name associated with the first person, a second thumbnail image associated with a second person, and a second name associated with the second person;

 responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including:

  a first digital file associated with the first person, the first name associated with the first person, and a first map image;

 responsive to an input that is indicative of a selection of the first map image in the first person view, causing a first location view to be displayed on the interface, the first location view including:

  an interactive geographic map, a first indication positioned at a first location on the interactive geographic map, and a second indication positioned at a second location on the interactive geographic map; and

 responsive to an input that is indicative of a selection of the first digital file in the first person view, causing a slideshow to be displayed on the interface, the slideshow including a plurality of images associated with the first person.

**Claim 13:**

13. The method of claim 3, further comprising responsive to an input that is indicative of a selection associated with the second person, causing a second person

view to be displayed on the interface, the second person view including the second digital file associated with the second person, the second name associated with the second person, and a second map image.

## U.S. Patent 9,522,376

**Claim 1:**

1. A computer-implemented method of displaying digital files, comprising:

storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having embedded therein content data and metadata including tags, the content data including a digital photograph or image or video, the metadata including a geotag indicative of geographic coordinates where the digital photograph or image or video was taken;

displaying a map view on a video display device, the displaying the map view including displaying:

(i) a representation of an interactive map, the representation of the interactive map comprising a majority portion of a first screenshot of the video display device;

(ii) a first user selectable thumbnail image at a first location on the interactive map corresponding to the geographic coordinates of a first geotag, a first set of digital files including all of the digital files having the first geotag;

(iii) a first count value image partially overlapping or directly connected to the first user selectable thumbnail image, the first count value image including a first number that corresponds to the number of digital photographs or images or videos in the first set of digital files;

(iv) a second user selectable thumbnail image at a second location on the interactive map corresponding to the geographic coordinates of a second geotag, a second set of digital files including all of the digital files having the second geotag; and

(v) a second count value image partially overlapping or directly connected to the second user selectable thumbnail image, the second count value image including a second number that corresponds to the number of digital photographs or images or videos in the second set of digital files;

responsive to a click or tap of the first user selectable thumbnail image, displaying a first location view on the video display device, the first location view comprising a majority portion of a screenshot of the video display device, the displaying the first location view including displaying (i) a first location name corresponding to the first geotag, (ii) a scaled replica of each of the digital photographs or images or videos in the first set of digital files, and (iii) a first map image indicating the geographic coordinates of the first geotag, the displayed scaled replicas of each of the digital photographs or images or videos in the first set of digital files not being overlaid on the first map image and the second screenshot of the video display device not including the interactive map; and

responsive to a click or tap of the second user selectable thumbnail image, displaying a second location view on the video display device, the second location view comprising a majority portion of a third screenshot of the video display device, the displaying the second location view including displaying (i) a second location name corresponding to the second geotag, (ii) a scaled replica of each of the digital photographs or images or videos in the second set of digital files, and (iii) a second map image indicating the geographic coordinates of the second geotag, the displayed scaled replicas of each of the digital photographs or images or videos in the second set of digital files not being overlaid on the second map image and the third screenshot of the video display device not including the interactive map.

## U.S. Patent 10,621,228

**Claim 1:**

1. A method comprising:

responsive to a first input, causing a map view to be displayed on an interface, the map view including:

    (i) an interactive map;

    (ii) a first location selectable thumbnail image at a first location on the interactive map; and

    (iii) a second location selectable thumbnail image at a second location on the interactive map;

responsive to an input that is indicative of a selection of the first location selectable thumbnail image, causing a first location view to be displayed on the interface, the first location view including (i) a first location name associated with the first location and (ii) a representation of at least a portion of one digital file in a first set of digital files, each of the digital files in the first set of digital files being produced from outputs of one or more digital imaging devices, the first set of digital files including digital files associated with the first location;

responsive to an input that is indicative of a selection of the second location selectable thumbnail image, causing a second location view to be displayed on the interface, the second location view including (i) a second location name associated with the second location and (ii) a representation of at least a portion of one digital file in a second set of digital files, each of the digital files in the second set of digital files being produced from outputs of the one or more digital imaging devices, the second set of digital files including digital files associated with the second location; and

responsive to a second input that is subsequent to the first input, causing a people view to be displayed on the interface, the people view including:

    (i) a first person selectable thumbnail image including a representation of a face of a first person, the first person being associated with a third set of digital files including digital photographs and videos;

    (ii) a first name associated with the first person, the first name being displayed adjacent to the first person selectable thumbnail image;

(iii) a second person selectable thumbnail image including a representation of a face of a second person, the second person being associated with a fourth set of digital files including digital photographs and videos; and

(iv) a second name associated with the second person, the second name being displayed adjacent to the second person selectable thumbnail image.

**Claim 15:**

15. The method of claim 1, further comprising:

responsive to an input that is indicative of a selection, in the first location view, of the representation of the at least a portion of the one digital file in the first set of digital files, causing a first digital file to be displayed on the interface; and

responsive to an input that is indicative of a selection, in the second location view, of the representation of the at least a portion of the one digital file in the second set of digital filed, causing a second digital file to be displayed on the interface.

## U.S. Patent 10,423,658

**Claim 1:**

1. A computer-implemented method of displaying at least a portion of a plurality of (i) digital photographs, (ii) videos, or (iii) a combination of (i) and (ii), each of the digital photographs and videos being associated with a geotag indicative of geographic coordinates where the respective digital photograph or video was taken, the method comprising:

displaying an application view on a video display device including displaying a plurality of selectable elements, the plurality of selectable elements including a location selectable element;

responsive to a click or tap of the location selectable element, displaying a map view on a video display device, the displaying the map view including displaying:

    (i) a representation of an interactive map;

    (ii) a first location selectable thumbnail image at a first location on the interactive map, the first location being associated with the geographic coordinates of a first geotag, a first set of digital photographs and videos including all of the digital photographs and videos associated with the first geotag;

    (iii) a first count value image partially overlapping the first location selectable thumbnail image, the first count value image including a first number that corresponds to the number of digital photographs and videos in the first set of digital photographs and videos;

    (iv) a second location selectable thumbnail image at a second location on the interactive map, the second location being associated with the geographic coordinates of a second geotag, a second set of digital photographs and videos including all of the digital photographs and videos associated with the second geotag; and

    (v) a second count value image partially overlapping the second location selectable thumbnail image, the second count value image including a second number that corresponds to the number of digital photographs and videos in the second set of digital photographs and videos;

responsive to a click or tap of the first location selectable thumbnail image, displaying a first location view on the video display device, the displaying the first location view including displaying (i) a first location name associated with the first geotag and (ii) a scaled replica of each of the digital photographs and videos in the first set of digital photographs and videos, the displayed scaled replicas of each of the digital photographs and videos in the first set of digital photographs and videos not being overlaid on the interactive map; and

responsive to a click or tap of the second location selectable thumbnail image, displaying a second location view on the video display device, the displaying the second location view including displaying (i) a second location name corresponding to the second geotag and (ii) a scaled replica of each of the digital photographs and videos in the second set of digital photographs and videos, the displayed scaled replicas of each of the digital photographs and videos in the second set of digital photographs and videos not being overlaid on the interactive map.

**Claim 3:**

The computer-implemented method of claim 1, further comprising responsive to a click or tap of a first one of the displayed scaled replicas in the first location view, displaying a first digital photograph associated with the first scaled replica in the first location view and a first map image indicating the geographic coordinates of the first geotag.

**Claim 7:**

The computer-implemented method of claim 5, further comprising responsive to a click or tap of the first person selectable thumbnail image, displaying a first person view, the displaying the first person view including displaying (i) the name associated with the first person and (ii) a scaled replica of each of the digital photographs and videos in the third set of digital photographs.

**Claim 8:**

The computer-implemented method of claim 7, wherein the displaying the first person view further includes displaying a first-person-location selectable element.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-2361, 2024-1043, 2024-1050, 2024-1318, 2024-1230

**Short Case Caption** Apple Inc. v. MemoryWeb, LLC

**Filing Party/Entity** MemoryWeb, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/02/2024

Signature: /s/ Jennifer Hayes

Name: Jennifer Hayes

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| MemoryWeb, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| George Dandalides | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES......................................................................1

JURISDICTIONAL STATEMENT ........................................................................2

INTRODUCTION ...................................................................................................3

COUNTER-STATEMENT OF THE ISSUES – APPLE APPEALS ......................6

STATEMENT OF THE ISSUES – MEMORYWEB APPEALS ............................6

STATEMENT OF THE CASE................................................................................7

    A.    The Inventions of the MemoryWeb Patents.................................................7

    B.    The Applied Art..........................................................................................11

    C.    Counter-Statement of the Case for Apple's Appeals .................................13

        1.    PGR2022-00006 ('020 Patent, Claims 13-16 and 45-48) ........13

            a)    Apple's Petition Does Not Address the "Second Map Image" Limitation....................................................13

            b)    Apple's Petition was Deficient ......................................15

            c)    The Board Rejected Apple's Arguments Again on Rehearing ........................................................................15

        2.    IPR2022-00032 ('376 Patent).....................................................16

            a)    Apple's Petition Contained a Critical Error ..................16

            b)    Apple's Obviousness Theory Was Based on a Flawed Premise ...........................................................................18

    D.    Statement of the Case for MemoryWeb's Appeals.............................20

        1.    IPR2022-00031 ('228 Patent, Claim 15) ...................................20

            a)    Apple Challenges the '228 Patent as Obvious over A3UM and Belitz..........................................................20

            b)    The Decision Ignored a Critical Error in Apple's Petition ..........................................................................22

        2.    IPR2022-00033 ('658 Patent, Claims 3-4 and 8-12)................23

            a)    Apple Challenges the '658 Patent as Obvious over A3UM and Belitz..........................................................23

            b)    The Board Found Claims 3-4 and 8-12 Unpatentable....25

c) The Board's Rehearing Decision Repeated the Same Errors ...........................................................................26

3. PGR2022-00006 ('020 Patent, Claims 1-5, 8-12, 17-37, 40-44, and 49-59) ..............................................................27

a) The "First Map Image" is Not Displayed "Responsive to" the Claimed "Input" .....................................27

b) The Board Finds that the "First Map Image" Does Not Need to be Displayed "Responsive To" the Claimed Input .......................................................................28

SUMMARY OF THE ARGUMENT ....................................................29

STANDARD OF REVIEW ..................................................................31

ARGUMENT ........................................................................................33

I. THE BOARD'S DETERMINATION THAT CLAIMS 13-16 AND 45-48 OF THE '020 PATENT ARE NOT UNPATENTABLE SHOULD BE AFFIRMED ....................................................................................33

A. The Board Did Not Abuse its Discretion in Rejecting Apple's Challenge to Claims 13-16 and 45-48 ................................33

1. Apple's Petition Did Not Address the "Second Map Image" Requirement ..............................................33

2. The Board Properly Rejected Apple's Attempt to Rewrite its Petition in its Reply .................................40

3. Apple's Case Law is Readily Distinguishable and Does Not Support Vacatur ........................................41

B. MemoryWeb's Claim Construction for the "First" and "Second" Map Images Provides an Alternative Ground for Affirmance .........................................................................43

1. The "First" and "Second" Map Images are Distinct Components of the Invention ..................................44

2. Apple Forfeited Any Argument that A3UM Discloses or Suggests Distinct "First" and "Second" Map Images ...............46

II. THE BOARD'S '376 PATENT DECISION SHOULD BE AFFIRMED....46

A. Apple's Obviousness Theory was Based on a Flawed Premise .........47

B. The Board Did Not Abuse its Discretion in Rejecting Apple's

            Belated Obviousness Theory in its Reply ...........................................51

    C.    The Board's Finding that Apple's Recast Obviousness Theory
            Failed on the Merits is Supported by Substantial Evidence ...............54

III.  THE BOARD ERRED IN FINDING CLAIM 15 OF THE '228 PATENT
      UNPATENTABLE...........................................................................................59

    A.    The Board's Findings are Inadequate and Misunderstood the
            Issues .................................................................................................60

    B.    The Board's Now-Final Fact Findings in the '376 Patent
            Proceeding Preclude the Argument in Apple's Petition ....................65

IV.  THE BOARD'S FINDING THAT CLAIMS 3-4 AND 8-12 OF THE '658
      PATENT ARE UNPATENTABLE SHOULD BE REVERSED ................68

    A.    The Board Erred in Finding Claims 3-4 Unpatentable ......................68

          1.    Apple's Reliance on an Erroneous Assertion Regarding A3UM
                 was not "Irrelevant" ....................................................................69

          2.    The Board's Obviousness Findings are Not Supported by
                 Substantial Evidence ..................................................................71

    B.    The Board's Findings for Dependent Claims 8-12 Should be
            Reversed Because They Are Based on an Erroneous Claim
            Interpretation .....................................................................................73

V.   THE BOARD'S FINDING THAT CLAIMS 1-5, 8-12, 17-37, 40-44, and
      49-59 OF THE '020 PATENT ARE UNPATENTABLE SHOULD BE
      REVERSED................................................................................................76

    A.    The Board Erred in Construing the Claims to Not Require that
            the "First Map Image" be Displayed "Responsive To" a
            Specific Input ....................................................................................77

    B.    The Decision Should be Reversed Regardless of Whether
            "Responsive To" Requires Direct Causation or Allows
            Intervening Inputs..............................................................................79

CONCLUSION AND RELIEF SOUGHT ............................................................82

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alacritech, Inc. v. Intel Corp.*,
966 F.3d 1367 (Fed. Cir. 2020) ......................................................60, 61, 71, 73

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020) ......................................................53, 59

*Arctic Cat Inc. v. Polaris Indus., Inc.*,
795 F.App'x 827 (Fed. Cir. 2019) ......................................................58, 73

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ......................................................54

*Axonics, Inc. v. Medtronic, Inc.*,
73 F.4th 950 (Fed. Cir. 2023) ......................................................56, 57

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
616 F.3d 1249 (Fed. Cir. 2010) ......................................................45

*CRFD Research, Inc. v. Matal*,
876 F.3d 1330 (Fed. Cir. 2017) ......................................................42, 43

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015) ......................................................58

*Ericsson Inc. v. Intell. Ventures I LLC*,
901 F.3d 1374 (Fed. Cir. 2018) ......................................................52

*Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed. Cir. 2005) ......................................................44

*Google LLC v. Conversant Wireless Licensing S.A.R.L.*,
753 F.App'x 890 (Fed. Cir. 2018) ......................................................60, 62, 64

*Google LLC v. Hammond Dev. Int'l, Inc.*,
54 F.4th 1377 (Fed. Cir. 2022) ......................................................65, 66, 67

iv

*Henny Penny Corp. v. Frymaster LLC*,
    938 F.3d 1324 (Fed. Cir. 2019) ...........................................32, 40, 58

*In re Comiskey*,
    554 F.3d 967 (Fed. Cir. 2009) ...........................................................43

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ...........................................................72

*In re Keller*,
    642 F.2d 413 (CCPA 1981) ...............................................................72

*In re Lee*,
    277 F.3d 1338 (Fed. Cir. 2002) ...................................................32, 60

*In re Magnum Oil Tools Int'l, Ltd.*,
    829 F.3d 1364 (Fed. Cir. 2016) ..........................................61, 62, 81

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*,
    821 F.3d 1359 (Fed. Cir. 2016) ...................................................34, 40

*MaxLinear, Inc. v. CF CRESPE LLC*,
    880 F.3d 1373 (Fed. Cir. 2018) ........................................................66

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
    403 F.3d 1364 (Fed. Cir. 2005) ........................................................64

*Netflix, Inc. v. DivX, LLC*,
    84 F.4th 1371 (Fed. Cir. 2023) ..................................................*passim*

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
    952 F.3d 1336 (Fed. Cir. 2020) ........................................................31

*Pers. Web Techs., LLC v. Apple, Inc.*,
    848 F.3d 987 (Fed. Cir. 2017) ..........................................................60

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................31

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
   882 F.3d 1056 (Fed. Cir. 2018) ..................................................31, 32

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004) ..................................................45, 75

*Praxair Distrib., Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*,
   890 F.3d 1024 (Fed. Cir. 2018) ..........................................................31

*SAS Inst., Inc. v. Iancu*,
   138 S. Ct. 1348 (2018).................................................................33, 43

*TQ Delta, LLC v. Cisco Sys., Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019) ..................................................60, 64

*Uniloc 2017 LLC v. Facebook, Inc.*,
   2021 WL 5370490 (Fed. Cir. Nov. 18, 2021) .............................41, 42

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
   17 F.4th 155 (Fed. Cir. 2021) ..............................................................32

*Wi-Lan, Inc. v. Apple, Inc.*,
   811 F.3d 455 (Fed. Cir. 2016) ....................................................45, 74

*Winner Int'l Royalty Corp. v. Wang*,
   202 F.3d 1340 (Fed. Cir. 2000) ..........................................................58

*Yita LLC v. MacNeil IP LLC*,
   69 F.4th 1356 (Fed. Cir. 2023) ..................................................52, 53

**Statutes**

5 U.S.C. § 706(2) .......................................................................................32

28 U.S.C. § 1295(a)(4)(A) ...........................................................................2

35 U.S.C. § 141(c) ........................................................................................2

35 U.S.C. § 312(a)(3).................................................................................34

35 U.S.C. § 318 .............................................................................................2

**35 U.S.C. § 319** ..................................................................................2

**Rules and Regulations**

37 C.F.R. § 42.23(b) ..........................................................................40

37 C.F.R. § 90.3(a)(1) .........................................................................2

37 C.F.R. § 42.104(b)(3).....................................................................64

37 C.F.R. § 42.104(b)(5).....................................................................51

**Other Authorities**

Fed. Cir. R. 28(j) ..................................................................................7

U.S. Patent Trial and Appeal Board, Consolidated Trial Practice
Guide (Nov. 2019) ..............................................................................64

## STATEMENT OF RELATED CASES

No other appeal from these proceedings has previously been before this or any other appellate court. The following proceedings may be directly affected by this Court's decision in these appeals:

- *MemoryWeb, LLC v. Samsung Electronics Co., Ltd.*, Nos. 24-1315, -1316 (Fed. Cir.);

- *MemoryWeb, LLC v. Samsung Electronics Co., Ltd.*, No. 24-1332 (Fed. Cir.);

- *MemoryWeb, LLC v. Unified Patents, LLC*, No. 24-1328 (Fed. Cir.);

- *MemoryWeb, LLC v. Apple Inc.*, 3:21-cv-09839-VC (N.D. Cal.); and

- *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et al*, 3:22-cv-03776-VC (N.D. Cal.).

Counsel is aware of no other case that may directly affect or be directly affected by the outcome of this appeal.

# JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. §§ 6(b) and 311 et seq. and issued its Final Written Decisions under 35 U.S.C. § 318 on June 7, 2023 in PGR2022-00006 (Appx1), May 18, 2023 in IPR2022-00033 (Appx273), and November 17, 2023 in IPR2022-00031 (Appx170). The Board denied Apple's rehearing request in PGR2022-00006 on August 3, 2023 (Appx105) and denied MemoryWeb's rehearing request in IPR2022-00033 on November 22, 2023 (Appx360). MemoryWeb timely appealed the Board's Decisions in IPR2022-00033 (Appx40046-40047) and IPR2022-00031 (Appx23347-23348) on January 3, 2024, and timely cross-appealed in PGR2022-00006 (Appx1576-1578) on October 5, 2023. 37 C.F.R. § 90.3(a)(1). This Court ordered consolidation. Dkt. 3; Dkt. 4. This Court has jurisdiction under 35 U.S.C. §§ 141(c) and 319 and 28 U.S.C. § 1295(a)(4)(A).

## INTRODUCTION

This appeal arises from three *inter partes* reviews and one post-grant review involving MemoryWeb's '020, '376, '228, and '658 Patents (collectively, "the MemoryWeb Patents") that are directed to systems and methods for managing digital files such as digital photographs, allowing users to capture and connect their memories by organizing, viewing, and preserving their digital files via an interactive interface in a novel way.

Apple appeals the Board's Decisions finding claims 13-16 and 45-48 of the '020 Patent and all claims of the '376 Patent not unpatentable. MemoryWeb appeals the Board's Decisions finding claim 15 of the '228 Patent, claims 3-4 and 8-12 of the '658 Patent, and claims 1-5, 8-12, 17-37, 40-44, and 49-59 of the '020 Patent unpatentable.[1] Each of the Board's Decisions are based on the Aperture 3 User Manual ("A3UM").

With respect to the '020 Patent, Apple presents the issue on appeal as a purported failure by the Board to consider its argument that A3UM discloses a "second map image." But the Board considered Apple's arguments twice and concluded that the Petition was silent about the "second map image." Because Apple

---

[1] MemoryWeb is not appealing the Board's unpatentability determinations for the other claims of the '228, '658, and '020 Patents.

does not show that the Board abused its discretion, the Court should affirm the Board's findings that claims 13-16 and 45-48 of the '020 Patent are not unpatentable.

With respect to the '376 Patent, Apple argues that the Board abused its discretion in finding that the Petition was based on a flawed premise. The Board's reading of the Petition, however, was well-founded: Apple argued that A3UM discloses two steps that would be combined in its obviousness theory, but, as Apple now concedes, the second step is not disclosed by A3UM. The Board rightly rejected Apple's attempt to correct this flaw in the Petition through its Reply. The Board also considered Apple's new obviousness arguments on the merits and rejected them. Those findings are supported by substantial evidence. The Court should therefore affirm the Decision finding claims 1-12 of the '376 Patent not unpatentable.

The Court should reverse or vacate the Board's finding that claim 15 of the '228 Patent is unpatentable. Apple's Petition made the same erroneous assertion regarding A3UM that it made in the '376 Patent proceeding. In finding claim 15 of the '228 Patent unpatentable, the Board ignored this mistake, misunderstood MemoryWeb's arguments, and failed to make any fact findings about A3UM. At a minimum, the Decision must be vacated because the Board's analysis is inadequate. Additionally, issue preclusion requires reversal of the Decision because Apple does not appeal the Board's findings on the same issue in the '376 Patent proceeding.

With respect to the '658 Patent, for claims 3-4, Apple's Petition again relied on the same erroneous assertion that was fatal to its challenge to the '376 Patent. The Board's finding that this error was "irrelevant" cannot stand because Apple's challenge was predicated on that assertion. Moreover, the Board's obviousness findings for claims 3-4 are conclusory and lack substantial evidence. The Board erred by interpreting claims 8 and 11 such that the "person-location selectable" element does not need to be displayed "responsive to" the claimed input. This finding should be reversed, and the Decision vacated and remanded.

For the appealed claims in the '020 Patent that were found unpatentable, the Board declined to resolve the parties' claim construction dispute regarding the meaning of "responsive to." Instead, the Board interpreted the claims such that the "first map image" does not need to be displayed "responsive to" the claimed input. This interpretation is inconsistent with the contextual claim language and should be reversed. The Board also erred in finding that A3UM discloses the first map image under MemoryWeb's construction even though A3UM lacks the required cause-effect relationship. This Decision should also be reversed, or at least vacated and remanded.

**COUNTER-STATEMENT OF THE ISSUES – APPLE APPEALS**

1.      Did the Board abuse its discretion in finding that the '020 Patent Petition was silent regarding the "second map image" limitation and Apple's Reply improperly introduced a new obviousness rationale?

2.      Did the Board abuse its discretion by finding Apple's '376 Patent Petition was predicated on an incorrect factual assertion? Did the Board correctly find that Apple's Reply presented a new obviousness theory? Did the Board correctly find that Apple's new obviousness theory failed?

**STATEMENT OF THE ISSUES – MEMORYWEB APPEALS**

1.      Do the Board's failure to make fact findings in the '228 Decision for claim 15 and misunderstanding of MemoryWeb's arguments require vacatur?

2.      Apple's challenge to claim 15 of the '228 Patent was predicated on the same erroneous factual assertion that resulted in the Board's finding that the '376 Patent was not unpatentable. Does issue preclusion flowing from the Board's now-final fact finding in the '376 Decision require reversal?

3.      The Board found claims 3-4 of the '658 Patent obvious despite Apple's reliance on the same erroneous factual assertion it made in the '376 Patent proceeding. Did the Board err in finding claims 3-4 obvious despite the deficiencies in Apple's Petition and unrebutted evidence that such a modification would not have been obvious?

4.      Claims 8-12 of the '658 Patent require that the "person-location selectable element" be displayed "responsive to" the claimed click or tap. Did the Board err in construing claims 8 and 11 to read out the "responsive to" requirement?

5.      Claims 1 and 31 of the '020 Patent require that the "first map image" be displayed "responsive to" the claimed input.

a.      Did the Board err in finding that the "responsive to" requirement does not apply to displaying the "first map image"?

b.      Did the Board err in finding that A3UM discloses a cause-effect relationship between displaying a first map image and the input where Apple failed to argue this and MemoryWeb presented unrebutted evidence to the contrary?

## STATEMENT OF THE CASE

**A.    The Inventions of the MemoryWeb Patents[2]**

During a time of explosive growth in the field of digital photography, the inventors recognized that then-existing technology failed to provide a way to easily organize, view, and display digital photos and videos. Appx240 (1:35-51), Appx245

---

[2] Pursuant to Fed. Cir. R. 28(j), MemoryWeb states that this section is substantially duplicative of content in briefs for related cases *MemoryWeb, LLC v. Unified Patents, LLC*, No. 24-1328, *MemoryWeb, LLC v. Samsung Electronics Co., Ltd.*, Nos. 24-1332, -1315, -1316.

(12:58-62), Appx246 (13:1-7).[3] While prior systems provided some organizational functionality, they all suffered from the same inability to easily organize and navigate the expanding volume of digital files. Appx240 (1:43-51).

The MemoryWeb Patents address the limitations of prior photo management systems by disclosing and claiming novel methods for organizing and displaying digital files "allow[ing] people to organize, view, preserve and share these files with all the memory details captured, connected, and vivified via an interactive interface." Appx240 (1:56-60). The patents disclose and claim novel and specific navigation pathways through a variety of "views" with different content in order to "save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience." Appx240 (2:51-55).

For example, the MemoryWeb Patents disclose an interactive map view with photos displayed "as photo thumbnails . . . on the map." Appx254 (29:32-39).

---

[3] The MemoryWeb Patents are related continuations and share materially the same specification. Citations in this Section are to the '376 Patent.



Appx230 (FIG. 41)

A user can select a thumbnail to see all photos from the same location. Appx254 (29:34-36). The patents disclose a "location view" which displays the "individual location name" and "[t]humbnails of each Digital File within the specific collection." Appx251 (24:22-28).



Appx223 (FIG. 34) (cropped)

9

The MemoryWeb Patents also disclose a "people view" which displays a thumbnail of each person's face along with their name. Appx250 (22:43-57).



Appx221 (FIG. 32) (cropped)

From within the people view, a user can select an individual's thumbnail and navigate to a "person view" that includes the person's name, a profile photo, and photos associated with that person. Appx250-251 (22:63-23:20).



Appx221 (FIG. 32) (excerpted)

These and other views containing specific content are interconnected in novel ways that allow users to intuitively navigate their web of memories.

**B. The Applied Art**

Apple relied on A3UM as the primary reference in each proceeding. A3UM relates to Apple's Aperture 3 photo editing and management software. Appx2463.

The A3UM interface is divided into multiple areas, including an Inspector pane, a Toolbar, a Viewer, and a Browser. Appx2507.



Appx2507

Relevant to the issues in these appeals, A3UM describes a "Places" view where images are organized by location. Appx2542, Appx2896. In this view, a map with pins indicating where photos were taken is displayed in the Viewer.



Appx2897

When a pin on the map is selected, the images associated with the selected location are shown in the Browser. Appx2897. When an image in the Browser is selected, a location label is displayed above the corresponding pin. Appx2896-2897.



Appx2897

## C.    Counter-Statement of the Case for Apple's Appeals

### 1.    PGR2022-00006 ('020 Patent, Claims 13-16 and 45-48)

Apple appeals the Board's holding that claims 13-16 and 45-48 of the '020 Patent are not unpatentable. Apple Br. at 21-31; Appx83-85.

#### a)    Apple's Petition Does Not Address the "Second Map Image" Limitation

Claims 1 and 31 of the '020 Patent recite a "first person view" that includes a "first map image." Appx444 (35:26-31), Appx445 (37:64-38:3). Dependent claims 13 and 45 are directed to displaying "a second person view" that includes a "second map image." Appx444 (36:22-28), Appx446 (39:9-15). The following is the sum total of Apple's contentions for claims 13 and 45 in the Petition:

13

A3UM discloses providing the same functionality for each face identified by the system, including showing that person in Faces view, displaying their name within A3UM's overall user interface. . . . Because A3UM discloses or renders obvious these features with respect to a "first person" (claims 1 and 31), A3UM discloses or renders obvious these features with respect to a "second person."

Appx747-748.

In response, MemoryWeb argued that Apple failed to address the "second map image." Appx1064. Apple's expert, Dr. Terveen, confirmed that he had not addressed the "second map image" in his declaration; instead, he testified that "the implication of what [he] wrote" was that the **_same_** element in A3UM satisfies both the "first" and "second" map image limitations. Appx10457-10458 (288:16-290:1). Notwithstanding that testimony, Dr. Terveen admitted that "the ordinary meaning of 'first map image' is different than the ordinary meaning of 'second map image.'" Appx10457 (291:16-19). Confronted with his own testimony, Dr. Terveen conceded that he would need to "revise" or "revisit" his opinions if the first and second map images are different. Appx10458 (290:12-291:12). Consistent with these admissions, MemoryWeb proposed construing the "second" map image to be distinct from the "first" map image. Appx988-990.

In reply, Apple argued that the first and second map images can be the same thing. Appx1304-1305. Apart from its response to MemoryWeb's claim construction, Apple's only substantive reply for claims 13 and 45 was as follows:

14

> Patentee's response on these claims presumes that the first/second map image cannot be the same image, and that visual aspects of the first and second map have patentable significance. Response 87-89. Neither is true.

Appx1335. Notably, the Reply never clarified what feature(s) in A3UM allegedly corresponded to the second map image. *Id*.

### b) Apple's Petition was Deficient

The Board found claims 13-16 and 45-48 not unpatentable because "the Petition as originally filed lacks any discussion of a second map image or how A3UM teaches or suggests this subject matter." Appx83 (citing Appx747-748). The Board found that Apple's Petition was "completely silent—or at best unclear—about what Petitioner regards as the first and second map images." Appx84. The Board also found that to the extent Apple's Reply argued that A3UM's Places button was both the first and second map images, that "would be an entirely new rationale that has no basis in the Petition" and therefore improper. Appx85.

### c) The Board Rejected Apple's Arguments Again on Rehearing

The Board denied Apple's rehearing request arguing that the Board misinterpreted the Petition. *See* Appx106. The Board thoroughly considered Apple's arguments but maintained that "even under a reading of the Petition favorable to [Apple], the challenge to claims 13 and 45 fails." Appx109. The Board also reiterated that Apple's Reply arguments were improper. Appx112.

### 2. IPR2022-00032 ('376 Patent)

Apple appeals the Board's holding that claims 1-12 of the '376 Patent are not unpatentable. Apple Br. at 31-48; Appx154-157.

### a) Apple's Petition Contained a Critical Error

Claim 1 of the '376 Patent recites "displaying a first location view" in response to "a click or tap of the first user selectable thumbnail image" in a previously displayed "map view" that includes an "interactive map." Appx516 (35:51-60). The first location view comprises "a majority portion of a [second] screenshot of the video display device," where the second screenshot does not include the interactive map from the map view. Appx516 (35:53-55), Appx516 (35:63-65). Independent claims 5 and 12 contain similar limitations. Appx517 (37:6-14), Appx517 (38:28-37).

Apple's Petition proposed combining two steps associated with A3UM's Places view. The first step involved "selecting a pin on the interactive map to display a thumbnail representation of all photos matching that location in the Browser" below the Places map. Appx11559.



Appx13497

The second step involved "[s]electing a thumbnail in the Browser" to "prompt[] the display of the original digital image in the Viewer" such that the resulting "display will be the digital image . . . represented by the thumbnail in the Browser ('not including the interactive map')." *Id*. Apple argued that "it would have been obvious to modify A3UM to combine these two steps." Appx11562-11563.

MemoryWeb argued that A3UM does ***not*** disclose replacing the Places map with a full-size image when a thumbnail is selected in the Browser. Appx11880-11882; Appx13495-13496; Appx21190-21192 (¶¶154-157); Appx20979-20980 (152:10-154:22); Appx21061 (323:7-324:16). Rather, A3UM discloses that selecting a thumbnail in the Browser causes a location label to appear above a pin on the map. *Id*. Apple's Petition never proposed modifying A3UM so that a full-size

17

image would be displayed instead of the Places map because it incorrectly assumed that A3UM already disclosed this. Appx11556-11566.

MemoryWeb established that even if Apple had proposed such a modification, a skilled artisan would not modify A3UM so that the Places map is replaced with a full-size image. Appx11880-11887. This is because the functionality of the Places map is intertwined with the Browser: selecting a thumbnail in the Browser highlights the corresponding pin on the map, while selecting a pin on the map highlights corresponding thumbnails in the Browser. *Id.* Replacing the map with an image would destroy that functionality and require additional user actions. Appx11885-11888.

Apple's Reply did not dispute that the Petition was wrong about what A3UM discloses. *See* Appx11956-11959. Instead, Apple argued that the Petition proposed modifying A3UM to include the second step. Appx11958-11959. In reply to MemoryWeb's evidence of non-obviousness, Apple merely argued that its proposed modification would be simple to implement. Appx11961-11962.

### b) Apple's Obviousness Theory Was Based on a Flawed Premise

In finding the '376 Patent not unpatentable, the Board held that Apple's Petition was "based on an incorrect assertion about how A3UM's Places view works" and that "in the Petition as originally filed, [Apple] has not shown that A3UM teaches or suggests 'the second screenshot of the video display device not

18

including the interactive map.'" Appx157. The Board agreed that selecting a thumbnail in the Browser does ***not*** display a full-size image in the Viewer. Appx154-157.

The Board considered Apple's post-hoc characterizations of the Petition in its Reply, but "disagree[d] that the Petition contains any such analysis." Appx157-158. This is because Apple's Petition argued that A3UM discloses replacing the Places map with a full-size image and that this functionality would be "retained" rather than added or modified. Appx158. The Board ruled that "the Petition provided no relevant obviousness rationale," and Apple's attempt to do so in its Reply violated the Board's rules. Appx159.

Despite the impropriety of Apple's Reply, the Board nevertheless considered and rejected Apple's arguments. Appx161-163. The Board weighed the relevant evidence and credited MemoryWeb's expert over Apple's. Appx163. The Board found Apple's proposed modification would result in "removing features from the Places view with no discernable benefit." Appx162. The Board also found Apple's theory flawed because the modification would "create[] an inefficiency that did not exist in A3UM" and "then purport[] to improve" that inefficiency. Appx161.

**D.    Statement of the Case for MemoryWeb's Appeals**

**1.    IPR2022-00031 ('228 Patent, Claim 15)**

Apple challenged claims 1-19 of the '228 Patent based on A3UM and Belitz. Appx21839. Dependent claim 15 is directed to "causing a [first/second] digital file to be displayed on the interface" responsive to an input "in the [first/second] location view." Appx591 (37:1-11).

**a)    Apple Challenges the '228 Patent as Obvious over A3UM and Belitz**

For the first/second "location view" limitations in claim 1 (Appx590 (35:43-49, 35:53-60)), Apple relied on A3UM's Places view. Appx21875-21878.



Appx24390

Apple argued that when a red pin on the map is selected: (1) a "callout" with a location name is displayed above the selected pin and (2) thumbnails are displayed in the Browser. Appx21876-21877.

To address the "causing a [first/second] digital file to be displayed on the interface" limitation in claim 15 (Appx591 (37:1-11)), Apple argued that in the Places view, selecting a thumbnail in the Browser displays a full-size image in the Viewer. Appx21908. Apple further argued that when combined with Belitz, "the A3UM technique of selecting the thumbnail in the Browser to prompt the display of the full image would be retained." Appx21909.

As it did in the '376 Patent proceeding (*supra* § B.1), MemoryWeb established that A3UM does ***not*** disclose displaying a full-size image when a thumbnail is selected in the Browser in the Places view. Appx22239-22241. While A3UM is capable of displaying an image in the Viewer in certain implementations unrelated to Apple's assertions, that functionality does not apply to the Places view. Appx22240-22241; Appx33304-33305 (¶¶193-194); Appx33078-33079 (152:10-154:22); Appx33160 (323:7-324:16).

Apple did not dispute this. Instead, Apple claimed its "Petition contended it would have been obvious to cause the Browser to display a full-size image in the Viewer when a thumbnail is clicked." Appx22474. MemoryWeb objected to Apple's

new theories for claim 15 and, despite their impropriety, nevertheless presented evidence rebutting Apple's positions. Appx22389-22391.

### b) The Decision Ignored a Critical Error in Apple's Petition

The Board found claims 1-19 unpatentable. Appx270. For claim 15, the Board summarized the parties' arguments but made no findings as to how A3UM and Belitz disclose or suggest the subject matter of claim 15. Appx263-266. Instead, the Board stated that it did "not see a connection between Patent Owner's contention that the A3UM 'Browser does not replace the map with a full-size image' and the language of claim 15." Appx265 (quoting Appx22389). The Board further stated that "[n]owhere does claim 15 . . . recite a requirement to 'replace the map with a full-size version of the image.'" *Id*. The Board made these findings despite acknowledging that Apple's Petition argued that A3UM discloses displays an image in the Viewer in the Places view when a thumbnail in the Browser is selected. Appx263 (citing Appx21908).

The Board ignored MemoryWeb's arguments that Apple's Reply improperly introduced a new obviousness theory and claim construction. Appx265-266. The Board seemingly agreed with Apple that the phrase "responsive to" allows intervening user actions but did not issue a formal construction or explain how this interpretation had any bearing on the outcome. Appx266.

### 2.    IPR2022-00033 ('658 Patent, Claims 3-4 and 8-12)

#### a)    Apple Challenges the '658 Patent as Obvious over A3UM and Belitz

Apple challenged claims 1-2 and 5-15 of the '658 Patent based on A3UM and Belitz and claims 3-4 based on A3UM, Belitz, and Rasmussen. Appx39269.

#### (1)    Apple Did Not Meet its Burden for Claims 3-4

Claim 3 recites displaying two features responsive to a click or tap of a scaled replica in a displayed first location view: (1) "a first digital photograph associated with the first scaled replica in the first location view" and (2) "a first map image indicating the geographic coordinates of the first geotag." Appx661 (36:15-20).

Apple's expert opined "[s]electing a thumbnail in the Browser then prompts the display of the original digital image in the Viewer, which replaces the Places map view." Appx40477-40478 (¶194); *see also* Appx40481 (¶198). Relying on this assertion, Dr. Terveen proposed "modifying A3UM so that selecting a photo in the browser, in addition to displaying that photo in the Viewer, would (optionally) automatically display the Map Pane at the bottom of the Inspector pane." Appx40481-40482 (¶199); Appx39344. Similar to the '376 Patent proceeding, MemoryWeb presented evidence that this assertion was incorrect. *Supra* § C.2.a; Appx39660-39661; Appx39822. MemoryWeb also presented evidence that a skilled artisan would not modify A3UM to include this functionality. Appx39822-39823.

### (2)    A3UM Does Not Disclose Displaying a "Person-Location Selectable Element" Under MemoryWeb's Construction

Dependent claims 7 and 10 recite: "responsive to a click or tap of the [first/second] person selectable thumbnail image, displaying a [first/second] person view." Appx661 (36:56-62), Appx662 (37:4-11). Claims 8 and 11 depend from claims 7 and 10, respectively, and recite "wherein the displaying the [first/second] person view further includes displaying a [first/second]-person-location selectable element." Appx661 (36:63-65), Appx662 (37:12-15).

Apple argued that in A3UM, the "Places links in the Library inspector" (illustrated below) was a "person-location selectable element." Appx39328-39329.



Appx39329 (annotating Appx40974)

Apple also identified A3UM's "Places toolbar button" as another "person-location selectable element." Appx39329.

MemoryWeb's Response demonstrated that the phrase "responsive to" requires a cause-effect relationship between (1) the click or tap in the people view and (2) displaying the person-location selectable element. Appx39599-39604; Appx39805-39807. In A3UM, neither alleged person-location selectable element is displayed "responsive to" the claimed click or tap because they are always displayed by default. Appx39662-39664; Appx39818-39820. That is, there is no causal connection between the relevant input and displaying the alleged person-location selectable element. *Id.*

In reply, Apple argued that "responsive to" "encompasses methods that include intervening actions by a user to enable or that are associated with the displaying action." Appx39882. Apple also argued that claim 8 only requires "that the person view further includes displaying the specified element." Appx39908. But Apple never disputed that A3UM fails to disclose displaying a person-location selectable element under MemoryWeb's construction. Appx39907- Appx39908; Appx39819. Nor did Apple explain how A3UM discloses displaying a person-location selectable element under its construction. *Id.*

### b)    The Board Found Claims 3-4 and 8-12 Unpatentable

The Board found all claims of the '658 Patent unpatentable. Appx357. For claims 3-4, the Board deemed Dr. Terveen's erroneous testimony about how A3UM's Places view works "irrelevant" because Apple purportedly did not rely on

that testimony for its "alternative theory." Appx355. The Board also found that it would have been obvious to modify A3UM to replaces the Places map with a full-size image, even though Apple did not argue this in the Petition or present any evidence to this effect. Appx354-355.

For claims 8-12, the Board declined to resolve the parties' dispute regarding the meaning of "responsive to." Instead, the Board found that "all claims 8 and 11 require is 'that the person view further includes displaying the specified element—it does not require independently displaying those elements.'" Appx346 (citing Appx39908). In other words, the Board interpreted the claims such that the "[first/second]-person-location selectable element[s]" in claims 8 and 11 do not need to be displayed "responsive to" the claimed "click or tap." *Id*. On that basis, the Board found that A3UM discloses claims 8 and 11. Appx347.

### c)    The Board's Rehearing Decision Repeated the Same Errors

MemoryWeb requested rehearing of the Board's findings for claims 3-4 and 8-11. For claims 3-4, the Rehearing Decision again ignored MemoryWeb's explanation as to why Dr. Terveen's incorrect assertion about A3UM's Places view was not "irrelevant." Appx40021-40027; Appx366-368. The Rehearing Decision acknowledged MemoryWeb's evidence of non-obviousness but rejected it in cursory fashion without explaining why one would have modified A3UM's Places view. Appx367.

26

For claims 8-12, MemoryWeb explained that the Board's construction ignored claim language specifying that "***the displaying** the first person view **further includes displaying*** a first-person-location selectable element." Appx40028-40030 (emphasis added). Based on antecedent basis, the phrase "the displaying the first person view" refers back to claim 7, which requires that this step occurs "responsive to a click or tap of the first person selectable thumbnail image." *Id*. In the Rehearing Decision, the Board merely stated, without more, that it addressed this claim language "on pages 73-74 of the" Decision. Appx368.

### 3.    PGR2022-00006 ('020 Patent, Claims 1-5, 8-12, 17-37, 40-44, and 49-59)

#### a)    The "First Map Image" is Not Displayed "Responsive to" the Claimed "Input"

Claim 1 of the '020 Patent recites "displaying a people view" including content for a "first person" and a "second person." Appx444 (35:18-23). Claim 1 also recites "causing a first person view to be displayed" that includes "a first map image." Appx444 (35:26-31). The first person view is displayed "responsive to an input that is indicative of a selection associated with the first person." Appx444 (35:25-26). Claim 31 includes similar limitations. Appx445 (37:64-38:3).

MemoryWeb argued that the phrase "responsive to" should be construed to require a cause-effect relationship between (1) the input that causes the first person view to be displayed and (2) displaying the first map image in the first person view.

27

Appx984-990; Appx1222-1224. MemoryWeb demonstrated that the alleged first map images Apple identified in A3UM were displayed by default such that there was no cause-effect relationship with the relevant input. Appx1036-1042.

Apple replied that "responsive to" allows "intervening actions by the computer and/or a user that enable or are directly associated with 'causing' the action." Appx1304. Apple also argued that the claims do not require that the first map image be displayed "responsive to" the input that displays the first person view. Appx1324. Notably, Apple did not dispute that A3UM does not disclose displaying a first map image under MemoryWeb's construction. Appx1323-1324.

### b) The Board Finds that the "First Map Image" Does Not Need to be Displayed "Responsive To" the Claimed Input

In finding claims 1-5, 8-12, 17-37, 40-44, and 49-59 unpatentable, the Board declined to resolve the dispute regarding the meaning of "responsive to" because, in the Board's view, the claims do "not require causing a map image to be displayed on the interface in response to an input." Appx54. In other words, the Board found the phrase "responsive to" inapplicable to the first map image. *Id*.

The Board also found that A3UM discloses displaying the first map image under MemoryWeb's construction. Appx56-59. The Board reached this conclusion despite MemoryWeb's unrebutted evidence establishing that the required cause-effect relationship is not disclosed in A3UM.

## SUMMARY OF THE ARGUMENT

I.    The Court should affirm the Board's holding in PGR2022-00006 that claims 13-16 and 45-48 of the '020 Patent are not unpatentable. Apple frames the issue as a purported failure by the Board to properly consider its arguments. But the Board thoroughly considered Apple's arguments for these claims twice—once in the Decision and again in the Rehearing Decision. After carefully examining Apple's Petition, the Board concluded that Apple's silence regarding the claimed "second map image" resulted in a failure of proof. Apple does not show an abuse of discretion.

II.    The Court should affirm the Board's holding in IPR2022-00032 that claims 1-12 of the '376 Patent are not unpatentable. The Board properly rejected Apple's challenge because its Petition was predicated on an incorrect assertion about A3UM's disclosure. Apple's post-hoc characterizations do not change that its original argument was built on a faulty premise. The Board correctly found that Apple's attempt to recast its argument in Reply was improper. And contrary to Apple's suggestions, the Board went so far as to address Apple's Reply arguments and rejected them. The Board's finding of non-obviousness is supported by substantial evidence.

III.    The Court should reverse, or at least vacate, the Board's finding in IPR2022-00031 that claim 15 of the '228 Patent is unpatentable. Apple made the

same erroneous assertion about A3UM's disclosure that it made in the '376 Patent proceeding. In nevertheless finding claim 15 unpatentable, the Board made no express findings as to how A3UM purportedly discloses the subject matter of claim 15. Instead, the Board mischaracterized MemoryWeb's arguments and the issues to excuse Apple's failure of proof. Additionally, the Board's non-appealed fact findings in the '376 Decision have preclusive effect. The Decision should be reversed because Apple's challenge to claim 15 is based on the same assertion it lost in the '376 Patent proceeding.

IV.    The Court should reverse the Board's findings in IPR2022-00033 that claims 3-4 and 8-12 of the '658 Patent are unpatentable. For claims 3-4, the Board wrongly excused Apple's erroneous assertion about A3UM's disclosure as "irrelevant" even though it was a fundamental assumption in Apple's theory. The Board's obviousness findings are also conclusory and lack substantial evidence. For claims 8-12, the Board improperly construed claims 8 and 11 so that the "person-location selectable" element does not need to be displayed "responsive to" the claimed input, even though the plain claim language requires this.

V.    The Court should reverse, or at least vacate, the Board's findings in PGR2022-00006 that claims 1-5, 8-12, 17-37, 40-44, and 49-59 of the '020 Patent are unpatentable. Rather than resolving the parties' dispute regarding the meaning of "responsive to," the Board found that the "first map image" in the "first person

view" does not need to be displayed "responsive to" the claimed input. This finding is inconsistent with the plain claim language, which requires that all features of the "first person view" be displayed "responsive to" the claimed input.

The Board also erred in finding that A3UM discloses displaying the first map image under MemoryWeb's construction for "responsive to." Undisputed evidence demonstrated that there is no cause-effect relationship between the relevant input and displaying the alleged first map image in A3UM. Instead, the alleged first map image is displayed by default and has no connection to the relevant input. The lack of evidence supporting the Board's conclusion is underscored by Apple's failure to argue otherwise.

## STANDARD OF REVIEW

Claim constructions are reviewed *de novo* and factual findings regarding extrinsic evidence are reviewed for substantial evidence. *Praxair Distrib., Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*, 890 F.3d 1024, 1031 (Fed. Cir. 2018). The *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), claim construction standard applies to these proceedings. *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 n.2 (Fed. Cir. 2020).

This Court reviews the Board's legal conclusions on obviousness *de novo* and its underlying factual findings for substantial evidence. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1064 (Fed. Cir. 2018). The Court will reverse decisions

where the Board's factual findings lack substantial evidence. *See, e.g.*, *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155 (Fed. Cir. 2021). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *Polaris*, 882 F.3d at 1064.

"The Board is entitled to discretion in how it interprets petitions." *Netflix, Inc. v. DivX, LLC*, 84 F.4th 1371, 1377 (Fed. Cir. 2023). The Board does not err when it rejects "additional, new arguments not contained in the petition." *Id*.

This Court reviews the Board's decisions under the Administrative Procedure Act ("APA") to determine whether the Board's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (quoting 5 U.S.C. § 706(2)). The Board abuses its discretion when its decision (1) is clearly unreasonable, arbitrary, or fanciful, (2) is based on an erroneous conclusion of law, (3) is based on a clearly erroneous fact finding, or (4) involves a record that contains no evidence on which the Board could rationally base its decision. *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330 (Fed. Cir. 2019).

## ARGUMENT

### I. THE BOARD'S DETERMINATION THAT CLAIMS 13-16 AND 45-48 OF THE '020 PATENT ARE NOT UNPATENTABLE SHOULD BE AFFIRMED

Apple asks the Court to vacate the Board's holding that claims 13-16 and 45-48 of the '020 Patent are not unpatentable because the Board "refused to consider the substance of Apple's challenge." Apple Br. at 24. But the Board considered Apple's arguments *twice*: first in the Decision and then again in the Rehearing Decision. The Board held that "the Petition is completely silent—or at best unclear—about what [Apple] regards as the first and second map images in its challenges to claim 13 and 45." Appx84. The Rehearing Decision reiterated that Apple's challenge suffered from "a failure of proof." Appx109. The Court should reject Apple's attempts to rewrite its Petition and affirm the Decision.

#### A. The Board Did Not Abuse its Discretion in Rejecting Apple's Challenge to Claims 13-16 and 45-48

##### 1. Apple's Petition Did Not Address the "Second Map Image" Requirement

"[I]n an *inter partes* review the petitioner is master of its complaint" and "the petition [is] the centerpiece of the proceeding both before and after institution." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355-58 (2018). This Court has recognized that "[i]t is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'" *Intelligent Bio-Systems, Inc.*

*v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) (quoting 35 U.S.C. § 312(a)(3)).

The Board acted well within its discretion in rejecting Apple's challenge based on the Petition's failure to address the second map image limitation. The Board fully considered Apple's arguments and held that "the Petition as originally filed lacks any discussion of a second map image or how A3UM teaches or suggests this subject matter." Appx83 (citing Appx747-748). That is, the Board found that "the Petition is completely silent—or at best unclear—about what [Apple] regards as the first and second map images." Appx84. This critical deficiency in the Petition was fatal to Apple's challenge.

Apple previously presented in its rehearing request many of the same arguments it advances in this appeal. The Board considered those arguments and found that "even under a reading of the Petition favorable" to Apple, the deficiencies in the Petition resulted in "a failure of proof." Appx109. The Board's consideration of Apple's arguments for claims 13-15 and 45-48, including in its Rehearing Request, belie Apples' claim that the Board "refused to consider the substance of Apple's challenge." Apple Br. at 24.

The Board's finding that the Petition failed to explain how A3UM discloses the second map image limitation is well-founded. Apart from quoting the claim

language, the following is the entirety of Apple's contentions for these claims in the Petition:

> A3UM discloses providing the same functionality for each face identified by the system, including showing that person in Faces view, displaying their name within A3UM's overall user interface. . . . Because A3UM discloses or renders obvious these features with respect to a "first person" (claims 1 and 31), A3UM discloses or renders obvious these features with respect to a "second person."

Appx747-748; Appx82; Appx107. The issue is not that the Board failed to consider this argument, as Apple suggests, but rather that the Petition "does not mention or discuss 'a second map image' at all." Appx107.

Given the Petition's silence, the Board went so far as to address three possible arguments for the second map image Apple did not even make: (1) a single instance of the A3UM Places button comprising both map images, (2) both instances of the A3UM Places button comprising both map images, or (3) one of the first or second map images corresponding to one instance of the A3UM Places button. Appx84; Appx108-109. To this point, Apple argues that the Petition "showed multiple ways in which the prior art discloses first and second map images." Apple Br. at 28. This is not true as Apple never made any of these arguments; these were the Board's attempts to fill the void in Apple's Petition. While Apple identified two alternative features in A3UM for the first map image, it did not identify anything for the second map image. Appx747-748. It was Apple's "burden to make clear when alternative arguments are being presented and to sufficiently expound on each one." *Netflix*, 84

F.4th at 1380. Apple cannot "rely on a vague, generic, and/or meandering petition" and fault the Board for not addressing an argument it did not make. *Id*. at 1377.

Apple's attempts to rewrite the Petition are unavailing. Apple argues the Petition addressed the "second map image" because it argued that the requirements of claims 13 and 45 "were satisfied in the same way as the parallel elements of claim 1." Apple Br. at 25. Specifically, Apple points to the Petition's citation to arguments for claims 1 and 31 and statement that "[b]ecause A3UM discloses or renders obvious these features with respect to a 'first person' (claims 1 and 31), A3UM discloses or renders obvious these features with respect to a 'second person.'" Apple Br. at 25 (quoting Appx747-748).

The Board's Decision squarely addressed this language in the Petition. While the Board acknowledged the Petition's assertion that "A3UM discloses providing the same functionality for each face identified by the system, including showing that person in Faces view, displaying their name within A3UM's overall user interface," conspicuously absent was any discussion of the "second map image." Appx747; Appx107-108. The reference to "showing that person in Faces view" addressed the "second digital file" limitation, while the reference to "displaying their name" addressed the "second name" limitation. Appx444 (36:25-28), Appx446 (39:12-15). The Board found that "it is not apparent, and [Apple] does not explain, how or why 'the same functionality for each face' is relevant to the recited 'second map image.'"

Appx107. Instead, "the most natural reading of the Petition is that the phrase "same functionality for each face" refers to . . . 'showing the person' or 'displaying their name'" and not the second map image. Appx108.

Apple now argues that its reference to "the same functionality" in the Petition adequately addressed the second map image because the second map image "is a function." Apple Br. at 29. But the Board considered this argument and rejected it, finding that "the 'second map image' is not a function." Appx107. Apple does not explain how the Board erred in this finding.

The Board also rejected Apple's argument that the Petition relied on the same feature in A3UM as both map images because it was "inconsistent with how the Petition interpreted other terms qualified by 'first' and 'second.'" Appx111; Appx84. Apple argues that "[t]he Board thought the petition treated the first and second persons as different people but did not take a parallel approach for the map images." Apple Br. at 30. But the Board found, and Apple does not dispute, that "the Petition maps the first and second person to different people" and that "Dr. Terveen confirmed that the terms 'first' and 'second' . . . refer to different things in the analysis." Appx84 (citing Appx10457 (286:21-288:5)). Apple identifies no abuse of discretion.

Instead, Apple claims that the Board's "reasoning depends on a claim-construction dispute that the Board refused to resolve." Apple Br. at 30. This misses

the point: regardless of claim construction, Apple consistently treated the various "first" and "second" limitations as distinct elements by pointing to different features in A3UM. Appx84. This, coupled with the Petition's silence regarding the second map image, undermines Apple's claim that its Petition considered the "first" and "second" map images to the same thing. If Apple intended to treat the "first" and "second" map image terms differently than every other "first" or "second" term, it was Apple's "burden to present a clear argument" to that effect in the Petition, but it did not. *Netflix*, 84 F.4th at 1377.

Similar to its positions before the Board, Apple takes contradictory positions in this appeal. On one hand, Apple argues that its Petition relied "on the same Places button" for the "first" and "second" map images because those claim elements can be the same thing. Apple Br. at 28. On the other hand, Apple argues that it "did identify differences between the first and second map images in the petition." Apple Br. at 30. These arguments are inconsistent, and Apple forfeited the latter by failing to raise it before the Board. Appx1335; *Netflix*, 84 F.4th at 1378 ("Any argument not raised to the Board is forfeited").

Apple also argues that MemoryWeb's Response "confirms that the petition was clear" in addressing the second map image. Apple Br. at 26. The Board also properly considered and rejected this argument. Appx110-111. MemoryWeb's Response argued "that the Petition does not identify how A3UM teaches a 'second

38

map image.'" Appx83 (citing Appx1064). While MemoryWeb presented arguments for the second map image, the Board recognized that MemoryWeb "relied on the deposition of [Apple]'s declarant, Dr. Terveen, to fill in the gaps in the Petition and then proceeded to argue against Dr. Terveen's position." Appx110 (citing Appx1064-1065). Apple identifies no error in the Board's reasoning.

Finally, Apple argues that the Petition's analysis of "claim 14 puts to rest any question about the clarity of Apple's Petition." Apple Br. at 25. Not so. Apart from quoting the claim language, Apple's contentions for claims 14 and 46 consist of a single sentence: "[b]ecause A3UM discloses or renders obvious these features with respect to a 'first person' and 'first location view' (claims 1 and 31), A3UM discloses or renders obvious these features with respect to a 'second person' and a 'second location view.'" Appx748. This analysis is deficient for the same reasons the Board found Apple's analysis lacking for claim 13 because it does not mention the second map image. Appx748. While Apple claims that this "argument makes sense only because the petition . . . had already identified the Places button as the second map image" (which it did not), this is yet another example where Apple is improperly "fault[ing] the Board for failing to understand what the petition really meant" when the Petition was at best unclear. *Netflix*, 84 F.4th at 1377; Appx84.

## 2.    The Board Properly Rejected Apple's Attempt to Rewrite its Petition in its Reply

Apple argues that the Board erred by rejecting its attempt to rewrite the Petition through its Reply because the Reply was "permissibly clarifying." Apple Br. at 26-27. The Board did not abuse its discretion in refusing to allow Apple a second bite at the apple. *See* Appx84; Appx110. The Board's rules reinforce the statutory requirements for the content of the petition by limiting the permissible scope of the reply. 37 C.F.R. § 42.23(b); *Intelligent Bio-Systems*, 821 F.3d at 1369.

A reply can only be considered "clarifying" if it builds on something already argued in the petition. In this case, Apple's Petition was silent regarding the second map image. *Supra* § I.A.1. The Board was right to find that Apple's Reply presented "an entirely new rationale" for the second map image rather than merely clarifying the Petition. *See* Appx85 (citing *Henny Penny*, 938 F.3d at 1331-32); Appx110.

If anything, the Board gave Apple far more credit than it was due for supposedly arguing that both Places buttons in A3UM satisfy both the "first" and the "second" map image limitations. The following is the entirety of Apple's Reply arguments for the second map image:

> Patentee's response on these claims presumes that the first/second map image cannot be the same image, and that visual aspects of the first and second map have patentable significance. Response 87-89. Neither is true. *See* I.B.

Appx1335. These two sentences do not clarify what feature(s) in A3UM allegedly correspond to the second map image; at best, they merely address MemoryWeb's claim construction. *Id*. The Reply did not make "clear that [Apple's] challenge was based on identifying the same Places buttons as both the 'first map image' and 'second map image'" because the Reply did not say this. Apple Br. at 27; Appx1335.

Apple also argues that "MemoryWeb never argued the reply presented a new argument." Apple Br. at 27. But MemoryWeb had no reason to argue this because Apple failed to expressly articulate any theory for the second map image in the Reply. Instead, Apple only disputed MemoryWeb's proposed construction and, thus, MemoryWeb limited is argument to this issue. Appx1335.

### 3.    Apple's Case Law is Readily Distinguishable and Does Not Support Vacatur

None of the cases cited by Apple support vacating and remanding the Decision because none of those cases involved a petition nearly as deficient as Apple's Petition.

Apple relies on this Court's non-precedential decision in *Uniloc 2017 LLC v. Facebook, Inc*. *See* Apple Br. at 23-24, 26, 29. In that case, Facebook filed two petitions, one addressing an independent claim and another addressing a dependent claim. *Uniloc*, 2021 WL 5370480, at *2 (Fed. Cir. Nov. 18, 2021). In the first petition, Facebook relied on one reference for the "instant voice message limitation" in the independent claim. *Id*. In the second petition relating to the dependent claim,

41

Facebook relied on two references for the "instant voice message limitation." *Id*. The Board erred because the Petition fairly conveyed an argument for the dependent claim that the Board ignored. *Id*. at *8. Notably, "[t]he Board did not state . . . any contrary fair reading of the petition or reply passages." *Id*.

The present case is readily distinguishable from *Uniloc* because the Board considered the content of Apple's Petition in two well-reasoned decisions but concluded that the Petition was inadequate. *Supra* § I.A.1. Unlike in *Uniloc*, the Board in this case identified three possible arguments Apple's Petition could have, but did not, make. Appx84; Appx112. Additionally, in *Uniloc*, the Court quoted passages from the petition where Facebook expressly made the relevant arguments. 2021 WL 5370480, at *8. There is nothing like that in this case: Apple's Petition contained only two sentences for claims 13 and 45 that did not address the second map image. Appx83; Appx747-748.

Apple's reliance on *CRFD Research, Inc. v. Matal*, 876 F.3d 1330 (Fed. Cir. 2017) for the proposition that the Board must consider "incorporated" arguments is also misplaced. Apple Br. at 27-28. There, the petition argued that a certain feature would have been obvious in a ground the Board did not institute "for redundancy reasons" and the petition "expressly incorporated this argument as part of other grounds of unpatentability on which the Board instituted trial." *CRFD*, 876 F.3d at 1346. Hulu was "unfairly prejudice[d]" by the Board's decision "[t]o bar Hulu from

42

pressing an argument it raised in a ground the Board found 'redundant' and that it expressly incorporated into other proposed grounds." *Id*.

The facts of this case are a far cry from *CRFD*, which was decided prior to the abrogation of partial-institution practice. *SAS Inst.*, 138 S. Ct. 1348. Unlike in *CRFD* where the Board ignored an incorporated argument, "the Board considered [Apple]'s analysis of claim 1 in assessing the challenge to claim 13" but found that it was "unclear how that analysis addresses the 'second map image' in claim 13." Appx108-109. In *CRFD*, the Court held that the Board erred because the argument at issue was expressly included in the petition, albeit in connection with a different ground, whereas in this case the Board reviewed all pertinent sections of the Petition and found that none of them contain any argument for the second map image. *Id*.

## B. MemoryWeb's Claim Construction for the "First" and "Second" Map Images Provides an Alternative Ground for Affirmance

The Court can also affirm the Decision based on MemoryWeb's claim construction requiring that the "first map image" be different than the "second map image." While the Board declined to decide this issue, the Court can, and should, independently resolve the claim construction dispute in MemoryWeb's favor and affirm because Apple never identified distinct "first" and "second" map images in A3UM. *See In re Comiskey*, 554 F.3d 967, 974 (Fed. Cir. 2009) (holding that the Court may affirm on an alternative legal ground if no fact findings or agency expertise is required).

### 1. The "First" and "Second" Map Images are Distinct Components of the Invention

The '020 Patent claims several views and features that include "first" or "second" modifiers to delineate distinct elements. As confirmed by Apple's expert, the "first" and "second" map images should be construed as distinct map images displayed in different views. Appx989-990.

All claims of the '020 Patent recite a "first person" and a "second person." Appx444 (35:18-23). There was no dispute that the claimed "first person" and "second person" are different people. Appx10457 (286:2-288:2); Appx10585-10586 (¶140). Indeed, the Board acknowledged that Apple's Petition "discusses a first and second person, which it interprets as different people." Appx83.

Likewise, the "first" and "second" thumbnail images and the "first" and "second" digital files are different. Appx10457 (288:3-15). The Board found that Apple's expert understood "the terms 'first' and 'second' . . . refer to different things" throughout the claims. Appx84 (citing Appx10457 (286:21-288:5)). Importantly, Apple's expert admitted that "the ordinary meaning of 'first map image' would be different than the ordinary meaning of 'second map image.'" Appx10458 (291:16-19); *see also* Appx10585 (¶139).

Descriptors like "first" and "second" are commonly used in patent claims distinguish different elements. *See, e.g.*, *Gillette Co. v. Energizer Holdings, Inc*., 405 F.3d 1367, 1373 (Fed. Cir. 2005) (finding the terms "first, second, and third" were

used to distinguish three separate blades). The fact that the claims separately recite a "first" and "second" map images gives rise to a presumption that they are distinct. *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010). Indeed, the "first" and "second" modifiers throughout the claims would be superfluous if they did not distinguish separate persons, digital files, names, and map images. *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (stating that "interpretations that render some portion of the claim language superfluous are disfavored").

Claims 14 and 46, which depend from claims 13 and 45 and recite a "second location view," reinforce this conclusion. Appx444 (36:30-39), Appx446 (39:16-25). Based on antecedence, these claims refer to the same "interactive geographic map" previously introduced in the "first location view." Appx444 (35:32-36), Appx445 (38:4-8); Appx10586 (¶141); *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) (explaining that "[s]ubsequent use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim"). That is, the claims specify displaying the same "interactive geographic map" in both the first and second location views. *Id*. By contrast, the claims use "first" and "second" modifiers for related but distinct elements, such as the "map image," that appear in different person views. This shows that MemoryWeb knew how to claim the same element in multiple views but did not do so for the "map image."

45

### 2. Apple Forfeited Any Argument that A3UM Discloses or Suggests Distinct "First" and "Second" Map Images

Resolving the claim construction dispute regarding the "first" and "second" map images is case dispositive for claims 13-16 and 45-47. Apple effectively admitted that A3UM does not disclose distinct "first" and "second" map images. Appx1335; Appx1237-1238. Indeed, MemoryWeb specifically asked Apple's expert what would happen if MemoryWeb's construction were adopted, and he admitted that he would need to "revisit [his] opinion regarding claims 13 and 45 and revise if necessary." Appx10458 (290:2-294:12).

While Apple identified two alleged "map images" in A3UM in connection with the first map image limitation, it never argued that one of those is the "first" map image and the other is the "second" map image. Appx747-748; Appx1335. To the contrary, Apple argues that both examples are ***both*** the "first" map image and the "second" map image. *See* Apple Br. at 24-25. Thus, Apple has forfeited any conceivable argument that A3UM satisfies MemoryWeb's construction. *Netflix*, 84 F.4th at 1378. As such, construing the "first" and "second" map images to be distinct, provides an independent basis for affirming the Decision.

## II. THE BOARD'S '376 PATENT DECISION SHOULD BE AFFIRMED

The Board correctly held that Apple failed to show that the prior art "teaches or suggests 'the second screenshot of the video display device not including the interactive map,' as recited in claim 1" of the '376 Patent. Appx157. The Board

found that "the most natural reading of the Petition leads to the conclusion that [Apple]'s obviousness rationale" for the claimed location view "rests on an assertion that was shown to be incorrect based on the record that was developed during trial." Appx163. Specifically, Apple was wrong about a critical aspect of A3UM's Places view that it relied on. Appx153-157.

Apple does not appeal the Board's finding that it was wrong about A3UM. Apple Br. at 38. To prevail, Apple must show that the Board's interpretation of its Petition was an abuse of discretion. And because the Board nevertheless considered the theory Apple claims it made in the Petition and rejected it on the merits, Apple also must show that that finding is not supported by substantial evidence. The Board acted well within its discretion by holding Apple to the theory in its Petition, and its non-obviousness findings are supported by substantial evidence.

## A.    Apple's Obviousness Theory was Based on a Flawed Premise

Contrary to Apple's suggestion, the Board did not "cut short its obviousness analysis on the '376 Patent." Apple Br. at 31. The Board considered the obviousness theory in the Petition and found that it was "based on an incorrect assertion about how A3UM's Places view works" and as such, Apple failed to show "that A3UM teaches or suggests 'the second screenshot of the video display device not including the interactive map,' as recited in claim 1." Appx157; *see also* Appx150-151,

Appx163. Apple argues that the Board's interpretation of its Petition "was wrong" but does not come close to showing any abuse of discretion. Apple Br. at 38.

The Board correctly recognized that Apple's initial obviousness theory was predicated on combining two steps associated with A3UM's Places view. Appx160; Appx11562-11563. For the first step, the Board agreed with Apple that in A3UM's Places view, "a red pin [on the map] turns orange when selected and the images associated with the location marked by the orange pin are selected in the Browser." Appx152; Appx11556; Appx13496-13497.



Appx13497

Apple relied on this step in A3UM to address the requirements that each location view includes a "location name" and "scaled replicas." Appx11556-11557.

The Board correctly recognized that the second step in Apple's argument related to what happens "when the user selects images in the Browser" below the map. Appx152. In order "to address the [claim] requirement that the second screenshot does not include the interactive map," Apple argued:

> Selecting a thumbnail in the Browser then prompts display of the original digital image in the Viewer. EX1005, 251. This display will be the digital image (e.g., a full-size photo) represented by the thumbnail in the Browser ("not including the interactive map").

Appx152-153; Appx11559. In other words, Apple argued that selecting a thumbnail in the Browser displays an image in the Viewer, replacing the map. *Id.*; *see also* Appx11562.

The Board agreed with MemoryWeb that "the Places-view map is ***not replaced*** with an image when the user selects a thumbnail image in the Places-view Browser." Appx152-153 (emphasis added). Apple does not appeal this finding. Apple Br. at 38. Indeed, Apple could not credibly argue otherwise because its expert admitted that A3UM does not disclose replacing the Places view map with a full-size image. Appx11882; Appx20979-20980 (152:10-154:22); Appx21061 (323:7-324:16). Apple's appeal therefore boils down to whether the Board abused its discretion in interpreting its Petition as depending on the presence of the alleged second "step" in A3UM.

The Board's conclusion that Apple's Petition was "based on an incorrect assertion about how A3UM's Places view works" (Appx157) is well-founded. The

Petition relied on "A3UM as disclosing" that selecting a thumbnail in the Browser replaces the map in the Places view; it never proposed modifying A3UM to include this functionality. Appx158. The Board's finding is supported by the fact that Apple specifically argued that the alleged functionality where selecting a thumbnail in the Browser replaces the map would be "***retained***" in its proposed combination, which "suggests that A3UM would be unmodified in the combination." Appx158 (quoting Appx11559-11560) (emphasis added).

The Court should reject Apple's argument that it is irrelevant whether A3UM discloses the second step. Apple Br. at 39. As the Board found, and Apple acknowledges, the Petition proposed "'to modify' the Aperture manual and 'combine' the multiple steps required to replace 'the Places map' with 'an image to display in a larger fashion in the viewer." Appx160; Apple Br. at 42. Apple's original argument presupposed that both steps are disclosed in A3UM, but the second step is not disclosed. The Board's finding that Apple's argument was "based on an incorrect assertion about how A3UM's Places view works" was not an abuse of discretion. Appx157.

Apple next argues that the Board declined "to address any features except those in the Places view of Aperture, despite recognizing that Apple's petition expressly identified features in other views." Apple Br. at 42. Here, Apple relies on A3UM's description of how the Browser and Viewer work ***outside*** of the Places

50

view. Appx154-158; Appx21193 (¶159). The Board expressly addressed this but found that the Petition "did not provide any reason for combining the Viewer-Browser features on page 251 with the Places view described elsewhere." Appx159. Apple had merely alleged "that it was possible to combine the Places view with the Browser features from other views" but did not "attempt to explain why one of ordinary skill in the art would have done so." *Id*. (citing Appx12144-12145). Apple identifies no error here.

Apple has shown no abuse of discretion in the Board's finding "the most natural reading of the Petition leads to the conclusion that [Apple]'s obviousness rationale" for the features of the claimed location view "rests on an assertion that was shown to be incorrect." Appx163.

### B.    The Board Did Not Abuse its Discretion in Rejecting Apple's Belated Obviousness Theory in its Reply

The Board also rejected Apple's new obviousness argument in its Reply as improper. Appx157-159 (stating "[w]e disagree that the Petition contains" the theory in Apple's Reply and finding it to be an improper "new rationale"); 37 C.F.R. § 42.104(b)(5). Apple has not demonstrated any abuse of discretion.

As an initial matter, Apple's argument that the Board "exclud[ed] Apple's explanation in reply" (Apple Br. at 42) is specious because the Board actually considered the arguments in Apple's Reply and rejected them on the merits (*infra* § II.C). The Board correctly found that Apple's proposal in its Reply to modify A3UM

such that selecting a thumbnail in the Browser replaces the Places map was improper. Appx159. This was not an abuse of discretion because the Petition never proposed this modification: it assumed that A3UM already disclosed this. *Supra* § II.A; *Yita LLC v. MacNeil IP LLC*, 69 F.4th 1356, 1366 (Fed. Cir. 2023) (collecting cases holding "that the Board acts within its discretion when it declines . . . to consider a new theory of unpatentability for the first time in reply").

In an attempt to justify the new obviousness rationale in its Reply, Apple argues that it relied on the same prior art as the Petition. Apple Br. 41-42. However, Apple's cited cases are inapposite. In *Ericsson Inc. v. Intell. Ventures I LLC*, this Court was faced with a "special case" in which the parties and the Board "all initially applied the broadest reasonable interpretation claim construction standard, and only after institution applied *Phillips*." 901 F.3d 1374, 1380 (Fed. Cir. 2018). This Court vacated the decision because the petitioner "deserved an opportunity" to address the "changed circumstances" relating to the claim construction standard. *Id*.

The unique facts of *Ericsson* have no relevance to this case. Apple's arguments were not tied to any claim construction issues, let alone a change in the applicable legal standard. Appx12142-12148. The fact that MemoryWeb disproved one of the core assumptions in Apple's Petition did not grant Apple a license to present a new theory in its Reply. *Supra* § II.A.

Apple also argues that the Board's findings in *Apple Inc. v. Andrea Elecs. Corp.* were vacated under "similar circumstances." Apple Br. at 42 (citing 949 F.3d 697, 706 (Fed. Cir. 2020)). Not so. In *Andrea*, Apple's reply pointed to "another example of the same algorithm to further explain why" the prior art disclosed certain limitations. 949 F.3d at 706. The Court noted that Apple's petition relied "on one example of an algorithm," and that it would be "unreasonable" to require Apple's petition to "discuss all potential permutations of the variables" for the algorithm. *Id*. Additionally, "any ambiguity as to whether Apple raised a new argument on reply [was] eliminated" because "Apple's reply squarely responds to [the] Patent Owner Response." *Id*. at 706-07.

*Andrea* is distinguishable at least because Apple does not argue that its Reply was responsive to MemoryWeb's arguments. *See* Apple Br. at 41-42. And unlike in *Andrea* where the reply merely cited additional examples of the same algorithm, Apple's Reply proposed an entirely new modification to the functionality of A3UM's Places view. Appx12142-12148. *Andrea* does not suggest that a petitioner can argue a feature is disclosed in the Petition, then change its theory to obviousness in its reply. *Yita*, 69 F.4th at 1367 (holding that the Board properly rejected an obviousness in a reply when the petition "focused . . . only on what [the prior art] discloses").

53

Apple also argues that "A3UM teaches switching from the Places view to one with Viewer and Browser involves clicking an icon in the toolbar." Apple Br. at 39; Appx12144. However, the Petition never relied on this alleged functionality in connection with the "location view" limitations – it only argued that selecting a thumbnail in the Browser displays an image in the Viewer. *See* Appx152-153. The Board rightly disregarded this new theory. *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1367 (Fed. Cir. 2015) (holding that the Board correctly rejected the petitioner's "reliance, in its Reply submissions, on previously unidentified portions of a prior-art reference to make a meaningfully distinct contention").

Because the Board interpreted the Petition as arguing that A3UM "disclos[es] the feature at issue" and the "the Petition provided no relevant obviousness rationale," the Board did not abuse its discretion in finding Apple's attempt to raise a new obviousness rationale in its Reply improper. Appx158-159.

### C.    The Board's Finding that Apple's Recast Obviousness Theory Failed on the Merits is Supported by Substantial Evidence

Apple's suggestion that the Board "cut short its obviousness analysis on the '376 Patent" is incorrect: the Board fully considered Apple's Reply arguments even though they were not in the Petition. Apple Br. at 31; Appx161. After weighing the facts, including unrebutted testimony, the Board held that it would not have been obvious to modify A3UM as Apple suggested. Appx162-163. That finding is supported by substantial evidence.

The Board rejected Apple's obviousness arguments because they "ignore[d] the features in A3UM that depend on selecting the Browser images to interact with the map." Appx162. In A3UM, selecting a thumbnail in the Browser highlights the corresponding pin on the map and displays a location label. Appx162; Appx13495-13496.



Appx13496

The Board found that this functionality would be eliminated if the Places map were replaced by a full-size image, undermining any motivation to modify A3UM to do so. Appx162.

The Board also found that in A3UM, the "user manually assigns locations to images by selecting them in the Browser and then interacting with the map shown

in the Places view." Appx162. Apple never explained "how the user would be able to accomplish this if the map were replaced with the full-size image when the Browser image is selected," further undermining Apple's theory. *Id*. Apple now argues that the user could alternatively modify the location data using the Metadata Inspector. Apple Br. at 46. However, Apple ignores the Board's finding that it never provided this explanation—or any other explanation—in the proceedings below. Appx162. Apple's appellate arguments cannot cure this deficiency because Apple forfeited them by failing to raise them before the Board. *Netflix*, 84 F.4th at 1378.

Apple argues that the Board's non-obviousness findings "continued to rely on the same misreading of the petition." Apple Br. at 43. However, as discussed above, the Board properly read the Petition as being based on a faulty assertion. *Supra* § II.A. Apple also argues that "there is no dispute that the Aperture manual discloses using multiple clicks to achieve the functionality on which Apple focused." Apple Br. at 43. This is not true. A3UM does not disclose any click within the Places feature that replaces the map in the Viewer with a full-size image. *Supra* § II.A.

In an attempt to identify a legal error, Apple argues that the Board erred in rejecting Apple's proposed modification for failing "to preserve features of a reference that are not claim requirements." Apple Br. at 44 (citing *Axonics, Inc. v. Medtronic, Inc.*, 73 F.4th 950, 957 (Fed. Cir. 2023)). *Axonics* is inapposite. In that case, the primary reference, Young, was directed to trigeminal-nerve simulation,

whereas the secondary reference, Gerber, was directed to sacral-nerve stimulation. *Id*. at 954. In that case, this Court found that the Board erred by focusing on whether one would be motivated "to make the Gerber-Young combination for use in the Young-specific trigeminal-nerve context" because the claims were "not limited to the trigeminal-nerve context." *Id*. at 957. The Board also erred by limiting the relevant art to sacral-nerve simulation where the challenged patents made "no reference to sacral anatomy or sacral neuromodulation." *Id*. at 958.

Contrary to Apple's assertion, the Board did not "commit[] the same error here" as in *Axonics*. Apple Br. at 45. The Board did not unduly narrow the scope of relevant prior art. 73 F.4th at 957. Nor did the Board find that A3UM was limited to a specific use case not required by the claims. *Id*. at 958. Instead, the Board found that modifying A3UM such that selecting a thumbnail in the Browser replaces the map would result in disadvantages. Appx161-163. That conclusion is well supported, as evidenced by Apple's acknowledgement that its proposed modification "would remove, or 'require additional steps' to access, 'features in [Aperture] that depend on' the interface functionality Apple proposed modifying." Apple Br. at 45; *see also* Appx11885-11888; Appx21195-21199 (¶¶165-171).

Apple argues that even if its modification "involved tradeoffs in functionality, that alone would not defeat obviousness" because "[o]bviousness does not require a proposed combination to be the referred or most desirable one." Apple Br. at 47.

This ignores this Court's instruction that "[t]he Board must weigh the benefits and drawbacks of the [proposed] modification against each other, to determine whether there would be a motivation to combine." *Arctic Cat Inc. v. Polaris Indus., Inc.*, 795 F.App'x 827, 833 (Fed. Cir. 2019) (non-precedential) (citing *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000)). Indeed, this Court has rejected the same argument Apple makes here. *Henny Penny*, 938 F.3d at 1332 (confirming that benefits lost and gained must be considered in an obviousness analysis).

Apple never disputed that its proposed modification would result in disadvantages or argued that those disadvantages would be outweighed by any purported benefits; instead, Apple merely argued that MemoryWeb "has not alleged this modification would present any technical challenge to a skilled artisan to implement." Appx12144. The Board rightly rejected this conclusory argument because it was Apple's burden to prove obviousness. Appx158-159 (citing *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015)).

The Board also found Apple's purported motivation for modifying A3UM—removing intermediate clicks—lacking for another reason. As discussed above, A3UM does not disclose replacing the Places map with a full-size image. *Supra* § II.A. In its Reply, Apple proposed modifying the A3UM Places view to add that functionality. By adding that functionality to A3UM, Apple's proposal would add

an additional click that was not originally present in A3UM, even though its obviousness rationale was based on eliminating clicks. Appx161. The Board recognized the circularity in Apple's proposal and rightly rejected it. *Id*.

Apple has not shown any error in the Board's well-reasoned findings that it would not have been obvious to modify A3UM as proposed in its Reply. *Apple*, 949 F.3d at 710 (declining to "overrule the Board's fact-intensive inquiry as to whether a person skilled in the art would have been motivated to combine").

## III.    THE BOARD ERRED IN FINDING CLAIM 15 OF THE '228 PATENT UNPATENTABLE

The Court must reverse the Board's finding that claim 15 of the '228 Patent is unpatentable. In violation of the APA and this Court's precedent, the Decision made no express findings as to how A3UM and Belitz disclose claim 15's requirement that a "digital file" be displayed "responsive to" a selection within each "location view." Unlike the '020 and '376 Patent Decisions where the Board engaged in substantial analysis of the issues and arguments, the Board mischaracterized the issues and failed to fully and properly address MemoryWeb's arguments. The Board's failures to identify evidence and reasoning for its conclusion requires vacatur and remand.

To the extent the Board implicitly adopted the arguments in Apple's Petition—which is not clear from the Decision—those arguments were contradicted by the evidence. Apple's sole argument for claim 15 was that in A3UM's Places

Case: 23-2361    Document: 33    Page: 78    Filed: 07/02/2024

view, selecting a thumbnail below the map displays a full-size image. This is the same assertion the Board found wrong in the '376 Patent proceeding. *Supra* § I.A.

### A.    The Board's Findings are Inadequate and Misunderstood the Issues

Under the APA, "the Board is obligated to 'provide an administrative recording showing the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions.'" *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019) (quoting *Lee*, 277 F.3d at 1342). This obligation "enable[s] judicial review and [] avoid[s] judicial displacement of agency authority." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 994 (Fed. Cir. 2017). Vacatur is required when the Board's analysis is incomplete and fails to address key issues and arguments. *Google LLC v. Conversant Wireless Licensing S.A.R.L.*, 753 F.App'x 890, 895 (Fed. Cir. 2018) (vacating where Board's decision was incomplete and failed to address key issues) (non-precedential).

In *Alacritech, Inc. v. Intel Corp.*, this Court vacated the Board's decision because it did not adequately address the parties' arguments and explain how the prior art teaches or suggests the claimed subject matter. 966 F.3d 1367, 1371-73 (Fed. Cir. 2020). The claims required that reassembly take place in the network interface, and the parties disputed where reassembly occurred in the prior art. *Id.* at 1371. The decision failed "to acknowledge that aspect of the parties' dispute, much less explain how the prior art teaches or suggests reassembly in the network

interface." *Id*. While the Board summarized the petitioner's arguments, it "did not endorse, adopt, or otherwise suggest that it was persuaded by" them. *Id*. Further, merely rejecting "certain arguments made by [patent owner] d[id] not necessarily support the Board's finding that the asserted prior art teaches or suggest reassembly in the network interface." *Id*. at 1371.

As in *Alacritech*, the Court must vacate the Decision because it merely summarized the parties' arguments for claim 15 without making any findings (1) as to what A3UM and Belitz disclose or (2) how such disclosures meet the requirements of claim 15. Appx263-266. Indeed, apart from the claim language, the Decision cites no evidence following its summary of the arguments. Appx265-266. The Decision does not expressly adopt any of Apple's arguments; instead, the Board's cursory discussion was limited to rejecting MemoryWeb's arguments. *Id*. That is not a substitute for express findings regarding how the prior art teaches or suggests the subject matter of claim 15. *Alacritech*, 966 F.3d at 1371-72. For at least these reasons, the Decision should be vacated.

The Board improperly shifted the burden of proof from Apple to MemoryWeb by rejecting MemoryWeb's arguments rather than explaining how Apple met its burden. In *In re Magnum Oil Tools Int'l, Ltd.*, this Court ruled that the Board erred because "rather than require [the petitioner] to prove its assertion of obviousness, the Board improperly shifted the burden to [patent owner] to disprove obviousness."

829 F.3d 1364 at 1378 (Fed. Cir. 2016). The Court highlighted examples where "the Board expected [the patentee] to explain, and faulted [the patentee] for allegedly failing to explain" why the claims were not obvious. *Id*. This demonstrated that "the Board improperly assumed, without decision, that" the petitioner's position was "correct . . . [and] required the patentee . . . to rebut the position of the petitioner . . . and to prove nonobviousness." *Id*. The same is true here: rather than explaining why the prior art renders claim 15 unpatentable or why it agreed with Apple's contentions, the Board reached its conclusion by summarily rejecting MemoryWeb's arguments. Appx265-266.

The Board's limited discussion also reflects a misunderstanding of the issues. To address the requirement in claim 15 that a "digital file" is displayed "responsive to" a selection in the "location view," Apple argued that in A3UM's Places view, selecting a thumbnail in the Browser causes a full-size image to be displayed in the Viewer. Appx21908-21909. As discussed above, MemoryWeb established, and the Board agreed in the '376 Patent proceeding, that Apple's assertions were incorrect. Appx22239-22241; Appx22389-22391; Appx33302-3305 (¶¶191-94); Appx24389-24390, Appx24398; Appx33078-33079 (152:10-154:22); Appx33160 (323:7-324:16); Appx151-157. Apple does not contest that finding in the '376 Patent proceeding. Apple Br. at 38.

The Board misunderstood the reason MemoryWeb presented this evidence regarding A3UM. Appx265. Contrary to the Board's statement in the Decision, MemoryWeb did not argue that claim 15 "recite[s] a requirement to 'replace the map with a full-size version of the image.'" Appx266; Appx22239-22241; Appx22389-22390. Whether A3UM discloses this functionality was at issue because Apple's Petition relied on it to challenge claim 15. Appx21908-21909. Indeed, Apple's expert testified that selecting a thumbnail in the Browser "replaces the Places map view" as support for his opinion that A3UM discloses claim 15. Appx23919-23920 (¶241). The Board failed to understand that MemoryWeb's argument was a direct rebuttal to evidence Apple relied on. As a result, the Board never addressed whether A3UM discloses the functionality Apple alleged in its Petition. This misunderstanding of the issues warrants vacatur. *Google*, 753 F.App'x at 895.

The Board further misunderstood the issues when it stated that MemoryWeb's "argument regarding the recited language 'responsive to' is also unavailing." Appx266. Recognizing the shortcomings in its Petition, Apple argued for the first time in its Reply that the "responsive to" claim language "accommodates intervening actions of a user between the selection and the action being caused." Appx22474-22475. MemoryWeb explained that it was improper for Apple to propose a claim construction for "responsive to" for the first time in its Reply. Appx22391-22392; *see also* U.S. Patent Trial and Appeal Board, Consolidated Trial Practice Guide 45

63

(Nov. 2019); 37 C.F.R. § 42.104(b)(3).[4] Nevertheless, out of an abundance of caution, MemoryWeb responded to Apple's belated construction. Appx22392-22393.

To the extent the Board's findings were based on its statement that "responsive to" does not "necessarily prohibit a related user action," this requires vacatur for three reasons. Appx266. First, the Board did not address MemoryWeb's argument that Apple's claim construction proposal in the Reply was improper. *Id.*; Appx22391-22392. Second, the Board seemingly construed the phrase "responsive to" without engaging in any meaningful claim construction analysis. Appx266; *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1371 (Fed. Cir. 2005) (finding claim construction analysis "inadequate because it does not supply the basis for its reasoning sufficient for a meaningful review"). Third, the Board made no findings as to how A3UM and Belitz would satisfy claim 15 even if, *arguendo*, "responsive to" were broadly construed. Appx266. The Decision should be vacated because it provides a conclusion without identifying supporting evidence or reasoning. *TQ Delta*, 942 F.3d at 1358; *Google*, 753 F.App'x at 895.

---

[4] As further evidence of the Board's arbitrary findings in these proceedings, the Board ignored MemoryWeb's argument that Apple's Reply claim construction was improper, yet in the '658 Patent decision, suggested that MemoryWeb needed to show "good cause" for the Board to consider its constructions. Appx284.

The Board did not do its job: it never explained how the prior art allegedly meets the requirements of claim 15 and misunderstood the dispute.[5] For at least these reasons, the Decision should be vacated and remanded.

### B.    The Board's Now-Final Fact Findings in the '376 Patent Proceeding Preclude the Argument in Apple's Petition

While the Decision should at least be vacated, the Board's findings in the '376 Patent proceeding that Apple does not appeal are now final and have preclusive effect. *Google LLC v. Hammond Dev. Int'l, Inc.*, 54 F.4th 1377, 1381 (Fed. Cir. 2022) (holding that collateral estoppel applies to IPR proceedings). As discussed above, the Board found, and Apple does not contest, that A3UM does ***not*** disclose replacing the Places map with a full-size image. *Supra* § II.A. Because Apple's argument for claim 15 of the '228 Patent was based on the same factual assertion, issue preclusion requires reversal.

Issue preclusion applies when "(1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the issue in the first action." *Google*, 54 F.4th at 1381. All four requirements are satisfied here.

---

[5] The Board's inadequate analysis is underscored by its reference to the wrong claims in its conclusion. Appx266 (referring to claims 8-9 instead of claim 15).

First, the issue of whether A3UM fails to disclose replacing the Places map with a full-size image is identical to the issue decided in the '376 Patent Decision. *Google*, 54 F.4th at 138. In both cases, Apple argued A3UM discloses that selecting a thumbnail in the Browser displays a full-size image in the Viewer, replacing the Places map, and that this functionality would be "retained" in its proposed modifications. Appx11559-11560; Appx21908-21909. Apple's expert offered nearly identical opinions on this point. Appx12983-12984 (¶¶186-87) ('376 Patent); Appx23919-23920 (¶¶241-42) ('228 Patent).

In the '376 Decision, the Board thoroughly considered Apple's assertions and rejected them, finding that A3UM does ***not*** disclose displaying a full-size image in the Viewer when selecting a thumbnail in the Browser in the Places view. *Supra* § I.A; Appx151-157. While Apple is appealing the Board's ultimate conclusions in the '376 Decision, it does not appeal the Board's finding regarding A3UM's disclosure. Apple Br. at 38. Indeed, it could not legitimately do so due to A3UM's clear disclosure and Apple's expert confirming the same. *Supra* § I.A.1. Thus, the fact finding by the Board is final. *See MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1376 (Fed. Cir. 2018) (finding that "issue preclusion applies even though the precluding judgment . . . comes into existence while the case as to which preclusion is sought (this case) is on appeal").

66

Second, whether A3UM discloses replacing the Places map with a full-size image was thoroughly litigated. *Google*, 54 F.4th at 1381. MemoryWeb argued in both proceedings that A3UM does not disclose that selecting a thumbnail below the map replaces the map. Appx11880-11882; Appx13495-13496; Appx22238-22242; Appx22389-22390. Apple replied to those arguments. Appx11956-11959; Appx22473-22475. The Board sided with MemoryWeb in the '376 Decision and found that Apple's assertions about A3UM were incorrect. Appx151-157.

Third, resolution of this issue was essential to the final judgment in the '376 Decision. *Google*, 54 F.4th at 1381. The Board rejected Apple's challenge to the '376 Patent because in A3UM, "the Places-view map is not replaced with an image when the user selects a thumbnail image in the Places-view Browser." Appx152-153; *supra* § II.A. While the Board also addressed and rejected Apple's alternative obviousness argument for the '376 Patent, it would have no reason to reach that issue if A3UM disclosed replacing the Places map with a full-size image.

Fourth, Apple had a full and fair opportunity to litigate this issue in both proceedings. *Google*, 54 F.4th at 1381. Apple replied to MemoryWeb's evidence rebutting its arguments in the Petition. Appx22472-22475; Appx12142-12145. Despite losing this issue in the '376 Decision, Apple chose not to appeal that finding. *See* Apple Br. at 38.

In sum, the same issue was at issue in both proceedings. Apple lost the issue in the '376 Decision, chose not to appeal that result, and is therefore barred from arguing otherwise for the '228 Patent.

## IV.    THE BOARD'S FINDING THAT CLAIMS 3-4 AND 8-12 OF THE '658 PATENT ARE UNPATENTABLE SHOULD BE REVERSED

The Board erred in finding that claims 3-4 and 8-12 of the '658 Patent are unpatentable. For claims 3-4, the Board excused Apple from the same error it made in the '376 Patent proceeding regarding whether A3UM discloses replacing the Places map with a full-size image. The Board also erred by finding these claims obvious with conclusory findings that ignored evidence of non-obviousness.

For claims 8-12, the Board erred by basing its findings on an erroneous claim construction. The Board interpreted these claims such that the "[first/second]-person-location selectable element[s]" in claims 8 and 11 do not need to be displayed "responsive to" the same click or tap that displays the "[first/second] person view" even though this is expressly required in the claim. That finding should be reversed, and the Decision should be vacated and remanded for further proceedings.

### A.    The Board Erred in Finding Claims 3-4 Unpatentable

The Board committed two errors in finding claims 3-4 of the '658 Patent unpatentable. First, the Board failed to recognize that Apple's challenge was predicated on the same erroneous assertion Apple made in the '376 and '228 Patent proceeding regarding A3UM's Places view. *Supra* § II.A. Yet in the '658 Patent

68

proceeding, the Board found Apple's erroneous assertion about A3UM "irrelevant" even though Apple's arguments were based on that assertion.

Second, putting aside Apple's incorrect assertions, the Board's finding that it would have been obvious to modify A3UM is not supported by substantial evidence. The Board summarily dismissed MemoryWeb's evidence of non-obviousness without providing a reasoned explanation for its conclusion.

### 1. Apple's Reliance on an Erroneous Assertion Regarding A3UM was not "Irrelevant"

Claim 3 recites displaying two features responsive to a click or tap in the first location view: (1) "a first digital photograph" and (2) "a first map image." Appx661 (36:15-20). To address the "digital photograph" requirement, Apple's expert testified that in A3UM, "[s]electing a thumbnail in the Browser then prompts the display of the original digital image in the Viewer, which replaces the Places map view." Appx40477-40478 (¶194).

MemoryWeb established, and Apple did not dispute, that Dr. Terveen's assertion that the A3UM Places map is replaced by a full-size image was wrong. Appx39660-39661; Appx39822. This is the same issue the Board resolved in MemoryWeb's favor in the '376 Patent proceeding. *Supra* § I.A. In contrast to the Board's well-reasoned '376 Patent decision, the Board dismissed this critical error in the '658 Patent proceeding, stating that "even if Dr. Terveen's testimony in paragraph 194 of Exhibit 1003" was wrong, "this testimony was not relied upon in

69

[Apple's] obviousness theory, and thus, is 'irrelevant' to that theory." Appx355. Contrary to the Board's finding, Apple *did* rely on Dr. Terveen's erroneous testimony in its obviousness analysis. Appx39342 (citing Appx40477-40478 (¶194)).

Dr. Terveen repeated the same paragraph 194 assertion in paragraph 198: "A3UM discloses that selecting an image in the Browser will display that image in the Viewer." Appx40481 (¶198). This paragraph was also cited in the Petition. Appx39344 (citing Appx40481 (¶198)).

Apple's alternative obviousness theory involved "modifying A3UM so that selecting a photo in the browser, in addition to displaying that photo in the Viewer, would (optionally) automatically display the Map Pane at the bottom of the Inspector pane." Appx40481-40482 (¶199); Appx39344. The Board found this argument rendered Dr. Terveen's erroneous assertion irrelevant. Appx355. The phrase "in addition to," however, reinforces that Dr. Terveen wrongly assumed that A3UM already discloses that selecting a thumbnail in the Browser displays a photo in the Viewer. Appx40477-40479 (¶¶194-195), Appx40481 (¶198). Indeed, Dr. Terveen was unequivocal that "[t]his functionality *would be maintained* by the suggested combination." Appx40478-40479 (¶195) (emphasis added). Read in its full context, Dr. Terveen misunderstood how A3UM's Places view works. Dr. Terveen's

opinions were based on the same flaw the Board found relevant to the '376 Patent proceeding. *Supra* § II.A.

The Decision should be reversed because the Board wrongly deemed Dr. Terveen's erroneous testimony "irrelevant."

### 2.    The Board's Obviousness Findings are Not Supported by Substantial Evidence

Putting aside Apple's erroneous assertions, the Board's obviousness findings should be reversed, or at least vacated, because they are not adequately explained or supported by substantial evidence. *Alacritech*, 966 F.3d at 1372-73.

In the Decision, the Board made *zero* findings as to why it would have been obvious to modify A3UM's Places view so that selecting a thumbnail in the Browser displays an image in the Viewer. Appx354-355. This is consistent with Apple's failure to propose such a modification. *Supra* § IV.A.1. The Decision also ignored MemoryWeb's undisputed evidence of non-obviousness demonstrating that in A3UM, there is a functional relationship between the Places map and the Browser where (1) selecting a pin on the map highlights the corresponding thumbnail in the Browser and (2) selecting an image in the Browser highlights the corresponding pin on the map. Appx39822-39823; Appx49504-49506 (¶¶213-216). A skilled artisan would not have modified the Places view to replace the map when a thumbnail in the Browser is selected because doing so would destroy that functional relationship. *Id*. Indeed, the Board agreed in the '376 Patent proceeding. *Supra* § II.C.

71

MemoryWeb's rehearing request explained that the Board failed to make any findings as to why Apple's proposal was allegedly obvious or engage with MemoryWeb's arguments. Appx40027. Despite MemoryWeb's clear explanations, the Rehearing Decision ignored MemoryWeb's arguments and evidence. For instance, the Board stated that "the test for obviousness . . . [is] 'not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference.'" Appx367 (quoting *In re Keller*, 642 F.2d 413, 425 (CCPA 1981)). But MemoryWeb did not argue that one reference could not be bodily incorporated into another; MemoryWeb argued there is an advantageous functional relationship in A3UM that would be eliminated in Apple's modification. Appx39822-39823; Appx49504-49506 (¶¶213-216).

The Rehearing Decision then concluded, without more, that "the teachings of A3UM render the subject matter of claims 3 and 4 obvious notwithstanding the presence of a functional relationship such as the one noted by" MemoryWeb "or whether the modification applied by" Apple "would destroy such a functional relationship." Appx367-368. Once again, the Board failed to explain **why** these claims were obvious or cite **any** evidence to support its conclusion. *Id*.; *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (holding that "rejections on obviousness grounds cannot be sustained by mere conclusory statements"). The Board's failure to provide

any explanation for its conclusions and inadequate consideration of MemoryWeb's evidence requires vacatur. *Alacritech*, 966 F.3d at 1372-73.

The Board's conclusion is also legally flawed because the Board was required to "weigh the benefits and drawbacks of the [proposed] modification against each other, to determine whether there would be a motivation to combine." *Arctic Cat*, 795 F.App'x at 833. MemoryWeb demonstrated disadvantages to the proposed modification, and the Board was required to weigh them against any purported benefits. Appx39822-39823. The Board did not find any advantage to Apple's proposed modification, let alone weigh any such advantage against the disadvantages, as it was required to do. Indeed, in the '376 Patent proceeding the Board found that there was no such benefit for the same modification. *Supra* § II.C; Appx162. For this additional reason, the Decision should be reversed, or at least vacated and remanded.

**B.    The Board's Findings for Dependent Claims 8-12 Should be Reversed Because They Are Based on an Erroneous Claim Interpretation**

The Board erred in interpreting claims 8 and 11 such that the "person-location selectable element" does not need to be displayed "responsive to" the same click or tap that displays the first and second person views. Claims 7 and 10 recite: "responsive to a click or tap of the [first/second] person selectable thumbnail image, displaying a [first/second] person view." Appx661 (36:57-62), Appx662 (37:5-11).

73

Claims 8 and 11 depend from claims 7 and 10, respectively, and add that "the displaying the [first/second] person view further includes displaying a [first/second]-person-location selectable element." Appx661 (36:63-65), Appx662 (37:12-15).

The parties disputed whether the phrase "responsive to" requires a direct cause-effect relationship, as MemoryWeb proposed, or whether it allows intervening actions, as Apple proposed. Appx39600-39607; Appx39880-39882; Appx39805-39807. Rather than resolve this dispute, the Board found that "all claims 8 and 11 require is 'that the person view further includes the specified element.'" Appx346. In other words, the Board found that the person-location selectable element does not need to be displayed "responsive to" the claimed click or tap, mooting the dispute regarding the meaning of "responsive to." The Court should correct the Board's erroneous interpretation.

The claims do ***not*** state that each person view "further includes" a person-location selectable element. Rather, the claims recite that "***the displaying*** the [first/second] person view further includes displaying a [first/second]-person-location selectable element." Appx661 (36:63-65), Appx662 (37:12-15). Based on antecedent basis, the phrase "***the displaying*** the first person view" in claim 8 refers back to the step of "displaying a first person view" in claim 7. *Wi-Lan*, 811 F.3d at 462. The "displaying the [first/second] person view" step occurs "responsive to" a particular input. Taken together, the claim requires that "displaying the first-person-

74

location selectable element" is part of the same step or transaction that occurs "responsive to" a click or tap. Appx39819. The Board's finding to the contrary improperly reads the phrase "the displaying" out of the claims. *Power Mosfet*, 378 F.3d at 1410.

Even putting the antecedence issue aside, claim 7 requires displaying a "first person view" including two features "responsive to" a click or tap of the first person selectable thumbnail image. Appx661 (36:56-62). Claim 8 adds the first-person-location selectable element as an additional feature in the first person view. Appx661 (36:63-65). Because the claim requires displaying the first person view responsive to a particular click or tap of, it necessarily requires displaying all elements of the first person view responsive to the same click or tap.

What is more, the Board's treatment of the "person-location selectable element" recited in claim 8 is inconsistent with its treatment of the other features of the first person view. The Decision acknowledges that the phrase "responsive to" in claim 7 "pertains to" displaying the other features of the first person view. Appx345-346. Just as displaying the name and scaled replica is "responsive to" the click or tap, displaying the "[first/second]-person-location selectable element" also occurs "responsive to" the click or tap. The Board offered no reason for treating claims 7 and 8 differently. Appx346.

The Court should correct the Board's claim construction error and vacate and remand for the Board to consider the parties' remaining dispute, including (1) the meaning of "responsive to" and (2) whether A3UM discloses displaying a "person-location selectable element" under the proper construction.

## V.    THE BOARD'S FINDING THAT CLAIMS 1-5, 8-12, 17-37, 40-44, and 49-59 OF THE '020 PATENT ARE UNPATENTABLE SHOULD BE REVERSED

The Board's finding that claims 1-5, 8-12, 17-37, 40-44, and 49-59 of the '020 Patent are unpatentable should be reversed. While the Board did not issue a formal claim construction for the "first person view," it misunderstood MemoryWeb's arguments and erroneously interpreted the claims such that the "first map image" need not be displayed "responsive to" the input that displays the "first person view." Because the first person view is displayed "responsive to" a particular input and the first map image is part of the first person view, the first map image must be displayed "responsive to" the input. The Board's finding to the contrary should be reversed.

The parties proposed competing constructions for the phrase "responsive to:" MemoryWeb proposed construing this phrase to require a cause-effect relationship, whereas Apple argued for a broader construction allowing intervening user actions. The Board's alternative finding that A3UM meets MemoryWeb's construction for "responsive to" should be reversed because Apple never argued this and because it is contrary to undisputed evidence.

76

### A.    The Board Erred in Construing the Claims to Not Require that the "First Map Image" be Displayed "Responsive To" a Specific Input

The Board's finding that that the claims do "not require causing a map image to be displayed on the interface in response to an input" is inconsistent with the plain and ordinary claim language and cannot stand. Appx54.

The "first person view" must be displayed "responsive to an input associated with the first person." Appx444 (35:25-31), Appx445 (37:64-38:3). The first person view is a single view that includes three features: a first digital file, a first name, and a first map image. *Id.* The Board agreed that that "first person view" must include a first map image. Appx45-55. All three features—including the first map image—must be displayed in the same view to form the first person view. The claims specify that the first person view is displayed ""responsive to an input that is indicative of a selection associated with the first person." Appx444 (35:25-31), Appx445 (37:64-38:3). Because the "first person view" must (1) include three features and (2) be displayed responsive to the claimed input, the first map image must be displayed responsive to the input.

In reaching the opposite conclusion, the Board misunderstood MemoryWeb to be arguing "that the claim precludes other views from also including a map" image and its construction requires "the only time the map image appears is in response to

the input." Appx55.[6] MemoryWeb never argued this. Appx984-990; Appx1222-1224. The Board confused MemoryWeb's straightforward claim construction with its arguments regarding A3UM. As discussed *infra*, MemoryWeb demonstrated that in A3UM, there is no cause-effect relationship because the alleged first map image is always displayed by default and has no cause-effect relationship with the input. Appx1036-1042; Appx1227-1231. A map image can be displayed in multiple views but nonetheless be displayed "responsive to" the relevant input, but that is not the case in A3UM. *Infra* § V.B.1.

The Board also misunderstood MemoryWeb to be arguing that the first map image must "be displayed independently." Appx55. MemoryWeb argued that all features of the first person view, including the first map, must be displayed responsive to the claimed input. Appx984-990; Appx1222-1224. In response to Apple's Reply, MemoryWeb's Sur-Reply expressly stated that under its construction, "all three elements of the first person view are displayed together to make up the first person view; they ***are not displayed independently***." Appx1229 (emphasis added).

Because the Board erred in its interpretation of the first person view limitations, the Court must reverse, or at least vacate this ruling.

---

[6] The Board referred to a "map view" but presumably meant "map image." Appx55.

### B.   The Decision Should be Reversed Regardless of Whether "Responsive To" Requires Direct Causation or Allows Intervening Inputs

MemoryWeb established that the phrase "responsive to" requires a cause-effect relationship between the claimed input and displaying the first map image. Appx984-990; Appx1222-1224. In reply, Apple argued that "responsive to" allows "intervening actions by the computer and/or a user that enable or are directly associated with 'causing' the action." Appx1304.

Despite its erroneous finding that the phrase "responsive to" does not apply to the first map image, the Board found that A3UM discloses displaying the first map image under MemoryWeb's claim construction. Appx56-59. Specifically, the Board found that "A3UM describes a cause-effect relationship between the input and the display of a view of the images, the toolbar, and the inspector panes." Appx56. This finding should be reversed for two reasons.

First, the Board's finding that A3UM discloses displaying the first map image under MemoryWeb's construction is not supported by any evidence. In reaching its conclusion, the Board stated that it "credit[ed] Dr. Terveen's testimony." Appx56. But Dr. Terveen never opined on the meaning of "responsive to," let alone whether there is a cause-effect relationship between the claimed input and displaying the alleged map image in A3UM. That is because Apple did not address the meaning of "responsive to" until its Reply. Appx1304.

79

The Board's conclusion is contrary to undisputed evidence. In A3UM, the Places link in the Library inspector (one alleged first map image) is displayed by default "[w]hen you first open Aperture." Appx2467, Appx2507; Appx10596-10597 (¶160). Selecting a thumbnail in the alleged people view (the alleged input) has no impact on whether the Places link (the alleged map image) is displayed. Appx10596-10598 (¶¶160-61).

 

Appx2880 (annotated)

Likewise, the Places button in the Toolbar (the other alleged first map image) is displayed by default and is unaffected by the alleged input. Appx2467; Appx2525-2526; Appx10599-10601 (¶¶162-64); Appx10374 (110:2-25).

 

Appx2880 (annotated)

This evidence demonstrates that there is no cause-effect relationship between the alleged input and displaying the alleged map images.

Second, the Board failed to "base its decision on arguments that were advanced by a party." *Magnum Oil*, 829 F.3d at 1381. Apple never argued that A3UM discloses displaying a "first map image" under MemoryWeb's construction. *See* Appx1324. That is, Apple never disputed that A3UM lacks a cause-effect relationship between the alleged input and displaying either of the alleged first map images. Appx1036-1039. In finding that A3UM discloses a first map image MemoryWeb's construction, the Board adopted an argument on Apple's behalf in violation of the APA. *Magnum Oil*, 829 F.3d at 1381 (holding that the Board cannot "adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner").

While these errors at least require vacatur and remand, the Court can reverse regardless of which construction for "responsive to" is correct because Apple never

argued that A3UM meets its broader construction. Appx1323-1325. Accordingly, the Court should reverse the Board's findings for these claims. In the alternative, the Court should vacate and remand for further proceedings on the meaning of "responsive to" and whether A3UM meets the proper claim construction.

## CONCLUSION AND RELIEF SOUGHT

The Board's decisions holding that claims 1-12 of the '376 Patent and claims 13-16 and 45-48 of the '020 Patent are not unpatentable should be affirmed. The Board's final written decisions holding that claim 15 of the '228 Patent, claims 3-4 and 8-12 of the '658 Patent, and claims 1-5, 8-12, 17-37, 40-44, and 49-59 of the '020 Patent are unpatentable should be reversed or vacated and remanded for further proceedings.

Respectfully submitted,

/s/ *Jennifer Hayes*
JENNIFER HAYES
NIXON PEABODY LLP
300 South Grand Avenue
Suite 4100
Los Angeles, CA 90071-3151
Tel:    213-629-6000
Fax:    213-629-6001

DANIEL SCHWARTZ
MATTHEW WERBER
ANGELO CHRISTOPHER
NIXON PEABODY LLP
70 West Madison Street
Suite 5200

Chicago, IL 60602-4378
Tel:    312-977-4400
Fax:    312-977-4405

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Federal Circuit Rule 32(b)(3), I certify that the brief contained herein has a proportionally spaced 14-point font typeface and contains 16,488 words, based on the "Word Count" feature of Microsoft Word, excluding the cover page, patent claims, Certificate of Interest, Tables of Contents and Authorities, Statement of Related Cases, signature block, Addendum, Certificate of Compliance, and Certificate of Service.

Date:  July 2, 2024                              */s/ Jennifer Hayes*

JENNIFER HAYES
**NIXON PEABODY LLP**
300 South Grand Avenue
Suite 4100
Los Angeles, CA 90071-3151
Telephone: (213) 629-6000
Facsimile: (213) 629-6001

*Counsel for Cross-Appellant*
*MemoryWeb, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Jennifer Hayes, hereby certify that, on this 2nd day of July 2024, I caused a copy of the foregoing **Cross-Appellant MemoryWeb LLC's Principal and Response Brief** to be served on counsel of record via the court's CM/ECF system.


Date:  July 2, 2024                    */s/ Jennifer Hayes*

JENNIFER HAYES
**NIXON PEABODY LLP**
300 South Grand Avenue
Suite 4100
Los Angeles, CA 90071-3151
Telephone: (213) 629-6000
Facsimile: (213) 629-6001

*Counsel for Cross-Appellant*
*MemoryWeb, LLC*

# ADDENDUM TABLE OF CONTENTS

| Date | Document | Appendix Page(s) |
|------|----------|------------------|
| 2023-12-08 | Final Written Decision - IPR2022-00031 | Appx170 |
| 2023-05-18 | Final Written Decision - IPR2022-00033 | Appx273 |
| 2023-11-22 | Decision Denying Request for Rehearing – IPR2022-00033 | Appx360 |
| 2021-10-30 | U.S. Patent No. 10,621,228 | Appx519 |
| 2021-11-03 | U.S. Patent No. 10,423,658 | Appx592 |

# ADDENDUM

Trials@uspto.gov                                              Paper 85
571-272-7822                                        Entered: December 8, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

————————————

IPR2022-00031
Patent 10,621,228 B2

————————————

Before LYNNE H. BROWNE, NORMAN H. BEAMER, and
KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge.*


JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Denying Motion to Exclude
Denying Motion to Terminate
Granting Motion to Seal
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

IPR2022-00031
Patent 10,621,228 B2

## I.     INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed herein, we determine that Petitioner, Apple Inc., ("Petitioner" or "Apple") has shown by a preponderance of the evidence that claims 1–19 ("the challenged claims") of U.S. Patent No. 10,621,228 B2 (Ex. 1001, "the '228 Patent") are unpatentable.  *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

*A.     Background*

Petitioner filed a Petition (Paper 1, "Pet." or "Petition") to institute an *inter partes* review of the challenged claims.[1]  MemoryWeb, LLC ("Patent Owner" or "MemoryWeb") filed a Preliminary Response.  Paper 8 ("Prelim. Resp.").  With our authorization, Petitioner filed a Preliminary Reply (Paper 10) and Patent Owner filed a Preliminary Sur-Reply (Paper 11).  Based upon the record at that time, we instituted *inter partes* review on all challenged claims on the grounds presented in the Petition.  Paper 12 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 20, "PO Resp."), Petitioner filed a Reply (Paper 26, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 31, "PO Sur-reply").

---

[1] We refer to the present proceeding, *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00031, as "the *Apple* proceeding" to distinguish it from two other related proceedings challenging the '228 Patent.

2

IPR2022-00031
Patent 10,621,228 B2

Patent Owner filed a Motion to Exclude certain evidence (Paper 34), Petitioner filed an Opposition (Paper 35), and Patent Owner filed a Reply (Paper 38).

On March 14, 2023, an oral hearing was held.[2]  A transcript of the hearing was made a part of this record.  Paper 44.

In a related proceeding challenging claims 1–7 of the '228 Patent, *Unified Patents, LLC v. MemoryWeb, LLC*, IPR2021-01413 (the "*Unified* proceeding"), the Board entered an Order (Paper 56 (confidential)) on March 8, 2023, identifying Apple as an unnamed Real Party in Interest (the "RPI Order"), and on March 14, 2023, entered a Final Written Decision (Paper 58 (confidential)) finding claims 1–7 of the '228 Patent unpatentable.

In an email to the Board dated March 15, 2023, counsel for Patent Owner requested authorization to file a motion to terminate a related proceeding challenging the '228 Patent, *Samsung Electronics Co., Ltd., v. MemoryWeb, LLC*, IPR2022-00222 (the "*Samsung* proceeding"), in light of the Board's Final Written Decision in the *Unified* proceeding.  Ex. 3007; *see also* Ex. 3003, 24:18–25:7, 38:16–41:6.

On March 31, 2023, a joint conference call was held with counsel from the *Unified*, *Samsung*, and *Apple* proceedings to discuss the impact of the Board's Final Written Decision in the *Unified* proceeding.  Ex. 3003. The topics discussed on the conference call included the Board's RPI Order

---

[2] The Hearing held on March 14, 2023, was a joint hearing for the following cases:  IPR2022-00031 (Patent 10,621,228); IPR2022-00032 (Patent 9,552,376); IPR2022-00033 (Patent 10,423,658); and PGR2022-00006 (Patent 11,017,020).  Paper 44.

3

IPR2022-00031
Patent 10,621,228 B2

in the *Unified* proceeding, Patent Owner's request to file a motion to terminate the *Samsung* proceeding, as well as issues related to real party in interest, waiver, estoppel and discovery, among others. *See id.*

On May 4, 2023, the Chief Administrative Patent Judge determined that good cause existed to extend the one-year period for issuing a Final Written Decision in this case in view of the limited time remaining before expiration of the one-year period for issuing a Final Written Decision and under the unique circumstances of this case. Paper 41.

On May 16, 2023, we issued an Order extending the one-year pendency of this proceeding by up to six months. Paper 42.

On May 22, 2023, the Director issued a public version[3] of a Decision Granting Director Review (Paper 76, "Director's Decision") in the *Unified* proceeding, vacating-in-part the Final Written Decision (Section I.B) (Paper 58 (confidential) and Paper 67 (public)) and the Board's Order identifying Apple as an RPI (Paper 56 (confidential)) in that proceeding.

On May 30, 2023, we issued an Order directing the parties to confer and submit a proposed joint briefing schedule and discovery plan to address the waiver, RPI, and estoppel issues. Paper 43. The parties submitted their joint proposal by email on June 9, 2023. Ex. 3005.

On June 15, 2023, we issued an Order setting a briefing schedule for the parties to submit their arguments on the issues outlined in Exhibit 3005 (First Phase). Paper 45.

---

[3] On May 16, 2023, a confidential version of the Director's Decision Granting Director Review (Paper 74) was issued, but made available only to the parties and the Board.

4

IPR2022-00031
Patent 10,621,228 B2

On June 30, 2023, Patent Owner filed its opening brief on the issues of good cause, supplemental information, and additional discovery (Paper 47), and Petitioner filed its opening brief on the issues of waiver and estoppel (Paper 46).

On July 14, 2023, Patent Owner filed its response brief on the issues of waiver and estoppel (Paper 49), and Petitioner filed its response brief on the issues of good cause, supplemental information, and additional discovery (Paper 48).

On August 11, 2023, we issued an Order setting a schedule for the parties to conduct discovery on the RPI issue, to brief Patent Owner's requested motion to terminate, to file motions to exclude, and for a second oral hearing. Paper 50.

With respect to Patent Owner's motion to terminate, Patent Owner filed its opening brief (Paper 57), Petitioner filed an opposition (Paper 64), and Patent Owner filed a reply (Paper 71).

On October 18, 2023, a second oral hearing was held to permit the parties to address the issues of waiver, real party in interest, estoppel, and termination, among others. A transcript of the proceeding was made a part of the record. Paper 75.

B.    *Related Matters*

The parties state that the '228 patent is related to the following U.S. Patents: 9,098,531 ("the '531 Patent"); 9,552,376 ("the '376 Patent"); 10,423,658 ("the '658 Patent"); 11,017,020 ("the '020 Patent"); 11,163,823 ("the '823 Patent"), and 11,170,042 ("the '042 Patent"). Paper 6, 1; Paper 7,

5

IPR2022-00031
Patent 10,621,228 B2

2. The parties further state that the '228 patent is related to pending U.S. Patent Application 17/459,933. Paper 6, 1; Paper 7, 2–3.

The parties identify the following as related district court matters: *MemoryWeb, LLC v. Apple Inc.*, No. 6:21-cv-00531 (W.D. Tex.); *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et al.*, No. 6:21-cv-00411 (W.D. Tex.); and *MyHeritage (USA), Inc. et. al. v. MemoryWeb, LLC*, No. 1:21-cv-02666 (N.D. Ill.). Paper 6, 1–2; Paper 7, 2.

The parties identify the '228 patent as the subject of the following additional petitions: *Unified Patents, LLC v. MemoryWeb, LLC*, IPR2021-01413 (the "*Unified* proceeding" or "*Unified*"); and *Samsung Electronics Co., Ltd., v. MemoryWeb, LLC*, IPR2022-00222 (the "*Samsung* proceeding" or "*Samsung*"). Paper 6, 1; Paper 7, 2–3. The parties also identify the following related patents as the subjects of the following petitions: *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00032 ('376 patent); *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00033 ('658 patent); *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00111 ('020 patent); and *Apple Inc. v. MemoryWeb, LLC*, PGR2022-00006 ('020 patent). Paper 6, 1; Paper 7, 2–3.

C.    *The '228 Patent (Ex. 1001)*

The '228 patent is titled "Method and Apparatus for Managing Digital Files" and "relates generally to the management of digital files and, more particularly, to a computer-implemented system and method for managing and using digital files such as digital photographs." Ex. 1001, code (54), 1:21–24. The '228 patent describes a need for "a medium that allows people to organize, view, preserve and share [digital] files with all the memory details captured, connected and vivified via an interactive interface" and

6

IPR2022-00031
Patent 10,621,228 B2

"allow digital files, including documents, photos, videos and audio, to tell a full story now, and for generations to come." *Id.* at 1:60–67. The '228 patent provides a solution in the form of "a computer-implemented method of associating digital tags with digital files" and "a web-based digital file storage system [that] comprises a digital file repository for storing and retrieving digital files." *Id.* at 2:3–6, 2:21–25, 2:40–45.

The '228 patent describes details of an "Application" (also called the "MemoryWeb Application"), which is an online program that can (i) import, associate and embed digital tags to digital files, (ii) view, sort, annotate, and share digital files from various Application Views, and (iii) store the digital files through an interactive storage system through a user relationship table. *Id.* at 8:63–9:16. The '228 patent explains that the Application may be accessible "over various user interfaces" including those of "smart phones (e.g., iPhones), Personal Digital Assistants (PDAs) and Tablets (e.g., iPads)." *Id.* at 9:18–22. The Application provides views (i.e., "Application Views") that utilize the Application's ability to associate digital tags to digital files and display them in customized views such as Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes. *Id.* at 9:23–28. The views enable a user to display the user's digital media files and their tagged attributes. *Id.* at 5:57–60. The views include, *inter alia*: a location view that "identifies within an interactive map ([e.g.,] Google map . . .), where digital files were taken or originated . . . [and] can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users"; a people view that "shows thumbnail photos of all the people in the

7

IPR2022-00031
Patent 10,621,228 B2

system that can be clicked in for a people profile view"; and a people profile view that "shows a profile picture of an individual, their birth/death information, family relationships, overview (comments) on the person, as well as links to other views that contain that individual in the system." *Id.* at 6:13–30. Some views provided by the '228 patent's Application are shown in Figures 32 and 34, reproduced below. *Id.* at 3:61–66, 28:22–24.

Figure 32, below, illustrates a People Application View (at indicator 1400) and a People Profile Application View (at indicator 1430). *Id.* at 18:37–40, 22:59–61.



FIG. 32

IPR2022-00031
Patent 10,621,228 B2

In Figure 32, above, People Application View 1400 is used to display all the people that were created within a user's Application. *Id.* at 22:60–23:11. This view can be seen by selecting "People" (illustrated at menu item 1401) from any of the Application Views within the Application, which then provides a list of people in various sort orders. *Id.* For each person, a thumbnail of their face along with their name is depicted, as shown in Figure 32, where Jon Smith (item 1403) and JC Jon Smith (item 1404) along with some other people are illustrated. *Id.* Also, at the top of every Application View within the Application, the user can select to apply filters (Apply Filters at item 1451). *Id.* In the People Profile Application View in Figure 32, a single profile (item 1430) is illustrated. *Id.* at 23:11–49. The profile shows: the individual's name (displayed at the top of the page, at 1431) along with their nicknames (at 1433); when they were born (at 1434); their family members (at 1435, 1436, 1437); their biography (at 1438); and a profile photo (at 1439). *Id.* For each person, the system can allow the user to quickly see all the tags that are associated to a person. *Id.*

In Figure 32, the system illustrates that there are four photos (1452) associated with that person and illustrates thumbnails of each of the four photos (1446). *Id.* These thumbnails can be selected and then the user will be taken to the slideshow view for that digital file. *Id.* If the user selects Locations (1443), all of the locations that the specific person has been tagged within will be displayed. *Id.* If the user selects Family Relationships (1444), the people that the user is associated with will be displayed in a family chart or tree. *Id.* If the user selects any of the Application Dot-Tags

9

IPR2022-00031
Patent 10,621,228 B2

such as the individual's mother Jane Smith (Doe) (1449), the application
will take the user to an individual people profile view of Jane Smith (Doe).
*Id.* An Application Dot-Tag is a structure that enables navigation of the data
in the Application, helps the user organize their digital files with key
components of related information such as people, date of file, location, and
collection, and indicates the manner in which a Digital Tag is displayed
within the Application using pill-shaped indicators that can reside near a
file's image or overlaid on the file's image. *Id.* at 9:40–67. The '228 patent
explains that the "Application Dot-Tag is more than just text" because
"Memory-Web Application Dot-Tags act as mini search engines that allow
the user to see how many matching files there are to that MemoryWeb Tag
and if selected will take the user to the corresponding Application View to
illustrate the linked search results of that Application Dot-Tag." *Id.*

Figure 34 of the '228 patent, reproduced below, illustrates Location
Views. *Id.* at 21:36–38, 24:16–17.

10

IPR2022-00031
Patent 10,621,228 B2



Figure 34, above, shows Location Application View 1600 that displays all the locations that were created within the user's Application; for each location, a thumbnail of a digital file from that location (e.g., Wrigley Field 1601); a view of a single location (1630), with the individual location name displayed at the top of the page (1632); thumbnails of each digital file within the specific collection, such as a photo (1633) taken at Wrigley Field (1634) that is associated with the location Wrigley Field. *Id.* at 24:16–54. The '228 patent provides that "the Application can interact with a Third Party Geographical Mapping System to pull maps that correspond to the exact location of Digital Files that have a location tag." *Id.* at 32:10–13.

Figure 41 of the '228 patent, reproduced below, is a screenshot of an Application Dot-Tag Filter in a Location Application View. *Id.* at 4:7–8.

11

IPR2022-00031
Patent 10,621,228 B2

**FIG. 41**



Figure 41, above, illustrates filtering results for an Application Dot-Tag filter in a Location Application View (at item 0870), providing a world map view that illustrates all the locations that are associated with one or more digital files for a user. *Id.* at 29:40–64, 32:15–18. As shown in Figure 41, digital files are displayed within an interactive map (e.g., a Google map). *Id.* at 29:40–64. Individual or groups of digital files are illustrated as photo thumbnails (at indicators 0874 and 0875) on the map, and the user can select the thumbnail to see all the digital files with the same location, or the user can use the interactive map and narrow the map view by using a zoom in/zoom out bar (0876) or by selecting the map. *Id.* If an advanced filter is applied in the Locations Application View, a filter (e.g., of "JC Smith" at

12

IPR2022-00031
Patent 10,621,228 B2

item 0872) is illustrated, and only the digital files that contain the person JC Smith are illustrated with their geographic location on the map. *Id.*

D.    *Challenged Claims*

Petitioner challenges claims 1–19 of the '228 patent. Pet. 3. Claim 1 is the only independent claim of the '228 patent. Claim 1 is set out below.

1. A method comprising:

responsive to a first input, causing a map view to be displayed on an interface, the map view including:

(i) an interactive map;

(ii) a first location selectable thumbnail image at a first location on the interactive map; and

(iii) a second location selectable thumbnail image at a second location on the interactive map;

responsive to an input that is indicative of a selection of the first location selectable thumbnail image, causing a first location view to be displayed on the interface, the first location view including

(i) a first location name associated with the first location and

(ii) a representation of at least a portion of one digital file in a first set of digital files, each of the digital files in the first set of digital files being produced from outputs of one or more digital imaging devices, the first set of digital files including digital files associated with the first location;

responsive to an input that is indicative of a selection of the second location selectable thumbnail image, causing a second location view to be displayed on the interface, the second location view including

(i) a second location name associated with the second location and

13

IPR2022-00031
Patent 10,621,228 B2

(ii) a representation of at least a portion of one digital file in a second set of digital files, each of the digital files in the second set of digital files being produced from outputs of the one or more digital imaging devices, the second set of digital files including digital files associated with the second location; and

responsive to a second input that is subsequent to the first input, causing a people view to be displayed on the interface, the people view including:

(i) a first person selectable thumbnail image including a representation of a face of a first person, the first person being associated with a third set of digital files including digital photographs and videos;

(ii) a first name associated with the first person, the first name being displayed adjacent to the first person selectable thumbnail image;

(iii) a second person selectable thumbnail image including a representation of a face of a second person, the second person being associated with a fourth set of digital files including digital photographs and videos; and

(iv) a second name associated with the second person, the second name being displayed adjacent to the second person selectable thumbnail image.

Ex. 1001, 35:32–36:11 (format adjusted).

14

IPR2022-00031
Patent 10,621,228 B2

    *E.*    *Evidence*

| Reference or Declaration | Date | Exhibit No. |
|---|---|---|
| Declaration of Loren Terveen, Ph.D. ("Terveen Dec.") | Oct. 30, 2021 | Ex. 1003 |
| Aperture 3 User Manual, Apple Inc. ("A3UM") | 2009 | Ex. 1005 |
| U.S. Publication No. 2010/0058212 A1 ("Belitz") | March 4, 2010 | Ex. 1006 |
| Declaration of Matthew Birdsell ("Birdsell Dec.") | Oct. 29, 2021 | Ex. 1020 |
| Declaration of Jeff Lasker ("Lasker Dec.") | Sep. 29, 2023 | Ex. 1118 |
| Declaration of Rajeev Surati, Ph.D. ("Surati Dec.") | Sep. 23, 2021 | Ex. 2025 |
| Declaration of Eugene Lhymn ("Lhymn Dec.") | Sep. 15, 2023 | Ex. 2111 |

15

IPR2022-00031
Patent 10,621,228 B2

### F.    Asserted Grounds of Unpatentability

| Claim(s) Challenged | 35 U.S.C. §[4] | Reference(s) |
|---|---|---|
| 1–19 | 103(a) | A3UM, Belitz |

Pet. 3.

## II.    ANALYSIS

### A.    Forfeiture/Waiver[5]

#### 1.    Petitioner's Arguments

Petitioner contends that Patent Owner "has waived and/or forfeited its ability to raise an RPI [real party in interest] issue in this proceeding, or to allege estoppel under 35 U.S.C. § 315(e)(1) based on an RPI issue." Paper 46, 1. Petitioner argues that Patent Owner "cannot deny it could have raised its RPI assertions earlier: it did so in IPR2021-01413 ('*Unified*') in **December of 2021** and did so again in IPR2022-00222 ('*Samsung*') in **March of 2022**." *Id.* (citing *Unified*, Paper 8, 22–28 (Dec. 17, 2021); *Samsung*, Paper 8, 30-31 (Mar. 16, 2022). Petitioner also argues that Patent

---

[4] The Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. The '228 patent claims priority to Patent Application No. 13/157,214, providing an effective filing date of June 9, 2011. *See* Ex. 1001, code (63). Because this priority date is before the effective date of the applicable AIA amendments (March 16, 2013), we use the pre-AIA version of 35 U.S.C. § 103 in this proceeding.

[5] Petitioner observes that the Federal Circuit and the Board "have used the terms 'forfeiture' and 'waiver' interchangeably" when discussing these principles. Paper 46, 3 n.2 (citing *In re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020) (observing that the Court has "seemingly … used the terms interchangeably at times" and that the Court "mainly uses the term 'waiver' when applying the doctrine of 'forfeiture'")).

16

IPR2022-00031
Patent 10,621,228 B2

Owner "chose not to assert in this proceeding, at any time before it was submitted for decision, that Apple should be estopped under 35 U.S.C. § 315(e)(1) because of a supposed RPI relationship between Apple and Unified." Paper 46, 2.

Petitioner alleges that Patent Owner's "intentional delay in raising both issues has prejudiced Apple," in that "Apple could have sought to align the schedules of this proceeding with *Unified*, thereby eliminating the possibility of estoppel under § 315(e)(1)," but because the "Final Written Decision ('FWD') in *Unified* has issued, however, Apple cannot do that." *Id.*

Petitioner argues that "by not timely raising an RPI issue of which it has been aware since 2021, MemoryWeb has waived and/or forfeited its ability to now argue that Apple and Unified are RPIs of one another or to introduce new evidence on such an issue." *Id.*

Petitioner contends that "the *latest* time a patent owner may lodge such an argument or objection is in the [Patent Owner Response]," *Id.* at 15 (citing *Unified Patents v. JustService.net LLC*, IPR2020-01258, 2022 WL 494800, at *1 (PTAB Feb. 16, 2022); *Unified Patents Inc. v. Mobility Workx, LLC*, IPR2018-01150, 2019 WL 6481774, at *1 (PTAB Dec. 2, 2019); *Funai Elec. Co. v. Gold Charm Ltd.*, No. IPR2015-01468, 2016 WL 7995297, at *22 (PTAB Dec. 27, 2016); *Unified Patents Inc. v. Nonend Inventions N.V.*, IPR2016-00174, Paper 26 at 6-7 (PTAB May 8, 2017).

Petitioner asserts that "MemoryWeb never raised an RPI issue [in the *Apple* proceeding] before the evening of March 14, 2023—roughly two hours after the oral hearing in this proceeding concluded and the proceeding

17

IPR2022-00031
Patent 10,621,228 B2

had been submitted for decision by the Board," even though Patent Owner "alleged an RPI relationship existed between Apple and Unified" on December 17, 2021, in its Patent Owner Response in the *Unified* proceeding. Paper 46, 17 (citing *Unified*, Paper 8, 22–28 (Dec. 17, 2021); *Apple*, Paper 20 (Sept. 23, 2022). Petitioner argues that Patent Owner "could have raised its RPI assertions and sought to introduce its RPI evidence in the *Apple* proceeding long before it filed its POR in this proceeding in September 2022." Paper 46, 18 (citing *Apple*, Paper 20 (Sept. 23, 2022).

Petitioner contends that Patent Owner's failure to "timely raise the RPI-based estoppel issue before this proceeding had been submitted for decision (as it had done in *Unified* and *Samsung*)" undermines Patent Owner's estoppel arguments. Paper 46, 26–27. Petitioner argues that the "premise of MemoryWeb's position is that the only proper time to raise an estoppel argument was ***after*** the issuance of the FWD in *Unified*. But that cannot be reconciled with what MemoryWeb did in both [the] *Unified* or *Samsung*" proceedings. *Id.* at 28. Petitioner contends that "[i]n each [of those] proceeding[s], MemoryWeb made RPI and estoppel arguments in its [Patent Owner Responses]." *Id.* Petitioner contends that Patent Owner "knew how and when to raise and preserve an estoppel argument in a timely manner and did so in the other two proceedings—but chose to not do so here." *Id.* at 29.

### 2. *Patent Owner's Arguments*

Patent Owner contends that Petitioner "has not established that MemoryWeb failed to make the timely assertion of its rights or intentionally relinquished or abandoned a known right," and that Petitioner "has not

18

IPR2022-00031
Patent 10,621,228 B2

identified *any* authority prior to the Director['s] Decision suggesting that MemoryWeb needed to introduce arguments and evidence in this proceeding regarding Apple's RPI status." Paper 49, 3–4.

Patent Owner argues that it "does not contend that Apple failed to name Unified as an RPI in this proceeding. Thus, there was nothing for MemoryWeb to respond or object to in its Response in this proceeding." *Id.* at 4. Patent Owner also points out that "Apple offers no authority holding that MemoryWeb was obligated to assert an Apple-Unified RPI relationship prior to the issue of estoppel becoming ripe." *Id.* at 7. Patent Owner also argues that "the protective order in *Unified* . . . barred MemoryWeb from simply introducing the evidence from *Unified* into evidence in this proceeding." *Id.* at 9.

Patent Owner argues that Apple "could not be estopped unless and until *Unified* resulted in a final written decision," and "[t]hat did not occur until March 14, 2023." Paper 49, 10. Patent Owner also argues that "[i]f Apple's arguments are accepted, the parties and the Board must expend resources litigating [the real party in interest issue] (including potential third-party subpoenas), even though [a final written decision] has not yet and may never occur" in the first proceeding. *Id.*

Patent Owner contends that "good cause exists to excuse any untimeliness in introducing evidence and arguments regarding Apple's RPI status in the Unified IPR." *Id.* at 7 (citing 37 C.F.R. § 42.5(c)(3)). Patent Owner asserts that "[t]he Director['s] Decision represents 'new guidance' or 'an intervening change in the law,' which constitutes good cause." *Id.* at 8 (citing *Microsoft Corp. v. IPA Techs., Inc.*, IPR2019-00810, Paper 8 at 3

19

IPR2022-00031
Patent 10,621,228 B2

(PTAB Sep. 5, 2019). Patent Owner further contends that "[a]ny alleged prejudice to Apple pales in comparison to the prejudice to MemoryWeb if Apple's arguments are accepted." Paper 49, 8.

### 3. Discussion

We first consider the issue raised by Petitioner that Patent Owner "has waived and/or forfeited its ability to raise an RPI issue in this proceeding, or to allege estoppel under 35 U.S.C. § 315(e)(1) based on an RPI issue." Paper 46, 1. After considering the evidence and the arguments of the parties, we determine that the weight of the evidence establishes that Patent Owner has forfeited and/or waived any right it may have had to raise the RPI issue or assert estoppel under 35 U.S.C. § 315(e)(1) in this proceeding.

### a) Notice

Patent Owner first argues that "Apple has not identified *any* authority prior to the Director['s] Decision suggesting that MemoryWeb needed to introduce arguments and evidence in this proceeding regarding Apple's RPI status in *Unified* to reserve MemoryWeb's rights in the event *Unified* resulted in a final written decision." Paper 49, 4.

35 U.S.C. § 312 (a)(2) states that "[a] petition filed under section 311 may be considered only if . . . the petition identifies all real parties in interest." 37 C.F.R. § 42.8 (b)(1) of the Board's rules regarding mandatory notices also requires that the petition "[i]dentify each real party-in-interest for the party."

Citing 35 U.S.C. § 312, MemoryWeb first alleged in its Patent Owner Preliminary Response in the *Unified* proceeding filed on December 12, 2021, that "the Petition fails to name all real parties-in-interest ("RPIs"), including at least Samsung and Apple, and should therefore be denied." *See*

20

IPR2022-00031
Patent 10,621,228 B2

*Unified*, IPR2021-01413, Paper 8, 22.  MemoryWeb repeated this same allegation in the *Unified* proceeding approximately six months later in its Patent Owner Response filed on June 6, 2022.  *See Unified*, Paper 23, 14 ("the Board should terminate this proceeding because Petitioner has failed to name all real parties-in-interest ("RPIs"), including at least Samsung and Apple").  The question thus becomes whether MemoryWeb was under an obligation to notify Apple in this proceeding that it was alleging that Apple was an unnamed RPI in the *Unified* case, so that Apple would have fair notice and an opportunity to respond.

Apple points out in its brief that the Board has held on a number of occasions that failing to raise an RPI issue in the Patent Owner Response forfeits and/or waives the issue.  *See, e.g.*, *Unified Patents v. JustService.net LLC*, *IPR2020-*01258, 2022 WL 494800, at *1 (PTAB Feb. 16, 2022) ("Patent Owner did not raise the RPI issue in its post-institution Response. We agree with Petitioner that Patent Owner has thus forfeited any RPI arguments."); *Unified Patents Inc. v. Mobility Workx, LLC*, IPR2018-01150, 2019 WL 6481774, at *1 (PTAB Dec. 2, 2019) ("Patent Owner argued in its Preliminary Response that Petitioner failed to name all real parties in interest (RPIs) in its Petition as required by 35 U.S.C. § 312(a)([2])…. Patent Owner does not present this argument in its Patent Owner Response and, therefore, has waived it."); *Funai Elec. Co. v. Gold Charm Ltd.*, No. IPR2015-01468, 2016 WL 7995297, at *22 (PTAB Dec. 27, 2016) (same); *Unified Patents Inc. v. Nonend Inventions N.V.*, IPR2016-00174, Paper 26 at 6-7 (PTAB May 8, 2017) (patent owner waived RPI arguments because it did not present its RPI contentions in its patent owner response).  While these cases

21

IPR2022-00031
Patent 10,621,228 B2

are not identical in posture to this one, they do stand for the proposition that the latest time for a Patent Owner to raise the RPI issue is in the Patent Owner Response.

Patent Owner's argument that it "does not contend that Apple failed to name Unified as an RPI in this proceeding," and "[t]hus, there was nothing for MemoryWeb to respond or object to in its Response in this proceeding," misses the point. Paper 49, 4. The point is whether Patent Owner should have put Apple on notice in its Patent Owner Response that it was contesting that Apple was an unnamed RPI in the *Unified* proceeding, so that Apple would be put on notice and be in a position to respond.

The Board's rules with respect to default filing times provide that "[a] party should seek relief promptly after the need for relief is identified. Delay in seeking relief may justify a denial of relief sought." 37 C.F.R. § 42.25(b). As mentioned earlier, the evidence shows that on December 12, 2021, MemoryWeb alleged in its Preliminary Response in the *Unified* case that "the Petition fails to name all real parties-in-interest ("RPIs"), including at least Samsung and Apple, and should therefore be denied." *Unified*, Paper 8, 22. MemoryWeb repeated this allegation in its Patent Owner Response filed on June 6, 2022. *Unified*, Paper 23, 14.

Nonetheless, when MemoryWeb filed its Patent Owner Response in the *Apple* proceeding some three months later on September 23, 2022, MemoryWeb failed to put Apple on notice that it was alleging that Apple was an RPI in the *Unified* case, thus depriving Apple of timely, fair, and reasonable notice that this issue was being contested and giving Apple an opportunity to respond.

22

IPR2022-00031
Patent 10,621,228 B2

The record also shows that MemoryWeb did not raise the RPI or estoppel issues in this proceeding, or request leave to file a motion to terminate this proceeding, until *after* the oral hearing had been held on March 14, 2023, and the case had been submitted to the Board for a final decision. *See* Ex. 3003, 24:18–25:7 (transcript of conference call dated March 31, 2023) (counsel for MemoryWeb acknowledging that "MemoryWeb has not reached out to the Board about a similar motion [to stay or terminate] in the Apple case"). When asked during a subsequent hearing whether Patent Owner could have raised these issues in this case, counsel for MemoryWeb responded, "Could we have? Yes. But that doesn't mean that we forfeited the right to because we were in no way ever required to." Paper 75, 41:13–22.

Patent Owner argues that "the protective order in *Unified* . . . barred MemoryWeb from simply introducing the evidence from *Unified* into evidence in this proceeding," but this is a misleading argument. Paper 49, 9. In the *Unified* case, MemoryWeb based its allegation in the Preliminary Response that Apple was an unnamed RPI on publicly available information. *See, e.g.*, *Unified*, Paper 8, 22 ("[P]ublicly available information confirms that Samsung and Apple are member companies, and as acknowledged by Unified, it is aware of related district court proceedings involving both Apple and Samsung."). Here, MemoryWeb could have relied on the same public information to put Apple on notice that it was alleging that Apple was an unnamed real party in interest in the *Unified* case. Instead, MemoryWeb chose to stand mute.

<div align="center">23</div>

IPR2022-00031
Patent 10,621,228 B2

> *b) Timing*

Patent Owner attempts to justify the timing of when it raised the estoppel defense in this proceeding by arguing that Apple "could not be estopped unless and until *Unified* resulted in a final written decision," and "[t]hat did not occur until March 14, 2023." Paper 49, 10. Patent Owner also contends that "[i]t would be illogical to require the patent owner to argue [RPI status] in its response to reserve its rights to seek estoppel later, especially given the potential that the exercise may become moot if [a final written decision] never occurs." *Id.* We disagree.

The question of when estoppel becomes ripe to assert is a different question than the question of when notice should be given to a party of a contested issue such as an unnamed RPI. As discussed, our rules provide that "[a] party should seek relief promptly after the need for relief is identified." 37 C.F.R. § 42.25(b) (2023). Here, MemoryWeb identified its need for relief at least as early as when it first contested the RPI issue in the *Unified* case.

Moreover, the obligation to provide fair and reasonable notice of contested issues or defenses falls on the party who is aware of the issues and defenses, who decides whether or not they will be raised or asserted, and who benefits if they are successful. *See, e.g.*, *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1299 (Fed. Cir. 2023) (holding that the burden of proving estoppel, i.e., that a skilled searcher exercising reasonable diligence would have identified an invalidity ground not raised in an *inter partes* review, rests on the patent holder). With respect to the RPI and estoppel issues in this case, we believe that party is clearly MemoryWeb.

24

IPR2022-00031
Patent 10,621,228 B2

We also disagree with MemoryWeb's suggestion that "the better approach would be to wait until the [final written decision] occurs or is imminent before the parties expend resources litigating the remainder of the requirements for estoppel." Paper 49, 11. The difficulty with MemoryWeb's suggestion is exemplified in this case, where MemoryWeb waited until the final written decision issued in the *Unified* proceeding (March 14, 2023) to raise the RPI and estoppel issues here and to request leave to file a motion to terminate, all of which occurred *after* the oral hearing had been held and *after* the case had been submitted to the Board for a final decision. *See* Paper 44; Ex. 3003, 24:18–25:7; Ex. 1093, 10.

Moreover, adopting MemoryWeb's suggestion of waiting until a final written decision issues in the first case before notifying Petitioner and the Board of the RPI and estoppel issues in the second case, would needlessly constrain the Board's ability to address and resolve the RPI and estoppel issues in a timely and efficient manner. For example, how would the Board effectively manage a situation where the first final written decision issues one week, or one day, or even one hour before the second? Clearly, MemoryWeb's suggestion that "the better approach would be to wait until the [final written decision] occurs or is imminent" is simply impracticable, would promote gamesmanship, and also fails to take into consideration the fundamental unfairness and resulting prejudice to both the Petitioner and the Board.

### c) Prejudice

Patent Owner contends that "Apple has not established any meaningful prejudice," and that "[a]ny alleged prejudice to Apple pales in

25

IPR2022-00031
Patent 10,621,228 B2

comparison to the prejudice to MemoryWeb if Apple's arguments are accepted." Paper 49, 8. We disagree.

The consequences of MemoryWeb's waiting to raise the RPI and estoppel issues in this case until *after* the final written decision in the *Unified* case are significant. First, Apple is now exposed to the risk of estoppel due to the earlier final written decision in the *Unified* proceeding. Apple could have avoided this risk by seeking to align the schedules in the *Unified* and *Apple* proceedings so that the final decisions in the two cases issued concurrently. For example, Apple asserts that

> [t]he parties met and conferred in July of 2022 to adjust the schedules of this and three other *Apple* proceedings involving related MemoryWeb patents. *See* EX3001, 1-6; *see also* EX1093, 11-12, 14-23. MemoryWeb made no mention of its intention to raise RPI and estoppel theories in this proceeding during those consultations. *See generally*, EX1093, 11-23. Had it done so, Apple could have sought to align this proceeding with the *Unified* proceeding.

Paper 46, 25 n.5. As Apple puts it, "the prejudice here is both clear and incurable." *Id.* at 24.

Moreover, because MemoryWeb waited to raise the RPI and estoppel issues until after the *Unified* final written decision issued, the Board and the parties have had to expend substantial additional resources on these issues, including by extending the one-year pendency of the *Apple* proceeding. Much of this extraordinary effort would likely have been avoided had Patent Owner simply provided timely, fair and reasonable notice to Apple that MemoryWeb considered Apple an unnamed RPI in the *Unified* proceeding and intended to assert IPR estoppel in this proceeding once a final written decision issued in the *Unified* proceeding. Early notice would have allowed

26

IPR2022-00031
Patent 10,621,228 B2

the parties to raise these issues with the Board in a timely manner and request alignment of the schedules or consolidation of the proceedings early on in the process.

Indeed, aligning the cases in a manner so that the final written decisions in the *Unified* and *Apple* proceedings issued at the same time would have eliminated much of the need to expend valuable time, effort, and resources on a number of these issues. Apple argues, for example, that such "sequencing would have spared both the Board and parties any need to waste the extensive resources that have now been devoted to this issue by eliminating the possibility of estoppel under § 315(e)(1)." Paper 46, 25.

Alternatively, consolidating the cases early on under 35 U.S.C. § 315(d) may have provided a more efficient and effective way to manage the cases and handle the various issues. But by waiting until *after* the final written decision issued in *Unified* to notify Apple of the contested RPI issue and to assert estoppel, MemoryWeb effectively foreclosed Apple's and the Board's ability to handle these issues in a more efficient and practicable way that would have avoided the unnecessary expenditure of additional resources.

### d) Good Cause

As noted earlier, our rules provide that "[a] party should seek relief promptly after the need for relief is identified." 37 C.F.R. § 42.25(b) (2023). But they also provide that "[d]elay in seeking relief may justify a denial of relief sought." *Id.* Nonetheless, "[a] late action will be excused on a showing of good cause or upon a Board decision that consideration on the merits would be in the interests of justice." 37 C.F.R. § 42.5(c)(3) (2023).

27

IPR2022-00031
Patent 10,621,228 B2

Patent Owner contends that "good cause exists to excuse any untimeliness in introducing evidence and arguments regarding Apple's RPI status in the Unified IPR." Paper 49, 7 (citing 37 C.F.R. § 42.5(c)(3)). Patent Owner asserts that "[t]he Director['s] Decision [*Unified*, Paper 76] represents 'new guidance' or 'an intervening change in the law,' which constitutes good cause." Paper 49, 8 (citing *Microsoft Corp. v. IPA Techs., Inc.*, IPR2019-00810, Paper 8 at 3 (PTAB Sep. 5, 2019)); *see also* Paper 47, 12. Patent Owner argues that "[g]iven the lack of guidance to the contrary prior to the Director['s] Decision, MemoryWeb's decision to address Apple's RPI status in the Unified IPR—rather than this proceeding—was reasonable and appropriate." Paper 47, 12–13.

Patent Owner also argues that its motion to terminate is not a "late action" because "[e]stoppel is only triggered if and when a related proceeding—in this case, the Unified IPR—results in a final written decision," and "MemoryWeb *immediately* sought to terminate this proceeding pursuant to 35 U.S.C. § 315(e)(1) the *same day* the Board issued the Unified FWD." Paper 47, 10 (citing Ex. 2039).

The record shows, however, that MemoryWeb identified "the need for relief" at least as early as December 17, 2021, when MemoryWeb alleged in its Preliminary Response in the *Unified* proceeding that "the Petition fails to name all real parties-in-interest ("RPIs"), including at least Samsung and Apple, and should therefore be denied." *Unified*, Paper 8, 22. MemoryWeb repeated this allegation approximately six months later when it filed its Patent Owner Response in that proceeding on June 6, 2022. *Id.*, Paper 23, 14 ("the Board should terminate this proceeding because Petitioner has

28

IPR2022-00031
Patent 10,621,228 B2

failed to name all real parties-in-interest ("RPIs"), including at least
Samsung and Apple").

Nonetheless, MemoryWeb did not raise the RPI or estoppel issues in
this proceeding when it filed its Patent Owner Response on September 23,
2022. Indeed, MemoryWeb did not raise either of these issues in this case
until *after* the oral hearing on March 14, 2023, after which the case was
submitted to the Board for final decision.

Although MemoryWeb attempts to justify this delay by pointing to the
release of the final written decision in *Unified*, we are not persuaded that the
lapse of time between when MemoryWeb first made the unnamed RPI
allegation in the *Unified* case (December 17, 2021), until the time it finally
raised the issue in this case (March 14, 2023), amounts to "seek[ing] relief
promptly after the need for relief is identified." Indeed, MemoryWeb could
have raised the issue in this case when it filed its Patent Owner Preliminary
Response (Paper 8, February 23, 2022), or when it filed its Patent Owner
Response (Paper 20, September 23, 2022). In our view, the lapse of time
between when MemoryWeb could have raised the issue in this case
(February 23, 2022 or September 23, 2022), and when it finally sought relief
(March 14, 2023), amounts to a delay that "justif[ies] a denial of relief
sought." 37 C.F.R. § 42.25(b) (2023).

Moreover, MemoryWeb does not provide a satisfactory explanation as
to why it was able to raise the contested RPI issue in the related *Samsung*
proceeding, which also challenges the '228 Patent, but not in this
proceeding. In *Samsung,* MemoryWeb asserted in its Preliminary Response
dated March 16, 2022, that "Samsung should have been named as a real

29

IPR2022-00031
Patent 10,621,228 B2

party in interest in the Unified IPR" and that "[b]oth the Apple and Samsung petitions address all of the claims of the '228 patent." *Samsung*, IPR2022-00222, Paper 8, 30–31. If MemoryWeb was able to apprise Samsung of the contested RPI issue in March 2022, then surely it could have apprised Apple of this issue when it filed its Patent Owner Response on September 23, 2022. When asked about this inconsistency at a hearing in this case, MemoryWeb's counsel simply stated that "the law didn't require us to do it in Samsung. Out of an abundance of caution, we did it. But it was not in any way required that we do it there." Paper 75, 40:10–18.

We also do not agree with Patent Owner's argument that "[t]he Director['s] Decision . . . constitutes good cause." Paper 49, 8. The Director['s] Decision was not made public until May 22, 2023, approximately 2 months *after* MemoryWeb raised the issues of RPI and estoppel in this proceeding. *Unified*, Paper 76. MemoryWeb's decision to finally raise these issues in this proceeding was prompted by the final written decision being issued in the *Unified* case, and was not related to the Director['s] Decision, which did not yet exist. *See* Paper 47, 10 ("MemoryWeb immediately sought to terminate this proceeding pursuant to 35 U.S.C. § 315(e)(1) the same day the Board issued the Unified FWD.") (emphasis omitted).

Upon considering the evidence and the arguments of the parties on the complete record, we find that the weight of the evidence establishes that Patent Owner could have, but did not, provide timely notice of the contested RPI and estoppel issues in this proceeding to the unfair surprise and prejudice of Petitioner. We also find that the weight of the evidence does

30

IPR2022-00031
Patent 10,621,228 B2

not establish that good cause exists to excuse this late action. Accordingly, we find that Patent Owner has forfeited and/or waived any right it may have had to raise the RPI issue or assert estoppel under 35 U.S.C. § 315(e)(1) in this proceeding.

B.    *Real Party in Interest ("RPI")*

Petitioner identifies itself as the only real party in interest. Pet. 2; Paper 6, 1. Patent Owner identifies itself as the only real party in interest. Paper 3, 2; Paper 7, 2. Patent Owner does not contest Petitioner's identification of itself as the only real part in interest. *See generally* Patent Owner Response; *see also* Paper 47, 13 ("MemoryWeb does not contend that Apple's identification of itself as the sole RPI in this proceeding is incorrect.").

With respect to the issue of whether Petitioner was properly named as a real party in interest in the *Unified* proceeding, we have found that Patent Owner has forfeited and/or waived the ability to raise that issue in this proceeding. *See* Section. II.A, above.

C.    *Estoppel*

With respect to the issue of IPR estoppel, we have found that Patent Owner has forfeited and/or waived any right it may have had to assert estoppel under 35 U.S.C. § 315(e)(1) in this proceeding. *See* Section. II.A, above.

D.    *Motion to Terminate*

Patent Owner has moved to terminate this proceeding pursuant to 35 U.S.C. § 315(e)(1), 37 C.F.R. § 42.73(d), and 35 U.S.C. § 315(d). Paper 57, 1. Patent Owner's motion to terminate these proceedings is denied given

31

IPR2022-00031
Patent 10,621,228 B2

our determination that Patent Owner has forfeited and/or waived any right it may have had to raise the RPI issue or assert estoppel in this proceeding. *See* Section. II.A, above. However, even if the RPI issue were to be considered in this case, and even if we were to determine that Petitioner is estopped as to claims 1–7, we would not terminate this proceeding as to those claims, nor would we terminate the proceeding as to the remaining claims, because it is in the interest of the public as well as the integrity of the patent system that the panel issue a final written decision on the merits of this case. *See, e.g.*, IPR2018-01248, Paper 34, 18.

    E.     *Principles of Law: Obviousness*

A claim is unpatentable as obvious under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.[6] *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415.

---

[6] The record does not present or address any evidence of nonobviousness.

IPR2022-00031
Patent 10,621,228 B2

Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417.  Reaching this conclusion, however, requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011).  Rather, obviousness requires the additional showing that a person of ordinary skill would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.*

    F.    *Level of Ordinary Skill*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).  "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field. *Custom Accessories, Inc. v. Jeffrey-Allan Indus. Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Orthopedic Equip. Co. v. U.S.*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

Petitioner contends that a "person of ordinary skill in the art in the field of the '228 patent in 2011 (or 2014) would have had (1) at least a

33

IPR2022-00031
Patent 10,621,228 B2

bachelor's degree in computer science, computer engineering, or electrical engineering, and (2) at least one year of experience designing graphical user interfaces for applications such as photo management systems." Pet. 9 (citing Ex. 1003 ¶¶ 41–43). Patent Owner "does not dispute Petitioner's proposed level of skill." PO Resp. 15

Based on the record, including our review of the '228 patent and the types of problems and solutions described in the patent and the cited prior art, we adopt Petitioner's assessment of the level of ordinary skill in the art and apply it for purposes of this Decision.

G.    *Claim Construction*

Pursuant to 37 C.F.R. § 42.100(b), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Under *Phillips,* claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and even extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (in the context of an *inter partes* review, applying *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

34

IPR2022-00031
Patent 10,621,228 B2

Petitioner states that "the Board need not expressly construe the claims." Pet. 13. Patent Owner "agrees that the claims can be afforded their plain and ordinary meaning and that no construction is necessary." PO Resp. 15.

For purposes of this Decision, we determine that no claim terms require express construction. *See Vivid Techs.*, 200 F.3d at 803 (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy").

### H.    Relevant Prior Art

#### 1.    A3UM (Ex. 1005)

A3UM (Aperture 3 User Manual) is a user manual for Apple's Aperture software product ("Aperture"), showing a copyright date of 2009. Ex. 1005, 3. Petitioner asserts that A3UM is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 13. Patent Owner disputes this assertion. *See* PO Resp. 15–42.

A3UM explains that Aperture is a "digital image management system that can track thousands of digital images and provides . . . image management and adjustment tools" and allows the user to "work with high-quality JPEG, TIFF, and RAW image files-and even HD video files." Ex. 1005, 1. A3UM states that Aperture organizes "photos, audio clips, and video clips." *Id.* at 21. A3UM "describes the Aperture interface, commands, and menus and gives step-by-step instructions for creating Aperture libraries and for accomplishing specific tasks." *Id.* at 3. One particular Aperture interface is the Aperture main window, reproduced below in an Aperture main window screenshot. *Id.* at 46.

35

IPR2022-00031
Patent 10,621,228 B2



The Aperture main window, above, shows various interface features including an "Inspector pane," a "Toolbar," a "Viewer," a "Browser," and a "Vault pane." *Id.* The Browser displays "thumbnail images contained in a folder, project, or album." *Id.* at 47. In this example, a "single row of thumbnails" is displayed. *Id.* at 47–48. The Browser also displays "video files [imported] into Aperture." *Id.* at 271. Next, the Viewer shows selected thumbnails from the Browser at full size, or allows side-by-side image comparison. *Id.* at 51. If video items were selected from the Browser, the Viewer can display those videos. *Id.* at 271. Further, the Inspector pane provides access to a Library inspector, via its Library tab, reproduced in an Inspector Pane screenshot below. *Id.* at 54.

36

IPR2022-00031
Patent 10,621,228 B2



Inspector Pane screenshot, above, illustrates how "[t]he Library inspector holds containers—projects, folders, and albums—" which are used to organize images. *Id.* at 55. When a particular "project, folder, or album in the Library inspector" is selected, "the images are displayed in the Browser and Viewer." *Id.* Further, the "Library inspector also provides a number of ways to view items in the library" and provides access to additional Aperture interface views, such as a Places view and a Faces view. *Id.* Those additional views are accessed by selecting the Places or Faces item in the Library inspector (as shown in the Inspector Pane screenshot) or by selecting the Places or Faces button in the toolbar (as shown in the Aperture main window screenshot). *Id.* at 81, 424.

The Places view "automatically plots the location of each image on [a] map" and provides "images associated with a location." *Id.* at 435–436. That is, the Places view organizes "images by the locations where they were taken" and "categorizes the images by location and converts" the location to "place names, such as Vancouver, Canada." *Id.* at 30. A screenshot of one

37

IPR2022-00031
Patent 10,621,228 B2

exemplary Places view, within the overall Aperture main window, is reproduced below. *Id.*



The screenshot, above, shows the Places view, the Inspector Pane, and the Browser. Another exemplary screenshot of the Places view showing "location pins [to] mark the locations where images or groups of images were shot" is reproduced below. *Id.* at 436–437.

38

IPR2022-00031
Patent 10,621,228 B2



The screenshot, above, shows the Places view with "location pins mark the locations where images or groups of images were shot." *Id.* at 436–437. In particular, the screenshot shows a location pin having a text callout indicating that a number of photos were taken at a national park. When a pin is selected, "the image or images associated with the location marked by the [selected] pin are selected in the Browser." *Id.* at 436.

Turning to the Faces view, the Faces view "show[s] all the photos of people with assigned names in the Aperture library." *Id.* at 78. A screenshot of the Faces view is reproduced below. *Id.* at 29, 78.

39

IPR2022-00031
Patent 10,621,228 B2



— Faces view

    The screenshot, above, shows the Faces view within the overall
Aperture main window, including images of people with assigned names.
By selecting a "person's snapshot in Faces view," Aperture displays "all of
the images in [the] library in which a person appears." *Id.* at 29, 79.  A
screenshot of all the images of a selected person is reproduced below.  *Id.* at
79–80; *see id.* at 29.

40

IPR2022-00031
Patent 10,621,228 B2



The screenshot, above, shows "all the confirmed images of that person appear at the top of the Faces browser, and all the suggested images of the person appear in a separate section below the confirmed images." *Id.* at 79–80. The suggested images of the person are determined in an automated

41

IPR2022-00031
Patent 10,621,228 B2

process which uses "face detection and face recognition technology" to suggest images corresponding to a named person. *Id.* at 417–419. Those suggested images can be confirmed as matches for the named person by selecting the "Confirm Faces" button. *Id.* at 80, 419. Alternatively, an image can have a name manually assigned to it. *Id.* at 421–422.

### *a) Prior Art Status of A3UM*

Petitioner contends that A3UM should be considered a printed publication because A3UM was publicly available through the Aperture 3 website and software DVD. Pet. 13–17. Patent Owner disputes this and contends that "Petitioner has not established that A3UM qualifies as prior art." PO Resp. 15.

### *(1)    Applicable Law*

Our governing statutes provide "[a] petitioner in an *inter partes* review may request to cancel as unpatentable one or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). Although Patent Owner challenges whether A3UM is a printed publication, the burden of persuasion remains on Petitioner to demonstrate unpatentability. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (*citing Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review).

Petitioner must demonstrate by a preponderance of the evidence that the challenged claims are unpatentable—including showing that the references relied upon are patents or printed publications. *See* 35 U.S.C. § 311(b); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365,

42

IPR2022-00031
Patent 10,621,228 B2

1375 (Fed. Cir. 2018), *as amended* (Sept. 20, 2018). "The preponderance of the evidence standard applicable to *inter partes* reviews requires proof that a fact was more likely than not to have occurred." *Instradent USA, Inc. v. Nobel Biocare Servs. AG,* IPR2015-01786, Paper 106 at 33 (PTAB Feb. 15, 2017) (internal quotations omitted).

The determination of whether a reference qualifies as a "printed publication" is a legal conclusion based on underlying factual findings. *Nobel*, 903 F.3d at 1375 (citing *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1356 (Fed. Cir. 2018)). The underlying factual findings include whether the reference was publicly accessible. *Id.* (citing *In re NTP, Inc.*, 654 F.3d 1279, 1296 (Fed. Cir. 2011)).

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1380 (Fed. Cir. 2018) (citing *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004)). In certain situations, particularly for manuscripts or dissertations stored in libraries, courts may inquire whether a reference was sufficiently indexed, catalogued, and shelved. *See, e.g.*, *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986); *In re Lister*, 583 F.3d 1307, 1315 (Fed. Cir. 2009) (manuscript became publicly accessible once it was placed in a searchable database). In other situations, such as for information displayed at meetings and trade shows, courts have explained that indexing is not required if it was sufficiently disseminated. *See Medtronic*, 891 F.3d at 1381 (citing *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1365 (Fed. Cir. 2014)). The Federal Circuit has summarized

43

IPR2022-00031
Patent 10,621,228 B2

that "[w]hile cataloging and indexing have played a significant role in our cases involving library references, we have explained that neither cataloging nor indexing is a necessary condition for a reference to be publicly accessible." *Lister*, 583 F.3d at 1312 (citing *Klopfenstein*, 380 F.3d at 1348).

    "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d at 898–99). "A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008) (quoting *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006)). The Federal Circuit has "interpreted § 102 broadly, finding that even relatively obscure documents qualify as prior art so long as the relevant public has a means of accessing them." *GoPro, Inc. v. Contour IP Holding LLC*, 908 F.3d 690, 693 (Fed. Cir. 2018).

    What constitutes a "printed publication" must also be determined in light of the technology employed. *Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019) (citing *Wyer*, 655 F.2d at 226). Public accessibility requires more than technical accessibility. *Id.* (citing *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 773 (Fed.

44

IPR2022-00031
Patent 10,621,228 B2

Cir. 2018)). "[A] work is not publicly accessible if the only people who know how to find it are the ones who created it." *Id.* at 1372. On the other hand, "a petitioner need not establish that specific persons actually accessed or received a work to show that the work was publicly accessible." *Id.* at 1374. "In fact, a limited distribution can make a work publicly accessible under certain circumstances." *Id.* (quoting *GoPro*, 908 F.3d at 694).

### (2)    Parties' Arguments

Petitioner contends that A3UM was publicly accessible at least as early as February 2010, and qualifies as prior art under section 102(b), because (1) a copy was enclosed as an HTML file set on the installation DVD included in each retail package of Aperture 3 sold by Apple, Inc. and was accessible by both the files themselves and through the software; and (2) it was available for PDF download on the apple.com website. Pet. 13–14. Petitioner primarily relies on a declaration by Matthew Birdsell, who "is an Apple employee with personal knowledge of the publication and dissemination of the Aperture 3 User Manual in early 2010," to demonstrate that A3UM qualifies as a printed publication. Pet. 13 (citing Ex. 1020 ¶¶ 2–4). In February 2010, Mr. Birdsell was an independent contractor for Apple who "personally worked on Apple documentation and publications regarding each version of Aperture throughout its lifespan, including Aperture 3." Ex. 1020 ¶ 2.

Mr. Birdsell testified that "more than 100,000 customers had purchased and were using the Aperture 3 product between February and June of 2010," which he based on his personal "experience with the utilization levels of the help resources on the Apple.com website at the time." Ex. 1020 ¶ 7. To support this statement, Petitioner submits an

45

IPR2022-00031
Patent 10,621,228 B2

Internet Archives' Wayback Machine capture of the home webpage of apple.com showing Aperture 3 for sale in February 2010 in addition to a table of contents that presumably can be accessed from the "Aperture 3 User Manual" hyperlink.  Pet. 14 (citing Ex. 1021); Pet. Reply 3.  Petitioner also includes three articles discussing Aperture 3 software and its February 9, 2010, release date, which, according to Petitioner, demonstrates that "many individuals had installed Aperture 3—and thereby transferred A3UM—onto their computers before June 2010, which required use of the installer DVD supplied via the retail package of Aperture 3."  Pet. 14–15 (citing Exs. 1044, 1045, 1048); *see also* Pet. Reply 3 (citing Ex. 1044, 1; Ex. 1045, 2; Ex. 1077, 1; Ex. 1089, 181:14–182:11, 192:2–7, 189:10–14, 170:6–13).

Using the installer DVD, Petitioner alleges that A3UM could be accessed by running the Aperture 3 software then selecting "Aperture 3: User Manual" in the "Help>Aperture Help" menu, which "would retrieve the locally-stored A3UM HTML file set copied during installation."  Pet. 15 (citing Ex. 1003 ¶¶ 85–96, 98; Ex. 1051, 7, 159); *see also* Pet. Reply 3 (citing Ex. 1003 ¶¶ 86–89; EX1020 ¶ 12(b)).  In addition to the internal help functionality, Petitioner asserts that "[s]killed artisans could obtain A3UM from the Aperture 3 installation DVD or from computers onto which Aperture 3 had been installed" by locating the HTML file set in the local copy of the Aperture 3 application bundle and opening the file set with a web browser.  Pet. 16 (citing Ex. 1003 ¶¶ 77–84, 90–96).

Petitioner alleges that "A3UM was also made publicly accessible via www.apple.com."  Pet. 16 (citing Ex. 1020 ¶¶ 17–29; Ex. 1003 ¶¶ 99–102).  Petitioner asserts that "the A3UM HTML file set was loaded onto a publicly

46

IPR2022-00031
Patent 10,621,228 B2

accessible website (http://documentation.apple.com/en/
aperture/usermanual/) where it became accessible to any member of the
public starting on the date of commercial sale of Aperture 3." Pet. 16 (citing
Ex. 1020 ¶¶ 9–11). To support this, Petitioner submits that archived copies
of the Aperture 3 website from 2010 "include an embedded URL pointing to
the HTML-based User Manual" and "display the same table of contents
entries as A3UM (EX1005), including sub-sections when manually
selected." *Id.* at 16–17 (citing Ex. 1003 ¶¶ 101–02; Ex. 1021, 6). Further,
Petitioner contends that "a skilled artisan, exercising only reasonable
diligence, could have located A3UM by following links on the apple.com
web site" or "[a]lternatively, that person could have located A3UM using the
search feature within the apple.com web site or using well-known search
engines." *Id.* at 17.

Patent Owner disputes that Petitioner's evidence of sales demonstrates
sufficient public accessibility of A3UM. PO Resp. 26. First, Patent Owner
contends that Mr. Birdsell is biased as a current Apple employee (PO Resp.
41–42) and his testimony about the number of copies sold is offered
"without any evidentiary support or conducting a personal investigation" and
"[m]ere speculation about the number of Aperture 3 purchases falls short of
the preponderance of the evidence burden Petitioner is required to meet."
*Id.* at 37–38 (citing Ex. 1020 ¶¶ 5–7; Ex. 2026, 53:16–55:17, 61:15–62:3;
*Instradent*, IPR2015-01786, Paper 106 at 33; *Samsung*, 929 F.3d at 1373
n.3). Patent Owner further argues that Petitioner is "unable to distinguish
between users who purchased retail boxes of Aperture 3 versus those who
upgraded from Aperture 2 to Aperture 3" without having the Aperture 3

47

IPR2022-00031
Patent 10,621,228 B2

DVD.  *Id.* at 26–27 (citing Ex. 2026, 62:23–63:20; 65:5–13).  Patent Owner also asserts that Dr. Terveen—an alleged POSITA—had no knowledge of any Aperture 3 sales prior to this case.  *Id.* at 27.

Moreover, Patent Owner argues that because users can only access the contents for A3UM when running the software program or following installation of the Aperture 3 application, A3UM "is part of an executing software program" and is not a patent or printed publication that can be the basis of an IPR.  PO Resp. 41. (citing *Ex Parte Nelson*, No. 2020-004978, 2020 WL 8186425, at *15 (PTAB Dec. 31, 2020); *Capsugel Belgium NV v. Innercap Techs., Inc.*, IPR2013-00331, Paper 9 at 15 (PTAB Dec. 9, 2013); *Supercell Oy v. GREE, Inc.*, IPR2021-00501, Paper 7 at 6 (PTAB Aug. 17, 2021)).  Additionally, Patent Owner claims that "Aperture 3 users were bound by such a license agreement" that prohibits copying A3UM as part of the software program.  Sur-reply 5 (citing Ex. 2007, 1–2).

Patent Owner also contends that the HTML file set was intentionally "hidden" or "invisible" on the installation DVDs and that Petitioner's own expert was unable to "testify that he knew where or how to find the 'hidden files' on his own" and that "his testimony suggests Petitioner's counsel provided him with 'tips' on how to find the hidden files."  PO Resp. 27–28 (citing, e.g., Ex. 2023, 63:23–64:5, 64:19–66:10; 67:8–19; 73:10–22, 79:10–15).  To locate the hidden files, Patent Owner contends that Dr. Terveen was unable to explain why he made specific choices to find the HTML file set and ultimately "traversed through 9 subsequent folder/file levels to find the user manual" after decompressing a hidden file named "Archive.pax.gz" located in the hidden "Aperture.pkg" folder.  *Id.* at 30–35 (citing, e.g., Ex.

48

IPR2022-00031
Patent 10,621,228 B2

2023, 77:10–78:7, 78:24–79:9, 87:1–6, 87:9–88:18, 100:23–101:10). Patent Owner states that "whether a reference is meaningfully indexed is an important factor for electronic sources like websites, not just physical libraries." *Id.* at 35 (citing *Acceleration Bay*, 908 F.3d at 773; *Samsung*, 929 F.3d at 1372–73). Patent Owner analogizes this to a physical library, arguing that it would be akin to

> requiring a person to know about the existence of a hidden section of a library (the *pkg. files), know how to access the hidden section of the library (i.e., unhiding the hidden files), know to move a portion of the hidden library section to another location (decompressing the Archive.pax.gz file), then know to navigate through thousands of shelves to collect a particular set of 746 books (the HTML file set).

*Id.* Because Petitioner failed to establish whether "the installation DVD included any search functionality for locating the HTML file set" or that "a POSITA would somehow look for hidden files, locally save and decompress one, then navigate through numerous sub-folders," Patent Owner contends that Petitioner has not satisfied the requirements of public accessibility. *Id.*

Patent Owner also argues that Petitioner has failed to refute that 1) "a POSITA exercising reasonable diligence would not have known to search for Aperture 3 or A3UM" and, 2) "a POSITA exercising reasonable diligence would not have found the website version of A3UM on Apple.com." PO Resp. 17–18. Patent Owner submits that "[t]he mere presence of a reference on a webpage is insufficient to establish public accessibility" and that a petitioner must demonstrate that a POSITA exercising reasonable diligence can locate the reference. *Id.* at 17 (citing *Acceleration Bay*, 908 F.3d at 772; *Samsung*, 929 F.3d at 1369); *see also Id.*

49

IPR2022-00031
Patent 10,621,228 B2

at 24 (citing *Elec. Frontier Found. v. Pers. Audio, LLC*, IPR2014-00070, Paper 21 at 22 (PTAB Apr. 18, 2014)).

Patent Owner asserts that "the Aperture 3 user manual page could be found only after executing several steps such as knowing to search for 'Aperture' or 'Aperture 3' in the search box or by navigating through a number of links on Apple.com" and that "there is no evidence on the record that searching Apple.com for other terms that would be common, like 'photo,' for example, would have yielded any Aperture-related results." *Id.* at 20 (citing Ex. 1020 ¶ 18; Ex. 2026, 67:21–69:11; Ex. 1003 ¶ 101). Patent Owner does note that "[w]hile users could have theoretically navigated to the product manual page, analytics evidence tracking the number of users who did so is unavailable and not in evidence." *Id.* at n.3 (citing Ex. 2026, 69:20–23).

Nevertheless, Patent Owner contends, even if a POSITA accessed "the Aperture 3 webpage through the homepage, a POSITA would still have needed to navigate through at least four more pages to reach the manual." *Id.* at 22 (Ex. 1003 ¶ 101; Ex. 1020 ¶ 19; Ex. 2026, 67:21–69:11). Thus, Patent Owner argues, because "the website's structure is critical in determining whether a reference is publicly accessible or merely technically accessible," Petitioner's argument is "without evidence showing 'meaningful indexing'" and demonstrates technical accessibility at best. *Id.* at 19, 22 (quoting *Salesforce.com, Inc. v. WSOU Investments, LLC*, IPR2022-00428, Paper 10 at 14 (July 13, 2022)); *id.* at 22–23 (citing *Acceleration Bay*, 908 F.3d at 773; *Samsung*, 929 F.3d at 1373).

IPR2022-00031
Patent 10,621,228 B2

Patent Owner also asserts that "the reference to Aperture 3 only
existed on the Apple.com homepage for only a matter of 'weeks,'" and such
"limited duration of accessibility is a strong indication that the user manual
through Apple.com website was not publicly accessible." *Id.* at 21 (citing
Ex. 2026, 56:23–57:9; *Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 847 F.
App'x 869, 876–77 (Fed. Cir. 2021)). Lastly, Patent Owner disputes that
Petitioner has demonstrated that Ex. 1005 is an adequate representation of
the PDF version on the website. PO Resp. 17–26.

<div align="center">

*(3)    Discussion*

</div>

We determine that Petitioner has proven by a preponderance of the
evidence that A3UM was "publicly accessible" both through distribution of
public sales of the Aperture 3 software and the Aperture 3 website.

Petitioner argues, and we agree, that the thousands of copies sold "far
exceeds the number of disclosures recognized under the relevant
dissemination law for printed publications." Pet. 14 (quoting *Cisco Sys.,
Inc. v. Centripetal Networks, Inc.*, IPR2018-01436, Paper 40 at 23–31 (Jan.
23, 2020) (finding 583 copies to be sufficient for being publicly available
through dissemination); citing *Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d
1104, 1109 (Fed. Cir. 1985) (determining six copies sufficient for
dissemination)); Pet. Reply 4. Patent Owner does not dispute Petitioner's
evidence that Apple offered to sell Aperture 3, or that a copy of the A3UM
reference was included on the Aperture 3 installer DVD sold in the relevant
timeframe. Patent Owner only disputes whether there were actual sales of
the DVD with the A3UM file set and submits that "Mr. Birdsell's testimony
cannot be corroborated because no such evidence exists, so it should be

<div align="center">

51

</div>

IPR2022-00031
Patent 10,621,228 B2

given little or no weight." PO Sur-reply 4 (citing Ex. 2026, 54:23–55:17, 69:13–19, 53:16–54:17).

As an initial matter, while Mr. Birdsell has been an Apple employee for over a decade, there is no evidence to suggest that he has a financial stake (e.g., losing employment) in the outcome of this matter, unlike in *Parrot*. *See Parrot*, IPR2018-01690, Paper 40 at 63–64 (giving little weight to testimony from witness who was a party's cofounder and admitted to having a financial stake in the outcome of the proceeding). Though the number of sales cannot be directly corroborated, Patent Owner has not offered any evidence beyond attorney argument that suggests Mr. Birdsell's testimony is unreliable.

Petitioner, however, has provided corroborating evidence to show that Aperture 3 was marketed, including a press release (Exhibit 1048), a feature on the home page of Apple (Exhibit 1021), and three separate reviewer articles (Exhibits 1044, 1045, 1048). *See also* Ex. 2026, 57:3–12 (stating that the presence of Aperture 3 on the Apple home page meant that it received "top billing"). Thus, it is not unreasonable to extrapolate that Aperture 3—sold on a website that Patent Owner's expert noted was "probably" one of the most visited websites in the world in 2010 (Ex. 1089, 188:9–16)—had been sold enough to be considered sufficiently disseminated to the public. Even without the knowledge of how many users purchased Aperture 3 retail boxes with the DVD instead of upgrading from Aperture 2 without the DVD, the fact that the Aperture series has been successful enough to manufacture three separate versions also supports this finding. Though Petitioner's expert lacked knowledge of Aperture 3 prior to

IPR2022-00031
Patent 10,621,228 B2

this case, Mr. Birdsell's testimony indicates that others knew about Aperture 3. *See, e.g.,* Ex. 1020 ¶ 7 (noting that at least 100,000 copies of Aperture 3 were sold); Ex. 2026, 51:16–20 (stating that website analytics corresponded with sales); 54:15–22 (discussing website access volume for Aperture 3). Although the evidence is not perfect, we find it far more likely than not that the A3UM was publicly accessible through retail copies of Aperture 3's installer DVD at least as of June 2010.

Patent Owner's argument that A3UM constitutes a product and not a printed publication is not persuasive because the A3UM HTML file set can be accessed without a special program or coding expertise. Patent Owner relies on *Ex parte Nelson* to support their argument; however, *Nelson* is distinguishable from the case here. No. 2020-004978, 2020 WL 8186425, at *15. The Examiner in *Nelson* relied on the actual software and not the user manuals to make rejections; additionally, there was insufficient evidence to suggest that the user manuals were included in the software distribution, unlike this case. *Id.*

Patent Owner also contends that the user manual at issue in *Cisco* was included on separate documentation disks that did not require installation of the software to view, unlike A3UM, which was hidden on the installation disk and required "a convoluted series of steps that likely proved challenging even to Petitioner's expert" to find. PO Resp. 36–37 (citing *Cisco*, IPR2018-01436, Paper 40 at 23). Because the *Cisco* documentation was separate from the software product and not embedded within, "there was a bright line demarcation" between the product and user manual that Patent

53

IPR2022-00031
Patent 10,621,228 B2

Owner argues does not exist in this case. *Id.* at 37 (citing *Cisco*, IPR2018-01436, Paper 40 at 23).

However, both Petitioner and Patent Owner demonstrate that the A3UM HTML file set is discrete and accessible through the files themselves and the DVD installer disk prior to installation. Ex. 1020 ¶¶ 12–16; Ex. 1003 ¶ 94; Ex. 1089, 27:4–7, 98:5–99:10; Ex. 1071, 5; Ex. 2023, 80:2–81:6; Ex. 2026, 71:11–72:8. The files are in a folder on their own and their contents can be accessed without Aperture 3 running. Ex. 1089, 98:5-99:10; Ex. 2023, 80:2–81:6. Though the user manual is most easily accessible through the actual Aperture 3 software in the internal help functionality after installation, that does not necessarily make it part of a product. Evidence also suggests that A3UM alone was available on the Aperture 3 website, which further indicates that there is a demarcation between the product and the user manual. *See, e.g.,* Ex. 1021; *see also* Ex. 2026, 56:13–22 (noting that the Aperture 3 software could only be distributed through retail boxes and not through online download in 2010).

Even though the HTML file set was not initially visible after installation, anyone who had the installer DVD could access the user manual. The relevant inquiry here is "whether the reference was "'available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.'" *Voter Verified, Inc. v. Premier Election Sols., Inc.*, 698 F.3d 1374, 1380 (Fed. Cir. 2012) (quoting *SRI*, 511 F.3d at 1194). In addition to this, "a printed publication need not be easily searchable after publication if it was sufficiently disseminated at the time of its publication." *Suffolk Techs., LLC v. AOL*

54

IPR2022-00031
Patent 10,621,228 B2

*Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014). As established above, we determined that A3UM was sufficiently disseminated through use of the help functionality on the Aperture 3 installer DVD that anyone could purchase, regardless of whether the files were hidden on the DVD.

We have considered Patent Owner's other arguments and have found them unpersuasive. Patent Owner argues that locating the hidden files[7] is similar to "being told that a book has been hidden in the library and then being asked to find it without guidance." Sur-reply 6 (citing Ex. 1089, 409:2–19; PO Resp. 35). Further, Patent Owner argues that even if a person of ordinary skill in the art "exercising reasonable diligence would have unhidden the files," Petitioner has not shown that why such a person would navigate to various subfolders or manipulate the application bundle. *Id.* (citing Ex. 2025 ¶¶ 110–111, 113; Ex. 1071).

We disagree with Patent Owner. Although "indexing or searchability is unnecessary for a reference to be a printed publication under § 102(b)," (*Jazz Pharms.*, 895 F.3d at 1359) a hierarchal indexing structure can indicate the ease of locating a reference. *See Suffolk Techs.*, 752 F.3d at 1365. Additionally, "[t]he expertise of the intended audience can help determine how easily those who viewed it could retain the displayed material." *Klopfenstein*, 380 F.3d at 1350–51. "Accessibility goes to the issue of whether interested members of the relevant public could obtain the

---

[7] Patent Owner argues that the files were intentionally hidden, but the evidence suggests that the HTML file set in this instance was not visible "to make the display to a user more compact" rather than purposefully creating obstacles to prevent access. Ex. 2023, 68:4–12; 71:11–72:8.

IPR2022-00031
Patent 10,621,228 B2

information if they wanted." *Constant v. Adv. Micro-Devices, Inc.*, 848 F.2d 1560, 1568 (Fed. Cir. 1988). The HTML file set was located in a hierarchal folder structure. Ex. 1003 ¶ 81. When beginning to search for the files, Patent Owner's expert testified that it "would be a reasonable assumption" that a person of ordinary skill in the art would figure out how to unhide files and understand by looking at books or searching the internet if interested. Ex. 1089, 138:11–139:14. Once a person of ordinary skill in the art consults with resources to familiarize themselves with MacOS application organization and distribution methods, they can understand basic principles regarding how to navigate a MacOS application file structure. *See, e.g.,* Ex. 1089, 56:17–57:17 (MacOS application bundles), 79:19–80:15 (hierarchal structure), 59:13–23 ("Resources" folder). This evidence suggests that the HTML file set was indexed in a meaningful way in the MacOS application organization structure such that an interested person of ordinary skill in the art would be able to find it with reasonable effort if they wanted to.

Moreover, we also determine that A3UM was "publicly accessible" via the Aperture 3 website. Mr. Birdsell testified that the HTML file set was loaded onto a staging server the night before Aperture 3's launch, then verified that "the files were live and accessible to customers and that all the links worked" on the website on launch day. *See* Ex. 2026, 35:16–37:14; 59:6–8; *see also* Ex. 1020 ¶¶ 10–11. Given that Apple had published a press release and marketed Aperture 3 on its home page, a person of ordinary skill in the art using a search engine such as Google to find photo management and editing software could find the Aperture 3 support page containing A3UM, according to Patent Owner's expert. *See* Ex. 1089, 187:12–188:8,

56

IPR2022-00031
Patent 10,621,228 B2

202:12–204:4, 205:17–206:2. This corroborates Mr. Birdsell's testimony

that approximately 95% of traffic accessing Aperture 3 came from search

engines. Ex. 2026: 67:13–20. These facts suggest that a person did not need

*a priori* knowledge of the reference in order to access it. *See Samsung*, 979

F.3d at 1374. Moreover, the experts from both parties were able to find the

Aperture 3 support page with the A3UM PDF on apple.com in a few clicks

by navigating to pages that seemed relevant to photo management and

editing, suggesting that a person of ordinary skill in the art in 2010 would

have found the Aperture 3 software with reasonable diligence. Ex. 1003

¶ 101; Ex. 1089, 207:22–208:22; *see generally* Exs. 1021; 1074.

There is no evidence to suggest that credentials were needed to access

the user manual and despite the software licensing agreement, the A3UM

website was public such that anyone could download it, so any concerns

about the inability to copy the manual are moot. *See Klopfenstein*, 380 F.3d

at 1351 (finding that prohibiting copying weighs against public

accessibility). Further, though Aperture 3 was marketed for "mere weeks"

on the home page, Aperture 3's product page remained for much longer. Ex.

2026, 66:8–12 (noting that Mr. Birdsell took A3UM off the Apple website at

the beginning of the pandemic in 2020).

Thus, we determine that Petitioner has proven by a preponderance of

the evidence that the PDF version of A3UM was "publicly accessible" by a

person of ordinary skill in the art for a time period long enough to be

considered sufficiently disseminated. *See Klopfenstein*, 380 F.3d at 1351–52

(determining that three days was long enough to consider a reference

"publicly available"). Because Petitioner demonstrated accessibility,

57

IPR2022-00031
Patent 10,621,228 B2

Petitioner had no requirement to show the number of people who actually accessed the PDF. *See, e.g., Samsung,* 929 F.3d at 1374; *Constant,* 848 F.2d at 1568.

Lastly, we address Patent Owner's argument that Petitioner has not demonstrated that Ex. 1005 was on the apple.com website in February 2010. Both Mr. Birdsell and Dr. Terveen individually compared Ex. 1005 to the HTML file set and found no discrepancies. Ex. 2026, 41:14–16; Ex. 2023, 61:13–17. Additionally, each page of Exhibit 1005 has the file path for each file located in the bottom left hand corner and the file path is consistent with the file path given above for the help files. *See generally* Ex. 1005. This evidence indicates that Ex. 1005 is the same as the HTML file set. Further, we credit Mr. Birdsell's unrebutted testimony that the same version of A3UM would have been sent to both the disk packaging team and the team responsible for loading A3UM onto the website. Ex. 2026, 40:15–41:10.

Patent Owner alleges that the version of the A3UM Table of Contents shown in Exhibit 1021 has a copyright date of 2011, indicating that A3UM pdf may not have been available on the website until after the critical date. PO Resp. 25 n.4; *compare* Ex. 2010 *with* Ex. 1021. However, in *Nautilus, Inc. v. Icon Health Fitness Inc.*, the Board noted that a date notation on a document is not dispositive and is only "one piece of evidence to consider in the public accessibility analysis." IPR2017-01363, Paper 33 at 16 (PTAB Nov. 28, 2018). The evidence indicates that the copyright date was due to the Wayback Machine's processes and does not reflect the actual copyright year of A3UM. Ex. 1055 (showing code that demonstrates copyright year

58

IPR2022-00031
Patent 10,621,228 B2

was inserted by Wayback Machine; Ex. 2026, 46:20–49:7 (explaining how the Wayback Machine archives webpages).

Based on the complete record, we determine that Petitioner has proven by a preponderance of the evidence that A3UM was publicly accessible before the critical date and therefore qualifies as printed publication prior art.

### 2. *Belitz (Ex. 1006)*

Belitz is a U.S. Patent Publication that published on March 4, 2010. Ex. 1001, codes (22), (60); Ex. 1006, code (43). Petitioner asserts that Belitz is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 22. Patent Owner does not contest this assertion. *See generally* PO Resp.

Belitz relates to a "user interface . . . configured to display a map and to display at least one marked location on said map." Ex. 1006, code (57). By way of background, Belitz explains that "[i]t is common to mark special locations on a map by associating a graphical object with that location. Examples of such locations are service points, restaurants, tourist attractions, visited places etc. and examples of graphical objects are photographs taken at such a location." *Id.* ¶ 2. Belitz further explains that "[i]f many locations are located close to one another they overlap and the view of the associated images become cluttered and it is difficult to discern between the various objects and the user is not provided with a good view of what location is associated with what." *Id.* Belitz presents a user interface attempting to address those concerns. *Id.* ¶ 5. Figures 4a and 4b, reproduced below, show screenshots of the user interface. *Id.* ¶¶ 51, 55.

IPR2022-00031
Patent 10,621,228 B2



**Fig. 4a**                    **Fig. 4b**

As shown in Figure 4a, above left, a "map 409 is displayed of a town called Roskilde. A location 408 is marked by a graphical object 410." *Id.* ¶ 51. "[G]raphical object 410 has a visual representation 411 which in this embodiment is a photograph that is associated with the location." *Id.* ¶ 52. Furthermore, "graphical object 410 carries a number indicator 412 which presents a viewer with a number. The number indicates how many graphical objects 410 are associated with that location and are stacked into one graphical object 410." *Id.* ¶ 54. Furthermore, "graphical objects stacked in the displayed graphical object or graphical group object 410 . . . can be associated with other locations that are in close proximity to the marked location 408" because "if the graphical objects associated with each location were to be displayed separately they would overlap which would clutter the view and be confusing to a user." *Id.*

60

IPR2022-00031
Patent 10,621,228 B2

Figure 4b shows map 408 having been "zoomed in showing the area in greater detail." *Id.* ¶ 55. At this zoom level, graphical object 410 is "split up into 4 graphical objects 410*a*, 410*b*, 410*c* and 410*d*" because the display of those graphical objects would not overlap. *Id.* Those graphical objects themselves also consist of some number of graphical objects. *Id.*

When a graphical object, e.g., graphical object 410, 410a, 410b, 410c, or 410d, is selected, a popup window is displayed over the graphical object. *Id.* ¶ 60. Figure 4c, reproduced below, is a screenshot showing the user interface after the selection of graphical object 410c. *Id.*



**Fig. 4c**

As shown in Figure 4c, above, the "popup window shows at least some of the visual representations 411 of the graphical object 410*c*. One 414 of the visual representations 411 or images as they are in this embodiment is shown in a larger size than the others which are shown in a list 415." *Id.* In some embodiments, "graphical objects are photographs that

61

IPR2022-00031
Patent 10,621,228 B2

are associated with the location where they were taken. The visual representations are thumbnails of the photographs." *Id.* ¶ 62.

### 3. Other References

Patent Owner asserts that Petitioner relies on excerpts from a textbook entitled, PHP Web 2.0 Mashup Projects ("PHP Web," Ex. 1035), and an Internet Archive printout regarding the Google Maps API ("Google Maps API," Ex. 1040), to impermissibly argue that a person of ordinary skill in the art would have had would have a reasonable expectation of success in modifying A3UM with Belitz. PO Resp. 44; *see* Pet. 29.

Patent Owner also argues that Petitioner relies on certain photo management products, Picasa Web Albums (Ex. 1033) and Panoramio (Exs. 1032, 1034), to supply a motivation to combine A3UM and Belitz, without establishing that they qualify as prior art or that their content was within the general knowledge of a person of ordinary skill in the art. PO Resp. 44; *see* Pet. 30.

Because we do not rely on any of Petitioner's arguments or evidence regarding Exhibits 1032–1035 and 1040 in arriving at our determination of obviousness, Patent Owner's arguments with respect to these exhibits is moot.

### I. Obviousness over A3UM and Belitz

Petitioner asserts that claims 1–19 are unpatentable as obvious under 35 U.S.C. § 103(a) over the combination of A3UM and Belitz. Pet. 24–79. Claim 1 is the only independent claim. We address Petitioner's rationale to combine the asserted art first, and then consider the evidence and arguments directed to the contested claims.

62

IPR2022-00031
Patent 10,621,228 B2

### 1. *Rationale to Combine*

Petitioner asserts that "[a] skilled artisan would have considered the teachings of A3UM and Belitz together, as both references (and the '228 patent) come from the same field of endeavor: 'managing and using digital files such as photographs.'" Pet. 24–25 (citing Ex. 1003 ¶ 119; Ex. 1001, 1:21–24; Ex. 1005, 1–2; Ex. 1006 ¶¶ 1, 62). Petitioner also asserts that "A3UM and Belitz address the same problems (also purportedly solved by the '228 patent): allowing 'people to organize, view, preserve and share' their digital photographs." Pet. 25 (citing Ex. 1003 ¶ 120; Ex. 1001, 1:61–67; Ex. 1005, 1–2; Ex. 1006 ¶¶ 2–5). Petitioner asserts that "A3UM and Belitz also describe analogous techniques—both describe use of a scalable interactive map with user-selectable markers (pins or thumbnail images) specifying the locations of photo(s) or other digital files, and use of those markers to retrieve digital files (e.g., photos) linked to those locations." Pet. 25 (citing Ex. 1003 ¶ 121; Ex. 1005, 30, 81–83, 429–466; Ex. 1006 ¶¶ 39, 50, 51–55, 62).

Petitioner argues that "[a] skilled artisan would have recognized that Belitz's thumbnail map markers are a functional equivalent of, and could be used as an alternative to the pins used in the A3UM interactive map." Pet. 25 (citing Ex. 1003 ¶ 123). Petitioner argues that "[i]t would have been obvious to a skilled artisan before June of 2010 to modify A3UM's Places view to incorporate Belitz's graphical object functionality, including, *inter alia*, its thumbnails and counts." Pet. 26 (citing Ex. 1003 ¶ 126).

Petitioner illustrates the result of this combination with the map displays shown below.

63

IPR2022-00031
Patent 10,621,228 B2



A3UM                          A3UM-Belitz

Petitioner's map displays, above, depict a map view from A3UM (left) with red pin markers and an annotated map view (right) showing the proposed combination of A3UM and Belitz, where A3UM's red pin markers have been replaced by Belitz's thumbnails on the map. Dr. Terveen explains that such a "modification would result in an interactive map displaying thumbnails with picture counts at locations where digital images are located, while allowing a user to interact with the thumbnail to display the name of the location and view pictures with that location." Ex. 1003 ¶ 126.

Petitioner argues that a skilled artisan would have been motivated to make this modification because "Belitz expressly teaches that 'it would be useful to be able to present a user with an overview of associated images to special locations which enables [the] user to clearly see the associations,' . . . and A3UM suggests the desirability of displaying such information in its Places interface." Pet. 28 (quoting Ex. 1006 ¶ 4; citing Ex. 1005, 81–83, 435).

Petitioner argues that "[a] skilled artisan would also have considered Belitz's thumbnail technique to be a known and predictable alternative to the A3UM pins, and that using thumbnails could appeal to certain users, thereby

64

IPR2022-00031
Patent 10,621,228 B2

potentially improving usability for such users." Pet. 28 (citing Ex. 1003
¶ 128). Petitioner also argues that "[a] skilled artisan would have had a
reasonable expectation of success in making this modification," because
"Belitz's thumbnail-plus-picture-count location marker would serve the
same functional purpose as the user-selectable pins in the A3UM interface—
both identify the quantity and location of photos to the user and enable
retrieval of photos at those locations." Pet. 28 (citing Ex. 1003 ¶ 130;
Ex. 1006 ¶¶ 54, 59–60, 62).

Petitioner further argues that "[a] skilled artisan, using the guidance in
Belitz and his or her knowledge, could have readily modified A3UM's
interactive map to use thumbnails overlaid with photo counts (instead of a
default pin marker) with a reasonable expectation of success." Pet. 30
(citing Ex. 1040, 42–46, 51–52; Ex. 1003 ¶ 134). "A skilled artisan,"
Petitioner argues, "would have considered the use of thumbnails as Belitz
teaches in the A3UM interactive map to be nothing more than the
predictable substitution of a known and equivalent interface element." Pet.
30 (citing Ex. 1003 ¶ 134).

Patent Owner contends that a person of ordinary skill in the art
"would not have modified A3UM to replace the pins with thumbnails
including numbers, while also maintaining the label that appears above a
selected pin in A3UM." PO Resp. 53 (citing Ex. 2025 ¶¶ 121–23). Patent
Owner asserts that a person of ordinary skill in the art "would recognize that
showing the count number twice for the same thumbnail is redundant and
unnecessary." PO Resp. 53–54 (citing Ex. 2025 ¶ 123). According to
Patent Owner, a person of ordinary skill in the art "would not create an

65

Appx234

IPR2022-00031
Patent 10,621,228 B2

interface with such elements because they would increase visual clutter, occupy a portion of the interface that could be used to convey other information (e.g., more of the map), and likely distract or confuse the user." PO Resp 54 (citing Ex. 2022, 288, 82).

Patent Owner asserts that a person of ordinary skill in the art "would have recognized that . . .  modifying an interface to include redundant information would be contrary to fundamental user interface design principles." PO Resp. 54 (citing Ex. 2025 ¶¶ 124–27). "For example," Patent Owner argues, "the Essential Guide to User Interface Design instructs interface designers that '[i]nformation that depicts the same value over and over should also be minimized or eliminated' and that redundancy should only be used 'if necessary.'" PO Resp. 54 (citing Ex. 2022, 288; Ex. 2025 ¶ 124). Patent Owner argues that "[a]bsent a specific reason for employing redundancy—and none has been identified by Petitioner or Dr. Terveen—a [person of ordinary skill in the art] would avoid redundancy in designing an interface." PO Resp. 54 (citing Ex. 2025 ¶ 126).

Patent Owner also asserts that "replacing the A3UM pins with Belitz's thumbnails would obscure more of the underlying map." PO Resp. 54 (citing Ex. 2025 ¶¶ 128–41). According to Patent Owner, "[u]sing thumbnails would create more visual clutter than the A3UM pins, which a [person of ordinary skill in the art] would know is undesirable in user interface design." PO Resp. 54–55 (citing Ex. 2025 ¶¶ 128–41; Ex. 1033, 4). According to Patent Owner, "Dr. Terveen admitted that he failed to consider these cluttering and map obscuring issues in rendering his opinions." PO Resp. 55 (citing Ex. 2024, 307:15–310:9).

66

IPR2022-00031
Patent 10,621,228 B2

Patent Owner argues that "Belitz does not provide a motivation to modify A3UM," because "Belitz is designed to only mark 'special locations' on a map, not an entire photo library." PO Resp. 56–57 (citing Ex. 1006, Title ¶¶ 2, 4, 10, 19, 71; Ex. 2025 ¶ 135). According to Patent Owner, "A3UM *already* achieves Belitz's objective of providing associations between images and locations without any modification." PO Resp. 57 (citing Ex. 2025 ¶ 142; Pet. 18).

Patent Owner argues that "it is improper [for Petitioner] to rely on [Google Maps documentation] in an obviousness challenge to demonstrate a reasonable expectation of success," because it is "non-prior art" and "even if considered, does not support Petitioner's obviousness arguments." PO Resp. 58–60 (citing *Yeda*, 906 F.3d at 1041–42; Exs. 1036 and 1040).

In its Reply, Petitioner argues that its proposed combination of A3UM and Belitz is "a known and predictable alternative to what a reference describes [and] is precisely the type of variation that *KSR* found to be obvious." Pet. Reply 20 (citing *KSR,* 550 U.S. at 401). Petitioner argues that concerns about "clutter" are unwarranted because the thumbnails in the proposed combination "can be any size—they can be as small as needed (*e.g.*, to avoid clutter)," and that "the claims do not impose aesthetic requirements for the map (*e.g.*, that it be 'uncluttered,' that it not obscure portions of the map, that it not use labels with thumbnails)." Pet. Reply 20.

Petitioner also argues that Patent Owner "ignores that the Petition identified features of A3UM and Belitz that resolve theoretical 'cluttering' concerns," including "dynamically grouping map markers into fewer markers when the map is zoomed out to reduce visual clutter on the map."

67

IPR2022-00031
Patent 10,621,228 B2

*Id.* at 21. Petitioner also argues that "the information in the combination is not redundant—the label provides the name of the location *and* a (more descriptive) count of images at that location." *Id.* (citing Pet. 26–27).

Petitioner contends that "Dr. Terveen's testimony easily satisfies the *Arctic Cat* standard because it identifies several distinct benefits of the combination." Pet. Reply 23 (citing Ex. 1003 ¶¶ 117–135). "For example," Petitioner points out, "Dr. Terveen explained that adding the thumbnails taught by Belitz could improve Aperture 3's overall usability by allowing users to more quickly identify the map marker they want to select." Pet. Reply 23 (citing Ex. 1003 ¶ 129 ; Ex. 1033, 4). According to Petitioner, "Dr. Terveen also explains that adapting the display of A3UM to include a number overlaid on a thumbnail as disclosed by Belitz, rather than via a tab as taught by A3UM, presents useful information to a user and would be trivial to implement." Pet. Reply 23 (citing Ex. 1003 ¶ 196). Petitioner contends that "Dr. Surati admitted that Google Maps API permits both using a custom icon (Ex. 1089, 250:25–16) and varying its size to accommodate a thumbnail (*id.* at 251:24–254:16). Pet. Reply 23–24

In its Sur-reply, Patent Owner contends that "the A3UM label and the Belitz count value would have the *same* number," and "Petitioner also does not explain how A3UM's location label provides a "more descriptive count." PO Sur-reply 13 (citing Ex. 2024, 305:8–306:3.6). Patent Owner also points out that "Petitioner does not explain how thumbnails would convey more 'useful information' than pins." PO Sur-reply 16 (citing Pet. Reply 23; Ex. 1003 ¶ 196).

IPR2022-00031
Patent 10,621,228 B2

Patent Owner also contends that "Petitioner's suggestion that the size of Belitz's thumbnails could be modified to avoid map obstruction . . . is a new argument not presented in the Petition," and "Petitioner fails to explain how its new thumbnail size modification would work." PO Sur-reply 14 (citing Pet. Reply, 22; Pet. 24–31). Patent Owner further contends that "Petitioner's argument that A3UM and Belitz describe grouping markers into fewer markers . . . is another new, impermissible argument." PO Sur-Reply 15 (citing Pet. Reply 21).

We disagree with Patent Owner. A reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (citing *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)). "Under the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). An obviousness determination "does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention." *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004).

Here, Petitioner has sufficiently articulated a rational basis for combining the teachings of A3UM and Belitz to provide particular benefits from the combination. Petitioner's proposed combination is to modify A3UM's Places view to incorporate Belitz's graphical object functionality,

69

IPR2022-00031
Patent 10,621,228 B2

including its thumbnails and picture counts. Pet. 26 (citing Ex. 1003 ¶ 126). The modification results in an interactive map displaying thumbnails with picture counts at locations where digital images are located, while allowing a user to interact with the thumbnail to display the name of the location and view pictures with that location. *Id.* at 26–27 (citing Ex. 1003 ¶ 126).

Petitioner points out, and we agree, that using thumbnails in this way "could appeal to certain users, thereby potentially improving usability for such users." Pet. 28 (citing Ex. 1003 ¶ 128). A skilled artisan would have been motivated to make this modification because Belitz expressly teaches that "it would be useful to be able to present a user with an overview of associated images to special locations which enables [the] user to clearly see the associations," and A3UM suggests the desirability of displaying such information in its Places interface. *See* Ex. 1006 ¶ 4; Ex. 1005, 81–83, 435.

We credit Dr. Terveen's testimony on this score that "[a] skilled artisan would have been motivated to modify A3UM's Places view to incorporate Belitz's graphical object functionality, including its thumbnails and counts because this combination would further improve the ease of use of A3UM." Ex. 1003 ¶ 129. Dr. Terveen explains that "Belitz displays thumbnails directly on the map, which can allow a user to more quickly identify which map marker they would like to select and display," and that "Belitz's count functionality displays the number of images linked from a marker overlaid on that marker's thumbnail, which can allow a user to more quickly identify which markers represent larger sets of photographs." *Id.* (citing Ex. 1006 ¶¶ 51–55, Fig. 4a-4b). Belitz thus "motivate[s] a skilled

70

IPR2022-00031
Patent 10,621,228 B2

artisan to make the combination in order to improve usability." Ex. 1003 ¶ 129.

Patent Owner argues that a person of ordinary skill in the art "would not have modified A3UM to replace the pins with thumbnails including numbers, while also maintaining the label that appears above a selected pin in A3UM," because "showing the count number twice for the same thumbnail is redundant and unnecessary." PO Resp. 53–54 (citing Ex. 2025 ¶ 123). Patent Owner misconstrues Petitioner's proposed combination. Petitioner is not proposing to use Belitz's thumbnails, "while also maintaining the label that appears above a selected pin in A3UM," but is using Belitz's thumbnails as an alternative to replace A3UM's pins. *See* Ex. 1003 ¶ 123 ("A skilled artisan would have recognized that Belitz's thumbnail map markers . . . could be used as an alternative to the pins used in the A3UM interactive map."). Thus, in the proposed combination each resulting thumbnail would only have a single picture count indicator. *See id.* ¶ 126.

Patent Owner also argues that "replacing the A3UM pins with Belitz's thumbnails would obscure more of the underlying map," and "would create more visual clutter than the A3UM pins." PO Resp. 54–55 (citing Ex. 2025 ¶¶ 128–41). However, both A3UM and Belitz dynamically group and ungroup related nearby markers into single markers to reduce visual clutter on the map. *See* Ex. 1005, 81–83, 437 ("Depending on the zoom setting in Places view, Aperture might use a single pin to represent a group of images shot in close proximity."); Ex. 1006 ¶¶ 54–56. Moreover, a person of ordinary skill in the art here would have at least a bachelor's degree in

71

computer science, computer engineering, or electrical engineering, and at least one year of experience designing graphical user interfaces for applications such as photo management systems.  *See* Sec. II.F, above.  So, modifying the size of thumbnails to adjust for any undesirable "visual clutter" would likely have been within the skill level of the ordinary artisan here and a routine design choice.

Patent Owner's argument that "Belitz does not provide a motivation to modify A3UM," because "Belitz is designed to only mark 'special locations' on a map, not an entire photo library."  PO Resp. 56–57.  We disagree.  Belitz clearly discloses that its interface and method for displaying locations on a map includes displaying thumbnails of photographs on a map where the photographs were taken at those map coordinates.  Belitz's number indicator also shows how many photographs are associated with that location.  Ex. 1006 ¶¶ 11, 52, 54, Figs. 4a–c.  Belitz does not disclose that its methods cannot be used with photographs from a photo library as Patent Owner argues.  *See* PO Resp. 56–57.  Nor do we credit Dr. Surati's testimony that Belitz's use of the term "special locations" makes Petitioner's proposed replacement of A3UM's push pins with Belitz's thumbnails undesirable because of possible clutter.  *See* Ex. 2025 ¶ 135.

Patent Owner argues that it is improper for Petitioner to rely on Google Maps documentation (Exs. 1035, 1040) to demonstrate a reasonable expectation of success because the documentation is "non-prior art."  PO Resp. 58–60.  We do not, however, rely on these references for our evaluation of Petitioner's demonstration of a reasonable expectation of success.  *See* Sec. II.H.3, above.

72

IPR2022-00031
Patent 10,621,228 B2

Finally, we disagree with Patent Owner's assertion that Petitioner's suggestion in its Reply that the size of Belitz's thumbnails could be modified to avoid map obstruction and that A3UM and Belitz describe grouping markers into fewer markers are new arguments.  PO Sur-reply 14–15. Petitioner is merely responding to Patent Owner's arguments raised in its Response.  The Petition clearly explains, for example, that A3UM and Belitz both teach "dynamically grouping map markers into fewer markers when the map is zoomed out to reduce visual clutter on the map."  *See* Petition 26 (citing Ex. 1003 ¶ 124; Ex. 1005, 437–438).

Based on the complete record, we determine that Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in the art would have had sufficient reason to combine the teachings of A3UM and Belitz in the manner proposed in the Petition.

2.    *Independent Claim 1*

Claim 1 is the only independent claim of the '228 Patent.  Ex. 1001, 35:32–36:11.  We consider the contested limitations first.

*a) Contested Limitations*

Claim 1 recites a "*people view*" that includes "*a [first/second] person selectable thumbnail image*" representing "*a face of a [first/second] person*" associated with "*a [third/fourth] set of digital files including digital photographs and videos.*"  Ex. 1001, 35:64–36:8.  Patent Owner contends that Petitioner has failed to show that A3UM discloses or renders obvious "*a [third/fourth] set of digital files including digital photographs and videos.*" PO Resp. 45–51.

For these limitations, Petitioner explains that "A3UM's Faces view displays 'snapshots containing people who have been assigned names using

73

IPR2022-00031
Patent 10,621,228 B2

the Faces feature.'" Pet. 46 (citing Ex. 1005, 28–29, 78–80; Ex. 1003 ¶ 168). Petitioner explains that "each person's snapshot is a small image ('*[first/second] person selectable thumbnail image*') containing a picture of their face ('*including a representation of a face of a [first/second] person*'). Pet. 46 (citing Ex. 1005, 28–29, 78–80). Petitioner asserts that A3UM "discloses multiple face views representing different individuals that will be associated with different sets of digital images." Pet. 47 (citing Ex. 1005, 28–29, 418–420).

Petitioner explains that "A3UM's snapshots also can be selected to display media associated with that person ('*[third/fourth] set of digital files*')." Pet. 48 (citing Ex. 1003 ¶ 173; Ex. 1005, 29). Petitioner asserts that "[t]hese '*set[s] of digital files*' include '*digital photographs and videos*,'" because "A3UM discloses that its Library inspector allows 'organizing your photos, audio clips, and video clips,' and then uses the term 'images' to refer to these three categories." Pet. 49 (citing Ex. 1005, 21; Ex. 1003 ¶ 174). Petitioner argues that "[a] skilled artisan also would understand from A3UM's disclosure that its repeated references to 'images' or 'digital images' refers to both photos and videos." Pet. 49 (citing Ex. 1003 ¶¶ 175–176).

Petitioner also argues that A3UM "describes a user associating a video file with a person in the same manner as is done for digital photographs." Pet. 50 (citing Ex. 1003 ¶¶ 177–178; Ex. 1005, 23, 421). In that example, Petitioner asserts that "[t]he upper left of the screen shows the 'Name' button is active (not greyed out), indicating that the software has detected a face in the selected media file." Pet. 51 (citing Ex. 1005, 64;

74

IPR2022-00031
Patent 10,621,228 B2

Ex. 1003 ¶ 180).  Petitioner's annotated screenshots of this example from A3UM are shown below.



Petitioner's annotated screenshots from A3UM, above, show an example of a user associating a video file with a person.  The images show a Filter HUD set to show video files, thumbnail images representing video clips, and a "Name" button.

According to Petitioner, the upper left section of the screen shows the "Name" button is active (not greyed out), indicating that the software has detected a face in the selected media file.  Pet. 51 (citing Ex. 1005, 64; Ex. 1003 ¶ 180).  Petitioner argues that "[a] skilled artisan would understand this to mean that the media file can be associated with a detected face (*e.g.*, the woman in the video frame) which will be correlated to a person's name, enabling it to be viewed in the Faces view for that person."  Pet. 51 (citing Ex. 1003 ¶ 180; Ex. 1005, 23, 64).  Petitioner argues, "A3UM thus describes associating individuals with a set of media files comprising both digital

75

IPR2022-00031
Patent 10,621,228 B2

photographs and videos ('the [first/second] person being associated with a [third/fourth] set of digital files including digital photographs and videos')." Pet. 52 (citing Ex. 1003 ¶ 182).

Petitioner alternatively argues that "[t]o the extent A3UM does not expressly disclose that the '*set[s] of digital files*' accessible through its Faces view include '*digital photographs and videos*,' it would have been obvious to a skilled artisan by 2010 to modify A3UM to allow videos to be associated with faces in the same way as photos." Pet. 52 (citing Ex. 1003 ¶¶ 183–184).

Petitioner argues that "A3UM already discloses extensive support for videos and displays them in-line with photos in the Browser, Ex. 1005, 157, 166, 185, 250, 413, 793, and allows users to interact with them as if they were images (until the user presses play)." Pet 52 (citing Ex. 1005, 51, 251, 271; Ex. 1003 ¶ 183). Petitioner argues that "[a]llowing support for videos in Faces view would involve at most detecting faces in the representative image of the video." Pet. 52–53 (citing Ex. 1003 ¶ 184; Ex. 1005, 23). Petitioner further argues that it was "well known by 2010 to detect faces in videos, with known methods including extracting keyframes and then identifying faces." Pet. 53 (citing Ex. 1003 ¶ 184; *e.g.*, Ex. 1049 ¶¶ 14–19, 51–53, Fig. 3; Ex. 1050, 1:6–15, 2:17–27, Fig. 1A). Petitioner asserts that "[a] user would have been motivated to detect faces in either the video still frame or the video itself and associate them with people in Faces view to expand the set of media made easily accessible through Faces view, which would have been an predictable arrangement of old techniques." Pet. 53 (citing Ex. 1003 ¶ 184; Ex. 1005, 28–29).

76

IPR2022-00031
Patent 10,621,228 B2

Patent Owner challenges Petitioner's "assert[ion] that A3UM's facial recognition capability in the Faces feature applies to videos the same way it applies to photographs." PO Resp. 49. Patent Owner asserts that A3UM defines the term "image" as "[a]n artifact that reproduces the likeness of some subject . . . also known as a picture," and that "[t]here are numerous instances in which A3UM differentiates between an 'image' and a 'video.'" *Id.* (citing Ex. 1005, 2, 13, 84, 157, 166, 169, 180, 1111; Ex. 2025 ¶¶ 153–154). Patent Owner thus argues that "A3UM's use of the term 'image' in connection with the Faces view does not mean that the Faces view includes videos." PO Resp. 46–47. Patent Owner asserts that "Dr. Terveen conceded that the instances of the word 'images' in A3UM he relied on to assert that 'images' necessarily includes photos and videos was merely 'informal' language rather than anything definitional." *Id.* at 47 (citing Ex. 2023, 355:17–357:19).

Patent Owner also argues that Petitioner's theory that an active "Name" button (not greyed out) indicates that the software has detected a face in the selected media file "is flawed because A3UM has numerous other examples where the Name button is 'active' even though there is indisputably no face in the selected image." *Id.* at 48 (citing Ex. 1005, 7, 15, 21, 24, 472–73, 40, 510, 1024; Ex. 2025 ¶¶ 155–58). Patent Owner argues that "[t]hese examples show that whether the 'Name' button is 'active' or 'inactive' (greyed-out) has no connection to whether the selected file has a face in it or not." PO Resp. 49 (citing Ex. 2025 ¶¶ 158–59). Patent Owner asserts that "[w]hen confronted with these examples contradicting his

77

IPR2022-00031
Patent 10,621,228 B2

opinions, Dr. Terveen admitted that he needed to 'revise' them." PO Resp. 49 (citing Ex. 2024, 372:16–375:21).

Patent Owner challenges Petitioner's argument that it would have been obvious to modify A3UM to allow videos to be associated with faces by "extracting keyframes and then identifying faces." PO Resp. 50 (citing Pet. 53; Exs. 1049, 1050). Patent Owner argues that the references "do not support Petitioner's contention: Ex. 1049 seemingly describes the opposite order (detecting faces in every frame then determining keyframes) and Ex. 1050 does not mention keyframes at all." PO Resp 49–50 (citing Pet. 52–53; Ex. 2025 ¶¶ 170–71).

In its Reply, Petitioner argues that claim 1 "does not require associating digital files (including videos) with people by ***facial recognition***," and that "A3UM teaches associating names to digital images without facial recognition." Pet. Reply 18 (citing Ex. 1089, 293:5–9, 297:1–10). Petitioner points out that "A3UM describes 'digital images' including photos, videos, and sound files, and several examples show videos in libraries and being treated interchangeably with photos." Pet. Reply, 18 (citing Pet. 49–50). Petitioner argues that "because A3UM supports metadata tagging of digital image files, enabling videos to be used in Places was obvious," and that "A3UM [also] makes obvious using these capabilities to support videos in Faces. Pet. Reply 19 (citing Pet. 20–21, 40, 47, 50, 52–53). Petitioner asserts that Dr. Surati "admitted that A3UM teaches manually associating names with digital files (which can include video and sound files)." Pet. Reply 19 (citing Ex. 1089, 281:3–15, 282:5–10; Ex. 1005, 421).

78

IPR2022-00031
Patent 10,621,228 B2

Nonetheless, Petitioner further argues that "A3UM describes and makes obvious use of facial recognition on videos, explaining video recognition can be performed on individual frames of a video ("keyframes") to lessen processing burdens," and that Dr. Surati admitted that "using keyframes would impose the same burden as processing a photo." Pet. Reply 19 (citing Ex. 1089, 284:25–285:11, 281:3–15, 276:3–17, 291:6–292:15; Ex. 1005, 422).

In its Sur-reply, Patent Owner agrees that claim 1 does not require facial recognition. PO Sur-reply 9. Patent Owner, however, challenges Petitioner's contention that Dr. Surati admitted that A3UM teaches manually associating names with digital files. *Id.* at 11. Patent Owner asserts that "Dr. Surati explained that manually associating an image with a person is only possible 'if there is a face that's recognized in the box,' i.e., if a face is detected in the image." *Id.* (citing Ex. 1089, 291:6–21). "Additionally," Patent Owner argues, "A3UM's manual process is limited to 'image[s],'" and "Petitioner's argument that the word 'image' in A3UM encompasses videos . . . is specious because A3UM explicitly defines 'image' in a way that excludes videos and consistently uses the words 'image' and 'videos' separately." PO Sur-reply 11 (citing Ex. 1005, 422). Patent Owner argues that "A3UM does not disclose allowing a user to use the 'Name' feature with videos." PO Sur-reply 11 (citing Ex. 1005, 1111; Ex. 2025 ¶ 151; Ex. 2024, 363:2–7).

Patent Owner further argues that a person of ordinary skill in the art would not modify A3UM to detect faces in videos "because (1) the evidence shows that A3UM's facial recognition for images suffered from numerous

79

IPR2022-00031
Patent 10,621,228 B2

problems and (2) extending that functionality to videos would exacerbate those problems." PO Sur-reply 11. Patent Owner asserts that "Dr. Surati merely agreed that it is possible to extract a JPEG from a video," and did not admit, as Petitioner argues, that "using keyframes would impose the same burden as processing a photo." PO Sur-reply 11 (citing Ex. 1089, 284:25–285:11).

We agree with Petitioner that the asserted prior art teaches or suggests a "*people view*" that includes "*a [third/fourth] set of digital files including digital photographs and videos*," as recited in independent claim 1. The Aperture 3 User Manual ("A3UM") explains that "Aperture is a photo editing and management tool that provides: . . . An open library structure [that] lets you store photos, audio clips, and video clips anywhere you want." Ex. 1005, 2. A3UM also explains that it "provides a Library inspector for organizing your photos, audio clips, and video clips," as well as "a Metadata inspector that allows you to review metadata and assign it to your images." Ex. 1005, 21.

We agree with Petitioner that a person of ordinary skill in the art reading A3UM in its entirety would understand that A3UM uses the term "images" at times to encompass both videos as well as photos. In addition to expressly stating that A3UM "provides a Library inspector for organizing your photos, audio clips, and video clips," A3UM provides examples showing both videos and photos being similarly organized and managed in A3UM libraries. Consider, for example, the A3UM Browser display, shown below.

80

IPR2022-00031
Patent 10,621,228 B2



The A3UM Browser display, shown above, depicts a series of five library thumbnail images aligned in a horizontal row. Ex. 1005, 271. Petitioner explains that the three thumbnail images on the right represent videos and each bears a video clip icon, whereas the two thumbnail images on the left represent photos without a video clip icon. Pet. 49, Ex. 1003 ¶¶ 174–175.

Petitioner's expert, Dr. Terveen, testifies, and we agree, that A3UM at times uses the term "images" to encompass the functionality for managing both digital photos and videos. Ex. 1003 ¶ 176 (citing Ex. 1005, 157 (discussing "Importing Images" as encompassing "video files"), 166 (discussing "Importing Image Files" as encompassing "import[ing] image, audio, and video files"), 185 (discussing "Importing Images" as encompassing importing "image, audio, and video files"), 250 (discussing "Displaying Images in the Viewer" as encompassing "video clips"), 412–413 (discussing how "[b]adges can appear on images," with one example meaning "[t]he thumbnail image represents a video clip"), 793 (discussing "Exporting Your Images" as encompassing exporting "video files").

81

IPR2022-00031
Patent 10,621,228 B2

Dr. Terveen also testifies, and we agree, that A3UM discloses functionality that allows users to add or modify metadata related to digital files, such as digital videos and photos. Ex. 1003 ¶ 109 (citing Ex. 1005, 345 (keywords "are descriptive words assigned to image versions and saved as metadata"), 421–422 (users can add names to computer-recognized faces)). As Dr. Terveen testifies, A3UM's Faces interface uses metadata to select and display digital files. Ex. 1003 ¶ 109 (citing Ex. 1005, 78–80 ("When you click the Faces button in the toolbar, Faces view shows all the photos of people with assigned names in the item selected in the Library inspector.")).

Dr. Terveen further testifies, and we agree, that A3UM allows a user to associate video files with a person in the same manner as it does for digital photographs. Ex. 1003 ¶ 177. For example, in the section entitled, "Finding and Displaying Images with the Filter HUD," A3UM depicts using the Filter HUD to select and display images from video files, in this instance displaying an image from a selected video file. Ex. 1005, 23. Dr. Terveen explains that A3UM is also "depicting the selectable 'Name button' in the toolbar where the Browser is displaying a video." Ex. 1003 ¶ 177. In the section, "Adding Names to Faces in Your Images," A3UM explains that clicking on the "Name button" in the toolbar allows the user to enter a person's name, thus assigning names to their faces. Ex. 1005, 421.

As Dr. Terveen testifies, "A3UM explains that a user can choose a specific moment in a video clip to serve as a thumbnail for the video," and that after choosing a specific moment in a video, "[t]he video frame at the position of the playhead is set as the video clip's poster frame, and the video

82

IPR2022-00031
Patent 10,621,228 B2

clip's thumbnail image in the Browser is updated." Ex. 1003 ¶ 177 (citing Ex. 1005, 274–275).

We, therefore, agree with Dr Terveen that when A3UM is taken as a whole, a skilled artisan would understand that A3UM's references to "images" or "digital images" may encompass videos, that digital photos and videos are treated the same way by A3UM's library, filtering, and other functionality, and that the "Name" button allows a user to associate a video with a person in the same way as a digital photo. Ex. 1003 ¶ 182. We agree that a skilled artisan would therefore understand that A3UM's Faces view would allow a user to access associated photos and videos of a given person.

We also agree with Dr. Terveen's testimony that it would have been obvious to further modify the A3UM-Belitz combination to allow users to associate both photos and videos with a given person to the extent this capability is not expressly disclosed in A3UM. *See* Ex. 1003 ¶¶ 183–184. Such a modification would have allowed both types of media to be displayed in A3UM's Faces view so a user could access photos and videos of the same person together, and would simply arrange old elements, each performing the same function it had been known to perform, to yield no more than one would expect from such an arrangement, notwithstanding Patent Owner's argument that extending such functionality to videos would exacerbate certain problems. *Id.*

A3UM's functionality of using metadata to associate thumbnail images of still photos and videos with names, keywords and other important identifiable and searchable information further supports the conclusion that a skilled artisan would understand A3UM as a whole teaches that images of a

83

IPR2022-00031
Patent 10,621,228 B2

person can individually be associated with a set of media files comprising both digital photographs and videos. *See* Ex. 1005, 21, 23, 58, 421–423.

We disagree with Patent Owner that A3UM's use of the word "images" excludes digital videos. Patent Owner points to A3UM's Glossary, which describes "image" as "an artifact that reproduces the likeness of some subject [usually a physical object or person] also known as a *picture*." PO Resp. 46 (citing Ex. 1005, 1111). The use of the term "artifact" does little to indicate the particular form an image may take or the type of media used to embody it. The description "reproduces the likeness of some subject, usually a physical object or person," is not directed to the form or media of the image either. The use of the synonym "*picture*" directs us to that listing in the Glossary, which is described as a "visual representation rendered on a flat surface or screen, such as a photograph." *Id.* at 1114.

Based on A3UM's Glossary then, an "image" is "an artifact that reproduces the likeness of some subject, usually a physical object or person, also known as a *picture*," which is a "visual representation rendered on a flat surface or screen, such as a photograph." While this description of "image" includes a photograph, we do not see how it excludes a video, which could also be an artifact that reproduces the likeness of a person, including a visual representation of a person capable of being rendered on a flat surface or screen.

As Patent Owner argues, there are instances in A3UM where the terms "images" and "video" are used in a manner that distinguish them. For example, A3UM's section, "Slideshow Editor," states that "[y]ou can use the

84

IPR2022-00031
Patent 10,621,228 B2

Slideshow Editor to create slideshows that include video and audio clips as well as images" (Ex. 1005, 84), and the section "Importing Images" states that "Aperture provides tools and workflow options that make it easy to import your images," and "[y]ou can also import audio and video files" (*Id.* at 157).

The relevant question, however, is whether a person of ordinary skill in the art, considering A3UM as a whole, would understand that A3UM describes a Faces view that associates a person's *thumbnail image* of their face with *digital files* that include *photographs and videos*. There is no doubt that A3UM's "open library structure lets you store photos, audio clips, and video clips anywhere you want" (Ex. 1005, 2) and also "provides a Library inspector for organizing your photos, audio clips, and video clips," as well as a "Metadata inspector that allows you to review metadata and assign it to your images" (Ex. 1005, 21).

Moreover, we credit Dr. Terveen's testimony explaining how "A3UM illustrates that a user can associate a video file with a person in the same way a user associates digital photographs with a person." Ex. 1003 ¶ 177 (citing Ex. 1005, 23, 64, 274–275). We also accept Dr. Terveen's testimony where he describes the process in A3UM through which a video file can be associated with a person (Ex. 1003 ¶ 179 (citing Ex. 1005, 23, 271, 413)), as well as his testimony explaining how a skilled artisan would understand that A3UM's active "Name" button when the Viewer displays a video clip means that it can be selected to associate a detected face (*e.g.*, the face of the woman shown in the video frame) with a person's name, such that it can be

85

IPR2022-00031
Patent 10,621,228 B2

viewed using A3UM's Faces functionality (Ex. 1003 ¶ 180 (citing Ex. 1005, 23).

Patent Owner assertion that Dr. Terveen "conceded" that the instances of the word "images" in A3UM he relied on were merely "informal" language is unavailing. It is A3UM's contextual use of the term "images" along with the examples showing how A3UM's Faces view associates thumbnail images of people with digital photo and video files as well as A3UM's underlying metadata functionality that provides the basis for a skilled artisan to understand the full scope of A3UM's teachings.

Patent Owner's argument that A3UM shows examples where the Name button is "active" even though there is no human face in the selected image is largely unavailing. *See* PO Resp. 48–49. Patent Owner's examples showing A3UM may have an "active" Name button when the Viewer displays an image of a boat, a bear, penguins, or a mountain misses the point. *Id.* Patent Owner's argument does not undo A3UM's express teaching of how to manually assign names to human faces using the Name button in the toolbar when there is a selected image in the Browser with people in it. *See* Ex. 1005, 23, 28, 421. A person of ordinary skill in the art would readily understand that A3UM's process of manually assigning names to human faces using the Name button in the toolbar when there is a selected image in the Browser with people in it may be limited to images of people, and may not apply in situations without human faces, such as images of boats, bears, penguins, and mountains.

Based on the complete record and for the reasons we discuss, we find that that Petitioner has demonstrated by a preponderance of the evidence that

86

IPR2022-00031
Patent 10,621,228 B2

the asserted prior art meets the recited "*a [third/fourth] set of digital files including digital photographs and videos*" of independent claim 1.

*b) Uncontested Limitations*

Petitioner provides evidence and arguments that the combined teachings of A3UM and Belitz meet the remaining limitations of independent claim 1, including the claim's preamble.[8] *See* Pet. 31–55. Petitioner provides the testimony of Dr. Terveen in support of its position with respect to these limitations. *See* Ex. 1003 ¶¶ 136–173, 186–190.

Patent Owner does not contest Petitioner's evidence and arguments with respect to these limitations. *See* PO Resp. 45–51. Dr. Surati does not provide testimony specifically directed to these limitations. *See* Ex. 2025 ¶¶ 118–179.

We have considered Petitioner's evidence and arguments with respect to these portions of independent claim 1, including the relevant testimony of Dr. Terveen, which stands unrebutted. Based on the complete record, we determine that Petitioner has demonstrated that the combined teachings of A3UM and Belitz meet the remaining uncontested limitations of independent claim 1, including the preamble.

*c) Conclusion on Independent Claim 1*

We have considered the evidence and arguments of record concerning the challenge to independent claim 1 based on the combined teachings of A3UM and Belitz. Based on the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the

---

[8] We do not make a determination of whether or not claim 1's preamble is limiting.

IPR2022-00031
Patent 10,621,228 B2

proposed combination of A3UM and Belitz satisfies the subject matter recited by independent claim 1, and that a person of ordinary skill in the art would have had sufficient reason to combine the teachings of the asserted art in the manner described in the Petition.

> 3.    *Dependent Claims*

Petitioner argues that A3UM and Belitz teach the recited limitations of dependent claims 2–19. *See* Pet. 55–79. Petitioner provides the testimony of Dr. Terveen in support of its position. *See* Ex. 1003 ¶¶ 191–258.

In its Response, Patent Owner only contests Petitioner's showing with respect to dependent claims 8, 9, and 15. *See* PO Resp. 60–69. Patent Owner does not separately contest Petitioner's showing with respect to dependent claims 2–7, 10–14, and 16–19. Dr. Surati also does not specifically address Petitioner's evidence or arguments directed to dependent claims 2–7, 10–14, and 16–19. *See* Ex. 2025, 82–93.

We have considered Petitioner's evidence and arguments with respect to these uncontested dependent claims, as well as the testimonial evidence of Dr. Terveen, which stands unrebutted. Based on the complete record, we are persuaded that Petitioner has demonstrated that the combined teachings of A3UM and Belitz meet the recited limitations of dependent claims 2–7, 10–14, and 16–19.

We now address contested dependent claims 8, 9, and 15.

> *a) Dependent Claims 8, 9*

Dependent claims 8 and 9 read as follows:

8/9. The method of claim 2, further comprising, subsequent to the map view being displayed on the interface, responsive

88

IPR2022-00031
Patent 10,621,228 B2

> to an input that is indicative of zooming [in/out] on the interactive
> map, modifying the first indication feature.

Ex. 1001, 36:12–16.

> Dependent claim 2 (uncontested by Patent Owner), reads as follows:
> 2. The method of claim 1, wherein the map view further
> includes a first indication feature associated with the first
> location selectable thumbnail image, the first indication
> feature being based on a number of digital files in the first
> set of digital files.

*Id.* at 36:34–41.

With respect to claim 2, Petitioner explains that "[a]s combined,
A3UM would display Belitz's graphical objects comprising counts of digital
images at a location marked on a map (*e.g.*, "*[first/second] indication
feature*." Pet. 56 (citing Ex. 1003 ¶ 193). According to Petitioner, "[i]n
Belitz, the counts are overlaid on thumbnails and represent the number of
pictures at that location ("*[first/second] set of digital files*"). Pet. 56 (citing
Ex. 1006 ¶¶ 52, 54, 59, 62, Figs 4a–4b).

With respect to claims 8/9, Petitioner points out that "A3UM explains
that '[d]epending on the zoom setting in Places view, Aperture might use a
single pin to represent a group of images shot in close proximity,'" and
"A3UM also explains that multiple pins will be displayed as a single pin
when a user zooms out, and that single pin can identify a greater number of
digital images relative to the separate pins." Pet. 60 (citing Ex. 1005, 438–
439).

Petitioner argues that "a skilled artisan would have found it obvious to modify the A3UM interactive map to use Belitz's thumbnails with image count overlays instead of pins." Pet. 61. According to Petitioner, "Belitz and A3UM handle zooming interaction with the grouping of markers in the same manner." *Id.* (citing Ex. 1003 ¶ 207). Petitioner point out that "Belitz explains that Figure 4a discloses a single graphical object 410, but when a user zooms in on the map, the graphical object 410 is instead split up into 4 graphical objects 410a, 410b, 410c, and 410d, each representing their own number of graphical objects." Pet. 61 (citing Ex. 1006 ¶¶ 51, 55; Ex. 1003, ¶ 207). "Should the user zoom out," Petitioner explains, "the graphical objects are again combined." Pet. 61 (citing Ex. 1006 ¶ 56; Ex. 1003 ¶ 207).

"Thus," concludes Petitioner, "zooming in or out will change the number of photographs represented by the marker in the manner taught by both A3UM and Belitz and would thus change the counts displayed for the displayed marker(s) (*"modifying the first indication feature"*)." Pet. 61–62 (citing Ex. 1003 ¶ 208; Ex. 1005, 438–439; Ex. 1006 ¶¶ 51, 55–56, Figs. 4a–4b).

In its Response, Patent Owner argues that "while the graphical object 410 in Fig. 4a is described in the text as having 13 graphical objects in the stack, only 6 of those graphical objects are associated with the location of the graphical object 410 on the map in Fig. 4a, as evidenced by Fig. 4b where 7 of them are broken out separately." PO Resp. 63 (citing Ex. 2025 ¶ 187). "This is why," Patent Owner argues, "the number indicator 412 in Fig. 4a has a 6 instead of a 13." PO Resp. 63. According to Patent Owner, a person of ordinary skill in the art "would read Belitz's text as consistent with

IPR2022-00031
Patent 10,621,228 B2

the numbers in the drawings, rather than reading the drawings as including the wrong number." PO Resp. 63–64. "Based on the foregoing," asserts Patent Owner, "it is clear that the number indicator 412 in Belitz is *not* modified responsive to zooming in or zooming out – it is intentionally the same." PO Resp. 64 (citing Ex. 2025 ¶ 187).

> In its Reply, Petitioner argues that

> Patentee's reading of Belitz (as it acknowledges) would undermine the functionality disclosed in Belitz, as the numerical indicators would lose all reliability in this system, as a user "would not know that there are additional files at nearby locations until they zoom in on the map." Response, 64. And Belitz notes that when displaying the zoomed-in map, "the controller is configured to determine whether the graphical objects overlap or not . . ." EX1006, ¶55. The fact that another embodiment reveals other image sets, as argued by Patentee, is not dispositive of obviousness. These modifications to the interactive map in response to zooming in and out disclosed by Belitz refute Patentee's argument.

Pet. Reply 25.

> In its Sur-reply, Patent Owner asserts that "the alleged indication feature in Belitz . . . is *not* modified when changing the zoom level," because "[i]n Fig. 4a, there are 13 objects in the stack, but only 6 are associated with the location where the thumbnail is positioned on the map, so that number does *not* change relative to Fig. 4b." Sur-reply 18–20 (citing Ex. 1006, Figs 4a–4b; Ex. 2025 ¶¶ 185, 187; Ex. 2024, 337:11–340:19).

> We disagree with Patent Owner. Dr. Terveen's explains with respect to Belitz's Figures 4a–4c, that

> [i]n the embodiment where all of the "graphical objects" are photographs, Belitz indicates the visual representations of the "graphical objects" that are displayed on the map "are

91

IPR2022-00031
Patent 10,621,228 B2

> thumbnails of the photographs." EX1006, ¶62. Also, in this
> embodiment, the number of graphical objects being represented
> on the map at a location will be the number of photographs with
> that location. EX1006, ¶¶54, 59, 62. In this case . . . the
> thumbnails ("graphical objects") displayed on the Belitz
> interface can include a number . . . overlaid on the top right
> corner of the thumbnail . . . representing the number of
> photographs that are associated with that location. EX1006, ¶54.

Ex. 1003 ¶ 115. Dr. Terveen's explanation is consistent with the description

of the number indicator in Belitz, which explains that

> [i]n this embodiment the graphical object 410 carries a number
> indicator 412 which presents a viewer with a number. The
> number indicates how many graphical objects 410 are associated
> with that location and are stacked into one graphical object 410.

Ex. 1006 ¶ 54.

> Belitz also explains that in one embodiment

> all graphical objects are photographs that are associated with the
> location where they were taken. The visual representations are
> thumbnails of the photographs. Photographs taken close by to
> each other are stacked together depending on the zoom level. If
> a user zooms in, the stacks will be split up and if the user zooms
> out the stacks will be merged.

*Id.* ¶ 62.

> Belitz further explains that

> FIG. 4*b* is another screenshot of a display 403 of a device
> or a user interface according to the teachings herein. In this
> screenshot the map 408 has been zoomed in showing the area in
> greater detail. When displaying the zoomed in map 409 the
> controller is configured to determine whether the graphical
> objects overlap or not and in this embodiment the graphical
> object 410 displayed in FIG. 4*a* which comprised 13 other
> graphical objects has now been split up into 4 graphical objects

92

IPR2022-00031
Patent 10,621,228 B2

> 410*a*, 410*b*, 410*c* and 410*d* each consisting of 1, 6, 4 and 2 graphical objects respectively.
>
> Should a user zoom out from FIG. 4*b* the display would return to the screenshot sown in FIG. 4*a* and the graphical objects 410*a*, 410*b*, 410*c* and 410*d* would again be determined to overlap and be stacked in a group graphical object 410.

*Id.* ¶¶ 55–56.

Dr. Terveen explains that "[z]ooming in or out could change the number of photographs represented by the marker, and would thus change the count displayed for that marker ("*modifying the first indication feature*"). Ex. 1003 ¶ 208 (Ex. 1006 ¶¶ 51, 55–56, Figs. 4a–4b).

Petitioner's argument notwithstanding, based on this record we find that a person of ordinary skill in the art would understand that Belitz describes an embodiment where all graphical objects are photographs that are associated with the location where they were taken, and that the visual representations are thumbnails of the photographs. The thumbnail of the photographs displays a number indicator that indicates how many photographs are associated with that location and are stacked into the thumbnail. Photographs taken close by to each other are stacked together depending on the zoom level, so that if a user zooms in, the stacks will be split up and if the user zooms out the stacks will be merged, and the displayed number indicator will adjust accordingly to indicate the number of photographs associated with that location. *See* Ex. 1006 ¶¶ 52–56, 62, Figs. 4a–4c; Ex. 1003 ¶¶ 115, 205–209.

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the asserted prior art meets the recited limitations of dependent claims 8 and 9.

93

IPR2022-00031
Patent 10,621,228 B2

### b) Dependent Claim 15

Dependent claim 15 reads:

15. The method of claim 1, further comprising:

responsive to an input that is indicative of a selection, in the first location view, of the representation of the at least a portion of the one digital file in the first set of digital files, causing a first digital file to be displayed on the interface; and

responsive to an input that is indicative of a selection, in the second location view, of the representation of the at least a portion of the one digital file in the second set of digital filed, causing a second digital file to be displayed on the interface.

Ex. 1001, 37:1–11.

Petitioner contends that A3UM combined with Belitz satisfies these features. Pet. 72 (citing Ex. 1003 ¶¶ 240–243). Petitioner asserts that "A3UM shows that selecting a pin on the interactive map causes the display of a thumbnail representation of all the photos matching the location represented by the pin in the Browser." Pet. 72 (citing Ex. 1005, 436–437). According to Petitioner, "[s]electing a thumbnail in the Browser then prompts the display of the original digital image in the Viewer." Pet. 72 (citing Ex. 1005, 251) ("When you select images in the Browser, the Viewer immediately displays a detailed view of your selection."). "This display in the Viewer," Petitioner explains, "will be of the digital image (*e.g.*, a full-size photo) represented by the thumbnail in the browser." Pet. 72 (citing Ex. 1005, 51) ("When you select one or more thumbnail images in the Browser, those images are displayed in the Viewer. You can use the Viewer to examine an image at its full size or compare multiple images side by side."). Pet. 72 (citing Ex. 1003 ¶ 241). Petitioner argues that "[a] skilled person would not modify this latter functionality in the suggested combination with

94

IPR2022-00031
Patent 10,621,228 B2

Belitz—the thumbnails would replace the pin, but the A3UM technique of selecting the thumbnail in the Browser to prompt display of the full image would be retained." Pet 72–73 (citing Ex. 1003 ¶ 242).

In its Response, Patent Owner argues that "[*n*]*owhere* in connection with the Places view does A3UM show a selected image in the Browser replacing the map with a full-size version." PO Resp. 66 (citing Ex. 2025 ¶¶ 191–192). "In fact," Patent Owner argues, "Dr. Terveen conceded during his deposition that A3UM does *not* disclose that Places map is replaced with an image in response to selected an image in the Browser below the map." PO Resp. 66 (citing Ex. 2023, 152:10–154:22; Ex. 2024, 323:7–324:16). Patent Owner alleges that "Dr. Terveen conceded during his deposition that A3UM does *not* disclose that Places map is replaced with an image in response to selected an image in the Browser below the map." PO Resp. 66 (citing Ex. 2023, 152:10–154:22; Ex. 2024, 323:7–324:16). Patent Owner asserts that "[t]he portions of A3UM relied on Petitioner and Dr. Terveen in connection with claim 15 are unrelated to the Places view." PO Resp. 66 (citing Ex. 1005, 51, 251; Ex. 1003 ¶ 194).

In its Reply, Petitioner argues that Patent Owner mischaracterizes the Petition. Petitioner asserts that "the obviousness challenge in the Petition was based on a combination of different behaviors of the Browser associated with distinct views in the A3UM interface." Pet. Reply 26 ("The Petition first cites A3UM at 436–437, which describes behaviors in the Places View. Then it cites A3UM at 51 and 251, which both describe behaviors available in the Viewer view."). Petitioner asserts that "the Petition contended it would have been obvious to cause the Browser to display a full-size image

95

IPR2022-00031
Patent 10,621,228 B2

*in the Viewer* when a thumbnail is clicked after a set of thumbnails is presented following selection of a location on the ***Places*** map." Pet. Reply 27.

In its Sur-reply, Patent Owner argues that "Petitioner now concedes that in A3UM's Places view, selecting an image in the Browser does ***not*** replace the map with a full-size version of the image." PO Sur-reply 22 (citing Pet. Reply, 26–28; Ex. 2023, 152:10–154:22; Ex. 2024, 323:7– 324:16; PO Resp. 65–67). Patent Owner disputes Petitioner's argument that "the Petition contended it would have been obvious to cause the Browser to display a full-size image in the Viewer when a thumbnail is clicked" in the Places view, arguing that "[n]ew obviousness contentions are beyond the permissible scope of a reply." PO Sur-reply 22–23 (quoting Pet. Reply 27). Patent Owner also contests any attempt by Petitioner to propose a claim construction for the phrase "responsive to" that would allow for an intervening action between "an input that is indicative of a selection" and "causing a first digital file to be displayed." PO Sur-reply 24–25. Finally, Patent Owner argues that displaying a [first/second] digital file ***anywhere*** in A3UM would render the claim language meaningless. *Id.* at 26.

Patent Owner's arguments are unavailing. We do not see a connection between Patent Owner's contention that the A3UM "Browser does not replace the map with a full-size version of the image" and the language of claim 15. PO Sur-reply 22. Claim 15 recites in pertinent part, "*responsive to an input that is indicative of a selection, in the [first/second] location view, of . . . a portion of the one digital file in the [first/second] set of digital files, causing a [first/second] digital file to be displayed on the*

96

IPR2022-00031
Patent 10,621,228 B2

*interface*." Nowhere does claim 15 (or independent claim 1) recite a requirement to "replace the map with a full-size version of the image" as Patent Owner suggests.

Moreover, claim 15 requires that the "*[first/second] digital file **be displayed on the interface***." (emphasis added). So as long as the digital file is displayed *on the interface*, the claim language would be satisfied.

Patent Owner's argument regarding the recited language "responsive to" is also unavailing. We see nothing in the language of claim 15 (or independent claim 1) that would necessarily prohibit a related user action between the "*input that is indicative of a selection*," and "*causing a . . . digital file to be displayed on the interface*."

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the asserted prior art meets the recited limitations of dependent claims 8 and 9.

### c) Conclusion on Dependent Claims

We have considered the evidence and arguments of record concerning the challenge to dependent claims 2–19 based on the combined teachings of A3UM and Belitz. Based on the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the proposed combination of A3UM and Belitz satisfies the subject matter recited by these claims, and that a person of ordinary skill in the art would have had sufficient reason to combine the teachings of the asserted art in the manner described in the Petition.

J.    *Patent Owner's Motion to Exclude (Paper 34)*

Patent Owner moves to exclude Exhibit 1005, a copy of the Aperture 3 User Manual, relied on by Petitioner as prior art. Paper 34. Patent Owner

97

IPR2022-00031
Patent 10,621,228 B2

argues that Petitioner has not properly authenticated Exhibit 1005 as a true and correct copy of A3UM publicly available as of February 2010. *Id.* at 1. Petitioner submitted the declarations of its employee, Mr. Birdsell, and its expert, Dr. Terveen, to authenticate Ex. 1005 as a true and correct copy of A3UM. *See* Exs. 1020 and 1003. Patent Owner argues, however, that neither witness possesses the personal knowledge required to authenticate Exhibit 1005 as an admissible exhibit. Paper 34, 1.

Petitioner disagrees with Patent Owner and argues that Patent Owner mischaracterizes the relevant inquiry, which is whether the ***PDF*** that is EX1005 is an authentic copy of what is undisputed to be the Aperture 3 User Manual ("A3UM") in February of 2010—the set of interlinked HTML files with their associated resources (e.g., images) on the v3.0 Aperture 3 installation DVD (the "A3UM HTML file set"). Ex. 1020 ¶¶ 9–10, 12–14, 17–18.

Patent Owner does not dispute that the A3UM HTML file set is present on the v3.0 Aperture 3 installation DVD. Mr. Birdsell and Dr. Terveen both testified that it is, identified where it is located on the DVD, and described how it can be retrieved. *See* Ex. 1020 ¶¶ 12–16; Ex. 2026, 29:3–9; Ex. 1003 ¶¶ 73–74, 77–84, 90–92, 94–96.

Patent Owner does not dispute that the A3UM HTML file set on the v3.0 Aperture 3 installation DVD existed prior to February 2010. Indeed, Dr. Surati testified that the files on the Installer DVD existed by January 21, 2010 and could not be modified after that date. *See* Ex. 1089, 125:3–25; Ex. 1073, 1.

IPR2022-00031
Patent 10,621,228 B2

Patent Owner does not provide any evidence that contradicts or substantively undermines the testimony of Mr. Birdsell that the A3UM HTML file set on the v3.0 Aperture 3 installation DVD is a "one-for-one" copy of A3UM HTML file set loaded onto Apple's documentation servers on February 10, 2010. Ex. 2026, 40:15–41:21, 34:10–35:8, 35:16–37:25.

After considering the evidence of record presented, we conclude that Petitioner has properly and sufficiently authenticated Exhibit 1005, and therefore deny Patent Owner's motion to exclude.

> K.    *Joint Motion to Seal Demonstrative Exhibits (Paper 74)*

The parties jointly submit a Motion to Seal Patent Owner's Demonstrative Exhibit 2125 and Petitioner's Demonstrative Exhibit 1119 related to the motion to terminate. The parties submit the motion to safeguard confidential information of Unified, Apple, Samsung and MemoryWeb, pursuant to the Protective Order. *See* Paper 52.

The parties argue that the Demonstratives and the exhibits cited therein contain non-public, highly confidential proprietary business information pertaining to Petitioner's and Samsung's contractual relationship with Unified and confidential communications between MemoryWeb and Unified. Paper 74, 3. The parties assert that this information includes confidential commercial information that Unified, Apple, Samsung and MemoryWeb have not made, and do not intend to make, publicly available. *Id.* The parties state that this information was produced pursuant to the Protective Order. *Id.*

The parties also argue that the public disclosure of this information would expose the relevant parties' confidential business activities. *Id.* The

99

IPR2022-00031
Patent 10,621,228 B2

parties assert that the Demonstratives and the exhibits cited therein contain information that the relevant parties maintain as confidential. *Id.* Thus, the parties believe that the public will not be harmed by sealing the confidential business information. *Id.*

The parties submit that the Demonstratives are directly relevant to whether Apple is a real party in interest ("RPI") to Unified's IPR and are used in support of the parties' arguments at the oral hearing. *Id.* The parties assert that they must rely on the confidential information to present arguments related to whether Apple should have been named as an RPI in the *Unified* proceeding. *Id.* The parties contend that the interest in maintaining confidentiality outweighs the public interest in having an open record. *Id.*

Upon considering the parties' representations and arguments, and the contents of the documents sought to be sealed, we conclude that the parties have established good cause for sealing the requested documents.

100

IPR2022-00031
Patent 10,621,228 B2

### III.    CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–19 of U.S. Patent No. Patent 10,621,228 B2 are unpatentable on the bases set forth in the following table.[9]

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–19 | 103(a) | A3UM, Belitz | 1–19 | |
| **Overall Outcome** | | | 1–19 | |

---

[9] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

101

IPR2022-00031
Patent 10,621,228 B2

IV.    ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1–19 of U.S. Patent No. Patent 10,621,228 B2 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude (Paper 34) is *denied*;

FURTHER ORDERED that the Joint Motion to Seal Demonstrative Exhibits 1119 and 2125 (Paper 74) is *granted*;

FURTHER ORDERED that Patent Owner's request for leave to file a motion to terminate is *denied;*

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

102

IPR2022-00031
Patent 10,621,228 B2

For PETITIONER:

Jeffrey Kushan
SIDLEY AUSTIN LLP
jkushan@sidley.com

For PATENT OWNER:

Jennifer Hayes
George Dandalides
Matthew A. Werber
Daniel Schwartz
Angelo J. Christopher
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com
mwerber@nixonpeabody.com
djschwartz@nixonpeabody.com
achristopher@nixonpeabody.com

103

Trials@uspto.gov                                                    Paper 39
571-272-7822                                              Entered: May 18, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

APPLE INC.,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

————————————

IPR2022-00033
Patent 10,423,658 B2

————————————

Before LYNNE H. BROWNE, NORMAN H. BEAMER, and
KEVIN C. TROCK, *Administrative Patent Judges.*

BROWNE, *Administrative Patent Judge.*


JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2022-00033
Patent 10,428,658 B2

# I.    INTRODUCTION

We have authority to hear this inter partes review under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed below, we determine that Petitioner, Apple, Inc. ("Apple"), has shown by a preponderance of the evidence that claims 1–15 (the "challenged claims") of U.S. Patent No. 10,423,658 B2 (Ex. 1001, "the '658 Patent") are unpatentable.  *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

*A. Procedural History*

The Petition (Paper 1, "Pet." or "Petition") requested *inter partes* review of the challenged claims of the '658 Patent.  Patent Owner, MemoryWeb, LLC, filed a Preliminary Response.  Paper 8 ("Prelim. Resp.").  With our authorization, Petitioner filed a Preliminary Reply (Paper 10), and Patent Owner filed a Preliminary Sur-reply (Paper 11).  Based upon the record at that time, we instituted *inter partes* review on all challenged claims on the grounds presented in the Petition.  Paper 12 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 20, "PO Resp."), Petitioner filed a Reply (Paper 26, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 31, "PO Sur-reply").

Patent Owner filed a Motion to Exclude certain evidence (Paper 34). Petitioner opposed the Motion (Paper 35).  Patent Owner filed a Reply to Petitioner's Opposition to the Motion (Paper 38).

On March 14, 2023, an oral hearing was held.

2

IPR2022-00033
Patent 10,428,658 B2

### B. Real Party-in-Interest

Petitioner states that it "is the real party-in-interest for this petition." Pet. 2. Patent Owner states that it is the real party-in-interest. *See* Paper 3, 2. *See also* Paper 7, 2; Paper 19, 2.

### C. Related Matters

According to the parties, the '658 Patent was asserted in the following district court proceedings: *MemoryWeb, LLC v. Apple Inc.*, Case No. 6:21-cv-00531 (W.D. Tex.); *MyHeritage (USA), Inc. et. al. v. MemoryWeb, LLC*, Case No. 1:21-cv-02666 (N.D. Ill.) (dismissed); and *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et al.*, Case No. 6:21-cv-00411 (W.D. Tex.). Pet. 3; Paper 3, 2; Paper 7, 2; Paper 19, 2.

Patent Owner also identifies U.S. Patent No. 9,098,531 ("the '531 patent"), U.S. Patent No. 9,552,376 ("the '376 patent"), U.S. Patent No. 10,621,228 ("the '228 patent"), U.S. Patent No. 11,017,020 ("the '020 patent"), U.S. Patent No. 11,163,823 ("the '823 patent"), and pending U.S. Patent Application 17/459,933 as related to the '658 Patent. Paper 7, 2–3.

Patent Owner additionally indicates the following *inter partes* proceedings are related matters: *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00111 (PTAB) challenging the '020 patent; *Apple Inc. v. MemoryWeb, LLC*, PGR2022-00006 (PTAB) challenging the '020 patent; *Apple Inc. v. MemoryWeb*, LLC, IPR2022-00031 (PTAB) challenging the '228 patent; *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00032 (PTAB) challenging the '370 patent; and *Unified Patents, LLC v. MemoryWeb, LLC*, IPR2021-01413 (PTAB), (challenging the '228 patent.

3

IPR2022-00033
Patent 10,428,658 B2

### D. The '658 Patent (Ex. 1001)

The '658 Patent relates to a computer-implemented system and method for managing and using digital files such as digital photographs. Ex. 1001, 1:16–19. In particular, the '658 Patent aims to provide an "interactive platform" for users to gather, organize, view, navigate, search, share and archive digital files, e.g., digital photographs and videos. *Id.* at 13:12–18, 13:56–59. The interactive platform may be provided via an "Application" having various "Application Views" for interaction with and organization of digital files. *Id.* at 8:59–9:7. A screenshot of an exemplary type of Application View, a "Location Application View," is shown in Figure 41, reproduced below. *Id.* at 4:3–4.



**FIG. 41**

As shown in the Location Application View interface of Figure 41, "Digital Files are displayed within an interactive map (Google map shown as

IPR2022-00033
Patent 10,428,658 B2

an example)." Ex. 1001, 29:25–29.  Further, "[i]n this view, individual or groups of Digital Files are illustrated as photo thumbnails (see indicators 0874 and 0875) on the map and the user can select the thumbnail to see all the Digital Files with the same location." *Id.* at 29:32–36.  In the case that the user selects either one of the thumbnails, a "Single Location Application View" interface corresponding to the location is presented to the user, as shown in the bottom portion of Figure 34 reproduced below. *Id.*



**FIG. 34**

Focusing on the single location (1630) Locations Application View, an "individual location name is displayed at the top of the page (1632)." Ex. 1001, 24:22–24.  The single location Locations Application View further displays "[t]humbnails of each Digital File within the specific collections" of

5

IPR2022-00033
Patent 10,428,658 B2

digital files. *Id.* at 24:25–26; *see id.* at 23:56–59, Fig. 33. In the example shown in Figure 34, "one photo (1633) taken at Wrigley Field (1634) that is associated with the location called Wrigley Field" is displayed. *Id.* at 24:26–28.

Turning to another Application View described by the '658 Patent, a "Multiple People Application View" is shown in Figure 32 reproduced below. *Id.* at 3:58.



The Multiple People Application View "can be seen by selecting 'People' (1401) from any of the Application Views within the Application." Ex. 1001, 22:46–48. As shown in Figure 32, "Multiple People Application View" 1400 "display[s] all the people that were created within the user's Application." *Id.* at 22:44–46. "For each person, a thumbnail of their face

6

along with their name is depicted.  In this figure, Jon Smith (1403) and JC Jon Smith (1404) along with some other people are illustrated." *Id.* at 22:52–55.

Further, "[f]or each person," there are "tags that are associated to [that] person." Ex. 1001, 23:4–6.  In "Single People Profile Application View" 1430, associated tags are used show that there are, e.g., "four photos (1452) associated with that person." *Id*. at 23:6–9.  In another example, the person "grandma" has been tagged in, and so, is associated with, 100 photos. *Id.* at 24:56–59.  Put another way, digital files have tags, e.g., in a "Tag Block of the Relationship Table for the Digital File," which associate a particular digital file with a particular person or otherwise characterizes and documents the digital file.  *See id.* at 20:1–6; 24:42–52.

### E. Challenged Claims

Petitioner challenges claims 1–15 of the '658 Patent.  Pet. 1.  Claim 1, the only independent claim is reproduced below:

> 1. A computer-implemented method of displaying at least a portion of a plurality of (i) digital photographs, (ii) videos, or (iii) a combination of (i) and (ii), each of the digital photographs and videos being associated with a geotag indicative of geographic coordinates where the respective digital photograph or video was taken, the method comprising:

> displaying an application view on a video display device including displaying a plurality of selectable elements, the plurality of selectable elements including a location selectable element;

> responsive to a click or tap of the location selectable element, displaying a map view on a video display device, the displaying the map view including displaying:

> (i) a representation of an interactive map;

7

(ii) a first location selectable thumbnail image at a first location on the interactive map, the first location being associated with the geographic coordinates of a first geotag, a first set of digital photographs and videos including all of the digital photographs and videos associated with the first geotag;

(iii) a first count value image partially overlapping the first location selectable thumbnail image, the first count value image including a first number that corresponds to the number of digital photographs and videos in the first set of digital photographs and videos;

(iv) a second location selectable thumbnail image at a second location on the interactive map, the second location being associated with the geographic coordinates of a second geotag, a second set of digital photographs and videos including all of the digital photographs and videos associated with the second geotag; and

(v) a second count value image partially overlapping the second location selectable thumbnail image, the second count value image including a second number that corresponds to the number of digital photographs and videos in the second set of digital photographs and videos;

responsive to a click or tap of the first location selectable thumbnail image, displaying a first location view on the video display device, the displaying the first location view including displaying (i) a first location name associated with the first geotag and (ii) a scaled replica of each of the digital photographs and videos in the first set of digital photographs and videos, the displayed scaled replicas of each of the digital photographs and videos in the first set of digital photographs and videos not being overlaid on the interactive map; and

responsive to a click or tap of the second location selectable thumbnail image, displaying a second location view on the video display device, the displaying the second location view including displaying (i) a second location name corresponding to the second geotag and (ii) a scaled replica of each of the digital

8

IPR2022-00033
Patent 10,428,658 B2

photographs and videos in the second set of digital photographs
and videos, the displayed scaled replicas of each of the digital
photographs and videos in the second set of digital photographs
and videos not being overlaid on the interactive map.

Ex. 1001, 35:13–36:7.

F. *Evidence*

Petitioner relies upon the following evidence:

(1) Aperture 3 User Manual, Apple Inc. (2009) ("A3UM") (Ex.
1005);

(2) U.S. Publication No. 2010/0058212 A1, published Mar. 4,
2010 ("Belitz") (Ex. 1006);

(3) U.S. Patent. No. 7,620,496 B2, issued November 17, 2009
("Rasmussen") (Ex. 1025); and

(4) Declaration of Dr. Loren Terveen (Ex. 1003).

Patent Owner relies upon the following evidence:

(1) Declaration of Rajeev Surati, Ph.D. (Ex. 2001).

G. *Asserted Grounds of Unpatentability*

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s) |
|:---:|:---:|:---|
| 1, 2, 5–15 | 103(a) | A3UM, Belitz |
| 3, 4 | 103(a) | A3UM, Belitz, Rasmussen |

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284
(2011) ("AIA"), amended 35 U.S.C. § 103.  The '658 Patent claims priority
to Patent Application No. 13/157,214, providing an effective filing date of
June 9, 2011.  *See* Ex. 1001, code (63).  Because this priority date is before
the effective date of the applicable AIA amendments (March 16, 2013), we
use the pre-AIA version of 35 U.S.C. § 103 in this proceeding.

9

IPR2022-00033
Patent 10,428,658 B2

## II.    ANALYSIS

### A. Principles of Law: Obviousness

A claim is unpatentable as obvious under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.[2]  *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. Reaching this conclusion, however, requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness requires the additional showing that a person of ordinary skill would have

_____

[2] The current record does not present or address any evidence of nonobviousness.

10

IPR2022-00033
Patent 10,428,658 B2

selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.*

### B. *Level of Ordinary Skill*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner contends that a person of ordinary skill in the art "would have had (1) at least a bachelor's degree in computer science, computer engineering, or electrical engineering, and (2) at least one year of experience designing graphical user interfaces for applications such as photo management systems." Pet. 9 (citing Ex. 1003 ¶¶ 41–43). Patent Owner "does not dispute Petitioner's proposed level of skill." PO Resp. 14.

Petitioner's description of the level of ordinary skill is generally consistent with the subject matter of the '658 Patent, with the exception of the qualifier "at least," which creates a vagueness that may extend the level to that reflecting an expert. Based on the record presented, including our review of the '658 Patent and the types of problems and solutions described in the '658 Patent and the cited prior art, we determine that a person of ordinary skill in the art is a person with a bachelor's degree in computer science, computer engineering, electrical engineering, or a related field, with two years of academic or industry experience designing graphical user interfaces for applications such as photo management systems.

11

IPR2022-00033
Patent 10,428,658 B2

### C. Claim Construction

Pursuant to 37 C.F.R. § 42.100(b), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Under *Phillips,* claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and even extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (in the context of an *inter partes* review, applying *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

Petitioner asserts that "the Board need not expressly construe the claims." Pet. 12. "Patent Owner agrees that the claims should be afforded their plain and ordinary meaning, but offers a discussion of that meaning in connection with certain terms and phrases . . . in the event the Board determines that is necessary to resolve Petitioner's patentability challenges." PO Resp. 15. In its Sur-reply, Patent Owner proposes constructions for the claim terms "application view," "responsive to displaying," and "[first/second]-person-location selectable element." PO Sur-reply 8–13. Patent Owner has not shown good cause as to why we should consider these claims constructions at this late stage in this proceeding.

12

IPR2022-00033
Patent 10,428,658 B2

We agree with the Petitioner that no claim terms require express construction. *See Vivid Techs.*, 200 F.3d at 803 (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"). To the extent that the meaning of any claim term is addressed, we use its ordinary and customary meaning as discussed in our analysis below.

*D. Relevant Prior Art*

*1.    A3UM (Ex. 1005)*

A3UM is a user manual for Apple's Aperture software product, showing a copyright date of 2009. Ex. 1005, 3. Petitioner asserts that A3UM is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 12.

A3UM explains that the Aperture software product ("Aperture") is a "digital image management system that can track thousands of digital images and provides . . . image management and adjustment tools" and allows the user to "work with high-quality JPEG, TIFF, and RAW image files-and even HD video files." Ex. 1005, 1–2. A3UM states that Aperture organizes "photos, audio clips, and video clips." *Id.* at 21. A3UM "describes the Aperture interface, commands, and menus and gives step-by-step instructions for creating Aperture libraries and for accomplishing specific tasks." *Id.* at 3. One particular Aperture interface is the Aperture main window, reproduced below in an Aperture main window screenshot. *Id.* at 46.

13

IPR2022-00033
Patent 10,428,658 B2



The Aperture main window shows various interface features including an "Inspector pane," a "Toolbar," a "Viewer," a "Browser," and a "Vault pane." *Id.* The Browser displays "thumbnail images contained in a folder, project, or album." *Id.* at 47. In this example, a "single row of thumbnails" is displayed. *Id.* at 47–48. The Browser also displays "video files [imported] into Aperture." *Id.* at 271. Next, the Viewer shows selected thumbnails from the Browser at full size, or allows side-by-side image comparison. *Id.* at 51. If video items were selected from the Browser, the Viewer can display those videos. *Id.* at 271. Further, the Inspector pane provides access to a Library inspector, via its Library tab, reproduced in an Inspector Pane screenshot below. *Id.* at 54.

14

IPR2022-00033
Patent 10,428,658 B2



"The Library inspector holds containers—projects, folders, and albums—" which are used to organize images. *Id.* at 55. When a particular "project, folder, or album in the Library inspector" is selected, "the images are displayed in the Browser and Viewer." *Id.* Further, the "Library inspector also provides a number of ways to view items in the library" and provides access to additional Aperture interface views, such as a Places view and a Faces view. *Id.* Those additional views are accessed by selecting the Places or Faces item in the Library inspector (as shown in the Inspector Pane screenshot) or by selecting the Places or Faces button in the toolbar (as shown in the Aperture main window screenshot). *Id.* at 81, 424.

The Places view "automatically plots the location of each image on [a] map" and provides "images associated with a location." *Id.* at 435–436. That is, the Places view organizes "images by the locations where they were taken" and "categorizes the images by location and coverts" the location to "place names, such as Vancouver, Canada." *Id.* at 30. A screenshot of one exemplary Places view, within the overall Aperture main window, is reproduced below. *Id.*

15

IPR2022-00033
Patent 10,428,658 B2



Another exemplary screenshot of the Places view showing "location pins [to] mark the locations where images or groups of images were shot" is reproduced below. *Id.* at 435–437.

16

IPR2022-00033
Patent 10,428,658 B2



As shown above, "location pins mark the locations where images or groups of images were shot." *Id.* at 435–437. In particular, the screenshot shows a location pin having a text callout indicating that number of photos were taken at a national park. When a pin is selected, "the image or images associated with the location marked by the [selected] pin are selected in the Browser." *Id.* at 436.

Turning to the Faces view, the Faces view "show[s] all the photos of people with assigned names in the Aperture library." *Id.* at 78. A screenshot of the Faces view, within the overall Aperture main window, showing images of people with assigned names, is reproduced below. *Id.* at 29, 78.

17

IPR2022-00033
Patent 10,428,658 B2



By selecting a "person's snapshot in Faces view," Aperture displays "all of the images in [the] library in which a person appears." *Id.* at 29, 79. A screenshot of all the images of a selected person is reproduced below. *Id.* at 79–80; *see id.* at 29.

18

IPR2022-00033
Patent 10,428,658 B2



As shown above, "all the confirmed images of that person appear at the top of the Faces browser, and all the suggested images of the person appear in a separate section below the confirmed images." *Id.* at 79–80. The suggested images of the person are determined in an automated process which uses "face detection and face recognition technology" to suggest

19

images corresponding to a named person. *Id.* at 417–419. Those suggested images can be confirmed as matches for the named person by selecting the "Confirm Faces" button. *Id.* at 80, 425. Alternatively, an image can have a name manually assigned to it. *Id.* at 421–422.

### 2. *Belitz (Ex. 1006)*

Belitz is a U.S. Patent Publication that published on March 4, 2010, more than one year before the earliest priority date of the '658 Patent. Ex. 1001, code (22), (60); Ex. 1006, code (43). Petitioner asserts that Belitz is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 21.

Belitz relates to a "user interface . . . configured to display a map and to display at least one marked location on said map." Ex. 1006, code (57). By way of background, Belitz explains that "[i]t is common to mark special locations on a map by associating a graphical object with that location. Examples of such locations are service points, restaurants, tourist attractions, visited places etc[.] and examples of graphical objects are photographs taken at such a location." *Id.* ¶ 2. Belitz further explains "[i]f many locations are located close to one another they overlap and the view of the associated images become cluttered and it is difficult to discern between the various objects and the user is not provided with a good view of what location is associated with what." *Id.* Belitz presents a user interface attempting to address those concerns. *Id.* ¶ 5. Figures 4a and 4b, reproduced below, show screenshots of the user interface. *Id.* ¶ 51, 55.

20

IPR2022-00033
Patent 10,428,658 B2



Fig. 4a                      Fig. 4b

As shown in Figure 4a, a "map 409 is displayed of a town called Roskilde.  A location 408 is marked by a graphical object 410." *Id.* ¶ 51. "[G]raphical object 410 has a visual representation 411 which in this embodiment is a photograph that is associated with the location." *Id.* ¶ 52. Furthermore, "graphical object 410 carries a number indicator 412 which presents a viewer with a number.  The number indicates how many graphical objects 410 are associated with that location and are stacked into one graphical object 410." *Id.* ¶ 54.  Furthermore, "graphical objects stacked in the displayed graphical object or graphical group object 410 . . . can be associated with other locations that are in close proximity to the marked location 408" because "if the graphical objects associated with each location were to be displayed separately they would overlap which would clutter the view and be confusing to a user." *Id.*

Figure 4b shows map 408 having been "zoomed in showing the area in greater detail." *Id.* ¶ 55.  At this zoom level, graphical object 410 is "split

21

IPR2022-00033
Patent 10,428,658 B2

up into 4 graphical objects 410*a*, 410*b*, 410*c* and 410*d*" because the display of those graphical objects would not overlap.  *Id.*  Those graphical objects themselves also consist of some number of graphical objects.  *Id.*

When a graphical object, e.g., graphical object 410, 410a, 410b, 410c, or 410d, is selected, a popup window is displayed over the graphical object. *Id.* ¶ 60.  Figure 4c, reproduced below, is a screenshot showing the user interface after the selection of graphical object 410c.  *Id.*



**Fig. 4c**

As shown in Figure 4c, the "popup window shows at least some of the visual representations 411 of the graphical object 410*c*.".  One 414 of the visual representations 411 or images as they are in this embodiment is shown in a larger size than the others which are shown in a list 415."  *Id.*  In some embodiments, "graphical objects are photographs that are associated with the location where they were taken. The visual representations are thumbnails of the photographs."  *Id.* ¶ 62.

22

IPR2022-00033
Patent 10,428,658 B2

### 3. *Rasmussen (Ex. 1025)*

Rasmussen is a U.S. Patent that issued on November 17, 2009, more than one year before the earliest priority date of the '658 Patent. Ex. 1001, code (22), (60); Ex. 1025, code (45). Petitioner asserts that Rasmussen is prior art under pre-AIA 35 U.S.C. § 102(b). Pet. 23.

Rasmussen "relates to digital mapping systems, and more particularly, to techniques that provide more accurate and useful map scales." Ex. 1025, 1:18–20. In particular, Rasmussen describes digital map tools and user interface options for a digital map. *Id.* at 9:35–49, 48. Figure 2, reproduced below, shows exemplary tools and interface options. *Id.*



**Fig. 2**

As shown in Figure 2, a user may position endpoints at various locations on the map, creating measuring tool 205b between the endpoints. *Id.* at 9:61–65. "If the user clicks the tool 205*b* endpoints or the line between them, an information window . . . opens to show information about

23

IPR2022-00033
Patent 10,428,658 B2

the map locations marked by the tool 205*b* endpoints." *Id.* at 10:17–23. For example, "information window 215 is shown, and includes latitude/longitude and/or geocode information." *Id.* at 10:25–27.

### E. *A3UM as a Printed Publication*

Petitioner argues that A3UM should be considered a printed publication because A3UM was publicly available through the Aperture 3 website and software DVD. Pet. 12–17. Patent Owner disputes this and claims that Petitioner "has failed to establish that A3UM qualifies as printed publication prior art [under Section 102] by a preponderance of the evidence." PO Resp. 28.

### 1.    *Applicable Law*

Our governing statutes provide "[a] petitioner in an *inter partes* review may request to cancel as unpatentable one or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). Although Patent Owner challenges whether A3UM is a printed publication, the burden of persuasion remains on Petitioner to demonstrate unpatentability. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (*citing Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review). Petitioner must demonstrate by a preponderance of the evidence that the challenged claims are unpatentable—including showing that the references relied upon are patents or printed publications. *See* 35 U.S.C. § 311(b); *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018), *as amended* (Sept. 20, 2018). "The preponderance of the evidence standard

24

IPR2022-00033
Patent 10,428,658 B2

applicable to *inter partes* reviews requires proof that a fact was more likely than not to have occurred." *Instradent USA, Inc. v. Nobel Biocare Servs. AG,* IPR2015-01786, Paper 106 at 33 (PTAB Feb. 15, 2017) (internal quotations omitted).

The determination of whether a reference qualifies as a "printed publication" is a legal conclusion based on underlying factual findings. *Nobel,* 903 F.3d at 1375 (citing *Jazz Pharm., Inc. v. Amneal Pharm., LLC,* 895 F.3d 1347, 1356 (Fed. Cir. 2018)). The underlying factual findings include whether the reference was publicly accessible. *Id.* (citing *In re NTP, Inc.,* 654 F.3d 1279, 1296 (Fed. Cir. 2011)).

The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *Medtronic, Inc. v. Barry,* 891 F.3d 1368, 1380 (Fed. Cir. 2018) (citing *In re Klopfenstein,* 380 F.3d 1345, 1350 (Fed. Cir. 2004)). In certain situations, particularly for manuscripts or dissertations stored in libraries, courts may inquire whether a reference was sufficiently indexed, catalogued, and shelved. *See, e.g.,* *In re Hall,* 781 F.2d 897, 898–99 (Fed. Cir. 1986); *In re Lister,* 583 F.3d 1307, 1315 (Fed. Cir. 2009) (manuscript became publicly accessible once it was placed in a searchable database). In other situations, such as for information displayed at meetings and trade shows, courts have explained that indexing is not required if it was sufficiently disseminated. *See Medtronic,* 891 F.3d at 1381 (citing *Suffolk Techs., LLC v. AOL Inc.,* 752 F.3d 1358, 1365 (Fed. Cir. 2014)). The Federal Circuit has summarized that "[w]hile cataloging and indexing have played a significant role in our cases involving library references, we have explained that neither cataloging

25

nor indexing is a necessary condition for a reference to be publicly accessible." *Lister*, 583 F.3d at 1312 (citing *Klopfenstein*, 380 F.3d at 1348).

"Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d at 898–99). "A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008) (quoting *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006)). The Federal Circuit has "interpreted § 102 broadly, finding that even relatively obscure documents qualify as prior art so long as the relevant public has a means of accessing them." *GoPro, Inc. v. Contour IP Holding LLC*, 908 F.3d 690, 693 (Fed. Cir. 2018).

What constitutes a "printed publication" must also be determined in light of the technology employed. *Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019) (citing *Wyer*, 655 F.2d at 226). Public accessibility requires more than technical accessibility. *Id.* (citing *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 773 (Fed. Cir. 2018)). "[A] work is not publicly accessible if the only people who know how to find it are the ones who created it." *Id.* at 1372. On the other hand, "a petitioner need not establish that specific persons actually accessed

26

or received a work to show that the work was publicly accessible." *Id.* at 1374. "In fact, a limited distribution can make a work publicly accessible under certain circumstances." *Id.* (quoting *GoPro*, 908 F.3d at 694).

## 2.    *Petitioner's Assertions*

Petitioner contends that A3UM was publicly accessible at least as early as February 2010, and qualifies as prior art under section 102(b), because (1) a copy was enclosed as an HTML file set on the installation DVD included in each retail package of Aperture 3 sold by Apple, Inc. and was accessible by both the files themselves and through the software; and (2) it was also published on the www.apple.com website.[3]  Pet. 12–13 (citing Ex. 1020 PP 12–20).  Petitioner primarily relies on a declaration by Matthew Birdsell, who "is an Apple employee with personal knowledge of the publication and dissemination of the Aperture 3 User Manual in early 2010," to demonstrate that A3UM qualifies as a printed publication.  Pet. 13 (citing Ex. 1020 ¶¶ 2–4).  In February 2010, Mr. Birdsell was an independent contractor for Apple who "personally worked on Apple documentation and publications regarding each version of Aperture throughout its lifespan, including Aperture 3."  Ex. 1020 ¶ 2.

Mr. Birdsell testified that "more than 100,000 customers had purchased and were using the Aperture 3 product between February and June of 2010," which he based on his personal "experience with the utilization levels of the help resources on the Apple.com website at the time."  Ex. 1020 ¶ 7.  To support this statement, Petitioner submits an

---

[3] Petitioner indicates that it "relies on the HTML file set form of the Aperture 3 User Manual (A3UM, EX1005) in this proceeding."  Pet. 13 (citing Ex. 1020 ¶ 9).

IPR2022-00033
Patent 10,428,658 B2

Internet Archives' Wayback Machine capture of the home webpage of apple.com showing Aperture 3 for sale in February 2010 in addition to a table of contents that presumably can be accessed from the "Aperture 3 User Manual" hyperlink.  Pet. 13 (citing Ex. 1021); *see also* Pet. Reply 7, 12. Petitioner also includes three articles discussing Aperture 3 software and its February 9, 2010, release date, which, Petitioner contends, demonstrate that "many individuals had installed Aperture 3—and thereby transferred A3UM—onto their computers before June 2010, which required use of the installer DVD supplied via the retail package of Aperture 3."  Pet. 13–14 (citing Exs. 1044, 1045, 1048).

Using the installer DVD, Petitioner alleges that A3UM could be accessed by running the Aperture 3 software then selecting "Aperture 3 User Manual" in the "Help>Aperture Help" menu, which "would retrieve the locally-stored A3UM HTML file set copied during installation."  Pet. 15 (citing Ex. 1003 ¶¶ 86–97, 99; Ex. 1051, 7, 159); *see also* Pet. Reply 15–19. In addition to the internal help functionality, Petitioner asserts that "[s]killed artisans could obtain A3UM from the Aperture 3 installation DVD or from computers onto which Aperture 3 had been installed" by locating the HTML file set in the local copy of the Aperture 3 application bundle and opening the file set with a web browser.  Pet. 15 (citing Ex. 1003 ¶¶ 78–85, 91–97; Ex. 1020 ¶ 14)).

Petitioner alleges that A3UM (the HTML file set) "was also published on the www.apple.com website."  Pet. 13 (citing Ex. 1020 ¶¶ 17–20). Petitioner asserts that "the A3UM HTML file set was loaded onto a publicly accessible website (http://documentation.apple.com/en/ aperture/usermanual/) where it became accessible to any member of the

28

public starting on the date of commercial sale of Aperture 3." Pet. 16 (citing Ex. 1020 ¶¶ 9–11). To support this, Petitioner submits that archived copies of the Aperture 3 website from 2010 "include an embedded URL pointing to the HTML-based User Manual" and "display the same table of contents entries as A3UM (EX1005), including sub-sections when manually selected." *Id.* (citing Ex. 1003 ¶ 103; Ex. 1021, 6). Further, Petitioner contends that "a skilled artisan, exercising only reasonable diligence, could have located A3UM by following links on the apple.com web site" or "[a]lternatively, that person could have located A3UM using the search feature within the apple.com web site or using well-known search engines." *Id.* at 16–17 (citing Ex. 1003 ¶¶ 101–103; Ex. 1021; Ex. 1020 ¶¶ 18–19).

> 3. *Patent Owner's Response*

Patent Owner contends that Petitioner "has failed to establish that A3UM qualifies as printed publication prior art by a preponderance of the evidence." PO Resp. 28 (citing *Instradent USA, Inc. v. Nobel Biocare Services AG,* IPR2015-01786, Paper 106 at 33 (PTAB Feb. 15, 2017). In support of this general contention, Patent Owner presents six arguments. Each of these arguments is discussed below.

> a) *Patent Owner's First Argument: Petitioner Has Not Shown That the Website Version of A3UM Was Publicly Accessible*

Patent Owner contends that Petitioner has not shown that the website version of A3UM was publicly accessible. PO Resp. 29–35. Patent Owner asserts that Dr. Terveen's testimony "that Apple was 'well-known' in 2010 and that a person 'interested in learning about Apple software' would have visited www.Apple.com and then allegedly proceeded to the Aperture 3 user manual page" is insufficient to show that a person of ordinary skill in the art

29

IPR2022-00033
Patent 10,428,658 B2

exercising reasonable diligence would have "known to navigate to Apple.com and then look for the Aperture 3 user manual page in search of A3UM." *Id.* 30 (citing Ex. 1003 ¶ 101; *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 772 (Fed. Cir. 2018). According to Patent Owner, "[e]ven if an unspecified group of consumers knew of Aperture 3 during the relevant timeframe, there is no evidence those consumers were POSITA[4]s or that an interested POSITA would have known of Aperture 3 or had any motivation to look for it." *Id.* at 30–31.

Patent Owner further contends that "[e]ven if a POSITA navigated to Apple.com, Petitioner has nevertheless failed to establish that a POSITA exercising reasonable diligence would have actually found the Aperture 3 user manual page." PO Resp. 32. According to Patent Owner, "'Aperture' or 'Aperture 3' would not be common search terms to a POSITA, and there is no evidence on the record that searching Apple.com for other terms that would be common, like 'photo,' for example, would have yielded any Aperture-related results." *Id.* Patent Owner contends further that "even if accessing the Aperture 3 webpage through the homepage, a POSITA would still have needed to navigate through at least four more pages to reach the manual." *Id.* at 34 (citing Ex. 1003 ¶ 102; Ex. 1020 ¶19; Ex. 2026, 67:21–69:11).

> b)    *Patent Owner Second Argument: Petitioner Has Not Shown That Ex. 1005 Accurately Represents What*

---

[4] Person of ordinary skill in the art.

30

IPR2022-00033
Patent 10,428,658 B2

> *Was Shown on the Aperture 3 User Manual Page Before*
> *June 2010*

Patent Owner contends that Petitioner has not shown that Ex. 1005 accurately represents what was shown on the Aperture 3 user manual page before June 2010. PO Resp. 35–38. Patent Owner asserts that "Ex. 1005 is an 1,122-page PDF compilation created from approximately 750 individual HTML files purportedly found on an Aperture 3 installation DVD of unknown origin, provided (and presumably prepared) by counsel in 2021." *Id.* at 35 (citing Ex. 1003 ¶ 82; Ex. 2023, 57:10–16, 59:4–10; Ex. 2024, 251:15–252:15; *see also* Ex. 2026, 38:25–39:3). According to Patent Owner, "[w]ithout an archived version of the Aperture 3 product manual page, it is impossible to know if Ex. 1005 accurately represents what was available on that page in 2010." *Id.* at 38 (citing *B/E Aerospace, Inc. v. C & D Zodiac, Inc.*, 709 F.App'x 687, 697–98 (Fed. Cir. 2017).

> c)    *Patent Owner's Third Argument: Petitioner's*
> *Evidence of Sales is Insufficient to Show Public*
> *Accessibility*

Patent Owner contends that Petitioner's sales evidence fails to establish public accessibility because, Petitioner "is unable to distinguish between users who purchased retail boxes of Aperture 3 versus those who upgraded from Aperture 2 to Aperture 3," and that "[f]or those who upgraded, there is no evidence they had the DVD." PO Resp. 39 (citing Ex. 2026, 62:23–63:20, 65:5–13). Patent Owner contends further that "Petitioner has not offered any evidence that users who purchased the Aperture 3 product would have accessed the website." *Id.*

31

IPR2022-00033
Patent 10,428,658 B2

> d)     *Patent Owner's Fourth Argument: Petitioner's*
> *Reliance on the Aperture 3 Installation DVD is*
> *Insufficient to Show That A3UM is a Printed Publication*

Patent Owner contends that the HTML file set on the

Aperture 3 installation DVD is not a printed publication because "[e]ven if

those HTML files were technically present on a DVD circulated to

consumers, they were not publicly accessible because they were 'hidden' or

'invisible' and required a complex series of steps to un-hide."

PO Resp. 39–40.  Patent Owner asserts that "Dr. Terveen—Petitioner's

technical expert and alleged POSITA in this matter—could not testify that

he knew where or how to find the 'hidden files' on his own" and that "his

testimony suggests Petitioner's counsel provided him with 'tips' on how to

find the hidden files and conceded that it was 'possible' that he did not know

how to find the hidden HTML file set without counsel's 'tips.'"  *Id.* at 40.

Patent Owner asserts further that "the steps required to actually locate

the HTML file set further demonstrate that the HTML file set was not

publicly accessible."  PO Resp. 41 (citing Ex. 2025 ¶¶ 118–22).  Patent

Owner contends that "the user manual could only be located at the following

path ***after arriving at the Archive.pax.gz*** location:

/Archive/Applications/Aperture.app/Contents/Resources/English.lproj/

aperture_help/en/aperture/."  *Id.* at 45 (citing Ex. 1003 ¶ 82; Ex. 2023,

100:23–101:10).  According to Patent Owner, "a POSITA with the Aperture

3 installation DVD lacked any reasonable way of locating the HTML file set

unless they already knew what to look for and where to look or if they

expanded and inspected every single folder."  *Id.* at 46 (citing *Samsung*, 929

F.3d at 1372).

IPR2022-00033
Patent 10,428,658 B2

In addition, Patent Owner contends that *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01436, Paper 40 (PTAB Jan. 23, 2020), relied upon by Petitioner in claiming that the HTML file set on the Aperture 3 installation DVD is a printed publication, is "clearly distinguishable." PO Resp. 48. Patent Owner asserts that "the product manual at issue in *Cisco* 'was enclosed on documentation disks (CD-ROM/DVD) included with each Sourcefire 3D System product sold by Sourcefire, Inc." and that "[a]ll one needed to do to view the manual in *Cisco* was to insert the DVD to see the PDF." *Id.* (citing *Cisco*, Paper 40, p. 23; Ex. 1005 ¶ 11). Whereas, "the Aperture 3 DVD did not include the manual in PDF format. Instead, the HTML file set was purposely hidden inside the installation DVD, requiring a convoluted series of steps that likely proved challenging even to Petitioner's expert." *Id.* at 48–49 (citing *id.* at 41–48).

> ### e) Patent Owner's Fifth Argument: Aperture 3 Installed on a Mac Computer is Not a Printed Publication

Patent Owner contends that the HTML file set installed on a Mac Computer is not a printed publication. PO Resp. 50–53. Patent Owner asserts that Petitioner's reliance on installation of the Aperture 3 HTML file set on a Mac Computer "crosses the line between relying on material that may arguably constitute a printed publication to relying on a component within a software program that is out of bounds for an IPR." *Id.* at 50. According to Patent Owner, "[t]he user manual pop-up window seen only by users running Aperture 3 is not a printed publication: it is part of an executing software program. Likewise, the files in the installed Aperture 3 application constitute part of the actual program installed on MacBook, not a printed publication." *Id.* at 53.

33

IPR2022-00033
Patent 10,428,658 B2

>   f)    *Patent Owner's Sixth Argument: Mr. Birdsell's Testimony Lacks Credibility*

Patent Owner contends that Mr. Birdsell's testimony lacks credibility because Mr. Birdsell is an Apple employee.  PO Resp. 53.  Patent Owner asserts that "[m]uch of Mr. Birdsell's testimony was based on memory from over 10-years ago with no corroborating emails or similar documentary evidence" and that "Mr. Birdsell struggled with basic facts." *Id.* at 54.

>   g)    *Arguments Pertaining to Other Alleged Non-Prior Art*

In addition to arguing that A3UM is not prior art, Patent Owner also contends that "Petitioner relies on at least two references related to Google Maps to show a reasonable expectation of success: (1) excerpts from a textbook entitled 'PHP Web 2.0 Mashup Projects' (hereinafter, 'PHP Web,' Ex. 1035) and (2) an Internet Archive printout regarding the Google Maps API (hereinafter, 'Google Maps API,' Ex. 1040).  PO Resp 55 (citing Pet. 28).  Patent Owner also contends that "Petitioner also relies on webpage printouts discussing certain alleged photo management products to support the motivation to combine: Picasa Web Albums (Ex. 1033) and Panaoramio (Exs. 1032 and 1034)." *Id.* at 56 (citing Pet. 29).  According to Patent Owner, Petitioner does not attempt to establish that any of these exhibits qualify as prior art. *See id.* at 55–56.

Petitioner does not rely upon the exhibits identified by Patent Owner (Exs. 1032–1035, and 1040), as prior art references that form the substantive basis of Petitioner's obviousness challenges to claims 1–15. *See* Pet. 3. Accordingly, they need not qualify as prior art and we do not discuss this argument further.

    *4.  Petitioner's Reply*

       *a)  Reply to Patent Owner's First Argument: That Petitioner Has Not Shown That the Website Version of A3UM Was Publicly Accessible*

Petitioner asserts that no evidence contradicts Mr. Birdsell's testimony that "***at least 100,000 individuals actually did access*** [A3UM via Apple's website] between February and June of 2010, based on his recollection of Apple analytical reports of 'documentation.apple.com[.]'" Pet. Reply 7 (citing Ex. 2026, 51:16–20, 54:6–22, 55:20–56:11; *see also* Ex. 1020 ¶ 7).  Petitioner also replies that no testimony contradicts Mr. Birdsell's further testimony that he "recalled loading the HTML file set that is A3UM onto a staging server on February 8, 2010, and that 'within a few hours after publication' on February 9, 2010, he and his team verified 'the files were live and accessible to customers and that all the links worked.'" *Id.* (citing Ex. 2026, 36:19–36:12, 36:21–37:25; 59:6–8; Ex. 1020 ¶¶ 10–11).

Petitioner asserts that "[w]itnesses from both parties testified [A3UM] is located on and can be retrieved from (i) the Installer DVD and (ii) a local copy of the Aperture application bundle after installation" and that "[p]rinted documentation in the Aperture 3 retail box explains the Aperture 3 user manual is on the computer after installation."  Pet. Reply 8 (citing Ex. 1003 ¶¶ 75–94, 99; Ex. 2001 ¶ 108; Ex. 2025 ¶ 118; Ex. 2026, 25:19–24; Ex. 1089, 139:20–140:1, 143:9–13; Ex. 1051, 7, 135, 159).  Petitioner asserts further that "Dr. Surati confirmed the Installer DVD has creation-modification dates establishing files on it necessarily existed ***before*** February 2010," that "[a]nyone who used Aperture 3 in February 2010 could access and inspect A3UM using the Aperture help window," and that "[t]he high volume of accesses of A3UM on Apple's website confirms people were

aware of A3UM starting in February 2010." *Id.* (citing Ex. 1089, 125:3–25; Ex. 1073, 1; Ex. 1003 ¶¶ 87–90; Ex. 1020 ¶ 12(b)).

In addition, Petitioner asserts that "[a]n array of evidence corroborates [Petitioner's assertion that the A3UM installer DVD was publicly distributed], including (i) Apple's press release . . . (ii) Mr. Birdsell's recollections about its release date, his activities around that release date, and that he witnessed it for sale in Apple stores then . . . and (iii) webpages captured between February and June 2010 reporting experiences of people using Aperture 3." Pet. Reply 8–9 (citing Ex. 1048, 1; Ex. 1020 ¶¶ 5–7; Ex. 2026, 59:10–60:10, 62:4–21; Ex. 1044, 1; Ex. 1045, 2; Ex. 1077, 1; Ex. 1089, 181:14–182:11, 192:2–7, 189:10–14, 170:6–13). Petitioner asserts further that "[s]killed artisans thus knew of and could have retrieved A3UM starting in February 2010." *Id.* at 9.

> b)     *Reply to Patent Owner's Second Argument: That Petitioner Has Not Shown that Ex. 1005 Accurately Represents What Was Shown on the Aperture 3 User Manual Page Before June 2010*

Petitioner asserts that Patent Owner "has not disputed that EX1005 is a true and correct copy of the A3UM HTML file set ***on the v3.0 Aperture Installer DVD***." Pet. Reply 20. Petitioner asserts that "[t]he 'provenance' of A3UM is also clear— the footer reports the path to each HTML file used to render each page, and they are all in the 'usermanual' subfolder in the 'Resources' subfolder of a local copy (*i.e.* 'file:///') of the Aperture 3 application bundle. *Id.* at 20–21 (citing Ex. 1005; Ex. 1003 ¶¶ 81, 73; Ex. 2024, 252:13–15).

Petitioner points out that "Dr. Surati confirmed he could retrieve the A3UM HTML file set from the Installer DVD as Dr. Terveen did" and "that

IPR2022-00033
Patent 10,428,658 B2

all the files on the Installer DVD existed by January 21, 2010 and could not be modified after that date." Pet. Reply 21 (citing Ex. 1089, 125:3–25, 139:20–140:1; Ex. 2025 ¶ 117; Ex. 1003 ¶¶ 80–81; Ex. 1073,1). Petitioner also points to Mr. Birdsell's testimony "that the same A3UM HTML file set was (i) packaged for distribution on the Installer DVD and (ii) loaded on apple.com." *Id.* (citing Ex. 2026, 40:15–41:10, 41:17–42:12; Ex. 1020 ¶ 4). Thus, according to Petitioner, "because EX1005 was produced from HTML files on the v3.0 Aperture Installer DVD that existed before February 2010, and because that HTML file set is 'one-for-one' identical to the one accessible from the Aperture support page, . . . EX1005 was publicly accessible from the apple.com website and from the Installer DVD." *Id.*

> c)  *Reply to Patent Owner's Third Argument: That Petitioner's Evidence of Sales is Insufficient to Show Public Accessibility*

Petitioner asserts that "Mr. Birdsell's testimony *is* evidence" and it "is reliable—he had clear recollections of relevant facts and his testimony is corroborated by other evidence (*e.g.*, reports of third parties using Aperture 3 in webpages captured before June 2010)." Pet. Reply 9 (citing *In re Jolley*, 308 F.3d 1317, 1328 (Fed. Cir. 2002); *In re Apple Inc.*, 979 F.3d 1332, 1336 (Fed. Cir. 2020); Ex. 1044, 1; Ex. 1045, 2; Ex. 1007, 1; Ex. 1089, 170:6–13, 181:14–182:11, 189:10–14, 192:2–7). Petitioner asserts that the cases cited by Patent Owner in support of its arguments "about numbers of copies that must distributed to establish public availability" "found numbers far fewer than 100,000 copies were sufficient" to make the required showing. *Id.* at 9–10 (citing PO Resp. 51–52; *Cisco*, Paper 40, p. 23–31; *Mass. Inst.of Tech. v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985)).

37

> d)    *Reply to Patent Owner's Fourth Argument: That Petitioner's Reliance on the Aperture 3 Installation DVD is Insufficient to Show That A3UM is a Printed Publication*

Petitioner asserts that Dr. Surati's testimony isn't credible.  Pet. Reply 13–15.  Specifically, Petitioner asserts that "[a]s his deposition shows, he was unfamiliar with how MacOS applications are organized and distributed, that their help files are typically stored in the application bundle, and how to reveal hidden files" and that "despite confirming a skilled person would have consulted Apple documentation or MacOS 'how to' books if they had questions, he did not."  *Id.* at 13 (citing Ex. 1089, 36:2–11, 42:23–42:8, 44:2–14, 405:20–406:19; Ex. 2025 ¶¶ 114–117).  Petitioner asserts that "[a]fter reviewing such documentation, Dr. Surati confirmed it teaches" how MacOS applications are organized and distributed and notes that "Dr. Surati analogized locating A3UM within the Installer DVD to ***finding a book in a library***."  *Id.* at 13–15 (footnote omitted, citing Ex. 1089, 407:8–19).  Thus, according to Petitioner

> a skilled artisan who took even the most basic steps to familiarize himself with how MacOS applications are organized and distributed would have known ***where*** to look for HTML help files (*e.g.*, A3UM) in the Aperture 3 application bundle (*i.e.*, in the "Resources" folder) and ***how*** to retrieve them from (i) the Installer DVD and (ii) after installation, the local copy of the Aperture 3 application bundle.

*Id.* at 15. (citing Ex. 1003 ¶¶ 93–94; Ex. 2025 ¶ 118; Ex. 1089, 36:2–11, 42:23–43:8, 44:2–14, 407:20–408:8).

Petitioner then summarizes the steps Dr. Surati took to retrieve A3UM from the installer DVD as outlined in Ex. 1089.  Pet. Reply 15–19.

38

IPR2022-00033
Patent 10,428,658 B2

        *e)     Reply to Patent Owner's Fifth Argument: That*
        *Aperture 3 Installed on a Mac Computer is Not a Printed*
        *Publication*

Petitioner asserts that Patent Owner "can't dispute that installing Aperture 3

from the v3.0 Aperture Installer DVD is trivial or that it copies A3UM to the

user's computer" because "Dr. Surati confirmed this." Pet. Reply 19 (citing

Ex. 1003 ¶¶ 80–85, 91–98; Ex. 1020 ¶¶ 12, 14; Ex. 2026, 25:19–24;

Ex. 2025 ¶117). In addition, Petitioner asserts that "as both experts and the

Apple guidelines confirm, the A3UM HTML files in the Aperture 3

application bundle can be viewed with a Safari web browser ***without***

Aperture 3 running." *Id.* at 20. (footnote omitted, citing Ex 1003 ¶ 95; Ex.

1089, 27:4–7, 98:5–99:10; Ex. 1071, 5; Ex 2023, 80:2–81:6; Ex. 2026,

71:11–72:8).

        *f)     Reply to Patent Owner's Sixth Argument: That Mr.*
        *Birdsell's Testimony Lacks Credibility*

    Petitioner asserts that "witnesses ordinarily testify from their

recollections, and [Patent Owner] had ample opportunity to prove bias or

defective recollections and failed to do so." Pet. Reply 22. Petitioner asserts

further that "Mr. Birdsell's recollections are also corroborated by other

evidence." *Id.* (citing *Jolley*, 308 F.3d 1328, *Apple,* 979 F.3d 1336; Ex.

1020, ¶ 13; Ex. 1003 ¶¶ 71, 103; Ex. 1089, 104:6–15; Ex. 1020 ¶¶ 5–7,

14–16; Ex. 2026, 59:10–60:9, 62:4–21).

        *5.    Patent Owner's Sur-reply*

    In response to Petitioner's Reply, Patent Owner reiterates some of its

arguments, namely is arguments pertaining to its first, second, fourth, and

fifth arguments outlined in Section II.E.3 above. PO Sur-reply 1–7.

39

IPR2022-00033
Patent 10,428,658 B2

> a)    *Patent Owner's First Argument: Petitioner Has Not Shown That the Website Version of A3UM Was Publicly Accessible*

Patent Owner contends that "Petitioner's theories are flawed because they require *a priori* knowledge of Aperture 3 and A3UM." PO Sur-reply 1 (citing Pet. Reply 8). According to Patent Owner, "[a] POSITA would not have possessed this prerequisite knowledge, as evidenced by Petitioner's own expert ***having never heard of Aperture 3*** prior to 2021." *Id.* (citing Ex. 2023, 49:14–50:11, 52:2–4; PO Resp. 30–31); *see also id.* at 6 (reiterating this argument and asserting that "[t]here is also no evidence that Apple was known for photo management software such that one interested in the relevant subject matter would visit apple.com." (citing *Corning Optical Communications LLC v. Dali Wireless, Inc.*, IPR2021-00762, Paper 37 at 24–25 (PTAB Oct. 11, 2022)). Patent Owner contests Petitioner's characterization of Dr. Surati's testimony as admitting "that one would have learned of Aperture by Googling 'photo editing and management software' or 'photo management software'" arguing that "Dr. Surati was asked to speculate whether searching the exact phrase 'photo editing and management software' could have yielded a result mentioning Aperture 3" "not because an interested artisan would use it for a search, but because it conveniently appears in an Apple document." *Id.* at 1 (citing Pet. Reply 10; Ex. 1089, 204:9–205:3; Ex. 1048, 1; *Corning*, IPR2021-00762, Paper 37 at 26; *see also id.* at 6 (reiterating this argument and asserting that "[a]ny mention of Aperture 3 on the apple.com homepage was limited to mere weeks, which weighs against a finding of public accessibility." (citing Pet. Reply 12–13; PO Resp. 35)).

40

IPR2022-00033
Patent 10,428,658 B2

Patent Owner contends that "Petitioner proffers no evidence (1) that a POSITA would use its newly proposed search terms, nor (2) whether or where 2011 Google search results would contain a reference to Aperture 3 or A3UM." PO Sur-reply 2 (citing Pet. Reply 10). Given this alleged lack of evidence, Patent Owner contends that "Petitioner's argument as to how a POSITA would learn of Aperture 3 and A3UM rests on speculation and should be rejected." *Id.*

> b)   *Patent Owner Second Argument: Petitioner Has Not Shown That Ex. 1005 Accurately Represents What Was Shown on the Aperture 3 User Manual Page Before June 2010*

Patent Owner contends that the Petition "lacks credible evidence as to the origins of EX1005 and incorrectly argues that Patent Owner 'has not disputed that EX1005 is a true and correct copy of' A3UM." PO Sur-reply 2 (citing Pet. Reply 20). Patent Owner states that it "objected to EX1005's authenticity." *Id.* (citing Paper 14, 3). Patent Owner contends that "neither of Petitioner's witnesses could explain how EX1005 was created" as "[b]oth witnesses only 'spot-checked' parts of EX1005 against a table of contents." *Id.* (citing PO Resp. 36; Ex 2026, 20:5–6, 41:11–16, 44:15–17, 21–23; Ex. 2023, 57:10–59:10, 62:3–12).

Patent Owner contends that "Petitioner depends on uncorroborated assertions from its employee, Mr. Birdsell" that "cannot be corroborated because no such evidence exists, so it should be given little or no weight." PO Sur-reply 2–3 (citing Ex. 2026, 54:23–55:17, 69:13–19, 53:16–54:17; *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 138 (Fed. Cir. 1986); *Parrot S.A. v. Qfo Labs, Inc.*, IPR2018-01690, Paper 40 at 63–64 (PTAB Feb. 20, 2020); *see also id.* at 7).

41

IPR2022-00033
Patent 10,428,658 B2

Patent Owner contends that "Mr. Birdsell could only speculate as to the number of Aperture sales."  PO Sur-reply 3 (citing Pet. Reply 9).  According to Patent Owner, in this case "sales *are* required because accessing A3UM via a DVD requires a sale."  *Id.*  In addition, Patent Owner contends that another indication that A3UM was not publicly accessible is the fact that Aperture 3 users were bound by a license agreement.  *Id.* (citing Ex. 2007, 1–2).

> c)    *Patent Owner's Fourth Argument: Petitioner's Reliance on the Aperture 3 Installation DVD is Insufficient to Show That A3UM is a Printed Publication*

Patent Owner contends that "Petitioner failed to establish that a POSITA would know A3UM is **hidden** on the DVD."  PO Sur-reply 4 (citing *id.* at 2–3).  According to Patent Owner, "[t]he Reply goes to great lengths to explain how one could unhide A3UM" and "[t]hese arguments underscore the need for in-depth knowledge or research regarding how Mac OS applications 'are organized and distributed' to locate A3UM."  *Id.* (citing Pet. Reply 13–16).  Patent Owner argues further that Petitioner's expert "did not find the hidden files on his own and required 'tips' from counsel."  *Id.* (citing PO Resp. 40–41; Ex. 2023, 67:8–19, 73:10–22, 79:10–15; *Corning*, IPR2021-00762, Paper 37 at 19–20).

Patent Owner further contends that even if "an artisan exercising reasonable diligence would have unhidden the files, Petitioner does not explain how navigating to the Archive.pax.gz file, copying, then decompressing it as one of numerous steps comports with reasonable diligence" and that Petitioner does not "dispute that the DVD lacked search functionality."  PO Sur-reply 4 (citing Pet. Reply 18; PO Resp. 43–44, 47; Ex. 2025 ¶¶ 119–120).

42

In addition, Patent Owner contends that Dr. Surati did not analogize locating A3UM within the Installer DVD to finding a book in a library. PO Sur-reply 5 (citing Pet. Reply 15, Ex. 1089, 407:8–19, footnote omitted). Rather, according to Patent Owner, "Dr. Surati testified that finding the hidden A3UM files is akin to being told that a book is hidden in a library and being asked to find it without guidance." *Id.* (citing Ex. 1089, 409:2–19; PO Resp. 49).

> d)   *Patent Owner's Patent Owner's Fifth Argument: Aperture 3 Installed on a Mac Computer is Not a Printed Publication*

Patent owner contends that even if A3UM can be viewed with a Safari web browner without Aperture 3 running, "that does not change the fact that A3UM is a component of an installed software product that one would have to take many steps to locate." PO Sur-reply 6.

> 6.   *Discussion*

We determine that Petitioner has proven by a preponderance of the evidence that A3UM was "publicly accessible" both through distribution of public sales of the Aperture 3 software and the Aperture 3 website for several reasons. Because much of our decision is premised on our determination that Mr. Birdsell's testimony is credible, we begin our discussion with Patent Owner's sixth argument, that Mr. Birdsell's testimony is not credible before discussing Patent Owner's other arguments.

> a)   *Patent Owner's Sixth Argument: Mr. Birdsell's Testimony Lacks Credibility*

We credit Mr. Birdsell's testimony. Although, Mr. Birdsell has been an Apple employee for over a decade, there is no evidence to suggest that he has a financial stake (e.g., losing employment) in the outcome of this matter,

IPR2022-00033
Patent 10,428,658 B2

unlike in *Parrot*. *See Parrot*, IPR2018-01690, Paper 40 at 63–64 (giving little weight to testimony from witness who was a party's cofounder and admitted to having a financial stake in the outcome of the proceeding). We agree with Petitioner that "witnesses ordinarily testify from their recollections, and [Patent Owner] had ample opportunity to prove bias or defective recollections and failed to do so." Pet. Reply 22. As discussed below, Petitioner provides corroborating evidence in support of Mr. Birdsell's testimony, whereas Patent Owner offers no evidence beyond attorney argument that Mr. Birdsell's testimony is unreliable.

> b)    *Patent Owner's First Argument: Petitioner Has Not Shown That the Website Version of A3UM was Publicly Accessible*

We determine that Petitioner has proven by a preponderance of the evidence that the website version of A3UM was publicly accessible. We credit Mr. Birdsell's testimony that the HTML file set was loaded onto a staging server the night before Aperture 3's launch, and that he personally, as well as the quality assurance team, verified that "the files were live and accessible to customers and that all the links worked" on the website on launch day. Ex. 2026, 36:21–37:5, 36:8–12. Further, Apple published a press release (Ex. 1077) and marketed Aperture 3 on its home page. Ex. 1077; Ex. 1078. Dr. Surati's testimony shows that a person of ordinary skill in the art using a search engine such as Google to find photo management and editing software would have been able to find the Aperture 3 support page containing A3UM in February 2010. *See* Ex. 1089, 187:12–188:8, 202:12–204:4, 205:17–206:2. This testimony also corroborates Mr. Birdsell's testimony that approximately 95% of traffic accessing Aperture 3 came from search engines. Ex. 2026: 67:13–20.

44

IPR2022-00033
Patent 10,428,658 B2

These facts indicate that a person did not need *a priori* knowledge of the reference in order to access it.  *See Samsung*, 979 F.3d at 1374. Moreover, the experts from both parties were able to find the Aperture 3 support page with the A3UM PDF on apple.com in a few clicks by navigating to pages that seemed relevant to photo management and editing, indicating that a POSITA in 2010 could have found the Aperture 3 software through reasonable diligence without searching on the website.  Ex. 1003 ¶ 101; Ex. 1089, 207:22–208:22; *see generally* Exs. 1021; 1074.

There is no evidence to suggest that credentials were needed to access the user manual and despite the software licensing agreement, A3UM was public such that anyone could download it, so any concerns about the inability to copy the manual are moot.  *See Klopfenstein*, 380 F.3d at 1351 (finding that prohibiting copying weighs against public accessibility). Further, assuming *arguendo* that Aperture 3 was marketed for "mere weeks" on the home page, Aperture 3's product page remained for much longer. Ex. 2026, 66:8–12 (noting that Mr. Birdsell took A3UM off the Apple website at the beginning of the pandemic in 2020).  Thus, we determine that Petitioner has proven by a preponderance of the evidence that the HTML version of A3UM was "publicly accessible" by a POSITA for a time period long enough to be considered sufficiently disseminated.  S*ee Klopfenstein*, 380 F.3d at 1351–52 (determining that three days was long enough to consider a reference "publicly available").  Because Petitioner demonstrated accessibility, Petitioner had no requirement to show the number of people who actually accessed the HTML files.  *See, e.g., Samsung,* 929 F.3d at 1374; *Constant*, 848 F.2d at 1568.

45

IPR2022-00033
Patent 10,428,658 B2

> c)    *Patent Owner Second Argument: Petitioner Has Not Shown that Ex. 1005 Accurately Represents What Was Shown on the Aperture 3 User Manual Page Before June 2010*

We determine that Petitioner has demonstrated by a preponderance of the evidence that Ex. 1005 accurately represents what was shown on the Aperture 3 user manual page. Both Mr. Birdsell and Dr. Terveen individually compared Ex. 1005 to the HTML file set and found no discrepancies. Ex. 2026, 41:14–16; Ex. 2023, 61:13–17. Additionally, each page of Exhibit 1005 has the file path for each file located in the bottom left hand corner and the file path is consistent with the file path given above for the help files. *See generally* Ex. 1005. Both of these together, with no evidence from Patent Owner to suggest otherwise, indicate that Ex. 1005 is the same as the HTML file set. Further, we credit Mr. Birdsell's unrebutted testimony that the same version of A3UM would have been sent to both the disk packaging team and the team responsible for loading A3UM onto the website. Ex. 2026, 40:15–41:10.

Patent Owner alleges that the version of the A3UM Table of Contents shown in Exhibit 1021 has a copyright date of 2011, indicating that A3UM may not have been available on the website until after the critical date. PO Resp. 37 n.4; *compare* Ex. 2010 *with* Ex. 1021. However, in *Nautilus, Inc. v. Icon Health Fitness Inc.*, the Board noted that a date notation on a document is not dispositive and is only "one piece of evidence to consider in the public accessibility analysis." IPR2017-01363, Paper 33 at 16 (PTAB Nov. 28, 2018). Evidence indicates that the copyright date was due to the Wayback Machine's processes and does not reflect the actual copyright year of A3UM. Ex. 1055 (showing code that demonstrates copyright year was

46

IPR2022-00033
Patent 10,428,658 B2

inserted by Wayback Machine; Ex. 2026, 46:20–49:7 (explaining how the Wayback Machine archives webpages). This evidence illustrates that the Apple webpage more likely than not, based on the totality of the evidence, displayed A3UM in 2010.

> ### d)    Patent Owner's Third Argument: Petitioner's Evidence of Sales is Insufficient to Show Public Accessibility

Petitioner argues, and we agree, that the 100,000 copies sold "far exceeds the number of disclosures recognized under the relevant dissemination law for printed publications." Pet. 14 (quoting *Cisco Sys., Inc. v. Centripetal Networks, Inc.*, IPR2018-01436, Paper 40 at 23–31 (Jan. 23, 2020); citing *Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985); Reply 7. Patent Owner does not dispute Petitioner's evidence that Aperture 3 was publicly sold, or that a copy of the A3UM reference was included on the Aperture 3 installer DVD sold in the relevant timeframe. Patent Owner only disputes the number of copies sold and submits that Mr. Birdsell "merely 'believe[s]' that a number of customers purchased and were using the Aperture 3 product before June of 2010." PO Resp. 38.

Patent Owner has not offered any evidence beyond attorney argument that suggests Mr. Birdsell's testimony is unreliable. Petitioner, however, has provided corroborating evidence to show that Aperture 3 was marketed, including a press release (Exhibit 1048), a feature on the home page of Apple (Exhibit 1021), and two separate reviewer articles (Exhibits 1044, 1045). *See also* Ex. 2026, 57:3–12 (stating that the presence of Aperture 3 on the Apple home page meant that it received "top billing"). Thus, it is not unreasonable to conclude that Aperture 3—sold on a website that Patent Owner's expert noted was "probably" one of the most visited websites in the

47

world in 2010 (Ex. 1089, 188:9–16)—had sold enough copies to be considered sufficiently disseminated to the public, especially given the unrebutted testimony of Mr. Birdsell.  Even without the knowledge of how many users purchased Aperture 3 retail boxes when upgraded from Aperture 2, the fact that the Aperture series has been successful enough to manufacture three separate versions also supports this finding.  Though Petitioner's expert apparently lacked personal knowledge of Aperture 3 prior to this case, Mr. Birdsell's testimony, along with the other evidence corroborating Apple's marketing and sales of Aperture 3, shows that POSITAs would likely have known about Aperture 3.  *See, e.g.,* Ex. 1020, ¶ 7 (noting that at least 100,000 copies of Aperture 3 were sold); Ex. 2026, 51:16–20 (stating that website analytics corresponded with sales); 54:15–22 (discussing website access volume for Aperture 3); Exs. 1044, 1045, 1048 (published press releases and product reviews of Aperture 3).  We find it far more likely than not that A3UM was publicly accessible through retail sales of Aperture 3 software at least as of June 2010.

> e)    *Patent Owner's Fourth Argument: Petitioner's Reliance on the Aperture 3 Installation DVD is Insufficient to Show That A3UM is a Printed Publication*

We determine that Petitioner has shown by a preponderance of the evidence that the A3UM HTML file set present on the Aperture 3 installation DVD is a printed publication.  Even though the HTML file set was hidden after installation, anyone who had the installer DVD could access the A3UM file set.  The relevant inquiry here is "whether the reference was 'available to the extent that persons interested and ordinarily skilled in the subject matter or art[,] exercising reasonable diligence, can locate it.'" *Voter Verified, Inc. v. Premier Election Sols., Inc.*, 698 F.3d

48

IPR2022-00033
Patent 10,428,658 B2

1374, 1380 (Fed. Cir. 2012) (quoting *SRI*, 511 F.3d at 1194). The Petition outlines the steps a POSITA would have performed to "obtain A3UM from the Aperture 3 installation DVD or from computers onto which Aperture 3 had been installed." Pet. 15. Dr. Terveen's corroborating testimony explains how he obtained A3UM from the installation DVD and a computer onto which he had installed Aperture 3. Ex. 1003 ¶¶ 80–97. Dr. Surati's testimony also corroborates Petitioner's position. Ex. 1089, 16:4–14, 36:2–11, 42:23–43:8, 44:2–14, 64:6-65:2, 71:23–72:8, 72:21–24, 73:18–74:41, 86:16–87:5, 89:10–14, 97:9–13, 98:5–11, 100:16–101:2, 108:18–21, 127:3–8; 131:23–132:10, 135:16–21, 136:24–137:3, 141:25–142:20; Pet. Reply 15–19.

Further, "a printed publication need not be easily searchable after publication if it was sufficiently disseminated at the time of its publication." *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014). We determine that A3UM was sufficiently disseminated on the Aperture 3 installer DVD that anyone could purchase, regardless of whether the files were initially hidden on the DVD.

> *f)    Patent Owner's Fifth Argument: Aperture 3 Installed on a Mac Computer is not a Printed Publication*

We are not persuaded by Patent Owner's argument that A3UM constitutes a product and not a printed publication because the A3UM HTML file set can be accessed without a special program or coding expertise. Patent Owner relies on *Ex parte Nelson* to support their argument; however, *Nelson* is distinguishable from the case here. No. 2020-004978, 2020 WL 8186425 at *15. The examiner in *Nelson* relied on the actual software and not the user manuals to make rejections; additionally, there was insufficient evidence to suggest that the user manuals were included in the

49

software distribution, unlike this case. *Id.* The files are in a folder on their own and their contents can be accessed without Aperture 3 running. Ex. 1089, 98:5–99:10; Ex. 2023, 80:2–81:6. Although A3UM is most easily accessible through the actual Aperture 3 software in the internal help functionality after installation, that does not necessarily make it part of a product. Evidence also suggests that A3UM alone was available on the Aperture 3 website, which further indicates that there is a demarcation between the product and A3UM. *See, e.g.,* Ex. 1021; *see also* Ex. 2026, 56:13–22 (noting that the Aperture 3 software could only be distributed through retail boxes and not through online download in 2010).

> 7.     *Determination That A3UM is a Printed Publication*

Having considered the evidence of record and Patent Owner's arguments discussed above, we determine that Petitioner has shown by a preponderance of the evidence that A3UM is a printed publication and qualifies as prior art in this proceeding.

## F. Ground 1 - Obviousness of Claims 1, 2, and 5–15 over A3UM and Belitz

Petitioner asserts that claims 1, 2, and 5–15 are obvious over the combination of A3UM and Belitz under 35 U.S.C. § 103(a). Pet. 23–75.

> 1.     *Independent Claim 1*

For each limitation of claim 1, Petitioner asserts that A3UM alone or in combination with Belitz meets that limitation. Pet. 23–50. Petitioner also provides the testimony of Dr. Terveen in support of its position with respect to the limitations of claim 1. *See* Ex. 1003 ¶¶ 138–189. Patent Owner raises two issues in response to Petitioner's challenge to claim 1. We address each of these arguments below. We have reviewed Petitioner's evidence and

IPR2022-00033
Patent 10,428,658 B2

reasoning in support of this challenge. In addition, we have reviewed the testimony in support thereof. For the uncontested limitations of claim 1, we determine that Petitioner has shown by a preponderance of the evidence that the combined teachings of A3UM and Belitz meet the uncontested limitations. Accordingly, we focus our discussion of this challenge on Patent Owner's arguments.

> a)   *Patent Owner's Argument That Petitioner Fails to Identify an "Application View" That is Distinct From the Other Claimed Views*

Petitioner asserts that A3UM describes displaying a user interface ("*application view*") with various views, such as Faces and Places views, on a conventional computer monitor ("*video display device*") when it is executing. Pet. 36 (citing Ex. 1005, 65, 81–82, 158, 1081; Ex. 1003 ¶ 154). Petitioner asserts further that "A3UM also describes a Library inspector with a '*plurality of selectable elements*' including (i) a 'Places' item 'to view the locations assigned to images in the library on a map" ('*location selectable element'*) and, *e.g.*, (ii) a 'Faces' item 'to view people identified in images.'" *Id.* at 37 (citing Ex. 1005, 78–81, 125–126, 424, 436). In addition, Petitioner asserts that "A3UM provides a Toolbar with a '*plurality of selectable elements*' including (i) a 'Places' button to view the locations of images in a selected item in the Library inspector (another '*location selectable element*') and (ii) a 'Faces' button to view faces identified in a selected item in the Library inspector." *Id.* (citing Ex. 1005, 78–81, 125–126, 424, 436; Ex. 1003 ¶ 155).

Patent Owner contends that "[n]owhere does Petitioner identify an 'application view' in A3UM that is distinct" "from the 'map view,' 'people view,' and 'album view.'" PO Resp. 56 (citing *id.* at 15–19; Pet. 36–37; Ex.

51

IPR2022-00033
Patent 10,428,658 B2

2025 ¶¶ 159–160); *see also* PO Sur-reply 13–14.  According to Patent Owner, "Dr. Terveen testified that he believed that 'any of the views within the Aperture user interface are application views.'"  *Id.* at 57 (citing Ex. 2024, 297:19–298:7, 298:17–20).  Patent Owner contends that "[t]his interpretation conflicts with the plain language, which logically prohibits the claimed 'application view' from also being, for example, the 'map view' and the 'people view.'"  *Id.* (citing *id.* at 15–19; Ex. 2025 ¶ 161).

Petitioner replies that Patent Owner's argument rests on an incorrect claim construction and that Patent Owner mischaracterizes Dr. Terveen's testimony.  Pet. Reply 23.  According to Petitioner, Dr. Terveen "did not contend the claim language was met simply because A3UM has an interface.  He identified specific elements of different interfaces that met the requirements of the first clause of claim 1."  *Id.* (citing Ex. 1003 ¶ 155; Ex. 2024, 296:16–298:20).

In response to Petitioner's Reply, Patent Owner asserts that Petitioner raises a new argument by identifying the Library inspector and Toolbar as corresponding to the claims "application view."  PO Sur-reply 14.  Patent Owner is mistaken.  The Petition identifies these elements of A3UM as corresponding to the claimed application view.  Pet. 37.

We do not agree with Patent Owner that claim 1 requires an "application view" that is distinct from other views.  PO Resp. 56.  The '658 Patent describes various types of application views, such as the uploads application view, the people application view, the location application view, and the recipe application view.  *See, e.g.* Ex. 1001, 3:58–62.  Nowhere does the '658 Patent describe an "application view" that is distinct from one of these disclosed views.

52

IPR2022-00033
Patent 10,428,658 B2

Further, we agree with Petitioner that the Library inspector identified by Dr. Terveen meets the limitation of an "application view" even under Patent Owner's construction because it is a view that is not the same as the claimed "map view" or "people view" and it includes a plurality of selectable elements (Projects, Photos, Faces, Places, Flagged, and Trash buttons) including a location selectable element (Places button). Ex. 1005, 78. Even given Patent Owner's proposed construction, we are persuaded for the reasons stated by Petitioner that A3UM discloses an "application view" that is distinct from the other claimed views.

> b)    *Patent Owner's Argument That Petitioner Fails to Meet Its Burden to Show a POSITA Would Modify A3UM With Belitz*

> (1)    *Petitioner's Assertions*

Petitioner contends that "it would have been obvious to modify A3UM to substitute Belitz's thumbnail markers for A3UM's pins." Pet. 39. In support of this contention, Petitioner asserts that "[a] skilled artisan would have considered the teachings of A3UM and Belitz together, as both references (and the '658 Patent) come from the same field of endeavor: 'managing and using digital files such as photographs.'" *Id.* at 24 (citing Ex. 1003 ¶ 121; Ex. 1001, 1:16–19; Ex. 1005, 1–2; Ex. 1006 ¶¶ 1, 62). Petitioner asserts further that "A3UM and Belitz address the same problems (also purportedly solved by the '658 Patent): allowing 'people to organize, view, preserve and share' their digital photographs." *Id.* (citing Ex. 1003 ¶ 122; Ex. 1001, 1:56–62; Ex. 1005, 1–2; Ex. 1006 ¶¶ 2–5). Petitioner also asserts that A3UM and Belitz "describe analogous techniques—both describe use of a scalable interactive map with user-selectable markers (pins or thumbnail images) specifying the locations of photo(s) or other digital

53

files, and use of those markers to retrieve digital files (e.g., photos) linked to those locations." *Id.* at 25 (citing Ex. 1003 ¶ 123; Ex. 1005, 30, 81–83, 429–466; Ex1006, ¶¶ 39, 50, 51–55, 62; *see also id.* at 12–23).

Petitioner asserts that "[a] skilled artisan would have recognized that Belitz's thumbnail map markers are a functional equivalent of and could be used as an alternative to the pins used in the A3UM interactive map" because both references "describe enabling a user to zoom in and out of regions on their respective interactive maps" and "teach dynamically grouping map markers into fewer markers when the map is zoomed out to reduce visual clutter on the map." Pet. 25 (citing Ex. 1003 ¶¶ 125–126; Ex. 1005, 82, 437–438; Ex. 1006 ¶¶ 55–58, 62). Petitioner asserts further that "A3UM and Belitz also describe analogous ways of conveying the number of photos at a location via their map interfaces" in that "A3UM discloses displaying the number of images at a location after a user interaction with a pin . . . while Belitz displays that information on the thumbnail image without requiring a user interaction." Pet. 25 (citing Ex. 1003 ¶ 127; Ex. 1005, 436–-437; Ex. 1006 ¶¶ 51–55, Figs. 4a–4b)).

Petitioner reasons that "[i]t would have been obvious to a skilled artisan before June of 2010 to modify A3UM's Places view to incorporate Belitz's graphical object functionality, including, *inter alia*, its thumbnails and counts," because "[a]s Dr. Terveen explains, such a 'modification would result in an interactive map displaying thumbnails with picture counts at locations where digital images are located, while allowing a user to interact with the thumbnail to display the name of the location and view pictures with that location.'" Pet. 26 (citing Ex. 1003 ¶ 128; Ex. 1005, 437). Petitioner provides further reasoning in support of the proposed modification

54

IPR2022-00033
Patent 10,428,658 B2

(Pet. 26–30); however, in the interest of brevity we do not reproduce those reasons here.

*(2)    Patent Owner's Response*

Patent Owner contends that Petitioner fails to show that a person of ordinary skill in the art would modify A3UM in view of the teachings of Belitz. PO Resp. 57–65. Specifically, Patent Owner contends that "a POSITA would not have modified A3UM to replace the pins with thumbnails including numbers, while also maintaining the label that appears above a selected pin in A3UM." *Id.* at 58 (citing Ex. 2025 ¶ 167). Patent Owner contends further that "[a] POSITA would recognize that showing the count number twice for the same thumbnail is redundant and unnecessary" and that "[a] POSITA would not create a graphical interface with such elements because they would increase visual clutter, occupy a portion of the interface that could be used to convey other information (e.g., more of the map), and likely distract and confuse the user." *Id.* at 59 (citing Ex. 2025 ¶ 167; Ex. 2022, 288, 82); *see also* PO Sur-reply 14–15.

Patent Owner contends that "replacing the pins with <u>Belitz</u>'s thumbnails would obscure more of the underlying map" and "[t]his would reduce the amount of information that can be conveyed to the user via the map and create more visual clutter, which is undesirable in user interface design. PO Resp. 60 (citing Ex. 2025 ¶¶ 167–177; Ex. 2024, 306:4–308:2; Ex. 1003, 4); *see also* PO Sur-reply 15. Patent Owner contends further that Petitioner "does not identify any benefits to its proposed combination and fails to address the drawbacks." *Id.*

Patent Owner contends that "<u>Belitz</u> does not provide a motivation to modify <u>A3UM</u>" because "<u>Belitz</u> is designed to only mark 'special locations'

55

on a map, not an entire photo library," and "A3UM *already* achieves Belitz's objective of providing associations between images and locations without any modification." PO Resp. 62 (citing Ex. 2025 ¶¶ 173–186; Ex. 1006, Title, ¶¶ 2, 4, 10, 19, 71; Ex. 2025 ¶ 179).

Patent Owner contends that the Google Maps documentation "does not support Petitioner's assertions." PO Resp. 63. Specifically, Patent Owner contends that a person of ordinary skill in the art would not read the description of the GMarkerOptions object as meaning "that one could simply replace the default marker with a photograph using the Google Maps API." *Id.* at 64–65. Patent Owner contends that "the description suggests that one can substitute the default marker shown above with another symbol or shape, not that it would be substituted for a photograph." *Id.* at 65 (citing Ex. 2025 ¶¶ 191–194).

Patent Owner also contends that Petitioner has not shown that the Google Maps documentation —referenced by Petitioner in explaining that the Google Maps API used by A3UM would have allowed a person of ordinary skill in the art to implement Belitz's technique in . . . A3UM— qualifies as prior art, and, therefore, cannot be used to demonstrate a "reasonable expectation of success." PO Resp. 63.

*(3) Petitioner's Reply*

In reply to Patent Owner's argument that a "skilled person would not have replaced pins with thumbnails in the A3UM Places map because the thumbnails in Belitz perform the same function as the pins in A3UM and result in more clutter," Petitioner asserts that "a known and predictable alternative to what a reference describes is the precisely the type of variation that KSR found to be obvious." Pet. Reply 24 (citing PO Resp. 59–60);

IPR2022-00033
Patent 10,428,658 B2

*KSR*, 550 U.S. at 401).  Petitioner asserts that Patent Owner's "concerns about 'clutter' are also unwarranted" as "the claims encompass an interactive map of any size that needs to display ***only two thumbnails*** which also can be of any size." *Id.* (citing Ex. 1089, 226:21–228:3; 253:7–18).  Petitioner asserts that "contrary to [Patent Owner's] assertions (Response 58-60), the claims do not impose aesthetic requirements for the map (*e.g.*, that it be 'uncluttered,' that it not obscure portions of the map, that it not use labels with thumbnails)." *Id.*  Petitioner asserts further that Patent Owner "ignores that the Petition identified features of <u>A3UM</u> and <u>Belitz</u> that resolve theoretical 'cluttering' concerns" in that "[i]t explained that <u>A3UM</u> and <u>Belitz</u> both teach 'dynamically grouping map markers into fewer markers when the map is zoomed out to reduce visual clutter on the map.'" *Id.* at 25 (citing Pet. 25).

In reply to Patent Owner's argument that Belitz is designed to only mark "special locations" on a map, Petitioner points out that the claims do not require mapping of an entire photo library.  Pet. Reply 25 (citing PO Resp. 62, Ex. 1006 ¶ 71).  Petitioner also asserts that "Belitz also is not so limited—it describes techniques with general application, including use of selectable thumbnails as markers on an interactive map and avoiding cluttering by collapsing multiple thumbnails into a fewer number when the map is zoomed." *Id.* (citing Ex. 1006 ¶¶ 54, 62; Ex. 1005, 438–439).

In reply to Patent Owner's argument that "a skilled artisan would not make the combination because it would cause the <u>A3UM</u> interface to display redundant information," Petitioner asserts that "the information displayed in the combination is not redundant—the label provides the name of the

57

location *and* a (more descriptive) count of images at that location."  Pet.
Reply 25 (citing PO Resp. 58; Pet. 26; Ex. 1003 ¶ 128).

    In reply to Patent Owner's argument that "'replacing the pins with
Belitz's thumbnails would obscure more of the underlying map,'" Petitioner
asserts that "this supposed problem is both illusory and not solved by [Patent
Owner's] claimed methods—which permit use [of] thumbnails of any size
on a map, and raise the identical 'problem.'"  Pet. Reply 26 (citing PO Resp.
60).  Petitioner asserts further that "[t]he prevalence of products that used
thumbnails to display locations of photographs on maps prior to the
invention also refutes Patentee's assertion."  *Id.* (citing Ex. 1034; Ex. 1043).

    In reply to Patent Owner's argument that "Belitz provides no
motivation to modify A3UM because A3UM already achieves Belitz's
objective of associating images and locations, and thumbnails would not
make it better," Petitioner contends that "[t]his argument misstates the
record and the law."  Pet. Reply 26 (citing PO Resp. 60–63).  In support,
Petitioner asserts that "[a]n obviousness determination "does not require a
proposed combination of prior art teachings to lead to the preferred or the
most desirable implementation to support a sufficient motivation to
combine.'"  *Id.* at 26–27 (citing *In re Fulton,* 391 F.3d 1195, 1200–01 (Fed.
Cir. 2004).  Petitioner asserts further that Dr. Terveen's testimony "identifies
several distinct benefits of the combination" such as improvement in
"Aperture 3's overall usability by allowing users to more quickly identify
the map marker they want to select." Pet. Reply 27 (citing Ex. 1003 ¶¶ 119–
137).  According to Petitioner, Dr. Terveen's testimony "also explains that
adapting the display of A3UM to include a number overlaid on a thumbnail
as disclosed by Belitz, rather than via a tab as taught by A3UM, presents

IPR2022-00033
Patent 10,428,658 B2

useful information to a user and would be trivial to implement." *Id.* (citing Ex. 1003 ¶ 136).

In reply to Patent Owner's argument that a "skilled person would have read the guidance in the PHP Textbook and Google Maps API as only teaching substitutions of 'the default marker . . . with another symbol or shape," Petitioner asserts that "Dr. Surati admitted that Google Maps API permits both use of a custom icon . . . and that its size can be varied to accommodate a thumbnail." Pet. Reply 27–28 (citing PO Resp. 63–65; Ex. 1089, 250:25–16; 251:24–254:13). Petitioner also asserts that Patent Owner "incorrectly contends the Google Maps documentation is not prior art and cannot be used to demonstrate a reasonable expectation of success. But it is, and [Petitioner]'s reliance on Google Maps documentation is proper." *Id.* at 28 (citing *id.* at 7–22).

*(4)    Patent Owner's Sur-reply*

In response to Petitioner's Reply, Patent Owner reiterates many of its arguments from its Response. In the interest of brevity, we do not reproduce these arguments here.

Patent Owner submits that "Petitioner's suggestion that the size of Belitz's thumbnails could be modified to avoid map obstruction because the claims "permit use [of – sic] thumbnails of any size" is a new argument not presented in the Petition." PO Sur-reply 16 (citing Pet. Reply 26, Pet. 41–43; *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369–1370 (Fed. Cir. 2016). Patent Owner also contends that even if this isn't a new argument, "Petitioner fails to explain how its new thumbnail size modification would work." *Id.* (citing Pet. Reply 26).

59

IPR2022-00033
Patent 10,428,658 B2

Patent Owner contends that "the Petition did not argue that multiple A3UM pins would be combined into one Belitz thumbnail; rather, Petitioner proposed a 1-for-1 substitution." PO Sur-reply 17 (citing Pet. 26; Ex. 2024, 308:15–310:9). Patent Owner contends that "[t]he Reply's additional proposed modification reducing the number of thumbnails is another new, impermissible argument." *Id.* (citing *Intelligent Bio-Systems*, 821 F.3d at 1369–1370). Patent Owner further contends that "even if the thumbnails were consolidated to reduce obstruction of the map (and Petitioner does not explain how this would be done), Dr. Surati explained that doing so still results in a loss of information." *Id.* (citing Ex. 2025 ¶ 183).

Patent Owner contends that "Petitioner's cited authority confirms that 'the prior art as a whole must "suggest the desirability" of the combination,'" but "[t]he Reply identifies only two allegedly desirable aspects of Petitioner's combination." *Id.* at 18 (citing Pet. Reply, 27; *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004). Patent Owner further contends that "neither Petitioner nor Dr. Terveen explain how thumbnails facilitate quicker identification compared to pins" and "Petitioner does not explain how thumbnails would convey more "useful information" than pins." *Id.* at 18–19 (citing Pet. Reply, 27; Ex. 1003 ¶¶ 131, 136; 37 C.F.R. § 42.65(a)).

*(5)     Discussion*

We understand Petitioner's reasoning in support of the proposed combination to be predicated on substitution of one known alternative for another. Pet. 41; Pet. Reply 24; *KSR*, 550, U.S. 398 at 401 ("[a] court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions."); *see also id.* at 417

60

("when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.").  We credit Dr. Terveen's testimony that "[a] skilled artisan would have recognized that <u>Belitz</u>'s thumbnail map markers ("*thumbnail images*") are a functional equivalent of, and could be used as an alternative to the pins used in the <u>A3UM</u> interactive map; both are visual indicators that denote the existence of content such as photographs at the indicated location." Ex. 1003 ¶ 125.  Thus, we determine that Petitioner has provided sufficient reasons with rational underpinning for the proposed combination.

With respect to Patent Owner's arguments, we agree with Petitioner that claim 1 does not preclude "clutter" and that "the Petition identifies features of <u>A3UM</u> and <u>Belitz</u> that resolve theoretical "cluttering" concerns. Pet. Reply 24–25.  We also agree with Petitioner that Belitz's teachings are not limited to "special locations" and that claim 1 does not require mapping of an entire photo library.  *Id.* at 25.  We further agree with Petitioner that the proposed combination would not result in display of redundant information or unacceptable obscuring of the underlying map.  Pet. Reply 25–26.

Regarding Patent Owner's arguments that Google Maps API is not prior art, we need not address these arguments, as the proposed combination does not rely on Google Maps API.  Rather, Google Maps API is an evidence reference, which need not qualify as prior art.  *In re Wilson*, 311 F. 2d 266, 268–269 (CCPA 1962) (finding a post-critical date "teaching reference" to be permissible evidence of the inherent characteristics of a product).

IPR2022-00033
Patent 10,428,658 B2

Having considered the evidence, testimony, and arguments in the record, we determine that Petitioner has shown that a person of ordinary skill in the art would have combined the teachings of A3UM and Belitz in the manner proposed in the challenge to claim 1.  For these reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable over the combined teachings of A3UM and Belitz.

> ## 2.    *Dependent Claim 2*

Patent Owner did not present separate arguments for claim 2.  *See generally* PO Resp.  We have reviewed the evidence and testimony in support of Petitioner's challenge to claim 2 and determine that Petitioner has shown by a preponderance of the evidence that claim 2 is unpatentable over the combined teachings of A3UM and Belitz.

> ## 3.    *Dependent Claim 5*

Claim 5 requires, in the method of claim 1:

> wherein the plurality of selectable elements further includes a people selectable element, the method further comprising responsive to a click or tap of the people selectable element, displaying a people view, the displaying the people view including displaying:
>
> (i) a first person selectable thumbnail image including an image of a face of a first person, a third set of digital photographs and videos including digital photographs and videos associated with the first person;
>
> (ii) a name associated with the first person, the name associated with the first person being displayed adjacent to the first person selectable thumbnail image;
>
> (iii) a second person selectable thumbnail image including an image of a face of a second person, a fourth set of digital photographs and videos including digital photographs and videos associated with the second person; and

>     (iv) a name associated with the second person, the name
>     associated with the second person being displayed adjacent to the
>     second person selectable thumbnail image.

Ex. 1001, 30–49.

For each limitation of claim 5, Petitioner asserts that A3UM alone or in combination with Belitz meets that limitation.  Pet. 51–59.  Petitioner also provides the testimony of Dr. Terveen in support of its position with respect to the limitations of claim 5.  *See* Ex. 1003 ¶¶ 214–239.  Patent Owner raises one issue in response to Petitioner's challenge to claim 5 which we address below.  We have reviewed Petitioner's evidence and reasoning in support of this challenge.  In addition, we have reviewed the testimony in support thereof.  For the uncontested limitations of claim 5, we determine that Petitioner has shown by a preponderance of the evidence that the combined teachings of A3UM and Belitz meet these uncontested limitations.  Accordingly, we focus our discussion of this challenge on Patent Owner's single argument which pertains to the limitations of claim 5 that require displaying of photographs *and videos* (i.e. items (i) and (iii).  Ex. 1001, 36:36–37, 36:43–44.

Petitioner asserts that "A3UM shows detecting faces in videos."  Pet. 55 (citing Ex. 1003 ¶ 226).  As an example, Petitioner asserts that "A3UM shows . . . the Filter HUD being set to 'show[s] video files' and DSC_0042 is the only item selected" and explains "that DSC_0042 is a video file because it has a badge overlay of a motion picture camera icon, EX1005, 23, which A3UM explains means '[t]he thumbnail image represents a video clip.'"  *Id.* at 55–56 (citing Ex. 1005, 23, 271, 271).  Petitioner asserts that in this example when "[t]he upper left of the screen shows the 'Name' button is active (not greyed out), indicating that the software has detected a face in the

selected media file" "[a] skilled artisan would understand this to mean that the media file can be associated with a detected face (*e.g.*, the woman in the video frame) which will be correlated to a person's name, enabling it to be viewed in the Faces view for that person." *Id.* at 56–57 (citing Ex. 1005, 23, 64; Ex. 1003 ¶ 228).

Petitioner alternatively asserts that "it would have been obvious to a skilled artisan by 2010 to modify A3UM to allow videos to be associated with faces in the same way as photos" because "A3UM already discloses extensive support for videos and displays them in-line with photos in the Browser . . . and allows users to interact with them as if they were images (until the user presses play)." Pet. 57–58 (citing Ex. 1003 ¶¶ 231–233; Ex. 1005, 51, 157, 166, 185, 250–251, 271, 413, 783). According to Petitioner, "[a]llowing support for videos in Faces view would involve at most detecting faces in the representative image of the video, such as the woman's face shown above" which by 2010 was a well-known technique. *Id.* at 58 (citing Ex. 1003 ¶ 232; Ex. 1005, 23; Ex. 1049 ¶¶ 14–19, 51–53, Fig. 3; Ex. 1050, 1:6–15, 2:17–27, Fig. 1A). Petitioner asserts that "[a] user would have been motivated to detect faces in either the video still frame or the video itself and associate them with people in Faces view to expand the set of media made easily accessible through Faces view, which would have been an predictable arrangement of old techniques." *Id.* (citing Ex. 1003 ¶ 233; Ex. 1005, 28–29).

Patent Owner contends that "A3UM does not disclose that Faces applies to videos." PO Resp. 65 (emphasis omitted). Specifically, Patent Owner contends that "Dr. Terveen conceded [that] A3UM does not state that the facial recognition feature applies to . . . videos." *Id.* (citing Ex. 2025

¶¶ 219–222; Ex. 2024, 363:2–7).  Rather, Patent Owner contends, A3UM specifically defines an image as an artifact that reproduces the likeness of some subject or a picture.  *Id.* (citing Ex. 1005, 111; Ex. 2024 ¶ 221).  Patent Owner contends further that "there are numerous instances where A3UM differentiates between an 'image' and a 'video.'"  *Id.* at 65–66 (citing Ex. 1005, 2, 84, 157, 166, 169, 180; Ex. 2025 ¶ 222).

Patent Owner also contends that "Petitioner has not demonstrated that a POSITA would have a reasonable expectation of success in modifying A3UM to include facial recognition for videos."  PO Resp. 70 (citing Pet. 58; Ex. 2024 ¶ 234).  Patent Owner contends further that "Petitioner's own exhibits demonstrate that A3UM's facial recognition was not even successful for still images, let alone videos."  *Id.* (internal footnote omitted, citing Ex. 1044; 1045; 2025, ¶¶ 229–232).  "Given the documented problems associated with detecting faces in still images in Aperture 3," Patent Owner contends that "a POSITA would not have been motivated to further extend that unreliable functionality to videos."  *Id.* (citing 2025 ¶¶ 238–244; *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1361 (Fed. Cir. 2017)).

In reply to Patent Owner's contentions, Petitioner asserts that "claim 5 does not require associating digital files (including videos) with people by ***facial recognition***."  Pet. Reply 28 (citing Ex. 1089, 291:5–9, 295:1–10).  Petitioner asserts that the Petition "explained geotagging photos and videos for display on a map was well-known, and because A3UM supports metadata tagging of digital image files, enabling videos to be used in Places was obvious."  *Id.* (citing Pet. 31–35, 45–47).  Petitioner asserts that the Petition further "explained that A3UM makes obvious using these

capabilities to support videos in Faces" and that Patent Owner's "expert also admitted that A3UM teaches manually associating names with digital files (which can include video and sound files)." *Id.* at 28–29 (citing Pet. 57–58; Ex 1089, 281:3–15, 282:5–10; Ex. 1005, 421).

Turning to Patent Owner's contentions pertaining to the Petition's alternative obviousness theory, Petitioner asserts that Patent Owner's "criticism of Aperture 3's performance is baseless, refuted by other evidence and irrelevant" and that Dr. Surati refuted Patent Owner's assertion, "admitting [that] using keyframes would impose the same burden as processing a photo." Pet. Reply 29 (citing Ex. 1089, 159:3–8, 162:10–17. 149:5–13, 150:21–151:3, 153:8–13, 154:24–155, 165:9–166:2. 284:25–285:11, 281:3–15, 276:3–17, 291:6–292:15; Ex. 1005, 422).

Patent Owner responds that it has demonstrated that Petitioner's theory regarding A3UM's "Name" button "is demonstrably wrong" and that "Dr. Terveen confirmed that he needed to 'revise' his opinions on this point." PO Sur-reply 20–21 (citing Ex. 2024, 372:16–375:21). Patent Owner also reiterates its arguments regarding the alleged lack of a reasonable expectation of success in modifying A3UM to detect faces in videos. *Id.* at 21–22.

Having considered the evidence and testimony of record, as well as the arguments advance by both parties, we agree with Petitioner that "it would have been obvious to a skilled artisan by 2010 to modify A3UM to allow videos to be associated with faces in the same way as photos," we credit Dr. Terveen's testimony that by 2010, the technique of detecting faces in videos was well known, including by extracting keyframes and identifying faces in them. *See* Ex. 1003 ¶ 232. We further determine that

IPR2022-00033
Patent 10,428,658 B2

Ex. 1049 and Ex. 1050 support Dr. Terveen's testimony that techniques for detecting faces in videos were well-known by 2010. Ex. 1049 ¶¶14–19, 51–53, Fig. 3; Ex. 1050, 2:17–27. In view of this testimony and evidence we agree with Petitioner that "[a] user would have been motivated to detect faces in either the video still frame or the video itself and associate them with people in Faces view to expand the set of media made easily accessible through Faces view, which would have been [a] predictable arrangement of old techniques." Pet. 58 (citing Ex. 1003 ¶ 233).

Having considered the evidence, testimony, and arguments in the record, we determine that Petitioner has shown that A3UM would have rendered the contested limitations of claim 5 obvious to a person of ordinary skill in the art at the time of the invention. We determine that Petitioner has demonstrated by a preponderance of the evidence that claim 5 is unpatentable over the combined teachings of A3UM and Belitz.

### 4.   *Dependent Claims 6, 7, 9, and 10*

Patent Owner did not present separate arguments for claims 6, 7, 9, and 10. *See generally* PO Resp. We have reviewed the evidence and testimony in support of Petitioner's challenge to these claims and determine that Petitioner has shown by a preponderance of the evidence that claims 6, 7, 9, and 10 are unpatentable over the combined teachings of A3UM and Belitz.

### 5.   *Dependent Claims 8 and 11*

Claim 8 requires the method of claim 7, "wherein the displaying the first person view further includes displaying a first-person-location selectable element" and claim 11 requires the method of claim 10, "wherein

67

IPR2022-00033
Patent 10,428,658 B2

the displaying the second person view further includes displaying a second-person-location selectable element." Ex. 1001, 36:64–65, 37:13–14.

Petitioner asserts that in A3UM "[s]electing a user's snapshot will display . . . confirmed and unconfirmed images containing that person's faces within A3UM's interface, including the viewer, the toolbar, and the inspector panes (collectively, for a given person, the '*[first/second] person view*')." Pet. 62 (citing Ex. 1005, 418–419). Petitioner asserts that once a user's snapshot is selected, "A3UM displays a Places link in the Library inspector ('*[first/second]-person-location selectable element[s]*')." *Id.* at 62–63 (citing Ex. 1005, 9, 419; Ex. 1003 ¶¶ 250–251). According to Petitioner, "[t]his element is '*selectable*' to invoke A3UM's Places view for all images with location information." *Id.* at 63 (citing Ex. 1005, 81).

Alternatively, Petitioner asserts that

A3UM discloses using the Places button "[t]o show the location information for images in a specific item in the Library inspector," . . . and it would have been obvious to modify A3UM such that (1) a person can be selected in the Library inspector (allowing the Places button to be selected to display a Places map of that person's images), or (2) that selecting the Places toolbar button from Faces view will display a Places map of that person's images.

Pet. 63–64 (citing Ex. 1005, 81; Ex. 1003 ¶¶ 252, 255). Petitioner asserts that "A3UM discloses extensive support for using the Places toolbar button to display maps that display locations for only a subset of the user's library." *Id.* at 64 (citing Ex. 1003 ¶ 253).

According to Petitioner, "A3UM discloses that, '[t]o show the location information for images in a specific item in the Library inspector,' a user can 'select an item [such as Projects, folders, albums, and smart albums] in the Library inspector, then click the Places button in the

68

IPR2022-00033
Patent 10,428,658 B2

toolbar.'" Pet. 64 (citing Ex. 1005, 81, 436).  Petitioner asserts that "[u]sers can create smart albums that include all (and only) images of a specific person identified via the Faces functionality, such as by (1) defining the smart album with a face-specific rule or (2) 'drag[ging] the snapshot of the person to the Library inspector' to 'create a Smart Album configured to collect images of a person.'" *Id.* (citing Ex. 1005, 428).  Petitioner asserts further that "[e]ach Library item, including person-specific smart albums, can be selected and then used to define the set of images that are displayed in Places when the Places toolbar button is selected." *Id.* (citing Ex. 1003, ¶ 253; Ex. 1005, 81, 436).   In addition, Petitioner asserts that "[i]t was also well-known by early 2010 to filter map-based image interfaces to specific groupings of images, such as was disclosed by Flickr." *Id.* (citing Ex. 1033, 2; Ex. 1003 ¶ 254).

Petitioner asserts that "[a] skilled artisan would have been motivated to make this combination to improve the user experience and to allow exploring the locations of pictures of a given person" and that "[t]hese modifications would have been obvious in light of A3UM's disclosure of a variety of grouping-specific Places views . . . as well as person-specific smart albums that, if selected and then the user selects the Places toolbar button, would enable a user to display a person-specific Places view." Pet. 65 (citing Ex. 1003 ¶¶ 255–256; Ex. 1005, 81, 113, 116–118, 428, 436, 506–507).  Petitioner asserts further that "[m]odifying A3UM to allow the Places toolbar button from the '*person view*' to be selected to display a person-specific Places map would simply extend A3UM's grouping-specific Places maps to one additional grouping" and "provide a more focused Places

69

IPR2022-00033
Patent 10,428,658 B2

view that displays only images from a given set of images, *e.g.*, images of one specific person." *Id.* (citing Ex. 1003 ¶¶ 255–256).

Patent Owner contends that Petitioner fails to meet its burden for at least three reasons. PO Resp. 72; PO Sur-reply 22. First, Patent Owner contends that "nothing in A3UM that is alleged to be a [first/second]-person-location selectable element is displayed 'responsive to' selecting the first/second thumbnail image in the people view." PO Resp. 72 (citing *id.* at 19–24; Ex. 2025 ¶¶ 245–250); *see also* PO Sur-reply 23. Specifically, Patent Owner contends that "there is no causal connection between (1) clicking a thumbnail in the people view and (2) displaying the Places link or Places toolbar button" and that "[t]he Places link and Places button in the toolbar are both persistently included and displayed by default." PO Resp. 72 (citing Ex. 2025 ¶¶ 254–257; Ex. 1005, 6, 26).

Second, Patent Owner contends that "A3UM does not disclose separate and distinct [first/second]-person-location selectable elements as required in the claims." PO Resp. 75 (citing *id.* at 24–27); *see also* PO Sur-reply 23. According to Patent Owner "Dr. Terveen opines that the A3UM Places link corresponds to the claimed (1) location selectable element (claim 1) *and* (2) first-person-location selectable element (claim 8) *and* (3) second-person-location selectable element (claim 11)" and "Petitioner and Dr. Terveen simply assumed, without any analysis or justification, that a single selectable element in A3UM could correspond to three separate and distinct claim elements, each having a different claimed function. *Id.* (citing Ex. 2024, 333:17–334:10; Ex. 1003 ¶¶ 155, 159, 251; Pet. 62–65). Patent Owner contends that "[s]uch an interpretation is contrary to the plain claim language and cannot stand." *Id.* (citing *id.* at 24–27).

70

IPR2022-00033
Patent 10,428,658 B2

In response to Petitioner's alternative argument "that it would be obvious to modify the A3UM Places toolbar button so it 'could be selected to display the photos of the selected person in the Places view,'" Patent Owner contends that "a POSITA would not make such a modification" and that "even if they did, this modification does not rectify A3UM's lack of distinct first and second person-location selectable elements, as the Places toolbar button is being applied as disclosing both of the first and second person-location selectable elements in claims 8 and 11 *and* as disclosing the location selectable element in claim 1." PO Resp. 76 (citing Pet. 63–64; Ex. 1003 ¶¶ 155, 159, 252–256; Ex. 2025 ¶ 251); *see also* PO Sur-reply 24.

Third, Patent Owner contends that a POSITA would not modify the A3UM Places toolbar button as Petitioner suggests "because (1) the ***generic*** Places button is part of a generic toolbar and not specifically associated with any view and (2) the generic Places button would then be forced to perform different functions at different times, with insufficient context to guide the user." PO Resp. 78 (citing Ex. 2025 ¶ 267). Patent Owner contends that "[s]uch a hindsight reconstructed design is contrary to fundamental user interface design and illogical." *Id.* (citing Ex. 2025 ¶ 268).

Petitioner replies that "claims 8 and 11 add [to claims 7 and 10, from which they depend] that ***the person view*** further ***includes*** displaying the specified element—it does not require independently displaying those elements." Pet. Reply 30. Petitioner asserts further that "the claims also do not require the 'first' and 'second' person-location-selectable elements to be distinct from each other." *Id.* (citing *id.* at 4–6). According to Petitioner, "[t]he Petition explained that A3UM describes a user's selection of person's snapshot in the Faces view causing display of a different view—a 'person

71

view'—that includes images containing the person's face with the viewer, toolbar and inspector" and that the Petition "also showed that '[first/second] person view' includes display of a person-location-selectable element (the places link buttons)." *Id.* (citing Pet. 62–64). Petitioner asserts that "[b]ecause it is a different, 'person view' displayed responsive to the user's input, and it includes the 'location' element, it satisfies the claim." *Id.*

Petitioner replies that Patent Owner's argument that modifying the Places toolbar in the manner proposed in the Petitioner is an improper hindsight reconstruction "ignores the evidence showing that modification of the toolbar 'would be the predictable combination of techniques already disclosed by A3UM," such as the variety of grouping-specific Places views . . . and person-specific smart albums that can be enabled to display a person-specific Places view." Pet. Reply 31 (citing Ex. 1005, 81, 113, 116–118, 428, 436, 506–507). Petitioner replies further that Patent Owner "ignores that A3UM describes the Places toolbar button as being designed to display selected items when it is clicked" and that this description refutes Patent Owner's argument. *Id.* (citing Ex. 1005, 65).

In response, Patent Owner addresses some aspects of its prior arguments. PO Sur-reply 22–24. First, Patent Owner contends that "the Places link is not displayed 'responsive to' selecting the first/second thumbnail in the people view," because "the alleged '[first/second]-person-location selectable element' is displayed ***before*** the click/tap in the people view and remains displayed after; it is not caused to be displayed after some intervening input." *Id.* at 23 (citing PO Resp. 72–75; *id.* at 20–22).

Second, Patent Owner contends that "Petitioner effectively concedes that A3UM does not disclose distinct 'first' and 'second' person-location-

72

IPR2022-00033
Patent 10,428,658 B2

selectable elements; Petitioner merely argues this is not required." PO Sur-reply 23 (citing Pet. Reply 30; *id.* at 22–24; Ex. 2024, 334:11–335:12). Patent Owner contends further that "[w]hile the Places link is shown in what Petitioner contends are different person views, the Places link is a single element that never changes. A3UM does not display, for example, distinct selectable Places links in separate views." *Id.* at 23–24. In addition, Patent Owner contends that "Petitioner also does not dispute that (1) the '[first/second]-person-location selectable element' and 'location selectable element' must be distinct and (2) that it is relying on the singular Places link for all three claim elements." *Id.* at 24 (citing Pet. Reply 29–31; PO Resp. 75–76).

Third, Patent Owner contends that Petitioner's obviousness argument fails because "the Places toolbar button is always displayed by default, i.e., not 'responsive to' a click/tap in the people view under either party's construction." PO Sur-reply 24 (citing PO Resp. 8, 72–73). Patent Owner contends further that "[t]he proposed modification also does not change Petitioner's mapping of the same element in A3UM onto multiple claim elements." *Id.* (citing PO Resp. 76–79). Regarding Petitioner's reasoning in support of the proposed modification, Patent Owner contends that "in Petitioner's modification, the Places toolbar button would display different types of results in different contexts for the same library item, which renders the interface non-intuitive and unpredictable." *Id.* (citing PO Resp. 78).

Considering, Patent Owner's first argument that the "responsive to" limitation of claims 8 and 11 is not met by A3UM, we note that the "responsive to" requirement is recited in claim 7 and pertains to "displaying a *first person view*, the displaying the first person view including displaying

73

IPR2022-00033
Patent 10,428,658 B2

(i) the name associated with the first person and (ii) a scaled replica of each of the digital photographs and videos in the third set of digital photographs." Ex. 1001, 36:58–62.  We agree with Petitioner that all claims 8 and 11 require is "that ***the person view*** further ***includes*** displaying the specified element—it does not require independently displaying those elements."  Pet. Reply 30.

Turning to Patent Owner's second argument, we note that claim 11 depends from claim 10 which in turn depends from claim 7, not claim 8. Thus, even though claim 8 refers to a "first-person-location selectable element" and claim 11 refers to a "second-person-location selectable element," the "first-person-location selectable element" is not part of claim 11 and is not imputed to it.  Accordingly, there is nothing in claims 8 and 11 that precludes the requirements for a first-person-location selectable element and a second-person-location selectable element from being met by the same element of A3UM.

We further see nothing that precludes the Places tab from being both the selectable location element required by claim 1, and either the first-person-location selectable element required by claim 8 or the second-person-location selectable element required by claim 11.  We understand the recitation of a first-person-location selectable element in claim 8 and the recitation of a second-person-location selectable element in claim 11 to merely further define the selectable location element recited in claim 1, not to introduce another selectable location element.  For these reasons, we agree with Petitioner that claims 8 and 11 read on A3UM.

 We also agree with Petitioner that "it would have been obvious to modify <u>A3UM</u> so that the Places toolbar button (another '*[first/second]*-

74

IPR2022-00033
Patent 10,428,658 B2

*person-location selectable element*' and part of the '*[first/second] person view*') could be selected to display the photos of the selected person in the Places view." Pet. 63 (citing Ex. 1003 ¶¶ 252–256). Specifically, we agree that as explained in detail in the Petition, A3UM suggests the proposed modification. *Id.* at 64. Further, we do not find this explanation to be "contrary to fundamental user interface design and illogical" as argued by Patent Owner. PO Resp. 78, *see also* PO Sur-reply 24. Rather, we credit Dr. Terveen's testimony that such a modification would have been obvious to one of ordinary skill in the art. Ex. 1003 ¶¶ 252–257.

Having considered the evidence, testimony, and arguments in the record, we determine that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of A3UM and Belitz would have rendered claims 8 and 11 obvious to a person of ordinary skill in the art at the time of the invention.

6.    *Dependent Claims 12–15*

Patent Owner did not present separate arguments for claims 12–15. *See generally* PO Resp. We have reviewed the evidence and testimony in support of Petitioner's challenge to these claims and determine that Petitioner has shown by a preponderance of the evidence that claims 12–15 are unpatentable over the combined teachings of A3UM and Belitz.

*G. Ground 2 – Obviousness of Claims 3 and 4 Over A3UM, Belitz, and Rassmussen*

Claim 3 requires the method of claim 1, "further comprising responsive to a click or tap of a first one of the displayed scaled replicas in the first location view, displaying a first digital photograph associated with the first scaled replica in the first location view and a first map image

75

indicating the geographic coordinates of the first geotag." Ex. 1001, 36:15–20. Claim 4 requires the method of claim 3, "further comprising responsive to a click or tap of a first one of the displayed scaled replicas in the second location view, displaying a first digital photograph associated with the first scaled replica in the second location view and a second map image indicating the geographic coordinates of the second geotag." *Id.* at 36:21–27.

Petitioner asserts that "Belitz teaches that each graphical object can be represented by a thumbnail of a photograph ('*scaled representations*') associated with the location" and that "A3UM allows a user to click or tap on Places map markers to cause the Places view to focus on that specific location: 'To view the images associated with a location … Select a red pin.'" Pet. 75–76 (citing Ex. 1006 ¶¶ 60, 62; Ex. 1005, 436–438). Petitioner asserts further that in A3UM "[o]nce a pin is selected, 'the images or images associated with the location . . . are selected in the Browser' and displayed" and that "[w]hen implemented as Belitz describes, this would include the photograph used to generate the thumbnail." *Id.* at 76 (citing Ex. 1003 ¶¶ 194–195; Ex. 1005, 436–438; Ex. 1006 ¶ 62). Petitioner asserts that "A3UM further discloses an interface comprising a 'Metadata Inspector' which displays metadata . . . via an optional Map Pane, such as location information for a selected image." *Id.* (citing Ex. 1005, 21).

Petitioner asserts that

A3UM explains that the Metadata Inspector displays metadata values for a selected image, as well as, optionally, a small Map Pane ("*a [first/second] map image*") that includes "a red pin in the center of the map indicating where the image was shot" along with text within a tab linked to that location identifying, for example, the street address of the location ("1600

76

IPR2022-00033
Patent 10,428,658 B2

> pennsylvania ave NW") and the count of photos at that location
> ("1 Photo").

Pet. 77 (citing Ex. 1005, 458–459; Ex. 1003 ¶ 196; Ex. 1040, 42). Petitioner asserts further that "The Metadata inspector can be displayed for any selected image by clicking the Metadata tab or using the keyboard, after which the Map Pane can be displayed by selecting the Map Pane button." *Id.* at 77–78 (citing Ex. 1005, 58–60; Ex. 1003 ¶ 197). Based on these assertions, Petitioner reasons that "a skilled artisan would have found it obvious to modify A3UM's Places view to incorporate Belitz's thumbnails to show a preview of the photos accessible from a given marker and location." *Id.* at 75 (citing Ex. 1003 ¶¶ 119–137; *id.* at 24–30).

Specifically, for the requirement that the map images be displayed in claims 3 and 4, Petitioner asserts that "A3UM's disclosure encompasses a scenario where a user had previously selected the Metadata inspector, displayed the Map Pane, and then used the Places view" and that "[i]n such a scenario, selecting one of the photos in the Browser would, with a single click, display (i) the photo in the Viewer and (ii) the photo's information (and map) in the Metadata inspector." Pet. 78 (citing Ex. 1003 ¶ 198; Ex. 1005, 51, 58–60, 251, 458–459).

Alternatively, Petitioner asserts that "[a] skilled artisan would have appreciated the value of including small maps as ancillary UI elements in photo organizers, such as A3UM's Map Pane . . . and optionally-displayed Overview Map pane on the Places view." Pet. 78–79 (citing Ex. 1005, 82, 439–440, 458–459; Ex. 1003 ¶ 200). Petitioner asserts further that "[s]mall maps were known and useful UI elements in image management systems before 2010" and that displaying a "map pane 'can further enhance the [photo] browsing experience.'" *Id.* at 79 (citing Ex. 1003 ¶ 201; Ex. 1008,

77

IPR2022-00033
Patent 10,428,658 B2

3:42–45).  Based on these assertions, Petitioner reasons that "[a] skilled artisan would have been motivated to make this modification because it would have improved the user's experience."  *Id.* (citing Ex. 1003 ¶ 202). Petitioner asserts that "[t]his modification would have been well within a skilled artisan's abilities and suggested by A3UM's disclosure of automatically displaying certain UI elements if desired" and that "[m]odifying A3UM as stated would arrange old elements to perform their known function to yield no more than one would expect from such an arrangement."  *Id.* (citing Ex. 1003 ¶¶ 203–204).

For the requirement that the geographic coordinates of the geotags be indicated in claims 3 and 4, Petitioner admits that A3UM's Metadata Inspector "does not '*indicat[e] the geographic coordinates of the [first/second] geotag.*'"  Pet. 81.  Petitioner asserts, however, that "a skilled person would consider placement of the same '*geographic coordinates*' values on the Metadata Inspector pane in a different layout (*i.e.*, overlaid on the small map) to have been a routine design choice" because A3UM "teaches displaying descriptive location information (*e.g.*, street address) overlaid on the small map, and displaying other descriptive metadata about the location (*e.g.*, GPS latitude/longitude/altitude values) would have been an obvious alternative."  *Id.* at 81–82 (citing Ex. 1003 ¶ 208).  Petitioner asserts further that "providing such a display was suggested by Rasmussen . . . which teaches display of '*geographic coordinate*' values in a callout window (215) linked to the location of a map marker on a Google Map."  *Id.* at 82–83 (citing Ex. 1025, Fig. 2; 10:25–29, Ex. 1053, 138, Ex. 1003 ¶¶ 209–210).

78

IPR2022-00033
Patent 10,428,658 B2

Petitioner reasons that "[a] skilled artisan would have been motivated to modify A3UM's Map Pane marker to additionally display GPS coordinates ('*geographic coordinates*') in view of Rasmussen" because "[d]oing so would address known user preferences for display of GPS data with other image metadata when using an interactive Google Map." Pet. 83 (citing Ex. 1003 ¶ 210). Petitioner asserts that "as Dr. Terveen explains, 'skilled artisan would understand the benefits of simultaneously displaying a place name (memorable but imprecise) and the geographical coordinates (precise but not memorable to most).'" *Id.*

Patent Owner responds that "Petitioner failed to show that A3UM, Belitz, and Rasmussen render obvious these claims for four reasons." PO Resp. 79. First, Patent Owner contends that "Petitioner fails to address all of the claim limitations." *Id.* Patent Owner asserts that "[w]hile Petitioner discusses the 'map image' portion of claims 3-4, it does not address the claim requirement of 'displaying a first digital photograph . . . in the [first/second] location view'" because "[m]erely citing to an expert declaration for an explanation as to how that claim language is allegedly met amounts to impermissible incorporation by reference." *Id.* (citing Pet. 75–78; C.F.R. § 42.6(a)(3); *Cisco Sys., Inc. v. C-Cation Techs., LLC*, IPR2014-0054, Paper 22 at 9 (PTAB Aug. 29, 2014) (informative)).

Second, Patent Owner contends that "Dr. Terveen's description of how A3UM's Places feature functions is plainly wrong: selecting an image in the Browser below the map does ***not*** replace the map with a full-size version of the selected image in the Places view." PO Resp. 80. According to Patent Owner, "Dr. Terveen asserts that '[s]electing a thumbnail in the Browser then prompts the display of the original digital image in the Viewer,

79

which replaces the Places map view" which "is demonstrably wrong." *Id.* at 80–81 (citing Ex. 1003 ¶ 194). Patent Owner contends that "[t[]he Places map view in the Viewer persists and is not replaced" and "[*n*]*owhere* in connection with the Places view does A3UM show a selected image in the Browser replacing the map with a full-size version." *Id.* at 81 (citing Ex. 2025 ¶¶ 198–199). Patent Owner contends that "Dr. Terveen conceded during his deposition that A3UM does *not* disclose that the Places map is replaced with an image in response to selecting an image in the Browser below the map." *Id.* at 81–82 (citing Ex. 2023, 152:10–154:22; Ex. 2024, 323:7–324:16).

Third, Patent Owner contends that "the alleged [first/second] map image (i.e., the map pane map) in A3UM is not displayed 'responsive to' the relevant input as required in the claims." PO Resp. 80. According to Patent Owner, "Petitioner concedes this alleged '[first/second] map image' is only displayed after a user takes multiple steps that do not involve selecting anything in the Browser, including: (1) 'clicking the Metadata tab or using the keyboard' and (2) 'selecting the Map pane button' to show the Map Pane." *Id.* at 83 (citing Pet. 77–78) (internal citations omitted).

Fourth, Patent Owner contends that "even if Petitioner's other arguments were accepted (which they should not be), a POSITA would never modify A3UM in the manner Petitioner proposes." PO Resp. 80. Specifically, Patent Owner contends that "given that A3UM's Places map remains displayed when an image is selected in the Browser, a POSITA would not modify A3UM to automatically show the Map Pane (alleged [first/second] map image) when selecting an image below the Places map

80

IPR2022-00033
Patent 10,428,658 B2

because it is illogical to display two maps." *Id.*at 85 (citing Ex. 2025
¶¶ 210–211).

In reply to Patent Owner's first argument, Petitioner asserts that it
"explained [that] a skilled artisan would have been motivated to modify
A3UM to meet ***all*** claim limitations of claims 3 and 4." Pet. Reply. 32
(citing Pet. 75–84) (internal citation omitted). In reply to Patent Owner's
second argument, Petitioner asserts that Patent Owner's argument that one
paragraph of Dr. Terveen's testimony is demonstrably wrong "is irrelevant,
as two bases ***set forth in the Petition*** each demonstrate why claims 3-4 are
obvious." *Id.* (citing PO Resp. 80–81). In reply to Patent Owner's third
argument, Petitioner asserts that "[t]he display of the small map is ***directly***
responsive to the selection of the thumbnail—the Metadata Inspector
displays metadata associated with the digital image file represented by the
thumbnail that has been selected, including the location metadata in the
image." *Id.* at 34. And, in reply to Patent Owner's fourth argument,
Petitioner asserts that Patent Owner "does not respond with explanations or
evidence, but contends the artisan would not modify A3UM as proposed
because it would present redundant information." *Id.* at 35. Petitioner
asserts further that "[t]he information is not redundant—the label provides
additional information—and regardless, would be a known and predictable
alternative and therefore obvious." *Id.*

Patent Owner responds that "[t]he Petition did not explain how A3UM
allegedly meets the claim requirements of 'displaying a first digital
photograph . . . in the [first/second] location view'" and that "[a] generic
assertion that A3UM and Belitz 'meet all claim limitations,' is insufficient
because the petition must identify the challenge with particularity." PO Sur-

reply 24–25 (citing Pet. 75–78, PO Resp. 80' Pet. Reply 32; *Intelligent Bio-Sys.*, 821 F.3d at 1369).

Patent Owner contends that in its Reply, Petitioner makes a new argument that "it would be obvious to modify A3UM to replace the Places view map with an image" which "exceeds the permissible scope of a reply." PO Sur-reply 26 (citing *Intelligent Bio-Systems*, 821 F.3d at 1369–70). Patent Owner contends further that "even if Petitioner's new argument is considered, it is not supported by Dr. Terveen's testimony or any other evidence." *Id.* (citing Ex. 1003 ¶¶ 194–195). Patent Owner contends that "Dr. Surati explained that a POSITA would not modify A3UM's interplay between the Places map and Browser, where (1) selecting a pin on the map highlights the corresponding image in the Browser and (2) selecting an image in the Browser highlights the corresponding pin." *Id.* at 26–27 (citing Ex. 2025 ¶¶ 213–216.

In addition, Patent Owner reiterates its argument that "A3UM's map pane is not displayed 'responsive to a click or tap of a first one of the displayed scaled replicas in the [first/second] location view' as required in claims 3-4." PO Sur-reply 27 (citing PO Resp. 76–77).

Considering Patent Owner's first argument, that the Petition fails to address all of the limitations of claims 3 and 4, although we agree with Patent Owner that A3UM does not display a first/second map image in the first/second location view as required by claims 3 and 4, we do not agree that Petitioner's alternative obviousness theory fails to address all of the limitations. PO Resp. 80. In A3UM the first/second map image is displayed in the Metadata Inspector, not the Browser. Pet. 76; Ex. 1005, 58–60, 458–459. Thus, we agree with Patent Owner that A3UM does not disclose this

82

IPR2022-00033
Patent 10,428,658 B2

limitation.  In its alternative theory based on obviousness, however, the

Petition asserts that "it would have been obvious to modify A3UM such that

selecting a photo in the Browser, in addition to displaying that photo in the

Viewer, would display A3UM's Map Pane at the bottom of the Inspector

pane." Pet. 78 (citing Ex. 1003 ¶¶ 199–204).  The Petition also provides

reasoning in support of the proposed modification, as discussed above.  *See*

*id.* at 78–80.  Thus, the Petition addresses all of the limitations of claims 3

and 4.

Considering Patent Owner's second argument, that Dr. Terveen's

testimony is flawed, we agree with Petitioner that even if Dr. Terveen's

testimony in paragraph 194 of Exhibit 1003 "is demonstrably wrong," this

testimony was not relied upon in its obviousness theory, and thus, is

"irrelevant" to that theory.

Considering Patent Owner's third argument, that displaying of the

first/second map image is not "responsive to" a click or tap of a first/second

one of the displayed scaled replicas, we note that this argument is also not

applicable to the Petition's obviousness theory which proposes modification

of A3UM's Browser to include the display of both the photo and a map

pane.  Pet. 78.

Considering Patent Owner's fourth argument, that a POSITA would

not have modified A3UM in the manner proposed by the Petition because

such modification would result in the display of two maps, we determine

that Patent Owner mischaracterizes the proposed modification.  The

modification proposed by the Petition results in the display of a photo in the

Viewer with a map at the bottom in an Inspector pane.  *Id.*

83

IPR2022-00033
Patent 10,428,658 B2

Having considered the evidence, testimony, and arguments in the record, we determine that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of A3UM, Belitz, and Rassmussen would have rendered claims 3 and 4 obvious to a person of ordinary skill in the art at the time of the invention.

*H. Motion to Exclude*

Patent Owner filed a Motion to Exclude A3UM (Ex. 1005) on February 17, 2023. Paper 34. A3UM is the primary reference in this proceeding and was filed and served with the Petition on November 3, 2021. Paper 1. "Any objection to evidence submitted during a preliminary proceeding must be filed within ten business days of the institution of the trial." 37 C.F.R. § 42.64(b)(1). Trial was instituted in this proceeding on May 20, 2022. Paper 12. The deadline to file objections to Exhibit 1005 was May 30, 2022. Patent Owner's objections to Exhibit 1005 were not filed until June 6, 2022. Paper 14. Patent Owner has provided no reason for its delay in filing its objections to Exhibit 1005. Because Patent Owner's objections to Exhibit 1005 were untimely filed, Patent Owner's Motion to Exclude is denied. 37 C.F.R. § 42.64(b)(1), (c).

### III.    CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–15 of U.S.

84

IPR2022-00033
Patent 10,428,658 B2

Patent No. Patent 10,423,658 B2 are unpatentable on the bases set forth in the following table.[5]

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 5–15 | 103(a) | A3UM, Belitz | 1–15 | |
| 3, 4 | 103(a) | A3UM, Belitz, Rassmussen | 3, 4 | |
| **Overall Outcome** | | | 1–15 | |

---

[5] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

85

IPR2022-00033
Patent 10,428,658 B2

### IV.    ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1–15 of U.S. Patent No. Patent 10,423,658 B2 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude (Paper 34) is *denied*; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

86

IPR2022-00033
Patent 10,428,658 B2


PETITIONER:

Jeffrey P. Kushan
Thomas A. Broughan, III
Scott M. Border
SIDLEY AUSTIN LLP
jkushan@sidley.com
tbroughan@sidley.com
kyle.smith@sidley.com


PATENT OWNER:

Jennifer Hayes
George Dandalides
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com


87

Trials@uspto.gov                                              Paper 42
571-272-7822                                     Date: November 22, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

———————

IPR2022-00033
Patent 10,423,658 B2

———————

Before LYNNE H. BROWNE, NORMAN H. BEAMER, and
KEVIN C. TROCK, *Administrative Patent Judges.*

BROWNE, *Administrative Patent Judge.*


DECISION

Denying Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64(c)*
Denying Patent Owner's Request on Rehearing
*37 C.F.R. § 42.71(d)*

IPR2022-00033
Patent 10,423,658 B2

## I.   INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–15 (the "challenged claims") of U.S. Patent No. 10,423,658 B2 (Ex. 1001, "the '658 patent"). We determined, based on the record at that time, that the '658 patent was eligible for *inter partes* review, and instituted review on all challenged claims on the grounds presented in the Petition.  Paper 12 ("Institution Decision" or "Inst. Dec.").

On May 18, 2023, we entered a Final Written Decision (Paper 39, "Decision" or "Dec.") determining, in part, that Petitioner had shown claims 1–15 of the '658 patent are unpatentable by a preponderance of the evidence.  On June 16, 2023, Patent Owner timely filed a Request for Rehearing of that determination in the Decision.  Paper 41 ("Patent Owner's Request" or "Req. Reh'g").

As discussed below, we agree with Patent Owner that the Decision misapprehended Patent Owner's deadline for filing objections to Exhibit 1005 and consider those objections below.

## II.   ANALYSIS

### A.   *Legal Standards*

The applicable requirements for a request for rehearing are set forth in 37 C.F.R. § 42.71(d), which provides:

> A party dissatisfied with a decision may file a single request for rehearing without prior authorization from the Board.  The burden of showing a decision should be modified lies with the party challenging the decision.  The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, a reply, or a sur-reply.

IPR2022-00033
Patent 10,423,658 B2

We review our Decision under an abuse of discretion standard. 37 C.F.R. § 42.71(c). An abuse of discretion may arise if a decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if the decision represents an unreasonable judgment in weighing relevant factors. *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005); *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004); *In re Gartside*, 203 F.3d 1305, 1315–16 (Fed. Cir. 2000). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *OSI Pharm., LLC v. Apotex Inc.*, 939 F.3d 1375, 1381 (Fed. Cir. 2019) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). "The substantial evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision.'" *OSI Pharm.*, 939 F.3d at 1381–82 (quoting *Gartside*, 203 F.3d at 1312).

## B. Motion to Exclude

Patent Owner filed a Motion to Exclude A3UM (Ex. 1005) on February 17, 2023. Paper 34. Petitioner filed an Opposition to Patent Owner's Motion to Exclude on February 24, 2023. Paper 35 ("Mot. Opp"). In the Final Written Decision, we denied the Motion to Exclude because we determined that objections to Exhibit 1005 were untimely filed. Dec. 84.

In the Request for Rehearing, Patent Owner notes that evidence objections must be filed within ten business days of the institution of trial, and that a business day is a day other than a Saturday, Sunday, or Federal Holiday within the District of Colombia. Req. Reh'g 2 (citing 37 C.F.R. §§ 42.2, 42.64(b)(1)). Patent Owner asserts that "[t]he Decision erroneously calculated the deadline for Patent Owner's evidence objections as falling on a Federal holiday based on calendar days instead of business days." *Id.* at 3.

3

IPR2022-00033
Patent 10,423,658 B2

We agree with Patent Owner that in view of the May 30, 2022, Federal holiday, Patent Owner's objections were timely filed on June 6, 2022. We therefore address Patent Owner's Motion to Exclude below.

In the Motion to Exclude, Patent Owner asserts that Exhibit 1005 is neither authenticated nor self-authenticating. Paper 34, 2. Patent Owner asserts that "Petitioner cited testimony from its expert, Dr. Terveen, and its employee, Mr. Birdsell, in an attempt to establish the authenticity of Ex. 1005," but that "neither Dr. Terveen nor Mr. Birdsell could properly authenticate Ex. 1005 as a true, correct, and complete copy of A3UM." *Id.* Specifically, Patent Owner argues that neither Dr. Terveen nor Mr. Birdsell created Exhibit 1005 and that both merely "spot-checked" the manual to evaluate its authenticity. *Id.* at 3–5.

Patent Owner asserts that "Mr. Birdsell and Dr. Terveen's testimony regarding Ex. 1005 lacks the 'factual specificity' required for proper authentication." *Id.* at 5 (citing *Xactware Sols., Inc. v. Pictometry Int'l Corp.*, IPR2016-00594, Paper 46 at 11–12 (PTAB Aug. 24, 2017)). In the Request for Rehearing, Patent Owner further asserts that "[i]t was not Patent Owner's burden to identify discrepancies between Exhibit 1005 and the A3UM HTML file set," and that "it was Petitioner's burden to demonstrate that Ex. 1005 is what Petitioner claims it is." Req. Reh'g 5 (citing Fed. R. Evid. 901; *Inductev Inc. v. Witricity Corp.*, IPR2021-01166, Mot. Opp. 53 (PTAB Dec. 20, 2022)). Patent Owner asserts that "[j]ust as one who only 'spot-checks' a deck of cards cannot know that the deck has the correct 52 cards, Dr. Terveen and Mr. Birdsell could not have known whether Exhibit 1005 is a complete and accurate copy of the HTML files." *Id.* at 4 (citing Paper 38, 2–3).

4

IPR2022-00033
Patent 10,423,658 B2

We agree with Patent Owner that it was Petitioner's burden to demonstrate that Exhibit 1005 is what Petitioner claims it is, but note that authentication is a low bar, requiring only a rational basis that the document is what it is asserted to be. *See Inductev Inc. v. Witricity Corp.*, IPR2021-01166, Paper 35 at 53 (citing *Caterpillar Inc. v. Wirtgen Am., Inc.*, IPR2018-01091, Paper 49 at 72 (Nov. 27, 2019) (quoting *United States v. Turner*, 934 F.3d 794, 798 (8th Cir. 2019))). As Petitioner points out, Mr. Birdsell testified he was the "lead writer" of the Aperture 3 User Manual and personally participated in the creation and distribution of the A3UM HTML file set. Mot. Opp. 4 (citing Ex. 1020 ¶¶ 3–4, 8–9; Ex. 2026, 32:20–33:2, 35:16–37:14, 18:15–22). We agree with Petitioner that "[g]iven Mr. Birdsell's unique depth of familiarity with A3UM and the A3UM HTML file set, he was able to satisfy himself that EX1005 was a true and correct copy of the A3UM HTML file set distributed in February of 2010 by inspecting it in the manner he described." *Id.* at 3–4.

Further, as Petitioner points out, "Dr. Terveen testified that one step he took was to compare the first 100 pages of Exhibit 1005," "one by one, . . . compar[ing] them to the corresponding pages in the user manual available on the computer," and then performing a section by section comparison of Exhibit 1005 and the A3UM HTML file set, looking at the first page or two of each section. Mot. Opp. 7 (citing Ex. 2024, 380:20–381:3).

Weighing the parties' arguments and evidence, we determine that Petitioner demonstrates sufficiently that A3UM is what Petitioner purports it to be—the Aperture 3 User Manual, describing certain features and

5

IPR2022-00033
Patent 10,423,658 B2

interfaces of Apple's Aperture 3 product.[1]  For these reasons, Patent Owner's Motion to Exclude is unconvincing.

### C.  Claim Construction

In the Final Written Decision, we found that "no claim terms require express construction," and that "[t]o the extent that the meaning of any claim term is addressed, we use its ordinary and customary meaning." Dec. 13.

In the Request for Rehearing, Patent Owner asserts that "Patent Owner's Response noted that Petitioner applied its view of the claims' plain and ordinary meaning in the Petition," and that Patent Owner "agreed 'that the claims should be afforded their plain and ordinary meaning' but offered 'a discussion of that meaning' in case the Board determined that claim construction was 'necessary to resolve Petitioner's patentability challenges.'" Req. Reh'g 14 (quoting Paper 20, 15 ("PO Resp.")).  Patent Owner further indicates that "Patent Owner's Sur-Reply reiterated its original proposed constructions." *Id.* (citing Paper 31, 8–13 ("PO Sur-reply")).  Patent Owner asserts that "[t]o the extent the Decision declined to adopt Patent Owner's constructions because it understood that Patent Owner was required to show 'good cause' for proposing constructions at a 'late stage in this proceeding,' the Decision misapprehended the Response." *Id.* (citing Dec. 12).

As we indicated in the Decision, "[o]nly terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy." Dec. 12.  The ordinary and customary meanings we applied in

---

[1] Notably, Patent Owner does not assert that the reference filed by Petitioner as Exhibit 1005, A3UM, is different from the HTML file set or that Ex. 1005 reference has been altered in any substantive way that would affect the outcome of this proceeding. *See* IPR2021-01166, Paper 35 at 54.

6

IPR2022-00033
Patent 10,423,658 B2

the Decision appropriately support the Decision without requiring express construction of any terms. *Id.* at 13. For these reasons, Patent Owner does show that the Board misapprehended or overlooked Patent Owner's Response.

### D. Claims 3 and 4

With respect to claims 3 and 4, Patent Owner asserts that "the Decision misapprehended Patent Owner's arguments regarding the Petition's failure to address the claim requirement of 'displaying a first digital photograph . . . in the [first/second] location view.'" Req. Reh'g 5. Patent Owner further asserts that "the Decision misapprehended the Petition's proposed modification to A3UM and overlooked Patent Owner's argument that the Reply improperly introduced a new obviousness theory." *Id.* at 6. Furthermore, Patent Owner asserts that the Decision overlooked evidence of non-obviousness. *Id.*

With respect to "displaying a first digital photograph . . . in the [first/second] location view," Patent Owner asserts that "the Decision does not identify whether or how A3UM purportedly meets the requirement of 'displaying a first digital photograph . . . in the [first/second] location view' responsive to a click or tap of a scaled replica in the [first/second] location view. Req. Reh'g 8 (citing Dec. 75–84).

Further, Patent Owner argues that "[t]he Petition did ***not*** propose modifying A3UM so that a click or tap of a thumbnail in the Browser would cause a digital photograph to be displayed" but instead, according to Patent Owner, "[t]hat argument appeared for the first time in Petitioner's Reply." Req. Reh'g 8 (citing PO Resp. 79–82; PO Sur-reply 24–27). Patent Owner asserts that "[t]he Decision's summary of the parties' briefing cited Patent Owner's argument that Petitioner's Reply raised a new obviousness theory,"

7

IPR2022-00033
Patent 10,423,658 B2

but that the Decision did not "address the merits of Patent Owner's argument." *Id.* at 9 (citing Dec. 82–84).

Patent Owner argues that "there is a functional relationship between the Places map and the Browser where (1) selecting a pin on the map highlights the corresponding image in the Browser and (2) selecting an image in the Browser highlights the corresponding pin," and that "[m]odifying A3UM so that selecting a thumbnail in the Browser replaces the Places map would destroy that functional relationship." Req. Reh'g 11 (citing PO Sur-reply 26–27; Ex. 2025 ¶¶ 213–216).

As we stated in the Decision, the Petition asserts that "it would have been obvious to modify A3UM such that selecting a photo in the Browser, in addition to displaying that photo in the Viewer, would display A3UM's Map Pane at the bottom of the Inspector pane." Dec. 83 (citing Pet. 78). That is, the Decision credited this argument from the Petition which addresses displaying a first digital photograph in the [first/second] location view responsive to a click or tap of a scaled replica in the [first/second] location view. The argument was not raised for the first time in the Reply.

With respect to the asserted functional relationship between the Places Map and the Browser, we note that the test for obviousness "is what the combined teachings of the references would have suggested to those of ordinary skill in the art," and "not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference[,] nor . . . that the claimed invention must be expressly suggested in any one or all of the references." *In re Keller*, 642 F.2d 413, 425 (CCPA 1981). Petitioner has demonstrated that the teachings of A3UM render the subject matter of claims 3 and 4 obvious notwithstanding the presence of a functional relationship such as the one noted by Patent Owner or whether the

8

IPR2022-00033
Patent 10,423,658 B2

modification applied by Petitioner would destroy such a functional relationship. For these reasons, Patent Owner does not show that the Board misapprehended or overlooked Patent Owner's arguments regarding claims 3 and 4.

### E.  Claims 8 and 11

Patent Owner notes that claims 7 and 10 recite "responsive to a click or tap of the [first/second] person selectable thumbnail image, displaying a [first/second] person view," and that claims 8 and 11 depend from claims 7 and 10, respectively, and recite "wherein the displaying the [first/second] person view further includes displaying a [first/second]-person-location selectable element." Req. Reh'g 12.

Patent Owner asserts that "[t]he phrase '*the displaying* the first person view' finds antecedent basis from the step of 'displaying a first person view' recited in claim 7," and that "[i]n turn, claim 7 requires the 'displaying a first person view' be 'responsive to a click or tap of the first person selectable thumbnail image.'" Req. Reh'g 13.  Patent Owner concludes that "the 'displaying a first-person-location selectable element' in claim 8 must be 'responsive to a click or tap of the first person selectable thumbnail image' because it is part of the 'displaying a first person view' in claim 7." *Id.* (citing PO Sur-reply 23).  Patent Owner asserts that "[t]he Decision's reading of claims 8 and 10 overlooked or misapprehended the import of the phrase 'the displaying.'" *Id.*

We do not agree that we overlooked or misapprehended this claim language.  Rather, we addressed it on pages 73–74 of the Final Written Decision.  The fact that Patent Owner disagrees with our resolution of this issue is not grounds for rehearing.

9

IPR2022-00033
Patent 10,423,658 B2

### III.  CONCLUSION

For the above reasons, after considering Patent Owner's Request, we maintain the outcome of the Decision.

Outcome of Decision on Rehearing:

| Claims | 35 U.S.C. § | References | Denied | Granted |
|---|---|---|---|---|
| 1, 2, 5–15 | 103(a) | A3UM, Belitz | 1, 2, 5–15 | |
| 3, 4 | 103(a) | A3UM, Belitz, Rassmussen | 3, 4 | |
| **Overall Outcome** | | | 1–15 | |

Final Outcome of Final Written Decision after Rehearing:

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 5–15 | 103(a) | A3UM, Belitz | 1, 2, 5–15 | |
| 3, 4 | 103(a) | A3UM, Belitz, Rassmussen | 3, 4 | |
| **Overall Outcome** | | | 1–15 | |

### IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Patent Owner's Motion to Exclude is *denied*.

ORDERED that Patent Owner's Rehearing Request is *denied*.

10

IPR2022-00033
Patent 10,423,658 B2

FOR PETITIONER:

Jeffrey Kushan
SIDLEY AUSTIN LLP
jkushan@sidley.com


FOR PATENT OWNER:

Jennifer Hayes
George Dandalides
Matthew A. Werber
Daniel Schwartz
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com
mwerber@nixonpeabody.com
djschwartz@nixonpeabody.com

11

US010621228B2

(12) **United States Patent**
Desmond et al.

(10) Patent No.: **US 10,621,228 B2**
(45) Date of Patent: **\*Apr. 14, 2020**

(54) **METHOD AND APPARATUS FOR MANAGING DIGITAL FILES**

(71) Applicant: **NCM IP Holdings, LLC**, Glen Ellyn, IL (US)

(72) Inventors: **Christopher J. Desmond**, Glen Ellyn, IL (US); **Nancy L. Desmond**, Glen Ellyn, IL (US); **L. Michael Taylor**, Chicago, IL (US)

(73) Assignee: **NCM IP Holdings, LLC**, Glen Ellyn, IL (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/578,238**

(22) Filed: **Sep. 20, 2019**

(65) **Prior Publication Data**

US 2020/0026727 A1      Jan. 23, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 16/536,300, filed on Aug. 8, 2019, which is a continuation of application

(Continued)

(51) **Int. Cl.**
G06F 16/58           (2019.01)
G06F 16/901          (2019.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... **G06F 16/5866** (2019.01); **G06F 16/51** (2019.01); **G06F 16/901** (2019.01); **G06F 16/907** (2019.01); **G06F 3/0481** (2013.01)

(58) **Field of Classification Search**
CPC ... G06F 16/5866; G06F 16/907; G06F 16/901
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,694,514 A      12/1997  Evans
6,629,104 B1      9/2003  Parulski
(Continued)

FOREIGN PATENT DOCUMENTS

CN      102591922 B      10/2015
EP      2466869 A3       2/2017
(Continued)

OTHER PUBLICATIONS

Kustanowitz et al., "Motivating Annotation for Personal Digital Photo Libraries: Lowering Barriers while Raising Incentives," Tech. Report HCIL-2004-18, U. Maryland, 2005 (10 pages).
(Continued)

*Primary Examiner* — Loc Tran
(74) *Attorney, Agent, or Firm* — Nixon Peabody LLP

(57) **ABSTRACT**

A computer-implemented method of associating digital tags with digital files comprises storing a plurality of digital files having embedded therein content data and metadata including tags; receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and displaying, on a video display device associated with the client device, a first indication of the first tag label.

**19 Claims, 50 Drawing Sheets**



Petitioner Apple Inc. - Ex. 1001, p. 1

**US 10,621,228 B2**

Page 2

### Related U.S. Application Data

No. 15/375,927, filed on Dec. 12, 2016, now Pat. No. 10,423,658, which is a continuation of application No. 14/193,426, filed on Feb. 28, 2014, now Pat. No. 9,552,376, which is a continuation-in-part of application No. 13/157,214, filed on Jun. 9, 2011, now Pat. No. 9,098,531.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *G06F 16/51* | (2019.01) | |
| *G06F 16/907* | (2019.01) | |
| G06F 3/0481 | (2013.01) | |

(56)                **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,372,976 B2 | 5/2008 | Rhoad |
| 7,475,060 B2 | 1/2009 | Toyama |
| 7,480,669 B2 | 1/2009 | Lo |
| 7,694,236 B2 | 4/2010 | Gusmorino |
| 7,822,746 B2 | 10/2010 | Svendsen |
| 7,860,846 B2 | 12/2010 | Takahashi |
| 7,991,283 B2 | 8/2011 | Chen |
| 8,001,124 B2 | 8/2011 | Svendsen |
| 8,015,144 B2 | 9/2011 | Zheng |
| 8,024,317 B2 | 9/2011 | Nair |
| 8,032,508 B2 | 10/2011 | Martinez |
| 8,055,675 B2 | 11/2011 | Higgins |
| 8,060,492 B2 | 11/2011 | Nair |
| 8,069,142 B2 | 11/2011 | Davis |
| 8,086,048 B2 | 12/2011 | Naaman |
| 8,108,778 B2 | 1/2012 | Athsani |
| 8,150,844 B2 | 4/2012 | Redstone |
| 8,150,967 B2 | 4/2012 | King |
| 8,166,016 B2 | 4/2012 | Higgins |
| 8,166,168 B2 | 4/2012 | Hayashi |
| 8,171,388 B2 | 5/2012 | Zaltzman |
| 8,230,338 B2 | 7/2012 | Dugan |
| 8,255,379 B2 | 8/2012 | Govindachetty |
| 8,264,570 B2 | 9/2012 | Karimoto |
| 8,271,506 B2 | 9/2012 | Martinez |
| 8,281,027 B2 | 10/2012 | Martinez |
| 8,285,483 B2 | 10/2012 | Amer-Yahia |
| 8,307,029 B2 | 11/2012 | Davis |
| 8,315,959 B2 | 11/2012 | Zheng |
| 8,359,314 B2 | 1/2013 | Svendsen |
| 8,364,611 B2 | 1/2013 | Tendjoukian |
| 8,380,039 B2 | 2/2013 | Luo |
| 8,386,506 B2 | 2/2013 | Martinez |
| 8,390,702 B2 | 3/2013 | Bhatt |
| 8,401,771 B2 | 3/2013 | Krumm |
| 8,402,356 B2 | 3/2013 | Martinez |
| 8,429,156 B2 | 4/2013 | Buchmueller |
| 8,447,120 B2 | 5/2013 | Ji |
| 8,452,855 B2 | 5/2013 | Higgins |
| 8,458,115 B2 | 6/2013 | Cai |
| 8,463,931 B2 | 6/2013 | Evans |
| 8,484,223 B2 | 7/2013 | Ota |
| 8,489,115 B2 | 7/2013 | Rodriguez |
| 8,490,011 B2 | 7/2013 | Stapleton |
| 8,493,495 B2 | 7/2013 | D'Souza |
| 8,503,791 B2 | 8/2013 | Conwell |
| 8,504,073 B2 | 8/2013 | Svendsen |
| 8,520,979 B2 | 8/2013 | Conwell |
| D689,079 S | 9/2013 | Edwards |
| D689,080 S | 9/2013 | Edwards |
| D689,083 S | 9/2013 | Pasceri |
| D689,084 S | 9/2013 | Pasceri |
| D689,085 S | 9/2013 | Pasceri |
| 8,538,811 B2 | 9/2013 | Higgins |
| 8,538,813 B2 | 9/2013 | Kakarla |
| 8,542,294 B2 | 9/2013 | Bhatt |
| 8,554,623 B2 | 10/2013 | Higgins |
| 8,560,390 B2 | 10/2013 | Higgins |
| 8,560,517 B2 | 10/2013 | Yang |

| | | |
|---|---|---|
| 8,583,620 B2 | 11/2013 | Govindachetty |
| 8,583,668 B2 | 11/2013 | Higgins |
| 8,589,389 B2 | 11/2013 | Bisdikian |
| 8,589,486 B2 | 11/2013 | Martinez |
| 8,594,702 B2 | 11/2013 | Naaman |
| 8,606,021 B2 | 12/2013 | Conwell |
| 8,626,699 B2 | 1/2014 | Xie |
| 8,671,154 B2 | 3/2014 | Davis |
| 8,676,001 B2 | 3/2014 | Brucher |
| 8,706,406 B2 | 4/2014 | Kalaboukis |
| 8,745,133 B2 | 6/2014 | Martinez |
| 8,762,285 B2 | 6/2014 | Davis |
| D708,196 S | 7/2014 | Pasceri |
| D708,197 S | 7/2014 | Pasceri |
| D708,198 S | 7/2014 | Pasceri |
| 8,769,099 B2 | 7/2014 | Kalaboukis |
| 8,769,393 B1 | 7/2014 | Abhyanker |
| 8,799,371 B2 | 8/2014 | Davis |
| 8,805,165 B2 | 8/2014 | Luo |
| 8,806,365 B2 | 8/2014 | Stapleton |
| 8,810,597 B2 | 8/2014 | Akiya |
| 8,813,107 B2 | 8/2014 | Higgins |
| 8,825,472 B2 | 9/2014 | Raghuveer |
| 8,831,352 B2 | 9/2014 | Gao |
| 8,849,854 B2 | 9/2014 | Kakarla |
| 8,849,909 B2 | 9/2014 | Farmer |
| D715,819 S | 10/2014 | Pasceri |
| 8,880,568 B2 | 11/2014 | Perczynski |
| 8,890,888 B2 | 11/2014 | Lee |
| 8,892,495 B2 | 11/2014 | Hoffberg |
| 8,914,342 B2 | 12/2014 | Kalaboukis |
| 8,923,889 B2 | 12/2014 | Svendsen |
| 8,930,848 B2 | 1/2015 | Lim |
| 8,949,212 B1 | 2/2015 | Dhandapani |
| 8,954,425 B2 | 2/2015 | Xiao |
| 8,966,121 B2 | 2/2015 | Josefsberg |
| 8,972,177 B2 | 3/2015 | Zheng |
| 8,998,422 B1 | 4/2015 | Snavely |
| 9,009,177 B2 | 4/2015 | Zheng |
| 9,014,511 B2 | 4/2015 | Brucher |
| 9,015,617 B2 | 4/2015 | Stapleton |
| 9,015,633 B2 | 4/2015 | Takamura |
| 9,020,247 B2 | 4/2015 | Adam |
| 9,031,953 B2 | 5/2015 | Rathnavelu |
| 9,032,320 B2 | 5/2015 | Crawford |
| 9,055,037 B2 | 6/2015 | Evans |
| 9,063,226 B2 | 6/2015 | Zheng |
| 9,076,259 B2 | 7/2015 | Hourie |
| 9,092,409 B2 | 7/2015 | Charaniya |
| 9,098,545 B2 | 8/2015 | Abhyanker |
| 9,104,729 B2 | 8/2015 | Dong |
| 9,104,915 B2 | 8/2015 | Conwell |
| 9,110,903 B2 | 8/2015 | Martinez |
| 9,151,618 B2 | 10/2015 | Amer-Yahia |
| 9,158,794 B2 | 10/2015 | Higgins |
| 9,160,802 B2 | 10/2015 | Svendsen |
| 9,172,666 B2 | 10/2015 | Murdock |
| 9,202,200 B2 | 12/2015 | Stibel |
| 9,218,328 B2 | 12/2015 | Stapleton |
| 9,224,172 B2 | 12/2015 | Churchill |
| 9,235,766 B2 | 1/2016 | Li |
| 9,239,848 B2 | 1/2016 | Liu |
| 9,245,041 B2 | 1/2016 | Pilskalns |
| 9,261,376 B2 | 2/2016 | Zheng |
| D751,597 S | 3/2016 | Pasceri |
| 9,311,396 B2 | 4/2016 | Meadow |
| 9,336,240 B2 | 5/2016 | Bhatt |
| 9,372,931 B2 | 6/2016 | Capt |
| 9,390,104 B2 | 7/2016 | Thomee |
| 9,405,981 B2 | 8/2016 | Li |
| 9,418,485 B2 | 8/2016 | Lindberg |
| 9,424,595 B2 | 8/2016 | Svendsen |
| 9,460,116 B2 | 10/2016 | Pilskalns |
| 9,462,054 B2 | 10/2016 | Poletto |
| 9,465,513 B2 | 10/2016 | Sims |
| 9,471,834 B1 | 10/2016 | Filip |
| 9,483,500 B2 | 11/2016 | Brucher |
| 9,501,577 B2 | 11/2016 | Zheng |
| 9,507,778 B2 | 11/2016 | Jaffe |

Petitioner Apple Inc. - Ex. 1001, p. 2

**US 10,621,228 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,519,682 | B1 | 12/2016 | Pujara |
| 9,535,563 | B2 | 1/2017 | Hoffberg |
| 9,536,146 | B2 | 1/2017 | Zheng |
| 9,552,376 | B2 | 1/2017 | Desmond |
| 9,557,162 | B2 | 1/2017 | Rodriguez |
| 9,576,253 | B2 | 2/2017 | Zaltzman |
| 9,582,546 | B2 | 2/2017 | Hartford |
| 9,593,957 | B2 | 3/2017 | Zheng |
| 9,600,484 | B2 | 3/2017 | Davis |
| 9,626,685 | B2 | 4/2017 | Martinez |
| 9,646,025 | B2 | 5/2017 | Boyns |
| 9,654,570 | B2 | 5/2017 | Bisdikian |
| 9,674,650 | B2 | 6/2017 | Hartford |
| 9,679,456 | B2 | 6/2017 | East |
| 9,680,929 | B2 | 6/2017 | Tseng |
| 9,683,858 | B2 | 6/2017 | Zheng |
| 9,691,073 | B2 | 6/2017 | Tseng |
| 9,706,345 | B2 | 7/2017 | Davis |
| 9,710,961 | B2 | 7/2017 | Setlur |
| 9,721,188 | B2 | 8/2017 | Adam |
| 9,754,226 | B2 | 9/2017 | Zheng |
| 9,772,745 | B2 | 9/2017 | Hasenei |
| 9,787,799 | B2 | 10/2017 | Grue |
| 9,805,123 | B2 | 10/2017 | Nair |
| 9,811,879 | B2 | 11/2017 | Miller |
| 9,858,348 | B1 | 1/2018 | Higgins |
| 9,870,572 | B2 | 1/2018 | Chapin |
| 9,881,179 | B2 | 1/2018 | Patton |
| 9,882,994 | B2 | 1/2018 | Bisdikian |
| 9,942,121 | B2 | 4/2018 | Poletto |
| 10,019,850 | B2 | 7/2018 | Lindberg |
| 10,037,327 | B2 | 7/2018 | Thomee |
| 10,068,178 | B2 | 9/2018 | van Zwol |
| 10,074,093 | B2 | 9/2018 | Higgins |
| 10,083,533 | B2 | 9/2018 | Bhatt |
| 10,110,541 | B2 | 10/2018 | Li |
| 10,187,543 | B2 | 1/2019 | Lahcanski |
| 10,223,701 | B2 | 3/2019 | King |
| 10,230,803 | B2 | 3/2019 | Higgins |
| 10,235,444 | B2 | 3/2019 | Poletto |
| 10,242,051 | B2 | 3/2019 | Shinn |
| 10,282,752 | B2 | 5/2019 | Athsani |
| 10,288,433 | B2 | 5/2019 | Zheng |
| 10,289,643 | B2 | 5/2019 | Brucher |
| 10,303,975 | B2 | 5/2019 | Adam |
| 10,311,611 | B2 | 6/2019 | Stoop |
| 10,318,110 | B2 | 6/2019 | Naaman |
| 10,331,863 | B2 | 6/2019 | Patton |
| 10,360,352 | B2 | 7/2019 | Patton |
| 10,430,452 | B2 | 10/2019 | Ross |
| 10,445,346 | B2 | 10/2019 | Govindachetty |
| 2005/0060299 | A1 | 3/2005 | Filley |
| 2006/0165380 | A1* | 7/2006 | Tanaka .................. G11B 27/34 |
| | | | 386/227 |
| 2007/0118508 | A1 | 5/2007 | Svendsen |
| 2007/0282908 | A1 | 12/2007 | Van Der Meulen |
| 2008/0040034 | A1 | 2/2008 | Kanno |
| 2008/0051994 | A1 | 2/2008 | Fisher |
| 2008/0148175 | A1 | 6/2008 | Naaman |
| 2008/0201302 | A1 | 8/2008 | Kimchi |
| 2008/0250398 | A1 | 10/2008 | Takahashi |
| 2009/0013041 | A1 | 1/2009 | Farmer |
| 2009/0019085 | A1 | 1/2009 | Abhyankar |
| 2009/0049408 | A1 | 2/2009 | Naaman |
| 2009/0106705 | A1 | 4/2009 | Takamura |
| 2009/0113350 | A1* | 4/2009 | Hibino .................. G06F 16/41 |
| | | | 715/853 |
| 2009/0132689 | A1 | 5/2009 | Zaltzman |
| 2009/0132941 | A1 | 5/2009 | Pilskalns |
| 2009/0135438 | A1 | 5/2009 | Chopra |
| 2009/0216704 | A1 | 8/2009 | Zheng |
| 2009/0222302 | A1 | 9/2009 | Higgins |
| 2009/0254867 | A1 | 10/2009 | Farouki |
| 2009/0265631 | A1 | 10/2009 | Sigurbjornsson |
| 2009/0279794 | A1 | 11/2009 | Brucher |

| | | | |
|---|---|---|---|
| 2009/0288005 | A1 | 11/2009 | Stapleton |
| 2009/0290812 | A1 | 11/2009 | Naaman |
| 2009/0307618 | A1 | 12/2009 | Lawler |
| 2009/0325602 | A1 | 12/2009 | Higgins |
| 2010/0044419 | A1 | 2/2010 | Svendsen |
| 2010/0046842 | A1 | 2/2010 | Conwell |
| 2010/0053371 | A1 | 3/2010 | Karimoto |
| 2010/0064239 | A1 | 3/2010 | Crawford |
| 2010/0082427 | A1 | 4/2010 | Burgener |
| 2010/0107125 | A1 | 4/2010 | Ockene |
| 2010/0153348 | A1 | 6/2010 | Perczynski |
| 2010/0162411 | A1 | 6/2010 | Chang |
| 2010/0171763 | A1 | 7/2010 | Bhatt |
| 2010/0182341 | A1 | 7/2010 | Lee |
| 2010/0185509 | A1 | 7/2010 | Higgins |
| 2010/0241689 | A1 | 9/2010 | Davis |
| 2010/0241944 | A1 | 9/2010 | Athsani |
| 2010/0268717 | A1 | 10/2010 | Pilskalns |
| 2010/0268766 | A1 | 10/2010 | Bouget |
| 2010/0280913 | A1 | 11/2010 | O'Sullivan |
| 2010/0293035 | A1 | 11/2010 | Athsani |
| 2010/0293193 | A1 | 11/2010 | Harrison |
| 2011/0040779 | A1 | 2/2011 | Svendsen |
| 2011/0093458 | A1 | 4/2011 | Zheng |
| 2011/0109769 | A1 | 5/2011 | Bhatt |
| 2011/0113064 | A1 | 5/2011 | Govindachetty |
| 2011/0145258 | A1 | 6/2011 | Kankainen |
| 2011/0191014 | A1 | 8/2011 | Feng |
| 2011/0191253 | A1 | 8/2011 | Pilskalns |
| 2011/0202267 | A1 | 8/2011 | Amer-Yahia |
| 2011/0208426 | A1 | 8/2011 | Zheng |
| 2011/0289031 | A1 | 11/2011 | Zheng |
| 2011/0301832 | A1 | 12/2011 | Zheng |
| 2011/0314016 | A1 | 12/2011 | Svendsen |
| 2012/0114249 | A1 | 5/2012 | Conwell |
| 2012/0158755 | A1 | 6/2012 | Gammill |
| 2012/0218150 | A1 | 8/2012 | Oyabu |
| 2012/0220311 | A1 | 8/2012 | Rodriguez |
| 2012/0251011 | A1 | 10/2012 | Gao |
| 2012/0266090 | A1 | 10/2012 | Nealer |
| 2012/0278171 | A1 | 11/2012 | Tang |
| 2012/0278767 | A1 | 11/2012 | Stibel |
| 2012/0329441 | A1 | 12/2012 | Tseng |
| 2012/0331091 | A1 | 12/2012 | Tseng |
| 2013/0018881 | A1 | 1/2013 | Bhatt |
| 2013/0036165 | A1 | 2/2013 | Tseng |
| 2013/0063613 | A1 | 3/2013 | Conwell |
| 2013/0073202 | A1 | 3/2013 | Tseng |
| 2013/0101157 | A1 | 4/2013 | Li |
| 2013/0138685 | A1 | 5/2013 | Brucher |
| 2013/0141612 | A1 | 6/2013 | Bhatt |
| 2013/0151597 | A1 | 6/2013 | Akiya |
| 2013/0202198 | A1 | 8/2013 | Adam |
| 2013/0275536 | A1 | 10/2013 | Murdock |
| 2013/0339440 | A1 | 12/2013 | Balassanian |
| 2014/0059477 | A1 | 2/2014 | Wong |
| 2014/0071272 | A1 | 3/2014 | Rodriguez |
| 2014/0089811 | A1 | 3/2014 | Meadow |
| 2014/0101531 | A1 | 4/2014 | Capt |
| 2014/0101601 | A1 | 4/2014 | Tang |
| 2014/0143247 | A1 | 5/2014 | Rathnavelu |
| 2014/0149036 | A1 | 5/2014 | Amer-Yahia |
| 2014/0181089 | A1 | 6/2014 | Desmond |
| 2014/0188880 | A1 | 7/2014 | Abhyanker |
| 2014/0193087 | A1 | 7/2014 | Conwell |
| 2014/0354628 | A1 | 12/2014 | Lindberg |
| 2015/0039630 | A1 | 2/2015 | Thomee |
| 2015/0070165 | A1 | 3/2015 | Miller |
| 2015/0070397 | A1 | 3/2015 | Miller |
| 2015/0116540 | A1 | 4/2015 | Gilman |
| 2015/0117713 | A1 | 4/2015 | Zheng |
| 2015/0156247 | A1 | 6/2015 | Hensel |
| 2015/0186389 | A1 | 7/2015 | Zheng |
| 2015/0213057 | A1 | 7/2015 | Brucher |
| 2015/0213329 | A1 | 7/2015 | Adam |
| 2015/0244794 | A1 | 8/2015 | Poletto |
| 2015/0244833 | A1 | 8/2015 | Grue |
| 2015/0358224 | A1 | 12/2015 | Poletto |
| 2016/0092741 | A1 | 3/2016 | Li |

Petitioner Apple Inc. - Ex. 1001, p. 3

**US 10,621,228 B2**

Page 4

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

| 2016/0162512 | A1 | 6/2016 | Battistini |
| 2016/0247307 | A1 | 8/2016 | Stoop |
| 2016/0253358 | A1 | 9/2016 | Bhatt |
| 2016/0314187 | A1 | 10/2016 | Poletto |
| 2016/0321269 | A1 | 11/2016 | Thomee |
| 2016/0328444 | A1 | 11/2016 | Shinn |
| 2016/0344888 | A1 | 11/2016 | Lahcanski |
| 2017/0024415 | A1 | 1/2017 | Brucher |
| 2017/0103081 | A1 | 4/2017 | Jones |

FOREIGN PATENT DOCUMENTS

| EP | 2410014 | B1 | 10/2019 |
| WO | WO 2011/070225 | A1 | 6/2011 |
| WO | WO 2013/019376 | A1 | 2/2013 |
| WO | WO 2013/099704 | A1 | 7/2013 |

OTHER PUBLICATIONS

Miller et al., "Give and take: a study of consumer photo-sharing culture and practice," CHI '07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 347-356, 2007 (10 pages).

Ames et al., "Why we tag: motivations for annotation in mobile and online media," CHI '07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 971-980, ACM, 2007 (10 pages)10083533.

Yee et al., "Faceted Metadata for Image Search and Browsing", CHI 2003, pp. 401-408, 2003, ACM.

Ferre, "CAMELIS: Organizing and Browsing a Personal Photo Collection with a Logical Information System", Int. Conf. Concept Lattices and Their Applications, pp. 112-123, 2007, HAL.

Tomasson et al., "PhotoCube: Effective and Efficient Multi-Dimensional Browsing of Personal Photo Collections", ICMR '11, 2011, ACM.

Bartolini et al., "Integrating Semantic and Visual Facets for Browsing Digital Photo Collections", SBED, pp. 65-72, 2009.

Trattner et al., "Evaluating Tag-Based Information Access in Image Collections", Proceedings of the 23rd ACM Conference on Hypertext and Social Media, pp. 113-122, 2012 ACM.

Kang et al., "Capture, Annotate, Browse, Find, Share: Novel Interfaces for Personal Photo Management", International Journal of Human-Computer Interaction, 23(3), pp. 315-337, 2007, Lawrence Eribaum Associates, Inc.

Jaffe et al., "Generating Summaries and Visualization for Large Collections of GeoReferenced Photographs", MIR'06, pp. 89-98, 2006 ACM.

Torniai et al., "Sharing, Discovering and Browsing Geotagged Pictures on the Web", 2007, Hewlett-Packard Development Company, L.P., pp. 1-18 (19 pages).

Snavely et al., "Photo Tourism: Exploring Photo Collection in 3D", SIGGRAPH '06 ACM Transactions on Graphics, vol. 25, Issue 3, pp. 835-846, 2006 ACM.

Kisilevich et al., "Event-based analysis of People's Activities and Behavior Using Flickr and Panoramic Geotagged Photo Collections", 14th International Conference Information Visualization, pp. 289-296, 2010 IEEE.

Ahern et al., "World Explorer: Visualizing Aggregate Data From Unstructured Text in Geo-Referenced Collections", JCDL'07, pp. 1-10, 2007, ACM.

Kopf et al., "Deep photo: model-based photograph enhancement and viewing", ACM Transactions on Graphics, vol. 27, No. 5, Article 116, Dec. 2008, ACM (10 pages).

Amundsen, J.; "Using the Geographical Location of Photos in Mobile Phones"; Master of Science in Computer Science submission; Norwegian University of Science and Technology; Jul. 2008 (112 pages).

Gentile, I.; "Using Flickr Geotags to Find Similar Tourism Destinations"; master thesis, 2011; Politecnico di Milano, Dept. of Computer Engineering (96 pages).

Hollenstein, L.; "Capturing Vernacular Geography from Georeferenced Tags"; Master Thesis; Institute of Geography, University of Zurich; Nov. 2008 (139 pages).

Nutanong, S. et al.; "An Efficient Layout Method for a Large Collection of Geographic Data Entries"; Center for Automation Research, Institute for Advanced Computer Studies, Dept. of Computer Science, University of Maryland; pp. 717-720 (4 pages).

Slingsby, A. et al.; "Interactive tag maps and tag clouds for the multiscale exploration of large spatio-temporal datasets"; Information Visualization, pp. 497-504; 2007, IV '07. 11th International Conference. ISSN: 1550-6037 (9 pages).

Hoffman, A.; "Create Great iPhone Photos: Apps, Tips, Tricks, and Effects"; copyright 2011; ISBN-10: 1-59327-285-5, ISBN-13: 978-1-59327-285-2 (216 pages).

Chen, Y-F. et al.; "GeoTracker: Geospatial and Temporal RSS Navigation"; AT&T Labs—Research, Florham Park, NJ; WWW 2007 / Track: Browsers and User Interfaces, Session: Smarter Browsing, pp. 41-50 (10 pages).

Goodman, E.; "Destination Services: Tourist media and networked places"; School of Information, UC Berkeley; Mar. 2, 2007 (11 pages).

Rattenbury, T. et al.; "Towards Automatic Extraction of Event and Place Semantics from Flickr Tags"; SIGIR '07, Jul. 23-27, 2007; Amsterdam, The Netherlands; ACM 978-1-59593-597-7/07/0007 (8 pages).

Kadar, B. et al.; "Where Do Tourists Go? Visualizing and Analysing the Spatial Distribution of Geotagged Photography"; Cartographica 48:2, pp. 78-88; 2013; University of Toronto Press; doi: 10.3138/carto.48.2.1839 (11 pages).

Kennedy, L. et al.; "How Flickr Helps Us Make Sense of the World: Context and Content in Community-Contributed Media Collections"; MM '07, Sep. 23-28, 2007; Augsburg, Bavaria, Germany; Copyright 2007; ACM 978-1-59593-701-8/07/0009 (10 pages).

Richard, G. et al.; "Geotagging Photographs for Distribution on the Web"; Mineral Physics Institute, Earth and Space Sciences Building, Stony Brook University, Stony Brook. NY; date unknown (9 pages).

* cited by examiner

Petitioner Apple Inc. - Ex. 1001, p. 4

# FIG. 1



Petitioner Apple Inc. - Ex. 1001, p. 5

**FIG. 2**





Comments:
Suzanne and Anthony's Wedding Party where the cousins posed for a photo in the grass.  Note, Jack with the lollipop and the photographer with his shoe in the photo

People:
Jack Wong
CJ Wong
Mary Firestone
Zoe Peika
Nick Persons

Event: Suzanne & Anthony's Wedding Reception 2010

Camera Details: more

Location:
Historical Society
Lisle, IL 60532

Petitioner Apple Inc. - Ex. 1001, p. 6

**FIG. 3**



Petitioner Apple Inc. - Ex. 1001, p. 7

# FIG. 4



Petitioner Apple Inc. - Ex. 1001, p. 8

**FIG. 5**



Petitioner Apple Inc. - Ex. 1001, p. 9

**FIG. 6**



Petitioner Apple Inc. - Ex. 1001, p. 10

**FIG. 7**



**Clinton Dewitt Firestone IV**

Birth:       July 12, 1896
Death:       April 29, 1971
Parents:     Clinton Dewitt Firestone III and Viola Miller
Comments:   He was a WWII U.S. Air force pilot and POW in WWII and veteran
honorably discharged in December of 1947. He worked for 44 years for the
Firestone Tire and Rubber Company in retail, wholesale and original equipment
sales, marketing and management. He was born in Akron, OH and is buried in
Columbiana, OH.

Edit bio

Locations          Timeline          Family Tree          Recipes





Petitioner Apple Inc. - Ex. 1001, p. 11

**FIG. 8**



Petitioner Apple Inc. - Ex. 1001, p. 12

**FIG. 9**



Petitioner Apple Inc. - Ex. 1001, p. 13

# FIG. 10



**Desmond's Yellow Thai Chicken Curry**

Curry Mix
- Coconut milk (400 ml) – DO NOT SHAKE IT UP
- 800 gram of chicken (4 chicken breast)
- Fish sauce (Nam Pla) Thai Bamboo Garden – Bottle
- Garlic (2 cloves)
- Broccoli ( 2cups chopped)
- 2 Peppers (chopped)
- 2 Carrots (chopped)

- 1 Zucchini (chopped)
- Thai Basil (8 leaves)
- Lemon Grass (in jar) 1 teaspoon
- Chinese Ginger Root (in jar) 1 teaspoon

Rice
- Thai Rice (something that only takes 2 cups of water)
- Dice chicken in bowl and add two tablespoons of fish sauce. Let marinate for 20 minutes.
- Take thick part of coconut milk out into pan (about 4 tablespoons), Curry paste, 1 spoon of lemon grass, 1 spoon of ginger and garlic. Heat over high with boil and THEN stir for 1 minute. Add meat (uncooked) and fry until cooked over high heat
- Add milk, brown sugar and salt. Bring back to slight boil and constantly stir. Add veggies and soy sauce. Cook for about 10-14 minutes COVERED until veggies are cooked. Serve with a smile.

Chef: Barry Desmond



Video on How to Make It



Original Handwritten Recipe

Petitioner Apple Inc. - Ex. 1001, p. 14

# FIG. 11

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 15

## FIG. 12

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 16

**U.S. Patent**　　Apr. 14, 2020　　Sheet 13 of 50　　US 10,621,228 B2

## FIG. 13

Thumbnail | Table

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| + Alberts | 2 | 8 | 0 | 0 |
| + Annex | 2 | 7 | 0 | 0 |
| + Bade | 3 | 8 | 0 | 0 |
| + Bacon | 4 | 8 | 0 | 0 |
| + Bates | 5 | 7 | 1 | 0 |
| + Boone | 6 | 6 | 2 | 2 |
| + Danas | 7 | 5 | 4 | 1 |
| + Danes | 8 | 7 | 3 | 2 |
| - Monk (All) | 2 | 499 | 4 | 14 |
| Monk, CJ | 1 | 200 | 2 | 7 |
| Monk, Jack | 1 | 199 | 2 | 7 |
| + Firestone | 21 | 1249 | 17 | 39 |
| + Moore | 1 | 4 | 6 | 3 |
| + Slythe | 1 | 9 | 0 | 9 |
| + Stein | 2 | 249 | 1 | 3 |
| + Testy | 4 | 788 | 2 | 12 |

Petitioner Apple Inc. - Ex. 1001, p. 17

# FIG. 14

Thumbnail | Table

| Last Name | Relationship | # Photos | # Videos | # Docs |
|-----------|-------------|----------|----------|--------|
| Alberts, John | Cousin | 8 | 0 | 0 |
| Killian, Jack | Son | 7 | 0 | 0 |
| Killian, Brian | Nephew | 8 | 0 | 0 |
| Killian, Kevin | Nephew | 8 | 0 | 0 |
| Killian, Sarah | Daughter-in-law | 7 | 1 | 0 |
| Killian, John | Great Nephew | 6 | 2 | 2 |
| Killian, Mark | Great Nephew | 5 | 4 | 1 |
| Killian, Louis | Great Grandson | 7 | 3 | 2 |
| Killian, John | Grandson | 499 | 4 | 14 |
| Monk, CJ | Great Grandson | 200 | 2 | 7 |
| Monk, Jack | Great Grandson | 199 | 2 | 7 |
| Firestone, Mike | Third Cousin | 1249 | 17 | 39 |
| Moore, Bertha | Great Niece | 4 | 6 | 3 |
| Slythe, Sarah | Sister | 9 | 0 | 9 |
| Killian, John | Brother | 249 | 1 | 3 |
| Killian, Mike | Brother | 788 | 2 | 12 |

Petitioner Apple Inc. - Ex. 1001, p. 18

## FIG. 15

Thumbnail | Table

| Location Name | Address | City | State | Country | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|---|---|
| Dom | | Cologne | | Germany | 3 | 2 | 0 |
| Lucilla & Roberto | | Montalcino | | Italy | 6 | 1 | 0 |
| Lisle Home | 898 West St | Lisle | IL | USA | 45 | 12 | 2 |
| College | 545 Market | Akron | OH | USA | 64 | 2 | 0 |
| Amazon Trip | | Manus | | Brazil | 235 | 8 | 2 |
| Cabin | 999 Pine | Lake Geneva | WI | USA | 98 | 2 | 0 |
| Grad School | 903 Plymouth | Charleston | IL | USA | 1256 | 32 | 4 |
| Griffith Park | 298 Glencarin | Los Feliz | CA | USA | 12 | 0 | 0 |
| LA Equestrian Ctr | 568 Horse Dr | Glendale | CA | USA | 4 | 4 | 0 |
| Del Coronado | 12 Coronado Dr | Coronado | CA | USA | 321 | 4 | 0 |
| Fenway Park | 123 Yawke | Boston | MA | USA | 57 | 3 | 5 |
| Wrigley Field | 1190 W Addison | Chicago | IL | USA | 498 | 7 | 3 |
| Home | 444 Main | Anywhere | IL | USA | 10,987 | 49 | 9 |
| GA Grill Party | 321 Silver | Macon | GA | USA | 15 | 0 | 0 |
| Pike's Market | 786 Market | Seattle | WA | USA | 18 | 1 | 0 |
| Raffels | 345 Fong | Singapore | | Singapore | 23 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 19

**FIG. 16**

Category | Card | Table

| Recipe | Chef | Date | Category |
|--------|------|------|----------|
| Blacks Yellow Thai Chicken Curry | Jack Black | 31 Jan 2010 | Dinner |
| Skinny Germans | Gerda | 29 Dec 2003 | Breakfast |
| KFC in a Bag | The Kernal | 13 Sept 1988 | Anytime |
| Shit on a Shingle | George James | 5 Aug 1998 | Anytime |
| Mrs. Fields Cookies | Mrs. Fields | 21 July 1978 | Dessert |
| Chicken Pot Pie | Jack Black | 31 Jan 2010 | Dinner |
| Roll Your Own Dough | Vito Spadavecchio | 29 Dec 2003 | Dinner |
| Pizza ala Franciscan | Charles Faso | 13 Sept 1988 | Dinner |
| Meatball Delight | Ben Delight | 5 Aug 1998 | Dinner |
| Almond Cookies | Lori James | 21 July 1978 | Dessert |
| Jumpin Jack Flap Jacks | Jack Jack | 31 Jan 2010 | Breakfast |
| Vicki's Chow Mein | Vicki Firestone | 29 Dec 2003 | Dinner |
| Fat Steak | Barry Monk | 13 Sept 1988 | Dinner |
| Mud Pie | Nancy Monk | 5 Aug 1998 | Dessert |
| Caesar Salad | Christopher Monk | 21 July 1978 | Anytime |
| Daddio Pancakes | Barry Monk | 2 March 2011 | Breakfast |

Petitioner Apple Inc. - Ex. 1001, p. 20

**FIG. 17**



Petitioner Apple Inc. - Ex. 1001, p. 21

**FIG. 18**



Petitioner Apple Inc. - Ex. 1001, p. 22

# FIG. 19

**Captain Phil's Memory-Webb**

Welcome, Captain Phil
Last Login:     11.18.2010

**My recent memories:**
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10
- 12 visitors since last login date
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10

**My recent Webb views:**
- Captain Phil 2010 (photo album)
- Chicken Pot Pie (recipe)
- Captain Phil (Timeline)

**Updates and Alerts:**
- License renewal due 1.15.2011

| Media | Count | Archive Status | Count |
|---|---|---|---|
| # Photos | 1,342 | | 80% complete |
| # Videos | 75 | | 61% complete |
| # Documents | 173 | | |

**People Stats:**

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Monk | 7 | 499 | 4 | 14 |
| Firestone | 11 | 1,249 | 17 | 39 |
| Testy | 4 | 788 | 1 | 12 |

**Event Stats:**

| Event | Date | Location | # Media |
|---|---|---|---|
| Mike Testy's 1st Birthday | 13-Sept-1988 | Minneapolis, MN | 21 |
| Cubs Beat Cards Aug 1998 | 5-Aug-1998 | Chicago, IL | 2,199 |
| Nancy Learns to Ride Bike | 21-July-1978 | St. Louis, MO | 2 |

Petitioner Apple Inc. - Ex. 1001, p. 23

**FIG. 20**



Petitioner Apple Inc. - Ex. 1001, p. 24

**FIG. 21**



Petitioner Apple Inc. - Ex. 1001, p. 25

## FIG. 22



**EXIF Tags version 2.3 Image File Directories (Data Blocks)** 0320

**MemoryWeb_Tag (Data Blocks)** 0360

| Tag Labels 0321 | EXIF Family Group Name 0322 | Location 0323 | MemoryWeb Tag 0361 |
|---|---|---|---|
| | | | |
| Description Title | IFD0 | 0x9c9b or 0x010e | MediaAsset.Caption — 0362 |
| Description Subject | IFD0 | 0x9c9f | |
| Description Rating | | N/A | MediaAsset.StarRanking — 0363 |
| Description Tags | IFD0 | 0x9c9e | |
| Description Comments | IFD0 | 0x9c9c | |
| Origin Authors | IFD0 | 0x9c9d | |
| Origin Date Taken | ExifIFD 0334 | 0x9003 0335 | MediaAsset.DateCreated — 0364 |
| Origin Date Acquired | | N/A | |
| Origin Copyright | IFD0 | 0x8298 | |
| *Image (Image ID, Dimensions, Width Height, etc)* | | *Multiple* | |
| Width | | 0xbc80 | MediaAsset.Width — 0365 |
| Height | | 0xbc81 | MediaAsset.Height — 0366 |
| *Camera (Camera Maker, Camera Model, etc)* | | *Multiple* | |
| *Advanced Photo (Lens Maker, Lens Model, etc)* | | *Multiple* | |
| User Comment | ExifIFD | 0x9286 | This is used to inject information that do not currently have EXIF standardized tags including Collection, People, Location Name, Recipe Name, Person Tag Data Blocks (0380), etc. — 0367 |
| GPS Latitude | GPS | 0x0002 | MediaAsset.Location.Latitude — 0368 |
| GPS Latitude Ref | GPS | 0x0003 | MediaAsset.Location.Latitude — 0369 |
| GPS Longitude | GPS | 0x0004 | MediaAsset.Location.Longitude — 0370 |
| GPS Longitude Ref | GPS | 0x0005 | MediaAsset.Location.Longitude — 0371 |
| GPS Altitude | GPS | 0x0006 | |

Row labels on left: 0324, 0325, 0326, 0327, 0328, 0329, 0330, 0331, 0332, 0333

Petitioner Apple Inc. - Ex. 1001, p. 26

**FIG. 23**



Petitioner Apple Inc. - Ex. 1001, p. 27

**FIG. 24**



Petitioner Apple Inc. - Ex. 1001, p. 28

FIG. 25

0400
0401
Third Party Facial Recognition Provider
Outside MW System
Inside MW System
Start
0402
System request for thumbnails of all Digital Files that have unconfirmed faces
0300
User Relationship Table
0403
Retrieves Thumbnails of all Digital Files that have unconfirmed faces
0404
System sends Digital Files to Third Party Facial Recognition Provider
0405
System receives response from Third Party Facial Recognition Provider
0406
System parses identified faces and corresponding Facial Recognition data for each Digital File
0407
Existing (Trained) Face ID in User Relationship Table?
Yes
No
0408
Is Face Recognition above score threshold?
Yes
No
0409
System records and associates specific face for Digital File with a MemoryWeb Person ID and sends to MemoryWeb Person Tag (Data Blocks) in User Relationship Table
0410
System generates facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table
0411
System generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table

FIG. 26

0500
0501
Third Party Media Provider
Outside MW System
Inside MW System
0503
Systems sends registration confirmation
0504
Systems receives registration confirmation, Third Party Media ID
0507
System receives contact names and IDs from Third Party Media Provider (daily)
0502
User selects sharing of their information with Third Party Media Provider with MemoryWeb
Start
0505
System sends registration information to User Setting Table?
0506
System requests contact names and IDs from Third Party Media Provider (daily)
0508
Is Person a Match
Yes
No
0509
System associates existing Person to Tag Data Block of Relationship Table for Digital File
0510
System add new person to Tag Data Block of Relationship Table for Digital File
0300
User Relationship Table
User Settings Table
1900
1000
Share to Third Party Media Provider System

**FIG. 27**



1900

| Item |
|------|
| User's Name |
| Payment ID |
| Password |
| Account Type |
| User's email |
| Language preference |
| Date format |
| Email notifications |
| Contacts (with third Party Social Media) |
| Facebook ID |
| API Token |
| Payment Date |
| ... |

1901
1902
1903
1904
1905
1906
1907
1908
1909
1910
1911
1912
1913

Petitioner Apple Inc. - Ex. 1001, p. 31

**FIG. 28**

Start
User selects Digital File in MW
0601
System sends request to Relationship Table for specific Digital File
0602
User Relationship Table
0300
System retrieves Digital File and Digital File Tag Data Blocks from User Relationship Table
0603
System will display the Digital File and the corresponding Digital File Tag Data Blocks in the form of Application Dot-Tags
0604
User selects Application Dot-Tag
0605
Continuous Link of Application Dot-Tag System
0700
0600
User selects add for a MemoryWeb Tag
0606
Tag data exists?
0607
Yes
No
User selects matching MemoryWeb Tag
0608
User adds New MemoryWeb Tag
0609
System associates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0610
System creates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0611
User selects edit for a MemoryWeb Application Dot-Tag
0612
Tag data exists?
0613
User selects matching MemoryWeb Tag
0614
User adds New MemoryWeb Tag
0615
System associates existing MemoryWeb Tag to Tag Data Block of Relationship Table for Digital File
0616
System creates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0617
User selects delete for a MemoryWeb Application Dot-Tag
0618
System deletes association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0619

Case: 23-2361     Document: 33     Page: 339     Filed: 07/02/2024

## FIG. 29

**Structure**

0650

0651

0653

0652

### User Defined Tag Label

**####**

**Examples**

0654

Within Character Limit for Labels and Numbers

**453** Cologne Germany

0655

Exceeds Character Limit for Labels and Numbers

**>999** Holiday Photos from ...

0657

0658



0656

**45** Frank Smith

Dotted Application Dot-Tag denotes partial relationship. In this example, person is a half-sibling to another person.

Petitioner Apple Inc. - Ex. 1001, p. 33

FIG. 30

Start
User selects Application Dot-Tag
0700
0716
Displays Image in Slideshow view
0701
0702
Is Person Dot-Tag?
Yes
No
0703
Is Collection Dot-Tag?
Yes
No
0704
Is Location Dot-Tag?
Yes
No
0705
Is Date Dot-Tag?
Yes
No
0706
Is Recipe Dot-Tag?
Yes
No
0707
...
Yes
0708
System sends request to Relationship Table
User Relationship Table
0300
0709
If Person Application Dot-Tag, system retrieves data for that person from User's User Relationship Table and displays relationship data in People Profile View
0710
If Collection Application Dot-Tag, system retrieves data from that collection from User's User Relationship Table and displays relationship data in Collection View
0711
If Location Application Dot-Tag, system retrieves data from that Location from User's User Relationship Table and displays relationship data in individual Location View
0712
If date Application Dot-Tag, system retrieves data from that date from User's User Relationship Table and displays relationship data in Uploads View
0713
If Recipe Application Dot-Tag, system retrieves data from that Recipe from User's User Relationship Table and displays relationship data in Recipe View
0714
...
Yes
0715
Is Image Selected?
No
0717
User selects Application Dot-Tag



FIG. 31

Case: 23-2361    Document: 33    Page: 341    Filed: 07/02/2024

Petitioner Apple Inc. - Ex. 1001, p. 35

Appx553

FIG. 32

Multiple People Application View
1401
1450
1451
1400
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
Sort By:
Newest to Oldest
1402
Jon Smith
Jane Smith (Doe)
Jackson Smith
JC Jon Smith
1405
Page:
1
1403
1404
Items Per Page:
20
50
100
1430
Single People Profile Application View
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
< View all People
1432
1431—JC Jon Smith
Edit
1447
1453
1454
1433—Nicknames: Chip
1434—Born: 5 1/1/2004
1448
1449
1435—Parents: 4 Jon Smith and 4 Jane Smith (Doe)
1436—Siblings: 5 Jackson Smith
1437—Children:
1438—Biography: JC was named after his great, great grandfather from German who's real name was Johan Christoph.
1439
JC Tags:
1452
1441
1442
1443
1444
1445
4 Photos
3 Collections
2 Facial Recognitions
3 Locations
7 Family Relationships
1 Recipe
Change Profile Photo
1440
1446
Items Per Page:
Page:
1
20
50
100

FIG. 33

Multiple Collection View
1501
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
1500
Sort By:
Newest to Oldest
1502
1507
Our family
Smith Family Photos
Europe Trip
First Day of School
Jackson and JC Photos 2013
Baseball Games
Page:
1
1503
1504
1505
1506
Items Per Page:
20
50
100
Individual Collection View
1530
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
< View all Collections
1531
Share this Collection:
1534
Edit
Smith Family Photos
1532
1535
Our family
1533
Page:
1
Items Per Page:
20
50
100

FIG. 34

Multiple Location Application View
1605
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
1600
Sort By:
Newest to Oldest
1606
Wrigley Field
Abe Lincoln Elementary School
Home Sweet Home
Stonehenge
1601
1602
1603
1604
Page:
1
Items Per Page:
20
50
100
1630
Single Location Application View
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
< View all Locations
1631
Share this Collection:
Edit
1636
1637
Wrigley Field
3651 N. Clark St.
1632
Chicago Illinois, United States
1633
1 Photos
1634
1635
Page:
1
Items Per Page:
20
50
100

## FIG. 35



Petitioner Apple Inc. - Ex. 1001, p. 39

FIG. 36

1800
Uploads Collections People Locations Recipe Family Tree
Fast Search
Apply Filters
Show all Recipes
1802
Lori Doe Pecan Puffs
1801
Share this Collection:
1812
Edit
1813
Chef
1804
Lori Doe
1816
+ add / edit Chef
1803
Recipe Photos
1806
1807
Ingredients
1809
1 Stick of butter
1 cup of flour
½ teaspoon of vanilla
1 cup of grand pecans
2 tablespoons of sugar
Directions
1810
Mix all. Roll gently into 1 inch balls. 300
and immediately roll in sugar.
Comments
1811
This is one of my favorite recipes around the holidays and was
one of Grandma Lori's best!
1814
1808
1815

FIG. 37

0800
Start
User selects Advanced Filter
0801
0802
User types information into the text box
0803
System sends request
0804
System produces request
0805
System displays possible matches of filters
0806
User selects filter(s)
0807
User selects apply
0808
System sends request
0300
User Relationship Table
0809
If in Uploads view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0810
If in Collections view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0811
If in Locations view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0814
If in People view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0812
...
0813
User desires to add additional Advanced Filter
Continuous Link of Application Dot-Tags System
0700

**FIG. 38**



Petitioner Apple Inc. - Ex. 1001, p. 42

**FIG. 39**



Petitioner Apple Inc. - Ex. 1001, p. 43

**FIG. 40**



Petitioner Apple Inc. - Ex. 1001, p. 44

**FIG. 41**



Petitioner Apple Inc. - Ex. 1001, p. 45

**FIG. 42**



**FIG. 43**



Petitioner Apple Inc. - Ex. 1001, p. 47

**FIG. 44**

0900
Start
0901
User selects Search bar
0902
User types information to search
0903
System sends request
0300
User Relationship Table
0904
System searches all potential tags blocks
0905
System displays possible matches by category
0906
User selects match
0907
If user selects Person fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Person Profile View
0908
If user selects Collection fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Collections View
0909
If user selects Location fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Locations View
0910
If user selects Date fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Uploads View
0911
•••
Continuous Link of Application Dot-Tags System
0700

**FIG. 45**



Petitioner Apple Inc. - Ex. 1001, p. 49

FIG. 46

Share to Third Party Media Provider
0501
1000
Outside MW System
Inside MW System
1300
Application Export System
Start
1001
User selects share of Digital File or collection of Digital Files
1002
System requests Digital File and Tag Data Blocks
1003
System retrieves Digital File from Relationship Table
1006
Save Original Digital File with new tags within EXIF Image File Directories as MW Modified File
1004
System retrieves Digital Tags for Digital File from Relationship Table
1005
Inject tags into EXIF Tag Data Blocks
User Relationship Table
0300

FIG. 47

1101
Third Party Geographical Mapping Provider
1100
Outside MW System
Inside MW System
Start
1102
Location Application Dot-Tag?
Yes
No
1104
User selects location Application Dot-Tag
1105
System sends request to Relationship Table
1106
System requests mapping for specific location to Third Party Mapping System
1107
System receives mapping for specific location from Third Party Mapping System
1110
Systems combines map from Third Party Mapping System with Application Dot-Tags for specific location in Location View
1103
User selects Location Application View
0300
User Relationship Table
1108
System retrieves data from that Location from User's User Relationship Table.
1109
System sends Application Dot-Tags for that specific location

FIG. 48

1207
1200
Individual / Group of People
Outside MW System
Inside MW System
1300
Application Export System
Start
1201
User selects share of Digital File or collection of Digital Files
1202
System requests Digital File and Tag Data Blocks
1203
System retrieves Digital File from Relationship Table
1205
Save Original Digital File with new tags within EXIF Image File Directories as MW Modified File
1204
User Relationship Table
System retrieves tags for Digital File from Relationship Table
1206
Inject tags into EXIF Tag Data Blocks
0300

**FIG. 49**



Petitioner Apple Inc. - Ex. 1001, p. 53

**FIG. 50**



| Sample EXIF Image File Directories and ExifTool family 1 group names [1401] | Original File EXIF Tag Data [1402] | MW Modified File Tag Data [1403] |
|---|---|---|
| Description Title | | |
| Description Subject | | |
| Description Rating [1404] | —— 1416 | ☆☆☆☆☆ [1410] |
| Description Tags | | |
| Description Comments [1405] | —— 1417 | CAPTION: Jackson and JC's first day at school) PERSON: Jackson Smith, JC Smith LOCATION NAME: Abe Lincoln Elementary School COLLECTION: First Day of School COLLECTION: Jackson and JC Photos 2013 DATE: 8/28/2013 [1411] |
| Origin (Authors, Date Taken, Date Acquired, Copyright) | | |
| Image (Image ID, Dimensions, Width, Height, etc.) | | |
| Camera (Camera Maker, Camera Model, etc.) | | |
| Advanced Photo (Lens Maker, Lens Model, etc.) | | |
| GPS Latitude [1406] | —— 1418 | 39; 46; 4.377499999999999999 [1412] |
| GPS Longitude [1407] | —— 1419 | 89; 39; 55.3199999999999953 [1413] |
| File Name | IMG_3826JPG | IMG_3826JPG |
| File Item Type | JPG | JPG |
| File Folder Path [1408] | C:\Photos\2013 —— 1420 | C:\Photos\MW Backup\2013 [1414] |
| File Date Created [1409] | 11/01/2013 10:00 AM —— 1421 | 08/28/2013 8:00 AM [1415] |
| File Date Modified | | |
| File Size | 2.42 MB | 2.42 MB |
| File Attributes | A | A |
| File (Offline availability, Offline status, Shared with, Owner, Computer, etc.) | | |

Petitioner Apple Inc. - Ex. 1001, p. 54

US 10,621,228 B2

**1**

# METHOD AND APPARATUS FOR MANAGING DIGITAL FILES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/536,300, filed Aug. 8, 2019, which is a continuation of U.S. patent application Ser. No. 15/375,927, filed Dec. 12, 2016, now U.S. Pat. No. 10,423,658, which is a continuation of U.S. patent application Ser. No. 14/193, 426, filed Feb. 28, 2014, now U.S. Pat. No. 9,552,376, which is a continuation-in-part of U.S. patent application Ser. No. 13/157,214, filed Jun. 9, 2011, now U.S. Pat. No. 9,098,531, each of which is hereby incorporated by reference herein in its entirety.

## FIELD OF THE INVENTION

The present invention relates generally to the management of digital files and, more particularly, to a computer-implemented system and method for managing and using digital files such as digital photographs.

## BACKGROUND OF THE INVENTION

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums, or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, event, etc.) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos were printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of digital files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty digital files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of digital tags, dynamic viewing of digital files, and the ability to export the digital files with new digital tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of digital files is a medium that allows people to organize, view, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow digital files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

**2**

## SUMMARY

In accordance with one embodiment, a computer-implemented method of associating digital tags with digital files comprises (1) storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having embedded therein content data and metadata including tags; (2) receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; (3) modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; (4) receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; (5) responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and (6) displaying, on a video display device associated with the client device, a first indication of the first tag label.

In another embodiment a computer-implemented method of associating digital tags with digital files comprises storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having a content data portion and a metadata portion including tags; displaying, on a video display device associated with a client device, a first graphical representation of a first tag label of a first of the tags and associated with a first of the digital files; receiving, via a user interface device of the client device, a selection by a user of the client device of the first graphical representation of the first tag label as a search filter criterion or a search string entered via the user interface device corresponding to the first tag label; responsive to the receiving, automatically searching the digital files, using at least the first tag label as a search filter, for the digital files satisfying at least the search filter criterion; and displaying, on the video display device, an indication of the first tag label and a representation of the number of the digital files satisfying at least the search filter criterion.

In accordance with a further embodiment, a web-based digital file storage system comprises a digital file repository for storing and retrieving digital files; a digital tagging system permitting the user to assign a plurality of digital tags to each of the digital files, wherein the digital tagging system comprises at least one type of data selected from the group consisting of a person's name, a location, a recipe, a date, a family relationship, a person's profile, an event name, a rating, and a document type; a search filter, wherein the search filter allows the digital files to be searched according to a plurality of types of data; and a user interface that presents the digital files on a user's screen based on the digital tags, wherein the user interface further comprises a digital tag image, the digital tag image having at least one type of data represented thereon with text.

As described in detail below, the various embodiments provide much-needed platforms that save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention may best be understood by reference to the following description taken in conjunction with the accompanying drawings, in which:

FIG. 1 is a screenshot of an organizational functionality view of one embodiment of the disclosed system.

Petitioner Apple Inc. - Ex. 1001, p. 55

US 10,621,228 B2

3

FIG. **2** is a screenshot of a photo detail view of one embodiment of the disclosed system.

FIG. **3** is a screenshot of a gallery view of an event or album of one embodiment of the disclosed system.

FIG. **4** is screenshot of an individual event or album view of one embodiment of the disclosed system.

FIG. **5** is a screenshot of a location view of one embodiment of the disclosed system.

FIG. **6** is a screenshot of a people thumbnail view of one embodiment of the disclosed system.

FIG. **7** is a screenshot of a people profile view of one embodiment of the disclosed system.

FIG. **8** is a screenshot of a family tree view of one embodiment of the disclosed system.

FIG. **9** is a screenshot of a timeline view of one embodiment of the disclosed system.

FIG. **10** is a screenshot of a recipe chart, according to one embodiment of the disclosed system.

FIG. **11** is a screenshot of an album chart view of one embodiment of the disclosed system.

FIG. **12** is a screenshot of an event chart view of one embodiment of the disclosed system.

FIG. **13** is a screenshot of a people chart view of one embodiment of the disclosed system.

FIG. **14** is a screenshot of a family tree chart view of one embodiment of the disclosed system.

FIG. **15** is a screenshot of a location chart view of one embodiment of the disclosed system.

FIG. **16** is a screenshot of a recipe chart view of one embodiment of the disclosed system.

FIG. **17** is a screenshot of a slideshow view of one embodiment of the disclosed system.

FIG. **18** is a screenshot of an advanced search filter view of one embodiment of the disclosed system.

FIG. **19** is a screenshot of a homepage view of one embodiment of the disclosed system.

FIG. **20** is a diagram of the Overall System Process Flow of MemoryWeb.

FIG. **21** is a diagram of the System for Reading Phase, System Interpreting, and Adding Digital File and Corresponding Data to Relationship Table Phase.

FIG. **22** is a table of the EXIF and MemoryWeb Tag Data Blocks

FIG. **23** is a table of the Microsoft Windows and MemoryWeb Tag Data Blocks.

FIG. **24** is a table of the MemoryWeb Person Tag Data Blocks.

FIG. **25** is a diagram of the Third Party Facial Recognition System.

FIG. **26** is a diagram of the Third Party Media System (Data Exchange).

FIG. **27** is a table of the User Settings Table.

FIG. **28** is a diagram of the Application Digital Tag Organizer System.

FIG. **29** is an illustration of the Application Dot-Tag Shape and Content.

FIG. **30** is a diagram of the Continuous Link of Application Dot-Tag System.

FIG. **31** is an illustration of the Slideshow View of Digital File and Application Dot-Tags.

FIG. **32** is a screenshot of People Application Views.

FIG. **33** is a screenshot of Collection Application Views.

FIG. **34** is a screenshot of Location Application Views.

FIG. **35** is screenshot of Uploads Application View.

FIG. **36** is a screenshot of Recipe Application View.

FIG. **37** is a diagram of the Advanced Filters System.

4

FIG. **38** is a screenshot of Adding the First Application Dot-Tag using Advanced Filter.

FIG. **39** is a screenshot of Single Application Dot-Tag Filter for Each Application View.

FIG. **40** is a screenshot of Single Application Dot-Tag Filter for Date in Uploads Application View.

FIG. **41** is a screenshot of the Single Application Dot-Tag Filter in Location Application View.

FIG. **42** is a screenshot of Adding Another Application Dot-Tag Filter.

FIG. **43** is a screenshot of the Multi-Dot-Tag Filter in Location Application View.

FIG. **44** is a diagram of the Keyword Fast Search System.

FIG. **45** is a screenshot illustration of Using Keyword Fast Search.

FIG. **46** is a diagram of the Share to Third Party Social Network Provider System.

FIG. **47** is a diagram of the Third Party Location Mapping System.

FIG. **48** is a diagram of the Share to Individual System.

FIG. **49** is a diagram of the Application Export System.

FIG. **50** is a table illustrating the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb.

### DETAILED DESCRIPTION OF ILLUSTRATED EMBODIMENTS

Although the invention will be described in connection with certain preferred embodiments, it will be understood that the invention is not limited to those particular embodiments. On the contrary, the invention is intended to cover all alternatives, modifications, and equivalent arrangements as may be included within the spirit and scope of the invention as defined by the appended claims.

The present disclosure relates to one or more of the following features, elements or combinations thereof. A web-based digital file storage system is disclosed. The storage system may include a digital file repository for storing and retrieving digital files, such as photos, a digital tagging system configured to assign digital tags to the digital files, a sorting system, and a user interface.

The digital tagging system may include various types of data, such as a person's name, a location, a recipe, a date, a family relationship to the user, an event name, a rating, sharing rights, file type and a document name. The sorting system can allow the digital files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the digital files on a user's screen based on these user inputs.

The digital file repository may be accessible over the Internet. The sorting system may provide a user with the ability to search based on a plurality of digital tags. The disclosed system may also provide a way to track relationships between users, so that a family tree can be displayed.

Recipes may also be linked to a person's name, with, for example, a video and digital copy of original hand-written recipe to create a recipe view.

Moreover, the digital files and data can be exported as a single file with the digital tagging embedded within the exported file.

In another embodiment, a method of storing digital photographs is disclosed. The method may include the steps of storing a digital photograph in a file repository, associating a plurality of digital tags having different tag types with the digital photograph, providing a search function that permits

Petitioner Apple Inc. - Ex. 1001, p. 56

searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship, an event name, a rating, file type and a document type. The method may include a further step of providing access to the file repository via the Internet. The method may also allow for tracking relationships between users so that a family tree can be displayed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The presently disclosed method and application (herein alternatively referred to as a "system") provides users with an Internet-based interactive platform to gather, organize, view, share and archive digital files using a proprietary organization system and export tagging process. As used herein, the word "tag" refers to any type of digital data that can be assigned to a file to describe some aspect of that file through a tagging process. For images, the tagging is preferably in EXIF format. For videos, documents and other file formats, any appropriate format may be used. The disclosed system allows users to create, view and share digital files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

One disclosed embodiment includes an import feature. Users can import media files from users' favorite sources (e.g., computers, mobile phones, social networks, etc.). If any meta-tag information is embedded within the media (e.g., date taken and GPS coordinates), the system could automatically read and utilize it for the user. Digital files, media, meta-tags, and other data discussed herein may be saved to one or more file repositories (also referred to as a database herein).

In another aspect of the disclosed system, organizational functionality is provided. Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system and organizing feature allows a user to arrange large amounts of digital files with tags that can characterize and document the digital file(s). Digital files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, event, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. Tags can be assigned to a single file at a time, or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos and enter the tag only once. An example of the manner in which digital photos can be organized is presented in FIG. 1.

Yet another feature is the multiple views from which a user can display his or her digital media files and their tagged attributes. Using a user interface (e.g. a keyboard, mouse, or touch screen), users can select individual files, groups of files meeting specific criteria, or all files in their account from which to create views. These views may alternately take the form of a chart. These views will be auto-populated based upon either tag information already associated with the digital file upon import or the tags assigned to the digital files by the user within the aforemen-

tioned organization functionality. Each digital file can be enlarged, from any view or chart, by clicking an information ("i") button to show an enlarged version of the digital media file with all the tags that are assigned to that digital file, as illustrated in FIG. 2. In another embodiment, the user interface may be user-configurable, as discussed further herein.

The following views are shown with particularity. In FIG. 1, the gallery view allows the user to see all the digital media that are associated within a group such as an event or custom album. The gallery view for either events or albums is illustrated in FIG. 3.

As shown in FIG. 2, an individual album or event view allows one to see the files associated with a specific group. For example, one can view the digital files that relate to a group of files called "Trip to Italy 2011." The individual album or event view is illustrated in FIG. 4.

A location view, as shown in FIG. 5, identifies within an interactive map (Google map shown as an example), where digital files were taken or originated. The location view can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users.

A people view, as shown in FIG. 6, shows thumbnail photos of all the people in the system that can be clicked in for a people profile view. A people profile view, as shown in FIG. 7, shows a profile picture of an individual, their birth/death information, family relationships, overview (comments) on the person, as well as links to other views that contain that individual in the system.

A family tree view, as shown in FIG. 8, can illustrate interactive family trees where one can see the family tree of an individual or family. If a user clicks on an individual within the family tree, it will take him or her to the people profile view of that person.

The timeline view, as shown in FIG. 9, will be an interactive timeline that allows you to set ranges of digital files by year, month and day. The digital files shown in the timeline will also be interactive and if the user clicks on a digital file or group of digital files (e.g., event or album), the user will then view the information related to the digital file(s).

A recipe view, as shown in FIG. 10, will show a recipe along with any digital files that are associated with it. For example, a cherished family recipe may show a digital copy of the original handwritten recipe, a photo of the family member who was the chef and a video of the family member making the recipe.

Each of the aforementioned views may also be seen in a chart format view that is interactive when any item on the chart is clicked, the user will them be taken to a new screen that details all relevant digital files (and file types) for the clicked item.

For album or event chart views, as shown in FIGS. 11 and 12, the elements listed in those charts will include individuals who are part of each album/event, number of digital files, date and other pertinent information.

A people view, shown in FIG. 13, may demonstrate all the names of individuals that are in the system in an alphabetical listing. Such a people view can also contain details on each person such as the number of photos and videos that are associated with that person. The user can click on that person to pull up the profile view of the individual or click on the number of photos to see all the photos associated with that person.

In the family tree chart view, shown in FIG. 14, family lineage can be viewed in multiple ways. For example, a user

Petitioner Apple Inc. - Ex. 1001, p. 57

US 10,621,228 B2

7

can set himself as the tree anchor and then see a tree of all people entered into the database related to the user. The user could also set a contact as the tree anchor and then just view the descendants of that individual.

For a location chart view, as show in FIG. **15**, listings of all the locations that are in the system are displayed along with the number of digital files, as well as names of persons associated with each. A user can click on the location to see all the digital media files that are associated with a specific location.

A recipe chart, as shown in FIG. **16**, can show recipes that uploaded to the system. Along with the ingredients and steps of each recipe, this view can identify the chef(s) name, number of photos and videos associated with each.

For any of the views, the user can click on the digital file to start a slideshow feature that will allow them to scroll through an enlarged view of the digital file as illustrated in FIG. **17**.

Another embodiment of the disclosure is the search filter. This filter allows users to select one or more criteria that will narrow down their results to just those digital files matching input criteria. The entire system can be filtered by, for example, key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify digital files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, no upload date information or are lacking any other tag.

It should be noted that in one embodiment, searching via key word will search through all tagged information (user populated or auto-generated upon import). For example, if a user searched for the term "Ohio," the system would search for that term associated with any file in any way. If the user had files with Ohio as a state, file name, street name, person's name, file comment, etc., all would be retrieved.

Settings applied in the advanced search filter can cumulatively carry over to any subsequent pages until new criteria are selected. For example, a user can apply a filter to retrieve files associated with a particular person. Then the user can set a date range to further narrow results to show only those files for that selected person within the date range. Any pages viewed from that point forward throughout the entire site would only contain files associated with person and the date range specified. The advanced search filter is illustrated in FIG. **18**.

Yet another feature can be a user's homepage, as illustrated in FIG. **19**, that can summarize the user's content within the system including relevant information in the system. It is contemplated that a user's homepage may show a summary of the total number of photos, videos, documents and audio files that the user has uploaded. In this embodiment, for each group of digital files (e.g., photos), the percent of files that has been organized with pertinent data such as date, name(s) and location can be noted. In addition, the homepage can show a list of people that are in the system and the respective count for photos, videos, documents and audio files associated with each person. Also contemplated is a summary of the events, albums and locations that have been entered into the system. The user homepage may serve as an executive summary dashboard of one's entire system and can be modified to provide data in an executive summary format for a user.

Another feature is that the entire system including the dynamic views can be presented in a wide range of user outputs—e.g. on the user's computer, smartphone or tablet

8

display. The user may choose to present the digital files in any of the various types of ways disclosed herein. Other ways of outputting the files are also possible. The user can create and modify various sharing rights so that third parties may view the files and if desired, provide comments, apply tags or even download/copy the files for their own use.

Still another embodiment can provide export functionality. Once a user has used the organization functionality to assign information to data file(s), a user may want to export the data file in its original form (e.g., .jpg, .mp4, etc.) with the tags embedded within the digital file in the form of EXIF tags. In other words, a user can export his or her entire set of digital files, or may choose a subset based on keywords and tags. The exported digital files can include key tags and attributes users have assigned, and in one embodiment, such tags and attributes can be embedded within the digital files. For example, each exported digital file may be imbedded with user-entered data such as the people, location, and event name. This feature will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing digital files such as a social media website) where it can be viewed with these attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its digital files to a new digital archiving system.

A method is also disclosed. The method may include the steps of storing a digital file in a file repository, associating a plurality of digital tags having different tag types with the digital file, providing a search function that permits simultaneously searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship between individuals, an event name, a rating, and a document type.

Under the disclosed method, access may be provided to the repository via the Internet. Relationships between users may also be tracked such that a family tree can be displayed. A recipe may also be linked to a user or person. Finally, the method may include the step of outputting a digital file and its associated digital tags into a single file.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

A plurality of advantages arise from the various features of the present disclosure. It will be noted that alternative embodiments of various components of the disclosure may not include all of the features described yet still benefit from at least some of the advantages of such features. Those of ordinary skill in the art may readily devise their own implementations of a digital file organization system that incorporate one or more of the features of the present disclosure and fall within the spirit and scope of the disclosure.

Application (Also Called "MemoryWeb Application" or "System")—

The Application is an online program constructed using a mix of freeware code as well as custom-built proprietary coding with an interface that has many functions including:

Petitioner Apple Inc. - Ex. 1001, p. 58

US 10,621,228 B2

9 | 10

1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files. This Application has already been disclosed in U.S. patent application Ser. No. 13/157,214 and incorporated herein by reference. This Application is also being trademarked as "MemoryWeb" with the US Commissioner for Trademarks on Dec. 26, 2013 under application No.: 86/152,930. The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on mobile communication devices such as smart phones (e.g., iPhones), Personal Digital Assistants (PDAs) and Tablets (e.g., iPads).

Application Views—

The Application Views utilizes the Application's ability to associate Digital Tags to Digital Files and display them in customized views such as Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes.

Application Advanced Filter System—

A function that provides search capabilities using one or more Digital Tags within the Application, resulting in a narrowed output display of the applied filters to display one or more Digital Files and viewed in one or more Application Views. The Application Advanced Filter System can allow Digital Files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the Digital Files on a user's screen based on these user inputs.

Application Dot-Tag—

The manner in which a Digital Tag is displayed within the Application using pill-shaped indicators that can reside near a file's image or overlaid on the file's image. MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag. However, it should be understood that other shapes and indicators are contemplated by the present invention, and may even be user-configurable. For example, the indicator may take the form of a sticky note, a different shape, a doted shape, or any number of variations of indicators that may be functional in displaying one or more words. Colors may also be used to indicate differing categories of indicators, or differing associations/intersection of the indicators. Within the pill-shaped indicator, the specific Digital Tag information is used to display information about a Digital File. Throughout this document, the Application Dot-Tag is shown as illustrated in FIG. **29** (indicators **0650**, **0654**, **0655** and **0656**).

Application Digital Tag Organizer System—

Within the Application, a function for assigning one or more Digital Tags to one or more Digital Files at the same time through the Application Dot-Tag Organizer System. This feature allows Digital Tags to be assigned to items such as photos, videos, audio files, and documents. The information created from this functionality drives the outputs for the Application Views. The Application Digital Tag Organizer System will allow the tagging of key items as date, GPS location, star ranking, people (both name and facial recognition), album(s), family relationships, a date, event name, sharing rights, file type, document name, and recipes. Each of the Digital Tags is user-configurable.

Application Export System—

Ability to export Digital File(s) from the Application, with the Digital Tags that were created within or imported/uploaded into the Application, embedded inside the Digital File. The Digital Tags within the exported Digital File can then be viewed and used by any other applications that can read EXIF tags.

Application Programming Interface ("API")—

The Application Programming Interface (API) is the system that interacts with other communication points or services over HTTP via a POST, GET, PUT, DELETE methods. The API provides a way for users to access their MemoryWeb data outside of the web browser on mobile devices or other web connected devices. The actions within the API deliver MemoryWeb Digital Files and Digital Tags along with all meta data associated with such files and tags.

MW Automatic Uploader/Downloader Application—

Separate from the main MemoryWeb Application, there are additional proprietary applications created by Memory-Web for user to upload and download (export) Digital files to and from the main MemoryWeb Application. The first is the MW Automatic Uploader/Downloader built for Window's compatible computers. The second is the MW Automatic Uploader/Downloader build for MAC computer. Both of the MW Automatic Uploader/Downloader applications can be installed on the user's computer to automatically upload the desired Digital Files from their computer to the main MemoryWeb Application. In addition, the MW Automatic Uploader/Downloader applications allow for Digital Files to be exported from the main MemoryWeb Application to a desired folder on the user's computer with the updated tags embedded within the Digital File.

Storage System—

A storage system can be a cloud-based Storage System (e.g., Amazon's AWS, Dropbox, Box.net, Deutsche Telecom's Cloud, etc.), hard-drive, server, or any venue that allows one's information to be stored. The storage system would act as a database and file repository for storage and retrieval of Digital Files to and from the Application.

Digital Files—

An electronic file that can be in various file formats (e.g., PNG, JPEG, PDF, TIFF, MP3, MP4, WAV, and GIF) that are of items such as photos, videos, audio files, and documents.

Digital Tags—

The word "Digital Tag" refers to any type of digital data that can be assigned to a file to distinguish and describe some aspect of that file through a tagging process. Digital Tags will be comprised of various groups of digital data including:

a) EXIF Tags—EXIF stands for "Exchangeable Image File Format" and is a standard that specifies the formats for images, sound, video, and ancillary tags. The EXIF standard is an Open Standard produced by the Standardization Committee and is detailed within their

Petitioner Apple Inc. - Ex. 1001, p. 59

US 10,621,228 B2

11

document called *Standard of the Camera & Imaging Products Association*. Standard of the Camera & Imaging Products Association, CIPA DC-008 Translation-2012. Exchangeable image file format for digital still cameras: EXIF Version 2. 3. Established on April, 2010 and Revised on December, 2012. Prepared by: Standardization Committee. EXIF tags are also called "meta tags" or "metadata." The EXIF information is formatted according to the TIFF specification, and may be found in JPG, TIFF, PNG, JP2, PGF, MIFF, HDP, PSP and XCF images, as well as many TIFF-based RAW images, and even some AVI and MOV videos. The EXIF meta information is organized into different Image File Directories (IFD's) within an image. The names of these IFD's correspond to the ExifTool family 1 group names.

When Digital Files are captured with digital cameras (including smartphones), scanners and other systems handling image, video and sound files, certain EXIF tags are automatically populated within the Digital File and can cover a broad spectrum of information such as:

Descriptions (e.g., Title, Subject, Star Ratings, Tags, People, Comments)

Origin (e.g., Authors, Date taken, Copyright)

Image information (e.g., dimensions, color representation and size)

Camera Setting Information (e.g., camera maker, camera model), including static information such as the camera model and make, and information that varies with each image such as orientation (rotation), aperture, shutter speed, focal length, metering mode, and ISO speed information.

Advanced Photo Information (e.g., lens maker, lens model, contrast, brightness, EXIF version, etc.)

File Information (e.g., file name, item type (e.g., JPG file), date created, date modified, size, etc.)

A thumbnail for previewing the picture on the camera's LCD screen, in file managers, or in photo manipulation software.

Global Positioning System (GPS) information that is also known as geocoding.

The Application will auto-populate any existing EXIF Tags from the original Digital File upon upload into the Applications (as illustrated in FIG. **21**) and put this information into the Users Relationship Table on the Storage System.

b) Extensible Metadata Platform (XMP)—This is Adobe's Extensible Metadata Platform (XMP) format for labeling metadata within an Adobe file.

c) Png Textual Data (tEXt)—This is Portable Network Graphics (PNG) metadata format for labeling within a PNG file.

d) Microsoft Windows Tags—These are Microsoft Windows File Attributes that are stored in Data Blocks from Microsoft's system.

e) MemoryWeb Tags—These tags are typically developed within MemoryWeb and can relate to People Names, Recipes, Collections, Location Name, Family Relationships (also discussed in MemoryWeb Person Tags), Social Network Data (e.g., ID, contact IDs, etc.), File Folder Batch Name. This would be folder directory name that includes the name of each folder that eventually leads to the folder that the digital file was actually stored within the User's PC. This is used to help the user organize data within MemoryWeb based upon the

12

users organization system used on their PC. Facial Recognition Data, and other type of tags that are user defined.

f) MemoryWeb Person Tags—These user defined tags within MemoryWeb are specific to each person profile including such areas as Nicknames, Birthdates, Date of Birth, Date of Death, Biography, Family Relationships (e.g., Mother, Father, Brother, Sister, Daughter, Son, Spouse, etc.), Pets, and Firsts (e.g., First Steps, First Words, First time riding a bike, etc.).

The combination of all the aforementioned tags is collectively referred to as "Digital Tags." The list of groups and Digital Tag types will grow as technology in this area improves over time. These Digital Tags are also referred to as "File DNA" for MemoryWeb.

User Relationship Table—

Within the Application, each User will store the data related to Digital Files, Digital Tags, User Settings, and other specific information related to a User's repository of information is kept within the User Relationship Table.

Data Blocks—

Within the User Relationship Table, there are Data Blocks that will store information related to EXIF Tags, Microsoft Windows Tags, MemoryWeb Tags, and MemoryWeb Person Tags. These Data Blocks are used to generate the information that is displayed in such key components such as the Application Views and Application Dot-Tags.

Custom Code—

Proprietary scripts and code developed by MemoryWeb to enable key functions such as Dot-Tag relationships and ability to embed new user-defined tags into a file and/or override existing EXIF tags and the ability to navigate the application and it's functions via connections drawn from the associated tags

Open Source Libraries—

Non-proprietary code taken from the free, open source community integrated that is used by the Application.

User Interface—

The Application may be accessible over various "User Interfaces" including Personal Computers (e.g., Macs, Windows, etc.), Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad). The User Interfaces can be controlled through the Application using various tools such as a keyboard, mouse, and touch screen.

The present invention relates to an Application that has many functions including: 1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files.

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, and event) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos may have been printed for friends, rela-

Petitioner Apple Inc. - Ex. 1001, p. 60

US 10,621,228 B2

13

tives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of Digital Files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty Digital Files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of Digital Tags, dynamic viewing of Digital Files, and the ability to export the Digital Files with new Digital Tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of Digital Files is a medium that allows people to organize, view, navigate, search, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow Digital Files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

As disclosed in detail herein, the application provides the much needed platform that saves a user significant time, provides significant information with minimal screen space, and provides an appealing and customizable interface that will enhance the user experience.

Anytime the MemoryWeb Application exchanges information with an external Storage System or User Interface such as a phone, tablet, computer or other internet based user device, the interaction with the MemoryWeb Application involves Application Programming Interface (API). The API's allow each system to call the specific Digital Files and Digital Tags associated with each request so they can be viewed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The present disclosure relates to one or more of the following features, elements or combinations thereof. The Application allows the importation of Digital Files and then the association of Digital Tags to the Digital Files by using existing EXIF Tags of a Digital File as well as the Application's custom organization of Digital Tags for use in the Application. The Application then allows the Digital Files to be viewed, sorted, annotated, navigated, and shared using the various Application Views. The Application can also filter Digital Files using the Application Advanced Filter System functionality. The Digital Files can be stored through a Storage System that interacts with the Application. In addition, the Application allows for Digital Files to be exported with the Application's Digital Tags embedded within the Digital Files.

The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on User Interfaces such as Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad).

14

The presently disclosed Application provides users with an interactive platform to gather, organize, view, share and archive Digital Files using a proprietary organization system called the Application Digital Tag Organizer and export the modified Digital files with the Application's Digital Tags embedded within the Digital Flies using the Application Export feature.

The Application allows users to create, navigate, search, view and share Digital Files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

DESCRIPTION OF EMBODIMENTS

In FIG. **20**, the overall process flow of MemoryWeb is depicted. Each of the boxes depicted that are Inside the Memory-Web System (**0050**) are detailed additional figures within this application. However, to help illustrate the overall process flow, FIG. **20** was created. In FIG. **20**, the process begins when original digital file(s) are uploaded to MemoryWeb (**0101**). This process can take place in a variety of ways including when a user manually selects uploads from the Uploads Application View (see FIG. **35** indicator **1701**), installs the a MW Automatic Uploader/Downloader Application on their computer, or imports Digital Files from the users' other sources (e.g., mobile phones, social networks, etc.).

Once a file is uploaded, the System Reading Phase (**0100**) begins. Information from the System Reading Phase is then sent to the System Interpreting and Adding Data to Relationship Table Phase (**0200**). During this phase, information is passed back and forth to the Third Party Facial Recognition System (**0400**) to the Third Party Facial Recognition Provider (**0401**). The system will also coordinate between the Third Party Social Media (Data Exchange) (**0500**) and then to various Third Party Media Providers (**0501**). Another key step from the System Interpreting and Adding Data to Relationship Table Phase is adding both the Digital Files and the corresponding tags to the User Relationship Table (**0300**). As illustrated in subsequent figures within the patent application, the User Relationship Table serves as the key repository for all of the user's data that generates virtually every display from the application. From the User Relationship Table, the user can use the Applications Digital Tag Organizer System (**0600**), the Continuous Link of the Application Dot-Tag System (**0700**), the Advanced Filters System (**0800**), or the Keyword Fast Search System (**0900**). The user can also share Digital File(s) through the Share to Social Network Provider System (**1000**) to a Third Party Social Network Provider (**0501**) that is outside the MemoryWeb system or use the Share to Individual System (**1200**) to a Person (**1201**) that is Outside the MemoryWeb system using the data from the User Relationship Table. To help generate some of the map views, the system will utilize a Third Party Geographical Mapping System (**1100**) that connects to a Third Party Geographical Mapping Provider (**1101**) that is Outside the MemoryWeb system. The user can also export Digital Files with the Digital Tags embedded within the Digital File using the Application Export System (**1300**) that will send a MemoryWeb Modified File from MemoryWeb (**1301**) to a designated location by the User that is outside the MemoryWeb system.

As illustrated in FIG. **21**, the System Reading Phase (**0100**) is described in further detail. The System Reading

Petitioner Apple Inc. - Ex. 1001, p. 61

US 10,621,228 B2

15 | 16

Phase will first check if the digital file is a duplicate file (**0102**) that is already in the User's collection. If the file is a duplicate, it will not be uploaded (**0104**). However, if it is a new file for the user, the System Reading Phase will then locate the EXIF Image File Directories in the digital file (**0103**) and then send that information to the System Interpreting and Adding Data to Relationship Table Phase (**0200**).

As further illustrated in FIG. **21**, the System Interpreting and Adding Data to Relationship Table Phase will take the EXIF Image File Directories sent from the System Reading Phase and read and iterate through each EXIF tag item (**0201**). At this time, the system will identify faces from the digital file and then send this information to the Third Party Facial Recognition System (**0400**) that will coordinate with the Third Party Facial Recognition Provider (**0401**) that is outside the MemoryWeb. When the Third Party Facial Recognition System (**0400**) sends back data related to facial recognition of faces in the Digital File, it comes back then the system sends information related to people facial recognition tags to the MemoryWeb Person Tag (Data Blocks) within the User Relationship Table (**0300**). The detailed process of the Third Party Facial Recognition System (**0400**) is further explained in FIG. **25**.

During the Read & Integrate Through Each EXIF Tag item (**0201**) the process will also upload a the original Digital File in MemoryWeb (**0211**), the process will also store a copy of the original file within the User Relationship Table (**0300**) and create five duplicate copies (**0203**) of different resolution sizes as follows: XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and a Thumbnail Duplicate File (**0306**). Each duplicate file is used in different parts of the application depending upon the photo size needed for such areas within the Application such as Application Views, Application Dot-Tags, and Application Digital Tag Organizer System.

Another embodiment during the Read and iterate through each EXIF tag item (**0201**) stage is determining if a MemoryWeb tag exists (**0204**). A MemoryWeb tag is a Digital Tag that is currently being used as an Application Dot-Tag within the Application. If it is not a Digital Tag that MemoryWeb is currently using, the application will Save EXIF data to the User Relationship Table for Digital File (**0205**) and send this to the User Relationship table. This is done in case there are EXIF data that are desired to be used in future releases of the Application. For the Digital Tags that are being used in the Application, the system will Parse EXIF data into MemoryWeb Tags (**0206**), look up MW tag data (**0207**) and determine if a Digital Tag currently exists (**0208**). If a Digital Tag does not exist, the system will Create a new MW tag data ((**0209**) and send this to the appropriate Data Blocks within the User Relationship Table (**0300**). If Digital Tag data does exist, the system will Associate existing tag data ((**0210**) to the appropriate Data Blocks within the User Relationship Table (**0300**).

The third and final area within FIG. **21** is the System Indexing Digital Files and Tag Data Blocks for a Digital File within the User Relationship table (**0300**). In the User Relationship Table, the user's information system information stored such as User Settings (**0390**). Copies of the Original Digital File (**0301**), XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and Thumbnail Duplicate File (**0306**) are stored. The final area of the User Relationship Table relates to the data blocks including EXIF Tag (Data Blocks) (**0320**), Microsoft Windows Tag (Data Blocks) (**0320**),

MemoryWeb Tag (Data Blocks) (**0360**), and MemoryWeb Person Tag (Data Blocks) (**0380**).

In FIG. **22**, there are two charts that illustrate EXIF and MemoryWeb Tag Data Blocks. The first chart illustrates the EXIF Tags Version 2.3 (Data Blocks) (**0320**). For the EXIF Tags Version 2.3 (Data Blocks) (**0320**), the information from this table is an expert from an Open Source Library code produced by the Standardization Committee that is detailed within their document called Standard of the Camera & Imaging Products Association. While all the EXIF tags that are contained within a Digital File are read (as previously illustrated in FIG. **21** within the System Interpreting and Adding Data to Relationship Table Phase (**0200**)) and are stored within the system's User Relationship Table (**0300**), a summary of the primary EXIF tags that are currently used within MemoryWeb are illustrated in the EXIF Tag Blocks (**0320**). The EXIF tag information is organized into different Image File Directories (IFD's) or "Data Blocks" within an image and organized in the column heading of Tag Label (**0321**). The names of these IFD's correspond to an EXIF standard for ExifTool family 1 group names that are depicted in the column heading of EXIF Group (**0322**). The IFD's are stored within a specific data block location within a Digital File and these locations have a standard name of the specific location (**0323**) within the Digital File. The primary EXIF tags that are read and used by MemoryWeb to generate Application Dot-Tags are: Description Title (**0324**), Description Rating (**0325**), Origin Date Taken (**0326**), Digital File Width (**0327**), Digital File Height (**0328**), User Comment (**0329**), GPS Latitude (**0330**), GPS Latitude Ref (**0331**), GPS Longitude (**0332**), and GPS Longitude Ref (**0333**).

In FIG. **22**, the second chart illustrates the MemoryWeb Tag (Data Blocks) (**0360**) that overlap with standard EXIF tag blocks. As previously illustrated in FIG. **21**, the EXIF Tag Data blocks are read and brought into the User Relationship Table (**0300**). When the data is stored within the system's User Relationship Table, they are also stored with the corresponding EXIF tag label as illustrated in the column called MemoryWeb Tag (**0361**). For example, when a Digital File is brought into MemoryWeb and the system reads the Origin Date Taken (**0326**) for the EXIF Tag block, the system will denote this in the MemoryWeb table as MediaAsset.DateCreated (**0364**). This designation is very important as it allows MemoryWeb to re-inject any updated or new MemoryWeb Tag data into the corresponding standard EXIF Tag blocks of a Digital File when it is exported from MemoryWeb (as previously illustrated in FIG. **20** with the Application Export System (**1300**)). Continuing with this example, if the Origin Date Taken is modified within the MemoryWeb system, when the file is exported through the Application Export System (**1300**), the new updated date from MemoryWeb (**0364**) will be mapped to the EXIF Tag Data block with the Tag Label of Origin Date Taken (**0326**) with the EXIF Group called ExifIFD (**0334**) and the Location called 0x9003 (**0335**).

In situations where there is no standard EXIF Tag data block for the MemoryWeb Tag for such items such as Collections, People Location Name, Recipe Name, etc. (**0367**), they are mapped to a general EXIF Tag data block called User Comment (**0329**). As the standards for EXIF Tag data blocks change, the system can be mapped to any new specific EXIF Tag data blocks. For example, if an EXIF Tag Data block is made for Recipe Name, the MemoryWeb Tag related to Recipe Name will be mapped specifically to that new EXIF Tag data block as opposed to User Comment.

In FIG. **23**, there are two charts that illustrate Microsoft Windows and MemoryWeb Tag Data Blocks. The first chart

Petitioner Apple Inc. - Ex. 1001, p. 62

**17**

illustrates the standard Windows Imaging Component (WIC) Metadata (Data Blocks) (**0340**). Microsoft Windows has their metadata tag blocks contained in areas called Tag Labels (**0341**). The primary WIC Metadata data blocks that are read and used by MemoryWeb to generate Application Dot-Tags are: File Name (**0342**) and File Folder Path (**0343**). The corresponding MemoryWeb Tag data blocks (**0360**) for the WIC metadata tag blocks are called MediaAsset.File-name (**0372**) for the Microsoft file name and MediaAsset.UploadBatch.Batchname (**0373**) for the Microsoft File Folder Path. The ability for MemoryWeb to read the File Folder Path from Microsoft is a unique process used within MemoryWeb to help the user organize their photos based upon the organization methods they have already used within Microsoft. For example, if the user stored a group of photos on their Microsoft computer in the file directory C:/Photos/2013/First Day of School, MemoryWeb will automatically place the photos that were located within that Microsoft File Folder Path into a MemoryWeb Application Dot-Tag under a collection called "First Day of School" based upon the last folder within the file folder path. An example of the Application Dot-Tag that would be generated from the File Folder Path is in FIG. **31** with the label "First Day of School" (**0770**). In addition, MemoryWeb will allow the user to view the photos that are within a specific File Folder Path in the MemoryWeb Uploads Application View so that the user can organize photos from the same File Folder Path. An example of how this will be illustrated within MemoryWeb's Uploads Application View is in FIG. **35** with the groping of photos with the File Path Name C:/Photos/2013/First Day of School (**0709**).

In FIG. **24**, the MemoryWeb Person Tag Data Blocks (**0380**) that are contained with a User Relationship Table are illustrated. For any person that is added within a user's account, various MemoryWeb Person Tag Data Blocks are stored including: Person Name (**0395**), Nickname (**0381**), Birthdate (**0382**), Date of Death (**0383**), Biography (**0384**), Mother (**0385**), Father (**0386**), Brother(s) (**0387**), Sister(s) (**0388**), Daughter(s) (**0389**), Son(s) (**0390**), Spouse(s) (**0391**), Facial Recognition (**0392**), FacebookID (**0393**), Pets (**0394**), and other data blocks that will be added in the future as the Application grows (**0396**). These data blocks are primarily used in the People Profile Application View as illustrated in FIG. **32** (indicator **1430**). One embodiment within the MemoryWeb Person Tag Data Block contains the FacebookID (**0393**). As illustrated in FIG. **26** (indicator **0507**), information from Third Party Media Providers will be exchanged within MemoryWeb and the user's Face-bookID will be provided and stored within the MemoryWeb Person Tag Data Block. In addition, any of the User's contacts from Facebook will also be downloaded into the corresponding MemoryWeb Person Tag Data Blocks for any matching persons within the User's MemoryWeb account. The information from the Third Party Media Providers that are stored within MemoryWeb will be used to provide "push notifications" to the user for various items such as when the user or any one of its contacts posts a photo to that Social Media venue.

As illustrated in FIG. **25**, the Third Party Facial Recognition System (**0400**) is described in further detail. As photos are imported or uploaded into the Application, the systems will request thumbnail Digital Files (**0404**) from the User Relationship Table (**0300**). On a routine basis (e.g., daily), the system will retrieve all the thumbnails of Digital Files with unconfirmed faces (**0403**) and the send those Digital Files (**0404**) to the Third Party Recognition Provider (**0401**). The Third Party Facial Recognition Provider (**0401**) uses

**18**

their algorithms to find location of eyes, nose, mouth and many other points for each face detected in the photo. They will also determine gender, check if the person is smiling, have eyes open, lips sealed or wearing glasses. The Third Party Facial Recognition Provider will use their algorithms to associate potential matches of faces for the user's collection of photos. For each face, the system will send back attributes including gender (male, female), glasses (true, false), smiling (true, false), lips (sealed, parted), eyes, (open, closed), mood (happy, sad, angry, surprised, disgusted, scared, neutral), field in the response have two subfields: value (string) and confidence (integer). For each attribute, the Third Party Facial Recognition Provider will assign percentages of confidence (0% to 100%) for each attribute that can be used by the MemoryWeb Application to utilize.

The Third Party Facial Recognition Provider will then send the information relating to a person back to Memory-Web (**0405**). The MemoryWeb Application parse the identified faces and corresponding Facial Recognition data for each Digital File (**0406**). The system will interact with the User Relationship Table and determine if the face is an existing (i.e., "trained") face in MemoryWeb where there is a Face ID in the User Relationship Table (**0407**). If not, the system generates a facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0410**). If yes, the system will then determine if the face is above the system's thresholds for confirming a face is a specific person in the user's MemoryWeb system (**0408**). If no, system generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0411**). If yes, the system records and associates specific face for Digital File with a MemoryWeb Person ID and sends to Memory-Web Person Tag (Data Blocks) in User Relationship Table (**0409**).

Typically, the ability to confirm and deny facial recognition matches will be within the People Profile Application View as illustrated in FIG. **32** within the facial recognitions area (indicator **1442**). The system will also have other facial resonations area where the user can confirm or deny the suggested facial recognitions of a person for a Digital File. When the user denies the suggested facial recognition, the system dis-associates potential person match Tag, search's the user's collection for other potential matches, and then sends information to Tag Data Block of Relationship Table for the Digital File. If the user accepts the suggested facial recognition, the system sends this facial recognition tag confirmation to the User Relationship Table for the Digital File. Once a confirmation is made, the newly associated Digital File will have that confirmed person Application Dot-Tag associated to that Digital File for all Application Views. Each time an accepted or denied facial recognition is made for a specific person, the specific data points used for facial recognition is improved and sent to the Third Party Facial Recognition Provider for more accurate confirmations of that person during the next run for that person.

As illustrated in FIG. **26**, the Third Party Media System (Data Exchange) (**0500**) is described in further detail. There are numerous types of third party media systems that are contemplated for MemoryWeb including social network providers (e.g., Facebook, Twitter, and LinkedIn) and other photo sites (e.g., Flickr and Picasa). In addition, it is contemplated for the ability to print Digital Files from MemoryWeb using third party print providers such as Walgreens or Shutterfly. Further contemplated solutions might be from digital file warehouses such as Dropbox and box-

Petitioner Apple Inc. - Ex. 1001, p. 63

19 20

.net. All of the Third Party Media Systems will interact with MemoryWeb using the same system that is described within FIG. 26. The Third Party Social Media System starts when the user initiates sharing of their information with Third Party Media Provider with MemoryWeb (0502). When this is initiated, the system will send registration information (0503) to the Third Party Media Provider (0501). Once received, the Third Party Media Provider will send back a confirmation with the Third Party Social Media ID (0504) and then the system will send the information (0505) to the User Settings Table (0390) within the User Relationship Table (0300). The system will then send daily requests from the User Relationship Table for contact names and IDs (0506) to the Social Media Provider (0506). If there are new contact names that are not part of the user's current people, the system will receive new contact names and IDs from the Social Media Provider (0501). The user will have the ability to confirm or deny matches (0508) with their contacts within MemoryWeb. If there is a match, the system will associate the existing person within MemoryWeb to the same ID of the person within the Third Party Social Media platform (0509) and then send this to the User Relationship Table. If there is not a match, the system will add this additional contact as a new person and send (0510) this to the User Relationship Table. If the user wants to share or print Digital Files from MemoryWeb, they can do this with the Share to Third Party Media Provider System (1000) that is further detailed within FIG. 46.

In FIG. 27, the MemoryWeb User Settings Table is illustrated. As illustrated in the User Settings Table (1900), various data blocks of information is stored including the User's Name (1901), Payment ID (1902) that is used with third party payment providers, Password (1903), Account Type (1904) (i.e., free or paid account), User's email (1905), Language preference (1906), Date format preference (1907), Email notification (1908) preferences, the ability to share Contacts (with third Party Social Media) (1909), Facebook ID (1910), API Token (1911), Payment Date (1912) and other settings that will evolve as the Application grows (1913).

In FIG. 28, the Application Digital Tag Organizer System (0600) is illustrated. Within various Application Views the user can select, add, delete and edit MemoryWeb Tags for such areas as people, date, location, collections, star rankings, and recipes. An illustration of an Uploads Application View where MemoryWeb Tags for a Digital File can be selected, added, deleted, or edited is illustrated in FIG. 35. The Application Digital Tag Organizer System begins when the user selects one or more Digital Files in MemoryWeb (0601). The system then sends a request to the User Relationship Table for the specific Digital File (0602). The system then retrieves the Digital File and the Digital File Tag Data Blocks (0603) from the User Relationship Table (0300). Next, the system will display the Digital File and the corresponding Digital Tag Data Blocks in the form of Application Dot-Tags (0604). An example of how the system can illustrate a Digital File with the corresponding Application Dot-Tags is in FIG. 31 (indicators 0780, 0765, 0766, 0768, 0770, and 0771).

If the user selects an Application Dot-Tag (0605), the system will utilize the Continuous Link of Application Dot-Tags System (0700) to produce the results of that Application Dot-Tag within one of the Application Views that is later illustrated in FIG. 30.

If the user selects add for a MemoryWeb Tag (0606), the user can add a new MemoryWeb Tag. When the user begins to type in text to add a tag, the system will produce suggestions on matching MemoryWeb Tags or the option to add a new tag (0607). If a matching tag is selected (0608), the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (0610). Alternatively, if the tag does not exist the user can create a new MemoryWeb Tag (0609) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (0611).

If the user selects edit for a MemoryWeb Application Dot-Tag (0612), the user can add information text to edit the MemoryWeb Tag and the system will produce suggestions or matching MemoryWeb tags or the option to add a new tag (0613). If there is a match within the user's system, the matching MemoryWeb Tag will appear and the user can select the MemoryWeb Tag (0614). Once the matching tag is selected, the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (0616). Alternatively, the user can create a new MemoryWeb tag (0615) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (0617). If the user selects delete for a MemoryWeb Application Dot-Tag (0618), the system deletes the association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File (0619).

In FIG. 29, the Application Dot-Tag Shape and Content is illustrated (0650). MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag (as illustrated in FIG. 30). In essence, the Application Dot-Tags operate as mini search engines for the user's Digital Tags.

The structure of an Application Dot-Tag (0650) can take on an solid-line enclosed shape of a pill, dot or similar depiction (0651) and within the shape the name of the MemoryWeb Tag is displayed (0653) along with the number of Digital Files (0652) that are also associated with that same MemoryWeb Tag. FIG. 29 further illustrates more examples of the Application Dot-Tags. If the number of Digital Files associated with a specific MemoryWeb Tag is less than a certain number (e.g., 1000), the actual number of Digital Files associated with that MemoryWeb Tag is displayed. In FIG. 29, this is illustrated with an Application Dot-Tag that has 453 files that are associated with the location of Cologne, Germany (0654). However, if the number of Digital Files associated with a specific MemoryWeb tag are greater than the character length, a greater sign along with a number sequence that is less than the total number of associated Digital Files will be displayed (0655). In FIG. 29, this is illustrated with an Application Dot-Tag that has ">999" (0657) as the number of Digital Files with the exact same MemoryWeb Tag and if the name of the MemoryWeb tag is longer than the text sequence, only a portion of the MemoryWeb tag will be displayed along with an ellipse as illustrated in "Holiday Photos from . . . " (0658). Finally, the Application Dot-Tag may be illustrated with a dotted or similar distinction (as opposed to a solid line) to help indicate a partial relationship (0656). In the illustration in

Petitioner Apple Inc. - Ex. 1001, p. 64

US 10,621,228 B2

21

22

FIG. **29**, the dotted line is to indicate that only some of the selected Digital Files have the MemoryWeb Tag of Frank Smith.

In FIG. **30**, the Continuous Link of Dot Tag System is illustrated (**0700**). When a user selects an Application Dot-Tag, it will take them to the corresponding Application View that relates to the type of MemoryWeb Tag. The Continuous Link of Application Dot-Tag System begins when a user selects an Application Dot-Tag (**0701**).

If the Application Dot-Tag is a Person (**0702**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of how a user can select a person Application Dot-Tag is in FIG. **31** (indicator **0764**). For a person tag, the system receives data for that person from the User Relationship Table and displays the relationship data in a People Profile View (**0709**). A sample illustration of a selected Person Application Dot-Tag is in FIG. **32** (indicator **1430**).

If the Application Dot-Tag is a Collection (**0703**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a collection Application Dot-Tag that can be selected is in FIG. **31** (indicator **0781**). For a collection tag, the system receives data for that collection from the User Relationship Table and displays the relationship data in a Collection View (**0710**). A sample illustration of a selected Collection Application Dot-Tag within a Collection View is in FIG. **33** (indicator **1530**).

If the Application Dot-Tag is a Location (**0704**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a location Application Dot-Tag that can be selected is in FIG. **31** (indicator **0768**). For a location tag, the system receives data for that location from the User Relationship Table and displays the relationship data in a Location View (**0711**). A sample illustration of a selected Location Application Dot-Tag within a Location View is in FIG. **34** (indicator **1630**).

If the Application Dot-Tag is a Date (**0705**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a date Application Dot-Tag that can be selected is in FIG. **31** (indicator **0766**). For a date tag, the system receives data for that date from the User Relationship Table and displays the relationship data in Uploads View with that date filtered (**0712**). A sample illustration of a selected Date Application Dot-Tag within Uploads View is in FIG. **40** (indicator **0861**).

If the Application Dot-Tag is a Recipe (**0706**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). For a recipe tag, the system receives data for that recipe from the User Relationship Table and displays the relationship data in a Recipe View with that date filtered (**0713**). A sample illustration of a selected Date Application Dot-Tag within Recipe View is in FIG. **36** (indicator **1800**).

The Application is contemplated to have additional types of Application Dot-Tags (**0707**) in the future including Family Trees, Timespan, etc. and each of these MemoryWeb Tags will go through the same continuous link of Application Dot-Tag process. For an additional type of Application Dot-Tag, the system will receive data from the User Relationship Table and displays the relationship data in the corresponding view for that type of Application Dot-Tag (**0714**).

If within any of the Application Views the user selects a Digital File (**0715**), the Digital File is then displayed in a Slideshow View (**0716**) where the user can again select an Application Dot-Tag (**0701**) and start the continuous link of Application Dot-Tag functionality over again. Also within an Application View, if the user selects another Application Dot-Tag (**0717**), the entire continuous link of Application Dot-Tag functionality begins again and sends the request back to ask if the newly selected Application Dot-Tag is a person (**0702**).

In FIG. **31**, the Slideshow view of a Digital File, Application Dot-Tags, and comments are illustrated (**0750**). When viewing a Digital File or group of Digital Files within the Slideshow Application View (**0750**), the selected Digital File is displayed in the center of the screen (**0754**). If the user wants to export this photo with all the associated Memory-Web Tags, they can select export (**0751**) which will initiate the Application Export System as illustrated in FIG. **49**. If the user wants to see the Digital File that is one file before the selected Digital File, they select the left arrow (**0752**) or they can select the right arrow (**0753**) to display the next photo in the sequence. Below the Digital File, the comments (**0755**) that are specific to that Digital file are depicted. If the user wants to edit the comments, they select edit (**0756**). If the user would like to see a moving slideshow of all the photos that are part of the group of Digital Files, they can select on the play sign (**0757**) or simply click the specific thumbnail of a Digital File (**0758**) to be displayed. The user can also have the slideshow in a full screen slideshow by selecting the full screen icon (**0759**). If the user wants to share the individual Digital file via email, they can select the mail icon (**0760**) or share it through a third party median provider, in this case Facebook (**0761**). A more detailed description on how the share functionality works is in FIG. **46** (indicator **1000**).

In FIG. **31**, each Application Dot-Tag that is associated with a Digital File is illustrated to the right of the Digital File under each major MemoryWeb Tag area. For this example, the People area (**0763**) has Application Dot-Tags of Jackson Smith (**0780**) and JC Smith (**0764**) associated with the selected Digital File. In the Dates area (**0765**), the Application Dot-Tag of August 28, 2013 (**0766**) is associated with the selected Digital File. In the Locations Area (**0767**), the Application Dot-Tag of Abe Lincoln Elementary School (**0768**) in the location associated with the selected Digital File. In the Collections Area (**0769**), the Application Dot-Tags of First Day of School (**0770**) and Jackson and JC Photos 2013 (**0771**) are associated with the selected Digital File. The Star Rankings Area (**0782**) shows that four out of five stars (**0773**) was selected for this Digital File. If the Digital File is associated with a Recipe (**0774**) the Application Dot-Tag would be illustrated in this area. The Media Type area indicates that this is a Memento (**0776**). If the user wants to delete this Digital File from the Application, they can select the Delete Item function (**0779**). If the user wants to edit the Application Dot-Tags, they can select the edit icon (**0762**) and all the MemoryWeb Tag areas will be in edit mode as later illustrated in FIG. **35**. Finally, any original Digital File detail (e.g., file name, camera specifications, etc.) is illustrated (**0778**).

In FIG. **32**, both of the People Application Views are illustrated. The first People Application View (**1400**) is used to display all the people that were created within the user's Application. This view can be seen by selecting "People" (**1401**) from any of the Application Views within the Application. The people can be listed in various sort orders though a drop-down (**1402**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. Additional sorts are contemplated such as age

Petitioner Apple Inc. - Ex. 1001, p. 65

US 10,621,228 B2

23

sort. For each person, a thumbnail of their face along with their name is depicted. In this figure, Jon Smith (**1403**) and JC Jon Smith (**1404**) along with some other people are illustrated. Also, the user can determine if they want to have 20, 50 or 100 people shown at one time (**1405**) by selecting the corresponding number box. At the top of every Application View within the Application, the user can select Fast Search (**1450**) that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters (**1451**) that is further described in FIGS. **37-43**.

In the second People Application View within FIG. **32**, a single people profile (**1430**) is illustrated. The individuals name is displayed at the top of the page (**1431**) along with their Nicknames (**1433**), when they were Born (**1434**), who their parents are (**1435**), Siblings (**1436**), Children (**1437**), and the person's Biography (**1438**). The Person Profile Photo of that individual is illustrated (**1439**) and if the user wants to change the profile photo, they can change by selecting change profile photo (**1440**). For each person, the system can allow the user to quickly see all the tags that are associated to a person. In this example, the system illustrates that there are four photos (**1452**) associated with that person and will also illustrate thumbnails of each of the four photos (**1446**). These thumbnails can be selected and then the user will be taken to the slideshow view for that Digital File. If the user selects Collections (**1441**), all of the collections that the person has been tagged within will be displayed. If the user selects Facial Recognitions (**1442**), all the faces that are confirmed or need to be confirmed are displayed. This is the area where the user can select to confirm or deny a suggested facial recognition through the Third Party Facial Recognition System that is illustrated in FIG. **25**. If the user selects Locations (**1443**), all of the Locations that the specific person has been tagged within will be displayed. If the user selects Family Relationships (**1444**), the seven people that the user is associated with will be displayed in a family chart or tree. If the user selects Recipe (**1445**), all the recipe's that the user has been tagged within will be displayed. If the user wants to edit any details within the individual people profile, they can select edit (**1447**) and all the fields will allow the ability to edit the details. If the user selects any of the Application Dot-Tags such as the individuals mother Jane Smith (Doe) (**1449**), the application will utilize the Continuous Link of Application Dot-Tag System (see FIG. **30**) and take the user to an individual people profile view of Jane Smith (Doe). If the user selects View all People (**1432**), the Application will go back to the multiple People View (**1400**).

In FIG. **33**, both of the Collection Application Views are illustrated. The first Collection Application View is used to display all the collections that were created within the user's Application (**1500**). This view can be seen by selecting "Collections" (**1501**) from any of the Application Views within the Application. The collections can be listed in various sort orders though a drop-down (**1502**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each collection, a thumbnail of a Digital File from that collection depicted. In this figure, Smith Family Photos (**1503**), Europe Trip (**1504**), First Day of School (**1505**), Jackson and JC Photos 2013 (**1506**), and Baseball Games (**1507**) is illustrated. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

24

In the second Collections Application View within FIG. **33**, a single collection (**1530**) is illustrated. The individual collection name is displayed at the top of the page (**1532**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system shows photos (**1533**) associated with the Smith Family Photos Collection. If the user wants to edit any Digital Files within the collection, they can select edit (**1535**) and then the user can add or delete any Digital Files as well as set the cover photo for a collection. If the user wants to share this collection (**1534**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1531**), the Application will go back to the multiple Collection View (**1500**).

In FIG. **34**, both of the Location Application Views are illustrated. The first Location Application View is used to display all the locations that were created within the user's Application (**1600**). This view can be seen by selecting "Locations" (**1605**) from any of the Application Views within the Application. The locations can be listed in various sort orders though a drop-down (**1606**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each location, a thumbnail of a Digital File from that location depicted. In this figure, Wrigley Field (**1601**), Abe Lincoln Elementary School (**1602**), Home Sweet Home (**1603**), and Stonehenge (**1604**) is illustrated. What is also contemplated instead of a Digital File from that location is that a zoomed in image of a map from the specific location using the Third Party Geographical Mapping System later depicted in FIG. **47**. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

In the second Locations Application View within FIG. **34**, a single location (**1630**) is illustrated. The individual location name is displayed at the top of the page (**1632**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system illustrates a one photo (**1633**) taken at Wrigley Field (**1634**) that is associated with the location called Wrigley Field. If the user wants to edit any Digital Files within the collection, they can select edit (**1637**) and then the user can add or delete any Digital Files. If the user wants to share the Digital Files associated with this location (**1636**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1631**), the Application will go back to the multiple Collection View (**1600**). As part of the individual Location View, an interactive map displaying a zoomed-in image of the specific location is displayed (**1635**).

In FIG. **35**, the Uploads Application View and how it uses the Application Digital Tag Organizer System is illustrated (**1700**). Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system (also called Application Digital Tag Organizer) allows a user to select large amounts of Digital Files and add Digital Tags that can characterize and document the digital file(s). Digital Files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. One or more Digital

Petitioner Apple Inc. - Ex. 1001, p. 66

US 10,621,228 B2

25

Files can be selected at the same time and displayed with an overlaid check mark when activated (**1705** and **1710**) and then Digital Tags can be assigned to a single file at a time or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos (**1713**) and enter the tag only once. In addition, the system does include an indicator that appears when a user hovers over the Digital File providing all the relevant Digital Tags associated with that specific Digital File (**1737**) and in this example it shows the caption of "Family Smith finally sees Stonehenge," that four People are tagged to this photo, one collection is tagged to this photo, there are zero people recognized through Facial Recognition, and the date of this photo is from December 21, 2013. If the user wants to delete a single photo from uploads, they can click on the "x" (**1735**) that is displayed when the user hovers over the Digital File thumbnail. When there are multiple Digital Files, the user can determine how many images are displayed at one time in the Items Per Page Buttons (**1738**) that include such numbers at 20, 50 and 100 on the page at the same time. When there are more Digital Files that items per page, they are automatically grouped by pages and a Page Button (**1739**) can be selected to see the next set of Digital Files.

In the Uploads Location View, Digital Files can be directly uploaded to the Application by selecting Upload Files (**1701**) and the user will have the option to select the specific Digital Files to be uploaded from their Storage System. Users also have the option to install the Memory-Web Download Application that can be installed on either a Microsoft or MAC computer that will automatically upload and sync photos to and from the users Storage System to the MemoryWeb Application. Also displayed is the amount of space being used by the user within the Application (**1702**). Uploads of Digital Files can be listed in various sort orders though a drop-down (**1703**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. In addition, the Digital Files can be sorted by File Batch Name (A-Z) or File Batch Name (Z-A). In FIG. **35**, the sort of File Batch Name (A-Z) is selected (**1703**) and this provides three groups of Digital Files with the names File Folder C:/2013/Family Fun (**1704**), File Folder C:/2013/General (**1706**), and of File Folder C:/2013/First Day of School (**1709**). The File Batch Name is created when Digital Files are uploaded to the Application. The File Batch Name allows the user to see the file directory of how they had their Digital Files stored from another Storage System (e.g., on their computer hard drive) that allows for easier organization within the MemoryWeb Application. For example, in the sort of File Folder C:/2013/General (**1706**), two digital files (**1707** and **1708**) are illustrated that came from the exact same file folder path of the Users Storage system upon upload. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

On the right side of FIG. **35**, the associated Application Dot-Tags along with the ability to organize one or more Digital Files at the same time is illustrated. At the top of the screen, it shows how two Digital Files are selected (**1712**) that correspond to the selected (checked) Digital Files (**1705** and **1710**). Below this area illustrates all the Application Dot-Tags that are associated with the two selected Digital Files. The user has the option to select all (**1713**) the Digital Files being viewed in the Uploads View as well as selecting none (**1714**). By selecting all, the user can administer

26

Application Dot-Tags to all the selected Digital Files at the same time. If the user wants to delete Digital Files, they can select the Digital Files to be deleted and then select the Delete Selection (**1715**) option.

In FIG. **35**, each Application Dot-Tag that is associated with the selected Digital File(s) is illustrated. For this example, the People area (**1716**) has Application Dot-Tags of Jackson Smith (**1734**), Jane Smith (**1733**), Jon Smith (**1731**, and JC Smith (**1717**) that are associated with the two selected Digital Files (**1710** and **1705**). If the user wants to add a person to all the selected Digital Files, they can click on "+Add People" (**1718**) that will display a pop-up where the user can search for an existing person within the user's existing people within the Application or add a new person to the user's group of people within the Application. It is contemplated to have a Facial Recognition suggestions appear in this area of the Application that will allow users to confirm or deny a recognized person to a specific Digital File. However, the current version of the People area is useful for situations where a face is not recognized, but the user desires to tag a person to a Digital File, they can manually assign a Person Application Dot-Tag to that Digital File for an existing person (e.g., if the person's back is turned, it is a document that contains that person, a piece of art created by that person, etc.).

In the Dates area (**1719**), the organize functionality for assigning a Digital Tag of a date within the Digital File(s) is illustrated. Upon upload, the date when the Digital File was created is automatically read by the Application and illustrated as an Application Dot-Tag (**1720** and **1730**). As illustrated in the Dates area, the Application Dot-Tags of July 4, 2013 (**1720**) and August 28, 2013 (**1730**) are illustrated as they correspond to the dates that are associated with each of the selected Digital Files. If the user wants to change the date for all the selected Digital Files, they can click on "+Add/Edit Date" (**1721**) that will display a pop-up where the user can add a new date for the selected digital files within the Application. This is a very useful feature when an incorrect date is assigned to a digital file (e.g., if a photo from October 31, 1951 was digitized on December 31, 2012, the digitized dates would show as an Application Dot-Tag that the user can change in this section to the correct date of October 31, 1951).

In the Locations area (**1722**), the organize functionality for assigning Digital Tags of locations within the Digital File(s) is illustrated. Upon upload, the GPS location of where the Digital File was created (if applicable) is automatically read by the Application and illustrated as an Application Dot-Tag for locations of the selected files. In the locations area, the Application Dot-Tags of Abe Lincoln Elementary School (**1723**) and Wrigley Field (**1735**) are illustrated as they correspond to the locations that are associated with each of the selected Digital Files. If the user wants to change the location for all the selected Digital Files, they can click on "+Add/Edit location" (**1724**) that will display a pop-up where the user can search for an existing location within the user's existing locations within the Application or add a new location to the user's group of locations within the Application. Another added function to assign a location to the selected Digital Files is to use Search with Map (**1732**) that utilizes the Application's Third Party Geographical Mapping System that is further illustrated in FIG. **47** that allows the user to type in any relevant information (e.g., location name, address, state, etc.) and then the Application will search and pinpoint that location on a map.

In the Collections Area (**1725**), the organize functionality for assigning Digital Tags of albums within the Digital

Petitioner Apple Inc. - Ex. 1001, p. 67

US 10,621,228 B2

27                                    28

File(s) is illustrated. Digital Files can be associated to multiple albums. As illustrated in the Collections area, the Application Dot-Tags of First Day of School (**1726**), Jackson and JC Photos 2013 (**1727**), and Baseball Games (**1728**) are associated with the Collections for the selected Digital Files. If the user wants to add a Collection to all the selected Digital Files, they can click on "+Add/Create Collection" (**1729**) that will display a pop-up where the user can search for an existing Collection within the user's existing Collections within the Application or add a new Collection to the user's group of Collections within the Application.

Within the Uploads View, the ability to perform similar tagging of Star Rankings, Recipes, Family Relationships, and Media Types/Document Type are also contemplated as part of the Application Digital Tag Organizer System. For Star Rankings, it is contemplated to assign MemoryWeb Tags of star rankings within the Digital File(s). Upon upload, if the star ranking is already contained within the Digital File, it is automatically read by the Application and illustrated as an Application Dot-Tag. The user can select one or more Digital Files and then apply a star ranking between 1 and 5 in the Uploads Application View. For Recipes, it is contemplated to assign MemoryWeb Tags of Recipes to Digital File(s). The user can select one or more Digital Files and then type within the "Recipe" search bar to either add a new recipe or associate the Digital File(s) to an existing recipe. Digital Files can be associated to multiple recipes. For Media Type/Document Type, the user can choose from a list of common document types (e.g., Birth Certificate, Death Certificate, Marriage Certificate, etc.) can be utilized for common document type associations. Once a document type is assigned to one or more Digital Files, the document type appears within an Application Dot-Tag. Digital Files can be associated to multiple document types.

In FIG. **36**, an individual recipe view (**1800**) allows one to see all the information that is associated with a specific recipe. The name of the specific recipe is displayed at the top of the page (**1801**) and the People Profile picture of the "chef" associated with the recipe is illustrated (**1804**). If no chef is assigned, the user can select the "+add/edit chef" (**1803**) to either choose an existing person from the user's People in the Application or add a new person.

The view of various Digital Files within the recipe (**1808**) along with scrolling through the Digital Files using the arrow icons (**1814** and **1815**), the ability to share this recipe with others by selecting the sharing icon (**1812**), As the Digital Files are selected on using the film strip on the bottom, a larger thumbnail illustrating the Digital File is shown (**1807**). The recipe view also allows you to choose a chef for the recipe from the people within the user's Application. When a chef is selected, the profile picture (**1804**) of the person along with their name as an Application Dot-Tag (**1816**) is displayed. For each recipe, the user can insert the ingredients (**1809**), directions (**1810**), and comments (**1811**). Each of these areas can be edited by selecting the edit button (**1813**). Another contemplated feature allows the user to apply star rankings for the recipe as well as categorize they type of recipe (e.g., appetizer, entrée, etc.). It is further contemplated that the Digital Files within the individual recipe view may also include videos where they can be watched showing the chef making the recipe. It is also contemplated that the recipes will be interactive with external sources (e.g., the Food Network) so that recipes can be shared or imported with the Application and that visitors to the account will be able to post/share comments about the recipe. It is further contemplated that the user can print the recipe using a print icon.

In FIG. **37**, the Advanced Filters System is illustrated (**0800**). This feature allows the user to narrow the Digital Files being viewed within the Application Views by searching the user's entire collection of MemoryWeb Tags within the Application and then displaying the filtered information in one of the Application Views. Advanced Filters System can be filtered by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify Digital Files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, and no upload date information or are lacking any other tag. The Advanced Search Filter can be used within many of the views the Application to narrow the set of Digital Files being viewed. For example, you can use the Advanced Filter Button to only show the map view of locations a specific person has traveled in their lifetime.

When a user selects the "Advanced Filters" from almost any Application View (**0801**) (the button can be seen in FIGS. **32**, **33**, **34**, **35**, and **36**), a pop-up will appear that allows the user to type in text into the text box (**0802**). As the user is typing, the system sends a request (**0803**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0804**) and illustrate the potential matches of the filters to the user (**0805**). As the user types in another letter, the process of sending a request (**0803**) to the User Relationship Table (**0300**), producing results (**0804**) and producing a new set of results (**0805**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0806**) and then selects to apply this filter (**0807**), the system will send this request to the User Relationship Table (**0300**). This portion of the Advanced Filter System is further illustrated in FIG. **38**.

If the Advanced Filter System is applied within the Uploads View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0809**). An example of this output is later illustrated in FIG. **39** (indicator **0850**).

If the Advanced Filter System is applied within the Collections View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0810**). An example of this output is later illustrated in FIG. **39** (indicator **0852**).

If the Advanced Filter System is applied within the Locations View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0811**). An example of this output is later illustrated in FIG. **40** (indicator **0856**).

If the Advanced Filter System is applied within the People View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0814**). An example of this output is later illustrated in FIG. **39** (indicator **0854**).

If the Advanced Filter System is applied within other contemplated views within the Application such as Recipe, Family Trees, Timespan, etc. the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0812**).

If the user decides to add an additional filter (**0813**), the process is repeated when the user selects "Advanced Filter" (**0801**) while the pre-existing filters are still applied. An example of this process is later illustrated in FIG. **42** and FIG. **43**. If the user selects an Application Dot-Tag, then the

Petitioner Apple Inc. - Ex. 1001, p. 68

29 30

continuous Link of Application Dot-Tags System is engaged as illustrated in FIG. **30** (**0700**).

In FIG. **38**, the process of the Adding the First Application Dot-Tag using the Advanced Filter is illustrated. This is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0830**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0831**). The user can then type in the alphanumeric text search criteria within the Advanced Filters text box (**0838**). In this example, the word "Smith" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters (**0836**) that meet the criteria. In this example, the user selects the Application Dot-Tag of a person named JC Smith (**0832**). In Stage 3, "Apply" is selected and then the application lists the Application Dot-Tag of a Person named JC Smith as a current active filter (**0837**). This filter will then be applied to each Application view that is further illustrated in FIGS. **39** through **41**. If the user wants to clear all the filters, they can select "clear filters" (**0839**).

In FIG. **39**, an illustration of the results for a Single Application Dot-Tag Filter for each Application view is depicted. If the Advanced Filter is applied in the Uploads Application View (**0850**), the filter of "JC Smith" (**0851**) is illustrated and only the Digital Files that contain the person JC Smith are illustrated. If the Advanced Filter is applied in the Collections Application View (**0852**), the filter of "JC Smith" (**0853**) is illustrated and only the Collections that contain the person JC Smith are illustrated. If the Advanced Filter is applied in the People Application View (**0854**), the filter of "JC Smith" (**0855**) is illustrated and only the person named JC Smith is illustrated.

In FIG. **40**, an illustration of the results for a Single Application Dot-Tag Filter for a date within the Uploads Application View is depicted (**0860**). If the Advanced Filter is applied using a date filter within the Uploads Application View (**0861**), the filter date of "2013-07-04" (**0876**) is illustrated and only the Digital Files that contain that date are illustrated.

In FIG. **41**, an illustration of the results for a Single Application Dot-Tag Filter in the Location Application View is depicted (**0870**). Within the Location Application View the Digital Files are displayed within an interactive map (Google map shown as an example). The Location View can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users. In this view, individual or groups of Digital Files are illustrated as photo thumbnails (see indicators **0874** and **0875**) on the map and the user can select the thumbnail to see all the Digital Files with the same location (as seen FIG. **34** (indicator **1630**)) or the user can use the interactive map and narrow the map view by either using the zoom in/zoom out bar (**0876**) on the left or simply selecting the map. Note that the pinned locations include a thumbnail of the Digital File (or Collection cover) and the number of Digital Files for that location.

If the Advanced Filter is applied in the Locations Application View, the filter of "JC Smith" (**0872**) is illustrated and only the Digital Files that contain the person JC Smith are illustrated with their geographic location on the map. The user can select to clear this filter (**0873**) or see this Advanced Filter with the view of locations as a list (**0871**). In FIG. **41**, there are two illustrated on the map (**0874** and **0875**).

In FIG. **42**, the process of the Adding another Application Dot-Tag using the Advanced Filter is illustrated. Continuing on the process that was illustrated in FIG. **38** where the first

Application Dot-Tag filter of "Person: JC Smith" was applied, the ability to add a second Application Dot-Tag if further illustrated in FIG. **42**. As with FIG. **38**, FIG. **42** is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0880**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0881**). The user can then type in the text search criteria for the second Advanced Filter within the Advanced Filters text box. In this example, the word "Abe" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters that meet the criteria. In this example, the user selects the Application Dot-Tag of a location named Abe Lincoln Elementary School (**0882**). In Stage 3 (**0883**), the application lists the Application Dot-Tags of both the Person named JC Smith (**0884**) as well as the location of Abe Lincoln Elementary School (**0885**) as part of the Current Active Filters. The user then selects "Apply" (**0886**) to see these filters illustrated in the Application Views. This filter will then be applied to each application view as previously illustrated in FIGS. **39** through **41**.

In FIG. **43**, an illustration of the results for Adding Another Application Dot-Tag Filter in the Location Application View is depicted (**0890**). Continuing on the process that was illustrated in FIG. **42**, in FIG. **43** (**0890**) the Application Dot-Tag filters of "Person: JC Smith" (**0891**) and "Location: Abe Lincoln Elementary School" (**0892**) are illustrated. There is one overlapping location that contains both filters for a Digital File that is illustrated on the map (**0893**).

In FIG. **44**, the Fast Search System is illustrated (**0900**). Throughout the Application, groups or individual Digital Files can be searched quickly using the Fast Search bar that is at the top of each Application View. Once a key word or phrase is entered into this area, the user's entire collection of Digital Tags within the Application that includes all the Digital tags are searched for potential matches. This feature allows the user to search their entire collection of MemoryWeb Tags within the Application and then displays the information grouped by people, collections, locations, documents, and recipes. The Fast Search System can be searched by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates.

When a user selects the Fast Search bar from almost any Application View (**0901**), the user can type in alphanumeric text into the text box (**0902**). As the user is typing, the system sends a request (**0903**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0904**) and illustrate the potential matches by category for the user (**0905**). As the user types in another letter, the process of sending a request (**0903**) to the User Relationship Table (**0300**), producing results (**0904**) and producing a new set of results (**0905**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0906**), the system will send this request to the User Relationship Table (**0300**). This process is further illustrated in FIG. **45**.

If the user selects a person Fast Search tag, the system retrieves data for the person from the User's Relationship Table and displays the relationship data (**0907**) in the Person Profile View as illustrated in FIG. **32** (indicator **1430**).

If the user selects a collection Fast Search tag, the system retrieves data for the collection from the User's Relationship Table and displays the relationship data (**0908**) in the Collection View as illustrated in FIG. **33** (indicator **1530**).

Petitioner Apple Inc. - Ex. 1001, p. 69

US 10,621,228 B2

31                                                32

If the user selects a location Fast Search tag, the system retrieves data for the location from the User's Relationship Table and displays the relationship data (**0909**) in the Location View as illustrated in FIG. **34** (indicator **1630**).

If the user selects a date Fast Search tag, the system retrieves data for the date from the User's Relationship Table and displays the relationship data (**0910**) in the Uploads View in FIG. **40** (indicator **1861**).

If the Fast Search System is applied within other contemplated views within the Application such as Family Trees, Timespan, etc. the system retrieves data for the search from the User's Relationship Table and displays the relationship data (**0911**). As part of the contemplated search process is to also search comments related to a Digital File.

In FIG. **45**, the process of using the Keyword Fast Search is illustrated. This is a visual depiction of the process that was illustrated in FIG. **44**. In Stage 1 (**0930**), the user selects the Fast Search bar at the top of one of the Application Views. This takes the user to Stage 2 (**0931**) where the user can then type in the alphanumeric text search criteria within the Fast Search text box (**0932**). In this example, the word "Wrigley" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available MemoryWeb Tag results (**0933**) that meet the criteria. Note how the results are organized by various MemoryWeb Tag categories such as Person, Collection, Location, Recipe, and comments. In Stage 3 (**0934**), the user selects one of the results. In this example, the user selects the location of Wrigley Field (**0935**). When the user selects a specific MemoryWeb Tag, it takes them to Stage 4 where the information related to that tag is displayed in the corresponding view as discussed within FIG. **44**. For the example where the user selected the Location of Wrigley Field, the user was taken to the individual locations Application View where the location of Wrigley Field and the corresponding Digital Files are displayed (**0936**).

In FIG. **46**, the Share to Third Party Media Provider System (**1000**) is illustrated. This feature allows the user to share Digital Files from MemoryWeb directly to a third party application. The process begins when the user selects to share a Digital File or collection of Digital Files within the MemoryWeb Application (**1001**). Examples of where the user can select share can be seen in FIG. **31** (indicator **0760**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Once the request is made, the system requests the Digital File and Tag Data Blocks (**1002**) from the User Relationship Table (**0300**). The system then retrieves the Digital File from the User Relationship Table (**1003**). At the same time, the system will also retrieve the Digital Tags from the Relationship Table (**1004**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1005**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1006**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**1300**) which then sends the Digital File outside the MemoryWeb Application to the Third Party Media Provider (**0501**).

In FIG. **47**, the Third Party Geographical Mapping System is illustrated (**1100**). When Digital Files are imported into MemoryWeb, if there is any GPS data available from the EXIF Tags (See FIG. **22** (indicators **0330**, **0331**, **0332**, and **0333**)), the system will utilize this data and automatically create a MemoryWeb location tag within the Application (See FIG. **22** (indicators **0368**, **0369**, **0370** and **0371**)). However, if the GPS coordinates were missing from a Digital File when it was imported into the Application (See FIG. **50** (indicators **1418** and **1419**)), the user can add the Location (which the application will automatically add the associated GPS tags) to the Digital File using the Application Digital Tag Organization System (see FIG. **28**). As locations are associated with a Digital File, the Application can interact with a Third Party Geographical Mapping System to pull maps that correspond to the exact location of Digital Files that have a location tag (see FIG. **34** (indicator **1630** and FIG. **40**, indicator **0875**)). In addition, the Application utilizes a world map view to illustrate all the locations that are associated to one or more Digital Files for a user within the Location Application View (see FIG. **41** (indicator **0880**)).

The Third Party Geographical Mapping System begins when a Location Application Dot Tag (**1102**) is selected (**1104**), the system will send a request (**1105**) to the User Relationship Table (**0300**). Examples of when Location Application Dot-Tags can be selected are illustrated in FIG. **31** (indicator **0768** and FIG. **35**, indicators **1723** and **1735**). In FIG. **47** if the Locations Application View is selected (**1103**), the system will send a request (**1105**) to the User Relationship Table. The Location Application View can be selected from almost any Application view as illustrated in FIG. **34** (indicator **1605**). When either a single location or the world map view is selected, the system will retrieve the data (**1108**) from the User Relationship Table (**0300**) and send a request (**1106**) to the Third Party Geographical Mapping Provider (**1101**) who generates the map request and then sends the information back to the system for the specific location (**1107**). At the same time, the Application Dot-Tags and Digital Files associated with the location or map request are retrieved and then sent (**1109**) to the Locations Application view. The system will combine the map information along with the Application Dot-Tags and Digital Files and display this information within the Location Application View (**1100**). Examples of a single Location Application View can be seen in FIG. **34** (indicator **1630**) and FIG. **40** (indicator **0875**), and an example of a world map view can be seen in FIG. **41** (indicator **0880**).

In FIG. **48**, the Share to Individual System is illustrated (**1200**). The Share to an individual person or a group of people starts when a user initiates share of a Digital File or a Collection of Digital Files (**1201**). Examples of where the user share functions are illustrates are in FIG. **31** (indicators **0760** and **0761**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Next, the system requests the Digital File and Tag Data Blocks (**1202**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1203**) from the User Relationship Table.

At the same time, the system will also retrieve the Digital Tags of the Digital File from the Relationship Table (**1204**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1206**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1205**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System

Petitioner Apple Inc. - Ex. 1001, p. 70

US 10,621,228 B2

33                                          34

(**1300**) which then sends the Digital File outside the MemoryWeb Application to an Individual or Group of People (**1207**).

In FIG. **49**, the Application Export System is illustrated (**1300**). The Application Export System starts when a user selects the export of a Digital File within the application (**1302**) or has installed the MW Automatic Uploader/Downloader Application (**1308**). An example of where the user can select the export of a Digital file within the Application is FIG. **31** (indicator **0751**). If the user has installed the MW Automatic Uploader/Downloader Application, the export functionality of the user's entire collection of Digital Files will be downloaded to the User's desired folder on their computer with the Digital Tags embedded within the Digital Files. If neither a user initiated download nor the MW Automatic Uploader/Downloader Application is not used, then the Application Export is not initiated (**1309**). For either a user initiated download or one using the MW Automatic Uploader/Downloader Application, the system requests the Digital File(s) and Tag Data Blocks (**1303**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1304**) from the User Relationship Table. At the same time, the system will also retrieve the Digital Tags of the Digital File from the User Relationship Table (**1305**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1306**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File(s) (**1307**). The application then exports the Digital File(s) with the new EXIF Tag Data Blocks to the desired Storage System of the user (**1301**).

In FIG. **50**, there are three charts for the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb. This Figure is meant to demonstrate how the EXIF Tag Data Blocks for a Digital File (in this example a JPG file) prior to the use of MemoryWeb Application appear and then how these EXIF Tag Data Blocks are populated with Digital Tags upon export from the MemoryWeb Application.

The first chart illustrates common EXIF Tags (Data Blocks) (**1401**) and lists certain common the EXIfTool Family 1 Group names that are displayed in the file properties of a JPG file when using Microsoft Windows (these are the same EXIF Tag Blocks that were illustrated in FIG. **22** indicator **1320**)). In the second chart (**1402**), the Digital Tags associated with the original Digital File are displayed. In the third chart (**1403**), the updated Digital Tags for the same original Digital File once exported from the MemoryWeb Application is displayed.

In the second chart (**1402**), the original Digital File prior to import to the MemoryWeb Application did not have Digital Tags for data blocks such as Description Rating (**1416**), Description Comments (**1417**), GPS Latitude (**1418**), GPS Longitude (**1419**). Also in the second chart the Digital Tags for the data blocks of File Folder Path (**1420**) and File Date Created (**1421**) are illustrated.

In the third chart (**1403**), the original Digital File that was exported from the MemoryWeb Application now contains new or modified Digital Tags for certain data blocks. For example, a star rating of four out of five stars (**1410**) with the new MW Modified Digital File is now associated with the Description Rating (**1404**) where it was blank (**1416**) with the original file before using the MemoryWeb Application.

Another example is the listing of MemoryWeb Tags within the Description Comments data block (**1411**) as: CAPTION: Jackson and JC's first day at school!, PERSON: Jackson Smith, JC Smith, LOCATION NAME: Abe Lincoln Elementary School, COLLECTION: First Day of School, COLLECTION: Jackson and JC Photos 2013, DATE: 8/28/2013. All of these Digital Tags are now associated with the Description Comments (**1405**) where it was blank (**1417**) with the original file before using the MemoryWeb Application.

Also updated in the MW Modified Digital File are the GPS Latitude (**1412**) and GPS Longitude (**1413**) as Digital Tags that were assigned in the MemoryWeb Application using the location feature with the Application Digital Tag Organizer System. These tags now replace the blank tags (indicators **1418** and **1419**) that were in the original file before using the MemoryWeb Application.

A final example is how the date was modified in the MemoryWeb Application where a new date of August 28, 2013 (**1415**) was assigned to the Digital File. This replaced the old date that was originally tagged with a date of November 1, 2013 (**1421**). In a typical Digital File, only the date and perhaps the GPS location if taken with certain newer photo device is pre-populated in a Digital File. For the example in FIG. **50**, the Digital File may have been created or scanned on November 1, 2013, but with the MemoryWeb Application Digital Tag Organizer System the user was able to correctly assign the date the photo was taken and now this date is always part of the Digital File within the MemoryWeb Application, but also when the Digital File is exported from MemoryWeb.

A benefit of the Export System is that users can export a single Digital File or their entire set of Digital Files (using the MW Automatic Uploader/Downloader Application), with all the updated Digital Tags from the MemoryWeb Application embedded within the Digital File(s). This feature is unique as it will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing Digital Files such as a social media website) where it can be viewed with these Digital Tag attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its Digital Files to a new digital system.

The application also contemplates the use of a Family Tree Application View where the individual people that have been created within the Application can be displayed with family relationships. This view can illustrate interactive family trees where one can see the family tree of an individual or family. Any family relationships created in the user's personal profile are already pre-populated by the Application for the Family Tree View. If a user selects on an individual within the family tree, it will take them to the people profile Application View of that person. Family Trees can quickly be viewed with the family tree drop-down sort feature. As with other areas within the Application, the family tree view can be narrowed down using an Advanced Filters System. For matching family members, the system will have drag/drop functionality to make new associations to a family tree. It is also contemplated that various family tree views could be displayed (e.g., pedigree chart, fan chart, directs descendants chart, etc.). In addition, it is contemplated that family tree relationships from either data files (e.g., GEDCOM files) or other sources (e.g., Family Search

Petitioner Apple Inc. - Ex. 1001, p. 71

35 36

database) would either be imported into the user's versions of the Application or utilize these sources in associating the family tree information.

Another Application View that is contemplated is Timespan or Timeline. The Timeline Application View will have an interactive timeline to display the dates within the Digital Files of the Application for a user. The timeline view acts as an interactive filter or funnel of Digital Files whereas when the user starts to define the parameters of dates towards the bottom, the information above it is filtered to display the major groups of Digital Files that meets the selected date range criteria in various formats until you are able to view an individual Digital File. This funnel approach is designed to allow the user to appreciate the vast amount of data that can be associated with a date range, but then allow them to filter the information with the user's desired criteria. This will be a very useful tool when users want to see the growth and progress of an individual as well as memorialize a lifetime of a friend or family member.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

The invention claimed is:

1. A method comprising:
responsive to a first input, causing a map view to be displayed on an interface, the map view including:
 (i) an interactive map;
 (ii) a first location selectable thumbnail image at a first location on the interactive map; and
 (iii) a second location selectable thumbnail image at a second location on the interactive map;
responsive to an input that is indicative of a selection of the first location selectable thumbnail image, causing a first location view to be displayed on the interface, the first location view including (i) a first location name associated with the first location and (ii) a representation of at least a portion of one digital file in a first set of digital files, each of the digital files in the first set of digital files being produced from outputs of one or more digital imaging devices, the first set of digital files including digital files associated with the first location;
responsive to an input that is indicative of a selection of the second location selectable thumbnail image, causing a second location view to be displayed on the interface, the second location view including (i) a second location name associated with the second location and (ii) a representation of at least a portion of one digital file in a second set of digital files, each of the digital files in the second set of digital files being produced from outputs of the one or more digital imaging devices, the second set of digital files including digital files associated with the second location; and
responsive to an input that is subsequent to the first input, causing a people view to be displayed on the interface, the people view including:
 (i) a first person selectable thumbnail image including a representation of a face of a first person, the first person being associated with a third set of digital files including digital photographs and videos;

 (ii) a first name associated with the first person, the first name being displayed adjacent to the first person selectable thumbnail image;
 (iii) a second person selectable thumbnail image including a representation of a face of a second person, the second person being associated with a fourth set of digital files including digital photographs and videos; and
 (iv) a second name associated with the second person, the second name being displayed adjacent to the second person selectable thumbnail image.

2. The method of claim 1, wherein the map view further includes a first indication feature associated with the first location selectable thumbnail image, the first indication feature being based on a number of digital files in the first set of digital files.

3. The method of claim 2, wherein the first indication feature is connected to the first location selectable thumbnail image.

4. The method of claim 2, wherein the first indication feature includes a first number indicative of the number of digital files in the first set of digital files.

5. The method of claim 2, wherein the map view further includes a second indication feature associated with the second location selectable thumbnail image, the second indication feature being based on a number of digital files in the second set of digital files.

6. The method of claim 5, wherein the second indication feature is connected to the second location selectable thumbnail image.

7. The method of claim 5, wherein the second indication feature includes a second number indicative of the number of digital files in the second set of digital files.

8. The method of claim 2, further comprising, subsequent to the map view being displayed on the interface, responsive to an input that is indicative of zooming in on the interactive map, modifying the first indication feature.

9. The method of claim 2, further comprising, subsequent to the map view being displayed on the interface, responsive to an input that is indicative of zooming out on the interactive map, modifying the first indication feature.

10. The method of claim 2, further comprising, subsequent to the map view being displayed on the interface, responsive to an input that is indicative of a filter selection, modifying the first indication feature.

11. The method of claim 1, wherein the first location selectable thumbnail image is a first collection cover image and wherein the second location selectable thumbnail image is a second collection cover image that is different than the first collection cover image.

12. The method of claim 1, wherein the first location selectable thumbnail image includes a representation of at least one of the digital files in the first set of digital files, and wherein the second location selectable thumbnail image includes a representation of at least one of the digital files in the second set of digital files.

13. The method of claim 12 wherein the representation of the at least a portion of the one digital file in the first set of digital files is not overlaid on the interactive map, and wherein the representation of the at least a portion of the one digital file in the second set of digital files is not overlaid on the interactive map.

14. The method of claim 1, wherein the first location view includes a representation of at least a portion of all of the digital files in the first set of digital files and the second location view includes a representation of at least a portion of all of the digital files in the second set of digital files.

Petitioner Apple Inc. - Ex. 1001, p. 72

US 10,621,228 B2

37      38

**15**. The method of claim **1**, further comprising:

responsive to an input that is indicative of a selection, in the first location view, of the representation of the at least a portion of the one digital file in the first set of digital files, causing a first digital file to be displayed on the interface; and

responsive to an input that is indicative of a selection, in the second location view, of the representation of the at least a portion of the one digital file in the second set of digital filed, causing a second digital file to be displayed on the interface.

**16**. The method of claim **1**, further comprising:

receiving alphanumeric text as a tag;

associating the tag with a first digital file in first set of digital files;

receiving a request to export the first digital file; and

responsive to receiving the request to export, exporting the first digital file by causing the first digital file to be communicated along with the tag.

**17**. The method of claim **1**, further comprising, prior to receiving the first input, causing the interface to display a plurality of selectable elements, the plurality of selectable elements including a location selectable element and a people selectable element, wherein the first input is indicative of a selection of the location selectable element, and wherein the second input is indicative of a selection of the people selectable element.

**18**. The method of claim **1**, further comprising responsive to an input that is indicative of a selection of the first person selectable thumbnail image, causing a first person view to be displayed on the interface, the first person view including (i) the first name and (ii) a representation of each digital file in the third set of digital files.

**19**. The method of claim **18**, further comprising responsive to an input that is indicative of a selection of the second person selectable thumbnail image, causing a second person view to be displayed on the interface, the second person view including (i) the second name and (ii) a representation of each digital file in the fourth set of digital files.

\*   \*   \*   \*   \*

Petitioner Apple Inc. - Ex. 1001, p. 73

US010423658B2

(12) **United States Patent**
Desmond et al.

(10) Patent No.: **US 10,423,658 B2**
(45) Date of Patent: **\*Sep. 24, 2019**

---

(54) **METHOD AND APPARATUS FOR MANAGING DIGITAL FILES**

(71) Applicant: **MemoryWeb, LLC**, Glen Ellyn, IL (US)

(72) Inventors: **Christopher J. Desmond**, Glen Ellyn, IL (US); **Nancy L. Desmond**, Glen Ellyn, IL (US); **L. Michael Taylor**, Chicago, IL (US)

(73) Assignee: **NCM IP HOLDINGS, LLC**, Glen Ellyn, IL (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 518 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/375,927**

(22) Filed: **Dec. 12, 2016**

(65) **Prior Publication Data**

US 2017/0091225 A1     Mar. 30, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/193,426, filed on Feb. 28, 2014, now Pat. No. 9,552,376, which is a
(Continued)

(51) **Int. Cl.**
*G06F 16/90* (2019.01)
*G06F 16/58* (2019.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... *G06F 16/5866* (2019.01); *G06F 16/51* (2019.01); *G06F 16/901* (2019.01); *G06F 16/907* (2019.01); *G06F 3/0481* (2013.01)

(58) **Field of Classification Search**
CPC ... G06F 16/5866; G06F 16/907; G06F 16/901
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,694,514 A | 12/1997 | Evans | |
| 6,629,104 B1 | 9/2003 | Parulski | |

(Continued)

OTHER PUBLICATIONS

Kustanowitz et al., "Motivating Annotation for Personal Digital Photo Libraries: Lowering Barriers while Raising Incentives," Tech. Report HCIL-2004-18, U. Maryland, 2005 (10 pages).
(Continued)

*Primary Examiner* — Loc Tran
(74) *Attorney, Agent, or Firm* — Nixon Peabody LLP

(57) **ABSTRACT**

A computer-implemented method of associating digital tags with digital files comprises storing a plurality of digital files having embedded therein content data and metadata including tags; receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and displaying, on a video display device associated with the client device, a first indication of the first tag label.

**15 Claims, 50 Drawing Sheets**



Petitioner Apple Inc. - Ex. 1001, p. 1

US 10,423,658 B2
Page 2

### Related U.S. Application Data

continuation-in-part of application No. 13/157,214, filed on Jun. 9, 2011, now Pat. No. 9,098,531.

(51) **Int. Cl.**

| | | |
|---|---|---|
| **G06F 16/51** | (2019.01) | |
| **G06F 16/901** | (2019.01) | |
| **G06F 16/907** | (2019.01) | |
| G06F 3/0481 | (2013.01) | |

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,372,976 B2 | 5/2008 | Rhoad | |
| 7,480,669 B2 | 1/2009 | Lo | |
| 7,694,236 B2 | 4/2010 | Gusmorino | |
| 8,150,844 B2 | 4/2012 | Redstone | |
| 8,484,223 B2 | 7/2013 | Ota | |
| 2006/0165380 A1 * | 7/2006 | Tanaka | G11B 27/34 386/227 |
| 2007/0282908 A1 | 12/2007 | Van Der Meulen | |
| 2009/0113350 A1 * | 4/2009 | Hibino | G06F 16/41 715/853 |
| 2009/0265631 A1 | 10/2009 | Sigurbjornsson | |

#### OTHER PUBLICATIONS

Miller et al., "Give and take: a study of consumer photo-sharing culture and practice," CHI ' 07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 347-356, 2007 (10 pages).

Ames et al., "Why we tag: motivations for annotation in mobile and online media," CHI '07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 971-980, ACM, 2007 (10 pages).

Yee et al., "Faceted Metadata for Image Search and Browsing", CHI 2003, pp. 401-408, 2003, ACM.

Ferre, "CAMELIS: Organizing and Browsing a Personal Photo Collection with a Logical Information System", Int. Conf. Concept Lattices and Their Applications, pp. 112-123, 2007, HAL.

Tomasson et al., "PhotoCube: Effective and Efficient Multi-Dimensional Browsing of Personal Photo Collections", ICMR '11, 2011, ACM.

Bartolini et al., "Integrating Semantic and Visual Facets for Browsing Digital Photo Collections", SBED, pp. 65-72, 2009.

Trattner et al., "Evaluating Tag-Based Information Access in Image Collections", Proceedings of the 23rd ACM Conference on Hypertext and Social Media, pp. 113-122, 2012 ACM.

Kang et al., "Capture, Annotate, Browse, Find, Share: Novel Interfaces for Personal Photo Management", International Journal of Human-Computer Interaction, 23(3), pp. 315-337, 2007, Lawrence Eribaum Associates, Inc.

Jaffe et al., "Generating Summaries and Visualization for Large Collections of GeoReferenced Photographs", MIR'06, pp. 89-98, 2006 ACM.

Tornial et al., "Sharing, Discovering and Browsing Geotagged Pictures on the Web", 2007, Hewlett-Packard Development Company, L.P., pp. 1-18.

Snavely et al., "Photo Tourism: Exploring Photo Collection in 3D", SIGGRAPH '06 ACM Transactions on Graphics, vol. 25, Issue 3, pp. 835-846, 2006 ACM.

Kisilevich et al., "Event-based analysis of People's Activities and Behavior Using Flickr and Panoramio Geotagged Photo Collections", 14th International Conference Information Visualization, pp. 289-296, 2010 IEEE.

Ahern et al., "World Explorer: Visualizing Aggregate Data From Unstructured Text in Geo-Referenced Collections", JCDL'07, pp. 1-10, 2007, ACM.

Kopf et al., "Deep photo: model-based photograph enhancement and viewing", ACM Transactions on Graphics, vol. 27, No. 5, Article 116, Dec. 2008, ACM (10 pages).

* cited by examiner

Petitioner Apple Inc. - Ex. 1001, p. 2

**FIG. 1**



Petitioner Apple Inc. - Ex. 1001, p. 3

**FIG. 2**

 

Comments:
Suzanne and Anthony's Wedding Party where the cousins posed
for a photo in the grass.  Note, Jack with the lollipop and the
photographer with his shoe in the photo

People:
Jack Wong
CJ Wong
Mary Firestone
Zoe Peika
Nick Persons

Event: Suzanne & Anthony's Wedding Reception 2010

Camera Details: more

Location:
Historical Society
Lisle, IL 60532

Petitioner Apple Inc. - Ex. 1001, p. 4

## FIG. 3



Petitioner Apple Inc. - Ex. 1001, p. 5

**FIG. 4**



Petitioner Apple Inc. - Ex. 1001, p. 6

**FIG. 5**



Petitioner Apple Inc. - Ex. 1001, p. 7

**FIG. 6**



Petitioner Apple Inc. - Ex. 1001, p. 8

**FIG. 7**



**Clinton Dewitt Firestone IV**

Birth:     July 12, 1896
Death:     April 29, 1971
Parents:   Clinton Dewitt Firestone III and Viola Miller
Comments:  He was a WWII U.S. Air force pilot and POW in WWII and veteran honorably discharged in December of 1947. He worked for 44 years for the Firestone Tire and Rubber Company in retail, wholesale and original equipment sales, marketing and management. He was born in Akron, OH and is buried in Columbiana, OH.

Edit bio

| Locations | Timeline | Family Tree | Recipes |
|-----------|----------|-------------|---------|

   

Petitioner Apple Inc. - Ex. 1001, p. 9

## FIG. 8



Petitioner Apple Inc. - Ex. 1001, p. 10

**FIG. 9**



Petitioner Apple Inc. - Ex. 1001, p. 11

# FIG. 10



**Desmond's Yellow Thai Chicken Curry**

Curry Mix
- Coconut milk (400 ml) – DO NOT SHAKE IT UP
- 800 gram of chicken (4 chicken breast)
- Fish sauce (Nam Pla) Thai Bamboo Garden – Bottle
- Garlic (2 cloves)
- Broccoli ( 2cups chopped)
- 2 Peppers (chopped)
- 2 Carrots (chopped)

- 1 Zucchini (chopped)
- Thai Basil (8 leaves)
- Lemon Grass (in jar) 1 teaspoon
- Chinese Ginger Root (in jar) 1 teaspoon

Rice
- Thai Rice (something that only takes 2 cups of water)
- Dice chicken in bowl and add two tablespoons of fish sauce. Let marinate for 20 minutes.
- Take thick part of coconut milk out into pan (about 4 tablespoons), Curry paste, 1 spoon of lemon grass, 1 spoon of ginger and garlic. Heat over high with boil and THEN stir for 1 minute. Add meat (uncooked) and fry until cooked over high heat
- Add milk, brown sugar and salt. Bring back to slight boil and constantly stir. Add veggies and soy sauce. Cook for about 10-14 minutes COVERED until veggies are cooked. Serve with a smile.

Chef: Barry Desmond



Video on How to Make It



Original Handwritten Recipe

Petitioner Apple Inc. - Ex. 1001, p. 12

# FIG. 11

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 13

## FIG. 12

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 14

**U.S. Patent**    **Sep. 24, 2019**    **Sheet 13 of 50**    **US 10,423,658 B2**

# FIG. 13

Thumbnail | Table

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| + Alberts | 2 | 8 | 0 | 0 |
| + Annex | 2 | 7 | 0 | 0 |
| + Bade | 3 | 8 | 0 | 0 |
| + Bacon | 4 | 8 | 0 | 0 |
| + Bates | 5 | 7 | 1 | 0 |
| + Boone | 6 | 6 | 2 | 2 |
| + Danas | 7 | 5 | 4 | 1 |
| + Danes | 8 | 7 | 3 | 2 |
| - Monk (All) | 2 | 499 | 4 | 14 |
| Monk, CJ | 1 | 200 | 2 | 7 |
| Monk, Jack | 1 | 199 | 2 | 7 |
| + Firestone | 21 | 1249 | 17 | 39 |
| + Moore | 1 | 4 | 6 | 3 |
| + Slythe | 1 | 9 | 0 | 9 |
| + Stein | 2 | 249 | 1 | 3 |
| + Testy | 4 | 788 | 2 | 12 |

Petitioner Apple Inc. - Ex. 1001, p. 15

# FIG. 14

Thumbnail | Table

| Last Name | Relationship | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Alberts, John | Cousin | 8 | 0 | 0 |
| Killian, Jack | Son | 7 | 0 | 0 |
| Killian, Brian | Nephew | 8 | 0 | 0 |
| Killian, Kevin | Nephew | 8 | 0 | 0 |
| Killian, Sarah | Daughter-in-law | 7 | 1 | 0 |
| Killian, John | Great Nephew | 6 | 2 | 2 |
| Killian, Mark | Great Nephew | 5 | 4 | 1 |
| Killian, Louis | Great Grandson | 7 | 3 | 2 |
| Killian, John | Grandson | 499 | 4 | 14 |
| Monk, CJ | Great Grandson | 200 | 2 | 7 |
| Monk, Jack | Great Grandson | 199 | 2 | 7 |
| Firestone, Mike | Third Cousin | 1249 | 17 | 39 |
| Moore, Bertha | Great Niece | 4 | 6 | 3 |
| Slythe, Sarah | Sister | 9 | 0 | 9 |
| Killian, John | Brother | 249 | 1 | 3 |
| Killian, Mike | Brother | 788 | 2 | 12 |

Petitioner Apple Inc. - Ex. 1001, p. 16

**U.S. Patent**   Sep. 24, 2019   Sheet 15 of 50   US 10,423,658 B2

## FIG. 15

Thumbnail | Table

| Location Name | Address | City | State | Country | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|---|---|
| Dom | | Cologne | | Germany | 3 | 2 | 0 |
| Lucilla & Roberto | | Montalcino | | Italy | 6 | 1 | 0 |
| Lisle Home | 898 West St | Lisle | IL | USA | 45 | 12 | 2 |
| College | 545 Market | Akron | OH | USA | 64 | 2 | 0 |
| Amazon Trip | | Manus | | Brazil | 235 | 8 | 2 |
| Cabin | 999 Pine | Lake Geneva | WI | USA | 98 | 2 | 0 |
| Grad School | 903 Plymouth | Charleston | IL | USA | 1256 | 32 | 4 |
| Griffith Park | 298 Glencarin | Los Feliz | CA | USA | 12 | 0 | 0 |
| LA Equestrian Ctr | 568 Horse Dr | Glendale | CA | USA | 4 | 4 | 0 |
| Del Coronado | 12 Coronado Dr | Coronado | CA | USA | 321 | 4 | 0 |
| Fenway Park | 123 Yawke | Boston | MA | USA | 57 | 3 | 5 |
| Wrigley Field | 1190 W Addison | Chicago | IL | USA | 498 | 7 | 3 |
| Home | 444 Main | Anywhere | IL | USA | 10,987 | 49 | 9 |
| GA Grill Party | 321 Silver | Macon | GA | USA | 15 | 0 | 0 |
| Pike's Market | 786 Market | Seattle | WA | USA | 18 | 1 | 0 |
| Raffels | 345 Fong | Singapore | | Singapore | 23 | 2 | 0 |

Petitioner Apple Inc. - Ex. 1001, p. 17

## FIG. 16

Category | Card | Table

| Recipe | Chef | Date | Category |
|---|---|---|---|
| Blacks Yellow Thai Chicken Curry | Jack Black | 31 Jan 2010 | Dinner |
| Skinny Germans | Gerda | 29 Dec 2003 | Breakfast |
| KFC in a Bag | The Kernal | 13 Sept 1988 | Anytime |
| Shit on a Shingle | George James | 5 Aug 1998 | Anytime |
| Mrs. Fields Cookies | Mrs. Fields | 21 July 1978 | Dessert |
| Chicken Pot Pie | Jack Black | 31 Jan 2010 | Dinner |
| Roll Your Own Dough | Vito Spadavecchio | 29 Dec 2003 | Dinner |
| Pizza ala Franciscan | Charles Faso | 13 Sept 1988 | Dinner |
| Meatball Delight | Ben Delight | 5 Aug 1998 | Dinner |
| Almond Cookies | Lori James | 21 July 1978 | Dessert |
| Jumpin Jack Flap Jacks | Jack Jack | 31 Jan 2010 | Breakfast |
| Vicki's Chow Mein | Vicki Firestone | 29 Dec 2003 | Dinner |
| Fat Steak | Barry Monk | 13 Sept 1988 | Dinner |
| Mud Pie | Nancy Monk | 5 Aug 1998 | Dessert |
| Caesar Salad | Christopher Monk | 21 July 1978 | Anytime |
| Daddio Pancakes | Barry Monk | 2 March 2011 | Breakfast |

Petitioner Apple Inc. - Ex. 1001, p. 18

**FIG. 17**



Petitioner Apple Inc. - Ex. 1001, p. 19

# FIG. 18



Petitioner Apple Inc. - Ex. 1001, p. 20

## FIG. 19



**Captain Phil's Memory-Webb**

Welcome, Captain Phil
Last Login:    11.18.2010

| Media | Count | Archive Status | | Count |
|---|---|---|---|---|
| # Photos | 1,342 | | | 80% complete |
| # Videos | 75 | | | 61% complete |
| # Documents | 173 | | | |

**My recent memories:**
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10
- 12 visitors since last login date
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10

**My recent Webb views:**
- Captain Phil 2010 (photo album)
- Chicken Pot Pie (recipe)
- Captain Phil (Timeline)

**Updates and Alerts:**
- License renewal due 1.15.2011

**People Stats:**

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Monk | 7 | 499 | 4 | 14 |
| Firestone | 11 | 1,249 | 17 | 39 |
| Testy | 4 | 788 | 1 | 12 |

**Event Stats:**

| Event | Date | Location | # Media |
|---|---|---|---|
| Mike Testy's 1st Birthday | 13-Sept-1988 | Minneapolis, MN | 21 |
| Cubs Beat Cards Aug 1998 | 5-Aug-1998 | Chicago, IL | 2,199 |
| Nancy Learns to Ride Bike | 21-July-1978 | St. Louis, MO | 2 |

Petitioner Apple Inc. - Ex. 1001, p. 21

**FIG. 20**



Petitioner Apple Inc. - Ex. 1001, p. 22

**FIG. 21**



Petitioner Apple Inc. - Ex. 1001, p. 23

## FIG. 22



**EXIF Tags version 2.3 Image File Directories (Data Blocks)** 0320

**MemoryWeb Tag (Data Blocks)** 0360

| Tag Labels 0321 | EXIF Family Group Name 0322 | Location 0323 | MemoryWeb Tag 0361 |
|---|---|---|---|
| Description Title | IFD0 | 0x9c9b or 0x010e | MediaAsset.Caption 0362 |
| Description Subject | IFD0 | 0x9c9f | |
| Description Rating | | N/A | MediaAsset.StarRanking 0363 |
| Description Tags | IFD0 | 0x9c9e | |
| Description Comments | IFD0 | 0x9c9c | |
| Origin Authors | IFD0 | 0x9c9d | |
| Origin Date Taken | ExifIFD 0334 | 0x9003 0335 | MediaAsset.DateCreated 0364 |
| Origin Date Acquired | | N/A | |
| Origin Copyright | IFD0 | 0x8298 | |
| Image (Image ID, Dimensions, Width Height, etc) | | Multiple | |
| Width | | 0xbc80 | MediaAsset.Width 0365 |
| Height | | 0xbc81 | MediaAsset.Height 0366 |
| Camera (Camera Maker, Camera Model, etc) | | Multiple | |
| Advanced Photo (Lens Maker, Lens Model, etc) | | Multiple | |
| User Comment | ExifIFD | 0x9286 | This is used to inject information that do not currently have EXIF standardized tags including Collection, People, Location Name, Recipe Name, Person Tag Data Blocks (0380), etc. 0367 |
| GPS Latitude | GPS | 0x0002 | MediaAsset.Location.Latitude 0368 |
| GPS Latitude Ref | GPS | 0x0003 | MediaAsset.Location.Latitude 0369 |
| GPS Longitude | GPS | 0x0004 | MediaAsset.Location.Longitude 0370 |
| GPS Longitude Ref | GPS | 0x0005 | MediaAsset.Location.Longitude 0371 |
| GPS Altitude | GPS | 0x0006 | |

0324, 0325, 0326, 0327, 0328, 0329, 0330, 0331, 0332, 0333

Petitioner Apple Inc. - Ex. 1001, p. 24

**FIG. 23**



Petitioner Apple Inc. - Ex. 1001, p. 25

## FIG. 24



Petitioner Apple Inc. - Ex. 1001, p. 26

FIG. 25

0400
0401
Third Party Facial Recognition Provider
Outside MW System
Inside MW System
Start
0402
System request for thumbnails of all Digital Files that have unconfirmed faces
0404
System sends Digital Files to Third Party Facial Recognition Provider
0405
System receives response from Third Party Facial Recognition Provider
0406
System parses identified faces and corresponding Facial Recognition data for each Digital File
0300
User Relationship Table
0403
Retrieves Thumbnails of all Digital Files that have unconfirmed faces
0407
Existing (Trained) Face ID in User Relationship Table?
Yes
0408
Is Face Recognition above score threshold?
Yes
0409
System records and associates specific face for Digital File with a MemoryWeb Person ID and sends to MemoryWeb Person Tag (Data Blocks) in User Relationship Table
No
0410
System generates facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table
No
0411
System generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table

FIG. 26

0500
0501
Third Party Media Provider
Outside MW System
Inside MW System
0503
Systems sends registration confirmation
0504
Systems receives registration confirmation, Third Party Media ID
0507
System receives contact names and IDs from Third Party Media Provider (daily)
0502
User selects sharing of their information with Third Party Media Provider with MemoryWeb
Start
0505
System sends registration information to User Setting Table?
0506
System requests contact names and IDs from Third Party Media Provider (daily)
0508
Is Person a Match
Yes
No
0509
System associates existing Person to Tag Data Block of Relationship Table for Digital File
0300
User Relationship Table
0510
System add new person to Tag Data Block of Relationship Table for Digital File
1000
User Settings Table
1900
Share to Third Party Media Provider System

**FIG. 27**



1900

| | Item |
|---|---|
| 1901 | User's Name |
| 1902 | Payment ID |
| 1903 | Password |
| 1904 | Account Type |
| 1905 | User's email |
| 1906 | Language preference |
| 1907 | Date format |
| 1908 | Email notifications |
| 1909 | Contacts (with third Party Social Media) |
| 1910 | Facebook ID |
| 1911 | API Token |
| 1912 | Payment Date |
| 1913 | ... |

Petitioner Apple Inc. - Ex. 1001, p. 29

**FIG. 28**

Start
User selects Digital File in MW
0601
System sends request to Relationship Table for specific Digital File
0602
User Relationship Table
0300
System retrieves Digital File and Digital File Tag Data Blocks from User Relationship Table
0603
System will display the Digital File and the corresponding Digital File Tag Data Blocks in the form of Application Dot-Tags
0604
User selects Application Dot-Tag
0605
Continuous Link of Application Dot-Tag System
0700
0600
User selects add for a MemoryWeb Tag
0606
Tag data exists?
0607
Yes
No
User selects matching MemoryWeb Tag
0608
User adds New MemoryWeb Tag
0609
System associates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0610
System creates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0611
User selects edit for a MemoryWeb Application Dot-Tag
0612
Tag data exists?
0613
User selects matching MemoryWeb Tag
0614
User adds New MemoryWeb Tag
0615
System associates existing MemoryWeb Tag to Tag Data Block of Relationship Table for Digital File
0616
System creates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0617
User selects delete for a MemoryWeb Application Dot-Tag
0618
System deletes association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0619

**FIG. 29**

**Structure**



**Examples**

**Within Character Limit for Labels and Numbers**



Dotted Application Dot-Tag denotes partial relationship. In this example, person is a half-sibling to another person.



**Exceeds Character Limit for Label and Numbers**



Petitioner Apple Inc. - Ex. 1001, p. 31

FIG. 30

Start
User selects Application Dot-Tag
0701
0700
0716
Displays Image in Slideshow view
0702
Is Person Dot-Tag?
Yes
No
0703
Is Collection Dot-Tag?
Yes
No
0704
Is Location Dot-Tag?
Yes
No
0705
Is Date Dot-Tag?
Yes
No
0706
Is Recipe Dot-Tag?
Yes
No
0707
•••
Yes
0708
System sends request to Relationship Table
User Relationship Table
0300
0709
If Person Application Dot-Tag, system retrieves data for that person from User's User Relationship Table and displays relationship data in People Profile View
0710
If Collection Application Dot-Tag, system retrieves data from that collection from User's User Relationship Table and displays relationship data in Collection View
0711
If Location Application Dot-Tag, system retrieves data from that Location from User's User Relationship Table and displays relationship data in individual Location View
0712
If date Application Dot-Tag, system retrieves data from that date from User's User Relationship Table and displays relationship data in Uploads View
0713
If Recipe Application Dot-Tag, system retrieves data from that Recipe from User's User Relationship Table and displays relationship data in Recipe View
0714
•••
Yes
0715
Is Image Selected?
No
0717
User selects Application Dot-Tag

**FIG. 31**



Petitioner Apple Inc. - Ex. 1001, p. 33

FIG. 32

Multiple People Application View
1401
1450
1451
1400
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
Sort By:
Newest to Oldest
1402
Jon Smith
Jane Smith (Doe)
Jackson Smith
JC Jon Smith
1405
1403
1404
Page:
1
Items Per Page:
20
50
100
1430
Single People Profile Application View
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
< View all People
1432
1431—JC Jon Smith
Edit
1447
1453
1454
1433—Nicknames: Chip
1434—Born: 1/1/2004
1448
1449
1435—Parents: Jon Smith and Jane Smith (Doe)
1436—Siblings: Jackson Smith
1437—Children:
1438—Biography: JC was named after his great, great grandfather from German who's real name was Johan Christoph.
1439
JC Tags:
1452
1441
1442
1443
1444
1445
4 Photos
3 Collections
2 Facial Recognitions
3 Locations
7 Family Relationships
1 Recipe
Change Profile Photo
1440
1446
Page:
1
Items Per Page:
20
50
100

FIG. 33

Multiple Collection View
1501
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
1500
Sort By:
Newest to Oldest
1502
1507
Our Family
Smith Family Photos
Europe Trip
First Day of School
Jackson and JC Photos 2013
Baseball Games
Page:
1
1503
1504
1505
1506
Items Per Page:
20
50
100
Individual Collection View
1530
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
< View all Collections
1531
Share this Collection:
1534
Edit
1535
Smith Family Photos
1532
Our Family
1533
Page:
1
Items Per Page:
20
50
100

**FIG. 34**



Petitioner Apple Inc. - Ex. 1001, p. 36

**FIG. 35**



Petitioner Apple Inc. - Ex. 1001, p. 37

FIG. 36

1800
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
Show all Recipes
1802
Lori Doe Pecan Puffs
1801
Share this Collection:
1812
Edit
1813
Chef
1804
Lori Doe
1816
+ add / edit Chef
1803
Recipe Photos
1806
1807
Ingredients
1809
1 Stick of butter
1 cup of flour
½ teaspoon of vanilla
1 cup of grand pecans
2 tablespoons of sugar
Directions
1810
Mix all. Roll gently into 1 inch balls. 300
and immediately roll in sugar.
Comments
1811
This is one of my favorite recipes around the holidays and was
one of Grandma Lori's best!
1814
1808
1815

FIG. 37

0800
Start
User selects Advanced Filter
0801
0802
User types information into the text box
0803
System sends request
0804
System produces request
0805
System displays possible matches of filters
0806
User selects filter(s)
0807
User selects apply
0808
System sends request
0300
User Relationship Table
0809
If in Uploads view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0810
If in Collections view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0811
If in Locations view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0814
If in People view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0812
...
0813
User desires to add additional Advanced Filter
Continuous Link of Application Dot-Tags System
0700

**FIG. 38**



Petitioner Apple Inc. - Ex. 1001, p. 40

**FIG. 39**



Petitioner Apple Inc. - Ex. 1001, p. 41

**FIG. 40**



Petitioner Apple Inc. - Ex. 1001, p. 42

**FIG. 41**



Petitioner Apple Inc. - Ex. 1001, p. 43

**FIG. 42**



Petitioner Apple Inc. - Ex. 1001, p. 44

**FIG. 43**



Petitioner Apple Inc. - Ex. 1001, p. 45

FIG. 44

0900
Start
0901
User selects Search bar
0902
User types information to search
0903
System sends request
0300
User Relationship Table
0904
System searches all potential tags blocks
0905
System displays possible matches by category
0906
User selects match
0907
If user selects Person fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Person Profile View
0908
If user selects Collection fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Collections View
0909
If user selects Location fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Locations View
0910
If user selects Date fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Uploads View
0911
...
Continuous Link of Application Dot-Tags System
0700

FIG. 45

0930
Fast Search
Apply Filters...
0931
0932
Wrigley
0933
Results
Person: Jon Wrigley Doe
Collection: Family trip to Wrigley August 2013
Location: Wrigley Field
Recipe: Wrigley Field Cookies
Comments: Jon and Jane's first game at Wrigley Field
0934
Wrigley
Results
Person: Jon Wrigley Doe
Album: Family trip to Wrigley August 2013
Location: Wrigley Field
Recipe: Wrigley Field Cookies
Comments: Jon and Jane's first game at Wrigley Field
0935
0936
Wrigley Field
3651 N. Clark St.
Chicago Illinois, United States

**FIG. 46**



Petitioner Apple Inc. - Ex. 1001, p. 48

**FIG. 47**

1101
Third Party Geographical Mapping Provider
1100
Outside MW System
Inside MW System
Start
1102
Location Application Dot-Tag?
Yes
No
1104
User selects location Application Dot-Tag
1105
System sends request to Relationship Table
1103
User selects Location Application View
0300
User Relationship Table
1106
System requests mapping for specific location to Third Party Mapping System
1108
System retrieves data from that Location from User's User Relationship Table.
1107
System receives mapping for specific location from Third Party Mapping System
1109
System sends Application Dot-Tags for that specific location
1110
Systems combines map from Third Party Mapping System with Application Dot-Tags for specific location in Location View

**FIG. 48**



Petitioner Apple Inc. - Ex. 1001, p. 50

**FIG. 49**



Petitioner Apple Inc. - Ex. 1001, p. 51

**FIG. 50**

| Ref. | 1401 Sample EXIF Image File Directories and ExifTool family 1 group names | 1402 Original File EXIF Tag Data | 1403 MW Modified File Tag Data | Ref. |
|---|---|---|---|---|
| | Description Title | | | |
| | Description Subject | | | |
| 1404 | Description Rating | 1416 | | 1410 |
| | Description Tags | | | |
| 1405 | Description Comments | 1417 | CAPTION: Jackson and JC's first day at school!<br>PERSON: Jackson Smith, JC Smith<br>LOCATION NAME: Abe Lincoln Elementary School<br>COLLECTION: First Day of School<br>COLLECTION: Jackson and JC Photos 2013<br>DATE: 8/28/2013 | 1411 |
| | Origin (Authors, Date Taken, Date Acquired, Copyright) | | | |
| | Image (Image ID, Dimensions, Width, Height, etc.) | | | |
| | Camera (Camera Maker, Camera Model, etc.) | | | |
| | Advanced Photo (Lens Maker, Lens Model, etc.) | | | |
| 1406 | GPS Latitude | 1418 | 39; 46; 4.377499999999999999 | 1412 |
| 1407 | GPS Longitude | 1419 | 89; 39; 55.319999999999999953 | 1413 |
| | File Name | IMG_3826.JPG | IMG_3826.JPG | |
| | File Item Type | JPG | JPG | |
| 1408 | File Folder Path | C:\Photos\2013 — 1420 | C:\Photos\MW Backup\2013 | 1414 |
| 1409 | File Date Created | 11/01/2013 10:00 AM — 1421 | 08/28/2013 8:00 AM | 1415 |
| | File Date Modified | | | |
| | File Size | 2.42 MB | 2.42 MB | |
| | File Attributes | A | A | |
| | File (Offline availability, Offline status, Shared with, Owner, Computer, etc.) | | | |

US 10,423,658 B2

1

# METHOD AND APPARATUS FOR MANAGING DIGITAL FILES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/193,426, filed Feb. 28, 2014, now allowed, which is a continuation-in-part of and claims priority to U.S. patent application Ser. No. 13/157,214, filed Jun. 9, 2011, now U.S. Pat. No. 9,098,531, each of which is hereby incorporated by reference herein in its entirety.

## FIELD OF THE INVENTION

The present invention relates generally to the management of digital files and, more particularly, to a computer-implemented system and method for managing and using digital files such as digital photographs.

## BACKGROUND OF THE INVENTION

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums, or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, event, etc.) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos were printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of digital files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty digital files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of digital tags, dynamic viewing of digital files, and the ability to export the digital files with new digital tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of digital files is a medium that allows people to organize, view, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow digital files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

## SUMMARY

In accordance with one embodiment, a computer-implemented method of associating digital tags with digital files

2

comprises (1) storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having embedded therein content data and metadata including tags; (2) receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; (3) modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; (4) receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; (5) responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and (6) displaying, on a video display device associated with the client device, a first indication of the first tag label.

In another embodiment, a computer-implemented method of associating digital tags with digital files comprises storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having a content data portion and a metadata portion including tags; displaying, on a video display device associated with a client device, a first graphical representation of a first tag label of a first of the tags and associated with a first of the digital files; receiving, via a user interface device of the client device, a selection by a user of the client device of the first graphical representation of the first tag label as a search filter criterion or a search string entered via the user interface device corresponding to the first tag label; responsive to the receiving, automatically searching through the digital files, using at least the first tag label as a search filter, for the digital files satisfying at least the search filter criterion; and displaying, on the video display device, an indication of the first tag label and a representation of the number of the digital files satisfying at least the search filter criterion.

In accordance with a further embodiment, a web-based digital file storage system comprises a digital file repository for storing and retrieving digital files; a digital tagging system permitting the user to assign a plurality of digital tags to each of the digital files, wherein the digital tagging system comprises at least one type of data selected from the group consisting of a person's name, a location, a recipe, a date, a family relationship, a person's profile, an event name, a rating, and a document type; a search filter, wherein the search filter allows the digital files to be searched according to a plurality of types of data; and a user interface that presents the digital files on a user's screen based on the digital tags, wherein the user interface further comprises a digital tag image, the digital tag image having at least one type of data represented thereon with text.

As described in detail below, the various embodiments provide much-needed platforms that save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention may best be understood by reference to the following description taken in conjunction with the accompanying drawings, in which:

FIG. 1 is a screenshot of an organizational functionality view of one embodiment of the disclosed system.

FIG. 2 is a screenshot of a photo detail view of one embodiment of the disclosed system.

FIG. 3 is a screenshot of a gallery view of an event or album of one embodiment of the disclosed system.

Petitioner Apple Inc. - Ex. 1001, p. 53

US 10,423,658 B2

3

FIG. **4** is screenshot of an individual event or album view of one embodiment of the disclosed system.

FIG. **5** is a screenshot of a location view of one embodiment of the disclosed system.

FIG. **6** is a screenshot of a people thumbnail view of one embodiment of the disclosed system.

FIG. **7** is a screenshot of a people profile view of one embodiment of the disclosed system.

FIG. **8** is a screenshot of a family tree view of one embodiment of the disclosed system.

FIG. **9** is a screenshot of a timeline view of one embodiment of the disclosed system.

FIG. **10** is a screenshot of a recipe chart, according to one embodiment of the disclosed system.

FIG. **11** is a screenshot of an album chart view of one embodiment of the disclosed system.

FIG. **12** is a screenshot of an event chart view of one embodiment of the disclosed system.

FIG. **13** is a screenshot of a people chart view of one embodiment of the disclosed system.

FIG. **14** is a screenshot of a family tree chart view of one embodiment of the disclosed system.

FIG. **15** is a screenshot of a location chart view of one embodiment of the disclosed system.

FIG. **16** is a screenshot of a recipe chart view of one embodiment of the disclosed system.

FIG. **17** is a screenshot of a slideshow view of one embodiment of the disclosed system.

FIG. **18** is a screenshot of an advanced search filter view of one embodiment of the disclosed system.

FIG. **19** is a screenshot of a homepage view of one embodiment of the disclosed system.

FIG. **20** is a diagram of the Overall System Process Flow of MemoryWeb.

FIG. **21** is a diagram of the System for Reading Phase, System Interpreting, and Adding Digital File and Corresponding Data to Relationship Table Phase.

FIG. **22** is a table of the EXIF and MemoryWeb Tag Data Blocks

FIG. **23** is a table of the Microsoft Windows and MemoryWeb Tag Data Blocks.

FIG. **24** is a table of the MemoryWeb Person Tag Data Blocks.

FIG. **25** is a diagram of the Third Party Facial Recognition System.

FIG. **26** is a diagram of the Third Party Media System (Data Exchange).

FIG. **27** is a table of the User Settings Table.

FIG. **28** is a diagram of the Application Digital Tag Organizer System.

FIG. **29** is an illustration of the Application Dot-Tag Shape and Content.

FIG. **30** is a diagram of the Continuous Link of Application Dot-Tag System.

FIG. **31** is an illustration of the Slideshow View of Digital File and Application Dot-Tags.

FIG. **32** is a screenshot of People Application Views.

FIG. **33** is a screenshot of Collection Application Views.

FIG. **34** is a screenshot of Location Application Views.

FIG. **35** is screenshot of Uploads Application View.

FIG. **36** is a screenshot of Recipe Application View.

FIG. **37** is a diagram of the Advanced Filters System.

FIG. **38** is a screenshot of Adding the First Application Dot-Tag using Advanced Filter.

FIG. **39** is a screenshot of Single Application Dot-Tag Filter for Each Application View.

4

FIG. **40** is a screenshot of Single Application Dot-Tag Filter for Date in Uploads Application View.

FIG. **41** is a screenshot of the Single Application Dot-Tag Filter in Location Application View.

FIG. **42** is a screenshot of Adding Another Application Dot-Tag Filter.

FIG. **43** is a screenshot of the Multi-Dot-Tag Filter in Location Application View.

FIG. **44** is a diagram of the Keyword Fast Search System.

FIG. **45** is a screenshot illustration of Using Keyword Fast Search.

FIG. **46** is a diagram of the Share to Third Party Social Network Provider System.

FIG. **47** is a diagram of the Third Party Location Mapping System.

FIG. **48** is a diagram of the Share to Individual System.

FIG. **49** is a diagram of the Application Export System.

FIG. **50** is a table illustrating the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb.

## DETAILED DESCRIPTION OF ILLUSTRATED EMBODIMENTS

Although the invention will be described in connection with certain preferred embodiments, it will be understood that the invention is not limited to those particular embodiments. On the contrary, the invention is intended to cover all alternatives, modifications, and equivalent arrangements as may be included within the spirit and scope of the invention as defined by the appended claims.

The present disclosure relates to one or more of the following features, elements or combinations thereof. A web-based digital file storage system is disclosed. The storage system may include a digital file repository for storing and retrieving digital files, such as photos, a digital tagging system configured to assign digital tags to the digital files, a sorting system, and a user interface.

The digital tagging system may include various types of data, such as a person's name, a location, a recipe, a date, a family relationship to the user, an event name, a rating, sharing rights, file type and a document name. The sorting system can allow the digital files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the digital files on a user's screen based on these user inputs.

The digital file repository may be accessible over the Internet. The sorting system may provide a user with the ability to search based on a plurality of digital tags. The disclosed system may also provide a way to track relationships between users, so that a family tree can be displayed.

Recipes may also be linked to a person's name, with, for example, a video and digital copy of original hand-written recipe to create a recipe view.

Moreover, the digital files and data can be exported as a single file with the digital tagging embedded within the exported file.

In another embodiment, a method of storing digital photographs is disclosed. The method may include the steps of storing a digital photograph in a file repository, associating a plurality of digital tags having different tag types with the digital photograph, providing a search function that permits searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a

Petitioner Apple Inc. - Ex. 1001, p. 54

US 10,423,658 B2

5

relationship, an event name, a rating, file type and a document type. The method may include a further step of providing access to the file repository via the Internet. The method may also allow for tracking relationships between users so that a family tree can be displayed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The presently disclosed method and application (herein alternatively referred to as a "system") provides users with an Internet-based interactive platform to gather, organize, view, share and archive digital files using a proprietary organization system and export tagging process. As used herein, the word "tag" refers to any type of digital data that can be assigned to a file to describe some aspect of that file through a tagging process. For images, the tagging is preferably in EXIF format. For videos, documents and other file formats, any appropriate format may be used. The disclosed system allows users to create, view and share digital files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

One disclosed embodiment includes an import feature. Users can import media files from users' favorite sources (e.g., computers, mobile phones, social networks, etc.). If any meta-tag information is embedded within the media (e.g., date taken and GPS coordinates), the system could automatically read and utilize it for the user. Digital files, media, meta-tags, and other data discussed herein may be saved to one or more file repositories (also referred to as a database herein).

In another aspect of the disclosed system, organizational functionality is provided. Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system and organizing feature allows a user to arrange large amounts of digital files with tags that can characterize and document the digital file(s). Digital files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, event, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. Tags can be assigned to a single file at a time, or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos and enter the tag only once. An example of the manner in which digital photos can be organized is presented is seen in FIG. **1**.

Yet another feature is the multiple views from which a user can display his or her digital media files and their tagged attributes. Using a user interface (e.g. a keyboard, mouse, or touch screen), users can select individual files, groups of files meeting specific criteria, or all files in their account from which to create views. These views may alternately take the form of a chart. These views will be auto-populated based upon either tag information already associated with the digital file upon import or the tags assigned to the digital files by the user within the aforementioned organization functionality. Each digital file can be enlarged, from any view or chart, by clicking an information ("i") button to show an enlarged version of the digital media file with all the tags that are assigned to that digital file, as

6

illustrated in FIG. **2**. In another embodiment, the user interface may be user-configurable, as discussed further herein.

The following views are shown with particularity. In FIG. **1**, the gallery view allows the user to see all the digital media that are associated within a group such as an event or custom album. The gallery view for either events or albums is illustrated in FIG. **3**.

As shown in FIG. **2**, an individual album or event view allows one to see the files associated with a specific group. For example, one can view the digital files that relate to a group of files called "Trip to Italy 2011." The individual album or event view is illustrated in FIG. **4**.

A location view, as shown in FIG. **5**, identifies within an interactive map (Google map shown as an example), where digital files were taken or originated. The location view can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users.

A people view, as shown in FIG. **6**, shows thumbnail photos of all the people in the system that can be clicked in for a people profile view. A people profile view, as shown in FIG. **7**, shows a profile picture of an individual, their birth/death information, family relationships, overview (comments) on the person, as well as links to other views that contain that individual in the system.

A family tree view, as shown in FIG. **8**, can illustrate interactive family trees where one can see the family tree of an individual or family. If a user clicks on an individual within the family tree, it will take him or her to the people profile view of that person.

The timeline view, as shown in FIG. **9**, will be an interactive timeline that allows you to set ranges of digital files by year, month and day. The digital files shown in the timeline will also be interactive and if the user clicks on a digital file or group of digital files (e.g., event or album), the user will then view the information related to the digital file(s).

A recipe view, as shown in FIG. **10**, will show a recipe along with any digital files that are associated with it. For example, a cherished family recipe may show a digital copy of the original handwritten recipe, a photo of the family member who was the chef and a video of the family member making the recipe.

Each of the aforementioned views may also be seen in a chart format view that is interactive when any item on the chart is clicked, the user will them be taken to a new screen that details all relevant digital files (and file types) for the clicked item.

For album or event chart views, as shown in FIGS. **11** and **12**, the elements listed in those charts will include individuals who are part of each album/event, number of digital files, date and other pertinent information.

A people view, shown in FIG. **13**, may demonstrate all the names of individuals that are in the system in an alphabetical listing. Such a people view can also contain details on each person such as the number of photos and videos that are associated with that person. The user can click on that person to pull up the profile view of the individual or click on the number of photos to see all the photos associated with that person.

In the family tree chart view, shown in FIG. **14**, family lineage can be viewed in multiple ways. For example, a user can set himself as the tree anchor and then see a tree of all people entered into the database related to the user. The user could also set a contact as the tree anchor and then just view the descendants of that individual.

Petitioner Apple Inc. - Ex. 1001, p. 55

US 10,423,658 B2

7
8

For a location chart view, as show in FIG. **15**, listings of all the locations that are in the system are displayed along with the number of digital files, as well as names of persons associated with each. A user can click on the location to see all the digital media files that are associated with a specific location.

A recipe chart, as shown in FIG. **16**, can show recipes that uploaded to the system. Along with the ingredients and steps of each recipe, this view can identify the chef(s) name, number of photos and videos associated with each.

For any of the views, the user can click on the digital file to start a slideshow feature that will allow them to scroll through an enlarged view of the digital file as illustrated in FIG. **17**.

Another aspect of the disclosure is the search filter. This filter allows users to select one or more criteria that will narrow down their results to just those digital files matching input criteria. The entire system can be filtered by, for example, key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify digital files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, no upload date information or are lacking any other tag.

It should be noted that in one embodiment, searching via key word will search through all tagged information (user populated or auto-generated upon import). For example, if a user searched for the term "Ohio," the system would search for that term associated with any file in any way. If the user had files with Ohio as a state, file name, street name, person's name, file comment, etc., all would be retrieved.

Settings applied in the advanced search filter can cumulatively carry over to any subsequent pages until new criteria are selected. For example, a user can apply a filter to retrieve files associated with a particular person. Then the user can set a date range to further narrow results to show only those files for that selected person within the date range. Any pages viewed from that point forward throughout the entire site would only contain files associated with person and the date range specified. The advanced search filter is illustrated in FIG. **18**.

Yet another feature can be a user's homepage, as illustrated in FIG. **19**, that can summarize the user's content within the system including relevant information in the system. It is contemplated that a user's homepage may show a summary of the total number of photos, videos, documents and audio files that the user has uploaded. In this embodiment, for each group of digital files (e.g., photos), the percent of files that has been organized with pertinent data such as date, name(s) and location can be noted. In addition, the homepage can show a list of people that are in the system and the respective count for photos, videos, documents and audio files associated with each person. Also contemplated is a summary of the events, albums and locations that have been entered into the system. The user homepage may serve as an executive summary dashboard of one's entire system and can be modified to provide data in an executive summary format for a user.

Another feature can be that the entire system including the dynamic views can be presented in a wide range of user outputs—e.g. on the user's computer, smartphone or tablet display. The user may choose to present the digital files in any of the various types of ways disclosed herein. Other ways of outputting the files are also possible. The user can create and modify various sharing rights so that third parties

may view the files and if desired, provide comments, apply tags or even download/copy the files for their own use.

Still another embodiment can provide export functionality. Once a user has used the organization functionality to assign information to data file(s), a user may want to export the data file in its original form (e.g., .jpg, .mp4, etc.) with the tags embedded within the digital file in the form of EXIF tags. In other words, a user can export his or her entire set of digital files, or may choose a subset based on keywords and tags. The exported digital files can include key tags and attributes users have assigned, and in one embodiment, such tags and attributes can be embedded within the digital files. For example, each exported digital file may be imbedded with user-entered data such as the people, location, and event name. This feature will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing digital files such as a social media website) where it can be viewed with these attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its digital files to a new digital archiving system.

A method is also disclosed. The method may include the steps of storing a digital file in a file repository, associating a plurality of digital tags having different tag types with the digital file, providing a search function that permits simultaneously searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship between individuals, an event name, a rating, and a document type.

Under the disclosed method, access may be provided to the repository via the Internet. Relationships between users may also be tracked such that a family tree can be displayed. A recipe may also be linked to a user or person. Finally, the method may include the step of outputting a digital file and its associated digital tags into a single file.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

A plurality of advantages arise from the various features of the present disclosure. It will be noted that alternative embodiments of various components of the disclosure may not include all of the features described yet still benefit from at least some of the advantages of such features. Those of ordinary skill in the art may readily devise their own implementations of a digital file organization system that incorporate one or more of the features of the present disclosure and fall within the spirit and scope of the disclosure.

Application (also called "MemoryWeb Application" or "System")—The Application is an online program constructed using a mix of freeware code as well as custom-built proprietary coding with an interface that has many functions including: 1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share

Petitioner Apple Inc. - Ex. 1001, p. 56

US 10,423,658 B2

9 | 10

Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files. This Application has already been disclosed in U.S. patent application Ser. No. 13/157,214 and incorporated herein by reference. This Application is also being trademarked as "Memory-Web" with the US Commissioner for Trademarks on Dec. 26, 2013 under application No. 86/152,930. The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on mobile communication devices such as smart phones (e.g., iPhones), Personal Digital Assistants (PDAs) and Tablets (e.g., iPads).

Application Views—The Application Views utilizes the Application's ability to associate Digital Tags to Digital Files and display them in customized views such as Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes.

Application Advanced Filter System—A function that provides search capabilities using one or more Digital Tags within the Application, resulting in a narrowed output display of the applied filters to display one or more Digital Files and viewed in one or more Application Views. The Application Advanced Filter System can allow Digital Files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the Digital Files on a user's screen based on these user inputs.

Application Dot-Tag—The manner in which a Digital Tag is displayed within the Application using pill-shaped indicators that can reside near a file's image or overlaid on the file's image. MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag. However, it should be understood that other shapes and indicators are contemplated by the present invention, and may even be user-configurable. For example, the indicator may take the form of a sticky note, a different shape, a doted shape, or any number of variations of indicators that may be functional in displaying one or more words. Colors may also be used to indicate differing categories of indicators, or differing associations/intersection of the indicators. Within the pill-shaped indicator, the specific Digital Tag information is used to display information about a Digital File. Throughout this document, the Application Dot-Tag is shown as illustrated in FIG. **29** (indicators **0650**, **0654**, **0655** and **0656**).

Application Digital Tag Organizer System—Within the Application, a function for assigning one or more Digital Tags to one or more Digital Files at the same time through the Application Dot-Tag Organizer System. This feature allows Digital Tags to be assigned to items such as photos, videos, audio files, and documents. The information created from this functionality drives the outputs for the Application

Views. The Application Digital Tag Organizer System will allow the tagging of key items as date, GPS location, star ranking, people (both name and facial recognition), album(s), family relationships, a date, event name, sharing rights, file type, document name, and recipes. Each of the Digital Tags is user-configurable.

Application Export System—Ability to export Digital File(s) from the Application, with the Digital Tags that were created within or imported/uploaded into the Application, embedded inside the Digital File. The Digital Tags within the exported Digital File can then be viewed and used by any other applications that can read EXIF tags.

Application Programming Interface ("API")—The Application Programming Interface (API) is the system that interacts with other communication points or services over HTTP via a POST, GET, PUT, DELETE methods. The API provides a way for users to access their MemoryWeb data outside of the web browser on mobile devices or other web connected devices. The actions within the API deliver MemoryWeb Digital Files and Digital Tags along with all meta data associated with such files and tags.

MW Automatic Uploader/Downloader Application—Separate from the main MemoryWeb Application, there are additional proprietary applications created by MemoryWeb for user to upload and download (export) Digital files to and from the main MemoryWeb Application. The first is the MW Automatic Uploader/Downloader built for Window's compatible computers. The second is the MW Automatic Uploader/Downloader build for MAC computer. Both of the MW Automatic Uploader/Downloader applications can be installed on the user's computer to automatically upload the desired Digital Files from their computer to the main MemoryWeb Application. In addition, the MW Automatic Uploader/Downloader applications allow for Digital Files to be exported from the main MemoryWeb Application to a desired folder on the user's computer with the updated tags embedded within the Digital File.

Storage System—A storage system can be a cloud-based Storage System (e.g., Amazon's AWS, Dropbox, Box.net, Deutsche Telecom's Cloud, etc.), hard-drive, server, or any venue that allows one's information to be stored. The storage system would act as a database and file repository for storage and retrieval of Digital Files to and from the Application.

Digital Files—An electronic file that can be in various file formats (e.g., PNG, JPEG, PDF, TIFF, MP3, MP4, WAV, and GIF) that are of items such as photos, videos, audio files, and documents.

Digital Tags—The word "Digital Tag" refers to any type of digital data that can be assigned to a file to distinguish and describe some aspect of that file through a tagging process. Digital Tags will be comprised of various groups of digital data including:

a) EXIF Tags—EXIF stands for "Exchangeable Image File Format" and is a standard that specifies the formats for images, sound, video, and ancillary tags. The EXIF standard is an Open Standard produced by the Standardization Committee and is detailed within their document called *Standard of the Camera & Imaging Products Association*. Standard of the Camera & Imaging Products Association, CIPA DC-008 Translation-2012. Exchangeable image file format for digital still cameras: EXIF Version 2.3. Established on April, 2010 and Revised on December, 2012. Prepared by: Standardization Committee. EXIF tags are also called "meta tags" or "metadata." The EXIF information is formatted according to the TIFF specification, and may

Petitioner Apple Inc. - Ex. 1001, p. 57

US 10,423,658 B2

11

be found in JPG, TIFF, PNG, JP2, PGF, MIFF, HDP, PSP and XCF images, as well as many TIFF-based RAW images, and even some AVI and MOV videos. The EXIF meta information is organized into different Image File Directories (IFD's) within an image. The names of these IFD's correspond to the ExifTool family 1 group names.

When Digital Files are captured with digital cameras (including smartphones), scanners and other systems handling image, video and sound files, certain EXIF tags are automatically populated within the Digital File and can cover a broad spectrum of information such as:

Descriptions (e.g., Title, Subject, Star Ratings, Tags, People, Comments)

Origin (e.g., Authors, Date taken, Copyright)

Image information (e.g., dimensions, color representation and size)

Camera Setting Information (e.g., camera maker, camera model), including static information such as the camera model and make, and information that varies with each image such as orientation (rotation), aperture, shutter speed, focal length, metering mode, and ISO speed information.

Advanced Photo Information (e.g., lens maker, lens model, contrast, brightness, EXIF version, etc.)

File Information (e.g., file name, item type (e.g., JPG file), date created, date modified, size, etc.)

A thumbnail for previewing the picture on the camera's LCD screen, in file managers, or in photo manipulation software.

Global Positioning System (GPS) information that is also known as geocoding.

The Application will auto-populate any existing EXIF Tags from the original Digital File upon upload into the Applications (as illustrated in FIG. 21) and put this information into the Users Relationship Table on the Storage System.

b) Extensible Metadata Platform (XMP)—This is Adobe's Extensible Metadata Platform (XMP) format for labeling metadata within an Adobe file.

c) Png Textual Data (tEXt)—This is Portable Network Graphics (PNG) metadata format for labeling within a PNG file.

d) Microsoft Windows Tags—These are Microsoft Windows File Attributes that are stored in Data Blocks from Microsoft's system.

e) MemoryWeb Tags—hese tags are typically developed within MemoryWeb and can relate to people Names, Recipes, Collections, Location Name, Family Relationships (also discussed in MemoryWeb Person Tags), Social Network Data (e.g., ID, contact IDs, etc.), File Folder Batch Name. This would be folder directory name that includes the name of each folder that eventually leads to the folder that the digital file was actually stored within the User's PC. This is used to help the user organize data within MemoryWeb based upon the users organization system used on their PC. Facial Recognition Data, and other type of tags that are user defined.

f) MemoryWeb Person Tags—These user defined tags within MemoryWeb are specific to each person profile including such areas as Nicknames, Birthdates, Date of Birth, Date of Death, Biography, Family Relationships (e.g., Mother, Father, Brother, Sister, Daughter, Son, Spouse, etc.), Pets, and Firsts (e.g., First Steps, First Words, First time riding a bike, etc.).

12

The combination of all the aforementioned tags is collectively referred to as "Digital Tags." The list of groups and Digital Tag types will grow as technology in this area improves over time. These Digital Tags are also referred to as "File DNA" for MemoryWeb.

User Relationship Table—Within the Application, each User will store the data related to Digital Files, Digital Tags, User Settings, and other specific information related to a User's repository of information is kept within the User Relationship Table.

Data Blocks—Within the User Relationship Table, there are Data Blocks that will store information related to EXIF Tags, Microsoft Windows Tags, MemoryWeb Tags, and MemoryWeb Person Tags. These Data Blocks are used to generate the information that is displayed in such key components such as the Application Views and Application Dot-Tags.

Custom Code—Proprietary scripts and code developed by MemoryWeb to enable key functions such as Dot-Tag relationships and ability to embed new user-defined tags into a file and/or override existing EXIF tags and the ability to navigate the application and it's functions via connections drawn from the associated tags

Open Source Libraries—Non-proprietary code taken from the free, open source community integrated that is used by the Application.

User Interface—The Application may be accessible over various "User Interfaces" including Personal Computers (e.g., Macs, Windows, etc.), Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad). The User Interfaces can be controlled through the Application using various tools such as a keyboard, mouse, and touch screen.

The present invention relates to an Application that has many functions including: 1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files.

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, and event) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos may have been printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of Digital Files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the

Petitioner Apple Inc. - Ex. 1001, p. 58

US 10,423,658 B2

13

14

modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty Digital Files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of Digital Tags, dynamic viewing of Digital Files, and the ability to export the Digital Files with new Digital Tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of Digital Files is a medium that allows people to organize, view, navigate, search, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow Digital Files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

As disclosed in detail herein, the application provides the much needed platform that saves a user significant time, provides significant information with minimal screen space, and provides an appealing and customizable interface that will enhance the user experience.

Anytime the MemoryWeb Application exchanges information with an external Storage System or User Interface such as a phone, tablet, computer or other internet based user device, the interaction with the MemoryWeb Application involves Application Programming Interface (API). The API's allow each system to call the specific Digital Files and Digital Tags associated with each request so they can be viewed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The present disclosure relates to one or more of the following features, elements or combinations thereof. The Application allows the importation of Digital Files and then the association of Digital Tags to the Digital Files by using existing EXIF Tags of a Digital File as well as the Application's custom organization of Digital Tags for use in the Application. The Application then allows the Digital Files to be viewed, sorted, annotated, navigated, and shared using the various Application Views. The Application can also filter Digital Files using the Application Advanced Filter System functionality. The Digital Files can be stored through a Storage System that interacts with the Application. In addition, the Application allows for Digital Files to be exported with the Application's Digital Tags embedded within the Digital Files.

The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on User Interfaces such as Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad).

The presently disclosed Application provides users with an interactive platform to gather, organize, view, share and archive Digital Files using a proprietary organization system called the Application Digital Tag Organizer and export the modified Digital files with the Application's Digital Tags embedded within the Digital Flies using the Application Export feature.

The Application allows users to create, navigate, search, view and share Digital Files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodi-

ments are disclosed that can accomplish these and other goals. Description of embodiments

In FIG. **20**, the overall process flow of MemoryWeb is depicted. Each of the boxes depicted that are Inside the Memory-Web System (**0050**) are detailed additional figures within this application. However, to help illustrate the overall process flow, FIG. **20** was created. In FIG. **20**, the process begins when original digital file(s) are uploaded to MemoryWeb (**0101**). This process can take place in a variety of ways including when a user manually selects uploads from the Uploads Application View (see FIG. **35** indicator **1701**), installs the a MW Automatic Uploader/Downloader Application on their computer, or imports Digital Files from the users' other sources (e.g., mobile phones, social networks, etc.).

Once a file is uploaded, the System Reading Phase (**0100**) begins. Information from the System Reading Phase is then sent to the System Interpreting and Adding Data to Relationship Table Phase (**0200**). During this phase, information is passed back and forth to the Third Party Facial Recognition System (**0400**) to the Third Party Facial Recognition Provider (**0401**). The system will also coordinate between the Third Party Social Media (Data Exchange) (**0500**) and then to various Third Party Media Providers (**0501**). Another key step from the System Interpreting and Adding Data to Relationship Table Phase is adding both the Digital Files and the corresponding tags to the User Relationship Table (**0300**). As illustrated in subsequent figures within the patent application, the User Relationship Table serves as the key repository for all of the user's data that generates virtually every display from the application. From the User Relationship Table, the user can use the Applications Digital Tag Organizer System (**0600**), the Continuous Link of the Application Dot-Tag System (**0700**), the Advanced Filters System (**0800**), or the Keyword Fast Search System (**0900**). The user can also share Digital File(s) through the Share to Social Network Provider System (**1000**) to a Third Party Social Network Provider (**0501**) that is outside the MemoryWeb system or use the Share to Individual System (**1200**) to a Person (**1201**) that is Outside the MemoryWeb system using the data from the User Relationship Table. To help generate some of the map views, the system will utilize a Third Party Geographical Mapping System (**1100**) that connects to a Third Party Geographical Mapping Provider (**1101**) that is Outside the MemoryWeb system. The user can also export Digital Files with the Digital Tags embedded within the Digital File using the Application Export System (**1300**) that will send a MemoryWeb Modified File from MemoryWeb (**1301**) to a designated location by the User that is outside the MemoryWeb system.

As illustrated in FIG. **21**, the System Reading Phase (**0100**) is described in further detail. The System Reading Phase will first check if the digital file is a duplicate file (**0102**) that is already in the User's collection. If the file is a duplicate, it will not be uploaded (**0104**). However, if it is a new file for the user, the System Reading Phase will then locate the EXIF Image File Directories in the digital file (**0103**) and then send that information to the System Interpreting and Adding Data to Relationship Table Phase (**0200**).

As further illustrated in FIG. **21**, the System Interpreting and Adding Data to Relationship Table Phase will take the EXIF Image File Directories sent from the System Reading Phase and read and iterate through each EXIF tag item (**0201**). At this time, the system will identify faces from the digital file and then send this information to the Third Party Facial Recognition System (**0400**) that will coordinate with the Third Party Facial Recognition Provider (**0401**) that is

Petitioner Apple Inc. - Ex. 1001, p. 59

US 10,423,658 B2

<table>
<tr><td>15</td><td>16</td></tr>
</table>

outside the MemoryWeb. When the Third Party Facial Recognition System (**0400**) sends back data related to facial recognition of faces in the Digital File, it comes back then the system sends information related to people facial recognition tags to the MemoryWeb Person Tag (Data Blocks) within the User Relationship Table (**0300**). The detailed process of the Third Party Facial Recognition System (**0400**) is further explained in FIG. **25**.

During the Read & Integrate Through Each EXIF Tag item (**0201**) the process will also upload a the original Digital File in MemoryWeb (**0211**), the process will also store a copy of the original file within the User Relationship Table (**0300**) and create five duplicate copies (**0203**) of different resolution sizes as follows: XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and a Thumbnail Duplicate File (**0306**). Each duplicate file is used in different parts of the application depending upon the photo size needed for such areas within the Application such as Application Views, Application Dot-Tags, and Application Digital Tag Organizer System.

Another embodiment during the Read and iterate through each EXIF tag item (**0201**) stage is determining if a MemoryWeb tag exists (**0204**). A MemoryWeb tag is a Digital Tag that is currently being used as an Application Dot-Tag within the Application. If it is not a Digital Tag that MemoryWeb is currently using, the application will Save EXIF data to the User Relationship Table for Digital File (**0205**) and send this to the User Relationship table. This is done in case there are EXIF data that are desired to be used in future releases of the Application. For the Digital Tags that are being used in the Application, the system will Parse EXIF data into MemoryWeb Tags (**0206**), look up MW tag data (**0207**) and determine if a Digital Tag currently exists (**0208**). If a Digital Tag does not exist, the system will Create a new MW tag data ((**0209**) and send this to the appropriate Data Blocks within the User Relationship Table (**0300**). If Digital Tag data does exist, the system will Associate existing tag data ((**0210**) to the appropriate Data Blocks within the User Relationship Table (**0300**).

The third and final area within FIG. **21** is the System Indexing Digital Files and Tag Data Blocks for a Digital File within the User Relationship table (**0300**). In the User Relationship Table, the user's information system information stored such as User Settings (**0390**). Copies of the Original Digital File (**0301**), XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and Thumbnail Duplicate File (**0306**) are stored. The final area of the User Relationship Table relates to the data blocks including EXIF Tag (Data Blocks) (**0320**), Microsoft Windows Tag (Data Blocks) (**0320**), MemoryWeb Tag (Data Blocks) (**0360**), and MemoryWeb Person Tag (Data Blocks) (**0380**).

In FIG. **22**, there are two charts that illustrate EXIF and MemoryWeb Tag Data Blocks. The first chart illustrates the EXIF Tags Version 2.3 (Data Blocks) (**0320**). For the EXIF Tags Version 2.3 (Data Blocks) (**0320**), the information from this table is an expert from an Open Source Library code produced by the Standardization Committee that is detailed within their document called Standard of the Camera & Imaging Products Association. While all the EXIF tags that are contained within a Digital File are read (as previously illustrated in FIG. **21** within the System Interpreting and Adding Data to Relationship Table Phase (**0200**)) and are stored within the system's User Relationship Table (**0300**), a summary of the primary EXIF tags that are currently used within MemoryWeb are illustrated in the EXIF Tag Blocks

(**0320**). The EXIF tag information is organized into different Image File Directories (IFD's) or "Data Blocks" within an image and organized in the column heading of Tag Label (**0321**). The names of these IFD's correspond to an EXIF standard for ExifTool family 1 group names that are depicted in the column heading of EXIF Group (**0322**). The IFD's are stored within a specific data block location within a Digital File and these locations have a standard name of the specific location (**0323**) within the Digital File. The primary EXIF tags that are read and used by MemoryWeb to generate Application Dot-Tags are: Description Title (**0324**), Description Rating (**0325**), Origin Date Taken (**0326**), Digital File Width (**0327**), Digital File Height (**0328**), User Comment (**0329**), GPS Latitude (**0330**), GPS Latitude Ref (**0331**), GPS Longitude (**0332**), and GPS Longitude Ref (**0333**).

In FIG. **22**, the second chart illustrates the MemoryWeb Tag (Data Blocks) (**0360**) that overlap with standard EXIF Tag blocks. As previously illustrated in FIG. **21**, the EXIF Tag Data blocks are read and brought into the User Relationship Table (**0300**). When the data is stored within the system's User Relationship Table, they are also stored with the corresponding EXIF tag label as illustrated in the column called MemoryWeb Tag (**0361**). For example, when a Digital File is brought into MemoryWeb and the system reads the Origin Date Taken (**0326**) for the EXIF Tag block, the system will denote this in the MemoryWeb table as MediaAsset.DateCreated (**0364**). This designation is very important as it allows MemoryWeb to re-inject any updated or new MemoryWeb Tag data into the corresponding standard EXIF Tag blocks of a Digital File when it is exported from MemoryWeb (as previously illustrated in FIG. **20** with the Application Export System (**1300**)). Continuing with this example, if the Origin Date Taken is modified within the MemoryWeb system, when the file is exported through the Application Export System (**1300**), the new updated date from MemoryWeb (**0364**) will be mapped to the EXIF Tag Data block with the Tag Label of Origin Date Taken (**0326**) with the EXIF Group called ExifIFD (**0334**) and the Location called 0x9003 (**0335**).

In situations where there is no standard EXIF Tag data block for the MemoryWeb Tag for such items such as Collections, People Location Name, Recipe Name, etc. (**0367**), they are mapped to a general EXIF Tag data block called User Comment (**0329**). As the standards for EXIF Tag data blocks change, the system can be mapped to any new specific EXIF Tag data blocks. For example, if an EXIF Tag Data block is made for Recipe Name, the MemoryWeb Tag related to Recipe Name will be mapped specifically to that new EXIF Tag data block as opposed to User Comment.

In FIG. **23**, there are two charts that illustrate Microsoft Windows and MemoryWeb Tag Data Blocks. The first chart illustrates the standard Windows Imaging Component (WIC) Metadata (Data Blocks) (**0340**). Microsoft Windows has their metadata tag blocks contained in areas called Tag Labels (**0341**).The primary WIC Metadata data blocks that are read and used by MemoryWeb to generate Application Dot-Tags are: File Name (**0342**) and File Folder Path (**0343**). The corresponding MemoryWeb Tag data blocks (**0360**) for the WIC metadata tag blocks are called MediaAsset.File-name (**0372**) for the Microsoft file name and MediaAsset.UploadBatch.Batchname (**0373**) for the Microsoft File Folder Path. The ability for MemoryWeb to read the File Folder Path from Microsoft is a unique process used within MemoryWeb to help the user organize their photos based upon the organization methods they have already used within Microsoft. For example, if the user stored a group of photos on their Microsoft computer in the file directory C:/Photos/

Petitioner Apple Inc. - Ex. 1001, p. 60

US 10,423,658 B2

17

2013/First Day of School, MemoryWeb will automatically place the photos that were located within that Microsoft File Folder Path into a MemoryWeb Application Dot-Tag under a collection called "First Day of School" based upon the last folder within the file folder path. An example of the Application Dot-Tag that would be generated from the File Folder Path is in FIG. **31** with the label "First Day of School" (**0770**). In addition, MemoryWeb will allow the user to view the photos that are within a specific File Folder Path in the MemoryWeb Uploads Application View so that the user can organize photos from the same File Folder Path. An example of how this will be illustrated within MemoryWeb's Uploads Application View is in FIG. **35** with the groping of photos with the File Path Name C:/Photos/2013/First Day of School (**0709**).

In FIG. **24**, the MemoryWeb Person Tag Data Blocks (**0380**) that are contained with a User Relationship Table are illustrated. For any person that is added within a user's account, various MemoryWeb Person Tag Data Blocks are stored including: Person Name (**0395**), Nickname (**0381**), Birthdate (**0382**), Date of Death (**0383**), Biography (**0384**), Mother (**0385**), Father (**0386**), Brother(s) (**0387**), Sister(s) (**0388**), Daughter(s) (**0389**), Son(s) (**0390**), Spouse(s) (**0391**), Facial Recognition (**0392**), FacebookID (**0393**), Pets (**0394**), and other data blocks that will be added in the future as the Application grows (**0396**). These data blocks are primarily used in the People Profile Application View as illustrated in FIG. **32** (indicator **1430**). One embodiment within the MemoryWeb Person Tag Data Block contains the FacebookID (**0393**). As illustrated in FIG. **26** (indicator **0507**), information from Third Party Media Providers will be exchanged within MemoryWeb and the user's FacebookID will be provided and stored within the MemoryWeb Person Tag Data Block. In addition, any of the User's contacts from Facebook will also be downloaded into the corresponding MemoryWeb Person Tag Data Blocks for any matching persons within the user's MemoryWeb account. The information from the Third Party Media Providers that are stored within MemoryWeb will be used to provide "push notifications" to the user for various items such as when the user or any one of its contacts posts a photo to that Social Media venue.

As illustrated in FIG. **25**, the Third Party Facial Recognition System (**0400**) is described in further detail. As photos are imported or uploaded into the Application, the systems will request thumbnail Digital Files (**0404**) from the User Relationship Table (**0300**). On a routine basis (e.g., daily), the system will retrieve all the thumbnails of Digital Files with unconfirmed faces (**0403**) and the send those Digital Files (**0404**) to the Third Party Recognition Provider (**0401**). The Third Party Facial Recognition Provider (**0401**) uses their algorithms to find location of eyes, nose, mouth and many other points for each face detected in the photo. They will also determine gender, check if the person is smiling, have eyes open, lips sealed or wearing glasses. The Third Party Facial Recognition Provider will use their algorithms to associate potential matches of faces for the user's collection of photos. For each face, the system will send back attributes including gender (male, female), glasses (true, false), smiling (true, false), lips (sealed, parted), eyes, (open, closed), mood (happy, sad, angry, surprised, disgusted, scared, neutral), field in the response have two subfields: value (string) and confidence (integer). For each attribute, the Third Party Facial Recognition Provider will assign percentages of confidence (0% to 100%) for each attribute that can be used by the MemoryWeb Application to utilize.

18

The Third Party Facial Recognition Provider will then send the information relating to a person back to Memory-Web (**0405**). The MemoryWeb Application parse the identified faces and corresponding Facial Recognition data for each Digital File (**0406**). The system will interact with the User Relationship Table and determine if the face is an existing (i.e., "trained") face in MemoryWeb where there is a Face ID in the User Relationship Table (**0407**). If not, the system generates a facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0410**). If yes, the system will then determine if the face is above the system's thresholds for confirming a face is a specific person in the user's MemoryWeb system (**0408**). If no, system generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0411**). If yes, the system records and associates specific face for Digital File with a MemoryWeb Person ID and sends to Memory-Web Person Tag (Data Blocks) in User Relationship Table (**0409**).

Typically, the ability to confirm and deny facial recognition matches will be within the People Profile Application View as illustrated in FIG. **32** within the facial recognitions area (indicator **1442**). The system will also have other facial resonations area where the user can confirm or deny the suggested facial recognitions of a person for a Digital File. When the user denies the suggested facial recognition, the system dis-associates potential person match Tag, search's the user's collection for other potential matches, and then sends information to Tag Data Block of Relationship Table for the Digital File. If the user accepts the suggested facial recognition, the system sends this facial recognition tag confirmation to the User Relationship Table for the Digital File. Once a confirmation is made, the newly associated Digital File will have that confirmed person Application Dot-Tag associated to that Digital File for all Application Views. Each time an accepted or denied facial recognition is made for a specific person, the specific data points used for facial recognition is improved and sent to the Third Party Facial Recognition Provider for more accurate confirmations of that person during the next run for that person.

As illustrated in FIG. **26**, the Third Party Media System (Data Exchange) (**0500**) is described in further detail. There are numerous types of third party media systems that are contemplated for MemoryWeb including social network providers (e.g., Facebook, Twitter, and LinkedIn) and other photo sites (e.g., Flickr and Picasa). In addition, it is contemplated for the ability to print Digital Files from MemoryWeb using third party print providers such as Walgreens or Shutterfly. Further contemplated solutions might be from digital file warehouses such as Dropbox and box-.net. All of the Third Party Media Systems will interact with MemoryWeb using the same system that is described within FIG. **26**. The Third Party Social Media System starts when the user initiates sharing of their information with Third Party Media Provider with MemoryWeb (**0502**). When this is initiated, the system will send registration information (**0503**) to the Third Party Media Provider (**0501**). Once received, the Third Party Media Provider will send back a confirmation with the Third Party Social Media ID (**0504**) and then the system will send the information (**0505**) to the User Settings Table (**0390**) within the User Relationship Table (**0300**). The system will then send daily requests from the User Relationship Table for contact names and IDs (**0506**) to the Social Media Provider (**0506**). If there are new contact names that are not part of the user's current people,

Petitioner Apple Inc. - Ex. 1001, p. 61

US 10,423,658 B2

19 20

the system will receive new contact names and IDs from the Social Media Provider (**0501**). The user will have the ability to confirm or deny matches (**0508**) with their contacts within MemoryWeb. If there is a match, the system will associate the existing person within MemoryWeb to the same ID of the person within the Third Party Social Media platform (**0509**) and then send this to the User Relationship Table. If there is not a match, the system will add this additional contact as a new person and send (**0510**) this to the User Relationship Table. If the user wants to share or print Digital Files from MemoryWeb, they can do this with the Share to Third Party Media Provider System (**1000**) that is further detailed within FIG. **46**.

In FIG. **27**, the MemoryWeb User Settings Table is illustrated. As illustrated in the User Settings Table (**1900**), various data blocks of information is stored including the User's Name (**1901**), Payment ID (**1902**) that is used with third party payment providers, Password (**1903**), Account Type (**1904**) (i.e., free or paid account), User's email (**1905**), Language preference (**1906**), Date format preference (**1907**), Email notification (**1908**) preferences, the ability to share Contacts (with third Party Social Media) (**1909**), Facebook ID (**1910**), API Token (**1911**), Payment Date (**1912**) and other settings that will evolve as the Application grows (**1913**).

In FIG. **28**, the Application Digital Tag Organizer System (**0600**) is illustrated. Within various Application Views the user can select, add, delete and edit MemoryWeb Tags for such areas as people, date, location, collections, star rankings, and recipes. An illustration of an Uploads Application View where MemoryWeb Tags for a Digital File can be selected, added, deleted, or edited is illustrated in FIG. **35**. The Application Digital Tag Organizer System begins when the user selects one or more Digital Files in MemoryWeb (**0601**). The system then sends a request to the User Relationship Table for the specific Digital File (**0602**). The system then retrieves the Digital File and the Digital File Tag Data Blocks (**0603**) from the User Relationship Table (**0300**). Next, the system will display the Digital File and the corresponding Digital File Tag Data Blocks in the form of Application Dot-Tags (**0604**). An example of how the system can illustrate a Digital File with the corresponding Application Dot-Tags is in FIG. **31** (indicators **0780**, **0765**, **0766**, **0768**, **0770**, and **0771**).

If the user selects an Application Dot-Tag (**0605**), the system will utilize the Continuous Link of Application Dot-Tags System (**0700**) to produce the results of that Application Dot-Tag within one of the Application Views that is later illustrated in FIG. **30**.

If the user selects add for a MemoryWeb Tag (**0606**), the user can add a new MemoryWeb Tag. When the user begins to type in text to add a tag, the system will produce suggestions on matching MemoryWeb Tags or the option to add a new tag (**0607**). If a matching tag is selected (**0608**), the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0610**). Alternatively, if the tag does not exist the user can create a new MemoryWeb Tag (**0609**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0611**).

If the user selects edit for a MemoryWeb Application Dot-Tag (**0612**), the user can add information text to edit the MemoryWeb Tag and the system will produce suggestions or matching MemoryWeb tags or the option to add a new tag (**0613**). If there is a match within the user's system, the matching MemoryWeb Tag will appear and the user can select the MemoryWeb Tag (**0614**). Once the matching tag

is selected, the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0616**). Alternatively, the user can create a new MemoryWeb Tag (**0615**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0617**). If the user selects delete for a MemoryWeb Application Dot-Tag (**0618**), the system deletes the association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File (**0619**).

In FIG. **29**, the Application Dot-Tag Shape and Content is illustrated (**0650**). MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag (as illustrated in FIG. **30**). In essence, the Application Dot-Tags operate as mini search engines for the user's Digital Tags.

The structure of an Application Dot-Tag (**0650**) can take on an solid-line enclosed shape of a pill, dot or similar depiction (**0651**) and within the shape the name of the MemoryWeb Tag is displayed (**0653**) along with the number of Digital Files (**0652**) that are also associated with that same MemoryWeb Tag. FIG. **29** further illustrates more examples of the Application Dot-Tags. If the number of Digital Files associated with a specific MemoryWeb Tag is less than a certain number (e.g., **1000**), the actual number of Digital Files associated with that MemoryWeb Tag is displayed. In FIG. **29**, this is illustrated with an Application Dot-Tag that has 453 files that are associated with the location of Cologne, Germany (**0654**). However, if the number of Digital Files associated with a specific MemoryWeb tag are greater than the character length, a greater sign along with a number sequence that is less than the total number of associated Digital Files will be displayed (**0655**). In FIG. **29**, this is illustrated with an Application Dot-Tag that has ">999" (**0657**) as the number of Digital Files with the exact same MemoryWeb Tag and if the name of the MemoryWeb tag is longer than the text sequence, only a portion of the MemoryWeb tag will be displayed along with an ellipse as illustrated with "Holiday Photos from . . . " (**0658**). Finally, the Application Dot-Tag may be illustrated with a dotted or similar distinction (as opposed to a solid line) to help indicate a partial relationship (**0656**). In the illustration in FIG. **29**, the dotted line is to indicate that only some of the selected Digital Files have the MemoryWeb Tag of Frank Smith.

In FIG. **30**, the Continuous Link of Dot Tag System is illustrated (**0700**). When a user selects an Application Dot-Tag, it will take them to the corresponding Application View that relates to the type of MemoryWeb Tag. The Continuous Link of Application Dot-Tag System begins when a user selects an Application Dot-Tag (**0701**).

If the Application Dot-Tag is a Person (**0702**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of how a user can select a person Application Dot-Tag is in FIG. **31** (indicator **0764**). For a person tag, the system receives data for that person from the User Relationship Table and displays the relationship data in a People

Petitioner Apple Inc. - Ex. 1001, p. 62

US 10,423,658 B2

21                                                    22

Profile View (**0709**). A sample illustration of a selected Person Application Dot-Tag is in FIG. **32** (indicator **1430**).

If the Application Dot-Tag is a Collection (**0703**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a collection Application Dot-Tag that can be selected is in FIG. **31** (indicator **0781**). For a collection tag, the system receives data for that collection from the User Relationship Table and displays the relationship data in a Collection View (**0710**). A sample illustration of a selected Collection Application Dot-Tag within a Collection View is in FIG. **33** (indicator **1530**).

If the Application Dot-Tag is a Location (**0704**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a location Application Dot-Tag that can be selected is in FIG. **31** (indicator **0768**). For a location tag, the system receives data for that location from the User Relationship Table and displays the relationship data in a Location View (**0711**). A sample illustration of a selected Location Application Dot-Tag within a Location View is in FIG. **34** (indicator **1630**).

If the Application Dot-Tag is a Date (**0705**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a date Application Dot-Tag that can be selected is in FIG. **31** (indicator **0766**). For a date tag, the system receives data for that date from the User Relationship Table and displays the relationship data in Uploads View with that date filtered (**0712**). A sample illustration of a selected Date Application Dot-Tag within Uploads View is in FIG. **40** (indicator **0861**).

If the Application Dot-Tag is a Recipe (**0706**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). For a recipe tag, the system receives data for that recipe from the User Relationship Table and displays the relationship data in a Recipe View with that date filtered (**0713**). A sample illustration of a selected Date Application Dot-Tag within Recipe View is in FIG. **36** (indicator **1800**).

The Application is contemplated to have additional types of Application Dot-Tags (**0707**) in the future including Family Trees, Timespan, etc. and each of these MemoryWeb Tags will go through the same continuous link of Application Dot-Tag process. For an additional type of Application Dot-Tag, the system will receive data from the User Relationship Table and displays the relationship data in the corresponding view for that type of Application Dot-Tag (**0714**).

If within any of the Application Views the user selects a Digital File (**0715**), the Digital File is then displayed in a Slideshow View (**0716**) where the user can again select an Application Dot-Tag (**0701**) and start the continuous link of Application Dot-Tag functionality over again. Also within an Application View, if the user selects another Application Dot-Tag (**0717**), the entire continuous link of Application Dot-Tag functionality begins again and sends the request back to ask if the newly selected Application Dot-Tag is a person (**0702**).

In FIG. **31**, the Slideshow view of a Digital File, Application Dot-Tags, and comments are illustrated (**0750**). When viewing a Digital File or group of Digital Files within the Slideshow Application View (**0750**), the selected Digital File is displayed in the center of the screen (**0754**). If the user wants to export this photo with all the associated Memory-Web Tags, they can select export (**0751**) which will initiate the Application Export System as illustrated in FIG. **49**. If

the user wants to see the Digital File that is one file before the selected Digital File, they select the left arrow (**0752**) or they can select the right arrow (**0753**) to display the next photo in the sequence. Below the Digital File, the comments (**0755**) that are specific to that Digital file are depicted. If the user wants to edit the comments, they select edit (**0756**). If the user would like to see a moving slideshow of all the photos that are part of the group of Digital Files, they can select on the play sign (**0757**) or simply click the specific thumbnail of a Digital File (**0758**) to be displayed. The user can also have the slideshow in a full screen slideshow by selecting the full screen icon (**0759**). If the user wants to share the individual Digital file via email, they can select the mail icon (**0760**) or share it through a third party median provider, in this case Facebook (**0761**). A more detailed description on how the share functionality works is in FIG. **46** (indicator **1000**).

In FIG. **31**, each Application Dot-Tag that is associated with a Digital File is illustrated to the right of the Digital File under each major MemoryWeb Tag area. For this example, the People area (**0763**) has Application Dot-Tags of Jackson Smith (**0780**) and JC Smith (**0764**) associated with the selected Digital File. In the Dates area (**0765**), the Application Dot-Tag of August 28, 2013 (**0766**) is associated with the selected Digital File. In the Location Area (**0767**), the Application Dot-Tag of Abe Lincoln Elementary School (**0768**) in the location associated with the selected Digital File. In the Collections Area (**0769**), the Application Dot-Tags of First Day of School (**0770**) and Jackson and JC Photos 2013 (**0771**) are associated with the selected Digital File. The Star Rankings Area (**0782**) shows that four out of five stars (**0773**) was selected for this Digital File. If the Digital File is associated with a Recipe (**0774**) the Application Dot-Tag would be illustrated in this area. The Media Type area indicates that this is a Memento (**0776**). If the user wants to delete this Digital File from the Application, they can select the Delete Item function (**0779**). If the user wants to edit the Application Dot-Tags, they can select the edit icon (**0762**) and all the MemoryWeb Tag areas will be in edit mode as later illustrated in FIG. **35**. Finally, any original Digital File detail (e.g., file name, camera specifications, etc.) is illustrated (**0778**).

In FIG. **32**, both of the People Application Views are illustrated. The first People Application View (**1400**) is used to display all the people that were created within the user's Application. This view can be seen by selecting "People" (**1401**) from any of the Application Views within the Application. The people can be listed in various sort orders though a drop-down (**1402**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. Additional sorts are contemplated such as age sort. For each person, a thumbnail of their face along with their name is depicted. In this figure, Jon Smith (**1403**) and JC Jon Smith (**1404**) along with some other people are illustrated. Also, the user can determine if they want to have **20**, **50** or **100** people shown at one time (**1405**) by selecting the corresponding number box. At the top of every Application View within the Application, the user can select Fast Search (**1450**) that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters (**1451**) that is further described in FIGS. **37-43**.

In the second People Application View within FIG. **32**, a single people profile (**1430**) is illustrated. The individuals name is displayed at the top of the page (**1431**) along with their Nicknames (**1433**), when they were Born (**1434**), who their parents are (**1435**), Siblings (**1436**), Children (**1437**),

Petitioner Apple Inc. – Ex. 1001, p. 63

US 10,423,658 B2

23

and the person's Biography (**1438**). The Person Profile Photo of that individual is illustrated (**1439**) and if the user wants to change the profile photo, they can change by selecting change profile photo (**1440**). For each person, the system can allow the user to quickly see all the tags that are associated to a person. In this example, the system illustrates that there are four photos (**1452**) associated with that person and will also illustrate thumbnails of each of the four photos (**1446**). These thumbnails can be selected and then the user will be taken to the slideshow view for that Digital File. If the user selects Collections (**1441**), all of the collections that the person has been tagged within will be displayed. If the user selects Facial Recognitions (**1442**), all the faces that are confirmed or need to be confirmed are displayed. This is the area where the user can select to confirm or deny a suggested facial recognition through the Third Party Facial Recognition System that is illustrated in FIG. **25**. If the user selects Locations (**1443**), all of the Locations that the specific person has been tagged within will be displayed. If the user selects Family Relationships (**1444**), the seven people that the user is associated with will be displayed in a family chart or tree. If the user selects Recipe (**1445**), all the recipe's that the user has been tagged within will be displayed. If the user wants to edit any details within the individual people profile, they can select edit (**1447**) and all the fields will allow the ability to edit the details. If the user selects any of the Application Dot-Tags such as the individuals mother Jane Smith (Doe) (**1449**), the application will utilize the Continuous Link of Application Dot-Tag System (see FIG. **30**) and take the user to an individual people profile view of Jane Smith (Doe). If the user selects View all People (**1432**), the Application will go back to the multiple People View (**1400**).

In FIG. **33**, both of the Collection Application Views are illustrated. The first Collection Application View is used to display all the collections that were created within the user's Application (**1500**). This view can be seen by selecting "Collections" (**1501**) from any of the Application Views within the Application. The collections can be listed in various sort orders though a drop-down (**1502**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each collection, a thumbnail of a Digital File from that collection depicted. In this figure, Smith Family Photos (**1503**), Europe Trip (**1504**), First Day of School (**1505**), Jackson and JC Photos 2013 (**1506**), and Baseball Games (**1507**) is illustrated. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

In the second Collections Application View within FIG. **33**, a single collection (**1530**) is illustrated. The individual collection name is displayed at the top of the page (**1532**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system shows photos (**1533**) associated with the Smith Family Photos Collection. If the user wants to edit any Digital Files within the collection, they can select edit (**1535**) and then the user can add or delete any Digital Files as well as set the cover photo for a collection. If the user wants to share this collection (**1534**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1531**), the Application will go back to the multiple Collection View (**1500**).

24

In FIG. **34**, both of the Location Application Views are illustrated. The first Location Application View is used to display all the locations that were created within the user's Application (**1600**). This view can be seen by selecting "Locations" (**1605**) from any of the Application Views within the Application. The locations can be listed in various sort orders though a drop-down (**1606**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each location, a thumbnail of a Digital File from that location depicted. In this figure, Wrigley Field (**1601**), Abe Lincoln Elementary School (**1602**), Home Sweet Home (**1603**), and Stonehenge (**1604**) is illustrated. What is also contemplated instead of a Digital File from that location is that a zoomed in image of a map from the specific location using the Third Party Geographical Mapping System later depicted in FIG. **47**. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

In the second Locations Application View within FIG. **34**, a single location (**1630**) is illustrated. The individual location name is displayed at the top of the page (**1632**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system illustrates a one photo (**1633**) taken at Wrigley Field (**1634**) that is associated with the location called Wrigley Field. If the user wants to edit any Digital Files within the collection, they can select edit (**1637**) and then the user can add or delete any Digital Files. If the user wants to share the Digital Files associated with this location (**1636**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1631**), the Application will go back to the multiple Collection View (**1600**). As part of the individual Location View, an interactive map displaying a zoomed-in image of the specific location is displayed (**1635**).

In FIG. **35**, the Uploads Application View and how it uses the Application Digital Tag Organizer System is illustrated (**1700**). Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system (also called Application Digital Tag Organizer) allows a user to select large amounts of Digital Files and add Digital Tags that can characterize and document the digital file(s). Digital Files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. One or more Digital Files can be selected at the same time and displayed with an overlaid check mark when activated (**1705** and **1710**) and then Digital Tags can be assigned to a single file at a time or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos (**1713**) and enter the tag only once. In addition, the system does include an indicator that appears when a user hovers over the Digital File providing all the relevant Digital Tags associated with that specific Digital File (**1737**) and in this example it shows the caption of "Family Smith finally sees Stonehenge," that four People are tagged to this photo, one collection is tagged to this photo, there are zero people recognized through Facial Recognition, and the date of this photo is from December 21, 2013. If the user wants to delete

Petitioner Apple Inc. - Ex. 1001, p. 64

US 10,423,658 B2

25                                                                              26

a single photo from uploads, they can click on the "x" (**1735**) that is displayed when the user hovers over the Digital File thumbnail. When there are multiple Digital Files, the user can determine how many images are displayed at one time in the Items Per Page Buttons (**1738**) that include such numbers at 20, 50 and 100 on the page at the same time. When there are more Digital Files that items per page, they are automatically grouped by pages and a Page Button (**1739**) can be selected to see the next set of Digital Files.

In the Uploads Location View, Digital Files can be directly uploaded to the Application by selecting Upload Files (**1701**) and the user will have the option to select the specific Digital Files to be uploaded from their Storage System. Users also have the option to install the Memory-Web Download Application that can be installed on either a Microsoft or MAC computer that will automatically upload and sync photos to and from the users Storage System to the MemoryWeb Application. Also displayed is the amount of space being used by the user within the Application (**1702**). Uploads of Digital Files can be listed in various sort orders though a drop-down (**1703**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. In addition, the Digital Files can be sorted by File Batch Name (A-Z) or File Batch Name (Z-A). In FIG. **35**, the sort of File Batch Name (A-Z) is selected (**1703**) and this provides three groups of Digital Files with the names File Folder C:/2013/Family Fun (**1704**), File Folder C:/2013/General (**1706**), and of File Folder C:/2013/First Day of School (**1709**). The File Batch Name is created when Digital Files are uploaded to the Application. The File Batch Name allows the user to see the file directory of how they had their Digital Files stored from another Storage System (e.g., on their computer hard drive) that allows for easier organization within the MemoryWeb Application. For example, in the sort of File Folder C:/2013/General (**1706**), two digital files (**1707** and **1708**) are illustrated that came from the exact same file folder path of the Users Storage system upon upload. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

On the right side of FIG. **35**, the associated Application Dot-Tags along with the ability to organize one or more Digital Files at the same time is illustrated. At the top of the screen, it shows how two Digital Files are selected (**1712**) that correspond to the selected (checked) Digital Files (**1705** and **1710**). Below this area illustrates all the Application Dot-Tags that are associated with the two selected Digital Files. The user has the option to select all (**1713**) the Digital Files being viewed in the Uploads View as well as selecting none (**1714**). By selecting all, the user can administer Application Dot-Tags to all the selected Digital Files at the same time. If the user wants to delete Digital Files, they can select the Digital Files to be deleted and then select the Delete Selection (**1715**) option.

In FIG. **35**, each Application Dot-Tag that is associated with the selected Digital File(s) is illustrated. For this example, the People area (**1716**) has Application Dot-Tags of Jackson Smith (**1734**), Jane Smith (**1733**), Jon Smith (**1731**, and JC Smith (**1717**) that are associated with the two selected Digital Files (**1710** and **1705**). If the user wants to add a person to all the selected Digital Files, they can click on "+Add People" (**1718**) that will display a pop-up where the user can search for an existing person within the user's existing people within the Application or add a new person to the user's group of people within the Application. It is

contemplated to have a Facial Recognition suggestions appear in this area of the Application that will allow users to confirm or deny a recognized person to a specific Digital File. However, the current version of the People area is useful for situations where a face is not recognized, but the user desires to tag a person to a Digital File, they can manually assign a Person Application Dot-Tag to that Digital File for an existing person (e.g., if the person's back is turned, it is a document that contains that person, a piece of art created by that person, etc.).

In the Dates area (**1719**), the organize functionality for assigning a Digital Tag of a date within the Digital File(s) is illustrated. Upon upload, the date when the Digital File was created is automatically read by the Application and illustrated as an Application Dot-Tag (**1720** and **1730**). As illustrated in the Dates area, the Application Dot-Tags of July 4, 2013 (**1720**) and August 28, 2013 (**1730**) are illustrated as they correspond to the dates that are associated with each of the selected Digital Files. If the user wants to change the date for all the selected Digital Files, they can click on "+Add/Edit Date" (**1721**) that will display a pop-up where the user can add a new date for the selected digital files within the Application. This is a very useful feature when an incorrect date is assigned to a digital file (e.g., if a photo from October 31, 1951 was digitized on December 31, 2012, the digitized dates would show as an Application Dot-Tag that the user can change in this section to the correct date of October 31, 1951).

In the Locations area (**1722**), the organize functionality for assigning Digital Tags of locations within the Digital File(s) is illustrated. Upon upload, the GPS location of where the Digital File was created (if applicable) is automatically read by the Application and illustrated as an Application Dot-Tag for locations of the selected files. In the locations area, the Application Dot-Tags of Abe Lincoln Elementary School (**1723**) and Wrigley Field (**1735**) are illustrated as they correspond to the locations that are associated with each of the selected Digital Files. If the user wants to change the location for all the selected Digital Files, they can click on "+Add/Edit location" (**1724**) that will display a pop-up where the user can search for an existing location within the user's existing locations within the Application or add a new location to the user's group of locations within the Application. Another added function to assign a location to the selected Digital Files is to use Search with Map (**1732**) that utilizes the Application's Third Party Geographical Mapping System that is further illustrated in FIG. **47** that allows the user to type in any relevant information (e.g., location name, address, state, etc.) and then the Application will search and pinpoint that location on a map.

In the Collections Area (**1725**), the organize functionality for assigning Digital Tags of albums within the Digital File(s) is illustrated. Digital Files can be associated to multiple albums. As illustrated in the Collections area, the Application Dot-Tags of First Day of School (**1726**), Jackson and JC Photos 2013 (**1727**), and Baseball Games (**1728**) are associated with the Collections for the selected Digital Files. If the user wants to add a Collection to all the selected Digital Files, they can click on "+Add/Create Collection" (**1729**) that will display a pop-up where the user can search for an existing Collection within the user's existing Collections within the Application or add a new Collection to the user's group of Collections within the Application.

Within the Uploads View, the ability to perform similar tagging of Star Rankings, Recipes, Family Relationships, and Media Types/Document Type are also contemplated as part of the Application Digital Tag Organizer System. For

Petitioner Apple Inc. - Ex. 1001, p. 65

US 10,423,658 B2

27

Star Rankings, it is contemplated to assign MemoryWeb Tags of star rankings within the Digital File(s). Upon upload, if the star ranking is already contained within the Digital File, it is automatically read by the Application and illustrated as an Application Dot-Tag. The user can select one or more Digital Files and then apply a star ranking between 1 and 5 in the Uploads Application View. For Recipes, it is contemplated to assign MemoryWeb Tags of Recipes to Digital File(s). The user can select one or more Digital Files and then type within the "Recipe" search bar to either add a new recipe or associate the Digital File(s) to an existing recipe. Digital Files can be associated to multiple recipes. For Media Type/Document Type, the user can choose from a list of common document types (e.g., Birth Certificate, Death Certificate, Marriage Certificate, etc.) can be utilized for common document type associations. Once a document type is assigned to one or more Digital Files, the document type appears within an Application Dot-Tag. Digital Files can be associated to multiple document types.

In FIG. **36**, an individual recipe view (**1800**) allows one to see all the information that is associated with a specific recipe. The name of the specific recipe is displayed at the top of the page (**1801**) and the People Profile picture of the "chef" associated with the recipe is illustrated (**1804**). If no chef is assigned, the user can select the "+add/edit chef" (**1803**) to either choose an existing person from the user's People in the Application or add a new person.

The view of various Digital Files within the recipe (**1808**) along with scrolling through the Digital Files using the arrow icons (**1814** and **1815**), the ability to share this recipe with others by selecting the sharing icon (**1812**). As the Digital Files are selected on using the film strip on the bottom, a larger thumbnail illustrating the Digital File is shown (**1807**). The recipe view also allows you to choose a chef for the recipe from the people within the user's Application. When a chef is selected, the profile picture (**1804**) of the person along with their name as an Application Dot-Tag (**1816**) is displayed. For each recipe, the user can insert the ingredients (**1809**), directions (**1810**), and comments (**1811**). Each of these areas can be edited by selecting the edit button (**1813**). Another contemplated feature allows the user to apply star rankings for the recipe as well as categorize they type of recipe (e.g., appetizer, entrée, etc.). It is further contemplated that the Digital Files within the individual recipe view may also include videos where they can be watched showing the chef making the recipe. It is also contemplated that the recipes will be interactive with external sources (e.g., the Food Network) so that recipes can be shared or imported with the Application and that visitors to the account will be able to post/share comments about the recipe. It is further contemplated that the user can print the recipe using a print icon.

In FIG. **37**, the Advanced Filters System is illustrated (**0800**). This feature allows the user to narrow the Digital Files being viewed within the Application Views by searching the user's entire collection of MemoryWeb Tags within the Application and then displaying the filtered information in one of the Application Views. Advanced Filters System can be filtered by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify Digital Files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, and no upload date information or are lacking any other tag. The Advanced Search Filter can be

28

used within many of the views the Application to narrow the set of Digital Files being viewed. For example, you can use the Advanced Filter Button to only show the map view of locations a specific person has traveled in their lifetime.

When a user selects the "Advanced Filters" from almost any Application View (**0801**) (the button can be seen in FIGS. **32**, **33**, **34**, **35**, and **36**), a pop-up will appear that allows the user to type in text into the text box (**0802**). As the user is typing, the system sends a request (**0803**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0804**) and illustrate the potential matches of the filters to the user (**0805**). As the user types in another letter, the process of sending a request (**0803**) to the User Relationship Table (**0300**), producing results (**0804**) and producing a new set of results (**0805**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0806**) and then selects to apply this filter (**0807**), the system will send this request to the User Relationship Table (**0300**). This portion of the Advanced Filter System is further illustrated in FIG. **38**.

If the Advanced Filter System is applied within the Uploads View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0809**). An example of this output is later illustrated in FIG. **39** (indicator **0850**).

If the Advanced Filter System is applied within the Collections View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0810**). An example of this output is later illustrated in FIG. **39** (indicator **0852**).

If the Advanced Filter System is applied within the Locations View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0811**). An example of this output is later illustrated in FIG. **40** (indicator **0856**).

If the Advanced Filter System is applied within the People View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0814**). An example of this output is later illustrated in FIG. **39** (indicator **0854**).

If the Advanced Filter System is applied within other contemplated views within the Application such as Recipe, Family Trees, Timespan, etc. the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0812**).

If the user decides to add an additional filter (**0813**), the process is repeated when the user selects "Advanced Filter" (**0801**) while the pre-existing filters are still applied. An example of this process is later illustrated in FIG. **42** and FIG. **43**. If the user selects an Application Dot-Tag, then the continuous Link of Application Dot-Tags System is engaged as illustrated in FIG. **30** (**0700**).

In FIG. **38**, the process of the Adding the First Application Dot-Tag using the Advanced Filter is illustrated. This is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0830**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0831**). The user can then type in the alphanumeric text search criteria within the Advanced Filters text box (**0838**). In this example, the word "Smith" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters (**0836**) that meet the criteria. In this example, the user selects the Application Dot-Tag of a person named JC Smith (**0832**). In Stage 3, "Apply" is selected and then the application lists the Application Dot-

Petitioner Apple Inc. - Ex. 1001, p. 66

US 10,423,658 B2

29                                    30

Tag of a Person named JC Smith as a current active filter (**0837**). This filter will then be applied to each Application view that is further illustrated in FIGS. **39** through **41**. If the user wants to clear all the filters, they can select "clear filters" (**0839**).

In FIG. **39**, an illustration of the results for a Single Application Dot-Tag Filter for each Application view is depicted. If the Advanced Filter is applied in the Uploads Application View (**0850**), the filter of "JC Smith" (**0851**) is illustrated and only the Digital Files that contain the person JC Smith are illustrated. If the Advanced Filter is applied in the Collections Application View (**0852**), the filter of "JC Smith" (**0853**) is illustrated and only the Collections that contain the person JC Smith are illustrated. If the Advanced Filter is applied in the People Application View (**0854**), the filter of "JC Smith" (**0855**) is illustrated and only the person named JC Smith is illustrated.

In FIG. **40**, an illustration of the results for a Single Application Dot-Tag Filter for a date within the Uploads Application View is depicted (**0860**). If the Advanced Filter is applied using a date filter within the Uploads Application View (**0861**), the filter date of "2013-07-04" (**0876**) is illustrated and only the Digital Files that contain that date are illustrated.

In FIG. **41**, an illustration of the results for a Single Application Dot-Tag Filter in the Location Application View is depicted (**0870**). Within the Location Application View the Digital Files are displayed within an interactive map (Google map shown as an example). The Location View can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users. In this view, individual or groups of Digital Files are illustrated as photo thumbnails (see indicators **0874** and **0875**) on the map and the user can select the thumbnail to see all the Digital Files with the same location (as seen FIG. **34** (indicator **1630**)) or the user can use the interactive map and narrow the map view by either using the zoom in/zoom out bar (**0876**) on the left or simply selecting the map. Note that the pinned locations include a thumbnail of the Digital File (or Collection cover) and the number of Digital Files for that location.

If the Advanced Filter is applied in the Locations Application View, the filter of "JC Smith" (**0872**) is illustrated and only the Digital Files that contain the person JC Smith are illustrated with their geographic location on the map. The user can select to clear this filter (**0873**) or see this Advanced Filter with the view of locations as a list (**0871**). In FIG. **41**, there are two illustrated on the map (**0874** and **0875**).

In FIG. **42**, the process of the Adding another Application Dot-Tag using the Advanced Filter is illustrated. Continuing on the process that was illustrated in FIG. **38** where the first Application Dot-Tag filter of "Person: JC Smith" was applied, the ability to add a second Application Dot-Tag if further illustrated in FIG. **42**. As with FIG. **38**, FIG. **42** is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0880**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0881**). The user can then type in the text search criteria for the second Advanced Filter within the Advanced Filters text box. In this example, the word "Abe" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters that meet the criteria. In this example, the user selects the Application Dot-Tag of a location named Abe Lincoln Elementary School (**0882**). In Stage 3 (**0883**), the application lists the Application Dot-Tags of both the Person named JC Smith (**0884**) as well as

the location of Abe Lincoln Elementary School (**0885**) as part of the Current Active Filters. The user then selects "Apply" (**0886**) to see these filters illustrated in the Application Views. This filter will then be applied to each Application view as previously illustrated in FIGS. **39** through **41**.

In FIG. **43**, an illustration of the results for Adding Another Application Dot-Tag Filter in the Location Application View is depicted (**0890**). Continuing on the process that was illustrated in FIG. **42**, in FIG. **43** (**0890**) the Application Dot-Tag filters of "Person: JC Smith" (**0891**) and "Location: Abe Lincoln Elementary School" (**0892**) are illustrated. There is one overlapping location that contains both filters for a Digital File that is illustrated on the map (**0893**).

In FIG. **44**, the Fast Search System is illustrated (**0900**). Throughout the Application, groups or individual Digital Files can be searched quickly using the Fast Search bar that is at the top of each Application view. Once a key word or phrase is entered into this area, the user's entire collection of Digital Tags within the Application that includes all the Digital tags are searched for potential matches. This feature allows the user to search their entire collection of MemoryWeb Tags within the Application and then displays the information grouped by people, collections, locations, documents, and recipes. The Fast Search System can be searched by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates.

When a user selects the Fast Search bar from almost any Application View (**0901**), the user can type in alphanumeric text into the text box (**0902**). As the user is typing, the system sends a request (**0903**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0904**) and illustrate the potential matches by category for the user (**0905**). As the user types in another letter, the process of sending a request (**0903**) to the User Relationship Table (**0300**), producing results (**0904**) and producing a new set of results (**0905**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0906**), the system will send this request to the User Relationship Table (**0300**). This process is further illustrated in FIG. **45**.

If the user selects a person Fast Search tag, the system retrieves data for the person from the User's Relationship Table and displays the relationship data (**0907**) in the Person Profile View as illustrated in FIG. **32** (indicator **1430**).

If the user selects a collection Fast Search tag, the system retrieves data for the collection from the User's Relationship Table and displays the relationship data (**0908**) in the Collection View as illustrated in FIG. **33** (indicator **1530**).

If the user selects a location Fast Search tag, the system retrieves data for the location from the User's Relationship Table and displays the relationship data (**0909**) in the Location View as illustrated in FIG. **34** (indicator **1630**).

If the user selects a date Fast Search tag, the system retrieves data for the date from the User's Relationship Table and displays the relationship data (**0910**) in the Uploads View as illustrated in FIG. **40** (indicator **1861**).

If the Fast Search System is applied within other contemplated views within the Application such as Family Trees, Timespan, etc. the system retrieves data for the search from the User's Relationship Table and displays the relationship data (**0911**). As part of the contemplated search process is to also search comments related to a Digital File.

In FIG. **45**, the process of using the Keyword Fast Search is illustrated. This is a visual depiction of the process that was illustrated in FIG. **44**. In Stage 1 (**0930**), the user selects

Petitioner Apple Inc. - Ex. 1001, p. 67

US 10,423,658 B2

31

the Fast Search bar at the top of one of the Application Views. This takes the user to Stage 2 (**0931**) where the user can then type in the alphanumeric text search criteria within the Fast Search text box (**0932**). In this example, the word "Wrigley" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available MemoryWeb Tag results (**0933**) that meet the criteria. Note how the results are organized by various MemoryWeb Tag categories such as Person, Collection, Location, Recipe, and comments. In Stage 3 (**0934**), the user selects one of the results. In this example, the user selects the location of Wrigley Field (**0935**). When the user selects a specific MemoryWeb Tag, it takes them to Stage 4 where the information related to that tag is displayed in the corresponding view as discussed within FIG. **44**. For the example where the user selected the Location of Wrigley Field, the user was taken to the individual locations Application View where the location of Wrigley Field and the corresponding Digital Files are displayed (**0936**).

In FIG. **46**, the Share to Third Party Media Provider System (**1000**) is illustrated. This feature allows the user to share Digital Files from MemoryWeb directly to a third party application. The process begins when the user selects to share a Digital File or collection of Digital Files within the MemoryWeb Application (**1001**). Examples of where the user can select share can be seen in FIG. **31** (indicator **0760**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Once the request is made, the system requests the Digital File and Tag Data Blocks (**1002**) from the User Relationship Table (**0300**). The system then retrieves the Digital File from the User Relationship Table (**1003**). At the same time, the system will also retrieve the Digital Tags from the Relationship Table (**1004**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1005**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1006**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**1300**) which then sends the Digital File outside the MemoryWeb Application to the Third Party Media Provider (**0501**).

In FIG. **47**, the Third Party Geographical Mapping System is illustrated (**1100**). When Digital Files are imported into MemoryWeb, if there is any GPS data available from the EXIF Tags (See FIG. **22** (indicators **0330**, **0331**, **0332**, and **0333**)), the system will utilize this data and automatically create a MemoryWeb location tag within the Application (See FIG. **22** (indicators **0368**, **0369**, **0370** and **0371**)). However, if the GPS coordinates were missing from a Digital File when it was imported into the Application (See FIG. **50** (indicators **1418** and **1419**)), the user can add the Location (which the application will automatically add the associated GPS tags) to the Digital File using the Application Digital Tag Organization System (see FIG. **28**). As locations are associated with a Digital File, the Application can interact with a Third Party Geographical Mapping System to pull maps that correspond to the exact location of Digital Files that have a location tag (see FIG. **34** (indicator **1630** and FIG. **40**, indicator **0875**)). In addition, the Application utilizes a world map view to illustrate all the locations

32

that are associated to one or more Digital Files for a user within the Location Application View (see FIG. **41** (indicator **0880**)).

The Third Party Geographical Mapping System begins when a Location Application Dot Tag (**1102**) is selected (**1104**), the system will send a request (**1105**) to the User Relationship Table (**0300**). Examples of when Location Application Dot-Tags can be selected are illustrated in FIG. **31** (indicator **0768** and FIG. **35**, indicators **1723** and **1735**). In FIG. **47** if the Locations Application View is selected (**1103**), the system will send a request (**1105**) to the User Relationship Table. The Location Application View can be selected from almost any Application view as illustrated in FIG. **34** (indicator **1605**). When either a single location or the world map view is selected, the system will retrieve the data (**1108**) from the User Relationship Table (**0300**) and send a request (**1106**) to the Third Party Geographical Mapping Provider (**1101**) who generates the map request and then sends the information back to the system for the specific location (**1107**). At the same time, the Application Dot-Tags and Digital Files associated with the location or map request are retrieved and then sent (**1109**) to the Locations Application view. The system will combine the map information along with the Application Dot-Tags and Digital Files and display this information within the Location Application View (**1100**). Examples of a single Location Application View can be seen in FIG. **34** (indicator **1630**) and FIG. **40** (indicator **0875**), and an example of a world map view can be seen in FIG. **41** (indicator **0880**).

In FIG. **48**, the Share to Individual System is illustrated (**1200**). The Share to an individual person or a group of people starts when a user initiates share of a Digital File or a Collection of Digital Files (**1201**). Examples of where the user share functions are illustrates are in FIG. **31** (indicators **0760** and **0761**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Next, the system requests the Digital File and Tag Data Blocks (**1202**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1203**) from the User Relationship Table.

At the same time, the system will also retrieve the Digital Tags of the Digital File from the Relationship Table (**1204**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1206**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1205**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**1300**) which then sends the Digital File outside the MemoryWeb Application to an Individual or Group of People (**1207**).

In FIG. **49**, the Application Export System is illustrated (**1300**). The Application Export System starts when a user selects the export of a Digital File within the application (**1302**) or has installed the MW Automatic Uploader/Downloader Application (**1308**). An example of where the user can select the export of a Digital file within the Application is FIG. **31** (indicator **0751**). If the user has installed the MW Automatic Uploader/Downloader Application, the export functionality of the user's entire collection of Digital Files will be downloaded to the User's desired folder on their computer with the Digital Tags embedded within the Digital Files. If neither a user initiated download nor the MW

Petitioner Apple Inc. - Ex. 1001, p. 68

US 10,423,658 B2

33                                                                    34

Automatic Uploader/Downloader Application is not used, then the Application Export is not initiated (**1309**). For either a user initiated download or one using the MW Automatic Uploader/Downloader Application, the system requests the Digital File(s) and Tag Data Blocks (**1303**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1304**) from the User Relationship Table. At the same time, the system will also retrieve the Digital Tags of the Digital File from the User Relationship Table (**1305**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1306**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File(s) (**1307**). The application then exports the Digital File(s) with the new EXIF Tag Data Blocks to the desired Storage System of the user (**1301**).

In FIG. **50**, there are three charts for the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb. This Figure is meant to demonstrate how the EXIF Tag Data Blocks for a Digital File (in this example a JPG file) prior to the use of MemoryWeb Application appear and then how these EXIF Tag Data Blocks are populated with Digital Tags upon export from the MemoryWeb Application.

The first chart illustrates common EXIF Tags (Data Blocks) (**1401**) and lists certain common the EXIfTool Family 1 Group names that are displayed in the file properties of a JPG file when using Microsoft Windows (these are the same EXIF Tag Blocks that were illustrated in FIG. **22** (indicator **1320**)). In the second chart (**1402**), the Digital Tags associated with the original Digital File are displayed. In the third chart (**1403**), the updated Digital Tags for the same original Digital File once exported from the MemoryWeb Application is displayed.

In the second chart (**1402**), the original Digital File prior to import to the MemoryWeb Application did not have Digital Tags for data blocks such as Description Rating (**1416**), Description Comments (**1417**), GPS Latitude (**1418**), GPS Longitude (**1419**). Also in the second chart the Digital Tags for the data blocks of File Folder Path (**1420**) and File Date Created (**1421**) are illustrated.

In the third chart (**1403**), the original Digital File that was exported from the MemoryWeb Application now contains new or modified Digital Tags for certain data blocks. For example, a star rating of four out of five stars (**1410**) with the new MW Modified Digital File is now associated with the Description Rating (**1404**) where it was blank (**1416**) with the original file before using the MemoryWeb Application.

Another example is the listing of MemoryWeb Tags within the Description Comments data block (**1411**) as: CAPTION: Jackson and JC's first day at school!, PERSON: Jackson Smith, JC Smith, LOCATION NAME: Abe Lincoln Elementary School, COLLECTION: First Day of School, COLLECTION: Jackson and JC Photos 2013, DATE: 8/28/2013. All of these Digital Tags are now associated with the Description Comments (**1405**) where it was blank (**1417**) with the original file before using the MemoryWeb Application.

Also updated in the MW Modified Digital File are the GPS Latitude (**1412**) and GPS Longitude (**1413**) as Digital Tags that were assigned in the MemoryWeb Application using the location feature with the Application Digital Tag Organizer System. These tags now replace the blank tags

(indicators **1418** and **1419**) that were in the original file before using the MemoryWeb Application.

A final example is how the date was modified in the MemoryWeb Application where a new date of August 28, 2013 (**1415**) was assigned to the Digital File. This replaced the old date that was originally tagged with a date of November 1, 2013 (**1421**). In a typical Digital File, only the date and perhaps the GPS location if taken with certain newer photo device is pre-populated in a Digital File. For the example in FIG. **50**, the Digital File may have been created or scanned on November 1, 2013, but with the MemoryWeb Application Digital Tag Organizer System the user was able to correctly assign the date the photo was taken and now this date is always part of the Digital File within the MemoryWeb Application, but also when the Digital File is exported from MemoryWeb.

A benefit of the Export System is that users can export a single Digital File or their entire set of Digital Files (using the MW Automatic Uploader/Downloader Application), with all the updated Digital Tags from the MemoryWeb Application embedded within the Digital File(s). This feature is unique as it will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing Digital Files such as a social media website) where it can be viewed with these Digital Tag attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its Digital Files to a new digital system.

The application also contemplates the use of a Family Tree Application View where the individual people that have been created within the Application can be displayed with family relationships. This view can illustrate interactive family trees where one can see the family tree of an individual or family. Any family relationships created in the user's personal profile are already pre-populated by the Application for the Family Tree View. If a user selects on an individual within the family tree, it will take them to the people profile Application View of that person. Family Trees can quickly be viewed with the family tree drop-down sort feature. As with other areas within the Application, the family tree view can be narrowed down using an Advanced Filters System. For matching family members, the system will have drag/drop functionality to make new associations to a family tree. It is also contemplated that various family tree views could be displayed (e.g., pedigree chart, fan chart, directs descendants chart, etc.). In addition, it is contemplated that family tree relationships from either data files (e.g., GEDCOM files) or other sources (e.g., Family Search database) would either be imported into the user's versions of the Application or utilize these sources in associating the family tree information.

Another Application View that is contemplated is Timespan or Timeline. The Timeline Application View will have an interactive timeline to display the dates within the Digital Files of the Application for a user. The timeline view acts as an interactive filter or funnel of Digital Files whereas when the user starts to define the parameters of dates towards the bottom, the information above it is filtered to display the major groups of Digital Files that meets the selected date range criteria in various formats until you are able to view an individual Digital File. This funnel approach is designed to allow the user to appreciate the vast amount of data that can be associated with a date range, but then allow them to filter the information with the user's desired criteria. This will be a very useful tool when users want to see the growth

Petitioner Apple Inc. - Ex. 1001, p. 69

and progress of an individual as well as memorialize a lifetime of a friend or family member.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

The invention claimed is:

**1**. A computer-implemented method of displaying at least a portion of a plurality of (i) digital photographs, (ii) videos, or (iii) a combination of (i) and (ii), each of the digital photographs and videos being associated with a geotag indicative of geographic coordinates where the respective digital photograph or video was taken, the method comprising:

displaying an application view on a video display device including displaying a plurality of selectable elements, the plurality of selectable elements including a location selectable element;

responsive to a click or tap of the location selectable element, displaying a map view on a video display device, the displaying the map view including displaying:

(i) a representation of an interactive map;

(ii) a first location selectable thumbnail image at a first location on the interactive map, the first location being associated with the geographic coordinates of a first geotag, a first set of digital photographs and videos including all of the digital photographs and videos associated with the first geotag;

(iii) a first count value image partially overlapping the first location selectable thumbnail image, the first count value image including a first number that corresponds to the number of digital photographs and videos in the first set of digital photographs and videos;

(iv) a second location selectable thumbnail image at a second location on the interactive map, the second location being associated with the geographic coordinates of a second geotag, a second set of digital photographs and videos including all of the digital photographs and videos associated with the second geotag; and

(v) a second count value image partially overlapping the second location selectable thumbnail image, the second count value image including a second number that corresponds to the number of digital photographs and videos in the second set of digital photographs and videos;

responsive to a click or tap of the first location selectable thumbnail image, displaying a first location view on the video display device, the displaying the first location view including displaying (i) a first location name associated with the first geotag and (ii) a scaled replica of each of the digital photographs and videos in the first set of digital photographs and videos, the displayed scaled replicas of each of the digital photographs and videos in the first set of digital photographs and videos not being overlaid on the interactive map; and

responsive to a click or tap of the second location selectable thumbnail image, displaying a second location view on the video display device, the displaying the second location view including displaying (i) a second

location name corresponding to the second geotag and (ii) a scaled replica of each of the digital photographs and videos in the second set of digital photographs and videos, the displayed scaled replicas of each of the digital photographs and videos in the second set of digital photographs and videos not being overlaid on the interactive map.

**2**. The computer-implemented method of claim **1**, wherein the first location selectable thumbnail image includes a scaled representation of at least one of the digital photographs in the first set of digital photographs, and wherein the second location selectable thumbnail image includes a scaled representation of at least one of the digital photographs in the second set of digital photographs.

**3**. The computer-implemented method of claim **1**, further comprising responsive to a click or tap of a first one of the displayed scaled replicas in the first location view, displaying a first digital photograph associated with the first scaled replica in the first location view and a first map image indicating the geographic coordinates of the first geotag.

**4**. The computer-implemented method of claim **3**, further comprising responsive to a click or tap of a first one of the displayed scaled replicas in the second location view, displaying a first digital photograph associated with the first scaled replica in the second location view and a second map image indicating the geographic coordinates of the second geotag.

**5**. The computer-implemented method of claim **1**, wherein the plurality of selectable elements further includes a people selectable element, the method further comprising responsive to a click or tap of the people selectable element, displaying a people view, the displaying the people view including displaying:

(i) a first person selectable thumbnail image including an image of a face of a first person, a third set of digital photographs and videos including digital photographs and videos associated with the first person;

(ii) a name associated with the first person, the name associated with the first person being displayed adjacent to the first person selectable thumbnail image;

(iii) a second person selectable thumbnail image including an image of a face of a second person, a fourth set of digital photographs and videos including digital photographs and videos associated with the second person; and

(iv) a name associated with the second person, the name associated with the second person being displayed adjacent to the second person selectable thumbnail image.

**6**. The computer-implemented method of claim **5**, wherein the displaying the people view further includes displaying the first person selectable thumbnail image and the second person selectable thumbnail image in an alphabetical order based on the names associated with first person and the second person.

**7**. The computer-implemented method of claim **5**, further comprising responsive to a click or tap of the first person selectable thumbnail image, displaying a first person view, the displaying the first person view including displaying (i) the name associated with the first person and (ii) a scaled replica of each of the digital photographs and videos in the third set of digital photographs.

**8**. The computer-implemented method of claim **7**, wherein the displaying the first person view further includes displaying a first-person-location selectable element.

**9**. The computer-implemented method of claim **8**, further comprising responsive to a click or tap of the first-person-

Petitioner Apple Inc. - Ex. 1001, p. 70

US 10,423,658 B2

37

38

location selectable element, displaying a representation of all locations having a digital photograph or video associated with the first person.

**10**. The computer-implemented method of claim **7**, further comprising responsive to a click or tap of the second person selectable thumbnail image, displaying a second person view, the displaying the second person view including displaying (i) the name associated with the second person and (ii) a scaled replica of each of the digital photographs and videos in the fourth set of digital photographs.

**11**. The computer-implemented method of claim **10**, wherein the displaying the second person view further includes displaying a second-person-location selectable element.

**12**. The computer-implemented method of claim **11**, further comprising responsive to a click or tap of the second-person-location selectable element, displaying a representation of all locations having a digital photograph or video associated with the second person.

**13**. The computer-implemented method of claim **1**, wherein the plurality of selectable elements further includes an album selectable element, the method further comprising responsive to a click or tap of the album selectable element, displaying an album view, the displaying the album view including displaying:

(i) a first album selectable thumbnail image including a scaled representation of at least one digital photograph in a third set of digital photographs and videos that

includes all of the digital photographs and videos associated with a first album tag;

(ii) a first album name associated with the first album, the first album name being displayed adjacent to the first album selectable thumbnail image;

(iii) a second album selectable thumbnail image including a scaled representation of at least one digital photograph in a fourth set of digital photographs and videos that includes all of the digital photographs and videos associated with a second album tag; and

(ii) a second album name associated with the second album, the second album name being displayed adjacent to the second album selectable thumbnail image.

**14**. The computer-implemented method of claim **13**, further comprising responsive to a click or tap of the first album selectable thumbnail image, displaying a first album view, the displaying the first album view including displaying (i) the first album name associated with the first album and (ii) a scaled replica of each of the digital photographs and videos in the third set of digital photographs and videos.

**15**. The computer-implemented method of claim **14**, further comprising responsive to a click or tap of the second album selectable thumbnail image, displaying a second album view, the displaying the second album view including displaying (i) the second album name associated with the second album and (ii) a scaled replica of each of the digital photographs and videos in the fourth set of digital photographs and videos.

*    *    *    *    *

Petitioner Apple Inc. - Ex. 1001, p. 71